# EXHIBIT A

ARTHUR BALDER, *Plaintiff*

- against -

SUSAN SANRANDON, *Defendant*

    :  Index No.

    :  **SUMMONS**

    :  Venue is based on CPLR §
    :  503(a)

— — — — — — — — — — — — — — — — — — — — — — — — — — — — — —X

TO:  Susan Sarandon
      147 W 15th St
      Suite 108 New
      York
      NY, 10011

**YOU ARE HEREBY SUMMONED** to answer the complaint of the plaintiff herein and to serve a copy of your answer on the plaintiff within 20 days after service of this Summons (not counting the day of service itself), or within 30 days after service is complete if the Summons is not delivered personally to you within the State of New York.

**YOU ARE HEREBY NOTIFIED THAT** should you fail to answer, a judgment will be entered against you by default for the relief demanded in the complaint. This is an action for tortious interference with contract and tortious interference with prospective economic advantage, and promissory estoppel.

Dated: New York, New
       York May 16,
       2020

Arthur Balder

2813 Palisade Avenue, Apt 1, New
Jersey
Telephone: (929) 888-3802
E-Mail: arthur@davincifilms.us

Case 1:22-cv-06401-JLR-SN Document 1-1 Filed 07/27/22 Page 3 of 102

SUPREME COURT OF THE STATE OF NEW YORK COUNTY OF NEW YORK

_____

                                x

ARTHUR BALDER,

               Plaintiff,

v.

SUSAN SARANDON,

               Defendant.

_____ x

:    Index No.

:

:    **<u>VERIFIED COMPLAINT</u>**

:

:

:

:

Plaintiff Arthur Balder ("plaintiff", also "AB"), as and for its Verified Complaint ("Complaint") against Susan Sarandon ("defendant", also "SS"), respectfully shows and alleges as follows:

## I.    PARTIES

1.    Plaintiff Arthur Balder is a filmmaker and producer organized under the laws of the State of New Jersey, with its principal place of business located at 2813 Palisade Ave, Union City, New Jersey, 07087.

2.    Upon information and belief, defendant Susan Sarandon is an actress, resident of New York, and doing business in the State of New York with a place of residence and business at 147 W 15th St, Suite 108 NYC, 10011.

Case 1:22-cv-06401-JLR-SN Document 1-1 Filed 07/27/22 Page 4 of 102

## II.    JURISDICTION AND VENUE

3.    Jurisdiction and venue are proper in New York County because the defendant is located and conducts business from her home office in the county, located at 147 West 15th Street, New York City, 10011, and because the parties' dispute arises out of actions that took place entirely in New York County between 2016 and 2022. Otherwise, being the plaintiff a resident of Hudson County, New Jersey, if the defendant were no more located in New York County, CPLR § 503(a) establishes that "the place of trial shall be" "if none of the parties then resided in the state, in any county designated by the plaintiff." If that be the case, hereby the plaintiff designates New York County as he place of trial. Additionally, on Exhibit B, page 2, the defendant's assistant established as address of the defendant's office: "*Our phone number is (212) 675-4285 but email is the best way for us to communicate so everything is in writing. The address here is 147 W 15th St. Suite 108 NYC 10011.*"

## III.    ORIGIN OF THE LAWSUIT

4.    This lawsuit arises from the defendant's tortious interference with a contract existing and valid, known to the defendant, between the plaintiff and a third party, David Shara, executive producer and partner of the plaintiff, the 'Producers Agreement' which regulates the production of the film 'American Mirror: Intimations of Immortality' (from now on "the film AM-IOI"), directed and produced by the plaintiff (s*ee* Exhibit A),

a film in which the defendant willingly participated; this lawsuit also arises from the defendant's tortious interference with other plaintiff's legitimate economic and business expectancies as a result from the defendant's malicious acts; this lawsuit arises from the defendant's malicious failure to provide to the plaintiff a release the absence of which has rendered impossible the commercial distribution of the aforementioned film AM-IOI since October 2020, being this one of the direct causes of professional and economic damage to the plaintiff, and economic loss, direct and consequential. This lawsuit is not frivolous, but the plaintiff's last resource to seek relief, since the plaintiff can prove he has spent too much time trying to solve the situation years ago, and especially since 2020, as the factual background in chronological order shows.

## IV.    FACTUAL BACKGROUND IN CHRONOLOGICAL ORDER

5.    In 2016 the defendant was invited to be part of the film 'AMERICAN MIRROR: INTIMATIONS OF IMMORTALITY' ("AM-IOI"), being produced and directed by the plaintiff, in collaboration with his partner, executive producer David Shara, a documentary film with the main participation of painter Tigran Tsitoghdzyan. The plaintiff's first choice was French actress Juliette Binoche, but artist Tigran Tsitoghdzyan insisted it was easier for him to convince the defendant,

Case 1:22-cv-06401-JLR-SN   Document 1-1   Filed 07/27/22   Page 6 of 102

since they already knew each other at a table-tennis club 'Spin New York 23' in Manhattan and there was a growing mutual sympathy between both. Emails show the defendant knew in advance what kind of shooting was to take place and where, because the plaintiff informed her of those details; she agreed on her participation and she set a date for her shooting, which was accepted by the plaintiff. At the shooting day it was made clear by the plaintiff to the defendant that the footage was intended to be used as part of the film AM-IOI and that the film was made with the intention to be commercially released at a later date, terms on which the defendant agreed and promised to fulfill any necessary paperwork to make it possible.

6.      The shooting consisted on a casual, documentary-style visit of the defendant to Tigran Tsitoghdzyan's studio, in which the defendant sits during a conversation with the artist while the artist keeps painting a portrait of her. The day before the shooting the plaintiff sent an email to Tigran Tsitoghdzyan with a set of questions to remember and to ask casually to the defendant during the takes, in order to obtain the kind of response the plaintiff, as director and producer, wished to better match the needs and vision of the film. Emails are written evidence that the questions Tigran Tsitoghdzyan poses to the defendant that are part of the film in its final version match the questions written on the file sent via email to Tigran Tsitoghdzyan the night before the shooting. The meeting

Case 1:22-cv-06401-JLR-SN Document 1-1 Filed 07/27/22 Page 7 of 102

is art-related, casual, and the result has been always deemed by both participants as respectful to both participants to the highest degree.

7.    Encouraged by the participation of the defendant in the film, and the promises and representations she made in person, the plaintiff and his partner decided to invest more resources and time in accomplishing the best film possible, since the defendant's participation and approval of the usage of her image in the rough cuts presented to her were a positive and unambiguous approval that could only mean a continuation, in good faith, of the agreements reached during and after her shooting in 2016. During 2017 the plaintiff shared via email with the defendant more rough cuts of the film in order to allow the defendant to see directly the result, and asked her if she agreed with the usage of the footage in which her likeness and voice appeared, and also of the rest of the film. Emails exchanged show the defendant had access to these film files, watched them, and approved of the use of her likeness and voice as recorded by the plaintiff, never raising any objection of any kind, save a petition to see if the 'wrinkles round her eyes' could be softened, a petition the plaintiff took seriously and committed to accomplish to better please the defendant. From conversations between Tigran Tsitoghdzyan and the plaintiff, Tigran Tsitoghdzyan and the defendant were in excellent personal terms, although they had chosen not to make it public at that moment. The plaintiff had heard many times from Tigran Tsitoghdzyan,

Case 1:22-cv-06401-JLR-SN   Document 1-1   Filed 07/27/22   Page 8 of 102

that the defendant was interested in him at a personal level in a manner that he was not interested in her. This personal interest was not reciprocal or understood in the same manner by Tigran Tsitoghdzyan, from what the plaintiff heard on several occasions from Tigran Tsitoghdzyan.

8.      In January 2018, the plaintiff sent the defendant a proposal for a new project in the form of a synopsis of a new script for a fiction film titled '16 hours' in which the character of an emergency room nurse was proposed to the defendant as an acting role. The defendant showed interest in reading the new script once finished. On Jan 12, 2018, 6:11 PM the defendant answered, just hours after sharing the synopsis via email: "From Susan: It seems like a really worthy idea. I don't know what to do with the treatment, but when you get your script I'll read it."

9.      Between March and June 2018, the plaintiff worked along with his team to set a number of participations in film festivals for the film AM-IOI, already finished, over a period of time covering half 2018 and all 2019. The plaintiff sent to the defendant the new script aforementioned in paragraph 8 '16 Hours' once it was finished and duly copyrighted.

10.     After presenting the film to the Yerevan International Film Festival, Armenia, the festival selected the film and also offered the defendant the Lifetime Achievement Award. On April 4, 2018, 3:07 PM, the plaintiff's partner, David Shara, on behalf of himself and the plaintiff,

Case 1:22-cv-06401-JLR-SN   Document 1-1   Filed 07/27/22   Page 9 of 102

sent to the defendant a detailed business proposal by email. (*See* Exhibit B). The film festival offered highest standard attendance to the defendant and any attendant accompanying her, following her exigencies, yet did not offer any kind of help for the plaintiff's attendance, director and producer, neither for the artist featured in the film, Tigran Tsitoghdzyan. This exchange via email shows that the defendant and the plaintiff and his partner David Shara confirmed previously existing agreements and promises made since 2016, based on previous conversations, by which the defendant accepted as a form of compensation an artwork for her participation in the shooting aforementioned that took place in June 2016 for the film AM-IOI. The reason why she had not gotten this compensation was because Tigran Tsitoghdzyan, the paintier, had not finished the portrait painting of the defendant since its start in the shooting in 2016. This long delay in the painting of her portrait is the cause for this upfront in the form of a hand-signed print being discussed in 2018 and no earlier. (*See* Exhibit B). Additionally, the partners also offered the defendant a percentage of the profits of the film, which the defendant answered affirmatively. Answering the business proposal, the defendant proposed, in order to start the promotional distribution before commercial distribution as it customary in the film industry, in her own words, to 'distribute the film to film festivals', without pointing out to any specific one. Again, it is clear in this conversation, because it is mentioned

expressly a business proposal, **that the film had been made to be distributed commercially**, that this was known to the defendant since 2016, when David Shara states to the defendant's assistant: "I am willing to give her [the defendant] a percentage of profits for her involvement and guidance" also adding: "**I am extremely interested in maximizing both exposure and profits. I am also interested in sharing profits and making money for Ms. Sarandon.**" The defendant answered directly, signing the text "From Susan": **"It's a very special film, but I really have no idea how to market it. I think you need an agent or maybe just look into submissions to festivals. The season is upon us so I think it's too late for this cycle."** It is fully ascertained that the defendant, exchanging emails with the plaintiff's office and with the plaintiff's partner, David Shara, accepts to be compensated for her shooting with an artwork as upfront, choosing herself the measurements and framing for the print offered. This compensation was valued at that time at around $45,000 USD. Additionally, the defendant is positively receptive to accept a percentage of profits and the proposal of David Shara is unambiguous about distributing the film commercially or about making "money for Susan Sarandon".

11.     The artwork was prepared, framed, packaged and delivered to the defendant's address on 147 West 15th Street, New York, New York, as agreed on the emails as a compensation for her participation in the film.

Case 1:22-cv-06401-JLR-SN   Document 1-1   Filed 07/27/22   Page 11 of 102

(*See* Exhibit B, address expressive confirmed by the defendant's assistant). The defendant declined to attend the Armenian Film Festival [GAIFF], and rejected the Lifetime Achievement Award. The film screening was also cancelled, a decision made in common agreement by the plaintiff and his partner. Once the defendant obtained the upfront compensation of the hand-signed print of a portrait of her likeness, her attitude changed. She paid no attention to the preparations the plaintiff and his partner were making in order to start promotional screenings in the festival circuit. Tigran Tsitoghdzyan told the plaintiff that he was unhappy with the lack of attention the defendant was paying to him on a personal level at that moment, and it was clear from his commentaries that the relationship between Tigran Tsitoghdzyan and the defendant had been cooling down because the personal interest of the defendant in Tigran Tsitoghdzyan had not been understood or felt the same way by Tigran Tsitoghdzyan, that it was not reciprocal.

12.     Following the direct advice of the defendant as read before on Exhibit B, the plaintiff decided with his partner, David Shara, and plaintiff accepted this professional challenge willingly, to get the 'film into film festivals'.

13.     In September 2018 the film had its world premiere at the Documentary Film Festival of Los Angeles [DOC LA]. The film won Best Soundtrack, Best Innovative Film, Best Cinematography and the

Case 1:22-cv-06401-JLR-SN   Document 1-1   Filed 07/27/22   Page 12 of 102

Parajanov-Vartanov Prize 2018 was awarded to the defendant in
connection with her participation in the film. Previous film personalities
who had won and accepted publicly the award are Martin Scorsese and
Francis Ford Coppola. The news were shared with the defendant via
email. The defendant did not answered that email, neither was received
any other kind of communication from the defendant. The defendant 's
office stopped answering any emails sent by the plaintiff or his assistants,
all of them only related to the film. The defendant did not have the
obligation to be grateful, neither publicly nor personally, but it is the
plaintiff's opinion that the 'silent treatment' that he and his team were
being given by the defendant was disparaging, undeserved and
disappointing, and below the industry standards in the light of the last
three years of flawless communications between his office, Da Vinci Films
LLC, in charge of producing the entire film, and the office and employees
of the defendant. The plaintiff shared these opinions with his partner,
David Shara, who was unambiguously of the same opinion. The text
messages exchanged on WhatsApp summarize what David Shara (best
friend, manager and confidant of Tigran Tsitoghdzyan since 2012) and the
plaintiff, already knew from conversations with Tigran Tsitoghdzyan. The
plaintiff, frustrated with the defendant's turning her back on the awards
the film was winning specifically for her (like the Parajanov-Vartanov
Price, for instance), her lack of gratitude and what was clearly ignoring

the film entirely for reasons that clearly could be understood as in connection with the film itself, sent this WhatsApp message to David Shara on [10/16/18, 21:38:29] AB: "The more this progresses the more obvious it becomes that Her Highness Sarandon is 'forcefully' ignoring our movie. (…) What stands clearly is that, no matter how good our work might be, no matter if you made clear the point regarding she being rewarded [a reference to the business proposal a few months ago that she accepted], she WON'T do anything basically because she did not get what she wanted --from Tigran. Did Harvey Weinstein punish actresses because they did not give him what he wanted...? She came into Tigran's movie, yes, but Tigran didn't go into Susan's movie. And she had her own 'script' already written right at the beginning -- and he rejected it very nicely, very nicely, but he rejected it. The film festivals are twitting her about this movie, some journalists are doing the same --she ignores all. Something quite similar, although without the very personal connotations, can I say about Ashley Hinshaw 'Grace-ful'. [10/16/18, 21:42:24] and his partner David Shara answered unambiguously affirmatively to this point of view clearly expressed by the plaintiff, a few minutes later on [10/16/18, 21:42:24] David Shara: **"Agreed on all fronts"** [10/16/18, 21:42:47] adding David Shara: "But Ashley isn't more than a model in her bra for 30 seconds [10/16/18, 21:42:52] David Shara: [while] "Susan is [the] star" [10/17/18, 11:35:49], referring to the fact that

the defendant's weight in the film was much higher than anyone else, and it was expected, at the very least, some gratitude and fairness regarding the film's accolades related specifically to her. (See Exhibit C)

14.     Weeks later the film was awarded Best Cinematography and Best Film at two other film festivals in Canada. The film was awarded Best International Documentary by the Italian film magazine Fabrique Du Cinema in Rome. The Jury President was two-time Academy award winner Paul Haggis, who extended his congratulations to the team of the film in social media. Critics in Italy praised the defendant presence in the film this way: "Susan Sarandon looks at her best" This news were also shared with the defendant via emails, who again never answered. The plaintiff and his partner agreed on the expansion of the film festival circuit into the end 2019, planning a US Oscar qualifying theatrical release by the end of 2019, in order to render the film Oscar-qualifying according to the Academy rules. The defendant's obstinately uncooperative attitude was a reason of growing concern for the plaintiff and his partner looking forward into wider distribution and commercial distribution. Conversation between the two partners took place as to how to understand and to remedy the defendant's attitude. His partner, David Shara, assured the plaintiff that all was directly related to what he had heard from Tigran, that the defendant's attitude was directly connected to her personal relation with Tigran, and not with the film itself, and that

there was not reciprocity. Being respectful to any feelings and personal relationship, however, the plaintiff found that attitude towards the film was unjust on the side of the defendant. They, the producer and executive producer, had relied on her promises and confirmations for years, they had spent money and a long period of time in making a good film that was not focused on personal aspects, and now that the film was going to festivals she was giving it publicly and privately the silent treatment.

15.    In December 2018 the plaintiff and his partner also agreed on starting a new film project, producing a film based on the propaganda created by the Nazis in order to criminalize, by means of public disparaging in malicious cartoons, the Jews in Europe but particularly in Germany before and during the rise of Hitler. Also around these dates the film 'Viper Club', starring the defendant, was released in the USA. The plaintiff watched the film and saw clear similarities between the main character played by the defendant, that of a nurse in an emergency room, and his own script proposal at the beginning of 2018, "16 Hours', in which the defendant showed great interest immediately, where the character proposed to the defendant was also that of a nurse in an emergency room.

16.    During January 2019 the plaintiff and his partner continued conversations as to how to better address the situation with the defendant, and also developing the festival circuit for the film AM-IOI, and as to how to start development of the new film to be produced about

the 'Nazi propaganda'. There was a growing number of questions related to the film AM-IOI, proposals for film festivals, and other requests, sent to the defendant, but which remained unanswered on her side, and that was posing a problem for the best performance of the film during its participation in the international film festival circuit, and also in the coming distribution. The lack attention of the defendant to the questions related to the film AM-IOI were creating a disadvantage, and were disappointing and disconcerting regarding the upcoming commercial distribution. The plaintiff's concern were legitimate, and was resolved to do his best to try to redress the situation or at least to understand the reason that was behind.

17. On February 5, 2019, an assistant at the plaintiff's office contacted the defendant's office to inform her of five new film festival selections and of different urgent requests coming from them. The plaintiff's office also asked on behalf of the plaintiff that he wished to establish a more fluid conversation related to the matters of the film with the defendant.

18. On Feb 16, 2019, 2:08 PM Bella to the defendant's assistant "Arthur wishes to be granted a more fluid contact to Ms Sarandon. Can you pass to Susan Arthur's petition of a phone number? He thinks some promotional aspects related to this film and also possibilities that are arising on the way would be much easier to be solved by simple, plain,

direct conversation."

19.    After being directed to leave a voice message, the plaintiff received a call from an 'unknown number', or 'blocked number' which showed no ID.   It was the defendant's assistant, Brian. In this conversation the plaintiff proposed to him the public acceptance of the Parajanov-Vartanov Price by the defendant, and explained the promising continuation of the film in the film festival circuit in 2019. As a consequence of this conversation, the plaintiff's assistant sent a new email titled "Follow up phone conversation Arthur-Brian", in which she detailed in writing the few petitions the plaintiff proposed to the defendant to better assess, within industry standards, the issue of the Parajanov Vartanov Award, and the defendant's participation in the film. David Shara, the partner, had insisted in inviting the defendant to a meeting at the offices in Manhattan. The tone of the email is shown by the plaintiff's team writing: "This is not pressing at all, but whenever she would be available, we would love to invite her to our offices on 5th Avenue with 47th Street (576 5th Avenue #1200, NY), and introduce the Parajanov-Vartanov Price with the due ceremony that she and the award deserve, and also to have a meeting with the executive producer, David Shara" The defendant's assistant answered the plaintiff's assistant: "Thanks Bella, I'll share with Susan when she's back in town." The continuation of this exchange of emails becomes a direct conversation

between the defendant and the plaintiff, and because of the dire consequences that this exchange of emails has for the plaintiff, it is important to explain clearly its succession and content.

8.     Feb 24, 2019, 11:53 AM, the plaintiff writes to the defendant's representative, making a reference to Brian's call not showing any ID number: "Hi Brian, let's catch up next week and talk in person about this situation. As almost everybody I generally do not answer "no ID callers" on the phone, you know how much spam there is out there, so sent me an email or notice before trying to contact me this way to be aware that's you."

9.     On Feb 25, 2019, 10:07 AM, the defendant's representative answers to the plaintiff: "Hey Arthur, I don't have any news for you at the moment, so there's no need to meet. I'll get back to you when I hear anything from Susan."

10.     On Feb 25, 2019, 12:11 PM, the plaintiff describes the issues he feels the project is encountering in the festival circuit this way: 'Hi Brian, the email containing the proposals is very concise and focuses on the main issues. Saying yes or no to the jury proposal of Fabrique Du Cinema cannot be delayed, because they have to announce a jury for 2019 and they cannot let it be 'indefinitely'." Further the plaintiff adds: "The proposal of our previous email is very clear, and very 'within' fair professional standards. I can aver that we have been all

through this time very nice, patient people. I did not suggest, nor requested for, any public commitment from Ms Sarandon when it was most needed: at the beginning, before first screening or announcing it. And I think it was something expectable on my and my team's side, but I did not request it, neither did she do anything spontaneously to help us. What have we done, then, to deserve this estrangement from a great star whom we've treated as good as she has allowed us to do all these three years? She has gotten the Parajanov-Vartanov Prize thanks to my film being there (we got Best Innovative Film, Best Cinematography and Best Composer, additionally), and thanks to these three years of work of my team. She cannot welcome this film publicly along with the award? The award is a good excuse to welcome the film, though not a necessary excuse to welcome it, and this is what I might call 'fair professional standards' among filmmakers and actors. After winning in Italy, a journalist as you well know since this info was in our office memo of past week, wrote at magazine Fabrique Du Cinema: "Sarandon looks at her most charismatic ever". (...) successful filmmaking, is a collaborative work, and I am missing a 'fair' collaboration, and at this point, in my opinion and anybody's opinion who is familiar with matter, media o no media, this seems to be very well-deserved on my/our side."

11.    On Feb 25, 2019, 6:20 PM, the defendant answers the previous communication sent by the plaintiff, signing it personally herself and

Case 1:22-cv-06401-JLR-SN   Document 1-1   Filed 07/27/22   Page 20 of 102

addressing it directly, as she had done on some previous occasions as described before, since the defendant has had always direct access to the email account managed by her assistant: "From Susan: Arthur, I find your email to be extremely rude. I've never received an email like that before from anyone, especially someone whose film I briefly appeared in without compensation. I had no idea you were going to sell this film based on me and if Tigran's portrait was in some way obligating me to do press, I'll gladly give it back. I understand your wanting to get the most press you possibly can but I have nothing positive to say about your film and am no longer interested in being associated with it. Please don't contact this office in the future unless it's to give me the address to return the portrait which again, I am happy to do. Susan."

12.    As a consequence of that, on Feb 27, 2019, 10:19 PM, the plaintiff answered directly the defendant, as he had the right to his own opinions as she had her right to voice hers: "Ms. Sarandon: This time you've gone too far. Our society is tired out of 'celebrities' in a privileged position who humiliate capriciously the work, good faith and professionalism of others without whose enormous dedication they are nothing. You may have an Oscar, but regretfully you lack many other basic things. You are not only ungrateful, but also unfair. Your communication is full of wrong statements that are in outrageous conflict with the emails exchanged during the last almost three years, and

overacting is the worst performance an actor can offer. You ought to be a
paradigm of good practices, but the reality is far down deep below the
acceptable. We are devastated, astonished, disappointed, but we also feel
stronger than ever in our commitment to cinematic art and to fair
practices in a film industry that still fosters abusive behaviors. And now
let's go by parts into your disgraceful note: "I find your email to be
extremely rude." Overacted. Extremely rude is your office making phone
calls from no-Id-callers (to avoid leaving a proof of the call taking
place), which is a practice generally connected with certain types of
'businesses' whose name I do prefer not to remember; thus calling this
way someone your 'office' knows is by definition more than an absence of
etiquette. I've had your office phone number for more than a year and
never used it until last week, when I left a message for Brian, which is an
evidence of how respectful I and my team are regarding others' privacy.
My email is a clear, consequential exposition of the situation. But the
truth is uncomfortable. "I've never received an email like that before from
anyone, especially someone whose film I briefly appeared in without
compensation." I've never in my life dealt with someone whose unfairness
is so deep and unrelenting as yours, especially when all details regarding
this film were exposed to you not only in person the day of shooting, but
also before that shooting and also afterwards. The conversations
regarding compensations are registered and there are emails about our

Case 1:22-cv-06401-JLR-SN   Document 1-1   Filed 07/27/22   Page 22 of 102

intentions and your answers–see next below.  My first choice had been always Juliette Binoche for that part of the film, but Tigran insisted you lived in New York. You were never my first choice, and I always had my doubts. "I had no idea you were going to sell this film based on me" Overacted: the film is sold with what it contains, and you came to the shooting knowing we were making a film whose topic was Tigran's art in connection with artistic beauty. Logically, you are part of it. You had idea: emails show you were informed we were going to try to sell this film: (…) there were answers from your office to these emails, as one on which you accepted a percentage proposed on any benefits generated, among other things, which shows our transparency and good will.   "and if Tigran's portrait was in some way obligating me to do press, I'll gladly give it back." Overacted: If requesting a public welcoming word from you for the Parajanov-Vartanov Award which you won only in connection with our film and our work of four years, is 'obligating to do press', then we are living in two completely different worlds, the real one, and Ms Sarandon's one. What you were asked for is education, respect, fairness and 'fair professional standards', being respectful for the work of my crew and mine and the producer's, and being also, why not?, thankful to people of the Parajanov-Vartanov Institute. That's not 'doing press', that's being consequent and fair with the facts: you willingly participated on a film, and you got an award thanks to that participation. (Period.) That's not

'doing press', that's showing minimum respect to others people achievements. 'Doing press' you know it very well is something far different than thanking for a very prestigious award. "I understand your wanting to get the most press you possibly can" Overacted: I did not need any publicity to generate in the first three months in the festival circuit more awards than all the documentaries that you have produced together in all your life (including from an Academy-award winner presided jury). I don't need publicity from you, and never asked for it precisely when it was most logically needed, at the beginning. I requested respect, not publicity, for our work AFTER the obvious success achieved. "but I have nothing positive to say about your film" Whatever you may think about my film is absolutely irrelevant to me, especially after, again, having won more awards in three months that all the documentaries that you have produced in your entire life. You do politics with your documentaries, capitalizing on your public profile, while on the contrary I do ART. Obviously I know a lot more of how to make an extraordinary documentary film than you. The level on which I work on artistic terms is just something impossible to follow for you, and it doesn't matter if you understand it or not. In short: I read Wordsworth, you read Twitter. Withal, anybody knows that to make a great film is needed much more than 'a star'. Just watch VIPER CLUB to see what I want to say. The striking similarity of the 'nurse-character' in both my script 16

HOURS and VIPER CLUB is of no importance, honestly, because no one can rescue a bad screen-writing as it is VIPER CLUB just adding a good character background in the last minute. Not to speak about the cinematography or the position of the camera in respect to the frame consequential development. Additionally, 60K total domestic gross out of 70 theatres is more than it deserves. I won't go on to enumerate your last ten years of films bombing in theatres. "and am no longer interested in being associated with it" Overacted. It is recalcitrant but necessary to enumerate: you knew what cameras were going to be used, even what lens -the best zoom lens in the world at that time-, before you came to the shooting. Pretending 'not wanting to be associated' with a film where you willingly participated, see and approve of the rough and final cuts before going to festivals and after going to them (successfully), &c. is just overacting, unimpressive, underwhelming. It is WE who have been treated more than rudely, undeservedly, unfoundedly, and here is most possibly the truth WHY: What for you came to the shooting, then, if you did not expect from us to make a film and consequently to try, in all fairness as everybody else –you included with your own films–, to recover one day at least part of the investment, but most importantly to make a unique, good film, as the awards show? What was the REAL reason why you felt so disappointed so as to do all you could to distance yourself from the shooting and the project...? You often pretend to be brave; are you

Case 1:22-cv-06401-JLR-SN   Document 1-1   Filed 07/27/22   Page 25 of 102

brave enough to recognize the true reason I am referring to? Or much more accurately: What did you expect from an at that time 39-years-old painter (you were perhaps 70 already), if not just being portrayed, as he faithfully did as best he could? What else was expected on your side that did not 'happen'? Is it all this tit-for-tat a response to not getting something else, besides being portrayed, that you expected to get – at least at the time when you came to the shooting? What was it? "Please don't contact this office in the future unless it's to give me the address to return the portrait which again, I am happy to do." Please make sure you or your office do not send calls again from no-ID-callers in the future – ever, – neither contact me nor my office – ever, unless it is to present respectfully an apology and to redress the situation. We are the victims in all this story, because the facts do not correspond in fairness with the consequences we have had to endure, and only represent mounting disadvantage perfectly calculated on your side for reasons that are not clear, and that bode ominously ill, pointing clearly in a direction that is extremely rejectable in our society in a moment when everybody has decided to put an end on such behaviours. We are now analyzing all this situation, media or no media, and its many implications. Arthur."

13.    It must be noted that just four hours and a few minutes later, on Feb 28, 2019, 02:37 AM, David Shara, the plaintiff's partner in the contract regulating the production of the film, writes to the plaintiff on

Case 1:22-cv-06401-JLR-SN   Document 1-1   Filed 07/27/22   Page 26 of 102

the WhatsApp platform [the highlight is ours]: [2/28/19, 02:37:10] David Shara: Please give me a call when you wake up, **you need to be careful with Susan. She can ruin you** [2/28/19, 02:37:34] David Shara: I want to call her and try and straighten things out, **we do not need her as an enemy** and it is not smart the way you were treating her [2/28/19, 02:51:46] David Shara: You cannot write this stuff, **she will make a lawsuit against us and ruin your dream**, this set of emails is unacceptable [2/28/19, 02:52:06] David Shara: **I read the emails**, that is not ok [2/28/19, 09:21:40] David Shara**: You need to write the nicest, most sincere apology in the world**. (See Exhibit D.)

14.   This set of messages was extremely concerning for the plaintiff because they show clearly that the email, a private communication never intended by the plaintiff to be shared or even less publicized, which the plaintiff had the right to write in order to redress the situation and to give answer to the unjust statements of the defendant, a set of opinions the plaintiff had the right to, and a set of opinions that was not publicly voiced but simply exchanged between two individual on the same level of mutual acceptance of a communication, that email had been disseminated directly by the only addressee of those communications, the defendant. The defendant, instead of addressing the specific points raised by the plaintiff, if she so willed, chose 1] to disparage privately the plaintiff's work and merits, in spite of them being obvious and 2] when the plaintiff

Case 1:22-cv-06401-JLR-SN   Document 1-1   Filed 07/27/22   Page 27 of 102

decided to also share his points of view about the defendant since she had chosen first to do the same, the defendant chose not to answer but to disseminate herself the private communications only to try to start a tortious interference on the plaintiff's present contract and other business expectancies and relations related to new projects with David Shara.

15.    1] Although the communications were a set of private communications, it is Ms Sarandon who disseminates them, sending them to the plaintiff's partner directly, as the messages show when David Shara states: "I read the emails". So he states he had seen the communications directly because they had been sent to him by her directly, since she had also decided to answer directly the plaintiff with a set of opinions that the plaintiff felt the need to answer, and had all the right to answer. No other person could have shared them in so short a period of time, so it is evident that the defendant chose not to answer the plaintiff, if she disagreed with his privately communicated opinions, but to disseminate the opinions of the plaintiff to the plaintiff's partner.

16.    2] The messages show a clear change of opinion in the plaintiff's partner, that attest a sense of fear and dread instilled in him by the defendant. Circumstantial evidence in those messages sent by the plaintiff's partner to the plaintiff show the partner writes under the fear of potential litigation (he mentions 'a lawsuit') and unambiguously states that the 'defendant' 'can ruin' the plaintiff. The plaintiff cannot

understand how and why the defendant would want to 'ruin' him.

17.    3] The defendant, knowing the existence of the partnership and contractual relation between the plaintiff and David Shara, decides, out of spite, not to answer the plaintiff if she disagreed on his points of view or opinions, but to show the communication in apparent connection with litigation threats [David Shara puts it very clear 'we don't want her as an enemy', he affirms 'she will make a lawsuit against us'] that clearly accomplish their goal to instill enough fear in the plaintiff's partner so as to make statements such as "be careful with Susan. She can ruin you", and goes on to state, more plainly showing his fear about implications on him, "we do not need her as an enemy". Clearly the plaintiff's partner has been cowered by a third party, the defendant, as a result of her seeking retaliation on the freely exercised right of the plaintiff to voice his opinion only after she had shared hers before, as clearly described before, and after the plaintiff exercised within the bounds of propriety his legitimate right to try to seek the best performance of the film in the festival circuit by trying to address the obstinate uncooperativeness of the defendant, that seemed to be motivated by reasons clearly not related to the film itself, but to her personal expectations related to Tigran Tsitoghdzyan.

18.    4] Furthermore, the final part of David Shara's messages indicates the plaintiff 'needs' to send 'an apology', as much as this states an attempt to violate, trample his right to his own opinions, as an

Case 1:22-cv-06401-JLR-SN Document 1-1 Filed 07/27/22 Page 29 of 102

unavoidable, mandatory condition to satisfy or placate the retaliatory mood of the defendant.

19.     5] The application of the 'double standard' had already begun before this set of communications, but from now on it will have dire consequences for the plaintiff.

## AS AND FOR A FIRST CAUSE OF ACTION FOR TORTIOUS INTERFERENCE WITH CONTRACT

20.     AB reincorporates the allegations set forth in paragraphs 1 through 20 as if fully setforth herein.

21.     On Feb 28, 2019, 11:54 AM, the plaintiff sends an email to his partner, David Shara. Since it is evident from David Shara's messages and Tigran's messages that they had already read the communications between plaintiff and defendant above detailed because the defendant had shared them immediately, thus the plaintiff, confused and alarmed by the words by his partner as shown on WhatsApp messages before, shares a communication with him, detailing his defense of the project. In this email the plaintiff summarizes how the defendant's attitudes are placing the film in a disadvantageous position, and that the defendant had been calculating her steps to create this disadvantage for reasons that, to him, seem to be beyond the merits of the film, since the film benefits her in all aspects in terms agreed on by the defendant herself.

Case 1:22-cv-06401-JLR-SN   Document 1-1   Filed 07/27/22   Page 30 of 102

22.     On Feb 28, 2019, 18:38, Tigran Tsitoghdzyan writes on SMS to the plaintiff: "Your email to Susan is a desastre. I cannot believe you found that much anger to hurt someone like Susan. It's beyond acceptable regardless interests of the movie or anything else." Then adds: "I think you [owe] her big apologies, don't know how she wouldn't just kill the film with her participation after all this." The plaintiff defended his position, answering: "my office kindly suggests a welcoming public word just for the award she won [Parajanov Vartanov Award], awarded to her thanks to Doc LA participation [of 'American Mirror] and THANKS TO four years of my work, then this is the answer from Ms Sarandon via email signed by her, among other unfair statements not supported by emails exchanged during 3 years with her office: "I don't have anything positive to say about your film and want to distance myself from it." Tigran answers: "Well it's her choice and need to thank her and let her go. Not throw hate on her, it's unexplainable for me" The plaintiff answers: "No one has thrown hate on anybody. We both, all have the right to exchange opinions in a free speech society. Or do you think that only her has the right to say such things without me having the same right to also express my opinion? Does she has the monopoly of opinion?" "Of course for you this is not important because you were not 4 years hooked to a project trying to get the best film possible and also treating Ms Sarandon's office and her with silken gloves, all to be slapped off when reasonably I

requested a bit of well deserved respect. Very nice, Tigran, very nice."
Tigran Tstotoghzian: "I shared with you my opinion on this and don't
want to get into debates." "If she doesn't want to do more all we can do is
to thank her and let her go." Plaintiff: "Who hasn't let her go? Who? When
did I request any help to her office when it was most needed, at the
beginning of the festival circuit? She is the one who publicly is criticizing
'conservative politicians' branding them as 'hypocrites'. Is she a hypocrite?
And: Is this hypocrisy calculated to curtail, limit the fair possibilities of
my work of the last 4 years? Is it ok for you? A person has the right to act
this way just because she is 'a celebrity'? What for she came to the
shooting?" "That's it: you shared an opinion but opinion generate debates.
If you don't want debates don't share opinions with me."

23.     On a phone conversation witnessed by the plaintiff's wife, David
Shara abused the plaintiff. He acknowledged he had talked to the
defendant, and he threatened the plaintiff to cancel the new project they
were planning to start since 2018, in preproduction called 'Nazi
propaganda', and also to cancel the entire festival circuit of the film AM-
IOI, unless the plaintiff changed his opinion at least in appearance and
sent the most "groveling apology I have ever read in my life to Susan
Sarandon." The plaintiff, offended and alarmed, explained to his partner
that the defendant had the right to her negative opinions about the film,
even if they were a disgrace and did not make any sense, but also that he,

the plaintiff, had his right to his own opinions, and that he stood by his opinions privately, and he had not vice them publicly, neither had any intention to do so. The plaintiff asked how it was possible that this private emails had been in his power, and his partner answered that she, the defendant, had shared them with Tigran Tstotoghzian and with him, and also stated that she was considering a lawsuit against 'us', the partner and the plaintiff. It was clear that the litigation threat was meant to interfere with the contract existing between the plaintiff and his partner. The plaintiff asked 'a lawsuit based on what?', and his partner insisted that the reason would be 'because of your email'. The plaintiff explained that it was not possible to do that because he had his right to his own opinions, and his partner hung up the phone call.

24.    The plaintiff did not receive any communication from the defendant, and kept the operations of the festival circuit for the film AM-IOI. The film's acceptance was growing and an increasing number of festivals around the world were selecting it.

## AS AND FOR A SECOND CAUSE OF ACTION FOR TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS ADVANTAGE

25.    The plaintiff reincorporates the allegations set forth in paragraphs 1 through 25 as if fully setforth herein.

26.    On Apr 15, 2019, at 11:08 AM the plaintiff sent a report to his

partner via email on how to better address the situation and the festival circuit, and after trying to contact his partner again, the plaintiff received the next WhatsApp messages from his partner (see second part of Exhibit D): [4/15/19, 12:12:32] David Shara: **Unfortunately we are not able to continue our relationship** [4/15/19, 12:12:54] David Shara: **The way you write to Susan and Tigran is unacceptable** [4/15/19, 12:15:33] David Shara: I cannot work with you anymore [4/15/19, 12:16:04] David Shara: **The other projects can never be exposed to the angry hateful words you spew at people** [4/15/19, 12:16:12] David Shara: "It is unacceptable" On Mon, Apr 15, 2019 at 12:21 PM, the plaintiff's partner wrote as a response to the plaintiff on an email that complemented the Whatsapp messages and made reference to them: "See my WhatsApp texts... **we are finished. No more money, no more projects**"

27.     That set of messages perfectly coordinated with an email sent are the unambiguous proof that the plaintiff was deprived of the new project 'Nazi propganda' in development as a direct consequence of the emails exchanged with the defendant, and as a direct consequence of the defendant sharing them to the partner with the intention of cause injury to present and future projects in which the participation and execution of the plaintiff as a producer and filmmaker had been already established before her tortious interference.

28.     The WhatsApp messages continued cascading from his partner into the plaintiff's phone as follows: [4/15/19, 12:41:17] AB: We will have to talk. [4/15/19, 12:41:33] David Shara: Speak to my mother  [4/15/19, 12:42:17] David Shara: **I cannot do any other work together**  [4/15/19, 12:42:38] David Shara: **I'm finished with this project and the others** [4/15/19, 12:42:48] David Shara: **Cancel the film festivals** [4/15/19, 12:42:55] David Shara: **I do not care about them**  [4/15/19, 12:44:41] David Shara: **The email u wrote to Susan and the way u treat Tigran is unacceptable**. [4/15/19, 12:56:24] David Shara: You cannot write that shit to Susan [4/15/19, 12:59:19] David Shara: She never signed up for any of that, you were lucky enough to get her to sit for you and be filmed, but she did not want anything to do with the project. In your head you made it that she was a part of this project, but she is a busy and famous woman and you twisted it around [4/15/19, 12:59:35] David Shara: Speak to my mom, I'm done [4/15/19, 12:59:54] AB: "in my head", no, in the emails. [4/15/19, 13:01:04] AB: She not only showed up knowing the camera was meant to be used, also knew the final result, consented to the use of her image, considered for 3 months going to Armenia's Yerevan film festival, and a long etc. [4/15/19, 13:01:17] AB: She is just a hypocrite. [4/15/19, 13:04:31] AB: Then tell me: Why then that 'busy and famous woman', as you mainly describe her, came to the shooting of a film, knowing the camera, setting, etc, if not to be part of it? [4/15/19, 13:04:58]

AB: That's what I asked, simply, asked her. Can you answer that...?
[4/15/19, 13:05:18] AB: Of course you can. [4/15/19, 13:07:08] AB: You are
the [executive] producer of this film, and it is with you with whom now I
will have to talk, not with your mom, with all due respect to her of course.
[4/15/19, 13:11:16] David Shara: You told her she only wanted to fuck him
and then when she was rejected it all changed [4/15/19, 13:11:26] David
Shara: That's insane and mean [4/15/19, 13:11:32] David Shara: It's
terrible [4/15/19, 13:11:40] David Shara: Not ok [4/15/19, 13:11:51] David
Shara: You're right about many things [4/15/19, 13:11:45] AB: I did not
say that, ever. [4/15/19, 13:11:57] David Shara: But not ok [4/15/19,
13:11:58] AB: Read my email. I asked her what for she came. [4/15/19,
13:12:04] David Shara: Yes you did [4/15/19, 13:13:55] AB: With all due
respect, David, I demanded an answer from her after telling me 'she has
nothing positive to say about my project', yes she did something, and also
after saying I needed all possible publicity --not true, we did well without
any publicity from her. On the contrary, YOU KNOW she was pretending
the film does not exist, looking somewhere else all the time. Then I
requested some respect at least for the award she got thanks to US.
[4/15/19, 13:14:52] AB: I did not affirm what for she came, I asked her,
and that's an enormous difference. [4/15/19, 13:18:03]."

29.    This exchange of written communications shows the way the
plaintiff was informed of the dire consequences: 1] It explicitly shows that

Case 1:22-cv-06401-JLR-SN Document 1-1 Filed 07/27/22 Page 36 of 102

his partner decides that the festival circuit must be canceled, with all the consequences that professionally would entail to the plaintiff. 2] It explicitly shows that his partner announces to the plaintiff that the other project in preproduction must be cancelled, and that he, his partner, does not want to partner with the plaintiff ever again, not because the plaintiff's work is not good enough, but because he exchanged privately opinions with the defendant and because this way the partner expected to please the defendant enough so as to avoid he himself, the partner, her retaliation and to gain her approval. 3] Finally it is clear that all these things were happening because the defendant did share the private exchange of emails between herself and the plaintiff and because she had made such legal threats so as to achieve a retaliatory effect on the plaintiff's work and career: new projects cancelled, and the actual film being ordered to disappear from the festival circuit, a work with film festivals that had taken almost a year to be implemented by the plaintiff with no help nor fair recognition of the merits it hitherto had gained also in favor of the defendant.

30. At the beginning of May 2019, and after being directed to Honey Shara, the partner's mother, and also a co-owner of the partner's co-production company, Optimum Diamonds LLC, the plaintiff sustained several phone conversations in which Honey Shara, on behalf of her son, the plaintiff's partner, requested from the plaintiff a written apology to be

sent to the defendant as the only way to be able to continue with the project of the film in the festival circuit and the Oscar-qualifying US limited theatrical release as stipulated and budgeted, and scheduled tentatively for end 2019 or beginning 2020. The plaintiff made it clear that he had nothing to apologize about, that he had the right to his own opinions, as the defendant had made it clear her rights to her own opinions. Honey Shara made it clear that they would not honor the agreements as stated in the Producers Agreement signed by the plaintiff and his partner (see Exhibit A), unless the plaintiff presented written apologies to the defendant.

31.    In may 2019 the plaintiff reminded again by emails his partner of his obligations under the Producers Agreement and subsequent plans and approved budgets in 2018 in order to continue with the project, and also complained that a project had been robbed off him simply 'to please others' retaliation wishes. It is remarkable that defendant never herself informed the plaintiff that her likeness should not be used anymore in the film, neither she sent any notice that she prohibited usage of her image. All these negative actions were the consequence of her demanding retaliatory actions to be executed by the plaintiff's partner, actions intended to harm the plaintiff professionally and economically, by interfering in the business relationships of the plaintiff. Firstly, interfering with the contract she knew existed and regulated the film

production and exploitation; secondly, with the economic expectancy the plaintiff had in the other projects already discussed [the 'Nazi propaganda' documentary film, cancelled] with the same partner and in preproduction, which had been obliterated.

32. On May 28, 2019, 9:56 AM, his partner goes on to directly answer the private email conversation between the plaintiff and the defendant, and in doing so he even included as CC copy Tigran Tsitoghdzyan, unlawfully sharing the conversation and contents of the communications privately held by the plaintiff. He wrote: "(…) People are allowed to call from blocked numbers...it's not morally offensive. Then your disdain for her views, despite not being the same as yours. She does not have to support our film, or you or anything. Without Susan, you would have nothing. Without Tigran, you would have nothing. Without me, you would have nothing. You forget all of these things. Yet you think you are Martin Scorsese.  The parajanov-varatsnov award is lovely, but it's not an Oscar and she doesn't need to be there. But you go crazy here. You say mean things about Tigran and everyone who doesn't support you and your views. You alienate. Instead of trying to be nice and gain support, you insult her and her choices. I cannot understand your methods. Read what you wrote. This is tough and mean. **I don't care about the 200-300,000 dollars I have put into this project. I do not care about this film. I care about Tigran and my family's**

**reputation.** This string of email does not represent my views at all. I find it offensive and childish. I am having a very heard time spending tens of thousands or 100,000 to send you on trips to support you and this project I don't care about. I think you should try and find someone to buy this project ASAP. **I don't want to spend any more on it. I'll have my lawyer review the contracts, but <u>remember that very few people have signed talent release.</u>** So think very carefully about what I have written and how you have acted towards Susan and Tigran...Sent from my iPhone"

33.    On May 28, 2019, 3:59 PM, following the previous email, Tigran Tsitoghdzyan remarkably added: "She came that day for me! Not for money, nor for the print." That shows very clearly how in his views her participation had been a consequence of their personal relationship, and how that factor was crucial to understand the defendant's true motivations in coming close to the film.

34.    The previous communication prompted an answer from the plaintiff on May 28, 2019, 2:44 PM, defending his position and his work and pointing out, among other things: "(...) My emails, on the contrary, aside from my opinions (to which I have a right as you have yours),  show the GOOD WILL to bring the film to its best fruition for everybody, but there is ill-will on your side, and against that little can be done. And one last thing: If you don't respect me or my work, do not expect the same

Case 1:22-cv-06401-JLR-SN   Document 1-1   Filed 07/27/22   Page 40 of 102

thing on my side.  You either change course or just choose another person to communicate with me and this office.(...) Your communications are dangerously malicious, bullying, insulting, plagued with false statements, misleading, designed to cause anxiety on persons who had delivered the very best for this investment over a period of time that represents in itself plainly a breach of contract. We have reached the limit." The plaintiff added answering the string of emails: **"Immoral is to ruin a film distribution just because two individuals exchange opinions."**

35.    During June and July 2019 it is Honey Shara, mother of the plaintiff's partner, David Shara, who communicates via email with the plaintiff. He requests the payments of the pending invoices, and Honey Shara answers that 'there is no money', and her emails indicate that the plaintiff should present an apology to get pending invoices paid. He makes clear that stopping paying the invoices related to the rest of 2019 film festival circuit would put the investment and the performance of the film in danger. The plaintiff keeps up the operations, and in July 2019 Honey Shara, while not paying pending invoices, requested confidential information about the plaintiff's company tax returns of previous years, which the plaintiff felt coerced to send to her in hopes that will bring some order to the situation of unpaid invoices.

36.    On July 5th 2019 the Oscar-qualifying Carthage Film Festival

informed the plaintiff that the film had been selected as part of its official selection World Films out of competition to take place in October 2019. The director of the the festival, the late Neyib Ayed, sent a letter to Da Vinci Films LLC, inviting the director to participate, and a letter to the defendant, **inviting the defendant to preside over the 2019 Grand Jury that would select the Oscar-qualifying winners**. A copy of this letter was also sent to the plaintiff. A staff member of plaintiff's office sent a copy to the defendant's by email on Jul 13, 2019, 7:46 AM. The defendant's office answered on Jul 16, 2019, 1:50 PM: "Thanks so much for reaching out. **Susan is not associated with American Mirror** and is not available to attend." It was not true that she was not associated with the film, and it was a flagrant proof of promissory estoppel.

37.     Between July and October 2019 the film won more than fifteen awards and participated in more than thirty festivals around the world. Official selections poured in for the last three months of the year.  At the same time, invoices were not being paid by his partner as it had been agreed in 2018, following his partner's intentions as manifested in the previously detailed emails, but the plaintiff kept up operations with his own credit and that of his small business, Da Vinci Films LLC. On Oct 15, 2019, 7:53 PM, the plaintiff made it clear to his partner that if he would not change course and honor the agreements, oral and written, he would have to start a legal action for breach of contract and breach of fiduciary

duty. On Oct 16, 2019, 1:19 AM, his partner answered: "**This project is over. You will never get another penny from me.** I will see you in court. You should look in the mirror and speak to your lovely wife. Perhaps she can teach you some manners." A few minutes later he added: "**Don't forget... you work for me, you do not own this film. You were paid with my money to make this film.** You will hear from my attorney. We have zero obligations to fund you. We have done everything you asked of us for many years. Then you decided to insult us. Think about it." The plaintiff had never been an employee of his partner, but this statement conveys a clear idea of the disparaging treatment the plaintiff was submitted to on a regular basis after the defendant's interference, the toxic environment the defendant had created with her interference.

38.     On Oct 16, 2019, 11:07 AM, the plaintiff answered, among other reasonings, to his partner: "Nothing sustains your words, while I talk about proven facts. Yes, you do have obligations, of course you have, as I have had mine. **This film was made for its distribution, it's not a toy you can put out just because you got a fit**. It has taken 5 years of work and very low budget for you, that's why you said, and you are acting consistently according to what you said, you "don't care about losing 300,000 USD" which is enough to show business disadvantage created on purpose." **"It is you who asked me to be in touch with your mother,**

**it is she who has been executing your plan.** You decided to hide behind." "**In the film industry we are tired of double standards, credit creep and abuse of power, hit lists, of boycotting careers and years of work to please someone: you are wading deep into a swamp**."

39.    Then on the same day October 16, 2019, his partner backpedaled and agreed on trying to find a solution that would avoid legal action, stating: "I will move on and forget the past if you will.  If not, I will see you in court and it will be ugly. You decide." **The plaintiff, trying to save the film, felt his best course of action was to accept the proposal of avoiding legal action**. In a phone conversation that followed this string of emails showing intention on both parts to find an amicable continuation, the plaintiff's partner, David Shara, acknowledged he had been acting since February 2019 under fear of the defendant's threatening legal action against the film and against him, but he assured the plaintiff that he would get all necessary talent releases as soon as possible to guarantee the film distribution. He also recognized the success the film was achieving was 'terrific', and that was a lesson for those who have tried to ruin it, himself included. But also he warned of the defendant's growing hatred against the plaintiff and the film on account of the tremendous success of the film. He also excused himself stating that **all what had happened before had happened because it had**

Case 1:22-cv-06401-JLR-SN   Document 1-1   Filed 07/27/22   Page 44 of 102

**been requested by the defendant as a consequence of the plaintiff's private email exchange with her**. He assured to plaintiff that he would try to assuage the defendant to sign a release, which was absolutely necessary to take the film to distribution. He also assured the plaintiff that she had no intention to sign that necessary release in order to render the film un-distributable, and that was why he had been trying to stop paying invoices. This further explains the degree of power and interference the defendant was exerting on the contract between the plaintiff and his partner.

40.      The plaintiff explained that the USA limited theatrical release, necessary to render the film Oscar-qualifying, was in peril. His partner stated that the defendant wanted to avoid that at all cost, that she did not want the film to get the Oscar-qualifying US theatrical release, a condition necessary by the Academy rules to render a film selection-able for any category. Plaintiff also informed his partner of the several distribution offers already in conversations after attending the film market of the Carthage Film Festival, where critics had praised the film as **"American Mirror joins the pantheon of such films as David Lynch's, Stanley Kubrick's, but also of writers as Marcel Proust in his the search of lost time"**, and the urgency of getting all the releases as soon as possible, since without them no deal could be struck, and they might be lost. He also explained that the film was gaining great

momentum internationally, and that had cost him great efforts and work during years, and the momentum could be lost if all pieces not be in place. The partner made himself responsible of collecting all the missing releases, promising to change the mind of the defendant in a conversation. It must be noted that by that date all the releases related to the people the plaintiff had invited to be part of his film Am-IOI already had been collected by the plaintiff, and also in the power of both partners, as proof of fiduciary duty by the plaintiff.

41. Between October and end of December 2019 the film wins another overwhelming tranche of international awards, but the USA limited Oscar-qualifying theatrical release must be suspended due to the key missing release of the defendant. In another phone conversation by end of December 2019, the partner explained to the plaintiff that the defendant wasn't willing to provide the release, but that he was trying to convince her. On that same conversation the partner went on to state to the plaintiff that "the situation was worst if it's possible because of the enormous success the film was conquering in the festival circuit, she feels humiliated by it". The plaintiff told his partner that was extremely concerning, and wrong. They agreed on delaying the USA theatrical release to 2020 in expectation of finding a solution with the defendant.

42. In January 2020 the film garners more awards, becoming most awarded film at Jaipur Film Festival, India, for instance, and more

conversations regarding distribution took place or continued or stalled. One of them came from MAD Solutions, the Arab world biggest distributor to theatres, TV and online platforms in the Middle East, but the release of the defendant made striking a deal impossible. On messages and phone calls, the plaintiff made it clear to his partner that Mad Solutions distribution offer may flounder, as other conversations related to international distributors, because they were missing the defendant's written release. Additionally, still invoices pending from 2019 were not yet paid by his partner.

43. By March 2020 COVID pandemic hit the world, and the entertainment industry was hit harder than many others. During this difficult months personal issues and problems overwhelmed the plaintiff while the defendant kept her position of not sending her release.

44. Between April and August the plaintiff's partner managed to pay the pending invoices from 2019. The plaintiff again raised the question of several problems related to the Producers Agreement between the partner and the plaintiff, and also the fact that the talent releases were still missing, rendering the film un-distributable in a year, 2020, when the interest for online-only film commercializations were breaking records because of the lockdowns, and the need of people for new content available online, since theatres were closed. It was a tremendous loss of opportunity for the distribution of a film that had had a stellar

performance in the international film festival circuit in 2019. Conversations about the film distribution with international buyers had been suspended due to the lack of the missing key release of the defendant.

45.     The plaintiff also informed of a new project for a new film in development, in which there was Academy-award winning talent in talks and the approval of the Francis Bacon Estate on the life of British painter Francis Bacon, based on a script by the plaintiff. The Francis Bacon Estate went on to assert that of the many proposals for a film based on Francis Bacon, the plaintiff's proposal was by far the best and the one they wished to become a film. But the situation was particularly troubling since the lack of distribution of AM-IOI, a multi-awarded, highly praised film now, was lacking the logical continuity of the film from film festivals into distribution, and that was clearly damaging the professional perception of the plaintiff by other film industry players. The no distribution of AM-IOI was making the raising of funds for the new film based on the life of Francis Bacon impossible, creating a tremendous professional damage for the plaintiff, injury for which the defendant is liable.

46.     The new 'Francis Bacon Project' in development by the plaintiff, that had attracted Academy-award winning talent across all fields,  and particularly a two-time Academy award winner actor as it will prove in

Case 1:22-cv-06401-JLR-SN   Document 1-1   Filed 07/27/22   Page 48 of 102

discovery, stalled during all these months and faced growing challenges to get funding mainly because his last film starring the defendant, and so multi-awarded, was lacking its due distribution plainly because of malicious maneuvers of the defendant and her interference with the existing contract. The damage that the situation has caused to the plaintiff has far reaching consequences. When on August 2020 the plaintiff insisted on these issues, his partner disappeared, announcing he would send his lawyer to contact the plaintiff.

47.     By mid-September, counsel representing the partner, David Shara, and his mother, Honey Shara, sent a letter to the plaintiff in which, besides congratulating him for his great work at the helm of producing and directing the film, he suggested that the plaintiff renounced to his rights as stated in the Producers Agreement in order to allow his partner and his mother to be fully in charge of the distribution of the film, in clear violation of the terms of the Producers Agreement, that establish that the plaintiff would be in charge of distribution, something that had been decided due to the extensive experience of the plaintiff in documentary filmmaking, as the results in the festival circuit clearly had showed.

48.     In a subsequent email conversation between the plaintiff and his partner's attorney, the partner made it clear through his counsel that: "The name and likeness releases have not been secured by our client

[David Shara]; **they can secure all of them in an expeditious manner - but you have to take a backseat on this project []**". Further adding relentlessly: "**<u>if you're serious about making money with this film and using it as a work that you can showcase so that your credits build and you have additional opportunities, you need to hand over the control of the film to our client</u>**." "without our client's written sign-off (and the releases), you simply can't exploit the film any further. **If you don't want to let them run the exploitation of the film at this point, our client is prepared to let the film "die on the vine".**" "Unfortunately for you, **you have no choices here Arthur - just trust that David's self-interest in getting the best deals and making the most money from the film** is in your best interest as well." The plaintiff was more than troubled by this situation. His partner was refusing to either consent to the plaintiff's distribution of the film and willingly keeping the film hostage by not providing a number of talent releases necessary to distribute the film, despite acknowledging that he could obtain the talent releases (and expeditiously so), all of them, included that of the defendant. **These actions were an obvious attempt to seize control of a universally acclaimed film.** In fact, **his partner threatened the plaintiff that if he did not hand over control of the film, the plaintiff would never receive profits from the film and would jeopardize his**

**professional reputation and success. His partner's statements show, at a minimum, that he was acting in coordination with the defendant, <u>since he affirms that he could get her release 'expeditiously'</u>, and by this, again, the defendant was seeking to interfere with both the distribution of AM-IOI and the plaintiff's other professional endeavors**, all in an effort to improperly enrich the plaintiff's partner, who thanks to her collaboration was able to coerce the plaintiff into a new 'agreement' that would deprive the plaintiff of his asserted rights. The tortious interference of the defendant has accomplished a *de facto* breach of the existing contract, something that was also against her own best interest; that, however, was not important as long as the interference was causing major injury to the plaintiff. It was the result of using her immense influence and power in the industry to quash the rights of a small filmmaker who had made an excellent, respectful, acclaimed work with her likeness, image and voice. She did not care about her losses as long as she could maximize the ruin to the plaintiff.

49.     Being clear that the partner was making an effort to seize control of the film's distribution through coercion, and that the partner could only make those assurances regarding the defendant's release thanks to the defendant's ongoing collaboration to deny the release to the producer, the plaintiff, who is the person entitled to set up the

distribution according to the Producers Agreement, then the plaintiff decided again to contact the defendant's office.

50.     In September 2020 representatives of the plaintiff contacted the defendant's representative, requesting a written, signed permission for image usage in the distribution of the film. On Sep 12, 2020, 9:21 AM, staff of plaintiff's office requested via email from the defendant to sign the 'attached talent release': "since the festival circuit has finished (70+ official selections, 40+ wins), and the film will start distribution, I request from you to send us the attached Talent Release signed by Ms Sarandon. It is a customary thing to do, and doesn't add anything new to the actual situation as it is, and confirms what you wrote in your previous email, that Ms Sarandon "is not associated with 'American Mirror'" in any way beyond that. I also attach the .docx file in case you may wish to add something. It contains a proviso that puts it clear that Ms Sarandon isn't obliged to any kind a promotion, which also doesn't add anything new. In sum, the Talent Release just reflects the actual situation as it has been for these years." The defendant's office, however, answered later to this email evasively: "Please refer any inquiries to Susan's agents. Thank you." Another proof of promissory estoppel, since the defendant had already established and chosen the rules by which the distribution would stand, and now used that evasive recommendation to further deny de facto providing the release. The defendant did not provide any release to

Case 1:22-cv-06401-JLR-SN   Document 1-1   Filed 07/27/22   Page 52 of 102

allow distribution to happen. On Sep 14, 2020, 1:32 PM, the defendant answered through his representative: "you're more than welcome to reach out to Shani Rosenzweig's office (Susan's agent)". This was the first time in four years that the defendant mentioned an agent in order to proceed, while the defendant herself had agreed on all the phases of the filmmaking, as described before in this complaint, from attending the shooting knowing the characteristics of the shooting, to agreeing on the measurements and nature of her compensation, to having discussed a business proposal sent by the plaintiff's partner, and answering to its clear terms in an affirmative manner. Attempts to call Shani Rosenzweig's office at United Talent resulted in the person answering hanging up the phone call as soon as they heard anybody was calling "on behalf of Arthur Balder". The moment the name of the plaintiff was mentioned the phone call was cut. All this showed unambiguously that directing the plaintiff's assistants to an agent that had never been part of the negotiations just in the moment when the film's distribution should start was a tortious act further confirming the promissory estoppel, and even a tactic to deflect the communications of the plaintiff and his assistants only to thwart them via third parties. Any further attempts to contact the defendant or his representatives were equally unsuccessful, and she did not provide the necessary written permission to allow the commercial distribution of the film.

51.    The COVID pandemic raging, economic activity paralyzed in the film industry, and not being able to distribute a work that had absorbed almost five years of his life, the plaintiff decided, in the light of the coercive maneuvers of his partner thanks to the collaboration of the defendant, to seek legal assistance.

52.    Finally it was a fact that all hopes faded for the USA limited theatrical release of the film to happen, as it had been agreed upon with his partner, and scheduled for end 2019, then re-scheduled to end 2020 fundamentally because of lacking the main talent release of the defendant, had been crushed. Time passing, the momentum gained by the international acclaim won by the plaintiff's work and extraordinary performance of the film in the international film festival circuit in 2019 faded into an irreparable loss for the business and for the professional perspectives of the plaintiff. For all these loses the plaintiff seeks the relief of the court in the form of monetary compensation and also punitive damages since the at-fault party behaved in a remarkably reckless and malicious manner.

53.    A law practice in New York, White & Case LLC, agreed in January 2021 on helping the plaintiff pro bono to attempt to solve the distribution of the film with his partner, David Shara, with the collaboration of attorneys Nathan Aduddell and Andrew Hammond. After an extensive period of research and preparation between February and

September 2021, in which no communication was received from the plaintiff's partner nor from the defendant, a Demand Letter was sent by White & Case LLC as counsel of the plaintiff to his partner's counsel in October 8th, 2021. The letter summarized the plaintiff's claims to his partner, and demanded also securing and sending the talent release of the defendant, among other claims. Written communications between counsel show on November 15, 2021, 9:54 AM, plaintiff's counsel requested clearly: "Given the passage of time already, and in light of your representation that the talent releases can be obtained "expeditiously," we request that all of the necessary and outstanding talent releases be provided no later than this coming Monday, November 22, 2021."

### AS FOR CIVIL CONSPIRACY

54. AB reincorporates the allegations set forth in paragraphs 1 through 54 as if fully set forth herein.

55. On November 18, 2021 1:46 PM , David Shara answered through his counsel: "**Tigran Tsitoghdzyan reached out to Susan Sarandon** - she is traveling right now but will be in NYC in the next few weeks - she agreed to meet Tigran for coffee - when this meeting occurs, he will ask her to provide a release. **I will have a release ready to be sent to her lawyer or manager <u>once their meeting occurs and we can confirm that she is willing to participate</u>** - I'll reach out to you

once the meeting occurs."

56.    On December 7, 2021 8:14 AM, after being urged by the plaintiff's counsel regarding the demands, the partner's counsel answered: "[] per my prior email to you, **everything hinges on Tigran Tsitoghdzyan's meeting with Susan Sarandon** which has not occurred yet." One month later there was still no answer, and the plaintiff's counsel insisted on the state of the situation. On January 3, 2022 3:00 PM, the plaintiff's counsel insisted on the plaintiff's demands regarding the defendant: "my client and I have been far more than accommodating so far. It has been three months since I sent you a letter requesting the talent releases. **It was shortly after that when you committed that David Shara would provide the talent releases and stop standing in the way of the film's distribution, in violation of his obligations** under the Producer's Agreement. What is more, **it was over one year ago, in September 2020, when you told Arthur that David [Shara] could secure "all of" the talent releases in an "expeditious manner."** But despite our accommodations – **accommodations far beyond what good faith or basic courtesy would call for** – we have now entered 2022 […] **As to Ms. Sarandon's talent release, we also expect to receive that no later than January 24, 2022,** but, in a spirit of compromise, we are willing to provide reasonable additional time as necessary to allow for a meeting to

be held with Ms. Sarandon (if it has not already taken place)."

57.     On January 18, 2022 11:41 AM the partner's counsel insisted: "Hey Nathan - nothing changed from when we spoke - **Tigran is trying to get a meeting with Susan - he is self-motivated in his desire to have the film exploited - it only helps him** - once that meeting occurs, the rest will fall into place."

58.     On January 30, 2022 5:13 PM, David Shara's counsel indicates what had been known and under discussion since 2019: "Hey Nathan - just to clarify - (…) - <u>**if we don't have Susan's release, no distributor will accept [the film] for distribution.**</u> Therefore, once you send me a copy of the release that she signed, I'll get the process underway for the rest." It must be noted that, as part of his email, David Shara's counsel shared an email sent to him by Honey Shara in which she noted on January 29, 2022 at 12:15 PM: "**I spoke to Tigran, who spoke to Susan. She didn't want to talk about the movie** so he didn't push her. Tigran feels quite certain that Susan signed a release for Arthur Balder."

59.     This was a falsehood introduced as a hear-say, since she had never signed a release and sent it to the plaintiff, as it will be proved by the defendant's own communications with the plaintiff's counsel a few days later on this chronology. It is impossible to believe, having the defendant met David Shara's envoy [Tigran] to obtain the release, that

Tigran Tstotoghzian was unable to clarify that fundamental point 'from her' directly. Instead of verifying it tete-a-tete, they put out a false assumption made by Tigran Tstotoghzian himself, who in that meeting had had the opportunity to obtain the answer directly from the defendant, with whom he met as the communication states unambiguously. The plaintiff's counsel answers on Feb 4, 2022, at 10:03 AM: "Respectfully, I do not follow your response and it continues to raise serious concerns." The last communication prompts David Shara's counsel to write to the plaintiff's counsel on February 4, 2022 10:09 AM "**Sorry Nathan - get me the Sarandon release and I'll go from there**."

60.    This tortious game ends by mid-February 2022, when the plaintiff's counsel contacts directly the defendant to address the situation of her release. The defendant's hide-and-go-seek game ends after a phone conversation takes place between the defendant's legal representation and the plaintiff's counsel. In this conversation the defendant, through counsel of the plaintiff, was asked for the talent release again. In spite of all, later on February 23, 2022, SMS messages sent by the defendant's representative to the plaintiff's counsel stated: Wed, Feb 23, 10:35 AM "hey nathan, it's brian from sarandon's. **she** had a talk with tigran and **might be willing to consider signing the release over to tigran and David**." Plaintiff's counsel answers: "Thank you very much for the update. Do you or Susan have a preference for the best way to move

forward? If not, I would be happy to relay this message to Tigran and David, so that they could reach out to Susan directly. Thank you." The defendant's representative answers: "I think you/arthur need to get with tigran and david and figure it out. whenever you all agree, feel free to reach back out. **But we'll only consider if tigran and david approve**." (See Exhibit E.)

61.    The previous messages are very concerning and troubling since they prove unambiguously and directly from the defendant the fact that the defendant was in clear and open coordination with David Shara in accomplishing the ruin of the film by not providing the plaintiff, the person holding the rights to start distribution, the necessary release for its distribution. Not only that, her approval to sign such a permission would 'only' happen 'if' the plaintiff agreed on the terms proposed by his partner, which, as it has been exposed before, were only intended to coerce the plaintiff and deprive him of his asserted rights as established in the Producers Agreement. The plaintiff's counsel reached out immediately to counsel of David Shara and of Tigran Tsitoghdzyan, on February 25, 2022 8:02 AM, requesting: "We are writing today about collecting a talent release from Susan Sarandon, who participated in the film. As you know, one of steps is in the lead-up to public distribution of the film is the collection of all outstanding talent releases, so it is important that we obtain Ms. Sarandon's release." David Shara's counsel

states on March 1, 2022 at 9:04 PM: "as discussed numerous times with
you by phone, **Susan wants nothing to do with your client - to say**
**she hates him is an understatement after he abused her by email**
**and by phone**" (See Exhibit F.) It is false, however, that the plaintiff
ever abused the defendant, it is false also that the defendant ever had any
phone conversation with the plaintiff, but the statement is important
because it links directly the defendant's motivation is 'hate', and her 'hate'
against the plaintiff is in unambiguous relationship with the email
discussed and showed in its entirety before from 2019. He then goes on to
add: "We need to discuss logistics before we obtain her release - I suggest
that we do a call with Andrew joining us." A meeting took place on which
it was agreed that the defendant's talent release would be obtained. The
conversations show that Tigran Tstotoghzian apparently commits to
obtain the talent release from the defendant via his counsel, but after
that conversation the counsel of David Shara disappeared, never
answering again the phone calls and emails made by the plaintiff's
counsel, and the defendant's release was never sent to the plaintiff nor to
his counsel to this date. The last communication in writing was from
April 5th, 2022. This set of emails show the intentions of the defendant
being fulfilled by her own will, even when other persons, who are
perfectly acquainted with her plans and motivations, committed to obtain
that release. The defendant's pattern of behavior, accomplishing her

vindictive designs to cause maximum harm to the plaintiff by interfering in others business relations and contracts, is, however, recklessly malicious, ill-intentioned in nature, manipulative beyond doubt, and tortious. She is perfectly aware of the injury she is causing to the plaintiff, and still her behavior continues in the same direction.

62.     The communications exchanged in 2019, 2020, 2021 and 2022, show that the defendant interfered tortiously between the partners to the Producers Agreement, doing all in her power to interfere with that contract in order to cause professional and financial injury to the plaintiff, which accrues since the moment the film could and had to be starting closing deals related to commercial distribution, beginning 2020. The events also show how the power of the defendant cowered and manipulated the partner of the plaintiff and other third parties involved in the film, in order to curtail all possibilities of success of the film in 2019, when his partner did all in his power to stop paying invoices to 'cancel' that way the performance in the festival circuit, and that had no other intention than to injure professionally the plaintiff, who would have been deprived of dozens of awards bestowed upon him and his film AM-IOI. The defendant knew that, having exchanged promises and after having agreed in writing to clear terms, she could not prohibit directly the usage of her image, but used all in her power to limit in 2019 the success of the film by making others do what she could not do in a manner that

Case 1:22-cv-06401-JLR-SN   Document 1-1   Filed 07/27/22   Page 61 of 102

would have been too obvious an act in bad faith that would have give the

plaintiff a direct cause of action at that moment. She chose instead to use

her influence on others to injure the plaintiff. Finally, since 2020, when

the release was requested from her directly by the plaintiff, and in 2022

she indicates that she would only agree to sign "if" the plaintiff's partner

agrees on terms that are only related to the partner's breach of contract,

i.e., accepting such terms would mean successfully coercing the plaintiff

into another form of contract, which is what she also tried to accomplish

as a vindictive scheme to further injury the plaintiff, depriving him of his

rights under the Producers Agreement, or, in the meantime, depriving the

film of any distribution, an act of spite that had caused irreparable

damages. **She would only agree to sign, then, if the partner**

**succeeded in coercing the plaintiff into accepting, at his**

**disadvantage, a new agreement**.

### AS AND FOR A SECOND
### CAUSE OF ACTION FOR PROMISSORY
### ESTOPPEL

63.    AB reincorporates the allegations set forth in paragraphs 1

through 63 as if fully set forth herein.

64.    The liability of the defendant is immense. She is not only the

necessary and main abettor behind the partner's coercion, but she is the

direct cause why the film could not be distributed commercially since the

moment it should have been, at least end of 2019, according to the events as hitherto described. The private and direct exchange of opinions by emails between the plaintiff and the defendant in 2019 marked the beginning of a clear succession of actions that were, and are as of today, intended to cause ongoing injury to the plaintiff.

65.   SS is liable to AB for promissory estoppel.  The defendant sufficiently and unambiguously established abundant implied and direct approval to the usage of her image in a film that was intended to be commercially released, and she knew that. Her not facilitating this in due time makes the defendant liable to the plaintiff for promissory estoppel.

66.   The plaintiff reliance on these promises was foreseeable by the defendant because the defendant is in the film business and industry, and she understands the reason and purpose for being part of a film, of accepting an upfront compensation and of agreeing on the terms of a business proposal which clearly offers her a percentage of the distribution profits. Additionally, depriving the business from its US limited Oscar-qualifying US theatrical release is designed to rob the plaintiff of well-deserved opportunities of recognition in his own country and area of professional development, the United States of America..

67.   As a result of the defendant's statements and promises, her subsequent intentional denial to do so  upon repeated requests, the plaintiff has been damaged financially and professionally, causing no

small emotional distress.

## ARGUMENTS

68.    The private exchange of emails that takes place on Feb 25, 2019 is private and between plaintiff and defendant, both having the right to freely entering into that conversation, being both entitled to the right to an opinion. It is the defendant who previously was giving the 'silent treatment' to the plaintiff and his team, who was disparaging the plaintiff's work publicly by not being thankful to institutions that had given the Parajanov Vartanov Award in a sign of sincere recognition. The conversation was not about the obligation of a promotion on the side of the defendant, however, but on basic rules of propriety, and the plaintiff had and has his right to his own opinions. However, both opinions were exchanged privately. **It was the defendant who chose to disseminate the emails, not to the media to make them public, of course, but to the partner of the plaintiff, with that intently and directly seeking retaliation by cowering the partner into believing that she could ruin him with a lawsuit**, to tortious interfere in the plaintiff's business relations, which she knew, as a consequence of this opinion shared with her. It was intended to cower his partner into taking actions directed to damage other projects already underway between the partner and the plaintiff, to ruin new possibilities of success by cancelling the remaining of the festival circuit in 2019, and ultimately the

commercial distribution of the film itself. The actions that clearly took place after Susan Sarandon disseminated a private communication never intended by the plaintiff to be public have been until today extremely damaging, disproportionate, abusive, and have caused what David Shara announced very clearly in his messages a few hours after she shared that communication to him: **"Be careful with Susan. She can ruin you."**

69.     The actions unleashed by the wrongful dissemination of this email in 2019 by the defendant are inchoate and preparatory for what starts in 2020. It is in 2020 when she outrightly does not provide the talent release necessary to the producer, the plaintiff, to ensure distribution, misleading him to agents that had never been part of any negotiation, agents who just hung up the phone call whenever anybody mentioned the words 'Arthur Balder', and this fact is further stated in 2022 when even the defendant states in writing that she 'might be willing to sign it' but only if Tigran and David agree'.

70.     To say that Susan Sarandon shows here disregard to others' freedom of speech and rights to an opinion is an understatement, being herself, however, an outspoken individual who enjoys conspicuously her First Amendment rights publicly and privately. It is particularly outrageous to see how she chooses the path of retaliation by disseminating an email conversation sustained privately, with the sole purpose of causing unbounded damage by interfering between the

Case 1:22-cv-06401-JLR-SN   Document 1-1   Filed 07/27/22   Page 65 of 102

plaintiff and his partner, the executive producer David Shara, even when ruining the film is clearly against her own interest, being herself a part of it praised by independent juries, having discussed a part of profits with the partner, David Shara. She is praised by the critics because of her participation, the film is acclaimed, and she even got what she chose to have as a compensation for the shooting and was informed clearly and unambiguously in a business proposal of the film being made to be 'commercially released', David Shara even stating 'I want to make money for Susan Sarandon', he wanted 'maximize profits and exposure', and even being promised, and accepting, a percentage of the film's distribution profits, and recommending herself a start of distribution by trying into film festivals. **But Sarandon's immense influence and fortune allows her to renounce to all this, as long as she can maximize the injure to another small professional; she acts seeking retaliation, is a perverse act of malice**.

71.    The reason why Susan Sarandon can chose to go against her own interests is obvious: given the unbalance between her own prestige and career, her own opportunities and funds, and those of the plaintiff, the filmmaker, she is perfectly conscious and aware that, in spite of the loss for herself ruining the distribution, that loss is nothing in comparison to the injury she caused to a filmmaker, the plaintiff, with few credits, for whom this film represented a great opportunity that he had nailed to

perfection, apparently to her dismay, as the list of awards shows unequivocally. **It is a spiteful, all-out-destructive, entirely vindictive, malicious in nature collection of acts intended to cause injury to the plaintiff, depriving him of his well-deserved merits, and this liability should be multiplied as many times as the court deem possible precisely when we examine the merits of the film internationally acclaimed of the producer and filmmaker, the plaintiff, and we see the immense privilege that the defendant is wielding against the basic, fundamental, constitutional rights of the plaintiff to his opinions, because it is thanks to the plaintiff's vision and devotion, that American Mirror is a remarkable achievement.**

72.     To fathom the depth of the wrong done, it must be noted that American Mirror received an astounding reception on the film festival circuit, winning awards for Best Feature Film, Best Documentary Film, Best Experimental Film, Grand Prix, and Best Film of Festival at international film festivals including the UK Film Festival (UK), the Jaipur International Film Festival (India), the Arlington Intl Film Festival, (US), the 53rd Worldfest Houston (US), the Ferrara Film Festival (Italy), the Prvi Kadar International Film Festival (Boznia-Herzegovina), and the Near Nazareth Film Festival (Israel).  In addition, American Mirror won Best Director at Ierapetra Documentary Film

Festival in Greece, and Peak City International Film Festival in the US);
it won Best Cinematography at Sydney Independent Film Festival in
Australia, DOC Los Angeles Parajanov-Vartanov Institute in the US, and
Jaipur International Film Festival in India; it won Best Original
Soundtrack at Doc Los Angeles; and it was named a finalist for Best
Original Soundtrack at the International Sound & Film Music of Croatia
and the Tenerife Film Music Festival (FIMUCITE) in Spain. At the
Jaipur International Film Festival, American Mirror was honored with
five awards (Best Documentary Feature, Best Cinematography, Best
Editing, Best Sound, and the Best Released Film), making it the most
awarded film in the history of the festival. AM-IOI also became the most
awarded film in the history of DOC Los Angeles, where it won for Best
Original Film, Best Original Soundtrack, and Best Cinematography. In
addition, the film won the prestigious Parajanov-Vartanov Prize, a
distinction previously given to Martin Scorsese and Francis Ford Coppola.

73.    As the below sampling shows, critics from around the world
have also given glowing praise to Mr. Balder and American Mirror:
"American Mirror is "strikingly original" and "there's a lingering, finely-
drawn intelligence to Arthur Balder's hallucinogenic compilation, one
which welcomes many readings no matter how you look at it" [Film
Inquiry, Australia] "Director Arthur Balder takes us on a visually
spectacular journey." American Mirror is "a revelation to Balder's craft."

[The Armenian Mirror-Spectator, US] "Arthur Balder is an artist at the same time creative and meticulous." [Chiara Carna, Fabrique Du Cinema Nr 24, Italy] American Mirror is a "very graceful and elegant work." [The Digital Journal, US] American Mirror is a "dynamic, visually sumptuous, cleverly directed film that leaves you breathless and enthralled long after you watch it." [Dragan Elcic, a film critic, a film professor and the Dean of Belgrade Academy of Arts in Serbia, and a highly regarded Serbian film director who has directed films recognized at the Oscars.]

74.    American Mirror also received praise from film critic Meriam Azizi in the Le Quotidienne, the official diary of the Oscar-qualifying Carthage Film Festival in Tunisia. Mr. Azizi wrote: "**American Mirror joins the pantheon of such films as David Lynch's, Stanley Kubrick's, but also of writers as Marcel Proust in his the search of lost time**." "Of all the documentaries [at the Carthage Film Festival], Arthur Balder's is the one that intrigues the most." **It is a "masterpiece.**"

75.    The reception garnered by American Mirror demonstrates that it is a great accomplishment.

76.    Of course, the awards and praise earned by the plaintiff and AM-IOI are due only to the plaintiff's efforts in submitting the film to a range of international film festivals and undertaking all of the corresponding responsibilities, including professional interaction with the

festival staff and executives. **It was not due to the wider, public distribution of the film, which the defendant has maliciously prevented after herself recommending the film to go to festivals as a first step to determine its potential success in commercial distribution.** Even more: many of those awards listed would have not been won if the plaintiff had followed the 'orders' of his partner in April 2019, if the defendant's tortious interference would have been fully successfully in 2019, when he was told bluntly to 'cancel the festivals' by David Shara, all as a consequence of the actions and malicious interference of the defendant, Susan Sarandon. **Susan Sarandon's actions represent another egregious example of abuse of power in the film industry, and deserve an exemplary fine of punitive damages that matches the size of the outrageous loss that her actions have caused.** She has actively act behind the scenes to ruin a film internationally acclaimed only to please her need of vengeance upon someone who had opinions not of her taste, after she sent to him disparaging opinions about his film. **She cannot be deemed an example to follow in the film industry, but an example of what should never happened: that someone uses the power at the apex of her career in order to cause ruin on the well-deserved and unambiguously merited results of a small filmmaker that invests five years of his life in a project that ends up being a source of**

**anxiety and depression.** To this date, the plaintiff is in medical treatment for anxiety and depression caused by all these events at the North Hudson Community Action Corporation medical center in West New York, and forensic proof of that will be provided in due time.

77.    David Shara states through his counsel that Susan Sarandon "hates" the plaintiff, specifically that "to say that Susan hates your client [the plaintiff] is an understatement". She, a person who has pretended to be a champion of civil rights, seems to 'hate' the plaintiff simply because he had asserted his opinions only after she asserted hers, only because he had put it very clear his believe that his film was a very good work and deserved respect, as afterwards the list of awards obtained in 2019 overwhelmingly confirmed, simply because championed fair standards, even when **nobody** else in his team was cooperating in good faith or in fairness to help the film achieving any success, **as a direct consequence of the well-documented, clearly timed defendant's tortious interference**. She seems to 'hate' the plaintiff, because the film wasn't cancelled for her vengeful pleasure, but instead it throve, and she seems to 'hate' him, always according to someone, Davis Shara's counsel, who is very well acquainted with her as recently as two months ago, because of the success achieved by the plaintiff's film in spite of the obstinately uncooperativeness of the defendant across the entire run of the film in the international festival circuit. **The plaintiff became the victim of a**

**double standard in a toxic film industry environment fostered, created and manipulated by a superstar that is accustomed to enjoy privileges, for whom rights, civil rights equally shared in a society guided by principles of equity, are not enough and in her eyes not the same for everyone, an environment that was purposely created by the defendant to cause injury at all cost to the plaintiff.** Once it was clear she could not send to ruin the festival circuit because of the plaintiff's determination to success in spite of all what was being made against him, she made sure the film would never go on to be commercially distributed in due time unless the plaintiff would be successfully coerced into losing his rights as asserted in the Producers Agreement with his partner, David Shara.

78.     According to the own words of Tigran Tsitoghdzyan, the only purpose of the defendant was to come close to the subject of the film, Tigran Tsitoghdzyan himself, being the participation in the film a way to do so, something even confirmed by Tigran Tstotoghzian, who referring to the shooting day of the defendant, states on an email on May 28, 2019, 3:59 PM: **"She came that day for me! Not for money, nor for the print."** This evinces what the plaintiff had heard many times from Tigran Tsitoghdzyan and from Tigran's longtime confidant and manager, David Shara: that the defendant was interested in him at a personal level in a manner that he was not interested in her. This personal interest was

not reciprocal or understood in the same manner. However, regarding the film, the defendant was treated fairly beyond the best imaginable accommodations. But all those accommodations and privileged treatment were of no value for the defendant, because something else did not go her way long before the plaintiff tried legitimately to ascertain why the defendant was 'turning her back on the film' by the end of 2018 and all the dedicated technical team that made it possible.

79.    The malice of the defendant stands out when we expose events in the light of these claims, which show how double standard and privilege are understood by the defendant as something normal. Be noted that, when The New York Times film critic Jeannette Catsoulis questioned, apropos of the theatrical release in the USA of the defendant's son Jack Henry Robbins' film "VHYes" , on Jan. 16, 2020, [quoted from The New York Times, Jeanette Cassoulis, Jan. 16, 2020] **"Little more than a collage of meaningless nostalgia, "VHYes" makes you wonder how it found its way into a movie theater. Though I'm sure that has nothing to do with the fact that two of its actors, Susan Sarandon and Tim Robbins, are also the director's parents"**,, the defendant slammed publicly the critic at The Hollywood Reporter [Tittle "Susan Sarandon Slams New York Times Review of Son's Film", published February 14, 2020] **stating that the NYT critic's attitude was "so unprofessional and obviously knows so little**

**about the business"**. It is a disgrace, and represents an new apex of hypocrisy, to see that precisely at that same time when this journalistic controversy was taking place, Susan Sarandon had been already fully engaged in thwarting the distribution of the defendant's film, AM-IOI, a film that was legitimately successful on its own merits and performance in the festival circuit, about which the defendant had, against all evidence, "nothing positive to say". It cannot be sufficiently emphasized that the plaintiff's film could not get the US theatrical Oscar-qualifying theatrical release precisely because the same Susan Sarandon that was slamming the NYT critic for voicing her opinions about her son's film was also engaged in wrongful actions directed to ruin the transition of the plaintiff's film AM-IOI from the festival circuit into the commercial distribution. For the defendant, the outstanding size of the plaintiff's film cinematic merits, as recognized by independent critics and awards bestowed by independent juries from all over the world, were of no value as long as she could accomplish her retaliation.

80.    For the defendant, relying on her immense prestige and career in the industry, as much as thwarting the film was clearly against her interest (as it is shown by the fact that she had been promised and she had thanked a percentage of the profits in a business proposal sent by executive producer David Shara in common agreement with the plaintiff,), that damage was welcome as long as she could get the

Case 1:22-cv-06401-JLR-SN   Document 1-1   Filed 07/27/22   Page 74 of 102

satisfaction she was looking for: a retaliation against the little known filmmaker, the plaintiff. She knew it was against her own interest, but this has been an act of malice, an interference to cause irreparable damage to the plaintiff.

81.    The plaintiff requested the necessary written permission in writing on multiple occasions. The defendant refused to honor her previous promises to provide a release in the terms agreed upon by her, and of her choice, as written communications show. Consequently, the defendant is liable.

82.    By reason of the facts and circumstances stated above, that will be supported on every single point with written evidence collected by the plaintiff, existing and real on each point, plaintiff has been damaged by defendant, and seeks compensatory damages in the sum of:

83.    No less than $2,000,000 for the lack of distribution of his film 'American Mirror: Intimations of Immortality',

84.    No less than $1,000,000 for the business loss, and business opportunity loss by cancellation of the film project 'Nazi propaganda';

85.    And no less than $3,000,000 for not being able to make his new fiction film project 'Francis Bacon Project', in which he was involved as screenwriter, producer and director, in which there was Academy Award winning talent attached, because plaintiff can prove that the direct cause of not being able to raise the funds to produce it, has been no other than

the lack of distribution of his acclaimed film 'American Mirror: Intimations of Immortality', being this a direct consequence of the professional vengeance sought by the defendant on a professional level as a consequence of her malicious actions;

WHEREFORE, Plaintiff requests that the Court enter judgment against the Defendant, in the amount of no less than $6,000,000, together with pre- and post-judgment interest as allowed by law; and punitive damages no less than five times the relief because the defendant Susan Sarandon behaved in a remarkably malicious manner, costs and disbursements of the action, and such other and further relief as the Court deems just and proper;

Dated: May 13, 2022
Respectfully submitted,

**ARTHUR BALDER**

2813 Palisade Avenue
Union City,
New Jersey
07087
Telephone:
(919) 888-3802
E-Mail: arthur@davincifilms.us

Case 1:22-cv-06401-JLR-SN   Document 1-1   Filed 07/27/22   Page 76 of 102

## VERIFICATION

STATE OF NEW YORK
COUNTY OF _NEW YORK_ ss:

_ARTHUR BALDER_____, being duly sworn, deposes and says:

I am the plaintiff in the above-entitled action. I have read the foregoing complaint and know the contents thereof. The same are true to my knowledge, except as to matters therein stated to be alleged on information and belief, and as to those matters, I believe them to be true.

State of New York
County of New York

ARTHUR BALDER

Sworn to before me this _____ day of __MAY 2 0 2022__, 2022

Notary Public

Alice J. McPherson
Notary Public, State of New York
Reg. No. 03MC6423676
Qualified in New York County
Commission Expires October 18, 20__

74 of 74

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

INDEX NUMBER _____

In the Matter of the Application of
ARTHUR BALDER

Petitioner,

- against -

SUSAN SARANDON

Respondent,

To the best of my knowledge, information and belief, formed after an inquiry reasonable under the circumstances, the presentation of these papers and the contentions therein are not frivolous as defined in subsection (c) of section 130 1.1 of the Rules of the Chief Administrator (22 NYCRR).

Sign Name: _____

Print Name: ARTHUR BALDER

Address: 2813 PALISADE AVE 1, UNION CITY, NJ

Telephone: 929-888-3802

Service of a copy of the within is hereby admitted

Dated: _____, 20 _____

Attorney for _____

---

**[Litigation back: Fill out right side of form only]**

*************************NOTICE OF ENTRY*************************

Sir/Madam:

Please take notice that the within is a (certified) true copy of a

_____ duly entered in the office of the clerk of

the within named court on the _____ day of _____, 20 ___

Dated: _____

Attorney for: _____

Yours, etc.

To: _____

Attorney(s) for _____

Office and Post

Office Address _____

*************************NOTICE OF SETTLEMENT*************************

Sir/Madam:

Please take notice that an _____

of which the within is a true copy will be presented for settlement

to the Hon. _____, one of the Justices

of the within court, at _____, on

_____, 20 ___ at _____ A.M./P.M.

Dated: _____, 20 ___

Presenting Party _____

Yours, etc.

To: _____

Attorney(s) for _____

CommenceAction – Rev. March 2021

---




# NYSCEF Confirmation Notice
## New York County Supreme Court

The NYSCEF website has received an electronic filing on 05/24/2022 12:48 PM. Please keep this notice as a confirmation of this filing.

**656451/2022**
**Arthur Balder v. Susan Sarandon**
**Assigned Judge: None Recorded**

## Documents Received on   05/24/2022 12:48 PM

| Doc # | Document Type |
|-------|---------------|
| 1 | SUMMONS + COMPLAINT |
| 2 | EXHIBIT(S) A |
| 3 | EXHIBIT(S) B |
| 4 | EXHIBIT(S) C |
| 5 | EXHIBIT(S) D |
| 6 | EXHIBIT(S) E |
| 7 | EXHIBIT(S) F |

## Filing User

Arthur Balder | arthurbalderfiles@gmail.com
2813 Palisade Ave, 1, Union City, NY 07087-4631

## E-mail Notifications

An email regarding this filing has been sent to the following on 05/24/2022 12:48 PM:

**Arthur Balder - arthurbalderfiles@gmail.com**

---

**Hon. Milton A. Tingling, New York County Clerk and Clerk of the Supreme Court**
Phone: 646-386-5956      Website: http://www.nycourts.gov/courts/1jd/supctmanh/county_clerk_operations.shtml

**NYSCEF Resource Center, nyscef@nycourts.gov**
Phone: (646) 386-3033 | Fax: (212) 401-9146 | Website: www.nycourts.gov/efile



# NYSCEF Confirmation Notice
## New York County Supreme Court



**656451/2022**
**Arthur Balder v. Susan Sarandon**
**Assigned Judge: None Recorded**

### Email Notifications NOT Sent

| Role | Party | Attorney |
|------|-------|----------|
| Respondent | Susan Sarandon | No consent on record. |

\* Court rules require hard copy service upon non-participating parties and attorneys who have opted-out or declined consent.

---

**Hon. Milton A. Tingling, New York County Clerk and Clerk of the Supreme Court**
Phone: 646-386-5956      Website: http://www.nycourts.gov/courts/1jd/supctmanh/county_clerk_operations.shtml

**NYSCEF Resource Center, nyscef@nycourts.gov**
Phone: (646) 386-3033 | Fax: (212) 401-9146 | Website: www.nycourts.gov/efile

**Exhibit A**

Contains the Producers Agreement signed by Arthur Balder, plaintiff, and his partner, David Shara, regulating production and distribution of the film.

Notes:

1.  The film title was provisional at the time of signing this document. In the Producers Agreement the film produced referred to as 'Mirrors' is the same referred to in the Complaint as 'American Mirror: Intimations of Immortality', which was the definitive title.

FILED: NEW YORK COUNTY CLERK 05/24/2022 12:48 PM
NYSCEF DOC. NO. 2
INDEX NO. 656451/2022
RECEIVED NYSCEF: 05/24/2022

**Producers' Agreement**
**Film 'Mirrors' / 'American Mirror'**

Date of Signature: December 5th, 2016

Intervene in the Agreement,

April 4, 2017

David Shara, whose address is presently XXXXXX, United States, from now on
**Executive Producer**,

AND

Arthur Balder, whose address is presently 2813 Palisade Ave 1, Union City, New Jersey,
US, from now on **Director / Producer**,

**Terms of the Agreement:**

That as a compensation of his work in the film provisionally titled 'Mirrors' or 'American
Mirror', started in April 2015, the **Director / Producer** will receive from the **Executive
Producer** an original painting hand-made by artist Tigran Tsitoghdzyan.

The **Executive Producer** agrees that it will be a painting of the series 'Mirrors',
portraying his wife, Bella Jazmin de la Guía, no later than the last day of the month of
May of the year 2017, and that the painting will be 75x50 inch.

Thus the **Director / Producer** agrees that he thereto renounces to any additional
upfront compensation calculated on the production budget of the film, but the **Director /
Producer will** have **20% of profits,** i.e. once final production budget recouped. The
final production budget will be the result of the sum of all production expenses that have
taken place until date and also adding those that may take place until the final
termination of the film.

The **Director / Producer** will provide and pay all additional Color Correction and Editing
of the film and other parts of the film yet to be filmed without further production cost
hereto, and will provide any additional directorial and producer's work and scripts
necessary to ensure the best result in such cases.

The **Executive Producer** agrees he will pay any additional costs to composer of
original soundtrack, and the **Director / Producer** will provide the composer any
necessary files to ensure his optimal performance of his work.

The **Director / Producer** will inform and discuss any distribution possibilities with the
**Executive Producer**, both being informed in due time to ensure the best performance
possible of the business.

The **Director / Producer** cannot make any decision regarding distribution without contacting and getting written confirmation by the **Executive Producer.** Revenues have to be paid directly to the **Executive Producer,** being distribution contracts always under his surveillance and executed according to his criteria.

If any **additional production costs** would be necessary beyond what has been already done to date, i. e., renting camera equipment, cameras, or lenses, for any additional shootings, etc, the Executive Producer would have to provide additional funds upon approval of new estimations and new budget.

Also is agreed that the **Executive Producer**'s name will be prominently displayed in the major credits of the film, opening and closing, as in any posters or publicities and trailers, as '**Executive Producer**'. The director will be credited as 'Directed by Arthur Balder' or ' An Arthur Balder film' in any posters or publicities or film trailers, and in the opening and closing credits of the film as 'Director'.

The producers agree to the listed terms listed above signing all TWO pages of the agreement.

Signed:

_____

Producer's Signature

Arthur Balder

Producer's Printed Name

_____

Executive Producer's Signature

David Shara     April 4, 2017

Executive Producer's Printed Name

~~December 8th, 2016~~

~~Date~~

**Exhibit B**

Set of emails from April 2018 in which the defendant explicitly accepts in writing upfront compensation for participating in the film in the form of an artwork print, and receives a business proposal sent by his partner, executive producer David Shara, also on behalf of the plaintiff, producer of the film, in which David Shara states he wants to 'make money for Susan Sarandon' and also that he is intent to 'maximize profits and exposure', to which she answers suggesting to start distributing the film into film festivals as a first step into commercial distribution, clearly and unambiguously exposed by David Shara.



**DVF Films <davincifilms.productionoffice@gmail.com>**

---

## Fwd: 15th GAIFF Parajanov's Thaler, a Lifetime Achievement Award

**Bryan Gibbs** <sillygooseemail@gmail.com>                                   Mon, Apr 16, 2018 at 4:26 PM
To: David Shara <davidshara@me.com>
Cc: DVF Films <davincifilms.productionoffice@gmail.com>, David Shara <davidshara@mac.com>

From Susan:

David,
Thank you for your kind dinner invitation but I'm working on *Ray Donovan* now through October so I don't think it's possible. It's a very special film, but I really have no idea how to market it. I think you need an agent or maybe just look into submissions to festivals. The season is upon us so I think it's too late for this cycle.
Susan

**BRYAN GIBBS** | Office of Susan Sarandon

On Wed, Apr 4, 2018 at 3:07 PM, David Shara <davidshara@me.com> wrote:
  Hello Brian,

  I think it is long overdue that I introduce myself. My name is David Shara and I have represented Tigran For the last six years as his partner and manager. I am also the producer of the film.
  I am not at all in the movie business or the art business other than this project, I am a fancy colored diamond specialist. This is the first movie production for my company, Optimum Diamonds. I am thrilled with all aspects of this project. Tigran is one of the most respected and sought after artist I have ever met. His art is Extraordinary, he oozes talent. I'm also thrilled with Mr. Arthur Balder and this film. I think his vision is very well conceived and executed in this art film/documentary film. It is both fun to watch and visually stimulating and beautiful. I am proud to be involved.

  That being said, I know very little about the movie industry and could use all the help I could get. I am very interested in Susan's involvement in this movie and I am willing to give her a percentage of profits for her involvement and guidance. I am a huge believer in taking advice from those who are much smarter and more experienced. I am very happy to share profits And accolades.

  I would love to hear her commentary, opinion and recommendations on the film after she watches it. It would be my pleasure to treat you, her and her team To a great big bottle of Burgundy and or dinner at the restaurant of her choosing to discuss the movie and a potential partnership. Please let me know your thoughts. I'm available to talk anytime. My phone number is 917-701-3440. My office is in the penthouse of 576 Fifth Avenue. If you are ever in Midtown, let this stand is an open invitation to come and see some of the worlds greatest and rarest natural fancy colored diamonds. Check out our website at www.optimumdiamonds.com.

  I would also like to discuss your thoughts on film festivals. Arthur Balder has done an incredible job on all aspects of this film including submission to film festivals. He deserves an enormous amount of credit. He has put in so much time, effort, expertise and skill. I am beyond proud of him. It is very rare that someone surprises me these days, but he truly impressed me with his patients, expertise, originality and skill level.

  I am extremely interested in maximizing both exposure and profits. I am also interested in sharing profits and making money for Ms. Sarandon. I am a huge believer in karma and taking care of your partners. I look forward to meeting you and hope we can do something fabulous here. Have a great dayAnd thank you in advance.

  David Shara

  Sent from my iPhone

  On Apr 4, 2018, at 2:37 PM, DVF Films <davincifilms.productionoffice@gmail.com> wrote:

      Dear Bryan,

      Let me know the best width (or height) for you and out of that number we get its correspondent width (or height) in proportion to it. Remember that one is a print of her portrait.

Maybe keeping this in mind she can verify what are the best the best sizes for each print.

We can provide a guest for Susan flying same category. Regarding Armenia the festival adds: "she is free to decide the dates of course, but we will be happy to host her
for the whole period as well as to provide with personal car, translator, deluxe room in 5 star hotel and a tour through Armenia, if she likes." GAIFF's whole period is / takes place July 8-15, 2018.

I think it would be good if her arrival and departure in Armenia is chosen as soon as possible for flights selection, &c.

Thank you for your quick response,

Bella Jazmin de la Guia,
Assistant to Producers
(201) 713-8509

On Wed, Apr 4, 2018 at 2:12 PM, Bryan Gibbs <sillygooseemail@gmail.com> wrote:
What is the next size smaller for the prints? And yes, whomever Susan travels with, they would have to travel together.

Thank you,

**BRYAN GIBBS** | Office of Susan Sarandon

On Mon, Apr 2, 2018 at 11:12 AM, DVF Films <davincifilms.productionoffice@gmail.com> wrote:
Dear Bryan,

thank you so much for this information and quick response.

-Regarding the prints: 65 x 45 inch is the smaller size we have now, is it OK? We can get them in any size, so if this is too big just let me know the best size for her as soon as possible.
-Regarding travelling conditions I have a doubt: the second and third guests travel conditions are the same as Susan's? I mean both have to travel highest class available?
I need to clarify this asap to move forward.

Thanks,

Bella Jazmin de la Guia,
Assistant to Producers
(201) 713-8509

On Fri, Mar 30, 2018 at 1:28 PM, Bryan Gibbs <sillygooseemail@gmail.com> wrote:
Hi Bella,

Our phone number is (212) 675-4285 but email is the best way for us to communicate so everything is in writing. The address here is 147 W 15th St. Suite 108 NYC 10011. What size are the prints? As for travel to a film festival, Susan would fly the highest class available, which in this case would be first class to Paris and then business to Yerevan. Also, she is always offered at least one guest, but more often two.

Thanks,

**BRYAN GIBBS** | Office of Susan Sarandon

On Thu, Mar 29, 2018 at 1:19 PM, DVF Films <davincifilms.productionoffice@gmail.com> wrote:
Dear Bryan,

from now on I will be helping the producers with any events related to 'American Mirror'.
I have to bring to your consideration the previous email with official offer of the GAIFF's Parajanov's Thaler, a Lifetime Achievement Award for contribution to World Cinema to Ms Sarandon,
because a response is needed to the film festival president on its acceptance independently of Ms Sarandon's agenda
still open due to her TV show. Please find the official invitation attached.

5/16/22, 7:50 PM                     Gmail - Fwd: GAIFF Parajanov's Thaler a Lifetime Achievement Award
Case 1:22-cv-06401-JLR   Document 1-7   Filed 07/27/22   Page 86 of 102

I will need to have a phone number of Ms Sarandon office to get a better communication in the future.
Also regarding the prints I will need an address for the prints to be sent to once framed and ready to ship.
For any inquires my phone number is (201) 713-8509.

Thanks,

Bella Jazmin de la Guia,
Assistant to Producers
(201) 713-8509


---------- Forwarded message ----------
From: **Arthur Balder** <arthurbalderfiles@gmail.com>
Date: Tue, Mar 27, 2018 at 6:36 PM
Subject: 15th GAIFF Parajanov's Thaler, a Lifetime Achievement Award
To: Bryan Gibbs <sillygooseemail@gmail.com>
Cc: David Shara <davidshara@me.com>, David Shara <davidshara@mac.com>


Hello Susan,

this email contains attached the official letter from Golden Apricot Intl Film Festival to "honor you with the
highest award of the festival - Parajanov's Thaler, a Lifetime Achievement Award for your contribution to World Cinema."

The letter was sent via email to Tigran a few days ago and he forwarded it to us and I bring it into our conversation now since today you answered regarding
Armenia Film fest.

They also would love to have you there as guest of honor, but nonetheless it corresponds to you to answer if you accept the award although your presence is not yet sure.

The complete email is below, please let me know so that we can answer them. They want to cover all the expenses, business ticket, deluxe 5-star hotel room,
tour through Armenia, &c.

All the best,
Arthur


---------- Forwarded message ----------
From: **TIGRAN TSITOGHDZYAN** <tigrants@icloud.com>
Date: Mon, Mar 19, 2018 at 4:34 PM
Subject: Fwd: Invitation to the 15th Golden Apricot International Film Festival
To: Arthur Balder <arthurbalderfiles@gmail.com>


Begin forwarded message:

**From:** <k.avetisyan@sputniknews.com>
**Subject: Invitation to the 15th Golden Apricot International Film Festival**
**Date:** March 17, 2018 at 8:04:50 AM EDT
**To:** <tigran.tsi@gmail.com>

Dear Ms. Sarandon,
Hope this email finds you well .
On behalf of Golden Apricot International Film Festival and Susanna
Harutyunyan, director of the festival,

I have the privilege to invite you as **Guest of Honor** to the 15th edition of our festival, which is scheduled for July 8-15, 2018

It would be great to welcome you among our guests to honor you with the highest award of the festival- Parajanov's Thaler-Lifetime Achievement Award for your contribution into the world cinema.

We would also love to organize a retrospective of your films during the festival.

**The festival administration will gladly cover all the expenses related to your trip and stay in Yerevan.**

**We can assure you of the highest level of reception. We will be happy to provide you with a business class ticket, personal car, translator, a deluxe room in a 5-star hotel, and of course, a tour through Armenia if you like.**

We are open to discuss other conditions of your trip too.

We are truly hoping that you will be able to accept our invitation.

Yerevan and Armenians are looking forward to meeting you very soon.

Attached you can find the official invitation.

We very much look forward to your thoughts and hope to welcome you in Armenia.

Sincerely,

Varvara.

*Varvara Hovhannisyan*

*Head of International Department*

*Golden Apricot Yerevan IFF*

*3 Moskovyan Str., 0001,*

*Yerevan Armenia*

*Tel/Fax +374 10 34 87 87*

*Mob.: + 374 98 200 798*

*WWW.GAIFF.AM*

---

Информация в данном сообщении электронной почты и вложениях к нему предназначена исключительно для персонального и конфиденциального использования назначенными получателями. Использование данного сообщения и вложений к нему во внеслужебных целях не допускается. Если вы не являетесь назначенным получателем, вы не можете читать, использовать, копировать, пересылать или иным образом распространять это сообщение и вложения к нему. Пожалуйста, если Вы получили это сообщение по ошибке, перешлите его назад и удалите все копии сообщения и вложений к нему из вашей системы. Спасибо.

This e-mail and any files sent with it are confidential and intended solely for the use of the named addressee. Use of this e-mail or any attachments for non-work-related purposes is strictly prohibited. If you are not the intended recipient of this e-mail, do not read, use, copy, resend or otherwise distribute the e-mail or any files sent with it. If you received this e-mail by mistake, please notify the sender by e-mail and delete all copies of the e-mail and attachments from your system. Thank you.

--

Bella Jazmin de la Guia
Assistant to Producers
(201) 713-8509
MP News

--

Bella Jazmin de la Guia
Assistant to Producers
(201) 713-8509
MP News



**DVF Films <davincifilms.productionoffice@gmail.com>**

## Fwd: 15th GAIFF Parajanov's Thaler, a Lifetime Achievement Award

**Bryan Gibbs** <sillygooseemail@gmail.com>                              Mon, Apr 16, 2018 at 4:23 PM
To: DVF Films <davincifilms.productionoffice@gmail.com>
Cc: David Shara <davidshara@me.com>, David Shara <davidshara@mac.com>

Hi There,

Susan was thinking about 3.5 feet tall for the prints. Would that work?

**BRYAN GIBBS** | Office of Susan Sarandon

[Quoted text hidden]

**Exhibit C**

Transcription with timestamp of WhatsApp Messages exchanged between plaintiff

and partner David Shara on October 16, 2018

[10/16/18, 16:17:55] AB: Please take a look at the press release draft, I added as address the

one on 5th Ave, that looks better and because BJ is taking care of some phone calls it is her

phone number there.

[10/16/18, 16:22:25] AB: Do you think it is a good idea to bring Florence to Toronto? Just let

me know what you think, because if yes I should start getting ready asap

[10/16/18, 16:32:38] AB: Centre piece on FilmSnobbery.com https://filmsnobbery.com/

american-mirror-with-susan-sarandon-to-world-premiere-at-doc-la/

[10/16/18, 16:38:14] AB: On the banner of the site: https://filmsnobbery.com/

[10/16/18, 20:26:45] AB: image omitted

[10/16/18, 20:27:43] David Shara: U getting excited?

[10/16/18, 21:38:29] AB: I have to keep focused. The more this progresses the more obvious

it becomes that Her Highness Sarandon is 'forcefully' ignoring our movie. This is happening

despite we having made a far better job than any of these flimsy, politically oriented,

squalid video-pamphlets that she 'produces' to makes us all believe she is an activist of

justice. She is not. What stands clearly is that, no matter how good our work might be, no

matter if you made clear the point regarding she being rewarded, she WON'T do anything

basically because she did not get what she wanted --from Tigran. Did Harvey Weinstein

punish actresses because they did not give him what he wanted...? She came into Tigran's

movie, yes, but Tigran didn't go into Susan's movie. And she had her own 'script' already

INDEX NO. 656451/2022

RECEIVED NYSCEF: 05/24/2022

written right at the beginning -- and he rejected it very nicely, very nicely, but he rejected it. The film festivals are twitting her about this movie, some journalists are doing the same --she ignores all. Something quite similar, although without the very personal connotations, can I say about Ashley Hinshaw 'Grace-ful'.

[10/16/18, 21:42:24] David Shara: Agreed on all fronts

[10/16/18, 21:42:47] David Shara: But Ashley isn't more than a model in her bra for 30 seconds

[10/16/18, 21:42:52] David Shara: Susan is star

**Exhibit D**

Transcription with timestamp of WhatsApp Messages exchanged between plaintiff and partner David Shara 2/28/2019, also on 4/15/2019 [pages 2 to 6].

[2/28/19, 02:37:10] David Shara: Please give me a call when you wake up, you need to be careful with Susan. She can ruin you

[2/28/19, 02:37:34] David Shara: I want to call her and try and straighten things out, we do not need her as an enemy and it is not smart the way you were treating her

[2/28/19, 02:51:46] David Shara: You cannot write this stuff, she will make a lawsuit against us and ruin your dream, this set of emails is unacceptable

[2/28/19, 02:52:06] David Shara: I read the emails, that is not ok

[2/28/19, 09:20:51] David Shara: Missed voice call

[2/28/19, 09:21:15] David Shara: I'm going to sleep, I'm flying tomorrow

[2/28/19, 09:21:40] David Shara: You need to write the nicest, most sincere apology in the world [

2/28/19, 09:21:49] David Shara: What you wrote is terrible [2/28/19, 12:00:24] AB: I have been treating her the 'smart' way for years, and the result has been that we have nothing, not even a well deserved respect. She's been doing all she can passively to curtail our possibilities of success. Only things have been going in an unexpected direction, despite what she expected after 'leaving all in the lurch'.

Case 1:22-cv-06401-JLR-SN Document 1-1 Filed 07/27/22 Page 93 of 102

What I wrote is the truth. She has been humiliating our work for years, and the last thing is to spite on the Parajanov Vartanov Prize. We've been treating her with silken gloves, all what for? To be slapped with a bunch of overacted statements the day I step in and ask WHAT'S GOING ON? How is it that she send to me such a disgraceful note. Why? It is very clear why. Very unfair. I sent the entire documentation and the entire emails exchange as it is. Too long for Wahtsup, you have now the emails. You should read them to get a chronological picture of the facts regarding this conversation.

There were no other WhatsApp messages exchanged until April. Transcription of 4/15/2019:

[4/15/19, 12:12:32] David Shara: Unfortunately we are not able to continue our relationship [4/15/19, 12:12:54] David Shara: The way you write to Susan and Tigran is unacceptable [4/15/19, 12:15:33] David Shara: I cannot work with you anymore

[4/15/19, 12:16:04] David Shara: The other projects can never be exposed to the angry hateful words you spew at people

[4/15/19, 12:16:12] David Shara: It is unacceptable

[4/15/19, 12:41:17] AB: We will have to talk.

[4/15/19, 12:41:33] David Shara: Speak to my mother

[4/15/19, 12:41:41] David Shara: I am too upset to talk

Case 1:22-cv-06401-JLR-SN Document 1-1 Filed 07/27/22 Page 94 of 102

[4/15/19, 12:41:57] David Shara: You are too much for me

[4/15/19, 12:42:15] AB: So do I am, but we have to face the facts.

[4/15/19, 12:42:17] David Shara: I cannot do any other work together

[4/15/19, 12:42:38] David Shara: I'm finished with this project and the others

[4/15/19, 12:42:48] David Shara: Cancel the film festivals

[4/15/19, 12:42:55] David Shara: I do not care about them

[4/15/19, 12:42:59] David Shara: It's not ok

[4/15/19, 12:43:34] AB: I cannot read the mind of people. You should have speak also sooner, if your ideas had changed, because in January you said other things.

[4/15/19, 12:43:49] AB: What is not OK?

[4/15/19, 12:44:01] David Shara: And you wrote terrible things without asking me

[4/15/19, 12:44:11] David Shara: Speak to my mother

[4/15/19, 12:44:35] AB: Why should I ask you about something that is connected with the way others were treating my work of 4 yours?

[4/15/19, 12:44:41] David Shara: The email u wrote to Susan and the way u treat Tigran is unacceptable

[4/15/19, 12:45:06] David Shara: Call honey

[4/15/19, 12:47:46] AB: The way I treat Tigran, no idea what's that. I was making a film about a painter, and the painter doesn't want to be shown painting an artwork. That's practically

sabotage. Then we have to press him to help with launching of the film festival circuit. Then we have to avoid the 'real part' of his life, he dealing with his condition

of the mediterranean fever, etc every month, or at least that he says. I have to get a good film while this capricious attitude contribute to limit all possibilities of getting what the audience expect: show the artist in his entirety. Practically sabotage, and despite that I got what I got.

[4/15/19, 12:50:02] AB: Regarding Susan: unacceptable that she treats a film this way after even getting a recognition thanks to my work. It is unacceptable, the things I wrote are perfectly and fully appropriate, and I made myself responsible of them. We were one day after that exchange of opinions as we had been three months before, six months before, or one year before.

[4/15/19, 12:55:27] AB: By the way: new projects. The Nazi propaganda project is about self-respect, and how to deprive people of it, and all you say and do now is just designed to undermine my professional possibilities just because I had self-respect. This is absolutely outrageous.

[4/15/19, 12:56:11] David Shara: Sorry, not interested

[4/15/19, 12:56:24] David Shara: You cannot write that shit to Susan

[4/15/19, 12:56:28] David Shara: How dare u

[4/15/19, 12:56:41] David Shara: You embarrassed yourself and all of us

[4/15/19, 12:56:48] David Shara: Beyond reproach

[4/15/19, 12:57:24] AB: I do believe professional standards are universal, and a celebrity doesn't have the right to go to these lengths as she went.

[4/15/19, 12:58:18] AB: Humans beings deserve respect, and also their work, and she manifestly showed the polar opposite.

Case 1:22-cv-06401-JLR-SN Document 1-1 Filed 07/27/22 Page 96 of 102

[4/15/19, 12:58:38] David Shara: U can never take it back

[4/15/19, 12:58:54] AB: Take what? I want to understand it...

[4/15/19, 12:59:22] AB: "It", the film is already done.

[4/15/19, 12:59:19] David Shara: She never signed up for any of that, you were lucky enough to get her to sit for you and be filmed, but she did not want anything to do with the project. In your head you made it that she was a part of this project, but she is a busy and famous woman and you twisted it around

[4/15/19, 12:59:35] David Shara: Speak to my mom, I'm done

[4/15/19, 12:59:54] AB: "in my head", no, in the emails.

[4/15/19, 13:01:04] AB: She not only showed up knowing the camera was meant to be used, also knew the final result, consented to the use of her image, considered for 3 months going to Armenia's Yerevan film festival, and a long etc.

[4/15/19, 13:01:17] AB: She is just a hypocrite.

[4/15/19, 13:04:31] AB: Then tell me: Why then than 'busy and famous woman', as you mainly describe her, came to the shooting of a film, knowing the camera, setting, etc, if not to be part of it?

[4/15/19, 13:04:58] AB: That's what I asked, simply, asked her. Can you answer that...? [4/15/19, 13:05:18] AB: Of course you can. [4/15/19, 13:07:08] AB: You are the [executive] producer of this film, and it is with you with whom now I will have to talk, not with your mom, with all due respect to her of course.

[4/15/19, 13:11:16] David Shara: You told her she only wanted to fuck him and then when she was rejected it all changed

Case 1:22-cv-06401-JLR-SN   Document 1-1   Filed 07/27/22   Page 97 of 102

[4/15/19, 13:11:26] David Shara: That's insane and mean

[4/15/19, 13:11:32] David Shara: It's terrible

[4/15/19, 13:11:40] David Shara: Not ok

[4/15/19, 13:11:51] David Shara: You're right about many things

[4/15/19, 13:11:45] AB: I did not say that, ever.

[4/15/19, 13:11:57] David Shara: But not ok

[4/15/19, 13:11:58] AB: Read my email. I asked her what for she came.

[4/15/19, 13:12:04] David Shara: Yes you did

[4/15/19, 13:13:55] AB: With all due respect, David, I demanded an answer from her after telling me 'she has nothing positive to say about my project', yes she did something, and also after saying I needed all possible publicity --not true, we did well without any publicity from her. On the contrary, YOU KNOW she was pretending the film does not exist, looking somewhere else all the time. Then I requested some respect at least for the award she got thanks to US.

[4/15/19, 13:14:52] AB: I did not affirm what for she came, I asked her, and that's an enormous difference.

[4/15/19, 13:15:01] AB: You deleted this message.

[4/15/19, 13:18:03] AB: With at this point almost 20 nominations, close to 15 film festivals, and 7 wins at medium size festivals, she had something positive to say if she were one tenth of the 'socialist' she pretends to be.

**Exhibit E**

Set of SMS exchanged between former plaintiff's counsel, Nathan Addudell, and

Brian Gibbs, the defendant's assistant, February 23, 2022. Brian Gibbs writes from

the defendant's office number 212 675-4285, which can be found also on one of the

emails sent by Brian Gibbs on **Exhibit B** as the phone number and email of choice

for any contacts for the defendant's office.

Case 1:22-cv-06401-JLR-SN    Document 1-1    Filed 07/27/22    Page 99 of 1



+1 (212) 675-4285 ›

Text Message
Wed, Feb 23, 10:35 AM

hey nathan, it's bryan from sarandon's. she had a talk with tigran and might be willing to consider singing the release over to tigran and david.

That's wonderful news, Bryan. Thank you very much for the update.

Do you or Susan have a preference for the best way to move forward?

If not, I would be happy to relay this message to Tigran and David, so that they could reach out to Susan directly.

Thank you again.

i think you/arthur need to get with tigran and david and figure it out. whenever you all agree, feel free to reach back out. but we'll only consider if tigran and david approve.

Text Message

**Exhibit F**

Email sent to former plaintiff's counsel, Nathan Aduddell, by David Shara's counsel on March 1, 2022, stating: "Susan wants nothing to do with your client - to say she hates him is an understatement"

INDEX NO. 656451/2022
RECEIVED NYSCEF: 05/24/2022

Case 1:22-cv-06401-JLR-SN   Document 1-1   Filed 07/27/22   Page 101 of 102

**From:** David Fritz <dfritz@boyarskifritz.com>
**Sent:** Tuesday, March 1, 2022 9:04 PM
**To:** Carl Bedell <carl@carlbedell.com>
**Cc:** Aduddell, Nathan <nathan.aduddell@whitecase.com>; Hammond, Andrew <ahammond@whitecase.com>
**Subject:** Re: American Mirror

Hey Nathan - Carl is being kind here - as discussed numerous times with you by phone, Susan wants nothing to do with your client - to say she hates him is an understatement after he abused her by email and by phone.

We need to discuss logistics before we obtain her release - I suggest that we do a call with Andrew joining us.

I have a crazy week so let's set a time on Monday or Tuesday next week.

let me know - thanks, David

_____

**David Fritz**
Partner

[BF] Boyarski Fritz LLP
Attorneys At Law

NEW YORK | LOS ANGELES

Office: 212-920-4925 x102
Mobile: 917-930-0100
dfritz@boyarskifritz.com
www.boyarskifritz.com

This email is confidential and may contain privileged information.  If you are not the intended recipient, please delete this email and notify us immediately.  Any unauthorized use, distribution, alteration or disclosure is prohibited and may be unlawful.