UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

_____
Write the full name of each plaintiff.


-against-


_____

_____

_____

_____
Write the full name of each defendant. If you need more space, please write "see attached" in the space above and attach an additional sheet of paper with the full list of names. The names listed above must be identical to those contained in Section II.

_____CV_____
(Include case number if one has been assigned)

**COMPLAINT**

Do you want a jury trial?
☐ Yes    ☐ No

---

**NOTICE**

The public can access electronic court files. For privacy and security reasons, papers filed with the court should therefore *not* contain: an individual's full social security number or full birth date; the full name of a person known to be a minor; or a complete financial account number. A filing may include *only*: the last four digits of a social security number; the year of an individual's birth; a minor's initials; and the last four digits of a financial account number. See Federal Rule of Civil Procedure 5.2.

---

Rev. 1/9/17

## I.   BASIS FOR JURISDICTION

Federal courts are courts of limited jurisdiction (limited power). Generally, only two types of cases can be heard in federal court: cases involving a federal question and cases involving diversity of citizenship of the parties. Under 28 U.S.C. § 1331, a case arising under the United States Constitution or federal laws or treaties is a federal question case. Under 28 U.S.C. § 1332, a case in which a citizen of one State sues a citizen of another State or nation, and the amount in controversy is more than $75,000, is a diversity case. In a diversity case, no defendant may be a citizen of the same State as any plaintiff.

What is the basis for federal-court jurisdiction in your case?

☐   **Federal Question**

☐   **Diversity of Citizenship**

### A.   If you checked Federal Question

Which of your federal constitutional or federal statutory rights have been violated?

_____

_____

_____

_____

### B.   If you checked Diversity of Citizenship

#### 1.   Citizenship of the parties

Of what State is each party a citizen?

The plaintiff , _____, is a citizen of the State of
            (Plaintiff's name)

_____
(State in which the person resides and intends to remain.)

or, if not lawfully admitted for permanent residence in the United States, a citizen or subject of the foreign state of

_____ .

If more than one plaintiff is named in the complaint, attach additional pages providing information for each additional plaintiff.

If the defendant is an individual:

The defendant, _____, is a citizen of the State of
                    (Defendant's name)

_____

or, if not lawfully admitted for permanent residence in the United States, a citizen or
subject of the foreign state of

_____.

If the defendant is a corporation:

The defendant, _____, is incorporated under the laws of

the State of _____

and has its principal place of business in the State of _____

or is incorporated under the laws of (foreign state) _____

and has its principal place of business in _____.

If more than one defendant is named in the complaint, attach additional pages providing
information for each additional defendant.

## II. PARTIES

### A. Plaintiff Information

Provide the following information for each plaintiff named in the complaint. Attach additional
pages if needed.

_____

First Name                    Middle Initial          Last Name

_____

Street Address

_____

County, City                          State                    Zip Code

_____

Telephone Number                      Email Address (if available)

**B.  Defendant Information**

To the best of your ability, provide addresses where each defendant may be served. If the correct information is not provided, it could delay or prevent service of the complaint on the defendant. Make sure that the defendants listed below are the same as those listed in the caption. Attach additional pages if needed.

Defendant 1: _____

First Name                          Last Name

_____

Current Job Title (or other identifying information)

_____

Current Work Address (or other address where defendant may be served)

_____

County, City                          State                  Zip Code

Defendant 2: _____

First Name                          Last Name

_____

Current Job Title (or other identifying information)

_____

Current Work Address (or other address where defendant may be served)

_____

County, City                          State                  Zip Code

Defendant 3: _____

First Name                          Last Name

_____

Current Job Title (or other identifying information)

_____

Current Work Address (or other address where defendant may be served)

_____

County, City                          State                  Zip Code

Defendant 4:

_____

First Name                          Last Name

_____

Current Job Title (or other identifying information)

_____

Current Work Address (or other address where defendant may be served)

_____

County, City                        State                Zip Code

## III. STATEMENT OF CLAIM

Place(s) of occurrence: _____

Date(s) of occurrence: _____

**FACTS:**

State here briefly the FACTS that support your case. Describe what happened, how you were harmed, and what each defendant personally did or failed to do that harmed you. Attach additional pages if needed.

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

**INJURIES:**

If you were injured as a result of these actions, describe your injuries and what medical treatment, if any, you required and received.

_____

_____

_____

_____

**IV. RELIEF**

State briefly what money damages or other relief you want the court to order.

_____

_____

_____

_____

_____

## V.  PLAINTIFF'S CERTIFICATION AND WARNINGS

By signing below, I certify to the best of my knowledge, information, and belief that: (1) the complaint is not being presented for an improper purpose (such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation); (2) the claims are supported by existing law or by a nonfrivolous argument to change existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Federal Rule of Civil Procedure 11.

I agree to notify the Clerk's Office in writing of any changes to my mailing address. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Each Plaintiff must sign and date the complaint. Attach additional pages if necessary. If seeking to proceed without prepayment of fees, each plaintiff must also submit an IFP application.

| | |
|---|---|
| Dated | Plaintiff's Signature |

| | | |
|---|---|---|
| First Name | Middle Initial | Last Name |

Street Address

| | | |
|---|---|---|
| County, City | State | Zip Code |

| | |
|---|---|
| Telephone Number | Email Address (if available) |

I have read the Pro Se (Nonprisoner) Consent to Receive Documents Electronically:
☐ Yes    ☐ No

If you do consent to receive documents electronically, submit the completed form with your complaint. If you do not consent, please do not attach the form.

## CONSENT TO ELECTRONIC SERVICE

I hereby consent to receive electronic service of notices and documents in my case(s) listed below. I affirm that:

1. I have regular access to my e-mail account and to the internet and will check regularly for Notices of Electronic Filing;

2. I have established a PACER account;

3. I understand that electronic service is service under Rule 5 of the Federal Rules of Civil Procedure and Rule 5.2 of the Local Civil Rules, and that I will no longer receive paper copies of case filings, including motions, decisions, orders, and other documents;

4. I will promptly notify the Court if there is any change in my personal data, such as name, address, or e-mail address, or if I wish to cancel this consent to electronic service;

5. I understand that I must regularly review the docket sheet of my case so that I do not miss a filing; and

6. I understand that this consent applies only to the cases listed below and that if I file additional cases in which I would like to receive electronic service of notices of documents, I must file consent forms for those cases.

**Civil case(s) filed in the Southern District of New York:**

**Note:** This consent will apply to all cases that you have filed in this court, so please list all of your pending and terminated cases. For each case, include the case name and docket number (for example, John Doe v. New City, 10-CV-01234).

_____

_____

_____
Name (Last, First, MI)

_____
Address          City          State          Zip Code

_____
Telephone Number          E-mail Address

_____
Date

Signature

**/S/ARTHUR BALDER**

**Return completed form to:**

Pro Se Intake Unit (Room 200)
500 Pearl Street
New York, NY 10007

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

                                  x

ARTHUR BALDER,

           Plaintiff,                  Case No. **22-cv-6401**

  — against —                **SECOND AMENDED**
                                      **COMPLAINT**

SUSAN SARANDON,
DAVID SHARA,
HONEY SHARA,                  Do you want a Jury Trial?
TIGRAN TSITOGHDZYAN

                                          **YES**

           Defendants.

_____  x

Pursuant to FRCP 19(1)(A) and (B), Plaintiff Arthur Balder ("Plaintiff"), as and for its **Second Amended Complaint** ("Complaint") against Defendants Susan Sarandon, David Shara, Honey Shara, and Tigran Tsitoghdzyan. Pursuant to FRCP 15(C)(1)(b), this Second Amended Complaint relates back to the Amended Complaint of August 4, 2022. The Plaintiff respectfully shows and alleges as follows:

## I.   PARTIES

1.     Plaintiff Arthur Balder is a filmmaker and producer organized under the laws of the State of New Jersey, with its principal place of business located at 2813 Palisade Ave, Union City, New Jersey, 07087. He is a resident of New Jersey.

2.      Susan Sarandon is an actress and producer, resident of New York, and doing business in the State of New York with a place of residence and business at 147 W 15th St, Suite 108 NYC, 10011.

3.      David Shara is a dealer, investor and collector of color diamonds, art dealer representing artist Tigran Tsitoghdzyan, and executive producer, resident of New York, and doing business in the State of New York with a place of business at 589 Fifth Avenue, Suite 1008, New York, NY, 10017.

4.      Honey Shara is a dealer, investor and collector of color diamonds and art dealer representing artist Tigran Tsitoghdzyan, resident of New York, and doing business in the State of New York with a place of business at 589 Fifth Avenue, Suite 1008, New York, NY, 10017.

5.      Tigran Tsitoghdzyan is a painter and Photoshop artist, resident of New York, and doing business in the State of New York with a place of residence and business at 15 Broad Street Apt 1030, New York, NY, 10005.

## II.    JURISDICTION AND VENUE

3.      This Court has original jurisdiction of the action based on diversity of citizenship pursuant to 28 U.S.C. §1332(a) and 28 U.S.C. §1441, as the amount in controversy exceeds $75,000.00, and Plaintiff resides in New Jersey, while Defendants reside in New York, and all actions took place in New York City, Manhattan, between 2016 and 2022,

and New York is the place of residence and place of business of all defendants. The action has been therefore removed on July 27, 2022, to this Court pursuant to 28 U.S.C. §1441(a) as this Court has original jurisdiction over these claims.

4.    Jurisdiction and venue are proper in New York County because all defendants are located in New York, and because the parties' dispute arises out of actions that took place entirely in New York County between 2016 and 2022. Otherwise, being the plaintiff a resident of Hudson County, New Jersey, if any defendants were no more located in New York County, CPLR § 503(a) establishes that "the place of trial shall be" "if none of the parties then resided in the state, in any county designated by the plaintiff."

### III.  <u>STATEMENT OF CLAIM</u>

1.  Place of occurrence: New York State.

2.  Dates of Occurrence: Since 2016 until now.

3.  By refusing to comply with their contractual obligations, all Defendants, in a coordinated effort, have tortiously interfered since 2019 with the Plaintiff's business expectancies and his contract, by intentionally obstructing since January 2020 the distribution of the film "American Mirror: Intimations of Immortality" (from now on "American Mirror", or "the Film"), directed and produced by the Plaintiff, to injure the Plaintiff's professional reputation in the eyes of the public and the film industry, to

deprive him of his rights under the Producers' Agreement (See Exhibit 1, Producers' Agreement), also by obstructing, without justification, a previously budgeted, approved of and scheduled for beginning 2020 Oscar-qualifying theatrical release in the United States, all in an attempt to coerce the Plaintiff into giving up his rights and handing control of the film over to Honey and David Shara, in the wake of the film's astounding critical reception. Sarandon and Tsitoghdzyan, by their tortious interference with the Plaintiff's business expectancies, have obtained cancellation of two other documentary projects that were in development by end 2018. Tsitoghdzyan and David Shara made fraudulent representations regarding the actual value of a painting by Tsitoghdzyan that was the upfront compensation for the Plaintiff's work as director and producer according to the contract. It is stipulated on it that the painting should have been given to the Plaintiff no later than the end of May 2017, but in fact was given to him by the end of February 2019, almost two years later than agreed on, and it was of poor quality and unfinished in spite of the unjustifiable delay. In September of 2020 the Plaintiff discovered that the public auction records of Tsitoghdzyan's artworks of 2014 and 2015 at Phillips Auctioneers LLC, New York, were a fraud orchestrated by Tsitoghdzyan and David Shara for their own profit.

4. The Plaintiff brings this action to enjoin the defendants from further breaches and interferences, to compel them to fulfill their legal

obligations, and to determine the extent of the damages and harm their actions have caused to the Plaintiff.

## IV.  **BY DEFENDANTS**

5.  Defendant Susan Sarandon has been tortiously interfering with the contract Producers' Agreement, signed by the Plaintiff and David Shara, the Executive Producer. She requested from David Shara, under threats of litigation from Sarandon to David Shara in David Shara's own written words, that the film be "cancelled" from the festival circuit from February 2019, with the sole purpose of professionally harming the Plaintiff. She refused to provide the signed talent release necessary for public release and distribution, which she promised to the Plaintiff since 2016; she refused to send it in 2019, which caused the permanent cancellation of the Film's public release as scheduled in 2020, and she further refused in 2020, and 2022, always in coordination with David Shara's attempt since 2020 to coerce the Plaintiff out of his rights under the Producers' Agreement. She has been tortiously interfering with other business expectations of the Plaintiff, since February 2019: she requested from David Shara that he cancel all other projects in the making at that date in collaboration with the Plaintiff. As a consequence of her actions, the Plaintiff was informed that two new projects, which had been in development since November 2018, should be cancelled. The funding of the project was being organized by David Shara, and he

clearly explained the Plaintiff should lose the project because of Susan Sarandon's interference. Sarandon promised directly to the Plaintiff in 2016, when she decided to participate in the Film and was filmed, to provide any documents the Plaintiff may need in the future. The Plaintiff requested those written permissions to guarantee the film distribution directly in 2019, 2020, and later in 2022. She never sent the signed documents. She approved of the usage of her image in the Film, she confirmed on emails to have seen the film online in 2017 and 2018, and she accepted a business proposal sent by David Shara in his and the Plaintiff's name in 2018. She accepted a way to be compensated for the filming of 2016, and chose her own terms in writing, and she agreed on profits from the distribution. She even suggested herself the Film "go to festivals", in her own words, as a first step for distribution in 2018-2019, before public release. But, in coordination with David Shara and the other Defendants and against her own promises, she refused to allow the Film's distribution out of malice.

6. Defendant David Shara, a dealer of color diamonds valued in the multimillion dollar range, signed a contract, the Producers' Agreement, on April 4, 2017, with the Plaintiff, Director and Producer, to serve as Executive Producer of the Film in expectation of its public release, to promote the image and artworks of an artist he represented as an art dealer, Tigran Tsitoghdzyan ("Tsitoghdzyan"), to make him better known and to increase the appreciation of the artist's artworks in the market. The Plaintiff

obtained and shared with David Shara all the talent releases for distribution signed by all the participants in the Film that had been invited by the Plaintiff (among others, Donald Kuspit, one of the most important living art critics). David Shara agreed on doing the same as related to the participants he had invited. He promised to obtain the talent release signed by Tsitoghdzyan, the subject of the Film, to use his image, the images of his artworks displayed, and the image of Tsitoghdzyan's son, which was included in the film because Tsitoghdzyan so it willed in order to grant that prospective publicity opportunity to his son. David Shara also invited other people, but although he promised he had obtained their signed talent releases, it was later in 2020 found out, because so he stated it, that he had never obtained them. This was not due to negligence: in 2020, David Shara stated that, although he had never obtained any of the talent releases necessary for commercial distribution, he could get all them related to the people he had invited to be part of the Film "expeditiously", of course including those depending on Sarandon and Tsitoghdzyan, but only if the Plaintiff agreed to sign a new contract in which he renounced to part of his rights. David Shara wanted to change the contract by coercion once the Film had been universally acclaimed in the festival circuit in 2019, and he did it in direct, plain coordination with Tsitoghdzyan and Sarandon. As a consequence of the Defendants coordinated actions, the Plaintiff has been harmed since the beginning of 2020, professionally and financially.

7.   Defendant Tsitoghdzyan agreed on being part of this Film, which was to be based on his paintings and the way he makes them. He promised repeatedly to the Plaintiff to provide any permissions that would be necessary as early as 2016 to guarantee the Film's distribution. He never provided them, in spite of the Plaintiff requesting them in 2017, 2018, 2019, 2020 and 2022. He was so pleased with the result, that he suggested that his son, a minor, be part of a sequence. The Plaintiff added this extra sequence in 2017. The Plaintiff requested the permissions signed by the father and mother of the minor in 2017, 2018, 2019, 2020, and in 2022. Tsitoghdzyan never sent those permits. Tsitoghdzyan requested a copy of the Film by the end of August 2019, with no right whatsoever to have any copy, in order to enrich himself by being able to show it privately to collectors, selected audiences and influential art dealers, under the excuse that he wanted to show it to his "parents". The Plaintiff, however, shared the Film multiple times with Tigran specifically to show it to his parents in 2018. Tsitoghdzyan's demand, placed urgently weeks before a grand opening of his artworks in an art gallery in Yerevan, Armenia, his homeland, was a clear indication of his interest of having a copy of the Film for his personal enrichment by showing it to his selected audiences. It was clear that Tsitoghdzyan wanted a copy of the final form of the Film for his own improper enrichment in the ways described before, and it was a tortious interference with the contract regulating the distribution of the Film and the

rights of the Plaintiff. The Plaintiff resisted this effort, but Tsitoghdzyan was coordinated with Honey Shara, David Shara's partner, who also stopped paying due invoices by that time to force the Plaintiff into doing things that were clearly wrong and against the contract. Honey Shara insisted, right at the same time Tsitoghdzyan was, by his counsel, wrongly requesting "formally" a copy of the Film, that the Plaintiff should give a copy to Tsitoghdzyan for his own promotional uses, which was contrary to the purpose of making the Film. That happened simply because Honey Shara and David Shara have a share in Tsitoghdzyan's artworks sales, and they did it against the best interests in the Film's distribution, and without the Plaintiff's consent.

8.   Defendant Honey Shara is a partner of David Shara, and a partner of Optimum Diamonds LLC, the company by which the Sharas were providing funds for the Film's production. Honey Shara tortiously interfered with the contract since 2019. She coerced the Plaintiff into giving a copy of the Film to Tsitoghdzyan in August 2019 for Tsitoghdzyan's own improper enrichment by not paying pending invoices due to the Plaintiff. In 2019, she stopped paying pending invoices with the sole intention to forcefully "cancel" the Film's run through the festival circuit that had been already budgeted and approved of in 2018, with the sole intention to harm the Film and the Plaintiff professionally and financially. In 2019 Honey Shara requested confidential information of Da Vinci Films LLC, the Plaintiff's company, tax

returns to partners, without any right to do so. The Plaintiff, having nothing to hide, shared this information simply because he felt coerced to do so since Honey Shara had put it very clearly that, if he were not to comply, she would not pay any pending invoices. Honey Shara coerced the Plaintiff in 2019 to present written apologies to Tsitoghdzyan if the Plaintiff wanted to get the pending invoices paid, simply because the Plaintiff had expressed his dissatisfaction as regards to the painting that was to be his upfront compensation according to the terms of the Contract Producers' Agreement. The painting, painted by Tsitoghdzyan, came to the Plaintiff almost two years later than stipulated in the Producers' Agreement, since it had to be finished according to the Producers' Agreement by May 2017, and on top of that it was of poor quality. The Plaintiff manifested those points, and as a consequence of that Honey Shara tried to coerce him into sending "written apologies" if he wanted to get invoices paid. Honey Shara, in coordination with all other defendants, was trying to coerce the Plaintiff out of his own rights to privately held opinions, threatening him with adverse professional consequences if he did not comply. In 2020, when the Film's distribution should have started, Honey Shara, in coordination with all other Defendants, attempted to coerce the Plaintiff out of the contract again, under threats of ruining definitively the Film's distribution. She joined David Shara's efforts to seize control of the Film's distribution through coercion. In fact, Honey Shara threatened the Plaintiff that if he did not hand over control of the

Film, the Plaintiff would never receive profits from the Film and would jeopardize his professional reputation and success and that of his company.

9.   Far from good faith, the Sharas' actions are an obvious attempt to seize control of a universally acclaimed Film, with the plain collaboration of the key talent, Tsitoghdzyan and Sarandon, denying to the Plaintiff what they had all promised in material breach of contract. They materialized this threat by depriving the Film of due distribution for now almost three years, shattering the budgeted, scheduled, agreed upon since 2018 Oscar-qualifying Theatrical release in the USA.


**V.    FACTS IN CHRONOLOGICAL ORDER**


1.   In 2016, David Shara and the Plaintiff agreed on making a documentary Film, based on painter and Photoshop artist Tsitoghdzyan, with the consent of collaboration of Tsitoghdzyan, who encouraged and recommended it. It was agreed on that Tsitoghdzyan would provide any written permissions that would be necessary in the future, that the Film would be distributed commercially after an initial film festival run, that the Film should be finished by mid-2017, and that the David Shara would provide the necessary funds only after the Plaintiff presented budgets and the parties approved them. David Shara and the Plaintiff also agreed that the upfront compensation would be a painting made by Tsitoghdzyan in the

style of the series "mirrors", which until then had always been portraits of faces of women. David Shara and the Plaintiff left other details open for the signing of a contract memorializing all aspects of Distribution. The Plaintiff accepted this form of upfront compensation only because Tsitoghdzyan and David Shara made representations to the Plaintiff of the enormous value of Tsitoghdzyan's artworks, mainly based on the auctions results at Phillips Auctioneers LLC, NYC, in 2014 and 2015, which were very high.

2.  Principal photography started and David Shara, always pretending to be very busy with the multimillion dollar dealing of color diamonds, delayed the date to discuss the form of a contract to be signed by both parties, which the Plaintiff insisted on because in his industry this is very normal and necessary.

3.  The Plaintiff invited some people to participate in the Film, among others Donald Kuspit, one of the most important living art critics in the world. Tsitoghdzyan and David Shara manifested their great satisfaction with it. The Plaintiff obtained talent releases necessary for Film distribution from the people he invited. David Shara promised to obtain the signed talent release of the people they were inviting, but never provided them to the Plaintiff. Tsitoghdzyan also promised to sign the talent release at a later date, but never provided it until July 26, 2022, when it was last requested in writing.

4.  Around March 2016, Sarandon was invited to participate in the

Film. In an email, the Plaintiff explained to her the kind of camera and lens (the best zoom lens extant at that time in the world) that was going to be used and the high expectations he had regarding the quality of her filming. Sarandon accepted the invitation and selected a date in June 2016. She came to the filming on the date agreed upon. The filming was directed by the Plaintiff, following customary proceedings. During the filming, Tsitoghdzyan presented a number of questions to Sarandon that the Plaintiff had prepared and sent the night before the filming to Tsitoghdzyan, in order to provide the Film with the kind of topics the Plaintiff as a director deemed the right ones. Sarandon, on the day of the filming, promised to the Plaintiff to provide any signed paperwork necessary for the Film's distribution at a later date upon his request.

5. Sharing some samples of the filming, Tsitoghdzyan and David Shara congratulated the Plaintiff on the enormous quality of the filming in general, and in particular of Sarandon's filming.

6. Tsitoghdzyan promised to the Plaintiff that he would paint a portrait in the style of the "mirrors" series, of 100 x 75 inches, and that the woman to be portrayed would be the Plaintiff's wife instead of any model of his choice. The Plaintiff agreed on it.

7. The conversation about the contract was again postponed in July 2016, and the Plaintiff felt uneasy when in September nobody addressed this open question that for him was very important. In October 2016 the Plaintiff

prepared two contract proposals for David Shara and for Tsitoghdzyan, just to start the conversation on the matter, but their reaction was surprisingly aggressive and dismissive. Tsitoghdzyan did not want any contract to exist. David Shara described the Plaintiff's intentions to formalize a contract as "garbage", although his work was "wonderful". The Plaintiff had presented a brief contract that summarized the guarantees necessary in his industry as regards to the profit sharing, but Tsitoghdzyan and David Shara wanted to "fire" the Plaintiff, and stated that they wanted him to disappear from it.

8.   In November 2016 Tsitoghdzyan insulted and abused in writing the Plaintiff on emails shared with David Shara. David Shara said that "all was finished". The Plaintiff understood that the tactics of avoiding the signature of a contract had been simply there the entire time to get control over the project, especially once Sarandon became part of it and once the Plaintiff had obtained great quality footage, and the possibilities of success and high revenue in distribution looked much higher. With the Plaintiff's departure, Tsitoghdzyan wanted to get artistic control over the rest of the project to further aggrandize his persona, and David Shara wanted simply to get control of the project in his own monetary self-interest, all by getting rid of the Plaintiff, who had already produced and directed principal photography, and who, in their solipsistic view of filmmaking, was no longer necessary, but "expendable".

9.   David Shara coerced the Plaintiff to accept disadvantageous terms

in the negotiation by threatening the Plaintiff that, if he did not agree on certain terms, he would "scrap the project".  Tsitoghdzyan had promised a painting of much bigger dimensions, 100 x 75 inches, but now that it was time to formalize the agreement, they wanted to scrap the promise and deprive the Plaintiff of the promised upfront compensation. David Shara made representations of fact as regards to the value of Tsitoghdzyan's paintings as follows, stating that the work of the Plaintiff was not worth it: e.g., Email from D. Shara to A. Balder dated October 25, 2016 (representing that he had sold Tsitoghdzyan's paintings "for up to 200,000"); Email from D. Shara to A. Balder dated November 29, 2016 (stating that Tsitoghdzyan's "mirror paintings cost 150-250,000 dollars").  Tsitoghdzyan himself wrote that they were "200k paintings". The Plaintiff believed in their representations, which were based upon the auction results of Phillips Auctioneers LLC, NYC, of the sales of Tsitoghdzyan's paintings in 2014 and 2015.  Phillips' appraisals and auction results were and are online to date. They show that the paintings were appraised at $30,000-40,000, and were sold as follows: Lot 217, September 17 2022, at $100,000 in 2015, Lot 2022, 16 September, $72,500. Both paintings were measured approximately 75 x 50 inches.

10. The Plaintiff's only way to get a contract signed was by accepting being coerced to renounce to the promised measurements of 100 x 75 inches for the painting and downsize to 75 x 50 inches, under the promises and

representations by David Shara that the value of the painting would be much higher in just a few years. David Shara also insisted the Plaintiff prepare a contract that summarized "briefly" the points agreed upon, stating clearly that it should be shorter "than the other" (the one the Plaintiff had proposed at the beginning). David Shara specifically insisted the contract be "brief", which was not good for a film industry contract, since it must cover in detail a variety of topics and details. The Plaintiff had no other option than to accept these proceedings and terms, in order to continue and finish his project because he knew he had already made a very good work with principal photography.

11. In 2016, 2017, and 2018 Tsitoghdzyan and David Shara proposed to and discussed with the Plaintiff, approved of and encouraged the propagation of press releases that were prepared by the Plaintiff and his associates in order to make as widely known as possible that the Film was in the making in 2016 and 2017, and that the Film had already been made in 2018 and 2019. These press releases contained explicit announcements informing the public that the Film would be distributed at a later date. This happened with the approval of the defendants, and based on their representations that the Film was made for a distribution as wide as possible. The press releases were sent and spread massively to the Latin American media, sectors of the European media, and the defendants insisted on sending press releases particularly targeting: the Armenian media, the

Armenian-American media, because Tsitoghdzyan is Armenian, and the art world, because of the nature of their business. They requested this to better promote the image and persona of Tsitoghdzyan, seeking influence in his home country, Armenia, and his community, the Armenian Americans, and his artworks and their sales. Both defendants acknowledged the making of the Film was opening many doors to Tsitoghdzyan and his artworks, increasing the sales of his artworks, and having an overall positive effect.

12. Those press releases announced explicitly that the production company was Da Vinci Films LLC, the business of the Plaintiff, in collaboration with Optimum Diamonds LLC, the company of David Shara, and that the Plaintiff was the director and producer of the Film. The press releases were put in massive circulation via cable news such as Notimex, the state news agency of Mexico, which serves news throughout great swathes of Latin America due to its influence, or Europa Press, a Spanish private cable news, or Armenpress, a major news agency of Armenia and Armenian speaking media influencing the Armenian diaspora around the world. The press releases represented the extent of the belief the Plaintiff put in the clear representations made by Tsitoghdzyan and David Shara regarding the distribution of the Film in its scheduled time. The Plaintiff was encouraged and persuaded to make them, and congratulated for putting them into circulation. Tsitoghdzyan, who was in contact with Sarandon, even put in writing very clearly that Sarandon "would like it also".

13. In 2017 and 2018, the relationship between the Plaintiff and David Shara was much better, perhaps because the work of the Plaintiff was showing great progress, turning the extant footage into a Film that was very promising in the eyes of everybody involved. David Shara expressed his satisfaction with the Plaintiff's work and the Plaintiff's budget results in terms of production on multiple occasions: Email from D. Shara to A. Balder dated April 15, 2016 ("Good work guys, keep it up!"); Email from D. Shara to A. Balder dated October 31, 2016 ("I wanted you to have it along with the percentage of profit. You deserve it. The movie is a wonderful achievement."); Email from D. Shara to A. Balder dated October 16, 2017 ("This is FANTASTIC ARTHUR....BRAVO"); Email from D. Shara to A. Balder dated October 23, 2017 ("Thanks for the update and keep up the good work!!! I have shown the trailer 10 times and people LOVE it...Love it."); Email from D. Shara to A. Balder October 30, 2017, 9:29 ("I am proud to be involved in this project and I'm very excited to see for the results"); November 30, 2017, 4:44 PM ("[T]his movie is going to kick ass!!!"); Email from D. Shara to A. Balder dated November 30, 2017 ("I am very happy with the progress across the board!!"); Email from D. Shara to A. Balder February 12, 2018 ("I am very happy with everything you have done and how carefully you have spent the money. You have been wonderful throughout the whole thing and I appreciate everything you have done."); Email from D. Shara to A. Balder dated November 6, 2019 ("[The film] is really is going very well, I

hope we are able to convert it into making money, but either way the accolades are incredibly impressive and they continue to pile up.").

14. Tsitoghdzyan expressed his concern with the fact that Susan Sarandon was interested in him romantically, but that he was not interested in her the same way. David Shara, who was now on more friendly terms with the Plaintiff, gave more details about the situation between Sarandon and Tsitoghdzyan, stating on multiple occasions that the best that could happen is that Sarandon and Tsitoghdzyan had an affair, which was what she wanted, and also because Tsitoghdzyan admired her so much. The Plaintiff was concerned only as regards to the Film and how these circumstances may influence the professional relationship of Sarandon and Tsitoghdzyan with the Film itself, which was absolutely not related to these personal questions in any imaginable manner.

15. In 2017, the Plaintiff invited Sarandon to watch the Film online. She acknowledged receipt of those emails, watched the Film and only asked if it was possible to erase the wrinkles around her eyes. The Plaintiff promised to do his best regarding this point, and again showed the result, which she approved of.

16. In 2017 and 2018, the Plaintiff requested to Tsitoghdzyan all talent releases signed related to his son, a minor, signed by his parents, and also related to Tsitoghdzyan and his artworks. Tsitoghdzyan did not answer those emails in writing, but promised verbally to get them at a later date.

The Plaintiff spoke to David Shara about this issue and other talent releases related to people David Shara had invited, and David Shara promised to get them, and to talk to Tsitoghdzyan so that he would provide the signature of the papers necessary for distribution.

17. In early 2018, the film festival circuit was in preparation by selective submissions to film festivals worldwide by the Plaintiff and his team. A new soundtrack was added to the Film and Sarandon watched the Film. Sarandon considered the possibility of going with Tsitoghdzyan to Armenia, because the Yerevan International Film Festival offered her the Lifetime Achievement Award, along with the Film premiere. David Shara sent a business proposal to Sarandon, in which he stated that he wanted to "maximize revenue and exposure", and that he wanted to "make money for Ms. Sarandon". She chose the kind of upfront compensation she wanted for her participation in the filming, which was a print of a portrait of her by Tsitoghdzyan, and she chose its size and the form of framing. She made this selection based on the public auction records results at Phillips, as mentioned before, thinking that the two hour filming of 2016 was going to be compensated with a hand-signed print by Tsitoghdzyan, containing original drawings, valued at $40,000-$50,000 at that time.

18. Sarandon also recommended in writing that the Film should "go to film festivals" as a preliminary step in terms of distribution.

19. In a rather abrupt manner, Sarandon decided that she would not

attend. David Shara told the Plaintiff that the relationship between Tsitoghdzyan and Sarandon was "cold" now. The Film was cancelled in Armenia.

20. In September 2018, the Film found its world premiere at the Los Angeles Documentary Film Festival, becoming the most awarded documentary that year. The festival, in coordination with the Parajanov-Vartanov Film Institute, also bestowed the Parajanov-Vartanov Award 2018 to Sarandon in connection to the Film. The award had been previously given to figures of the film industry such as Martin Scorsese and Francis Ford Coppola. The Plaintiff's office informed Sarandon of this, and the results of the premiere. Sarandon never answered this email, and never had any other conversation with Plaintiff related to the award.

21. The Plaintiff and David Shara discussed the situation and David Shara, disappointed and visibly angry, told the Plaintiff that her reaction was the consequence of "getting from Tigran what she wanted", and he confirmed that point of view in written messages. The Plaintiff insisted that there is nothing wrong in a romantic relationship that is consensual and that people have the right to their own private lives, but that it was wrong to act this way towards a Film that had been taking so much work simply because she did not want to be associated with it on account of Tsitoghdzyan's personal attitude towards her feelings. She had reviewed the Film, approved of it, everybody had treated her as best as they could, and this was wrong.

22. The Plaintiff found himself in a difficult spot in front of the Parajanov-Vartanov Institute, which expected at least a private word of gratitude from Sarandon. The Film went on by the end of 2018 to win more awards in Canada and in Rome, with a jury presided over by two-time Academy award winner Paul Haggis, winning Best International Documentary Film. The Plaintiff and David Shara agreed on sending some kind of reminder to Sarandon, but she did not answer any emails.

23. Some requests and ideas related to the Film were submitted by several film festivals to Sarandon via the Plaintiff and his company, Da Vinci Films LLC, and those requests needed at least some kind of answer from Sarandon. The Plaintiff expressed his concerns to David Shara, who shared them, and they both agreed that it was necessary to try to restart the communication with Sarandon, who had cut it off for no apparent reason since the Film premiered successfully in October 2018 and the Parajanov-Vartanov Award had been announced to her.

24. During 2018 David Shara proposed to the Plaintiff to start together two new projects: one was about the biggest diamond ever mined in Canada, and recently discovered, and the other was about the Nazi propaganda created by artists before the rise and terror of the Nazis in Europe, in order to demonize the Jews. It was envisioned as a high-profile documentary with a focus on a very serious issue to raise global awareness on the dangers of hypocritical stances motivating hatred and double

standards, in this case, the hatred against the Jews. For instance, to create the visual animations of the Nazi propaganda cartoons for that film, they intended to include Oscar-winning team Alison Snowden and David Fine behind 1993's "Bob's Birthday", a Canadian-British animated short film that won the Academy Award for Best Animated Short Film in 1993. Fine and Snowden were also nominated for Best Animated Short Film in 2018 for their work "Animal Behavior". David Fine is a family relation of Honey Shara. These two projects were in development by the end of 2018 and David Shara assured the Plaintiff that he had already found sponsors to provide part of the funds to finance the two projects with the Plaintiff.

25. Since the first screening of the Film around October 2018, the Plaintiff and David Shara found difficulties with Tsitoghdzyan in promoting the screenings of the first film festivals, and David Shara expressed his concerns as regards to that attitude once the Film's commercial distribution would start, scheduled by end 2019, beginning 2020 at the latest.

26. At the beginning of 2019, the Plaintiff insisted on the painting that according to the contract was supposed to be his upfront payment, and that should have been finished by May 2017. During the previous years he had heard from David Shara that the painting was taking longer because he had asked Tsitoghdzyan to add an extra level of detail, which is fundamental in the valuation of hyperrealistic artworks, the style of Tsitoghdzyan's series "mirrors". However, the Plaintiff asked Tsitoghdzyan about the painting,

and Tsitoghdzyan, always saying that it was "almost" finished, finally invited the Plaintiff to see it. The Plaintiff's first impression was that the painting was not executed with the technical degree of realism expected. After a few days he expressed his concerns to Tsitoghdzyan, telling him also that, in spite of having taken much longer than it should have, the making of the painting was inferior in quality. Tsitoghdzyan responded that there were no time specifications for finishing the painting, and that "something he did as a present" had no requirements.

27. The Plaintiff tried, as agreed with David Shara, to restart the communications with Sarandon. He sent this request to Sarandon's assistant. A number of short requests from some organizations were sent to her, and she was asked about the Parajanov-Vartanov Award. The assistant insisted that it was best to send an email, but invited the Plaintiff to call their office number. The Plaintiff had had this phone number for nearly two years, and he had never used it out of respect for Sarandon's clear interest in only having contacts via email. The Plaintiff called and left a message. A few days later, the Plaintiff received a phone called from a "blocked number". Generally not answering those kind of calls, which are uncommon and never from a trustable source, he did not answer, but after the insistence of a second call he picked up. It was Sarandon's assistant. The conversation was plain and the Plaintiff requested the same things that had been written on email and never addressed by Sarandon, and stated that it would be easier

to establish a more fluid communication. Sarandon's assistant's attitude was dismissive, arrogant and self-important, similar to the undertone of his emails for the last years.

28. The Plaintiff received a new email from Sarandon's assistant stating that Sarandon had nothing else to say. The Plaintiff then wrote his concerns related to Sarandon's attitude towards the Film and her disparaging treatment as regards to the Parajanov-Vartanov Award. The Plaintiff expressed that, although Sarandon had no "obligation" to be thankful, she had many reasons to be thankful to the Plaintiff's work and to the Film, and none to be recalcitrantly ungrateful.

29. Sarandon intervened directly in the conversation, stating: "I find your email to be extremely rude. I've never received an email like that before from anyone, especially someone whose film I briefly appeared in without compensation. I had no idea you were going to sell this film based on me and if Tigran's portrait was in some way obligating me to do press, I'll gladly give it back. I understand your wanting to get the most press you possibly can but I have nothing positive to say about your film and am no longer interested in being associated with it. Please don't contact this office in the future unless it's to give me the address to return the portrait which again, I am happy to do."

30. The Plaintiff answered, basically, that her promises from the past still stood, that he had nothing positive to say about her last film, "Viper

Club", which had bombed in theatres across the USA because, in his opinion, it was another very bad film. He reminded her of her verbal promises, and also of the fact that she had gotten the compensation she wanted and that she had discussed and approved a business proposal with David Shara. He also informed her that the Film was not going to be sold based on her, but based on "all that it contained", her included. Finally, the Plaintiff asked her what was it that she wanted and that she did not get from the Film, besides being part of a good film that was respectful towards her image, where she had approved of the usage of her image, that had yielded awards and out of which David Shara had promised her a percentage of profits, and where she had chosen the kind of compensation upfront for her two-hour long engagement for the filming of her sequence in 2016, where everybody had treated her and her self-important assistant extremely well since the beginning. This question made by the Plaintiff was based on numerous and confirmed-in-writing assurances by David Shara regarding what Tsitoghdzyan had told him over the last two years as regards to the relationship between Tsitoghdzyan and Sarandon, and that Sarandon had been interested romantically in Tsitoghdzyan, but Tsitoghdzyan had rejected those advances, trying to be "friends" with her, something that somehow she had finally also rejected.

31. In any case, this short, private exchange of mutually unfavorable opinions between the Plaintiff and Sarandon had tremendous consequences

for the Plaintiff. The Plaintiff notes that all outgoing emails sent from the Plaintiff's emails accounts, or those of his associates at Da Vinci Films LLC, contain the next notice: *CONFIDENTIALITY NOTICE This e-mail, including attachments, is covered by the Electronic Communications Privacy Act, 18 U.S.C. 2510-2521, is confidential, and may be legally privileged. You don't have any permission to disseminate or distribute it, for it is solely intended for you."

32. Sarandon did not answer the Plaintiff, but disseminated the email conversation to David Shara and Tsitoghdzyan with the purpose of harming the Plaintiff as follows. She talked to them, threatened them with litigation, and requested a) the film festival circuit already secured for the Film for 2019 **to be cancelled**, thus depriving the Film and the Plaintiff of any further possibility of recognition and merits; b) that any other projects in movement with the Plaintiff be cancelled, thus depriving the Plaintiff of prospective business advantages as regards to the projects mentioned before and in movement between him and David Shara;  and c) that the Producers' Agreement regulating the Film's distribution, profits and credits be modified in order to harm the Plaintiff and deprive him of his rights as described there. She made these requests to David Shara, who followed suit out of fear under her threats as follows.

33. On Feb. 28, 2019, David Shara contacted the Plaintiff via WhatsApp messages: "You need to be careful with Susan. She can ruin you";

"We do not need her as an enemy"; "You cannot write this stuff, she will make a lawsuit against us and ruin your dream, this set of emails is unacceptable"; "I read the emails"; "you need to write the nicest, most sincere apology in the world".

34. David Shara further stated in April 2019: "[4/15/19, 12:12:32] David Shara: Unfortunately we are not able to continue our relationship [4/15/19, 12:12:54] David Shara: "The way you write to Susan and Tigran is unacceptable [4/15/19, 12:15:33] David Shara: "I cannot work with you anymore". Specifically as a consequence of holding his opinions privately, the Plaintiff received these written notifications: "cannot do any other work together [4/15/19, 12:42:38] David Shara: "I'm finished with this project and the others" [4/15/19, 12:42:48] David Shara: "Cancel the film festivals" [4/15/19, 12:42:55] David Shara: "I do not care about them".

35. As an answer to the Plaintiff's arguments, David Shara further affirmed that all was a consequence of Sarandon sharing the private communications and requesting punishment: [4/15/19, 12:56:24] David Shara: "You cannot write that shit to Susan" [4/15/19, 12:56:28] David Shara: "How dare u" The Plaintiff answered: [4/15/19, 12:57:24] AB: "I do believe professional standards are universal, and a celebrity doesn't have the right to go to these lengths as she went." [4/15/19, 12:58:18] AB: "Humans beings deserve respect, and also their work, and she manifestly showed the polar opposite." David Shara gave more hints of Sarandon's threats: "She

never signed up for any of that, you were lucky enough to get her to sit for you and be filmed, but she did not want anything to do with the project. In your head you made it that she was a part of this project, but she is a busy and famous woman and you twisted it around." The Plaintiff argued: "[4/15/19, 13:01:04] AB: "She not only showed up knowing the camera was meant to be used, also knew the final result, consented to the use of her image, considered for 3 months going to Armenia's Yerevan film festival, and a long etc." [4/15/19, 13:01:17] AB: "She is just a hypocrite."

36. David Shara continued: [4/15/19, 13:11:16] David Shara: "You told her she only wanted to fuck him [Tsitoghdzyan] and then when she was rejected it all changed." The Plaintiff was shocked by these conclusions, and answered: [4/15/19, 13:11:45] AB: "I did not say that, ever." "With all due respect, David, I demanded an answer from her after telling me 'she has nothing positive to say about my project', yes she did something, and also after saying I needed all possible publicity --not true, we did well without any publicity from her. On the contrary, YOU KNOW she was pretending the film does not exist, looking somewhere else all the time. Then I requested some respect at least for the award [Parajanov Vartanov-Award for Sarandon out of Los Angeles Film Festival 2018] she got thanks to US." [4/15/19, 13:14:52] AB: **"I did not affirm what for she came** [to the filming in 2016 to be part of the Film]**, I asked her, and that's an enormous difference."** [Emphasis added because highlights the reality of

the communication referred to between Plaintiff and Susan Sarandon.]

37. In emails David Shara unlawfully shared private communications of the Plaintiff, protected by the Electronic Communications Privacy Act, 18 U.S.C. 2510-2521 notice in the Plaintiff's emails, adding all content indiscriminately in CC to Tsitoghdzyan and Honey Shara in May 2019. Both David Shara and Tsitoghdzyan verbally abused the Plaintiff in ways that are far below any propriety standards, as they had done before by the end of 2016 when they had tried to get rid of him once he requested a signed contract, in writing, stating clearly that they wanted to cancel the film festival circuit for the remainder of 2019.  It was clear that the Plaintiff was being boycotted, persecuted and insulted for having a reasoned opinion and for standing by his opinions privately in front of the celebrity Sarandon, but also that Tsitoghdzyan and David Shara felt, as they had done and in writing in 2016, that they could insult, disparage, and abuse the Plaintiff in ways that are not even comparable to the ways the Plaintiff, in a reasoned manner, had presented his opinions to Sarandon once she had shared her own opinions to the Plaintiff first and before. The double standard that was being applied was obvious, but its material consequences, besides persecuting someone for his rights to his own reasoned opinions, privately held and measured shared only with the intended person, were dire. David Shara stated in writing that he "did not care about losing 300,000 USD" as long as the Plaintiff suffered the consequences of getting the remaining

festival circuit participation in 2019 cancelled. David Shara also wrote, "remember very few people have signed the talent release", a clear reference that further announced what was to come afterwards had been already planned at that time in coordination with Tsitoghdzyan and Sarandon, decided to shatter the distribution if the Plaintiff would not agree on new terms as a punishment for having opinions.

38. The Plaintiff argued reasonably, but made it clear that the Film won't be boycotted because he was its Producer, and there was no material reason to act that way — to cancel the film festival circuit already in place for the rest of 2019. It must be noted that neither Sarandon nor any attorney in her name had contacted in writing the Plaintiff or his company, Da Vinci Films LLC, ordering to cancel her image in the Film, or prohibiting usage of her image, and that simply because she knew she could not do it without breaking her promises and previous acceptances. Instead, however, she began interfering with the contract, and with other business expectancies of the Plaintiff, by threatening with litigation David Shara, the Plaintiff's partner, and by requesting to harm the Plaintiff if David Shara wanted to avoid litigation, thus obtaining results harming the Plaintiff without leaving any direct fingerprints that the Plaintiff could use against her.

39. Pending invoices related to the execution of the film festival circuit were unpaid by June 2019. Honey Shara said in phone conversations with the Plaintiff that she had stepped in and that she was of her son's opinion

and backed his actions as his partner at Optimum Diamonds LLC, and that either the Plaintiff retract his opinions by sending a most groveling written apology to Sarandon and Tsitoghdzyan, or the invoices would remain unpaid. She wrote that suddenly they were "out of money" and that sending an apology to Susan and Tsitoghdzyan would make things easier.

40. In August 2019 Tsitoghdzyan, via his counsel, insisted and requested formally a copy of the Film "for his parents to watch it". The Plaintiff argued that that was not the true purpose, because there were many written communications showing that the Plaintiff had shared the Film with Tsitoghdzyan precisely and specifically for his parents to be able to watch it. The true reason was that Tsitoghdzyan was about to have a big solo show in Armenian's capital, Yerevan, and he wanted to cater the Film to his selected audience of collector, journalists, friends, business partners, to improperly enrich himself out of the Film without giving any kind of consent to authorize the commercial distribution of the Film. He wanted a copy for his own enrichment while he was taking advantage in terms of publicity by the dozens of film festivals that were screening the Film worldwide, but still was not providing the signed releases he had promised years ago directly to the Plaintiff regarding his image, that of his son, a minor he put in the Film, and his artworks. Honey Shara, in a phone conversation with the Plaintiff, threatened the Plaintiff with not paying anything else unless he provided a link with the final copy of the Film for Tsitoghdzyan to take advantage of it

the way he wanted. The Plaintiff, placed between a rock and a hard place, was coerced to send that link, knowing it was absolutely wrong and unlawful, and against the purposes of the Film's distribution. Honey Shara, however, disappeared and did not pay any invoice.

41. The Film had begun to win awards practically on a regular basis and its success was growing by the week. The invoices that were pending of payment by David Shara contained clear references to the moneys budgeted for the Oscar-qualifying Theatrical release of the Film scheduled for the end of 2019 or the beginning of 2020. The Plaintiff had already made arrangements with local distributors in Los Angeles and New York.

42. The Oscar-qualifying cinema festival Carthage Film Festival of Tunisia, the most prestigious film event in the African and Arabic world, selected the Film as one of the best of the world to be showcased in November, and also invited Sarandon to be jury president in 2019 at the same time, congratulating her and the Plaintiff for the great quality of the Film. Sarandon's assistant answered that "Susan is not associated with American Mirror."

43. The Plaintiff informed Honey Shara and David Shara that keeping the invoices unpaid was just a plan to asphyxiate the film festival circuit and to accomplish the plan to cancel it, that he was not going to allow it and that he was going to start a litigation immediately against them. David Shara backpedaled and agreed to pay the pending invoices, and congratulated the

Plaintiff on the "impressive" wins the Film was gaining everywhere in the world.

44. In a phone conversation, David Shara told the Plaintiff that he had been under pressure from Sarandon and Tsitoghdzyan to 1) harm the Plaintiff by cancelling the festival circuit; 2) harm the Plaintiff by cancelling all other projects with the Plaintiff; and 3) change the existing contract regulating the distribution signed between David Shara and the Plaintiff. David Shara manifested that Sarandon was absolutely furious precisely because of the tremendous run of the Film in the festival circuit, and that because by not cancelling the Film the many awards only have humiliated her words sent to the Plaintiff in February 2019 "I don't have anything positive to say about your film". David Shara stated that it was difficult to convince her to sign the talent release, and that Tsitoghdzyan was acting the same way, and that Tsitoghdzyan was happy enough that now he could use the Film privately to better represent himself and his artworks to his clients, collectors, and influential people, while at the same time pleasing the retaliatory mood of Sarandon by not providing the necessary talent releases that depended on his signature. The Plaintiff insisted that all that was wrong, and they should change course, and that the Oscar-qualifying theatrical release in the USA was very important, and it should happen immediately by Christmas 2019 or the early beginning of 2020. That kind of release was a minimum and had been already scheduled, but the actions of

David Shara and the interference of Sarandon and Tsitoghdzyan were materially damaging the possibilities of the Film having a much greater and wider public release in the USA in accordance with the string of accolades the Film was winning and the expectation that it was creating among distributors. Not having at hand the talent releases was materially already ruining the delicate moment when the film must pass from festival circuit into public release. The Plaintiff informed David Shara that there were several bids for the Film's distribution from important distributors worldwide and it was not possible to sign any contract, neither to promote the Film nor negotiate possibilities as amply and decidedly as it should be possible, simply because he had failed in obtaining the releases he made himself responsible to obtain and because Sarandon and Tsitoghdzyan were denying what they had promised to give years ago. Among others, MAF Solutions, one of the two biggest film distribution companies in the Arab world, was pending final OK to take the Film to all sorts of distribution channels, including Theatres in Cairo, Saudi Arabia, airlines, online, TV, etc. The contract was finally lost.

45. Pending invoices of 2019 were still pending to be paid by David Shara by the beginning of 2020. David Shara had not obtained any of the talent releases pending from Sarandon, Tsitoghdzyan, and the people he had invited to be part of the Film (notwithstanding their minor roles, David Shara was responsible for having them sign). In a phone conversation, the

Plaintiff also manifested his doubts as regards as the actual-real value of the painting he had been given as upfront compensation, and also regarding its poor quality. He felt defrauded  because 1) the Painting did not have even close the value represented by David Shara and Tsitoghdzyab, 2) because it was of poor quality, and 3) because it had been given to him 21 months later than stipulated in the Producers' Agreement.

46. The Plaintiff lost the Oscar-qualifying theatrical release that had been scheduled for the beginning of 2020, before the pandemic struck. At that time The New York Times film critic Jeannette Catsoulis questioned, apropos of the theatrical release in the USA of Sarandon's son Jack Henry Robbins' film "VHYes", on Jan. 16, 2020, "Little more than a collage of meaningless nostalgia, "VHYes" makes you wonder how it found its way into a movie theater. Though I'm sure that has nothing to do with the fact that two of its actors, Susan Sarandon and Tim Robbins, are also the director's parents". Sarandon slammed publicly the NYT's critic at The Hollywood Reporter [February 14, 2020] stating that her attitude was "so unprofessional and obviously knows so little about the business". It is a disgrace, and represents a new apex of hypocrisy, to see that precisely at that same time when this journalistic controversy was taking place as regards to the theatrical release of her son's film, Sarandon had been already fully engaged in thwarting the US Oscar-qualifying theatrical release of the Plaintiff's Film, a work that had been universally acclaimed on its own

legitimate merits, and not precisely because its main talent had been collaborating positively to contribute to its success, but on the contrary, while she had been doing all in her power to thwart the festival circuit.

47. When the pandemic struck, the film industry came to zero activity. The Plaintiff could not sell the painting even for a fraction of what had been represented to him. The Plaintiff could not secure any contracts for distribution, even considering that 2020 was going to be the best year ever for online streaming for documentaries precisely as a consequence of the lockdowns.

48. Invoices from 2019 were still pending to be paid by August 2020. By then the Plaintiff started a new conversation recapitulating the harm that the project had caused him. Once he claimed that compensation was necessary because the painting was in no way correct compensation for all the long period of time he had spent in the project, David Shara disappeared rapidly from the email conversations and Honey Shara gave ambiguous answers, announcing finally that they would contact the Plaintiff by their attorney.

49. By end of August 2020, in a conversation with Phillips Auctioneers LLC, the Plaintiff found out that the reason why Phillips would not auction or appraise any painting by Tsitoghdzyan again was that the two auction records of his 2014 and 2015 artworks seemed suspicious. Phillips' senior specialist, Rebekah Bowling, who had been in charge of the sale of Lot 217 in

the auction of 17 September 2015, which was a Tsitoghdzyan painting valued at 30,000 - 40,000 USD, and sold for 100,000 USD, stated that "Phillips has decided that we aren't comfortable offering works by the artist at the moment". The phone conversation that took place between the Plaintiff and Rebekah Phillips prior to the sending of that confirmation email, showed that Phillips had reasons to think that the auction had been tampered with. David Shara, himself, the art dealer of Tsitoghdzyan, had arranged a number of bettors in order to create an auction record that basically was the result of a scheme to defraud the public, by creating the impression of rising prices, a practice that is not uncommon in other rare and luxurious commodities, such as color diamonds. Recall that David Shara is a color diamonds dealer, that has bought, collected, cut to pieces and sold color diamonds in the multimillion dollar range, as the New York Times reports.

50. Only here, by the very end of August 2020, the Plaintiff discovered that he had been defrauded by Tsitoghdzyan and David Shara's reckless, false representations that Tsitoghdzyan's artworks were of enormous value, in order to avoid paying him according to standard practices an upfront for his extremely long dedication to the Film.

51. An attorney explicitly representing David Shara *and* Honey Shara contacted the Plaintiff in September 2020.

52. David and Honey Shara have refused to either consent to the

Plaintiff's distribution of the Film or provide a number of talent releases necessary to distribute the Film of people he had invited to be part of it only to keep the Film hostage at a later date, including David Shara's own wife, Morgan Shara, despite acknowledging that he can obtain the talent releases (and expeditiously so). In fact, David and Honey Shara threatened the Plaintiff that if he did not hand over control of the Film, the Plaintiff would never receive profits from the Film and would jeopardize his professional reputation and success.

53. For example, in correspondence from David and Honey Shara's counsel to the Plaintiff in 2020 (who at the time was unrepresented by counsel), they stated that:

54. *"[I]f you're serious about making money with this film and using it as a work that you can showcase so that your credits build and you have additional opportunities, you need to hand over the control of the film to our client."* David and Honey Shara *"can secure all of [the name and likeness releases] in an expeditious manner – but you have to take a backseat on this project." "If you don't want to comply, that's not a problem, this film will be put on a shelf and you will not make money from it." "You simply have 2 choices: agree to move forward where the Shara's [sic] are in control of the distribution (subject to reasonable and customary consultation with you) or they move on and this film is not commercially released." "[J]ust trust that David's self-interest in getting the best deals and making the most money*

*from the film is in your best interest as well." "Unfortunately for you, you have no choices here Arthur." "[T]here is no remedy for you if our client does not provide the releases for this film." "If you don't want to let [our client] run the exploitation of the film at this point, our client is prepared to let the film 'die on the vine.'"*

55. These statements, at a minimum, show that Honey and David Shara were acting in bad faith and seeking to interfere with both the distribution of the Film and the Plaintiff's other professional endeavors, all in an effort to improperly enrich themselves, and all in coordination with, and thanks to the active collaboration of Sarandon and Tsitoghdzyan.

56. Honey Shara is clearly partly responsible for this coercion. Her counsel indicated that the Plaintiff must agree to the coercion because both David *and* Honey Shara will it so, and these actions, and the harm they caused, are as much ascribed to her unambiguous ambition to get unilateral control of the Film by strong-arming the Plaintiff into a signing a new contract by coercion, as ascribed to her partner, David Shara.

57. Through their attorney they also stated, wrongly, that the fact that the Plaintiff had accepted his wife to be portrayed was a signal that he had no intention of making any profits out of the painting sales, because in that case he should have requested to have a "celebrity" painted, and not his wife. This is absurd, because, by the same rule, the woman portrayed in the artwork sold by Phillips as Lot 217 in 2015 is unknown, and not a celebrity,

yet that painting fetched a record high price, but that was only because David Shara was one of the absentee bettors, and the other absentee bettors had been arranged and were in agreement as to the result of the auction beforehand. Additionally, the argument makes no sense, since art is valued by its quality, not by the "fame" of the person painted.

58. Phillips Auctioneers LLC also prohibited the usage in the Film of the footage that Phillips streamed online of the auctioning of Lot 215 in October 2015. David Shara and Tsitoghdzyan had insisted in using parts of this footage in the Film. The Plaintiff had used that footage because they requested it, Tsitoghdzyan even insisting in cutting the final result of that auction, because, in his own written words: "the value of my paintings right now is much higher", further representing something that was false. In any case, that footage must be taking off a very complex sequence in terms of special effects, and that would represent a new postproduction cost that the Plaintiff does not have to pay for, and for which only Tsitoghdzyan and David Shara's actions are responsible for.

59. In September 2020, the Plaintiff contacted Sarandon to again request the necessary release to distribute the Film commercially, for its public release, and Sarandon's assistant directed the Plaintiff's associates to her United Talent Agent, who never answered back any phone calls. She even hang up as soon as she heard that the question was related to the Film. It was clear that Sarandon was in coordination with David Shara, that

David Shara had thought it profitable to follow her lead, as it was Tsitoghdzyan's intention.

60. The Plaintiff decided not to give in to these attempts of coercion even in the light of the threats, and sought legal assistance in November 2020. He did not get that assistance as soon as he wished, and in the meantime all Defendants made it clear that their threats were in earnest: the harm announced to the Plaintiff materialized. They did not show up again ever.

61. It was in October 2021 when the Plaintiff, represented by counsel, presented and sent a Demand Letter to David Shara with his demands and trying to find an amicable solution. Astonishingly, it was discovered that even then David Shara had not collected any talent releases yet.

62. Between October 2021 and April 2022, counsel of David Shara did not collaborate with the Plaintiff's counsel to solve the situation. It was more than apparent that he was too busy throwing lavish parties in Miami to amicably solve the problem.

63. During the first months of 2022, counsel of the Plaintiff reached out to Sarandon. She stated in writing that she would only sign the release "over to David [Shara] and Tigran [Tsitoghdzyan]", but never to the Plaintiff, despising openly the Plaintiff's rights under the Producers' Agreement, breaking her own contractual promises as made to the Plaintiff in 2016, and renewed in 2018, and further confirming that she was coordinated with the

other Defendants since the beginning in either successfully coercing the Plaintiff out of his rights under the Producers' Agreement, or just harming him financially and professionally as much and as long as possible, regardless of the personal distress that her actions had already caused and would further cause to him.

64. As a consequence of the Defendants' actions and the stress and extreme emotional distress caused by them as described before since 2019, the Plaintiff sought medical assistance and was diagnosed with Major Depression and General Anxiety Disorder, being in treatment since March 2022. The Plaintiff had never been diagnosed nor suffered from depression of any kind, and he has no history of family members having suffered depression ever. The social factors, the open contempt, the poorly concealed discrimination, and the inequality he has been submitted to; the abusive treatment suffered, written and in person, the manifestations of professional despise hurled upon him, all by the very people he had worked with and for, the Defendants, and all happening against the reality of the quality of his work as demonstrated by the accolades appointed by independent juries all over the world, have contributed massively to this result and are the true and only cause of the Plaintiff's actual state.

65. A project based on a script written by the Plaintiff in 2019 garnered great interest among high profile, Oscar-award winning talent at the beginning of 2020. It was a fiction film based on the life of the most

important British artist of the 20th century, Francis Bacon. The Plaintiff got the blessing of the Francis Bacon Estate, and garnered the support of Academy-award winners in the field of Acting, and a two-time Academy award nominee in the field of Cinematography, willing to be in charge of the filming, potentially also Oscar winners in the field of Costume Design and Make up that were British talent. It was clear, however, that it was impossible to raise funds to produce the film unless "American Mirror: Intimations of Immortality" were publicly distributed, because the lack of distribution of that Film was defaming its producer and director, the Plaintiff, interfering with his professional prospects, especially after exhibiting an very long list of wins across all technical fields, including Best Director, Best Cinematography, Best Editing, from cinematic events all over the world.

66. During the first months of 2022, Plaintiff's counsel reached out to Tsitoghdzyan. His counsel answered that the distribution of the Film "only helps his client [Tsitoghdzyan]". However, after repeated demands, Tsitoghdzyan never sent any talent release that depended on him as listed before. By April 2022 counsel of all Defendants simply disappeared and did not answer the emails sent by the Plaintiff's counsel. The Plaintiff reached out to Tsitoghdzyan and to David and Honey Shara requesting the signed talent releases and trying to find a solution by mid-July 2022. On July 24th, David Shara answered: "My attorneys will be in touch with you next week".

Nobody contacted the Plaintiff.

67. Between October 2021 and April 2022, the Plaintiff's counsel tried to find an amicable solution with the Defendants, providing accommodations far beyond what good faith or basic courtesy would call for in such unfavorable circumstances for the Plaintiff, created and maintained over such a long period of time by the Defendants. But the intentions of the Defendants were unambiguous, recalcitrant and intent on malicious harm, and they spurned all these attempts, adding insult to the harm itself.

68. David Shara, through his counsel, clearly and accurately summarized the situation this way in writing at the beginning of 2022: "**to say that Sarandon hates your client** [the Plaintiff] **is an understatement**" [Emphasis added]. That is, in sum, the source of the malice and ill-will that had motivated, inspired and to a great extent guided the actions of the others since 2019, although each one was seeking his own self-interest; Tsitoghdzyan obtaining a copy of the Film he has been using for his own enrichment since August 2019, and David and Honey Shara coercing the Plaintiff to get control of an universally acclaimed cinematic masterpiece in documentary filmmaking, strong-arming him into signing a new contract since 2020.

69. Never since 2016 has any of the Defendants manifested anything negative about the Film, related to their presence in it, or related to the way they appear in it. In other words, there was never any claim related to the

Plaintiff's work as a filmmaker.

70. To date, there was never any kind of communication in which his partner, David Shara, manifested any claim as to how the Plaintiff was making use of the funds provided to produce the Film. On the contrary, emails in 2016, 2017, 2018, 2019, and even 2020, sent from David Shara to the Plaintiff, only show congratulatory addresses that are unambiguous as to the way he felt as regards to how the Plaintiff was making use of the funds budgeted and approved of before being spent.

71. In order to appreciate the scale of the situation, it is necessary to provide the next facts as related to the Film's real success and situation right before the moment when its Oscar-qualifying theatrical release in the US was ruined, placing it in context of the appreciation of other independent juries, to infer from them a factual, non-biased perspective of the reality as regards to the opportunity the Plaintiff has been deprived of out of malice and wrongful conduct of the defendants:

72. *Official Selections & Wins (selection)*: Carthage Film Festival – Journees Cinematographiques Du Carthage (2019, Official Selection, Oscar-qualifying). Tallinn Black Nights Film Festival (2019, FIAPF A-class feature competitive). Milano Film Festival (2019, Official Selection). Melbourne Documentary Film Festival (2019 winner Honorable Jury Mention). Ferrara Film Festival (Official Selection 2020). Jaipur International Film Festival (most awarded film of the festival in 2020, becoming also most awarded film

in the history of the festival, winning Best Documentary Feature, Best Cinematography, Best Editing, Best Sound and Red Rose Award for Best Released Film). Kala Ghoda Arts Film Festival, Mumbai, India. Official Selection (2020). Orlando Film Festival (Winner of Arts in Focus Award, 2019). Prvi Kadar / First Frame international Film Festival, Sarajevo (winner Grand Prix for the Best Picture of Festival, 2019). UK Film Festival (Winner Best Documentary Feature, 2019). Near Nazareth Film Festival, Israel (winner Best Documentary Award, 2019). Asti Film Festival, Italy, (winner Premio Giura ASTIDOC competition, 2019.) Oaxaca FilmFest, (finalist for Best Feature Film, 2019). Guayaquil International Film Festival, Ecuador (winner Golden Iguana for Best International Documentary, 2019). Sydney Indie Film Festival (winner Best Cinematography, 2019). Arlington International Film Festival (winner Best of Festival, 2019). Mosaic World Film Festival, IL (winner Best Film of Festival Spotlight Award, 2019). Peak City International Film Festival, VA (winner Best Director Feature, 2019). Ierapetra Documentary Film Festival, Greece (winner Audience Award, Best Director Award, 2019) Visions Du Reel, Switzerland, (Official Selection, 2019) Fort Lauderdale International Film Festival, Florida (Official Selection 2019). Studio City International Film Festival, North Hollywood (2019). Burbank International Film Festival (Finalist Best Original Soundtrack, 2019.) International Music & Sound Film Festival, Croatia (finalist Best Original Soundtrack Documentary, 2019). Open World Toronto

Film Festival (winner Best Experimental Film, 2019). Fabrique Du Cinema Awards, Rome, Italy, (Winner Best International Documentary). DOC LA, Los Angeles (winner Best Original Soundtrack, Best Innovative Film, Best Cinematography).

73. *Critical reception (selection)*: "American Mirror is "strikingly original" and "there's a lingering, finely-drawn intelligence to Arthur Balder's hallucinogenic compilation, one which welcomes many readings no matter how you look at it" "'American Mirror' eschews any traditional documentary formats when attempting to align Balder's own film theory digressions alongside the scattered memories of his main subject" "mystifying, if not wholly fascinating" "Perplexing. It definitely shrugs off any expected genre conventions [Film Inquiry, Australia] "An engrossing tale that reflects on today's society's obsessions." By Stephanie Janssen, Volume One Magazine, USA "Director Arthur Balder takes us on a visually spectacular journey." American Mirror is "a revelation to Balder's craft." [The Armenian Mirror-Spectator, US] "Arthur Balder is an artist at the same time creative and meticulous." "Proof of it are the stylistic rigor and the aesthetic acumen with which he directed 'American Mirror'" "Susan Sarandon is more charismatic than ever in 'American Mirror'" [Chiara Carna, film magazine Fabrique Du Cinema Nr 24, Italy] American Mirror is a "very graceful and elegant work." [The Digital Journal, US] American Mirror is **a "dynamic, visually sumptuous, cleverly directed film that**

**leaves you breathless and enthralled long after you watch it.”** [Dragan Elcic, a film critic, a film professor and the Dean of Belgrade Academy of Arts in Serbia, and a highly regarded Serbian film director who has directed films recognized at the Oscars]. “‘American Mirror: Intimations of Immortality’ crosses borders and expands the forms of modern documentary film making.“ Branko Lazic, film director, Bosnia-Herzegovina, published by RTRS.tv. “A film that transcends genres and establishes its own rules of film narration.“ The Film also received praise from film critic Meriam Azizi in the *Le Quotidienne*, the official diary of the Oscar-qualifying Carthage Film Festival in Tunisia. Mr. Azizi wrote: **“American Mirror joins the pantheon of such films as David Lynch’s, Stanley Kubrick’s, but also of writers as Marcel Proust in his search of lost time.”** “Of all the documentaries [at the Carthage Film Festival], Arthur Balder’s is the one that intrigues the most.” **“It is a masterpiece.”**

## VI.  CAUSES OF ACTION

74. The Plaintiff reincorporates all the allegations set forth before as if fully set forth herein. As for a first **cause of action for breach of contract** by David Shara. David Shara is in material breach of contract. David Shara refuses to honor his obligations, to fulfill his promises. This repudiation follows a long list of material contract breaches by David Shara. The material breach of contract affects the distribution of the film, with the

purpose of interfering with other business relationships of the Plaintiff, by ridiculing his role as director and producer of a successful film that nonetheless "dies on the vine" unless the Plaintiff accepts David Shara's and Honey Shara's relentless attempts of coercion. It also affects the upfront compensation, a painting whose represented value is far lower than represented based on fraudulent auction records, and that, additionally was supposed to be ready and given to the Plaintiff no later than May 2017, but that was given to him, and at that unfinished, by end of February 2019.

75. As for a second **cause of action for tortious interference with contract** by Susan Sarandon, Honey Shara and Tigran Tsitoghdzyan. All three defendants are third parties. In fact, Tsitoghdzyan acts for his own benefit, getting a copy for his own improper enrichment rather than the party of the contract. They interfered with the Producers' Agreement, a valid contract they knew existed. The defendants proceeded on intentional procurement of the third-party's breach of contract without justification, and there is actual breach of contract resulting in damages therefrom. The Film's distribution also only benefits also Tsitoghdzyan and Sarandon from the publicity point of view, yet their interest in maliciously thwarting any prospect of success on the side of the Plaintiff is such, that they act without justification because the wrongful, malicious motivation is bigger than the obvious benefits they could have; of course Tsitoghdzyan also has no interest in the losses of the "third party" with whom the Plaintiff has an extant and

valid contract, David Shara. David Shara and Honey Shara allow it only to use them to get "more" out of their motivation: David Shara uses their motivations, and gives in to their demanded breach of contract, to coerce the Plaintiff out of his rights under the contract. Honey Shara interferes to cause a breach of contract for the same self-interested reason as David Shara. All defendants induced David Shara intentionally and without justification, against their own interests, and out of malice.

76. As for a third **cause of action for fraudulent representation and scheme to defraud** by David Shara and Tsitoghdzyan. David Shara and Tsitoghdzyan made numerous representations of fact as regards to the value of the upfront compensation, the painting, and its potentially much higher value that it would reach after 2016; the representations were false because they were based on fraudulent auction records of 2014 and 2015, which in fact remain   isolated, since in total the auction records of Tsitoghdzyan's artworks in the world is four, two of them after those of 2014 and 2015, and of those two one was "lot not sold" in Istanbul, and the other barely fetched 5,000 Swiss francs. They knew the representations were false, and reckless, because they have collaborated actively in creating the false auction record in 2015 as explained before. They made these representations with the intention that the Plaintiff rely on them, to avoid any upfront payment for his role as producer and director. The Plaintiff relied on them and as a consequence suffered damages as a consequence of relying on them.

77. As for a fourth **cause of action for tortious interference with business expectancies** by Susan Sarandon, Honey Shara and Tigran Tsitoghdzyan. The Plaintiff was deprived of two other projects because Sarandon and Tsitoghdzyan requested it so. Their only motivation was malice and retaliation to chastise the Plaintiff's simply for stating his opinions as described before. Circumstantial evidence proves that the harm would not ordinarily have occurred without malice of intentional tort. The outside parties purposefully and wrongfully disrupted the business relations and expectancies dramatically to cause harm to that relationship.

78. As for a fifth **cause of action for promissory estoppel** by Susan Sarandon and Tigran Tsitoghdzyan. As a consequence of not doing in due time what they had promised to do numerous times, the Plaintiff has suffered damages. The defendants are liable for promissory estoppel. The defendants sufficiently and unambiguously established abundant, implied and direct approval to the usage of their image in the Film that they knew was intended to be commercially released. Their not facilitating this in due time makes the defendants liable to the Plaintiff for promissory estoppel.

79. The Plaintiff reliance on these promises was foreseeable by the defendants, and particularly because Sarandon is a prominent member of the film industry, and she understands the reason and purpose for being part of a film, of accepting an upfront compensation and of agreeing on the terms of a business proposal which clearly offers her a percentage of the

distribution profits. Additionally, depriving the business from its US Oscar-qualifying US theatrical release is designed to rob the Plaintiff of well-deserved opportunities of recognition.

80. As a result of the defendants' statements and promises, their subsequent intentional denial to do so upon repeated requests, the Plaintiff has been damaged financially and professionally, causing no small emotional distress.

81. Susan Sarandon, Honey Shara and Tigran Tsitoghdzyan have engaged in **civil conspiracy** in order to fully accomplish the underlying tortious interference with contract, the breach of contract, actively coordinating their action to afford David Shara and Honey Shara their attempts of coercion, and, finally, to harm financially, professionally and emotionally the Plaintiff.

82. Finally, the influence of Sarandon on other people, organizations and their decisions cannot be sufficiently emphasized. Others truly made decisions thinking of how to please her, regardless of the harm they would cause, and the Sharas and Tsitoghdzyan decided that, no matter the substance of the facts, it was in their best interest to look good in her eyes, and that influence must be taken into consideration very seriously. For instance, in 2016, she prided herself in publicizing, via social media, that thanks to her publicly denying her approval of then-candidate Hilary Clinton, she had contributed massively to the flipping of the election in favor

of the Republican candidate. Sarandon likes the power of her celebrity status, uses it, even to slam a NYT reporter if her film review about his son's "documentary" does not please her, and enjoys using it publicly. It is not surprising then what the other defendants went on to do in order to please her and gain her favor and avoid her threatened litigation, that surely scared David Shara as regards to his own multimillion dollar color diamonds business, so dependent on looking good in the eyes of influential and wealthy people, and, by the way, to also take advantage of trampling the Plaintiff. This influencing power brings a feeling of being "above the law" for the one that wields it and for those who comply with the one that holds it, spreading a toxicity that corrupts the others' view of what is the right thing to do. To cite instances of how this is exacerbated in the film industry would be burdensome for this complaint, but it is well known that the proceedings into the Harvey Wainsteins' actions have shed a light on the existence of his 'hit-list' as regards other industry professionals who clearly could not compete in influence and power with him, and who consequently were professionally harmed by his actions. This case is not different, in fact shares too many common points as the motivations of Sarandon to turn her back on the Film, for reasons clearly not related to the Film itself.

83. The Plaintiff suffers all this harm because Sarandon, "hates" him, and that unambiguous, direct, and sincere statement cannot be sufficiently emphasized for context and scale. The Plaintiff is "hated" by Sarandon, that

that explains her malice, and she is known for her pleasure at wielding her power and influence. Recall David Shara, through his counsel, summarized the situation this way in writing at the beginning of 2022: "to say that Sarandon hates your client [the Plaintiff] is an understatement".

## VII. <u>INJURIES</u>

84. The Defendants' actions have caused severe harm to the Plaintiff.

85. The Plaintiff and David Shara entered into the Producers' Agreement (the "Agreement") on April 4, 2017. The Agreement establishes certain rights and obligations in respect to the parties' roles in the development of the Film: the Plaintiff as Director and Producer, and David Shara as Executive Producer. Relevant provisions of the Agreement are summarized below.

86. *Distribution rights*. The Agreement provides that the Plaintiff would have authority over distribution of the Film, subject only to receiving David Shara's written confirmation of distribution decisions. In addition, the Agreement establishes that the Plaintiff and David Shara would undertake to ensure best performance possible of the Film, providing that the "Director/ Producer will inform and discuss any distribution possibilities with the Executive Producer, both being informed in due time to ensure the best performance possible of the business."

87. *Upfront compensation*. The Agreement provides that David Shara

would give an original hand-made painting by Tsitoghdzyan to the Plaintiff as "upfront compensation" for his work in creating, developing and producing the Film. The painting was required to be in Tsitoghdzyan's "Mirrors" series, portraying the Plaintiff's wife, and having dimensions of 75"X50." David Shara was required to give the painting to Mr. Balder "no later than the last day of the month of May of the year 2017." As reflected in numerous exchanges between the Parties, the Plaintiff's agreement to receive the painting as upfront compensation by the end of May 2017 was a good-faith compromise made in reliance on the representations made by David Shara and Tsitoghdzyan regarding the substantial value and marketability of such a painting.

88. Furthermore, the choice that they gave the Plaintiff — a choice between handing over control of the Film or letting it "die on the vine" — has no basis in the contract. They told the Plaintiff that they could block the public release of the Film if they wanted because "[t]here is no obligation in the agreement to exploit the film." That is utterly false. The Producers' Agreement provides: a) that the Plaintiff has authority over "distribution" of the Film, subject only to "written confirmation" by David Shara (that's why the Plaintiff had been in charge of the film festival distribution, and at that undeniably successfully); b) that the Plaintiff is entitled to 20% of the Film's "profits," and c) that the aim of the distribution is the "best performance possible of the business."  The text of the Agreement thus makes clear that

David Shara has an obligation to support the Plaintiff in exploiting the Film for profit, with the best performance possible. It is also an inextricable affirmative covenant.

89. The contemporaneous evidence further confirms that the parties understood that the Film would be distributed for profit. In an email dated November 7, 2016, for example, David Shara told the Plaintiff to "[f]inish the film and try to get it sold. Get it into theaters, amazon, Apple TV etc"; "I recommend we finish the film and you get to work distributing it." In the business proposal sent to Sarandon in 2018, David Shara stated that his intention is to "make money for Susan Sarandon", and that he wanted to "maximize exposure and revenue". Even more clear: invoices from 2019 [specifically accepted and paid Invoices 19022 and 19016 based on 2018 budget approval], show that there were parts of the budget allotted specifically to the Oscar-qualifying theatrical release, consisting not in general assurances but in concrete terms as follows, written on the Invoices referred to: "PROJECT 'AMERICAN MIRROR' 2019 Securing of Theatres for Oscar-qualifying USA theatrical release of film 'American Mirror' SECURE THEATRE IN NYC, 1 WEEK* SECURE THEATRE IN LOS ANGELES, 1 WEEK* *Each run of 1 WEEK following the requirements of Theatrical Release as published by the Academy of Motion Pictures of America on its official site". David Shara, Honey Shara and Sarandon knew and had the intention of publicly releasing the Film for profit.

90. In any event, the law implies into every contract a covenant of good faith and fair dealing. For David Shara, Sarandon and Tsitoghdzyan to hold the talent releases hostage and withhold consent over the distribution of the Film — all in David Shara and Honey Shara's admitted "self-interest" and attempt to strong-arm the Plaintiff into ceding control — is a textbook breach of that duty and is designed to deprive the Plaintiff of the fruits of the Agreement, and of many years of work.

91. The Defendants' strategy to coerce the Plaintiff out of his rights under the Producers' Agreement is a model of hypocrisy and of bad faith, in which *malice* outweighs their own prospective losses, since their actions go clearly against the own best interest of each Defendant.

92. For these reasons, the Defendants' actions in blocking the public release for profit of the Film violate both the text and spirit of the Agreement and their own direct promises to the Plaintiff. They seduced him into investing years of work under fraudulent representations as regards to the distribution and as regards to the value of the upfront compensation, the painting.

93. The Plaintiff has been deprived of his right to a portion of the Film's profits since the beginning of 2020, the date when the Oscar-qualifying theatrical release should have taken place, and the date when distribution agreements should have been started being effective. The Plaintiff has had advanced discussions with prospective film distributers in

both the US and abroad about the distribution of 'American Mirror', including by way of theatrical release, TV, airline presentation, and online streaming. However, due to the Defendants' obstruction and the lack of the necessary talent releases, the Plaintiff has been unable to finalize those deals, or to otherwise distribute the Film.

94. To make matters worse, the momentum surrounding the Film that built through the course of 2019 has now been lost. Even assuming the Defendants reverse course and agree to honor their obligations going forward, the prospects of high-level distribution for the Film have been irretrievably impaired. In this respect, the Defendants' conduct deprived the Plaintiff from distributing the Film for the last three years, which has been one of the most advantageous periods in history for streaming video content and documentary films. They saw it happening, and they did not care.

95. The Defendants' conduct has injured the Plaintiff's professional reputation and success. Due to their improper refusal to allow the public release of the Film, the Plaintiff has been unable to leverage the Film's publicity to attract new opportunities. Numerous media outlets of global influence, including The New York Times, had expressed their interest in attending the theatrical release of the Film. In addition, the Defendants' refusal to permit the public release of the Film has interfered with the Plaintiff's ability to develop other projects, including the production of the Plaintiff's new script based on Francis Bacon's life, which has attracted the

interest of multiple Academy-award winning professionals.

96. Notably, as evidenced by the correspondence sent by them to the Plaintiff, the above harms were the very consequences that David and Honey Shara threatened would happen if the Plaintiff did not accede to the improper demand that he turn over control of the Film.

97. The Producers' Agreement establishes that the painting that was to be given to the Plaintiff as his upfront compensation was due to be sent to him "no later than the last day of the month May of 2017". But Plaintiff did not receive the painting until February of 2019. This deprived the Plaintiff of his opportunity to sell it before, but also represents that he was engaged in the making of the Film and in its film festival circuit deployment for far longer than previously thought when the contract was agreed on, by December 2016. The painting, additionally, is of far lower quality than promised to him. Despite this delay, the painting was not of the same quality as the other paintings in the "Mirrors" series, lacking the level of detail and refinement that the other paintings in the series possess – and which make paintings in the hyperrealism genre valuable.

98. The painting has a far lower price than represented by Tsitoghdzyan and David Shara in 2016, and that is because the auction records on which those fraudulent representations of value are fraudulent, the result of a scheme to defraud the public, enacted and executed by David Shara and his associates, and organized directly by Tsitoghdzyan and his

associates. Of note, Phillips NYC, the auction house where the grand record sales were made in 2014 and 2015, did not want even to appraise the painting in 2020, and auction houses of long tradition and recognized prestige in Europe have appraised a starting price of auction of €5,000/€6,000 as recently as September 5, 2022. This is extremely far from the value represented by David Shara and Tsitoghdzyan, and points clearly to other reasons beyond market fluctuation.

99. The Plaintiff has been deprived of his right to set up the public release and distribution of the Film.

100. The plaintiff has been deprived of an Oscar-qualifying Theatrical Release in the USA, with all that it means professionally, that had been scheduled for the beginning of 2020, budgeted, set up, and then cancelled indefinitely because of the Defendants' coordinated, malicious refusal to provide the necessary releases.

101. The obstruction of distribution by the coordinated efforts of all Defendants also cause, in light of their representations and encouragement to make those public releases based on their at that time unambiguous representations as to their intentions to publicly distribute the Film (2016-2020), a clear defamation of the Plaintiff's professional profile, and of his company, Da Vinci Films LLC. Paradoxically, the way the media world perceives the Plaintiff is as a "fraudster" who promoted, via massive press releases circulated by cable news agencies of great prestige, to them the

creation of the Film, and that the Film would be "distributed", but the Film suddenly disappeared just after being run through a festival circuit that collected many awards. The public thus has felt disappointed and defrauded by the work of the Plaintiff as a filmmaker and producer. Numerous fans of Sarandon have expressed their suspicion and frustration towards Da Vinci Films LLC, because they are not being able to watch a film that has attracted their interest since the first moment. This has weighed negatively in the way the public and the film industry players perceive the Plaintiff and his company, and this has happened against the Plaintiff's interest and actions, only as a consequence of the coordinated actions of all Defendants with the sole intention to harm him — they have also defrauded the public. Tsitoghdzyan's and David Shara's representations as to distribute the Film were fraudulent. They pushed the Plaintiff specifically to make public announcements in the form of massively distributed press releases based on their fraudulent representations, only to enrich themselves, particularly Tsitoghdzyan and David Shara and Honey Shara, with the massive publicity generated by such actions, and directly by the impact that such publicity they recognized had on the sales of Tsitoghdzyan's artworks. Recall that David Shara and Honey Shara were and are Tsitoghdzyan's sales agents and art dealers, and both enrich themselves also with the sale of each of Tsitoghdzyan's artwork.

102. The obstruction of the distribution of the Film for nearly three

years has consequently defamed the Plaintiff and his company. The Defendants knew perfectly that this would be the result of their actions. Sarandon is not a beginner in the film industry, and she more than anyone else knew and knows are the consequences of running a successful international film festival circuit and then cancelling the distribution of a Film in the USA, beginning with the cancellation of an Oscar-qualifying theatrical release. All Defendants, but especially Sarandon, knew that the consequences would be very negative in every single aspect for the Film and for the Plaintiff. They did not care about the negative consequences this would have upon them, as long as by doing it the Plaintiff would be ruined. In their calculations the Film's cancellation was not important for an actress, Susan Sarandon, that actually holds an Academy award and makes money on a regular basis by participating in fiction films every year; for Tsitoghdzyan because in the meantime he was able to use the Film privately to promote himself to influential collectors, art dealers, &c., and because the publicity of the making of the Film had flooded the media with oversized notions about his persona and the value of his artworks; and for Honey and David Shara the prospective revenue and profits of the Film are not important in comparison with the massive profits they make in the color diamonds industry and dealing. David Shara wrote it very clearly in May 2019: "I don't care about losing 300,000 USD" and in the same email, ominously displaying his true intentions, he added: "remember, very few

people have signed the talent release…"

103. The Plaintiff has lost the opportunity to leverage the Film's publicity and potential success that would have been unavoidably generated by the Oscar-qualifying Theatrical Release in the USA to obtain new opportunities and develop other projects.

104. The Plaintiff was deprived of two projects that were in development by the end of 2018 in collaboration with David Shara. One was based on the caricaturists that depicted the Jews in the pre-Nazi Europe. The other was a documentary about the biggest diamond that had been mined recently in a Canadian mine. David Shara cancelled these projects with the Plaintiff because Sarandon requested it as a retaliation against the Plaintiff in February 2019. David Shara specifically wrote that the cancellation was not due to the quality of the Plaintiff's work, but directly "because of the way to talk to Susan and Tigran." He also recognized, in writing, that "You have to be careful with Susan. She can ruin you".

105. The Plaintiff has not been able to secure funds for a new feature film project of massive importance, with Academy-Award winning and/or nominated talent in the fields of production, direction of photography, costume, make up and acting (each main talent in each category being an Academy nominee or even two-time Academy Award winner), precisely because of the bad publicity generated among film fund providers by the lack of public release of the Film, and the gap that it showcases publicly in the

way the industry perceives the work of the Plaintiff worldwide.

106.The Plaintiff has not been able to sell the painting that was given to him. Even Phillips NY does not want to appraise nor even to put on auction for reasons that clearly are connected with the scheme to defraud perpetrated by David Shara and Tsitoghdzyan and their close business associates in order to inflate, to create a false impression of impressive value behind the artworks of Tsitoghdzyan for their own self-interest benefit out of the confidence of the buyers generated by such outsized appraisals and auction results.

107. The Defendants' malicious obstruction of the public release of the Film has diminished the potential value of the painting given to the Plaintiff as upfront compensation for creating, producing and directing the Film. The Plaintiff agreed to receive the painting as upfront compensation based on David Shara's and Tsitoghdzyan's representation that the painting was worth hundreds of thousands of dollars, and with the expectation that the painting would increase in value upon the Film's release.

108. As a consequence of the Defendants' actions, the momentum that the Film gained during its festival circuit run between the end of 2018 and the end of 2019, has been absolutely ruined and lost.

109. The Plaintiff alleges that, being obvious that there was never a complaint related to his work in the Film, the quality of his Film, neither related to the honor and image of any of the participants in the Film, since

2016 until this day, and being obvious that the Film only has had a positive effect on each and every participant, as long as the Film was being shown. Thus the Plaintiff alleges that the Defendants have acted motivated by sheer malice out of hatred because of his rights to his own opinions, as much as they have been privately held and never publicly displayed.

110. In order to harm the Plaintiff they had also to act against their own interests. The release of the Film only would further promote the image and publicity of Tsitoghdzyan's own image and paintings; the release of the Film would only represent a revenue for David Shara to recoup his investment and collect profits as described in the Producers' Agreement; it would only further help understand Sarandon's thoughts about serious matters such as beauty and aging, sending as a whole an interesting message to the audience that only makes her look good and further promotes her on the best way possible. Additionally, Sarandon also had agreed in the business proposal, sent by David Shara in 2018 and affirmed by her in writing, to have a part of the profits of the Film, which David Shara offered to her.

111. The fraud perpetrated by David Shara, in close collaboration with Tsitoghdzyan, in order to inflate the price of Tsitoghdzyan's artworks by creating the false impression of outsize value via the manipulation of the auction records of 2014 and 2015 at Phillips Auctioneers LLC, is very troubling in itself, but it is particularly troubling coming from someone,

David Shara, whose main business and source of wealth is based on the faith that others put on his acquiring, cutting from rough form, trading and, in summary, representing the value of color diamonds he sells to others as investment vehicles, valued in the multimillion dollar range.

112. It is only malice that moves the Defendants, with a sense of superiority "above the law" based on their immense wealth (David Shara and Honey Shara being dealers of color diamonds of multimillion value), wealth and immense professional prestige and permanent access to new opportunities (Susan Sarandon), and wealth wrongfully obtained out of the false impression of value created basically and mainly by the auction records noted before, of 2014 and 2015 (Tsitoghdzyan) with the collaboration of David Shara's personal involvement and funds in the scheme to defraud the public.

113. The Film's production budget and film festival budget has been barely over 400,000 USD in total, paid between 2016 and August 2020, given the delay of invoices from 2019. That makes the budget was invested during four and a half years. This is an extremely long period of time before public release according to industry standards. A documentary of these characteristics, should not take more than two years for its production and film festival run. This shows the protracted dedication the Plaintiff had to devote, due to permanent and unjustified delays by Tsitoghdzyan during the filming of the project, due to the need to find a new soundtrack composer

after Tsitoghdzyan had forced as composer a "friend of a friend" of him, whose work was finally found unacceptable by David Shara and the Plaintiff, who decided in common agreement to substitute him.  All thi the budget related to time employed, show the scale of Plaintiff's dedication, results accomplished and low cost of funds provided to accomplish it versus the time it had cost.

114.  Ecstatic about power based on wealth and fame, feeling themselves "above the law", with disregard to consequences and damages inflicted purposely, timely coordinated and visibly united in purpose and action, the Sharas, Sarandon and Tsitoghdzyan have acted like a triad of Golgothan enemies, causing a calvary of severe financial and professional harm to the Plaintiff, and bringing severe emotional distress with real consequences, while at the same time taking advantage of his work and the making of his work. Since the injuries are the consequence of the Defendants' actions out of malice, tortious interference with the contract, with the business expectancies, in material breach of contract, promissory estoppel, fraudulent representations, the Plaintiff deserves relief.

## VIII. RELIEF

115. The Defendants knew perfectly that their actions, depriving the Film of worldwide distribution, and particularly depriving it of the budgeted, approved of, scheduled and already set up Oscars-qualifying theatrical

release in the United States, would exponentially increase the professional harm of the Plaintiff by several orders of magnitude. Wherefore: Order the Defendants to compensate the Plaintiff for the professional harm he has suffered to date as a consequence of their coordinated malicious actions as regards to the Film, no less than $3,000,000.

116. Order the Defendants to compensate the Plaintiff for the professional harm he has suffered to date as a consequence of their tortious interference with business expectancies, robbing him of two new projects as described before, no less than $3,000,000.

117. Order all Defendants to compensate the Plaintiff for the Emotional Distress caused by the malicious actions, causing medical conditions that they have brought upon him in the form of Major Depression and General Anxiety Disorder since March 2022, with the personal consequences that this has caused to him, no less than $2,000,000.

118. Order all Defendants to compensate the Plaintiff for the harm caused by the malicious obstruction of the Film release since the beginning of 2020, taking into consideration that 2020 and 2021 have been the best years for online streaming of documentaries as a consequence of the pandemic-induced lockdowns worldwide. No less than $2,000,000.

119. Order David Shara, and Honey Shara, and Tsitoghdzyan to pay the cost of modifying the Film in order to comply with Phillips Auctioneers LLC's prohibition of showing the auction footage of Lot 217 of October 2017,

including the reasonable costs required to modify the picture and final sound mix and to take all other production steps necessary to revise and finalize the Film for distribution; no less than  $70,000.

120. Order David Shara to pay no less than $2,000,000 as a publicity budget, non refundable from the Film's distribution revenue as part of the general Film's costs simply because it compensates for the damage his actions have caused to the great momentum the film had and it has lost, to be spent initially to promote the distribution of the Film, in order to reboot it — to compensate for the momentum and expectation that the protracted film festival caused, and that was ruined by his actions. This is as a consideration to the fact that the Film, as it has been left in oblivion, has been irreparably impaired by their actions unless such kind of invigorating action would take place.

121. Order punitive damages no less than four times the sum of all harm caused because their actions have been out of sheer malice, and because it can be proven to the Court that they have despised and disparaged multiple occasions to find amicable resolutions since 2020, choosing instead to prolong the ordeal until finally it had caused negative medical conditions upon the health of the Plaintiff.

122. Order to authorize the immediate distribution and best performance of the Film for profit, ordering David Shara and Honey Shara to provide confirmation of the Plaintiff's distribution decisions reasonably and

in good faith.

123. Order David Shara to provide all necessary talent releases that are missing and related to people he personally invited to keep the Film hostage by not obtaining them since 2016, forthwith, including, without limitation, those for Morgan Shara; Ashley Hinshaw; Hilary Rhoda; Ryan Ross; Jules Weinstein; and Melissa Wood.

124. Order Tsitoghdzyan to provide all talent releases he is responsible for and promised to the Plaintiff since 2016 (for the use of both his image and his artworks); his son A.T. (including releases from both Tsitoghdzyan and the mother of his son).

125. Order Sarandon to provide her talent release that she promised to the Plaintiff since 2016, and to him and others since 2017.

WHEREFORE, Plaintiff requests that the Court enter judgment against the Defendants, ascertaining their respective liability as it deem proper and just, in the amount of no less than $12,370,000; together with pre- and post-judgment interest as allowed by law; and Punitive Damages no less than four times the relief sought because the Defendants behaved purportedly in a remarkably malicious manner, even disparaging all the opportunities they have had to find an amicable solution for their own wrongful acts; costs and disbursements of the action; and such other and

further relief as the Court deems just and proper.

## V. PLAINTIFF'S CERTIFICATION AND WARNINGS

By signing below, I certify to the best of my knowledge, information, and belief that: (1) the complaint is not being presented for an improper purpose (such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation); (2) the claims are supported by existing law or by a nonfrivolous argument to change existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Federal Rule of Civil Procedure 11.

I agree to notify the Clerk's Office in writing of any changes to my mailing address. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Dated: On September 6, 2022

Respectfully submitted,

**/s/ ARTHUR BALDER**

2813 Palisade Avenue
Union City,
New Jersey
07087

Telephone:
(929) 888-3802