IN THE UNITED STATES DISTRICT
COURT FOR THE SOUTHERN
DISTRICT OF NEW YORK

—————————————————————x

ARTHUR BALDER,

      Plaintiff,

   - against- -

SUSAN SARANDON,
DAVID SHARA,
HONEY SHARA,
TIGRAN TSITOGHDZYAN

      Defendants.

—————————————————————x

Case No. **1:22-cv-6401-JLR-SN**

**THIRD AMENDED COMPLAINT**

Do you want a Jury Trial?

YES

Plaintiff Arthur Balder ("Plaintiff"), pursuant to Fed. R. Civ. P. 15(1)
(a) as and for its **Third Amended Complaint** ("Complaint") against Susan
Sarandon, for breach of contract, tortious interference with contract, unjust
enrichment, tortious interference with business expectations, promissory
estoppel, plagiarism and copyright infringement, and civil conspiracy; and
pursuant to Fed. R. Civ. P. 20(a)(2)(A)(B), since (A) the right to relief is
asserted against them jointly, severally, in the alternative with respect to or
arising out of the same transaction, occurrence, or series of transactions or
occurrences; and (B) the question of law or fact common to all defendants
arises in the action; Plaintiff thus adds defendants David Shara, Honey
Shara, and Tigran Tsitoghdzyan.

1

# I.  PARTIES

1.      Plaintiff Arthur Balder is a filmmaker and producer with its principal place of business located at 2813 Palisade Ave, Union City, New Jersey, 07087.

2.      Defendant Susan Sarandon is an actress and producer with a place of residence and business at 147 W 15th St, Suite 108 NYC, 10011.

3.      Defendant David Shara is a color-diamond dealer[1] and art dealer and executive producer, with a place of business at 589 5th Avenue #1008, New York, NY, 10017.

4.      Defendant Honey Shara is a color-diamond dealer and art dealer and executive producer, with a place of residence at 124 West 60th St Apt 49A, New York, NY, 10023, USA.

5.      Defendant Tigran Tsitoghdzyan is a painter and photoshop artist, with a place of residence and business at 15 Broad Street Apt 1030, New York, NY, 10005.


# II.  JURISDICTION AND VENUE

6.      This Court has original jurisdiction of the action based on diversity of citizenship pursuant to 28 U.S.C. §1332(a) and 28 U.S.C.

---

[1] [See Exhibit 8—The New York Times on multi million dollar deals of David Shara and Optimum Diamonds.]

§1441, as the amount in controversy exceeds $75,000.00, and Plaintiff resides in New Jersey, while Defendants reside in New York, and all actions took place in New York City, Manhattan, between 2016 and 2023, and New York is the place of residence and/or place of business of all defendants.

7.      Jurisdiction and venue are proper in New York County because all Defendants are located in New York, and because the parties' dispute arises out of actions that took place entirely in New York County between 2016 and 2022. Otherwise, being the plaintiff a resident of Hudson County, New Jersey, if the Defendants were no more located in New York County, CPLR § 503(a) establishes that "the place of trial shall be" "if none of the parties then resided in the state, in any county designated by the plaintiff." If that be the case, hereby the plaintiff designates New York County as he place of trial.

**TABLE OF CONTENTS**

**I. STATEMENT OF CLAIM**

**II. FACTS IN CHRONOLOGICAL ORDER**

       **A.  2016**

       **B.  2017**

       **C.  2018**

       **D.  2019**

       **E.  2020**

       **F.  2021**

       **G.  2022**

**III. INJURIES**

**IV. RELIEF**

**V. ARGUMENTS**

**VI. CERTIFICATION AND WARNINGS**

# I.  STATEMENT OF CLAIM

1.  Place of occurrence: New York State.

2.  Dates of Occurrence: Since 2016 until present day.

3.  Defendants, refusing contractual obligations, out of malice and against their own interest, intentionally obstructed since January 2020 the distribution of the film "American Mirror: Intimations of Immortality" ("Film"), directed and produced by the Plaintiff, for no other reason than Plaintiff voicing his concerns as regards to Sarandon's and Tigran's proven breach of contract against assurances and memos accepted and confirmed by them over years *in writing*, to injure the Plaintiff's professional reputation in the eyes of the public and the film industry, to defame him professionally, to deprive him of his rights under the Producers Agreement and other written agreements confirmed by course of performance; by obliterating, without justification, a previously budgeted, approved of and scheduled for beginning 2020 Oscar-qualifying theatrical release in the United States and an online streaming release in North America and English speaking countries, ruining distribution opportunities that, however, were exceptionally obtained only due to the undeniable international acclaim Plaintiff's work attained, because Defendants actions, *a priori*, precluded (and at that were directed to *preclude*) distribution of any short to be discussed, negotiated or presented to

any market in fair conditions[2] by any party or designated agent, with no other real purpose than to satisfy retaliatory and vengeful ill-will.

4.   This is a civil action against Susan Sarandon for breach of contract, tortious interference with contract, unjust enrichment, tortious interference with business expectations, promissory estoppel, plagiarism and copyright infringement, and civil conspiracy.

5.   This is a civil action against David Shara for breach of contract, breach of fiduciary duty, promissory estoppel, unjust enrichment, fraudulent representation, defamation, tortious interference with business expectations and civil conspiracy.

6.   This is a civil action against Tigran Tsitoghdzyan for breach of contract, promissory estoppel, unjust enrichment, fraudulent representation, copyright infringement, tortious interference with contract and tortious interference with business expectations, defamation and civil conspiracy.

7.   This is a civil action against Honey Shara for unjust enrichment, copyright infringement, tortious interference with contract, tortious interference with business expectations and civil conspiracy.

---

[2] Their not provided signed releases, while *enriching themselves* out of the agreements met in writing and never objected to by them (out of Plaintiff work and the positive consequences it had on them, material, publicity and prestige) acted as a tourniquet willingly placed to strangle the continuity of the film distribution, which they themselves had discussed, recommended and accepted in all manners and in writing, because that was profitable for them.

## II. FACTS IN CHRONOLOGICAL ORDER[3]

## A. 2016

8.     Plaintiff, David Shara and Tigran Tsitoghdzyan entered into a verbal agreement to make the film AMERICAN MIRROR: INTIMATIONS OF IMMORTALITY (the "Film") at the beginning of 2016, to promote the career and artworks of Tigran Tsitoghdzyan[4]. David Shara represented and still represents today Tsitoghdzyan as a sales agent (since at least 2013), selling his artworks and photoshop productions to his colour-diamonds collectors and other business associates of him through his network around Optimum Diamonds LLC, to whom he represents the artworks value in accordance to and over the

---

[3] Unless otherwise noted, emphasis in quotes from emails, SMSs, WhatsApp messages or any other form of communication is always added. Emphasis is also added to some particular allegations that are of especial interest or import.

[4] On 18, 2016, Tigran states in writing via email: "if you had a proper contract with producer, you will be in charge and penalized for 12 month late". It is important because N.Y. General Obligations Law § 5-701, (a) 1 "Every agreement, promise or undertaking is void, unless it or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith, or by his lawful agent, if such agreement, promise or undertaking: 1.   **By its terms is not to be performed within one year from the making thereof**".
    Tigran's written testimony, and not mere allegations, proves factually that the 'undertaking' was to be initially performed *within one year from the making*. Then the initial agreement, referenced to by Tigran in emails CCed to David Shara and Plaintiff, *cannot be declared void*. Delays were only a consequence of David and Tigran expanding constantly their expectations and adding more suggestions. The terms previously discussed should have been included without drama in the contract. It will be plainly demonstrated by emails cited and not by mere allegations, by their own written words, that Tigran and David submitted Plaintiff to extreme duress once he insisted in memorialising terms previously agreed on in contracts.

auction records of artworks by Tigran Tsitogdzyan at Phillips Auctioneers LLC that took place in 2014 and 2015. Tigran's own statements show David's share of all sells of Tigran was then and still is 50% (testimony of Tigran).

9.     David and Tigran wanted Plaintiff to make a documentary film displaying Tigran's artworks and his persona because two other art-focused films directed and produced by Plaintiff had been premiered at the MoMA in 2013 and 2015, with wide media coverage, and because in both the participation of renowned art critic Donald Kuspit[5] had been central. The quality of those previous works played a decisive role in David and Tigran wanting to work with the Plaintiff. Plaintiff had authored more than twelve novels in Spanish, some of them translated into ten different languages, and published originally in the Spanish and Latin American markets by Penguin Random House. On account of his work as a published writer, Plaintiff had been granted in 2013 a Green

---

[5] Excerpt from Encyclopaedia Britannica: "Donald Kuspit, (born March 26, 1935, New York, New York, U.S.), American art critic and art historian widely regarded as the foremost practitioner of psychoanalytic art criticism." Full article at https://www.britannica.com/biography/Donald-Kuspit

Excerpt from Encyclopedia.com: "Career: University of Frankfurt, Frankfurt, West Germany (now Germany), lecturer in English, 1957-59; Pennsylvania State University, University Park, assistant professor of philosophy, 1960-64; University of Saarland, Saarbruecken, Germany, Fulbright lecturer in philosophy and American studies, 1964-65; University of Windsor, Windsor, Ontario, associate professor of philosophy, 1966-70; University of North Carolina, Chapel Hill, professor of art history, 1970-78; State University of New York at Stony Brook, professor of art, 1978 —, head of department, 1978-83. Guest lecturer at School for Visual Arts, 1976—; A. D. White Professor at Large, Cornell University, 1991—. Contributing editor to Artforum, Sculpture, and New Art Examiner; editor of Art Criticism.

Donald Kuspit on Arthur Balder's first film: "**Balder's 'Little Spain' [**Plaintiff's first documentary] **is a kind of masterpiece.**" See at Huffington Post, published July 27, 2015: [ https://www.huffpost.com/entry/artur-balders-little-spai_b_7878804 ]

Card E11, which is the category "alien with extraordinary abilities", a rare immigration permit that is only granted after careful review of the professional merits of the petitioner based on extraordinary credentials, which Plaintiff satisfied to USCIS.

10. 2016's SMSs, emails prove Tigran knew from the beginning that a documentary was going to be made about him and his artworks. Tigran himself proposed to David the documentary to be made, and he proposed Plaintiff as director/producer, because obviously David had no idea of how to produce a film; Tigran encouraged David to finance it; Tigran, who understood this would only represent an enormous advantage for propelling his career, renounced to any profits the film may yield, assured Plaintiff on numerous occasions that he was granting his image permissions happily, also in writing on several emails; Tigran opened the doors of his little apartment to any necessary shootings. Tigran knew the terms of the agreement because written proof shows he was often intermediary between David and Plaintiff at this stage of the project on many aspects, because he was involved directly in the negotiation of those terms in 2016, emails show; Tigran knew that the film was made to be distributed in festivals and commercially, because that was only in his greatest interest in all aspects; Tsitoghdzyan promised to Plaintiff that he would provide any necessary permissions for showing his personal image and that of his artworks and his studio before

distribution 'any time'. It was only natural. Tsitoghdzyan manifested absolute satisfaction as he was invited by Plaintiff to take a look and download video files of some initial sequences [emails and SMSs prove it][6]. Tsitoghdzyan knew the terms of the agreement, since he negotiated some of them directly with Plaintiff, and presented them to David, who also agreed on them on several phone and in-person conversations. The main initially terms were: Plaintiff will have a 40% of profits the film may yield for his work as a producer, once budget expenses recouped by David Shara from revenue, who would have 60%, Plaintiff will get 100x75 painting of series mirrors by Tigran, the model will be Bella Jazmin de la Guia, David and Tigran would be credited as executive producer (Tigran explained many times the money David was investing was also his, so he insisted he deserved at least the credit), as it was natural. They had the intention, as Tigran's words mentioned before in footnote, to finish the project within one year, so by the beginning of 2017.

11.     Tigran expressly promised to Plaintiff to present, whenever necessary, the talent release signed for his artworks, estudio and his image recorded, and also that he would collect same talent releases signed by people he directly would invite (some models he had worked with

---

[6] This happened in 2016, 2017, and 2018. On some occasions, explicitly to show it to 'his parents'. Plaintiff appreciated and appreciates today Tigran's father. Tigran's motive in 2019 to obtain unlawfully a copy of the Film was not to show it to his parents, but to have it and to enrich himself unjustly using it for publicity and business purposes, showing it at private screenings.

before[7]). Plaintiff expected those terms to be signed into a contract, as it is absolutely natural in any industry, but that was constantly being delayed between beginning 2016 and October 2016. Plaintiff had no reasons at the beginning to distrust them. The decision to accept a painting of 100x75 inches series mirrors, derived from the constant representations of value made by Tigran. Tigran insisted that accepting a painting would make production much lighter, because in that case it would not be necessary for David to pay Plaintiff upfront compensation. Plaintiff relied in this representations and the two auction records of 2014 and 2015 of artworks by Tigran at Phillips NYC (paintings that were smaller in size but of same series 'mirrors'), which had been closed at prices much higher that the appraisal estimations published by Phillips NYC [See Exhibit 1, all extant auction records worldwide since 2014 —4 in total—including all online information by Phillips NYC related those two mentioned].

12.     Plaintiff set up, produced, hired personnel, wrote script for first filmings, among others, with actress Florence Faivre[8], art critic Donald

---

[7] Tigran had no issue with the talent release form that Donald Kuspit signed giving permission in writing, neither he had any problem inviting some models he had invited to participate in the film to sign the same form, and they signed it invited by Tigran. However, Tigran never returned it signed *himself.* Moreover, a recorded conversation between Plaintiff and Tigran on July 12, 2022, [a last attempt of Plaintiff to solve the problem] shows Tigran acknowledging that he received it and that he did not sign it because it was 'some crazy contract'. It was exactly the same one he was inviting others to sign. For others was good, he even recommended it, for him it was 'crazy' against what he had promised and represented, also in writing—later will be proved. He could have, in good faith, provided another form signed which was not 'crazy'. He never sent *anything,* because that as an excuse: the problem was not the form itself, but that he did not want to do it.

[8] Florence Faivre has performed with lead roles at "The Expanse", "The Elephant King", among others.

Kuspit [who only accepted to be filmed because he had already worked with Plaintiff in his other two previous projects premiered at MoMA]. Plaintiff had also introduced Kuspit to Tigran, who, not having ever had any kind of art catalog showing his artworks, craved to enlist in his first one an important art critic of world-renown. It was only thanks to the mediation of Plaintiff who facilitated Kuspit to be part of the first art catalog of Tigran. Tigran in SMS and emails shows how impressed and happy was with this mediation of Plaintiff, and also David made similar comments: that was only good for them and their business relationship of selling Tigran's artworks. Plaintiff helped Tigran to set up copyrighting of Tigran's body of artworks, Tigran always being the copyright owner and Plaintiff helping him uninterestedly to achieve this important level of protection, as David also congratulated it.[9]

13.    Tigran suggested Susan Sarandon as a possible asset for the film. Plaintiff manifested that French actress Juliette Binoche was more appropriated for that part of the film he envisioned [feminine beauty in ageing], but he had nothing against Sarandon being part of the film if she

_____

[9] Later on emails by end of 2016 will be shown that the Plaintiff will also be insulted by Tigran as a reward for that.   In October 2016, Tigran writes on an email charged with insults, among other things: "But you forgot that Susan [Sarandon] came for me, as all the others. You got Donald [Kuspit] and he is the one who is getting payed for every his word, so it's not a charity and shows how much respect he have for you…" "By the way Donald [Kuspit] is the only person who asked to get payed, which shows how much respect he have for you." That shows how much Kuspit respected Plaintiff's work. Interestingly he adds to that: "All the people involved in the movie where professionals [he refers to other models participating], and **including Susan [Sarandon] no-one asked to be rewarded.**" Interestingly Tigran offers written proof of what Plaintiff states Sarandon promised to him and Tigran and Plaintiff's wife in person on July 16, 2016, the day she attended her filming.

wanted to be, because he was a big admirer of her impressive, natural acting. Tigran suggested that he had met her before at a ping pong club of hers, and that she was "a woman who flirts a lot"', and that he felt she was "interested in him", and that that may help him convince her. Tigran explained that "she had been attracted to him at her ping-pong club SPiN", and proposed invite her to make a portrait of the series 'mirrors' [generally faces of women with transparent hands covering them].

14.    Plaintiff assessed Tigran in the emails sent to Sarandon to be part of the series 'mirrors'. Those emails date from April 12, 2016, onwards. Tigran clearly suggested: "I will write him [Brian Gibbs, Sarandon's assistant] about painting her [Sarandon] with few examples, nothing about the documentary". Tigran explained Plaintiff that he intended to get her in the Film, that that was his most important goal, but that to do it it was better that she did not noticed his true interest right at the beginning, and that it was better to only invite her to make a 'portrait' at the beginning. Tigran sent the email, Sarandon answered affirmatively. Tigran shared the email with Plaintiff and David Shara. David, writing to Tigran [CCing Plaintiff] "get her involved in the creative process". Tigran affirmed then: **"Ok I will ask for a quick meeting and it will be a great opportunity to explain her face to face about the documentary project and tell her that we want to include this**

**[her portrait] in the film."** David answered: "Tigran needs to show her that he is able to capture her essence, her soul, her inner beauty, her charity, her strength…" **and then he added, more explicitly: "She needs to fall in love with tigran"**, "He needs to be able to call her directly and speak to her. The relationship is everything. Friends…. Tigran, I would recommend that when you photograph her that you give her a short "interview" that you will learn insights into who she is." "**Make it PERSONAL.** Show her what an amazing person you are." Tigran agreed and answered: "I will meet Susan after 27th! **Super excited, <u>especially to get her for the documentary!</u>[10] <u>It will change the status of the movie!</u>**" David Shara: "Did she agree to be filmed for documentary?" Tigran answered: "didn't say anything about the documentary so far, will in person when we will meet" David Shara closed the email thread: **"Gotcha, smart…"**

15.     On April 15, 2016, SMS by Tsitoghdzyan to Plaintiff: **"We got Susan!"** Her acceptation to participate in the film was the result of a team work. Tigran had shown her several excerpts of the footage already shot until that date. In phone calls Tigran described to Plaintiff how Sarandon had loved the project, Tigran's paintings and also the sequences hitherto shot and presented in form of rough cut. Tigran was clear about

---

[10] Tigran had never introduced women in the series 'mirrors' that were not very young. Plaintiff's original idea was to elaborate on the idea that beauty not necessarily is attached exclusively to youth. Sarandon's participation was a result of that idea presiding over.

that: 'she loves the film as it goes and wants to be part of it'. He also added that she did not want anything in exchange but to be well portrayed. Tigran also was explicit about Sarandon inquiries about Plaintiff: Tigran had 'explained her the impressive films you have presented at MoMA.'[11]

16.    On May 5, 2016, SMS by Tsitoghdzyan to Plaintiff: "My doorman buzzed me this morning "Susan Sarandon is here for you" :) how cool was that lol so she was super nice, she came alone and stayed here for 2 hours, nice talking! And I took all pictures I needed! **She is fine to give a shooting day end of this month, so everything is rolling!** :)"[12]

17.    On May 24, 2016, the Plaintiff advised via SMS to Tsitoghdzyan: "I sent you an important email. Sarandon's young brother died past Thursday heart attack." The same day four hours later Tsitoghdzyan replied to it: "Ok got it.. I will write a word" Tsitoghdzyan did not have any idea of the death of Sarandon's brother, and it was Plaintiff's wife, always supporting Plaintiff in all sense, who noticed the news somewhere, and Plaintiff decided it was important for Tigran to send condolences to Sarandon, which he did.

---

[11] This is only natural: Sarandon is no beginner in the film world. Her talent and career has only been affirmed, admired and even aggrandised by Plaintiff: she knew already the project was interesting; she did not jump into a shooting, which dates she herself chose on July 16 2016, without her own conclusions as regards of the person who was at the helm of the project and what Plaintiff had done before.

[12] Shooting date was postponed.

18.     During these months of 2016 Tsitoghdzyan forwarded to Plaintiff many SMSs from David, describing when and who would be participating, among David's collaborators and invitees. David, when asked about the image talent release of those persons, answered that it was only natural they were very good friends of him and that they would provide them at a later date, that there was no doubt that they would do it that way, that Plaintiff should trust him. It was only reciprocal logic that Plaintiff would obtain the talent releases signed by people who were being invited by Plaintiff, a mutual [fiduciary] responsibility acting in good faith. Plaintiff did it, got them signed, shared a copy of each release signed with David, emails prove.[13] An a paramount example, Plaintiff requested from world-renown art-critic Donald Kuspit to sign a second copy of the release and to be sent via mail to the offices of David as a deference to David, and David Shara acknowledged its reception in writing via email, visibly proud of receiving the letter.

19.     Plaintiff tried on several occasions to settle a contract with both two other parts involved, Shara and Tsitoghzhyan, but they always found apparently reasonable excuses to postpone mainly because they were busy. Plaintiff's attention, responsible for all filming as a producer and director, and since Sarandon's filming date was close, was absorbed

---

[13] This representation and promise made by David Shara as regards to obtain the talent releases was made unambiguously, and was part of verbal agreements that nobody could imagine David Shara would one day break just to harm the Plaintiff and the film, as has been the case.

mainly by that and other important tasks. He had no reason not to trust David or Tigran verbal agreements, meant to be performed in less than a year.

20.     On June 1, 2016, Plaintiff sent a production memo as to how things stand with the Film's productions cost to David, CCing Tigran. The email proves that: 1) parties intended to premiere the Film in Yerevan Film Festival, Armenia, commenting of dates 10-14 July, 2016, **which proves that the Film was supposed to be made in less than 12 months[14];** 2) it shows that Tigran and David were adding more demands to the initial Film proposal, extending the obligations of Plaintiff, which Plaintiff accepted but not as an unrewarded full-time dedication; 3) due to Sarandon's delay of the shooting date, preliminary scheduled for May, finally took place on June 16, informs of delays and explains origin of additional costs; and more importantly, David Shara explicitly asks in an answer CCing Tigran: "Thank you for update… How much to finish completely including you?" Plaintiff elaborates on previsions, and states very clearly addressing that question: **"I have an agreement with Tigran, as I think he told you, since I do prefer to have an original painting as a reward than just being paid."** This Plaintiff had agreed based on the representations of value made by Tigran and David. It is clear that by this date both Tigran and David cannot deny *that **they***

_____

[14] These agreements, although oral, are not barred by the Statute of Frauds.

***knew of the existence of this agreement***, *that it had been commented to David, and neither David nor Tigran objected in writing or verbally to this detailed and specific string of emails*, which also proves that the undertaking was meant to be taken to competition —distribution being the last step— before 12 months.[15]

21.    Plaintiff prepared and advised on the communications with Sarandon as regards to participating in the film, prepared rough cuts of sequences in order to be shared with her by Tigran to show her the kind of work that was being made. Plaintiff also sent directly to Sarandon emails describing the kind of filming and the the quality he expected. She knew from the beginning by means of these communications that Plaintiff's artistic expectations were high, which was obviously a reason why she felt confident in participating. In emails leading up to the filming date, starting June 9, Brian Gibbs [Sarandon' assistant] received an email from Plaintiff, in which Plaintiff details the equipment he intends to use, and requests if Sarandon has any special demands, to include them in the shooting schedule of 16 June 2016. Brian Gibbs answered: "Tigran, did you discuss this with Susan at your first meeting? She never mentioned anything about being filmed for this so I'm not sure." Tigran answered

---

[15] Its continuation show that same string of conversations will be re-sent to David Shara in October 2016 when, shockingly and against all logic and against what they had agreed on, David and Tigran insulted, bullied and coerced Plaintiff because he simply wanted to set all this terms in contract form. And even David answers it denying simply what is there written and in their knowledge, and what they did not objected before Sarandon's filming. Once Sarandon was filmed, they wanted to get rid of Plaintiff, although he had been responsible of all the work, and at that successfully according to their own stamens, and congratulations.

reminding him about what Sarandon had assured him: "I told her that I'm in the middle of this documentary since a while and Arhur is documenting everything during this period of time. **Also the whole process of Susan's painting would be covered in every stage and it would be great if she could appear there for few minutes... We also talked more detailed about that when Susan came to my studio** for the photo shoot and we planned to do this later end of May or in June. So **I had her agreement that day and then we planned for June 16th at 12**." Sarandon's assistant confirmed: "Thank you both. **Susan said she doesn't have any requests, so I think we're all good.** Some water would be nice. Maybe some fruit if possible?" Plaintiff answered: "Of course will be there and water and someone specifically to take care of this. **Let her know I will receive her downstairs and that I am immensely grateful for her visit**."[16]

22.     The day before Sarandon's filming, **Plaintiff sent the script to Tigran, to memorise the questions**. Tigran received it via email and SMSs show the confirmation and that he studied it. A comparison of the file attached to that email and the questions Tigran poses to Sarandon's in the film shows 95% of the scene comes from Plaintiff's script. An SMS sent by Plaintiff to Tsitoghdzyan on June 16, 2016: "script sent". That was the script of Sarandon's sequence before the filming date,

---

[16] Plaintiff, Tigran and Plaintiff's wife received Susan downstairs on June 16, because Tigran's apartment, turned into a filming location, was crammed with people.

with specific questions to be made. Tsitoghdzyan answered via SMS "Ok got it" "Too much to memorise! My brain is so tired" Plaintiff also prepared the shooting script, camera positions, and produced the scene entirely. Two of the most powerful cameras were used, one of them equipped with the most advanced zoom Angenieoux that existed, in order to avoid changing lenses [Sarandon knew it, it had been described to her]. The scene with Sarandon is the central pillar of the film because of its quality in every single aspect, from content to image, and has been praised on many fronts, and it is the result of Plaintiff's script, not the result of Tigran's own ideas coming to him spontaneously, and Sarandon's reactions on camera to those questions prepared by Plaintiff and posed by Tigran. Those are Plaintiff's ideas prepared to give form to the film according to his preliminary vision: the film is not the result of random occurrences at all, but of Plaintiff's dedication to its every single aspect for years.

23. On June 16, 2016, Plaintiff, Plaintiff's wife and Tigran received Sarandon downstairs at the building entrance (Tigran's place) while scores still were fine-tuning the painting studio transformed in a film set. Briefly some ideas were discussed as regards to the shooting upstairs. Sarandon was kind, open, receptive to Plaintiff's ideas, professional, confident about the situation, and assured that she would provide any necessary talent release signed, either sent by Plaintiff or prepared by her

own agent, in order to guarantee distribution. She also stated that there was no problem promoting her participation in the media, if any press releases to be sent. Plaintiff had no reason not to believe the representations, made so clear by a personality of the film industry for whom these protocols are more than well-known, and whose talent Plaintiff had always admired, and he took for granted that her word must be 'gold-standard' and trustable 100%. He was wrong, later actions of Sarandon will prove. Sarandon also made it clear that she had come to be part of the film as an uninterested donation, and that she did not want anything as a compensation apart from "Tigran making a good portrait of me", she joked, and Tigran blushed. Tigran's own written statements also proof this, provided later in this Complaint.

24.     Plaintiff directed Sarandon and Tigran, they followed his instructions, the recordings prove, from "action" to "cut". Sarandon followed Plaintiff's brief directions and indications, and guided Tigran's masterfully. It was only natural that Tigran was insecure, and she helped him. A specialised make up artist of the highest level took care of Sarandon for almost one hour before filming.

25.     Rough cuts of the scene were later shared with David and Tigran, both expressed absolute elation at Plaintiff's work. Both congratulated him, and both expressed, in writing, enthusiasm and positive surprise at the result. It was the impression of Plaintiff that

nobody expected Plaintiff's work to be of that quality; nevertheless, the result was there, which was what mattered.

26.    On June 18, 2016, Plaintiff sent a letter to Sarandon via email. The email title is: **"A letter for Ms Srandon with greatest gratitude."** It was his spontaneous way to express what he felt for her participation. The email did not have any answers, neither any answer was expected, since its purpose was to express sincere gratitude for her having decided to participate in Plaintiff's film. That email further proves that Plaintiff was genuinely and truly thankful for her participation, and he expressed it unambiguously and spontaneously. Her later actions are only reason to unfathomable disappointment.

27.    Tsitoghdzyan had affirmed again his promised to Plaintiff, also, that as a compensation as a director he would paint a portrait of Plaintiff's wife of 100x75 inches. Plaintiff's wife was present during that conversation. That Tigran promised happily, and without ambiguity, because he had been watching the first rough cuts of many sequences filmed in 2016 [SMS of Tsitoghdzyan show utmost satisfaction after watching them], because he had seen the footage of Sarandon's scene, and because he had seen a rough cut of another important sequence already shot with actress Florence Faivre that had been shot in exteriors [Manhattan Henge]. He and David had already asked Plaintiff to promote the film and Sarandon's participation in the media 'massively'. All results

were being congratulated on a regular basis. Both Tsitoghdzyan and David manifested their utmost satisfaction with the work of the Plaintiff, yet David did not find any time to sit down with Plaintiff to give form to the contracts promised. He rather relied on Tsitoghdzyan being a kind of intermediary, since they were partners in selling Tsitoghdzyan's artworks to wealthy clients of David. Tigran had behaved as if he was another partner of the film, one interested because of different aspects than distribution and profits, but nevertheless very interested because its making, promotion and distribution only would enrich him in every single aspect [artworks sales, publicity, fame, professional respect, opening possibilities with galleries &c].

28.    For instance, on May 26, 2016, Tsitoghdzyan sent an SMS to the Plaintiff: "Just talked to David. Email him invoice and your wire information, he will wire you 20k tomorrow" The level of implication of Tsitoghdzyan leaves no doubt regarding his promises and guarantees, and how happy he was with the way things were going and with Plaintiff's work. That is just an example among many other instances, showing that Tsitoghdzyan had full knowledge of the terms discussed, and he himself promised, making all sort of guarantees, to Plaintiff that he would sign the permissions necessary soon in the future upon return from Armenia, since he intended to visit Armenia for a few months in summer 2016.

29.    SMSs show Tsitoghdzyan received and downloaded full video

files related to the rough cuts of the film. An SMS sent on June 1, 2016 shows Plaintiff's dissatisfaction with David Shara's attitude as regards to the lack of contract, sent to Tsitoghdzyan.

30.     Plaintiff was contrary to the idea of including Sarandon in press releases, although David Shara insisted on that to happen immediately after filming her. SMS sent by Plaintiff to Tsitoghdzyan: "just quickly to write here that I don't think is appropriate to let Susan participation go into news immediately. Looks like we are in a hurry to exploit it, and we will loose her confidence and look like scavengers. I think we should think about it and win her confidence. The film can be positive and successful also for her the way I see it." And Tsitoghdzyan's answer was: "Ok But **I don't think she mind if we advertise her presence**.." On in person conversations Tsitoghdzyan insisted that press releases should be prepared, and David Shara insisted on that on phone calls.

31.     The project was going extremely well, yet he did not understand why there was no time to sign a contract as time passed by and more scenes were built. Particularly after filming Sarandon Plaintiff began to feel uneasy about the situation.

32.     As regards to distribution, SMSs sent to Tsitoghdzyan from Plaintiff inform him of distribution possibilities: "I'm also to start preliminary contacts with mayor distributors of art house docs I the US,

among them Kina Lorber, to spread about the project, we have many chances to get all production moneys back." And Tsitoghdzyan's answer was: "Great"

33.    It cannot be disputed that Tigran had full knowledge of the process, was even overseeing some parts in the name of David, had full knowledge of the film made was to be distributed, and had full knowledge of the material filmed, as the SMS exchange on June 23, 2016, sent from Plaintiff to Tsitoghdzyan shows: "can we meet on Saturday? Will give you hard drive with all footage"

34.    On July 29, 2016, SMS sent from Tigran to the Plaintiff, who requested the image of the portrait of Sarandon to be included in the film, Tigran answered: "It will be done in September when I come back" [from Armenia].

35.    Between July and September both David and Tsitoghdzyan were absent. They had received in July via email a rough cut comprising all scenes, obtained hard drives with copies of all footage, they congratulated via email the quality of the work, yet they had avoided to give form and settle a contract in black on white with terms discussed and (apparently) happily approved of. Plaintiff insisted to David on a few phone calls, before their absence, in meeting to settle the terms of the contract as they had been discussed, but David said he was busy, and Tigran was in Armenia for three months, and again postponed it.

36.    In September 2016 Tigran met the Plaintiff to introduce a composer of his choice, who had been a recommendation of a friend of him. Plaintiff thought the composer was not the best choice after listening some samples, and he thought Tsitoghdzyan was trying to make decisions that could affect the film dramatically and that should not be made by him, but by Plaintiff, who was the producer and director and author of the original idea. The lack of contract establishing credits and responsibilities was becoming a problem, interfering with the Plaintiff's professional responsibilities. Plaintiff felt urged to raise the question of the contract clarifying all.

37.    On October 2, 2016, Plaintiff decided simply to start the conversation regarding the signing of contracts, and sent an SMS to Tsitoghdzyan: "We need to sign the contracts, they will be ready tmrw so that you can read them and then we talk.[17] I think it is important some things stay now clear black on white and they reflect the way we proceed." Tigran answered: "Ok". The Plaintiff sent two contract forms as a proposal via email, and he added via SMS: "Hi I sent you right now the contract's proposal. I think it is a very important step. The email contains a couple of clarifications that preliminary you should read. Then we can talk about it openly. We keep on working on editing."

---

[17] Nothing in the tone of this invitations sent by Plaintiff will show an imposition to sign that contract sent, because, beside main terms, necessarily also contracts, he expected, needed to have customary stipulations added that were regular in the film industry. Recall he had produced and directed three other films before, as briefly outlined in previous pages.

38.    Tigran did not answer the email with the contract proposal, neither the SMS. Since Tigran had been an intermediary and since he had stated on many occasions that the film was being financed in reality with the money that was coming out of the sales of his paintings, presenting himself to Plaintiff as the very person whose artwork's sales were making the production possible in reality, and since David obviously had no time in sitting down to draft and sign a contract, Plaintiff sent the proposal to Tigran to sign a compromise at least with him, that would give Plaintiff some written guarantees as regards to what had been not only agreed on, but executed in common agreement with David and Tigran.

39.    In absence of answer, which he found strange because it was an important mater, Plaintiff sent another SMS on October 7, 2016: "Did you receive my email? Also, regarding effects  [*i.e. special effects to be applied to some sequences*] proposed is more than late[18], and I'm still waiting for some indication."

40.    Again there was no answer, and on October 10, 2016 Plaintiff sent another SMS: "Hi Tigran. If you have some health issue that makes impossible to you to establish any kind of communication, I'd like truly to hear that you feel better. In any other case let me impress on you that this attitude is for me, at a personal and professional level, especially in

---

[18] Because, as stated before and as proven by Tigran's quoted email before, the undertaking was supposed to be performed fully in less than a year.

our circumstances regarding the film, total and absolutely unacceptable"
Same date Tsitoghdzyan replied via SMS: "I'm sick since I read your
email… I'm very upset and sad! We better meet all[19]"

41.    To Plaintiff's surprise, this drama and hostility had started
because the Plaintiff simply sent a two contracts proposal to sign with
Tsitoghdzyan as 'Executive producer", one collecting the terms for the
Plaintiff's work as a Director, and the other as Producer of the film, in
order to feel peace of mind as regards to his credits and to the terms that
simply had been agreed on before. On October 15 via SMS Tsitoghdzyan
proposed to meet "all" including David at his [Tigran's] place. For Plaintiff
it was strange the sudden and inexplicable hostility with which he was
being met just for simply insisting in earnest in signing contracts, and his
wife, also surprised with all this development, suggested to Plaintiff not
to meet with them at a private place, but at a public place, and so
Plaintiff requested to Tigran. SMSs sent also reminded on the great
favours Plaintiff had done to Tsitoghdzyan by convincing Donald Kuspit
to be not only part of the film, but also to write a long essay for the first
ever catalog published about Tsitoghdzyan, and to date the only extant, to
which also the Plaintiff contributed with a long essay.

42.    Nevertheless, on October 18, 2016, Tsitoghdzyan sent an

---

[19] The email, at the disposition of the Court for the sake of clarity, and not included here to avoid the
burden of making this complaint longer than necessary, does not contain anything wrong, but simply
the contract proposals attached and an invitation to read them… The sole mention of contracts, and
the fact that Plaintiff was seriously requesting them, made Tigran "sick" and even "upset".

abominable email, not rude but simply insulting, filled with demeaning to the Plaintiff, CCing David Shara. Suddenly all the work Plaintiff had done was "crap", among other things, because he had presented a contract proposal. There he stated: "you got the money and the green light **only because David trusted me, not you!** I want to remind you that we work with David already many years now and never had any financial misunderstandings or issues", "your budget proposal was completely unprofessional!"[20], "So it will be honest to say, that **you can do a crap movie with 80k**". As regards to the 100x75 inches painting, he again represents its value, stating "**and 200k value painting for your work this will never been accepted...**"[21]; "You didn't have a penny in your budget.. Is it professional? And I will tell you how it works in the movie industry..[22] You as a director is doing a script or artistic proposition and submitting it to independent movie producers with a professionally done budget, as they know the business. **If you are a respected and known film director**[23], there is no problem to find a producer who invest in your genius ideas"; "**if you had a proper contract with producer, you will**

---

[20] They have added more scenes to shot since the very preliminary conversations, and the budget had consequently changed as new ideas were being approved and shot. Budgets were commented and approved of before executed, and there had been no problem, only elation and congratulations in light of the results.

[21] Suddenly Plaintiff's work, otherwise congratulated to elation, was 'crap', and his work was not worthy what he had promised.

[22] In front of David Shara and Plaintiff, suddenly Tigran knows a lot about the film industry, treats the producer and director as if he had done nothing, and gives lessons.

[23] It seems a director is respected only if he is "known".

**be in charge and penalized for 12 month late**"[24]; "I used all my contacts to PR the upcoming movie at the Locarno festival, where 2 of jury members where expecting our film presentation 6 months ago, as well as Golden Apricot and Geneva festival."[25] He added more to humiliate the Plaintiff: "All that was for the respect to me." Although there is no evidence of the Plaintiff manifesting any anger, neither in SMS nor in emails, because this chronological exposition is exhaustive and shows what is there and that's all that surrounds the situation of the contracts, and the contract proposal was just a start point to address at last the conversation forever postponed in earnest, he added: "don't know where all that anger comes from…" There is no evidence of anger on Plaintiff's side, yet the false accusation will become a leitmotif.[26] "By the way Donald [Kuspit] is the only person who asked to get payed, **which shows how much respect he have for you**."[27]  It is necessary to clarify that Kuspit asked for a fee, according to Tigran's own words, for his work as a critic in the catalog, but granted unbounded permissions in writing to

---

[24] Recall note before: Tigran acknowledges the agreement was for less than a year time performance, yet he errs, however, in recounting dates.

[25] It must be noted that the film NEVER participated in any of those festivals, in spite of the long list of festivals that selected and awarded it.

[26] Whenever Plaintiff asserts his rights or reasons his opinions, he will be accused of 'anger', and even 'hate speech'.

[27] It seems that we must understand that if the most important living art critic is presented to him by the Plaintiff, facilitating that and bringing him to his studio, and then that art critic requested to Tigran a fee for writing a text, then it is the Plaintiff's fault, and that is simply because Donald Kuspit does not respect the Plaintiff…  that is why Kuspit participated in two other films of the Plaintiff.

Plaintiff for using his image in the film. That shows how much Kuspit respected Plaintiff's work, to Tigran's enrichment as subject of the film. Notably he adds to that: "All the people involved in the movie where professionals, and **including Susan [Sarandon]  no-one asked to be rewarded**." This is testimony by Tigran of what had been represented and promised to Plaintiff, and what Sarandon said herself to Plaintiff in person in front of his wife, from the beginning, that Sarandon was willing to participate expecting nothing, and what she herself had promised and said to Plaintiff in person.[28] Tigran, in his email designed to present suddenly the Plaintiff under the worst light possible to his partner, David, simply because Plaintiff presented a contract proposal, continued: "Then you come back and tell me that you have been writing a fiction movie script and want David to produce it for some many millions of dollars. You just got comfortable with what you got, and your appetite grew up.. It's good to be ambitious, but in a healthy way. You was openly saying that what you want to do is fiction, big budget, big money.. So when David didn't get interested in your script you came back to this movie and we slowly started to move on and it looked more like selling ['sailing'] in the open see ['sea'] without a GPS." Basically Tsitoghdzyan accused the Plaintiff of having written a fiction script, and the fact that

---

[28] She changed her tune at a later date, chose what she wanted for her filming, and accepted profits offered by Plaintiff and later by David in his business proposal sent in 2018, also part of following exhibits.

those ideas had been received with real interest by David, who never was intended to be a producer of such projects contrary to the false representations Tigran made here, but simply because he had shared it, that was *alarming* to him, and insults Plaintiff and his work after months congratulating him for every single aspect of his work; then demeans the work of the Plaintiff, contrary to all evidence and congratulations he had sent, comparing his work to **'sailing at sea without a GPS'[29]**. He added: "I think you got really on it this last 6 months, especially from the moment when we got Susan[30]. And then again, you felt that it can get big and you decided to dictate new rules. **But you forgot that Susan [Sarandon] came for me, as all the others. You got Donald [Kuspit] and he is the one who is getting payed for every his word, so it's not a charity[31] and shows how much respect he have for you...** If Susan will ask to get payed for this we'll need to break the bank, and you know it." "I was extremely open with you and never had secrets since we met. **nobody knew more about my private live then you did**." The comments Tigran made about Sarandon to the Plaintiff, and that the Plaintiff alleges, must thus be trusted following Tigran's own

---

[29] The accolades obtained by the film from independent juries all over the world answer Tigran's insults, which also are in stark contrast to Tigran's previous congratulations to Plaintiff for every single move he made, and show that his intent was other: to get Plaintiff fired because he did not need him anymore.

[30] Sarandon was filmed on June 16, 2016, four months before.

[31] again, Sarandon's promise was she did not want anything in exchange for her participation.

statement. As regards to why he felt 'sick' after receiving the email with the contract proposal, Tigran states: "So now you are asking why I got sick after reading your email? Well if you truly don't understand I will explain you! First and the biggest thing is that I felt completely betrayed by a friend." It seems that Plaintiff had no right to try to settle terms on a contract, that he had to act blindly on promises, and we will see how they have been broken over and over by Tigran and others. He added: "Not sending **like a freakin' lawyer** composed letter, with such a personal detachment as we are just business partners and complete foreigners…" Lawyers and written agreements are not, in Tsitoghdzyan's view, trustable. He continued: "When I received it I felt that the moment I open it it will destroy everything.. And it took me 2 days to open it! After few hours my fever went 42 and I was feeling worst than ever for 7 days straight in a complete loneliness, after what as a bonus I got **your crazy attitude by text messages…**" The SMSs are referred to before and noted in this Complaint, and they discredit this dramatic setting he presents only to place Plaintiff under the worst light possible to David Shara [remember, CCed to the email], the Plaintiff simply asked why there was no answer of any sort, and even made a note as regards to any possible health issues to justify it. Tigran added: "From the moment we agreed on the movie project I was living with it.. **I was seeing sequences**, was sharing with you all my visions and points of views. It

became my project as well, **and believe me, <u>I'm honest that not even for a second I had thoughts that I want a dollar for it or any credit</u>**[32]. He recognised he had been promoting the distribution of the film to the media: "I was talking amazingly about you and your movie in all and each Armenian medias, and **many people including officials where looking very much forward to see the premiere in Yerevan** and meet you in person!"[33] Tigran added: "**And after that you name me as a executive producer to sign contract with me avoiding David?**" The facts described before, supported by SMSs as evidence, show that those statements were false: Plaintiff had been trying to settle on a contract with David and Tigran what they had stated and affirmed and promised. Since Tigran had been very close to the project and acted as trusted intermediary, Plaintiff simply presented a proposal in the form of contracts to him. Tigran's email continues: "Without David this film will never start and no-one will finance you for this project! **<u>I refuse any kind of rewarding for this movie, I'm a subject here and don't want any credit, percentage or other rewarding forms for it.</u>**

---

[32] Tigran makes it very clear what is his position as regards to permits for his image, artworks, business expectation, during this exchange of emails that is taking place. He clearly states he never wanted anything, now attorneys of him and the others state that Tsitoghdzyan and Sarandon never stated that and they *have* today the right to negotiate everything. See MTD.

[33] The film never premiered in Armenia officially, but Tigran requested and obtained unlawfully, with the direct collaboration of Honey Shara, a copy of the final film in July August 2019 in order to show it privately to everybody because there was a kind of big solo show of him in Yerevan. He obtained that copy unlawfully, while denying to sign the talent releases he had promised for him, his son, a minor, and his artworks, to thwart the distribution of the film, as it will be further detailed later on this papers.

**David is the one and only producer**, he invested tons of money[34] in this and you should deal with him what are the conditions and shares after he get fully his money back! As it was planned from the beginning!"

43.     Tigran dictates how things should be, depriving Plaintiff in front of David of Plaintiff's only logical credit as producer, since the film was his original idea, and since he had done all a producer does, but importantly Tigran acknowledges in writing: ***"I refuse any kind of rewarding for this movie, I'm a subject here and don't want any credit, percentage or other rewarding forms for it."***

44.     Tigran email adds: "I got sick because you, my friend, **send me a fuckin contract right before releasing the film,**[35] **obliging me to give you a painting, not any, but the largest size I ever did. in your timeframes, model of choice, framed and signed...**" Suddenly he acknowledges what he had promised as if it had been an obligation imposed on him, which is false, it was part of the deal, or at least that is what he had represented. Interestingly he adds unambiguously: **"Regarding the painting I want to tell you the lawyer in you forgot the fact, that David as my manager owns 50% of the paintings I produce, so your demand and then the "contract"**

---

[34] The Film's total budget, spanning four years of dedication, barely surpassing 400,000 USD, is ultraslow given the results, quality, time of execution and dedication, and even its film festival circuit performance. It orderly distributed, it would have yield many millions of dollars since beginning 2020.

[35] This testimony of Tigran further proves that the initial verbal agreement and its terms were meant for an undertaking to be "performed within one year".

**needed to be addressed to both of us and get the two agreements and signatures.**" Although trying to discredit the situation from a personal point of view, he also acknowledges the existence of the agreement and the moment when it was met: "I remind you how you told me very randomly while we where walking in the street in the middle of the film process... You told me that from now on you see us as friends, as a team where we should stick together and that you want very much a painting from me"[36]. Tsitoghdzyan added offences: **"Today I feel like i hooked up with a hot girl who ask me to pay for the sex right in the middle of the action..."[37]** If that were not enough, he added, making fraudulent, reckless representations of value he had been making for a year: "**You ask me a 200k painting.. nothing less!** To be honest with you, **I was planning to paint your wife, but it was a present for me! A present from friend to a friend, not a payment for something! I will never paint anything by contract...**"; "I exist as an artist with or without this movie, **but you cannot exist without it as a film director[38]**. Your ego and ambitions are beyond I can take, and your

---

[36] The actions described before, the favours Plaintiff did to Tigran, and all the communications only show that Plaintiff had reasons to consider Tigran a true friend. It was only natural to expect reciprocity from Tigran.

[37] To put it clearly: Plaintiff is simply compared to a prostitute by Tigran CCing David once Plaintiff requests to put on paper what had been accepted verbally before. This and other hard insults, creating a toxic bullying ambient of duress under threat to 'scrap the project', should be kept in mind that come from Tigran and David, because they will be worthy being put in context in the events of 2019. **Plaintiff never writes anything even remotely similar to anybody.**

[38] I.e. if the film is 'scraped' Plaintiff will suffer the professional harm of losing it after so much good work.

attitude and inappropriate text messages blew my mind." Plaintiff has presented ALL text messages exchanged with Tsitoghdzyan around this time for the sake of absolute clarity, which are obviously the ones Tigran is referring to, and it seems that Plaintiff had no right to ask Tigran if he had received the contract proposals and why he was not answering, plus it seems that Plaintiff denying to meet him and David at Tigran's apartment was something extremely bad. Plaintiff believed that, given the hostility his insistence on contracts had raised, he did the right thing not meeting them in person. Tigran added on same email: "**I don't want to take away the credit of your good work throughout the film**". Then, notably he adds: "**If one day this film see light, no matter who and how will release it you should get full credit as a director and nobody can take it from you. I'm out of this and David will decide if this movie will ever see the light or not. I trust all my rights as the subject of the film to him and only![39]**" "I cc this letter to David, because all this is between 3 of us."

45.     We cannot emphasise sufficiently his written statement. He affirms unambiguously that he grants permission and also, as noted before, that he did not want anything from the distribution: ***"I trust all***

---

[39] Tigran had promised to Plaintiff to present the releases, but now he leaves no doubt as regard to the fact that David could have gotten Tigran's releases anytime and 'expeditiously'. David never obtaining it is just a coordination with Tigran and Sarandon orchestrated at a later date to harm the Plaintiff and the Film. All will act in bad faith and against written assurances that are contractually binding.

***my rights as the subject of the film to him and only!"***

46.     That is an email sent by Tigran to demean Plaintiff in front of David Shara, to paint the Plaintiff in the worst colours imaginable, presenting false perspectives and conclusions, to turn the man who had obtained almost all principal photography excelling in all aspects, the person Tigran and David had been congratulating, the Plaintiff, into someone who should be fired immediately because he had stood his ground and requested contracts to be signed; in short, it is a preparatory email to either get the Plaintiff 'fired', or to force him to renounce, or else to facilitate coercing the Plaintiff into terms that were not those promised. Plaintiff was being bullied, insulted, and then placed under duress. It was now only crystal-clear that they both had intended to go ahead without signing *any* contract with the Plaintiff, and that Plaintiff's insistence had broken their plans.

47.     Plaintiff answered to David and Tigran the highly insulting previous email professionally, and reasoning Tigran's statements point by point. As far as we know, Plaintiff has the right to his opinions. Plaintiff's self-defence, however, made Tsitoghdzyan angry and aggressive, and show his true colours, who on October 19 answered again CCing both Plaintiff and David. The reasoning of the Plaintiff, of course rejecting the affirmations of Tigran's email citing evidences of the past, who was being trashed via email by Tigran, and who simply defended his position by

reasoning them, was labeled as 'aggression', an 'hate', when in reality the one who was being insulted was the Plaintiff, and then Tigran threatened the Plaintiff with physical aggression, reminding him that he knew perfectly his location: "I grew up in a different environment then you, and so **before treating me a layer** [liar] **or a victim of the world on every line comparing to yourself as a different kind of a man and manhood I would suggest you to think twice what are you saying** You want to trash talk me and say this facing me then pick up a boxing club and **we will close this conversation quickly on a ring, if you are talking big balls different manhood style.** Its very easy to trash talk siting **behind your computer on the other side of the Hudson**. I'm not going to read all of your no point to no point sarcastic comments…" Once Tigran is contradicted by Plaintiff in writing, Tigran suggest to solve the situation via physical aggressions. Deranged because Plaintiff stood his ground, he added, comparing now the film to a 'waste': "**Are you going to give the money back to David for such a waste?** Since I know you changed couple of times your email and phone number.. **Thats the first sign that you have people after you**." Needless to note that Plaintiff had nobody after him. The wild tone of Tsitoghdzyan's characterisations, presented in CC copy to David Shara, had only one purpose: to get the Plaintiff presented suddenly as a 'low-life' of sorts, to get him out of the project putting him under duress. He adds: "**This was**

**your opportunity to do your first international movie with such a superstar…**" He also starts arguing that Plaintiff's wife should be taken out of the film, with clear intention to hurt the Plaintiff. "Regarding your wife in the movie it was nothing personal! Just that footage was really bad" And again, most importantly he added: "Want to talk to me, come and talk to me in person.. As I told you previously **I'm already out of this project and only David have the rights to use my own and my studio space images in this movie, as well as my paintings!**"[40] That last representation in writing cannot be sufficiently emphasised.

48.      Once this preliminary demolishing work had taken place, consisting on depicting Plaintiff as a lowlife who is expendable, David on same October 19, 2019 send his words with a Hobson choice: "Obviously we are **finished working together**. What do you want Arthur? Percentage etc? We will finish the movie separately with a music editor. You will get full credit for everything you did. You deserve all credit you want. **We cannot work together, but film should be finished and shown.** Make a proposal, **not the "contract" you put forward.**  I will finish with you if proposal is fair. **If not, we are finished and project is over. Emails only, no calls.**"

49.      The terms were being now drafted under coercive circumstances: Plaintiff was faced with a Hobson choice where there was

---

[40] We must emphasise this declarations of Tigran to dismantle the notions presented in MTD.

truly no choice. The contracts Plaintiff presented had nothing wrong, but David saw the opportunity to seize full control over the film and just downgrade all terms agreed on verbally. It must be noted that Plaintiff prepared those contracts out of simple templates and that because he found the fees of entertainment attorneys unaffordable, and wanted to save those expenses to all parties.

50.     Plaintiff answered Tigran threatening email again reasoning his points. Then David answered via email on October 20, 2016: "**We are not working together anymore**…" "I wrote that you should only email so we have a written record of all our conversations."[41] "I do not have time for a movie, **but I love tigran like my brother and do what he wants. Period.** Just come to a solution with him and lets move on… **We are clearly <u>not going to film festivals together</u>.**[42] **Let Tigran decide what to do with the movie...I am finished**.[43]" After receiving this email from David, indicating to come to a solution with Tigran, on October 24, 2016, Plaintiff sent an SMS to Tsitoghdzyan: "I think we have to get to an agreement regarding the painting before solving the film situation. I cannot do it the other way around. For us it is important to proceed that way. Try to place yourself in my position."

---

[41] David Shara acknowledges that these conversations are all there is about this situation, so the Court cannot err in drawing test from them.

[42] Another change: suddenly Plaintiff is deprived of enjoying the fruits of his artistic work.

[43] See that Tigran starts the drama, prepares the situation, and that he is behind and beside all movements by David.

51.     Via SMS Tsitoghdzyan replied on same date: "Artur as I told you on the phone **I don't paint with this state of mind, I don't give gifts by agreement**, especially after starting a project. **You should negotiate with David for your % on the film and I'm totally fine with whatever you and David decide! That will be your reward for the movie as it should be**.[44]" Even Tigran affirms the only way for Plaintiff to be rewarded is **"%" of profits on distribution**.

52.     These communications are extrinsic evidence to the Producers Agreement [attached as Exhibit 7], but they show 1) that when at last Plaintiff in earnest manifested that a contract was necessary and even made a proposal, he was met with outright hostility, and put under duress, 2) that he was denied what Tigran acknowledges had promised before, 3) that even at that time Tigran made it clear that he would be "totally fine with whatever you [the Plaintiff] and David [Shara] decide" regarding the Plaintiff's percentage of profits on the film, 4) that Plaintiff is put under duress with a threat, either accept reduced terms or the project would be discarded, and Tigran even suggests, insulting Plaintiff comparing his work to a prostitute, that he truly wishes to fight physically with him simply because Plaintiff had defended reasonably from the first barrage of insults [**prostitute**, etc]. It leaves no doubt

---

[44] Tigran leaves it clear: he does not want to honor the promise made, and makes it clear that all Plaintiff can get in cash is percentage of profits. Profits, however, cannot exist without distribution, and Tigran never gives signed the necessary talent releases.

regarding Tsitoghdzyan's permissions for distribution of the film, regarding Tigran's position not willing to negotiate anything for himself, also he promises, now in writing, that he will sign anything necessary. It shows that all parties were of same mind to those terms, and that unambiguously both David and Tigran were making constant and specific representations as the 'only' way for Plaintiff to find 'rewards': the film's distribution.

53.    Tsitoghdzyan not only knew the terms of the contract, he broke his promise, acknowledging it existed, simply because Plaintiff made a proposal for written contract, SMSs show.

54.    Plaintiff replied on October 25, 2016, via SMS: "Things are not as you want them to be. **You made a promise, we had a deal, I worked with that in mind. The only thing I wanted is a warrant to it, and suggested a frame.** I can keep my word and warrant it to you if you can keep yours. The situation is a whole as a whole. I think you were shocked too far because in my view warrants just put things clear. Situation is way too bad as you picture, cause the painting is for me very important. This is not right." Plaintiff relied on the value representations, and added: "**David's last email suggest talk to you in the last line. Now you say talk to him**. I think he is right you have to clear this point regarding the painting so that I decide**. You are legally very wrong about the real situation, my rights and the damages caused. **In the**

**end I was as you see very right trying to put contracts on the table**. **Just clear up if you can approach the painting agreement, establishing a frame for both of us, but a frame that defines both parts, and not one obscure and without time frame**[45], or if not say it clear." "It's not about being tougher or not, it is not a challenge or a fight, it is about being right or not, and about success for all of us, not only for two of us three. Hope these words find you well, certainly the last thing I want is you being sick."

55.     Tigran did not reply via SMS. It was David who wrote an email a few hours later because obviously Tigran had shared those SMSs with him, on October 25, referencing those last SMSs. **The email is signed by David** *and* **Tigran, meaning what he wrote was in the name of both, and must be taken as a statement of both Defendants**: "Hello Arthur, I understand that you spoke to tigran. He told me that you are pressing him for a 100 inch Mirror painting. **That is not going to happen. <u>I have sold them for up to 200,000 dollars and it takes Tigran 2 months to paint</u>**. I am going to make you 2 offers **and you should take one**. I am going to offer you a smaller painting [image was attached to email] and **33% of the PROFITS** of the film forever. The second option is no painting, but you get **12% of all revenue from the**

_____

[45] Plaintiff wanted dates and terms explicit, as regards to when the painting will be ready and sent to him, etc. Tigran will break also those terms, even as being part of the ill-gotten producers Agreement, which terms he knew perfectly because he is, as seen privy to all details of this situation that generates it.

**film forever...not profits, but revenue**!!!![46] It is far more generous than the standard directors contract that I have here. Typically directors get 7-10% of profits....and they don't get paintings. **Both of us are not interested in working together with you going forward**. We do not want to meet anymore and we **do not want to do press events or movie premieres with you**. The fun is gone from this project and it is not coming back." Of note both Defendants sign that email, David keeps making representations of value even higher than those of the auction records of 2014 and 2015 in order to avoid the claim of Plaintiff to get upfront compensation in cash, as it is normal, yet both break the promise of the 100x75 inch painting and offer one of 25x25 inch, one that nobody had wanted to buy, one that is not of 'mirror' series whose picture was attached to the same email, and, very important: again the distribution of the film is crucial, is guaranteed, is promised, **is just the representation made unambiguously that would compensate Plaintiff as producer.** It must be noted that Plaintiff had been promised the painting in exchange of upfront compensation for his work as a director, and the percentage was being promised for his role as a producer.

---

[46] It is impossible to make this promises if there is no real intention to distribute the film in due time. Plaintiff is enticed to keep on, because they make representations unambiguously attached to distribute the film. David Shara never obtaining any talent release he made himself responsible for is a breach of covenant of good faith, and not distributing it, it will be seen, is plain breach of contract acting in bad faith and its purpose is to harm Plaintiff, against his own interests.

56.     It must be emphasised that here David Shara confirms the value representation of the 100x75 inch painting, as 200,000 USD by end of 2016, plus **he states how long takes it to Tigran to create it: two months**.[47] The email continues with professional threats unless the terms are not accepted: "If this does not work for you, then we will finish the project with other editors and give you FULL CREDIT for everything you want. **If this does not work I will <u>scrap the project and the film will go in the garbage</u>. <u>I am very tempted to throw out the film (I paid for it) and start over with someone else</u>. <u>you have 24 hours to choose</u>.** You have already been paid a lot of money from me to make this film. **Either way, we are finished working together whatever you choose**, I want this point made very clear. **David and Tigran**."

57.     Plaintiff is submitted to an ultimatum that contains a very clear professional threat. The conditions under which the contract Producers Agreement was obtained were duress, with fraudulent and reckless representations of value [David was not selling those paintings at that time for such prizes], and Plaintiff was obviously obliged in a 24 hour ultimatum to make decisions that in a normal situation he would have never made this way. This negotiation was far from fair, the bargaining power was unilateral. Moreover, the ultimatum contains that Plaintiff, for reasons yet unknown and unjustified, is banned from any public

---

[47] The 75x50 inch painting finally badly painted for the Plaintiff was sent to Plaintiff **twenty two months later than the date stipulated by contract**.

recognition the film may ever have at film festivals or 'press events'. Thus both David *and* Tigran knew the terms of the contract, because they were sending an ultimatum even signed *by both of them in common agreement*. They were obliging him to accept a different agreement than that promised before by both and even at the time this conversation under duress was taking place the statute of frauds does not apply to what had been agreed before. There is abundant evidence showing Tigran knew he had said yes to the proposal, and also evidence showing the undeserved hostility raised simply by the mere presentation of a contractual solution memorialising previous terms. Plaintiff was unjustly mistreated for no apparent reason. The Defendants had the right to talk about the proposal with respect, but instead an artificial tragic tone is raised by Tigran, accusations and demeaning thrown upon the Plaintiff, he is insulted and presented with an ultimatum, and informed that he should disappear from an artistic project that had taken many months of his life. Plaintiff was under duress, plus the representations of value of paintings were fraudulent, plus the promises of distribution are integral to the negotiating of the deal, plus Tigran knows all this, plus Tigran acknowledges and describes himself his role, his pretentions as to profits

(none) and other terms, and that he lends all permits to David.[48] The email contains a photo of a painting of two unknown women that is 25x25 inch, and not one belonging to the 'mirror' series, that is the painting initially offered within the ultimatum. So they were offering a far smaller painting than promised before, and particularly one that nobody wanted.

58.    Plaintiff was under extreme duress[49]. He was facing losing a great opportunity he had worked very hard for, and the same people who had congratulated him for every single result were suddenly being revealed as utter enemies simply because Plaintiff had insisted in the existence of a contract. David put it clear that it was either accepting his terms or else obliteration of project. Tigran was affirming there was an agreement, but simply breaking it to facilitate the coercion or else taking control himself of the project, which is what Tigran in reality wanted. Plaintiff was betrayed, humiliated, insulted, and bullied, coerced into terms that were adverse no matter how to look at them. He was facing humiliation upon potential recognition, because he was being told he

_____

[48] Excuses of David Shara presented in the Motion to Dismiss [MTD] make no sense in light of these written communications. David had no need to negotiate anything with Tigran, he had full capacity, as he acknowledged in 2020, to distribute the film in due time and to obtain all talent releases 'expeditiously'. The promises by Tigran in writing from 2016, however, are also made to Plaintiff in context of Tigran signing this offered terms in writing: **Plaintiff accepts because he assumes Tigran's representations will stand.** Neither makes sense to argue, as it the case in the MTD, the notion of "Sarandon and Tsitoghdzyan exercising a legal right to control their publicity rights" is contradicted by Sarandon's and Tigran's own written words and their actions.

[49] Duress is c*oercion, threats, or psychological pressure to compel someone to act contrary to their wishes or interests.* In Williams v. Williams, 939 So.2d 1154, the court noted that duress *"is a condition of mind produced by an improper external pressure or influence that practically destroys the free agency of a party and causes him to do an act or make a contract not of his own volition."*

would never should appear in any premiere or screening. Plaintiff was in a state of the mind that did not allowed him react properly to further defend his rights, because the hostility, and what he was being informed of [he will never be present at a public screening of festival showing his work] coming from people he had trusted, was disturbing and shocking.

59. Plaintiff felt he had to accept worse terms because, if not, David Shara had stated it clearly he would "scrap the project and film will go in the garbage". [50]

60. After the Plaintiff answered the 24 hours coercive ultimatum sent by both David and Tigran, David did not answer. Plaintiff on October 31, requested to David Share via email: "we had better come to this situation to solve it giving to it a formal and serious form black on white. I am glad you respect my work and time, I respected your 24 hours proposal, so let us move on." On the same date David Shara answered: "I will do it today". David Shara later answered: "the painting is coming out

---

[50] The Producers Agreement does not contain provisions which are absolutely standard in the film industry, because it was drafted and formed under coercion, duress and fraudulent representations. Defendants want to convince the Court with MTD that the 'four corners' of the contract are all there is to be contemplated, but the circumstances under which it was obtained are of the essence to demonstrate provisions absolutely clear which do not contradict but supplement what in the 'four corners' of the Producers Agreement is clearly insufficient, partially integrated, and they are here not alleged but proven by written statements of the Defendants. No contract in the film industry, signed under normal and peaceful circumstances, does not contain detailed provisions as regards to distribution terms.

According to *§ 2-202. Final Written Expression: Parol or Extrinsic Evidence*, the promises, representations, statements of fact, even instructions sent to Plaintiff, as regards of Distribution of the Film, contemporaneous to these communications, explain and supplement, do not contradict, the insufficiently stated terms of the Producers' Agreement. Even more, the terms of the contract are explained and supplemented "by course of dealing, usage of trade and especially by course of performance and by evidence of consistent additional terms."

of my pocket...just so you know. I wanted you to have it along with the percentage of profit. **You deserve it. The movie is a wonderful achievement. Let's move forward and hopefully the movie will be a huge success and we can get it to many film festivals and on apple tv. <u>so far, the only stumbling block is having your wife in the film.</u>"**[51] David Shara makes it clear, as the contract is being drafted, **that the film is to be distributed to film festivals, and commercially, he mentions Apple TV** as a channel for monetisation, even more, all communications are specific that it will be Plaintiff the one burdened with that responsibility. **Yet still he tries to get the Plaintiff's wife out of the film, as a further condition by Tigran stated in one of his emails referenced before, adding insult to the injury.** David added: "I will go over the other details and come up with a draft of the agreement."

61.     On November 1, 2016, David Shara sends an email instructing the Plaintiff: "**write out the basic details of the contract** that you need full name, address, phone number details of the deal…etc If not, I can get it together next week"

62.     Obviously Plaintiff had reasons to fear the mercurial Defendants would not stand by their words, and again there was no sight of any contract after weeks. Being some close family members of the

---

[51] In retrospective, it is simply incredible David Shara dared to go to these lengths.

Plaintiff in very bad health, at this point Plaintiff requested from David Shara if it was possible to find **a termination agreement**, proposing a payment in cash for his work as a director of 200,000 USD, instead of the small painting they had unilaterally chosen for him. **That attempt is documented via email, and it shows Plaintiff tried to obtain a payment in cash for his work as director, an upfront, and leave the project, since he had been informed that he would never enjoy it in regular terms as a director, and he would be banned from it.** David answered to that proposal on November 7, 2016: "You want 200,000 dollars which is 400,000 dollars for me. Half goes to taxes and half goes to you." That was simply not true. He continued, harnessing Plaintiff to the project and making it clear: "**The best solution here is to finish the film as best you can and get it into as many film festivals and events as possible. We are partners in this film and the better it does, the better we do together.**" "**Finish the film and try to get it sold. Get it into theaters, amazon, Apple TV etc. That is the only option here.**" "**So I recommend we finish the film and**

**you get to work distributing it**."[52]

63.  On November 9, 2016, David Shara, after those terms regarding distribution have been discussed as shown before, sent this email: **"write up a "gentlemen's" short bullet point contract**

---

[52] This also dismantles another wrong misinterpretation the Defendants make in the MTD. In the midst of drafting the contract, when David Shara himself tells the Plaintiff to put together the basic points, he states clearly "**you get to work distributing it.**" These statements further clarify, do not contradict, but unambiguously complement the threadbare texture of the terms of the Producers' Agreement: "[Plaintiff] will inform and discuss any distribution possibilities with the Executive Producer, both being informed in due time to ensure the best performance possible of the business. "[Plaintiff] cannot make any decision regarding distribution without contacting and getting written confirmation by [Shara]. Revenues have to be paid directly to [Shara], being distribution contracts always under his surveillance and executed according to his criteria". Those two provisions are consistent with the extrinsic evidence. **That does not mean that Plaintiff shall not take care of the distribution, on the contrary it affirms it, just puts limitations that are respectful towards the person who is to provide the funds**, and **the extrinsic evidence supplements and explains what is too lightly exposed in the Producers Agreement**. Why is it lightly exposed? Because it must be noted that more evidence in this Complaint will show that **David Shara even imposes a material limitation to the length of the Producers Agreement being drafted**, thus forcing the Plaintiff to barely sketch ideas that in normal distribution agreements for films cover and detail many aspects over pages and pages. David Shara and Tigran did not want any contract to exist, and once they saw there was no other remedy, they humiliate, bully, insult, break promises to Plaintiff, coercing him to accept terms that are against his interest and by definition out of the ordinary [Plaintiff won't attend any event, press event or film festival ever] and even impose it to be short—yet he is clearly burdened with distributing it, if he expects any money ["film and you get to work distributing it"]. In other words: events, press, fame, is for Tigran and for his friends, Plaintiff is banned [only because Tigran wants it, and David "Tigran is like a brother and I do anything for him. Period."] from events, cannot leave either, because he must be tied to distribution if he wants any money.

When Plaintiff request a payment in cash instead of a painting, **he is told that the film will be distributed. "That is the only option here."** When Defendants state in the MTD that it is David Shara who will distribute it, they misconstrue and misinterpret the contract keeping it *in contradiction* with the extrinsic evidence that complements and clarifies only logically what is in the contract, because they hope that way they can confound the Court as regards to distribution. David Sara's indications in all these emails, however, are only logical: he did not have any idea of making nor of distributing a film, and puts the burden on the Plaintiff to obtain any profits to get rid of Plaintiff's insistence of getting a cash upfront compensation. He represents growing, reckless, fraudulent value of the paintings, plus insists the only way for Plaintiff to make money is to take upon his shoulders the burden of distribution, while they will have fun and fame in the festival circuit, after telling him he is banned from any film festival, press events, and professionally rewarding appearances in from of the Public.

The context, as much as it is coercive, does not leave any doubt: **David Shara states that the Plaintiff will have to work to distribute it in order to obtain profits.** Not only the Plaintiff must accept terms under coercion and duress, with an 24 hour ultimatum, in the midst of clear physical threats made by Tsitoghdzyan, but he is denied a cash compensation and also he is told that the only way to get some profits will be that he, the Plaintiff, will take care of distribution.

**between us <u>on one or 2 pages</u>"**[53]

64.     Since when the extension of a contract governing the credits, terms and distribution of a film, and particularly one with the participation of A-class Academy-award winning talent, must be placed in such a short extension [1-2 pages]? **Here David Shara even *dictates* the only kind of 'contract' he will be signing, and no other: one that is short enough to keep out, or barely outlined, aspects that in the film industry are essential, and much more detailed**[54]. It is not enough, it is not possible to interpret the business relationship solely from the point of view of a contract, the Producers Agreement, that is the product of a 24 hour ultimatum sent to the Plaintiff by David Shara and Tigran, an ultimatum signed by both David and Tigran, when the Plaintiff is asked to choose between bad and worse, or 'scrap the film and be sent in the garbage'[55] simply because Plaintiff requested to have a contract with previously agreed on terms, and in absence of proposals, he proposed one. David Shara added to the same email: "Lets move on and finish the movie and get it into many many festivals and theaters." Again manifesting to send the Film into theatres[56]. Plaintiff would have never

---

[53] Even the extension of the contract, suspiciously short to regulate, directing, producing and distribution for any trained eye, is, obviously, the result of an imposition to its extension by the party that is coercing.

[54] The MTD is rife with swan-singing about how perfect, complete and unambiguous is the contract…

[55] The bargaining power is unequal.

[56] This is exactly was later on was developed, scheduled, budgeted, approved, invoiced, and executed, only finally distribution was obliterated by Defendants.

accepted to take care of a project for so many years without clear promises, representations and the understanding that the film ***was made for distribution according to what is standard in the film industry: the film is made, it runs a film festival circuit, and right afterwards it is distributed to maximise the potential prestige and interest raised during the film festival run***[57]. Countless actions, however, show that was the course of performance chosen, actually in execution and agreed on. The Defendants actions destroy that logical and standard succession against their own written promises, agreements and representations. At the same time David also requested a new scene to be shot with actress Florence Faivre and Tigran at his offices. At a later date before that shooting, **Tsitoghdzyan requested his son, a minor, to be included in that new sequence**, *without ever afterwards providing the talent release from his and the mother to show the image of his son.*

65.     On November 10, Plaintiff wrote: "The 'agreement' has changed a lot since the 24-hours 'ultimatum' acceptance. What I accepted was: the film is finish, I deliver the master, the composer adds music and the sound-master mix. Painting given as contract signed by both parts, percentage detailed. **That's it. I don't know how to write it without offend anyone's sensibility, but I do not want to work one minute more in unfair circumstances for the glory of a person who does**

---

[57] Sarandon, in writing, in 2028, will recommend this course of performance, emails show.

**not value what I have done for, Tigran.** I want a fair deal for all three, not only for two of us, then everything is OK." Plaintiff went on to manifest what he felt was coercive this way: "This situation is totally 'unconventional'. The film grows and grows in the making, and spans a greater amount of time and dedication from 'my lifetime', while others are full-time dedicated to well paid business. The same 'others' make a drama when I say: 'We need a contract' and 'What about the painting?' It does not look good because it looks as it is: unfair. I want a fair compensation for my work, expertise and artistic result, that's all. I will illustrate: **If the budget increases, the higher is the amount to recoup, the less possibilities are to get paid upon profits, and the better is the product.** The better is the product, the better publicity for the actor-painter, and for the sales of the products: paintings and printings. Congratulations: you get what you want, a better publicity, and a better consideration of the product, consequent higher prizes. Thank's to my work, in part, although no one wants to say it out loud. A better film that helps to sell the products, while I am continuously being pushed out, let me say it, unfairly. There is no Mirror [painting, as promised], as it was agreed, I am given a painting without any choice, the one no one wants by the way (made it clear that I like it as a compensation of my work in the catalog, that's all). **It is a standard that all productions include in the production budget the upfront payments of director,**

producer, screenwriter, on account of their negotiated percentages. Why not me??** Well, because there was a Mirror on the way, it was a good reason to renounce to upfront payments that would have been an additional charge for you. That's why we made that deal, Tigran and I." "**What is a striking revelation is that you accept rising the budget for new unnecessary sequences to make Tigran happy while anything that could resemble we all three being happy with this, me included, is not possible. I truly don't understand that enmity**."

66.    David Shara did not answer, and on November 15, 2016, the Plaintiff insisted, seeing no payment anywhere on the horizon, plus being burdened with distribution: "**As always I am willing to dedicate more attention, time and professional expertise, but the agreement has to be modified because it means more work and responsibility for me**." Plaintiff was referring to the fact that they were adding more sequences to be filmed, edited, &c..

67.    On November 16, David Shara answered: "**The work is beautiful. Let's finish this and our agreement by Monday**. And let's finish the movie." On November 29, **David Shara sends another offer to the Plaintiff, which again avoids paying upfront compensation**. On same date the Plaintiff argued: "You offer me the 33%, but no upfront. **But you have to understand that upfront is something**

**standard and logical**, and most important of all, **I need it.**" "Now at least two months of full-time dedication[58] await in order to fulfill the film, and I know it is going to be more, because afterwards there are many other things to do, I described them previously, **all what is distribution tasks to ensure the best performance possible, to recoup budget and get profits, we need worldwide distribution and take care of the film fest strategy. I truly think this is right. I renounce to %33 but I have to get a payment because if not it makes things too complicate to me honestly**. On the other hand, the painting. The painting you offer is nice, but it is a very different thing to what I was promised and agreed." **The emails exchanged take for granted that the film would be finished in just a few months more, aspects of the negotiation are based on that kind of commitment. The film, however, still required two years more of dedication until 2020**, and by end of 2019 and first half of 2020 the Plaintiff had been trying to successfully distribute the film.

68.     On November 30, David Shara sent this email to Plaintiff, again coming back to the coercive Hobson choice: "I'm sorry, we are very far away. **I refused 125,000 dollars for metamorphosis mirror[59]. It**

---

[58] See that the estimation is that the film would be finished by May 2017. Plaintiff's responsibilities, including setting up distribution of festival circuit and representation of film, *extend into beginning 2020…*

[59] Mirror Metamorphosis is 60x60 inches, which shows how David's representations of value grew as Plaintiff tried to get logical upfront compensation: the representations of value grow, are not real, but reckless, only to deprive Plaintiff of any upfront compensation.

**is mine. I'm not selling or giving away. I'm sorry Arthur. I am out of patience. Go do other work, let's discuss in a few months.** I think you have lost touch with reality. You are asking for 55,000 to finish, plus 38,000 for you. Plus percentage. plus painting. Plus plus. **I am sick of this crap. Project is over. My offer was the best and last offer.** Sorry we are very far away and I'm fine putting music and leaving it as is **or throwing in the trash**. Good luck to you, but I am finished." A few minutes later he added via email again, justifying that any painting would be good enough to counter Plaintiff's petition of cash compensation for his role as a director, representing even higher painting's value in relationship to size [the painting referenced 'mirror metamorphosis' is 60x60 inch], then adds even higher prizes to the 'mirror' series, now they are not 100-150,000, but he represents more value: "**Tigran mirror paintings cost 150-250,000 dollars**[60]**. I don't think you get that. It's never happening.**" The representation of value of the paintings of Tigran kept growing (now "150-250,000 dollars"), clearly to convince the Plaintiff that renouncing to any upfront compensation was fine in exchange of a painting by Tigran that would only grow in price. That was reckless, done consciously to get rid of Plaintiff's pretension to upfront payment, and fraudulent later discovered [See 2020 facts chronology of this Complaint].

---

[60] The prices keep growing.

69.    David Shara was denying the Plaintiff an upfront compensation, denying him the initial percentage of profits as producer [33%], and obliging him to accept the promissory estoppel of Tigran as regards to the painting series 'mirrors' of 100x75 inches. He was representing higher and higher value for the paintings of Tigran over and over, in order to persuade the Plaintiff of the paintings enormous value in 2016, only to state that the Plaintiff's work did not deserve it. Facts will show that the Plaintiff's work gave birth to a universally acclaimed film, while the paintings in questions are rejected for appraisal and for auctioning by the same auction house, Phillips NYC, that had allowed the 2014 and 2015 fraudulent records to be created artificially by Tigran and David.  He had, however, no objection whatsoever in raising the budget by adding new sequences requested by Tigran to be shot in February 2017, including Tigran's son, a minor. Note that the representations of value made by David Shara and by Tigran previous as regards to Tigran's mirror series paintings are presented to get rid of the Plaintiff's request of an upfront compensation, and, in light of later discoveries that took place by end of August 2020, wildly exaggerated and reckless and fraudulent, and all to convince the Plaintiff that that was superior to an upfront compensation, which he had requested, and only because it was denied he tried to obtain the kind of painting that was, allegedly, and as represented by both of them, the best investment in exchange of no

upfront compensation: a mirror series portrait.

70.     On November 30, 2016, David Shara further assures his stance, when the Plaintiff and insists on the promise by Tigran of a 100x75 inches painting: "You want to make money on something that I am going to lose lots of money on. **If you are so confident then take the 33% and finish a killer movie. If it goes well you will make hundreds of thousands of dollars.**" David Shara insists on the fact that the only way to make money out of the film _**is to distribute it**_. Then again reminds the Plaintiff that **Tigran is aware of the negotiation inviting him this way to talk to him: "Or work out some other deal with tigran. I am done. I don't care anymore."** Fifteen minutes later David Shara insists via email, showing again a Hobson choice where there is really no choice: either the Plaintiff accept reduced terms imposed by David and Tigran, or the project is 'dead in the water': **"I am done. This project is finished. If you want your work seen then we will finish it." He means they will finish it** _**without**_ **the Plaintiff's further participation**. "If you have a problem with that then the movie **is dead in the water. You are making it impossible. You think your work is worth millions, it may be, but not for me. I think you are doing an amazing job**, but your demands are impossible to meet. **Let's part ways and we will finish and give you 100% full credit and still give you 33% profits as promised. But we are done."** Plaintiff insisted on his

demands to Tigran, and finally they accepted a painting of 75x50 inches, representing a few hours later: "**We will do a 75x 50 inch of your wife...worth 100,000 dollars now, potentially much more. I sell those pieces regularly for 125-150.**" He also states that Tigran wants the scene including his son, a minor, to be part of the film: "We need to film the painting in my office, but for 3-4,000 dollars (1000 for camera man and 2-3k equipment). If you can't do this cheap, then we will skip it, but **tigran thinks that piece should be in the movie**. <u>**You will get your painting in approximately 6 months**</u> as we are very very busy, <u>**but I will sign a contract guaranteeing it. You need to promote the film, enter into film festivals and take care of it as it was your own baby**</u>." Although this final stage of the contract drafting dates from November 30, 2016, David Shara won't return the signed contract after April 4, 2017, five months later. In May 2017 the painting was supposed to be finished. It was not until February 2019 that Tigran decided to show the painting to the Plaintiff. The delay was not justified in a context were, as it has been shown, both Tigran and David assured that Tigran can paint that painting in maximum two months [their own words quoted before], and when David assures that the painting won't be ready until six months later, as the contract faithfully reflects. That is one of David's breach of contract, and also a tortious interference of Tigran with Plaintiff's business expectations, since Tigran is aware of all these

terms, and decides to act this way to harm the Plaintiff.

71.     The delay in returning a signed copy of the contract by David Shara between end of November 2016 and beginning April 2017 cannot be explained but **as a new means to keep the Plaintiff on hot embers for as long as possible, it was another way to show that, even agreeing to certain limited terms, David Shara had the power to delay formalisation**. That was done to further prolong doubts and it was part of the many rituals of humiliation the Plaintiff was submitted to over years, to make sure Plaintiff would not dare to demand anything. An email dated April 4, 2017[61], sent by Plaintiff to David, attaches again the drafted contract to try to get it signed, after five months delay. Plaintiff, now aware of the mercurial temper of the subjects he had to deal with, carefully wrote: "Hi David, as you asked me for it, I attach it again [the Producers Agreement draft], it is the same file I sent you a couple of times since December. **I did not insist upon signature because after requesting it several times you did not give any answer**." David Shara answered on same date via email: "Perfect, I'm in a car on the way" The contract was signed on April 4, 2017.[62]

---

[61] While the Agreement bears a type-written date of December 5, 2016, the true date of execution, as reflected in the handwritten and initialed markings on the Agreement, is April 4, 2017. David Shara was again responsible for the delay in the memorialization of the Parties' contractual discussions and the execution of the Agreement.

[62] The MTD abounds with references to the date the contract was signed. The circumstances surrounding its making, and why it was signed so late, cannot be kept off the Court eyes because they are determinant to judge the ambiguity and the lack of integration of the Producers Agreement.

72.     On November 25, 2016, Plaintiff shared a link with Sarandon's assistant via email to take a look at the rough cut. Sarandon's assistant answered affirmatively requesting a link to download the cut on December 2, 2016. On December 22, Sarandon's assistant confirmed he had been able to download the rough cut of the opening sequence. There were no objections from Sarandon.

### B. 2017

73.     On February 6, 2017, Sarandon answered directly after reviewing the opening sequence of the film: "**I think it's very beautiful but didn't see enough of it to know where you're going with it. Do you have the ability to go in and fix under my eyes?** The lighting wasn't very generous. It certainly communicates a mood, but I'm so curious to know what's next." Plaintiff promised to do is best with his team to take care of the wrinkles.

74.     An email conversation between David, Tigran and the Plaintiff, spanning January 25, 2017 to February 2, 2017 shows how Tigran, after proposing it and considering it an important piece of the film, discusses the shooting of his son, a minor, and aspects of the shooting script prepared by the Plaintiff, and makes arrangements and suggestions as regards to the child. Tigran requests that Nadia Kazakova, the mother of

the child, be kept apart from the shooting, stating also that he did not wanted to see her there. Plaintiff, however, was conscious that the permit of the mother was absolutely necessary, and presented his objections to David Shara as regards to not having the mother present at shooting. David Shara, as it was to be expected, assured the Plaintiff that they should trust Tigran. After all what happened in 2016, and the contract not being returned signed, as explained and demonstrated before, Plaintiff decided to accept their representations. Tigran affirmed then and on other occasions that obtaining Nadia Kazakova's talent release signed as regards to her son would never be a problem, and insisted she should not be there 'because she had been unfaithful to him and that's why they had gotten divorced. She does not deserve to be here'.  Plaintiff believed any personal problems should not affect the mother's rights as regards to shooting her son, a minor. Nadia Kazakova had been portrayed on several occasions by Tigran, the paintings were to be present in the film, and Plaintiff had expressed his interest in having Nadia in the film, but did not insist in light of Tigran's comments and hostility. To this date, Nadia Kazakova's signed permit for the talent release of the son has never been presented to the Plaintiff, although it was requested to Tigran on

numerous occasions, neither obtained by David Shara.[63]

75.     Recall that proof has been presented that Tigran, in writing, via emails in November 2016, acknowledges to transfer all necessary rights and permissions as to use his image and the images of his artworks and studio to David Shara in the film. **However, he never acknowledged in writing, or at least the Plaintiff does not have proof of it, to transfer the rights related to the image of his son in the film to David Shara.** This way **Tigran has been using the presence of his son, a minor, as a means to keep the film hostage of his will** not to present the necessary permissions to use the image of his son and his mother, contradicting his promises, acting in bad faith to tortiously interfere with the contract whose terms he himself had proposed [recall ultimatum email sent by him and David Shara, signed by both] and to harm the Plaintiff. **It was Tigran, however, who imposed that condition to David Shara and to Plaintiff, requesting that the sequence appearing his son should be part of the film, not an idea**

---

[63] There are many emails sent by Plaintiff requesting these and other talent releases promised by him, and it would be burdensome for the Court to read a whole list, that will be presented at a later date, but choosing some examples we can mention those sent via email on Jul 15, 2017, and on Sep 12, 2017 explicitly requesting to Tigran all talent releases necessary on his side: related to his son, from him and the mother, and related to Tigran himself and to his artworks. **Those emails particularly were requested by David Shara to the Plaintiff to be sent to Tigran.** Tigran left those emails unanswered, and did not send by that or by any other way any of those papers signed. On Apr 26, 2019 the Plaintiff forwarded those emails to Honey Shara, who since September 2018 was directly part of the executive production team making decisions, to show that Tigran was not fulfilling his promises, and on the same date Honey Shara answered: *"Hello Arthur, I am totally sympathetic to your situation, but please understand mine."* Plaintiff did not understand hers, requested those talent releases signed to Tigran at later dates, with same result, the latest in July 2022, with no different result.

**of Plaintiff, neither of David Shara: an idea of Tigran to also promote his soon and make him part of a film where Susan Sarandon was central next to his father**. He requests it, he knows and approves of the shooting script presented by the Plaintiff, he approves of the sequence, he approves of the result, approves of its inclusion in the final cut, congratulates the result, he likes it, and he promises in 2017 in person to the Plaintiff and to David Shara to sign the talent releases related to the minor by him and the mother; *however, he never signed it himself neither obtained the one related to the mother, Nadia Kazakova.* He acts in bad faith to keep the film's distribution hostage and to thwart it. By doing so he harms the Plaintiff, but it must be noted that harming the Plaintiff outweighs all the potential benefits for Tigran related to the film being distributed. When in order to obtain the harm of a third party a party goes even against his own interests and promises, only outright malice can be the true motivation. There are no excuses for Tigran's action. He imposes the sequence to be part of the film, he approves of it, he manifests his happiness with the result, he manifests his satisfaction with its inclusion in the context of the entire film, he never manifests any kind of position as regards to the result neither to the way the footage was obtained, he promised to sign any permission and to provide that of the mother,… yet he chooses to retain it because by acting this way keeps hostage the distribution of the film and

harms the Plaintiff. The only possible answer is the malice outweighing all benefits, the action is intended to cause harm professionally to the Plaintiff, and certainly causes it not accidentally, but following a well elaborated sequence of steps over a long period of time. It is a tortious interference with the contract, a contract whose terms Tigran knew perfectly because we have shown, not just alleged, proven, that he was privy to the negotiation that gave the faulty and insufficient Producers Agreement as a result, simply because he also there interfered tortiously causing coercive circumstances against the Plaintiff and even signed, along with David Shara, an ultimatum for the Plaintiff as regards to that contract's final form.

76. ***Tsitoghdzyan delays the painting due to the Plaintiff by contract with the purpose to tortiously interfere with the contract between David Shara and the Plaintiff, which terms he knew, he even had negotiated and accepted himself.***

77. David Shara, via Email to Plaintiff, on July 27, 2017, addressing the delay in the making of the painting, and the delay in payments due: **"your wife's painting is being worked on now and will be done within a few weeks...tigran is on it full time**. you will get paid everything that is due to you, I promise." Some of these representations were utterly false: Tigran was not full time on it, and the painting was not sent to the Plaintiff until end of February 2019, not a

few weeks afterwards, but 16 months after the date stipulated, and even then it was unfinished. David mentions "Tigran is on it full time" because Tsitoghdzyan knew the terms of the deal as it has been demonstrated before, the dates; David Shara acknowledges it by stating that now Tsitoghdzyan is 'full time on it", and notwithstanding Tsitoghdzyan delayed as much as he wanted the painting because he had failed in getting rid of the Plaintiff as director and producer of the film in 2016 [for context recall the itinerary of events leading to the contract in 2016] and because Plaintiff was more confidently now making decisions according to his credits recognised by contract. Tigran did not want that contract to exist, and had had no intention to fulfil his contractual promises to Plaintiff ever. The fact that Plaintiff, in spite of duress and abuse submitted to in 2016 simply because he wanted a contract, had survived those circumstances was unsupportable for Tigran, posterior events will show.

78.    Tigran, knowing the terms and the stipulations of the Producers Agreement, delays the making of the painting and makes it of poor quality after years of delay simply to occasion a breach of contract, so he interferes tortiously with the contract to sour the relationship between executive producer, David Shara, and producer/director, the Plaintiff.

79.    On emails exchanged in 2016, and referenced before, David Shara and Tsitoghdzyan state that the time that a painting of 100x75

inches takes to get done is around two months [recall previous textual words of Defendants and date]. Tigran was not working at all on the painting, while the commitment of the Plaintiff on the a film that promotes him and his art was getting extended over time far beyond the deadline stipulated in the contract, May 2017, years beyond. While the Plaintiff was putting a real and sincere commitment in the making of the film in all its phases, Tigran, motivated by malice and envy in light of the growing quality of Plaintiff's artistic result, was doing all he could to interfere tortiously with the contract.

80. On April 4, 2017, Plaintiff informed David Shara of a copyright obtained by Plaintiff protecting all filmed material from the U.S. Copyright Office. Plaintiff shared a copy of the copyright certificate with David Shara—it must add to how Plaintiff invariably proceeds according to his promises and intentions, and always dealt in good faith, expecting the others would do the same. [Copyright Registration Number PAu-3-823-642]

81. Around May 2017 the Plaintiff and David reviewed the music that the composer Tigran had chosen from among his friends had provided to the sequences, forced upon the production in the deal met in November-December 2016 because David Shara explained **"I love Tigran as a brother, and I do whatever he wants. Period."** David Shara, however, was clearly disappointed with the result, and he asked

Plaintiff his opinion. Plaintiff was of the same opinion. Both decided then, in common agreement, that the music was not appropriate for the Film, that it undermined its artistic potential and its distribution potential. Both David and Plaintiff agreed on Plaintiff trying to find a new composer. Tigran expressed outright anger at his choice being discarded, and insisted in paying out of the production budget an exorbitant compensation for the composer he had chosen. That was interfering with the contract between Plaintiff and David, Tigran making decisions that affected the budget by imposing ways of dealing with a situation that were not for him to choose. Emails show Tigran interfered in the way this termination with that composer should be handled. Plaintiff kept David informed on these matters, emails show, David expressed satisfaction with the way things were being done. Plaintiff explained that production's matters should be in his hands, since he was the producer and he was acting in coordination with executive producer in common agreement.

82. Plaintiff now chose a new composer, Mark Petrie, and presented samples via email to David Shara in June 2017. David Shara stated in conversations that allowing Plaintiff doing his work was evidently much better for the film, and ultimately for his investment in it and for Tigran's promotion and publicity. The new composer, Mark Petri, after watching the film's rough cut, expressed outright admiration towards its qualities, found himself identified with Plaintiff's work, and

70

expressed his interest not in licensing previously made music for the film, which was the initial idea, but in *creating an original score for it*. Petri was praised by David as "the person the project needed" and hailed as a dramatically paramount decision made successfully by Plaintiff. David Shara expressed in writing on multiple occasions that the film was striding a giant leap ahead thanks to that choice.

83.     It was part of the deal with Mark Petri, however, which David knew of and congratulated, that he would release the music once the film would be distributed, and that he preserved the rights to license the different segments of the score, but that Plaintiff could always use those segments in the film forever. The expectations of Petri, based on the deal agreed on with Plaintiff, who acted in coordination with David, in common agree, have not been met at all, and his terms are today in breach of contract.

84.     The music created by Mark Petri went through a complex process of synchronisation with image between July and December 2017, as he was finishing different segments, and the result translated into nominations for Best Original Score and Best Sound at some of the most remarkable and important film-music-related competitions in the world, such as International Music & Sound Film Festival, Croatia[64] (finalist

---

[64] It is one of the most important film music competitions in the world. The board of the festival is made out of multi Oscar- and Bafta-nominated composers, and each the jury is formed out of similar seasoned or emerging talent in the film music field. [ http://www.isfmf.com/the-board/ ]

Best Original Soundtrack Documentary, 2019), Los Angeles Documentary Film Festival (winner Best Score Award), Jaipur Intl Film Festival (winner, Best Sound), Burbank Intl Film Festival (finalist, Best Original Soundtrack), FIMUCITE Film Music (finalist, Best Original Score for Documentary).

85.    The deal with Mark Petri is also broken as a consequence of Defendants' wrongful actions. Mark made a score specifically for the film. It was agreed that Mark would start distribution of the music at the same time the film would start distribution in theatres, beginning of 2020. To this date, the deal closed with the composer is also broken, his work 'dead in the water' 'scrapped' 'in the garbage', and 'dead on the vine'[65], a deal that David knew since 2017 and a deal met because the film would be distributed according to all Defendants. Defendants misled Plaintiff into actions and beliefs that are supported by their course of performance and promises, by their own explicit writings, then change course abruptly, careless of consequences because either they have infinite access to opportunity [Sarandon], or because they have enough wealth so as to take seriously the brinkmanship of coercing someone until getting what they want from him [the Plaintiff] against their own obvious interests and representations [the Sharas], or because childish envy and solipsistic satisfaction in unjust enrichment surpasses good judgment and obvious

---

[65] David Shara's own words, and David's attorney's own words related to the film at different moments in 2016 and 2020. His attorneys words were statements of fact.

personal interest trampling representations clearly made even in writing [Tsitoghdzyan]. The music has not been released, the composer has not been able to enjoy the prestige and rewards, professional and monetary, that he expected and the Plaintiff expected for him. The music the composer created, which garnered finalist nominations, and wins, at some of the most important film-music entered festivals in the world, has not been released until now thanks to Sarandon, Tsitoghdzyan and the Sharas. This has further eroded the professional prestige of the Plaintiff as a producer because the film has not had the performance he had been promised it would, in spite of the great results achieved by this collaboration between filmmaker and composer.

86. **Mark Petri claims now to Plaintiff the losses he has faced as a consequences of the actions aforementioned, and Plaintiff has explained what is the situation. Plaintiff will claim those damages in order to compensate Mark Petri [see section Relief of this Complaint].**

87. It was during these months of 2017, while the film was acquiring its final form thanks to countless polishing of special effects applied to certain sequences and the right music score being drafted and adapted and orchestrated, when David Shara made some confessions to the Plaintiff. In light of the Plaintiff's artistic results with the Film, David Shara was more open and seemed to trust more genuinely the fruits the

Plaintiff was achieving.[66] In the first place, David Shara acknowledged that the drama that Tigran had created in 2016 simply because the Plaintiff had insisted in drafting contracts was due to the fact that, at some point in 2016, Sarandon had proposed to Tigran placing her son, a would-be filmmaker at that time, at the helm of the project as a director. David Shara acknowledged that Plaintiff had "done the right thing" defending his position, and he added "I would had done the same". Third, he insisted that Tigran should remain "focused on his paintings, and leave the movie in our hands [his and Plaintiff's] without further interference". He was clearly annoyed at the situation generated by the composer Tigran had forced upon the production, and the unnecessary costs and loss of time it had brought with it.

88. Notably, more importantly, David Shara explained that, in his opinion, Sarandon wanted a "replacement of her previous young boyfriend", with whom she had shared strident media headlines due mainly to the age difference between both (he in his late thirties, she in her mid-sixties), because, he said, "naturally that would secure her new contracts with beauty firms such as L'Oreal", but that Tigran was "very hesitant to have an affair because she was an old woman, although he

---

[66] Some written statements by David Shara leave no doubt as to his opinion about how the project was advancing. After Plaintiff shared some budget proposals, David Shara answered on October 23, 2017: "*Thanks for the update and keep up the good work!!! I have shown the trailer 10 times and people LOVE it...Love it Let's talk budget, let's talk music, order of scenes/storyline, VFX, film festivals, PR etc*" On October 30, via email David Shara states: "*Keep up the good work, I am proud to be involved in this project and I'm very excited to see for the results*"

liked her very much". He stated that an affair with a young man such as Tigran would again propel upwards the perception of the public that Sarandon was a woman capable to seduce men much younger, and that only would help her career going on and keep up because, in his words, "that's the way Hollywood works, it's tough to get old for actors unless you are Clint Eastwood". Plaintiff agreed that Eastwood is a rare exception in many aspects, but he felt too shocked by all these revelations to say or do anything else. He felt all these personal interests, which had nothing to do with the film, however, could affect at some point the regular course of the film's performance.

89.     Plaintiff shared with David Shara the main ideas of Plaintiff's script "16 Hours", a fiction film focused on the opioid epidemic in the USA. David was interested in being executive producer and exploring the idea of raising funds with other investors, and suggested sending a brief synopsis of the film to Sarandon, to see if she would be interested in one of the roles, **the one of a nurse who works in an emergency room**.

90.     Around May 2017 an email thread shows it was being discussed to have a meeting between Sarandon and Plaintiff for the Plaintiff to show the cut of the film. The meeting was finally postponed because of a medical emergency of Plaintiff's wife, emails show. Sarandon instead informed of having a meeting with Tigran "at his place". Plaintiff and Sarandon never met again, they were never again at the same time and

place except for June 16, 2016. Plaintiff never talked to her on the phone either, for clarity.

91.    Morgan Shara, wife of David Shara, assisted during a period of time in 2017 and before by end of 2016[67] her husband in reviewing the progress of rough cut editing, besides having participated in a sequence along with others invitees of her husband [Jules Weinstain, Hilary Rhoda, Ashley Hinshaw Grace], as emails sent by Morgan Shara for instance on February 10, 2017, April 19, 2017, April 26, 2017, May 5, 2017, May 13, 2017, May 23, 2017, and before show. On January 31, 2017, Plaintiff shared with Morgan Shara, David Shara and Tsitoghdzyan the first sequence polished, that had taken a long tome to take form according to Plaintiff's original idea. Morgan Shara answered: "**Ohhhh my lord. This is amazing amazing mind blowing! Can't even tell you how amazing it is.** Just one question : why does it break right before he puts his pants on. It didn't in the other edit! This is so beautiful.  Can we meet together soon?) tigran. **Wow! Great job Arthur!**" And David Shara added: "I also like it…"

92.    Morgan Shara, a positive influence at all times, suggested some ideas to be discussed in the film. The most pressing and relevant was that

---

[67] On December 15, 2016, an email thread started by Morgan Shara, titled "Movie meet up", designed by her to restart the situation of the film, she wrote: *"Hello Arthur. Long time no speak. Hope you have been well. **David and I watched the film yesterday and it was very moving and beautiful.** Wanted to meet in person to discuss ideas, ask some questions. I know the holidays are upon us but please let me know if you have time to even catch up on the phone! Thank you so much."*

she found it incorrect, contrary to the intention of the film, frustrating, that there was no sequence showing Tigran's process of making a painting. Specifically, on February 16, Morgan Shara stated: "One thing I think is important is we show a sequence where we see how he does the painting, specifics how he takes photos of the subject, then chooses the shot of the face and the hands and overlaps them. We don't see any of that in the film yet do we?" "Looks so great and can't wait to see more!" Plaintiff had already explained Morgan and David Shara that that sequence had been instrumental and present in both previous films made by him collaborating with two other artists whose careers were much longer and complete in comparison to Tigran[68]. Tigran had refused over and over to allow that sequence to be filmed. The idea had been to film it to show the evolution of Sarandon's portrait, but Tigran's thwarted that. Morgan Shara stated that still in 2017 there was plenty of time to film a similar sequence with another painting that was in the making. She suggested it could be for instance Plaintiff's wife portrait, since Tigran had said to be 'full time on it'. Morgan shared those ideas in emails sent

---

[68] Previous artist-entered films made by Plaintiff contained that scene, because it is instrumental for a documentary that is supposed tone based on a painter. It was a clear attempt to boycott Plaintiff's script and logical expectations and what Tigran had also promised since the beginning. Tigran's process, which is based in photoshop combining fotos and later projecting them with projectors onto canvasses to achieve precision, was something Tigran was not interested in showing because it was, in his eyes, 'too simple' and would 'decrease the interest in his artworks'. Plaintiff was of a different opinion, as David Shara and Morgan Shara were at that time. All three understood Tigran's denial as frustrating, unjustified and boycotting, and underserved refusal to cooperate to undermine the potential of the film. David Shara, as shown before, was however ready to "do anything Tigran wanted" in part to keep undisturbed his commercial and profitable relationship with Tigran, even if that was at the expense of the film, something obviously was against Plaintiff's interest, and against what Tigran had promised Plaintiff long time ago.

CCing also Tigran. When Plaintiff discussed those ideas in person with Tigran (more or less around the time when Tigran's chosen composer was being dismissed by Plaintiff and David Shara[69]), Plaintiff witnessed again the same kind of outright, childish hostility that had been spread by Tigran in 2016 when Plaintiff proposed a contract, and that has been fully displayed before. Tigran's demeaning comments about Morgan Shara, [Tigran: "Morgan should close her mouth and simply take care of billionaires' wifes, which is what she only knows to do", for instance] shocked Plaintiff, and simply assured him in his belief that Tigran was frustrated for not having gained total control over the project in collaboration with Sarandon, who according to David Shara had flirted with idea to get her son at the helm of the project. Tigran refusals aimed now at discouraging David Shara's notion that the film could be good enough to this way stop Plaintiff's potentially great success, by thwarting petitions to make it more complete in ways that Tigran himself had

---

[69] The events, as they happen, contradict comments of David Shara sent to Plaintiff in the most insulting and misrepresenting manner. In 2019, as part of a barrage of incoherent untruths, David Shara writes to Plaintiff, CCing Tigran: "You have taken advantage of and ruined several relationships...including Tigran, the composer and Susan Sarandon." It is inadmissible this kind of jumbling around with the facts: Plaintiff did not 'ruin' any relationship between Tigran and his chosen composer. If the chosen composer was angry at Tigran simply because his music was not accepted, this is something that has nothing to do with Plaintiff's work. That composer was dismissed by Plaintiff and David in common agreement, emails show; but here we see the kind of manipulations Tigran operates on David once he wants to interfere and to attack professionally Plaintiff. He spreads instead personal false misconceptions that are not supported by the reality as this example shoos.

In short, Plaintiff will be insulted in 2019 simply because he and David decided to change the composer's nd because Plaintiff found another, Mark Petri, that proved to be an extraordinary successful decision by Plaintiff. This shows, however, the ongoing toxic  work environment he was submitted to since October 2016.

promised a long time ago. In 2016, at the beginning, when potential sequences were being discussed, already Plaintiff suggested that sequence, and Tigran had agreed in participating. Additionally, in 2016 it was agreed that Tigran would participate in a filmed interview to obtain certain statements. The material obtained was so bad, and Tigran's presence on camera in that process was so frustrating, that Plaintiff must leave it out of the film.

93.    In 2017 Plaintiff obtained other talent releases, and David received orderly copy of each of them. Tigran obtained talent releases of some models he had invited, then forwarded them to Plaintiff who shared them with David, emails show; however, the same templates that were good in his eyes to be signed by those models he himself had requested, the same Donald Kuspit had signed doubly [one copy sent to Plaintiff, other to David Shara] were and are not good to be signed by himself, in spite of all the evidence presented in this Complaint's Chronology's Year 2016. David Shara saw and approved of the talent release form signed by Donald Kuspit, signed by models invited by Tigran, signed by Plaintiff's wife, and asked Plaintiff to requests Tigran's talent release signed, but Tigran never answered the emails sent to him.  David Shara promised to obtain the talent release signed by all other missing participants invited by him.

94.    During the last months of 2017 Mark Petri and Plaintiff made a

great effort to sync the original score and the film's cut. Of note, accepting the composer forced upon production by Tigran had brought an unnecessary delay in finishing the film, and an unnecessary extra dedication of time by Plaintiff to the project. David Shara expressed increased frustration at the fact that Tigran was being recalcitrant and in-collaborative simply because David had not terminated his relationship with Plaintiff in 2016.

95.   On December 14, 2017, Plaintiff sent a proposal to Sarandon about a new project for the fiction film titled "16 Hours", copyrighted by Plaintiff. The proposal included a detailed synopsis and an outline of budget and business proposal with main conditions. The role proposed to Sarandon was that of a nurse working in an emergency room during an outburst of fentanyl wreaking havoc in a small US city already strained by unemployment and the use of opioids. Sarandon's assistant acknowledged receipt of proposal and attachment. Plaintiff had discussed previously this project with David Shara, who manifested interest in trying to find the funds to coproduce it. David Shara asked via email permission to share it with actors Topher Grace[70] and Ashley Hinshaw.

**C. 2018**

---

[70] Secondary actor in "Interstellar", "Traffic", "Ocean's Twelve", among others.

96.    On January 13, 2018, Sarandon sent a note after reading the synopsis: "From Susan: **It seems like a really worthy idea.** I don't know what to do with the treatment, but when you get your script I'll read it."

97.    In January David Shara insisted that they needed to get Sarandon's more direct involvement. Both knew that she had participated expecting nothing, and so she promised it clearly in 2016, Tigran's testimony shows as quoted before. Sarandon's representations had been clear and that she had granted permission to use her image, and she knew the film was for distribution. She had reviewed the final cut, without objecting to it, only requesting some retouches to her eyes wrinkles. **At this point Plaintiff accepted David's proposal, they drafted it and Plaintiff sent it to Sarandon**. David insisted in being presented as 'producer' of the film because, according to him, the prestige of his diamond business and the impression of wealth would look better in the eyes of Sarandon[71]. Plaintiff and David understood that they were being very generous to Sarandon, since she had already participated making it very clear she did not expect anything (except being well portrayed by Tigran), but they wanted to make her happy, and to show their thankfulness. David excused her manners as being part only of her romantic frustration as regards to Tigran, and both David and Plaintiff,

---

[71] Plaintiff was in no way interested in getting a similar reaction to that of 2016, and avoided contradicting the mercurial character of David Shara.

as team in charge of the film, wanted to be apart from those personal aspects and show respectful thankfulness with a big, generous proposal.

98. ***Sarandon's business proposal sent by Plaintiff, and her affirmative answers to terms***. On January 24, 2018, Plaintiff sent to Sarandon the business proposal approved of by David Shara and Plaintiff. The email shows the terms offered: "We want to offer as a compensation for your participation and kind visit of Tigran's studio for filming: -A large print, hand-embellished and signed by Tigran, of your own portrait (estimated value around $40k) -And another print hand-embellished and signed by Tigran of your choice (estimated value $40k) -Plus a 10% of all profits generated by the movie in any platform. **We'd like you along with Tigran to be part of the PR of the film, as far as your agenda would allow it, and organizing everything in anticipation for your convenience[72]**." Sarandon answered the Plaintiff, CCing David Shara: "From Susan: **Thank you so much. I would love to have prints that aren't gigantic. In terms of going to Armenia in June, I know that Im working on my TV show and there's no way to know if that would be possible at this point, we'd just have to wait, though I'd**

---

[72] The business proposal contains a petition to do PR, in a very mild and kind way, understanding her other needs related to other projects. The expectation of 'thankfulness' at least, from Sarandon, as regards for instance to significant awards won for her thanks to the existence of the Film, was only natural and logical on the side of the Plaintiff and his team.

**love to visit Armenia.**" Sarandon accepted all the terms[73], only requesting to downsize the prints, which she accepted, that were prepared for her, framed with best qualities, and shipped to her address as a consequence of this business proposal and its continuation afterwards. **The continuation of communications show _no objection whatsoever to the terms offered_, on the contrary,** even she directs David Shara and Plaintiff to "hire and agent" for setting up commercial distribution and to "go to film festivals". Sarandon accepted these terms, and barely only gratitude on her side and a minimum of reasonable decorum was expected from her. The terms contain an expectation of fair PR compromise. Thus, at a minimum, thankfulness on her side for important awards won for Sarandon thanks to the long years of dedication by Plaintiff to the film was expectable, out of respect also who gave the awards. Sarandon, however, had her own agenda, facts will show. [Exhibit 2 —Business proposal sent by Plaintiff to Sarandon and answers—David Shara intervention—no objections ever.]

99. *Press Release of February 2018 requested by Tigran and David.* Tigran requests, and David insist on it, from Plaintiff that a specific massive media press release be sent to the Armenian and Armenian-American press to make it known that the film soon will be distributed

---

[73] It is contrary to accepted contractual law doctrine and natural test in a response to an offer, that is not objected, and that remains in place without objection, cannot be construed falsely by one party at a later date only partially in self-interest, altering the original understanding once the other parties have believed that original representation and have worked within those parameters.

and to boost Tigran's popularity and painting sales. Tigran and David first encourage and ask for, then approve of the press release, which specifically talks about distribution to the public, the existence of the film and all in indivisible connection with Tigran's artworks[74]. Plaintiff and his company and third parties prepared this press release targeting specifically Armenian and Armenian-American media.[75] On February 9, 2018, Plaintiff informs via email of the Panarmenian[76] cable news wire spread to countless media outlets in Armenia and the Armenian diaspora of media outlets in Europe and US. Plaintiff writes: "PanArmenian is a leading news agency in the Armenian media market -it is though a small media market- and it has distributed the trailer a few hours ago in its showbiz English section, perhaps also in Armenian, but I cannot track that language." David Shara answered one hour later: **"Wow that's fantastic..."**

100. The result was, however, much more spread than expected, because the information about Tigran and his artworks was united with

---

[74] It is impossible to argue that the film and the press releases related to it were not directly promoting Tigran's business and prestige. That is why Tigran encouraged them, participated actively in them and congratulated them.

[75] The coverage reached hundreds of Armenian media outlets, in the Republic of Armenia and in the USA, because the press release had gone via cable news agencies such as PanArmenian. There is abundant proof in form of media outlets news still accessible online. It would be burdensome for the Court to be loaded with an extra Exhibit listing them.

[76] From Panamrmenian "About PanARMENIAN Network PanARMENIAN.Net is the first Armenian online news and analytical agency and one of the most cited Armenian informational resources worldwide. The agency's full information flow is being published on PanARMENIAN.Net website in 3 languages. [ https://panarmenian.net/eng/panmedia/about/ ]

Sarandon's participation and portrayal. On February 14, 2018, Plaintiff informed David via email: "I forward you below the request from one of the biggest TV broadcast and news conglomerates in Armenia, ARMENIA TV. They want complementary info for a TV story, &c. The impact performance of the PR we launched is so far much better than expected." David Shara answered on February 15, 2018: "**Keep up the great work Arthur, I am so proud of you and our project**" "Please let me know if I can help you in any other way". On a phone conversation David proposed to participate himself in the TV segment. Plaintiff agreed, remembering the threats made in 2016 as regards to Plaintiff never being present at any press events (as quoted directly from David Shara's emails in 2016) and, again, wanted to avoid another pyrophoric, mercurial reaction of David Shara. Since the content appears dubbed in Armenian, the Court will be able to understand that Plaintiff has not been able to understand what David and Tigran represented to the important media outlet, until requesting a translation on January 4, 2023, which is attached as full transcript of the TV segment as Exhibit 3.

101. Invoices of 2019, from budgets of 2019, show that what had been agreed was in now course of performance: the US Oscar qualifying theatrical release and the North America and English speaking countries distributing directly sent in movement by Plaintiff and David to secure higher revenue avoiding secondary market actors for those markets. In

fact, invoices show cost of translation for the languages to be added as an option in Apple TV platform, including many other languages different than English.[77]

102.   On Feb 19, 209, Tigran sent an email to Plaintiff and David, titled "Armenian TV", stating "Hey guys, this was live last night at 8PM on Armenian TV",  including url to whole segment of Post Fact, a tv show based on high profile news for the world that was and is still part of the Armenia Public TV, the most viewed TV channels of the Republic of Armenia. The segment was aired to Armenia and to Armenians outside Armenia. The Armenian diaspora is internationally very widely spread all over the world. Post Fact followers only on YouTube channel amount to 2.19 million.

103.   Plaintiff found that David Shara advertises himself as 'producer' of the film, not as 'executive producer'. The journalist, after talking at large with Tigran and David, states, regarding distribution, "The film is scheduled to premiere this fall, and before that an exclusive screening awaits the Armenian audience". David and Tigran actively advertised the imminent distribution of the film and its screening, also in Armenia. **It must be noted that the text of the journalist is based in direct conversations with Tigran and David Shara, because once**

---

[77] Budget memos shared, approved of and congratulated by David show other terms agreed on, and were paid. They haven't been included not to make this Complaint longer, but are at the Court's disposition.

**Plaintiff's media office set in contact the journalist of Post Fact and Tigran and David, Plaintiff's media office did not have any power nor any other communication related to that content. It was managed, carried on and executed directly by Tigran and David Shara**. And for good reason to them: the segment is just proof of the impressive, positive influence Plaintiff's dedication for years had on Tigran's publicity and business. The journalist states: "**Academy award winning actress Susan Sarandon starred in a movie about an Armenian painter." "Who is Tigran Tsitoghdzyan and why did an Academy Award winning actress star in a movie about him? Presents Vitali Grigoryan**." "Academy award winning actress Susan Sarandon's encounter with Tigran Tsitoghdzyan turns into a conversation and then a plot, using which a film director Artur Balder was going to shoot a movie." David Shara, advertised with a caption sticked to his image as "The producer of American Mirror", states: "This is not purely a documentary. There is art in this and a story. It's difficult to pin a genre on it. We didn't want to just film talking heads, we wanted to make a movie about Tigran's dreams." The segment, that will be presented as prove, presents David Shara speaking to the Armenian audience recorded via WhatsApp video call, Tigran also presented via WhatsApp video call, the journalist speaks, and the entire video displays and based on images of the work of the Plaintiff, including parts where Tigran and Sarandon

appear together, plus some parts of the dialog. The angle of the segment is very focused on presenting Tigran as an Armenian art-hero and as one of the most important artist because even a film is made in which Sarandon willingly participates. It is impossible to deny the unjust enrichment that this and other sought after press releases bring to Tigran and to David's business with Tigran thanks to Plaintiff's work, in connection to Tigran's actions denying  signed permissions from him and his son to distribute the film (David has been selling Tigran's artworks since 2012, according to Tigran's testimony as recently as July 2022, stating that he still by that time was represented by David.

104.    Emails exchanged as part of a budget in October 5, 2017, includes the DCP costs [Digital Cinema Package], a cost is only incurred for if distribution is intended, in the context of distribution affirmative discussion. It mentions the possibility of obtaining under the same budget "unlimited positive copies" for theatres, and the section **"Theaters Distribution, bicoastal"** elaborates on the theatrical release under their

control, and another section **"Internet Distribution Costs"**[78] leaves no doubt as to the online distribution being hands-on by them, and set up by Plaintiff, as simply part of the agreement initial, and the agreed on monetization step for North American and English speaking languages. David Shara is elated, and on an email he states explicitly referencing this set of actions on October 5: "i sent 25,000". Invoices were sent. On October 23 David's assent and enthusiasm at the prospects can be read in his own words: "Thanks for the update and keep up the good work!!! I have shown the trailer 10 times and people LOVE it...Love it Let's talk budget, let's talk music, order of scenes/storyline, VFX, film festivals, PR etc" Being part of this same trail of concerted, agreed on, mutually assented actions, he stated on February 12, 2018: "I am very happy with everything you have done and how carefully you have spent the money. You have been wonderful throughout the whole thing and I appreciate

---

[78] Plaintiff's email elaborates: "Then we have internet distribution costs, of which we do not need to worry now, but I gave you an estimation of putting the film on sale in the mayor platforms: Itunes [Apple TV], Amazon and Google Play. Its 3k to 5k, but also a few permits have to be done for instance to sell the movie, although in English, in certain territories, like Austrlia o New Zealand, or UK, or Germany. Those are good markets, but permissions of their motion picture associations are necessary, mandatory, so that Itunes puts the film on sale for people in those territories. I dont have these numbers now, but they are not a big deal."

David Shara knew perfectly, and it was simply clear and out of doubt, that he had to obtain the talent releases of the people he had invited to participate, because at that date Plaintiff had already obtained those of people he had made himself responsible for, David even receiving one from Donald Kuspit at his own offices out of request by Plaintiff.

The same can be said of Tigran: he knew he had to provide them as part of the 2016 agreement and his written sign off and consent, and Tigran obtained them signed from models he had invited to, yet he himself withhold them until today.

everything you have done."[79]

105.    In 2018 David Shara requested links to download and watch privately the film remotely, in order to distribute it to very rich clients of him who were potential buyers of Tigran's new paintings. David used this links to convince potential buyers that buying a painting by Tigran, or ordering a portrait by him, was an investing potentially worth millions in the next years. Among others, he acted this way with businessman Josh Guberman, who consequently order a portrait of his wife. David mentioned also some very rich buyers in Israel.

106.    David acknowledged that, thanks to this enormous push into the Armenian and Armenian-american media, coordinated with the others press releases sent in 2017 and 2016, Tigran's business was growing, and that Tigran was in talks 'to secure a big lone in Armenia to build a very modern villa that he intends to open periodically as museum to better promote and sell in Armenia.' Plaintiff's work, in all aspects, was

---

[79] Sarandon's wayward paltering in action after September 2018, once she had accepted terms contractual that she afterwards will not honor, ruins the illusion and work of years among all parties of the production team, and won't stop at that, simply because legitimately Plaintiff defended his work and his dignity as a worker who had trusted, like David Shara, her promises since 2016.

enriching Tigran unambiguously.[80] The prestige he gained thanks to the Film's being made, being promoted, and passing through a protracted festival circuit between 2019 and beginning 2020, were of the essence to materialise the growth and to gain the trust of financial institutions. Tigran has enriched himself unjustly thanks to Plaintiff's five years of dedication.

107.    This is just an example among many, and including all would be burdensome for the Court. Tigran was contacted by news agencies of Armenia on several occasions as a consequence of the press releases organised and sent by Plaintiff. David and Tigran made for years a self-interested public show of the film going to be distributed in all forms imaginable, both take advantage of it for their business (undeniable that the public reputation of an artist has an input on his prices and demand) even giving dates, and that is because there were deals in place with Plaintiff that complement, not contradict what in the Producers Agreement is partially integrated, in fact miserably poorly integrated, simply because even the extension of the contract is an imposition in the

---

[80] Time has proved that this was true. Tigran boasts a big, modern villa that he and his family open periodically to the public as a museum, under name "Tigran Art Studio", where his artworks appear on display. Proof of it can be seen here: [ https://www.google.com/search?q=tigran+art+studio+museum+in+armenia&oq=tigran+art+studio+museum+in+armenia&aqs=chrome..69i57.421j0j9&sourceid=chrome&ie=UTF-8 ]

This private house presented as a museum is another publicity stunt: Tigran's works are not present neither in demand by museums anywhere in the world, expect the National Gallery of Armenia, where, Plaintiff knows those details, there is one painting not because it was purchased by the museum, but because Tigran insisted in leaving it there in permanent display for obviously promotional self-interest.

context already shown of 2016's coercions on Plaintiff simply because he wanted the existence of a contract. The lack of distribution defames the Plaintiff and degrades his work. This representation to the public by Tigran and David constitutes proof of defamation once we put them in context with their actions directed to thwart the distribution of the Film.

108. Tigran approved of film, put his son in it, congratulated every single sequence, yet Plaintiff was insulted as shown before in 2016, because he dared to want a contract mirroring what had been promised to him by Tigran and David. Tigran was using the announcing of distribution of the Film to become instant 'celeb' especially targeting a small country and community, the Republic of Armenia, to aggrandise the perception of his persona at the expense of promoting a film's distribution that he was at the same time making steps to thwart: the taint releases of him, his son, the artworks were also requested to Tigran in 2018, and Tigran did not send them to anybody. He was unjustly enriching himself at the expense of Plaintiff's work, instructing Plaintiff, with David, to launch massive media press releases, that now stand as an undeniable proof of defamation for the Plaintiff's work, since the distribution they assured of the film depended directly from both Tigran [his talent releases, those of his artworks and those related to his son, a minor] and David [who has denied outright to obtain all talent releases], and did not come to happen. Other media interventions in 2019 will defame Plaintiff

massively in front of the public, this Complaint will *show* with exhibits and sworn translation.

109. David Shara in contemporary conversations stated very clearly that at present Plaintiff should remain apart from the media, not appearing in person, only preparing and sending the press releases, but allowing Tigran and he, David, being the center of attention 'to better sale Tigran's artworks', assuring Plaintiff that he [David] had in mind 'an impressive new documentary project about art' for Plaintiff to direct and produce in collaboration with him. Given the antecedents of 2016's coercion to sign a contract with unfavourable terms after breaking their promises, Plaintiff saw no better way to proceed at that time but following this petition, as much as it was abusive and demeaning his professional work and real involvement. David assured him that it was all because of Tigran's need of attention, and that it was better let it be so for the moment.

110. In the eyes of the public, Plaintiff now looks like an impostor thanks to these reckless, defamatory acts to promote and sell Tigran's artworks at the expense of Plaintiff's good work's announcement of distribution, because the Film seems to be an illusion that never existed, and this is deeply defaming against Plaintiff as producer and director. Plaintiff looks like an impostor simply because the Film is advertised as to be distributed massively first to festivals then commercially, even

indicating dates of distribution in those territories targeted, as noted before, to wide swaths of media in the Americas [in 2017 via Notimex cable news, biggest news agency of Central America, dates], the Spanish media [via Europa Press news agency, which covers vast list of clients across Spain and Latin America], United States [United Press International, Armenian-American media] and Armenia [massively informed by Armenian National TV, news agencies like Panamanian, and hundreds more, many dozens listed on file]. This is consequence of a course of performance agreed on and in execution[81].

111.    On March 29, 2018, the Armenian Film Festival of Yerevan sent a proposal to Plaintiff inviting Sarandon to take the Lifetime Achievement Award 2018. Plaintiff forwarded the email to Sarandon's assistant. The festival proposed: "The festival administration will gladly cover all the expenses related to your trip and stay in Yerevan.  We can assure you of the highest level of reception. We will be happy to provide you with a business class ticket, personal car, translator, a deluxe room in

---

[81] *§ 2-208. Course of Performance or Practical Construction. (1) Where the contract for sale involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other,* **any course of performance accepted or acquiesced in without objection shall be relevant to determine the meaning of the agreement**.

This course of performance agreed on and in execution —expecting to distribute the film after making it— complements the Producers Agreement' and is direct consequence of its extrinsic evidence provided in detail in allegations contained in Section A 2016 [proven with emails, showing Defendants' own words, not just allegations of Plaintiff], which consistently represent undeniable evidence of clarifying and complementing the Producers Agreement terms, prior and contemporaneous to memorialisation of Producers Agreement that are not contradicting it, but that explain and supplement the Producers Agreement sketchy shortness, which is a consequence of Plaintiff being put under duress and coercion by both Defendants in 2016.

a 5-star hotel, and of course, a tour through Armenia if you like." Plaintiff's wife took the reins of this emails thread. Sarandon's assistant dealt rudely with Plaintiff's wife. When she requested a more fluid way to communicate, asking "I will need to have a phone number of Ms Sarandon office to get a better communication in the future." Notably Sarandon's assistant answered: "**Our phone number is (212) 675-4285** but email is the best way for us to communicate **so everything is in writing**." As the film was finished and approaching distribution, Plaintiff and Plaintiff's team tried to have communication with Sarandon to deal with aspects of the film that inevitable required communicate with Sarandon's office. On same email thread Plaintiff's wife also requested the size Sarandon's would prefer for one of the prints she had accepted as part of the terms, a hand-signed print of her portrait, that she had chosen as upfront compensation. Sarandon's assistant answered: "What size are the prints? As for travel to a film festival, **Susan would fly the highest class available, which in this case would be first class to Paris and then business to Yerevan. Also, she is always offered at least one guest, but more often two**." Plaintiff's wife informed Sarandon's assistant of the print sizes, asking if they were fine for her choice, then requested if the travel conditions of first class were also necessary for Sarandon and Sarandon's guests. Sarandon's assistant answered curtly: "What is the next size smaller for the prints? And yes, whomever Susan

travels with, they would have to travel together." Plaintiff's wife kept same kind forms of communication inspire of Sarandon's assistant ritual curtness to communicate power to others. Plaintiff's office emails always started with "Dear Brian" **in spite of Brian Gibbs recalcitrant curtness and stiffness,** which Plaintiff felt was 'profiling' and 'discriminating' after two years of treating him and Sarandon with silken gloves, only to be rewarded with rude forms sent to Plaintiff's wife simply because they were offering Sarandon signed and framed prints valued, according to David Shara and Tigran, at more than 40,000 USD each as upfront for her two hour participation in the sequence of the film [total value represented by Tigran and David, 80,000 USD].

112. Notably these set of emails were being CCed with David Shara. At his point David Shara intervened in the email thread. The email is important because it is a direct continuation of the business proposal sent by Plaintiff detailing the terms that Sarandon obviously accepted, offering more terms than those assured by Sarandon and confirmed by Tigran in 2016.[82] According to David Shara she had a different perspective and expectations of Tigran to be being made public. It must be noted that her previous relationship had been even terminated online, publicly broadcast, with Sarandon and her boyfriend making a public show of the

---

[82] Recall, 2016 Sarandon had assured Plaintiff she did not want anything. It cannot be denied that Plaintiff and David Shara were being thankful and generous to Sarandon with their new offer, which obviously she accepted without objection.

breaking apart situation by broadcasting it life via a reality show by AOL, called "Connected"[83].

113.   In this email, part of Exhibit 2, David Shara writes, reiterating terms of the proposal: "My name is David Shara and I have represented Tigran For the last six years as his partner and manager. I am also the producer of the film."[84] " This is the first movie production for my company, Optimum Diamonds."[85] "I am very interested in Susan's involvement in this movie and **I am willing to give her a percentage**

---

[83] EOnline.com clarifies more this point on an article published March 5, 2017, titled **"Susan Sarandon, 68, and Jonathan Bricklin, 37, Split After 5 Years Together"** The article reads: *"The two currently star on Morgan Spurlock's new AOL series, Connected, which focuses on six New York couples. The show, which is centered on 12 individuals documenting their lives with handheld cameras over the course of six months, has caused a rift between Sarandon and Bricklin."* Online: https://www.eonline.com/news/632397/susan-sarandon-68-and-jonathan-bricklin-37-split-after-5-years-together

[84] The Producers Agreement leaves it clear that David Shara was not the producer of the film, but the executive producer. In the public sphere, the media, and in front of 'celebs' David Shara wanted to appear, and in fact presented himself, as producer of the film, contrary to all responsibilities Plaintiff had carried on since the beginning, and contrary to the contract and the extrinsic evidence that surrounds it and was presented here in section A, 2016. In the film industry this kind of attitude, arrogating to oneself credits unduly, is called "credit creep". Filmaker Magazine, January 16, 2019: *"The question is more than academic, because a kind of **"credit creep," where financiers, who might traditionally receive executive producer credits, are sometimes given producer credits, thereby confusing the recognition that should be directed towards producers who worked with the director for the entire project and may even have originated it.**"* https://filmmakermagazine.com/106670-document-producers-alliance-fights-credit-creep-with-proposed-industry-guidelines-for-documentary-film-producer-credits/
David Shara takes the credit for himself whenever it pleases him.

[85] That was not exactly the case: Optimum Diamonds was providing funds for the production with rights to profits, but the production was entirely executed by Da Vinci Films LLC and its team, Plaintiff's company, the original idea was Plaintiff's and Plaintiff was the producer.

of profits for her involvement and guidance.[86]” **“I am very happy to share profits and accolades.”** “If you are ever in Midtown, let this stand is an open invitation to come and see some of the worlds greatest and rarest natural fancy colored diamonds.” “I would also like to discuss your thoughts on film festivals. Arthur Balder has done an incredible job on all aspects of this film including submission to film festivals. He deserves an enormous amount of credit. He has put in so much time, effort, expertise and skill. I am beyond proud of him. It is very rare that someone surprises me these days, but he truly impressed me with his patience, expertise, originality and skill level. **I am extremely interested in maximizing both exposure and profits. I am also interested in sharing profits and making money for Ms. Sarandon**.” After this email, and as part of same thread, Plaintiff's wife again asked Sarandon's assistant if he had any special requirements for

---

[86] The percentage of profits is “for her participation **_and_** guidance.” She accepts it. Besides the affirmative comments she makes as part of this conversation, Sarandon did not *guide* ever the film anywhere once she got the prints she wanted. Sarandon, in contrast to what here accepts, did not even thanked important awards this project has won explicitly for her, including nominations for Best Actress, contrary to basic rules of courtesy and basic social standards.

Among the 88 nominations and awards listed by IMDb under her name, explicitly thanks to the Film [American Mirror] Sarandon appears as winner of the Golden Film Award 2019 by the US Hollywood International Film Festival, winner of the Jury Award by the European Cinematography Awards 2019, winner of the Parajanov Vartanov Award 2018, and nominated for the Monica Vitti Award by the Blow-up Chicago International Arthouse Film Fest, 2019. [ See link https://www.imdb.com/name/nm0000215/awards/?ref_=nm_awd ]

To state that the Film has done her any kind of disfavour is preposterous. The film enriches her in many aspects, while she, by breaching the contract, ruins the potential of the Film once it has run through a film festival circuit which does not harm her, but on the contrary, that further promotes positively Sarandon as part of it, simply because she wants to harm Plaintiff at all cost and to any others involved, who follow her lead out of fear of her baseless litigation threats, which of curse never are filed because she knows they are meritless, and because it is better to allow the film to enrich and promote her in a festival circuit that became spectacular against her lack of collaboration in all aspects.

Sarandon's travel. Sarandon's assistant first confirmed acceptance of a 3.5 feet tall faming for the print as upfront compensation for her participation. Then a new email, signed by Sarandon, came in afterwards: "David, Thank you for your kind dinner invitation but I'm working on Ray Donovan now through October so I don't think it's possible. **It's a very special film, but I really have no idea how to market it. I think you need an agent or maybe just look into submissions to festivals.** The season is upon us so I think it's too late for this cycle. Susan.[87]" David Shara assured via email answering: "Absolutely… we will print and mount **them** for her!!!" Sarandon was being given several artworks in exchange for her participation, and she was choosing the size and framing, and she was being offered profits from the distribution: she knew it was going to be distributed, she had promised to provide the necessary permits in 2016, and now she was accepting new enlarged terms that were different from those she accepted at the beginning in 2016.

---

[87] Sarandon *knows* that it's going to be marketed, knows that she is in, knows that she is part of it, has reviewed the final cuts and recognises it is a special cinematic work, but leaves any ideas and plans regarding distribution (and specifically marketing) at the production team's discretion.
Notably, she states **"The season is upon us so I think it's too late for this cycle"**, which out of film industry jargon means that the 'awards' season is almost there (these emails were being exchanged at the beginning of April), and that a film's run into end 2018 was already late. Obviously season refers to the clear succession "first film festival circuit, then commercial release". These two things are inextricable, because the festival circuit gives a sense of the potential of the film and his prestige makes it more interesting for distributors and audience alike. She then suggest what Plaintiff and David Shara also understood was the best: to prolong the film festival circuit into 2019, so that film could have its best 'entry point' by the end of 2019. All existing evidence, from budgets exchanged to invoices detailing even dates estimated and provisions for an Oscar qualifying theatrical release in the US, show unambiguously that this course of performance was agreed on, and in movement and decided already in 2018.

114.  Statute of frauds[88]: *a.  Every agreement, promise or undertaking is void,* **unless it or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith, or by his lawful agent, if such agreement, promise or undertaking**: *1.* **By its terms is not to be performed within one year from the making thereof** *or the performance of which is not to be completed before the end of a lifetime"* . Sarandon subscribes in writing the memorandum of the agreement that contains its terms, comments on them, do not object to them, specifies measurements of the two prints she accepts as upfront compensation, then counsels about distribution and marketing of the film —she knows the film, has seen it, she knows she is in it and it is impossible to deny *she knows the film is going to contain her sequence.*

115.  Plaintiff's wife asked Sarandon's assistant if she accepted or not the Lifetime Achievement being offered by the Arneniaan Festival of Yerevan. At this point, the assistant curtly answered: "No, I can't. As I've mentioned many times now we don't know her schedule for that time yet. If you need to know right now, it's a pass."[89] David Shara, always ready to accept this kind of rudeness from those who are either famous or rich

[88] New York Consolidated Laws, General Obligations Law - GOB § 5-701. Agreements required to be in writing.

[89] The set of communications clearly shows that Sarandon's office tone changed radically when she or her assistant exchanged emails directed to people she did not consider 'rich' or 'important'. Her kindness in these emails is in direct proportion with the *money* the interlocutor she talks to she understand has. This is interchangeable for Sarandon and for Sarandon's assistant. Not exactly consistent at all with the image she tries to sell in Twitter. It is discriminatory.

enough (or better both), answered directly to Plaintiff's wife, who was being pressed by the Armenian Film Festival to get an answer, since they had to get many arrangements on time for the event July 2018's dates: "She has not accepted Bella, please back off for now...Brian is getting irritated." Plaintiff's wife explained directly to David Shara: "think there has been a bit of a confusion. She may accept the award, although she may not be able to go there to take it due to her schedule. These are two different things. **I understand also the festival: they need to get organized.** Anyway..."

116.    Sarandon's office and Sarandon's assistant had shown a discriminatory tone in dealing with Plaintiff's team. A perusal of *__all__* emails exchanged with Sarandon's office from Plaintiff's team will show invariably 'silken gloves' manners on the Plaintiff's team side since 2016. Curt rudeness began to stream from the majority of Sarandon's office communications in 2018, interestingly **once, always according to David Shara's reports, the relationship between Tigran and Sarandon had cooled 'too much'.**

117.    The Armenia Film Festival pressed for an answer as regards to the Lifetime Achievement Award 2018. For Plaintiff and David Shara it was clear that Sarandon's postponing answering if she would accept the award or not was detrimental for the relationships with the film festival institution, because they needed to get organised. David Shara and

Plaintiff discussed plans to extend the film festival circuit into the first half of 2019, and also the second half of 2019, always thinking of immediate distribution once the film festival run had finished, following Sarandon's suggestion, which they agreed on.

118. Tigran was preparing a big show at an art gallery in the Meatpacking District, New York, in front of the newly opened Whitney Museum. Tigran wanted to use a version of the trailer especially prepared to upload it as a banner on the front page of his Facebook fanpage, in order to take advantage of it right before and during the show. The purpose was to take advantage of a version of the trailer to better sell his artworks and promote himself[90]. On May 16, 2018, Tigran writes to Plaintiff "Im preparing my upcoming show on June 7th, so crazy busy with that. I thought to upload this video on my FB cover but I can't download it. Can you send it via wetransfer or something else? Hope to see you on the show, will send you the invites as soon as get it."[91] Tigran downloaded the version, and uploaded this trailer, and kept it there for years as the banner of his persona — Plaintiff's trailer of a film Tigran did all in his power to destroy its distribution in due time, and whose talent releases he were not signing neither in 2018.

---

[90] More advantages for Tigran directly coming from the film, its existence, and to enrich himself thanks to it.

[91] Plaintiff and Tigran contacts were now scarce, and almost always only via email. The invitation to attend was 'pro forma' simply because he wanted the video. Plaintiff did not attend that event. Publicly available images show David Shara and his business associates attending it.

119.    David Shara expressed frustration at the fact that Sarandon did not help the film to get a premiere in the USA [since she had promised 'guidance'], after having attended the filming of her sequence in 2016 and being paid far more than she initially requested (she requested nothing initially). He also found rude that Sarandon was taking so lightly the Lifetime Achievement Award offered by the Armenian Film Festival, and especially not answering on time. The production team was being pressed by the Armenian Film Festival to get an answer.

120.    On June 5, 2018, Tigran sent an email to Plaintiff: "I finally got a reply from Susan after more than a month of silence. **She told me that will try to stop by the gallery for my opening and I thought maybe I should have a camera man to film it**[92], maybe we can even use the footage for the movie? I know its too late to add things, but it good be in a bonus footage or something, I dont know..." Even in June 2018, when the film is already locked with the composer's dedicated score, Tigran suggests new sequences to be shot and inserted. His interest in getting Sarandon's footage is clear. Plaintiff answered same date: "If you can get footage let's see it how it looks like and if it's usable, we will see. However it's better all looks like a shooting from the gallery to record the event not from the production company. On the other hand, **very**

---

[92] it is clear it is Tigran, and not Plaintiff, who always thinks of cameras whenever Sarandon is about to appear close to him at any event he deems 'publicitary'. It is Plaintiff who mildly rejects this exploiting invasion of the privacy of Sarandon, even under the excuse of a public event.

**important: Apricot** [Armenian Film Festival] **has a deadline to know if Susan goes or not to the film fest and if she accepts the lifetime award. She has to say final yes or no june 14 the latest.** The right person to ask her for that and get her answer is you."

121.   David Shara and Plaintiff discussed the situation. Plaintiff informed David that some music rights were still pending clearance, and that it was better not to screen the film yet due to potential copyright conflicts, postponing the world premiere a few months more. Both David and Plaintiff decided to cancel the screenings and the film's world premiere at that festival in Yerevan, Armenia.

122.   Tigran was informed of this decision, and he agreed on it. Plaintiff had several conversations with him and explained the decision they had made, <u>David and Plaintiff</u>. Tigran also talked to David. In 2019, however, Tigran made false public statements as regards to this situation in the Armenian press, stating that Plaintiff (only him, not Plaintiff and David Shara, as he knew it had been the case) had cancelled the film because it was not part of the official competition of Armenia Film Festival in 2018. <u>That was false and he knew it</u>, and a misrepresentation of Plaintiff's work to the public. Plaintiff requested to the journalist and to Tigran a modification or clarification of the text published at one of the most read Armenian entertainment outlets News.am, but no modification was made, in spite of Plaintiff requesting it clearly and timely to Tigran

in writing, emails show. Exhibit 4 shows a sworn translation of the part of the article were Tigran answered questions about this.

123. On July 5, 2018, Plaintiff's team informed Armenia Film Festival that the film's screenings had to be cancelled due to music copyright clearance.

124. Once Sarandon had accepted the terms of the agreement, and thanked Plaintiff and David Shara for them, once she had received the prints she had been offered as part of the agreement, never objecting to any of the terms, she knowing that the film was about to go into the film festival circuit Plaintiff and his company was setting up, and she suggesting that going to festivals was the logical beginning for marketing, there were no more communications from her. In spite of her name in the industry, in spite of the way she had been treated, of all had been offered to her and that she had accepted, she did not provide any kind of assistance at the delicate moment when the film should meet its first screening ever, and that unnerved David Shara. She did not have to, however, and nobody asked her for that. David Shara said to Plaintiff: "it seems that for her to be grateful she needs to sign it on a contract…"

125. Tigran rejected David's idea to employ a social media manager who would take care of promoting the film from Tigran's social media fan pages in Facebook and Instagram, something that everybody understood was only in his interest. The person David designated and employed for

that finally had to recognised that Tigran was not willing to participate. Tigran himself made it clear that he did not want to go to those lengths in promoting the film, emails show. David Shara expressed frustration and acknowledged that many things had not been and were not fair for Plaintiff and his work, but was genuinely happy for the world premiere now scheduled for October 21, 2018 ay the Los Angeles Documentary Film Festival and the Parajanov Vartanov Institute at the Raleigh Cinemas, Los Angeles. Sarandon was timely informed of the date and place of the premiere. She even did not answer any emails. Of course, she did not publish anything on social media, neither mentioned the film's upcoming premiere. She simply acted as if the film did not exist.[93]

126.     The Film found its world premiere on October 21, 2018 as part of the official selection of the Los Angeles Documentary Film Festival at the Raleigh Studios. The film became the most awarded film of the festival, and the most awarded film in the history of the festival. Additionally, the Parajanov-Vartanov Institute, an institution inspired by director Sergei Parajanov's and cinematographer Mikhail Vartanov's enormously important artistic work, bestowed the Parajanov-Vartanov

---

[93] Recall one of the terms of the business proposal: **_" -Plus a 10% of all profits generated by the movie in any platform. We'd like you along with Tigran to be part of the PR of the film, as far as your agenda would allow it, and organizing everything in anticipation for your convenience"_**. Certainly is difficult to believe she was so busy that she could not direct her assistant to publish a 'tweet' simply mentioning the upcoming date of the premiere. Plaintiff's office, however, did not request anything like that, his office simply informed her of the date, and of course they expected at least a private thankful word, and some respect towards the Price and the institution that had bestowed it on her.

Award 2018 on Sarandon for her participation in a film that was in the spirit of Parajanov's[94] highly artistic cinematic endeavours. Obviously, both David and Plaintiff decided only happily to communicate this news to Sarandon. An email was sent from Plaintiff's office. Sarandon did not even answer the emails informing her of the fact that the Award was at her disposition. The award had been previously given to, and publicly and honourably accepted by, Martin Scorsese and Francis Ford Coppola, among others. This was particularly disappointing to Plaintiff, because of the enormous admiration he feels towards Sergei Parajanov and Mikhail Vartanov. Her not respecting, spurning the award was also not honouring great artists who deserved better.

127.     Plaintiff and David Shara found that Sarandon's attitude towards the film was unprofessional, undeserved, and demeaning in a way that was not understandable. Plaintiff, however, had been already aware of Sarandon's paltering waywardness in the way her/ her office's emails were different when dealing when people she discriminated as not influential. Plaintiff was becoming very disappointed with her attitude.

---

[94] Sergey Parajanov was an Armenian film director, screenwriter and artist. He is is regarded by film critics, film historians and filmmakers to be one of the greatest and most influential filmmakers in cinema history. He invented his own cinematic style. "Before 1963 he directed four non-remarkable full-length feature and three short documentary films. In 1964 his «Shadows of Forgotten Ancestors» («Wild Horses of Fire»), brought him world fame. The strange thing about Parajanov's life is the fact that misfortune came only after he became famous. In 1965 he began his work over an anti-war film "Kiev Frescos», which was soon banned. In 1966 Parajanov was invited to Armenia where he started his work on "Sayat-Nova". With great difficulties, this film was released on a screen in 1969 under the title "The Colour of Pomegranates". It is considered to be his best work after which he was deprived of the possibility of making movies for 15 long years."
Source: Parajanov Museum, [ https://parajanovmuseum.am/ ]

David Shara explained to Plaintiff that the relationship between Sarandon between Tigran was going through a bad moment.

128.    In October 2017 Honey Shara, partner of David Shara and co-owner of Optimum Diamonds, is introduced by David Shara as part of executive production team. From the beginning David makes it clear that she will be also executive producer, and in charge of decisions. She was not introduced, and she did not behave, as an 'agent of a disclosed principal'. Honey Shara explained to Plaintiff that she 'has invested also money in the film along with David' (something also she will write on several communications afterwards), and that she is extremely proud of the result and the situation. David Shara explains that Honey has been providing funds, and that some decisions also will be made by her in agreement with him. Honey Shara is not introduced as an agent for communicating ideas by David, she also makes decisions, as this Complaint will give proof of. David Shara even explained that previous decisions of him had been made in agreement with her.

129.    Plaintiff shared opinions with David about Sarandon's attitude towards the situation, who was unambiguously of the same opinion. Text messages exchanged on WhatsApp summarize what David Shara (best friend, manager and confidant of Tigran Tsitoghdzyan since 2012) had stated many times and recently. Plaintiff sent this WhatsApp message to David Shara on [10/16/18, 21:38:29] AB: "The more this progresses the

more obvious it becomes that Her Highness Sarandon is 'forcefully' ignoring our movie. (…) What stands clearly is that, no matter how good our work might be, no matter if you made clear the point regarding she being rewarded [a reference to the business proposal a few months ago that she accepted], she WON'T do anything basically because she did not get what she wanted --from Tigran. Did Harvey Weinstein punish actresses because they did not give him what he wanted...? She came into Tigran's movie, yes, but Tigran didn't go into Susan's movie. And she had her own 'script' already written right at the beginning -- and he rejected it very nicely, very nicely, but he rejected it. The film festivals are twitting her about this movie, some journalists are doing the same --she ignores all. Something quite similar, although without the very personal connotations, can I say about Ashley Hinshaw 'Grace-ful'. [10/16/18, 21:42:24] and his partner David Shara answered unambiguously affirmatively to this point of view clearly expressed by the Plaintiff, a few minutes later on [10/16/18, 21:42:24] David Shara's answer leaves no doubt as regards to his opinion: **"Agreed on all fronts"** [10/16/18, 21:42:47] even adding David Shara: "But Ashley isn't more than a model in her bra for 30 seconds [10/16/18, 21:42:52] David Shara: [while] "Susan is [the] star" [10/17/18, 11:35:49], referring to the fact that the Sarandon's weight in the film was much higher than anyone else except Tigran naturally, and that she knew it, and it was expected, at the very least,

some gratitude and fairness regarding the film's accolades related specifically to her.

130. On a phone conversation, David Shara stated 'She should be proud and happy we've done this and compensate her, I don't understand her' and 'the hypocrisy of this lady is unbearable', 'what else did she expected from us?' And added: 'Tigran will help us'. David sounded indignant but also confident that Tigran, who had assured many times and given written testimony of that since 2016, that Sarandon had participated 'as a donation', which proved not to be such in the end, would clarify all this with her.

131. The film 'Viper Club', starring Sarandon, was released in the USA on October 26, 2018. Plaintiff watched the film and was shocked by the fact that **the main character played by Sarandon was that of a nurse in an emergency room**, the same role Plaintiff had proposed to Sarandon as part of his script proposal at the beginning of 2018, "16 Hours', in which Sarandon showed great interest immediately, an idea she described as "very worthy". Sarandon had taken elements from Plaintiff's original idea and script to better assist and round the character in a film, "Viper Club", that bombed in theatres across the USA because, besides those elements added obviously in the last minute to the production in order to better and round the main character played by Sarandon, the rest of the film was truly unremarkable. Sarandon was

also a main coproducer of "Viper Club", and obviously did all she could to make the best film possible—including copying the nurse character into its script.

132.    Meanwhile communications to Sarandon informing of the good start of Plaintiff's film in festivals remained unanswered in a rather conspicuous and shocking manner, given all the elements that had surrounded the production of the Film itself, her representations, tacit and written approvals, and promises since 2016, and the absence of any sort of disagreement, objection or problem. David Shara, increasingly frustrated, voiced his complaints as regards to Sarandon in conversations with Plaintiff that were witnessed by others. David Shara stated that the better our film was doing the more Sarandon was exaggerating her unprofessional attitude, which was also undeserved from all angles. Plaintiff agreed **_on all fronts_**.

133.    Plaintiff talked about the 'nurse in the emergency room' in 'Viper Club' with David and shared with him his concerns. David had known this project, "16 Hours", and the itinerary offering to Sarandon the nurse role, and Sarandon's answer after reading the treatment [Sarandon: "a very worthy idea"]. David said that most likely something had happened because it is too obvious, but insisted to Plaintiff in not saying anything because of two reasons: 1) they [Viper Club's production team, etc] could always show a fabricated memo or a script showing a

date previous to Plaintiff's communications with Sarandon, showing I it that the idea had been there before; and, most importantly, 2) because the sole mention would jeopardise all Plaintiff's work of the last years, and his [David's] investment. David insisted that it was better to let it be and hope for a great success with the Film. Plaintiff did not feel well about this situation, but hoped for a normalisation of Sarandon's actions at least as regards to the Film. David told Plaintiff that he had in mind two new projects, and that he wanted to compensate Plaintiff for the many wrongs this project [the Film's] was bringing on him on the personal and professional level with them.

134.  In October 2018, David proposed two new projects to Plaintiff: one was about a very large diamond that David had bought along with other investors. That project was meant to promote the big stone in anticipation of its potential cutting for high-profile clients, and was a more neutral-commercial approach to documenting the finding and characteristics of the stone with interviewees. David also assured that he had connections with Discovery Channel and other platforms interested in this kind of rare natural findings, and there was potential for a good distribution 'and lots of money'. The other was much more ambitious and important, based on the artists and art that made propaganda for the Nazis to demean Jews and minorities in Germany in the 1930s and 40s. David was very motivated about this project and set Plaintiff in contact

with a potential interviewee, a collector located in Europe, Arthur Langerman[95], also a Belgian diamantaire, whose family had suffered and fled the rise of Hitler. David assured that Langerman was a close friend, and that he had watched Plaintiff's film with Langerman during a recent trip to Europe, that Langerman was enthusiastic about the skills displayed, and that Langerman agreed on starting a new project that would further explore and made known to the wide public **the dangers of hypocrisy[96]**. Langerman's collection focus was the propagandistic art that had served to discriminate and demean sectors of population because of their race, religion and opinions. David suggested to analyse previous existing material, such as some documentaries and also books that revolve around this historical subject. Particularly David presented Plaintiff with a book, "Dessins assassins ou la corrosion antisémite"[97], to gather principal material on the main ideas to develop script as soon as possible. David assured that there were clear and powerful connections in Europe and Germany to escalate the project to the Berlinale (Berlin Film Festival), and to find worldwide distribution. Both understood that the festival run of such a project was potentially very wide, given the

---

[95] Langerman is known for having gathered of one of the largest private collections of anti-Semitic images in the world. The collection constitutes the Arthur Langerman Archives for the Study of Visual Antisemitism (ALAVA) at the Technical University of Berlin in Germany. Langerman was awarded Mensch of the Year 2020, by the Belgian magazine *Regards*, for his relentless work against antisemitism.

[96] David Shara, Honey Shara and Susan Sarandon, their breaches and wrongs committed against Plaintiff, are, paradoxically, models of hypocrisy in light of their many actions.

[97] "Assassin designs or the antisemitic corrosion" Stephane Grimaldi, published by Fayard.

numbers of friends that that film would find in the way, especially in the light of the debate that spreading and fabricating 'disinformation' was playing in modern democracies. David assured Plaintiff that money was ready to produce the film in 2019, since he had investors and 'very rich people' in Florida who were 'ready to sign blank checks', 'they want this movie to happen and after watching American Mirror they want you to make it'. He also assured that this time they would work timely, since they would not have to deal with 'capricious and uncooperative people like Tigran and ungrateful Sarandon'. David also said that these two project he expected to be a sort of compensation for the enormous delay Tigran had caused unnecessarily in the making of Plaintiff's wife portrait mirror 75x50 inch. Plaintiff script and idea included the animation of some themes recurrent in the iconography of Nazi-employed artists. To create the visual animations of the Nazi propaganda cartoons for that film, Honey Shara suggested to approach close relatives of her. They intended to include Oscar-winning team Alison Snowden and David Fine behind 1993's "Bob's Birthday", a Canadian-British animated short film that won the Academy Award for Best Animated Short Film in 1993. Fine and Snowden were also nominated for Best Animated Short Film in 2018 for their work "Animal Behavior". David Fine is a family relation of Honey Shara. Both project were intended to be completed in less than a year. Plaintiff accepted the terms offered by David, which were also

compensatory for the delay in giving him the painting under the contract Producers Agreement.

135.    Plaintiff employed most of November, December of 2018, and January 2019, developing the pre-production and budget of this project. The project was very serious, and clearly David Shara and Plaintiff were of one mind in it. Terms, conditions, subject matter were discussed and agreed on, also that the film should be done by summer 2019.

136.    Plaintiff and David agreed on the expansion of the film festival circuit into the end 2019, planning a US Oscar qualifying theatrical release by the end of 2019[98], in order to render the film Oscar-qualifying according to the Academy rules. Sarandon's obstinately uncooperative attitude was a reason of growing concern for Plaintiff and his partner looking forward into wider distribution and commercial distribution. Plaintiff reminded the terms of the business proposal, which were generous and, as regards o PR obligations by Sarandon, extremely mild. They could not imagine that lack of minimum respect and decorum was out of Sarandon's minimum standards. Conversation between the two

---

[98] There are emails showing exchange and approval of budgets in 2018 and 2019, where steps are detailed as to distribution. More exactly, invoices make references clear to distribution. Some invoices are provisions for the US theatrical release. The MTD of Defendants is a hotbed of hopefuls that either pretend some allegations were not present in the SAC, although they were, or just they were not 'specifically' described. Attaching all those emails would be burdensome for the Court.

In Reveille Independent LLC vs. Anotech International, 2015, the court determined that the unsigned memo constituted a binding contract **for the reason of contract acceptance by conduct**. In effect, the condition precedent was waived by the defendant's actions. The defendant also paid submitted invoices from the plaintiff, which was another factor establishing acceptance by conduct.

partners took place as to how to understand and to remedy the Sarandon's attitude. David assured Plaintiff that all was directly related to what he had heard from Tigran, that Sarandon's attitude was directly connected to her personal relation with Tigran, and not with the film itself, and that she had expected something much more public and creating headlines, 'like her previous relationship'. Being respectful to any feelings and personal relationship, however, Plaintiff found Sarandon's attitude *towards the Film*, its merits, and the proposal she accepted was unjust. They, the producer and executive producer, had relied on her promises and confirmations for years, they had spent money and a long period of time in making a good film that was not focused on personal aspects, and now that the film was succeeding at festivals **she was giving it publicly and privately the silent treatment against terms included in the proposal**.

137.    Tigran had introduced and recommended ARPA Film Festival, and Armenians-focused film festival in Los Angeles) as a potential venue for a screening. Tigran explained Plaintiff that it was of interest to him that the film participated at Armenian festivals in North America. The film was included in ARPA Film Festival in November 2018, and screened at the Egyptian Theatre in Los Angels. Tigran and Honey Shara attended the screening. Tigran went onto stage to promote himself and his art after the film had been screened, participating in a conversation in which he

also assured that distribution in USA, and also in Armenia, was underway.

138.   By end of October 2019 David and Plaintiff discussed the next steps of distribution of the Film. Bot agreed that Sarandon's attitude was creating a disadvantage for the Film, and that her attitude was unfair in light of the terms and the itinerary of her actions. David manifested that that weighted negatively going forward, but Plaintiff manifested that he was confident of the originality and potential of his work, and that they did not need Sarandon's public approval or recommendations, as much as they were well-deserved and as much as they could have been only positive for her[99]. For both her recalcitrant negative to just a simple act of thankfulness, to privately congratulate back and thank the Parajanov-Vartanov Prize, answering absolutely no communication, could only be interpreted as acting in bad faith as regards to the terms accepted and contrary to a good moral character, **but also contrary to regular standards of courtesy that are simply expectable, especially from a person with a long career**.

139.   Pomegranate Film Festival is an Armenian film festival in Toronto. On November 18, the festival ended with a screening in a great theatre with the projection of Plaintiff's film. Tigran and Honey Shara attended the screening. The screening was the central piece of the

---

[99] Paradoxically, Sarandon, in "American Mirror: Intimations of Immortality", states at one point: "when you try to earn others' approval, then you are looking for the wrong thing in life."

festival. Tigran attended and congratulated the 'glory-bath' he experienced, excitedly writing on SMS to the Plaintiff that he had to attend 'hundreds of Armenians' talking to him. Tigran went on stage to take and accept one of the awards that the film won on this occasion: Best Cinematography. **To this date, that award, that belongs to the technical team of the film, has been retained by Tigran while at the same time thwarting the distribution that most would have benefitted all the team that made that Best Cinematography award possible**. Honey Shara went onto stage advertised as co-producer (recall Honey Shara had not been involved in any kind of production operations, which had been solely Plaintiff's responsibility), and made a speech while also taking another award in the name of the production team taking the award Most Innovative Film. **To this date, the whereabouts of that award are unknown to the production team of the film, and never has Honey Shara stated a word as regards to how to proceed with an award that is not for executive producers.** Executive producer by contract David Shara, and executive producer Honey Shara, who claimed to be also an executive producer and who has made important decisions to thwart the distribution of the film since 2019, take home awards from the production team that earned them, awards that do not correspond to their credits and responsibilities, while this lawsuit must be filed precisely for them having ruined in bad

faith the excellent work of the production team they took awards from publicly. Honey Shara, on this public occasion, also affirmed next steps of the film's distribution. Plaintiff did not attend this ceremony because David had asked him to 'let Tigran have all the attention since it is an Armenia focused festival and he very much wishes to be the star there.'

140.    Mia Tonelli, David's wife's personal assistant, was tasked by David with social media outreach for the promotion of the Film. To that end, Tonelli was to be the person to post about upcoming screenings at film festivals, and potentially about awards won by the film. David placed a special budget to promote the film from Tigran's social media: the idea was to publish posts to Tigran's audience about the Film, which had been made out of Tigran's wish it to be done, and for promoting Tigran's persona and career. Tigran, however, who was behaving increasingly erratically as regards to the Film as it begun to win award after award, denied many of those posts prepared by Tonelli to be published, and finally made it clear in writing via email that he did not want anybody to have any kind of access, even as collaborator, into any of his social media fan pages. Tsitoghdzyan was breaking another promise he had made years ago to Plaintiff, in relationship to promotion of the Film, and also to David. David felt truly discouraged, and frustrated. Tigran said no to this, and made far less posts than it was expected on his side, expect, of course, about those screenings at which he had been present in person, and/or at

which he had been 'celebrated' by a crowd, as the Pomegranate Film Festival of Toronto, Canada, as explained before. David Shara told Plaintiff that this further showed Tigran's mixed feelings as regards to the Film's start being so abruptly successful, 'this is something nobody expected', David stated. Tigran was trying to discourage David about he [Tigran] being as involved during the distribution process as he had promised[100].

141.   For Plaintiff, these attitudes were reminiscent of Tigran's grand fussy drama artificially fabricated in 2016 to get Plaintiff fired simply because Plaintiff in the end asserted his rights to formalise promises and terms already accepted before on a written contractual form, only now Tigran saw that David was in love with the Film and proud of it, and that David had seen Plaintiff's way of working at the helm of the project, transforming the initial rough cut into something David and Honey Shara were very proud of, as David and Honey manifested on many occasions in writings (emails show, some of them already quoted and dated).

142.   David Shara requested to Plaintiff that Mia Tonelli be included in the editing department credits as a thankful gift for he involvement, and be credited in it as 'assistant editor'. That person had done nothing in editing the Film.

---

[100] Recall: at this point the painting owed to Plaintiff by contract was not yet ready. It had to be finished by May 2017, and David assured via email around those dates that Tigran was "full time on it". Recall Tigran and David's stamens that Tigran's painting of the biggest size 100x75 inches, he made in two months. Plaintiff owed painting was 75x50 inches. Tigran's delay is unjustifiable.

143.     David Shara and Plaintiff had agreed on the new festival run extended into 2019 with a theatrical release in the US, following the rules of Oscar-qualyfing, by end 2019. David Shara and Honey Shara had been and were being informed on a regular basis about the number of festivals selecting the film, and were aware of future screenings. Also Tigran was and had been being informed regularly.

144.     By November 2018 Fabrique Du Cinema, a cinema magazine in Italy, nominated the film for Best International Documentary 2018. On this occasion David Shara, now displeased at Tigran's attitude, insisted that Plaintiff should go in person to Italy to take the award if he won; David explained that Tigran had insisted in going himself in person, and that Tigran was eager to go to all events were the film was finalist.  David Shara also told Plaintiff that Tigran was reminding him, David, of the terms of 2016 email conversations, where David Shara had stated that Plaintiff should never attend any screenings and awards ceremonies. However, David Shara acknowledged that it was not 'fine' that the director should be placed constantly behind when in reality the film was the result 'of his extraordinary work'. A jury presided over by two-time Academy award winner Paul Haggis bestowed Best International Documentary 2018 to Plaintiff's film at Fabrique Du Cinema Awards, beating other finalists' high-profile documentaries, one of them an Italian one that had won at the Venice International Film Festival. David Shara

requested a copy of the award to be made for his personal gallery. Paul Haggis congratulated publicly the team for the work in the Film, Sarandon had never answer any communication since August 2018, never thanked the Parajanov-Vartanov Prize, and never answered any email related to it, neither to any other aspect. Critics in Italy praised Sarandon's presence in the film this way: "Susan Sarandon looks at her best in American Mirror." This news were also shared with Sarandon via emails, who again never answered any communication.

145.     As this situation progressed, David Shara suggested Plaintiff to approach Sarandon directly to try to address the situation of Sarandon and the Film, because Tigran had told David that Susan did 'not answer my messages anymore'. David, not sure if what Tigran said was true or not, but not willing to press Tigran, told Plaintiff that Sarandon's attitude was 'incredibly unprofessional and selfish', and that her 'games with far younger men, as much as they were fine if both parts consented, should not interfere with all the huge work done with the Film'[101]. He also proffered a stream of expletives against Sarandon that won't be quoted here out of respect to Sarandon, which was, however, emotionally understandable. If David was frustrated as executive producer, Plaintiff

---

[101] Sarandon, from her Twitter account, date April 28, 2022, in reply to "One of the worst things Hollywood ever did was stop making movies where Susan Sarandon gets to act slutty.... Now more than ever:" Sarandon's answer was: "There's still plenty of time." [to play slutty].
  The public may have celebrated the witty answer, but for us it is deplorable for the wrong reasons. One thing is to play these games on Twitter to make the day of the audience, and the other is to play with years of work because the 'slutty play' in the end, according to David's reports, did not go her way. Direct link: https://twitter.com/SusanSarandon/status/1519490863549894657

was confused by Sarandon's attitude, deeply disappointed discovering how wayward her games could be, and how unjust, coming from a person whose word he had taken for granted was 'gold standard' because of her reputation and career. Offended and also saddened by her utter lack of respect towards the Parajanov-Vartanov Prize and the film itself, and her own acceptance of the terms offered. Once she had obtained what she wanted, after attending the filming of her image, after requesting retouching to her eyes, after never objecting for years to way the film had been made, after accepting a new offer of terms sent by Plaintiff, 'to please her as she deserves' in David's words, then she just disappeared. Even more, she was giving them the silent treatment in a calculated and conspicuous manner[102] for no reason they could imagine, without any kind of problem or disagreement whatsoever, after years of confirmations, representations, written and by conduct, having even enriched herself accepting material compensations as part of the terms [she was quick in

---

[102] *"What's different about the silent treatment is **its intention is not to set a boundary or regain emotional regulation. The intention is to punish the other person,**" said Vaile Wright, senior director of health care innovation at the American Psychological Association" "**The silent treatment is a refusal to verbally communicate with another person, a way of withholding connection**" "there is also a profound psychological cost for the receiver. The silent treatment can damage relationships, sometimes irreparably. **When it becomes part of a pattern of behaviour, Wright said it can be abusive (...)**" "If someone is using the silent treatment on you, Wright said, it's important to find ways to emotionally regulate yourself. **You can focus on what things are in your control to protect yourself and your emotional well-being. If you feel safe enough, you can approach the person giving you the silent treatment and articulate how that behavior makes you feel.**"*

Previous excerpts from article pub. by USA Today on 2022/04/07 **" 'I felt as if I was dead to her': The psychological cost of the silent treatment"**, by Alia E. Dastagir. URL https://usatoday.com/story/life/health-wellness/2022/04/07/silent-treatment-how-its-defined-when-its-abuse-and-how-deal/9492221002/

accepting terms with profits and in allowing the prints to be framed and sent to her then home-offices in Manhattan]. The silent treatment, when deliberate and enacted with some pleasure and cruelty, it is named as an indicator or aspect of abusive relationships. Sarandon knew that her sudden silence, unmotivated, for no reason that Plaintiff or anybody else could imagine, and particularly her silence about the Parajanov Vartanov Prize, would cause harm and stress to the Plaintiff[103]. It was only natural that both David and Plaintiff felt offended and confused, and both had the moral and professional right, arising from the ongoing contractual obligations, to clarify her position and attitude, because it was polar opposite to terms she had never objected, on the contrary, she had accepted them by conduct and in writing, even requesting measurements and of course never objecting to profits offered, on the contrary, thanking them.

146.   In December 2018 Plaintiff attended an informal meeting at

---

[103] *"Why **the Silent Treatment Is Really About Abuse and Control: Ignoring a person communicates power over them.**" Article by Lisa Aronson Fontes, Ph.D. published by *Psychology Today*. Excerpts: *"**Hostile Withholding Is a Form of Gaslighting**" "Remember yourself: One of the problems with dealing with an abusive and controlling partner is that it can be difficult to remember who you are. (…) Do not allow your opinions, desires and goals to be erased." "**The silent treatment is just one tactic in a controlling person's toolbox**, decide what your limits are."*

David's office. His father Michael Shara[104] was present[105]. Michael Shara, husband of Honey Shara, and Michel's girlfriend, Alicia Stevens, had been exploring possible screening venues at academic institutions. David Shara had shared his concerns with Michael Shara, and Micheal had suggested to try to clarify the situation with Sarandon, that that was only natural. At this point David Shara pushed Plaintiff to try to communicate Sarandon's office, 'because she is not even answering Tigran, or at least that is what Tigran tells me'. Plaintiff felt bad at Sarandon's silent treatment in the light of growing recognition being awarded to the Film, and could not understand this kind of discrimination.

147. Plaintiff insisted to David Shara that the painting that by contract should had been finished a long time ago, should also at last be done. David said that 'it was all Tigran's fault' because he had been 'insisting but Tigran doesn't give a *****[106]'. David Shara was proud of

---

[104] Michael Shara is Curator and Professor, Department of Astrophysics, Division of Physical Sciences
Professor, Richard Gilder Graduate School at the American Museum of Natural History, NY.
https://www.amnh.org/research/staff-directory/michael-shara

[105] On April 27, at a meeting at David's offices, David sent an email introducing Plaintiff to Michael Shara, David Shara's father and a partner of Optimum Diamonds and Honey Shara's husband. David introduced Plaintiff to Micheal Shara and to Michael Shara's girlfriend, Alicia Stevens, this way: "**Please let me introduce you to Arthur Balder...he is the genius behind this beautiful Movie**. He is sitting in front of me and I will explain the connections in person." Alicia Stevens, Michael Shara's girlfriend, had been introducing David to some kind of charity event in London, at which for a brief moment of time David considered it was possible to project the Film in June 2018. Alicia Stevens had offered help to bring the film to screenings "you could also obviously do this at NYU Tisch, London Film School etc, You would get a lot of exposure to jury members and word of mouth for the festival circuit." In the end, none of those possible screenings took place, and all screenings came from Plaintiff's team setting up the international festival circuit for 2018 and 2019. Results will be described later.

[106] Plaintiff has omitted expletives in this complaint.

the film, happy with Plaintiff's results, and in love with the possibilities of distribution, that they discussed and ordered. As stated before, there was since October-November a budget approved for execution of film festival circuit into 2019, and they had decided to have an Oscar-qualifying theatrical release in the US by summer 2019, or, if there many film festival selections still pending, by end 2019 or beginning 2020. Both had decided that they wanted to keep control of the theatrical release in the USA. As regards to the painting to be given by contract to Plaintiff, David Shara made it very clear that 'he would make sure it would be finish in January'.

148.    David and Plaintiff were now aware, and shared that opinion, that Sarandon, to the greatest degree imaginable, and Tigran, in great measure and against his promises and even against his interest, were not willing to promote the Film. For David this was a hurdle, and, in his words, 'an incredible hassle', but Plaintiff insisted that the Film had life of its own, and that its quality would find recognition among impartial people, not precisely, although paradoxically, among the two people that most publicity and prestige were reaping out of the existence and making of the Film and of its distribution. Plaintiff insisted in 'upping the ante' in the face of the other Defendants artificially created, inexplicable adversity, and focus resources on the film festival circuit. David Shara was of one and the same mind with Plaintiff.

## D. 2019

149.    Tigran and Plaintiff had phone conversations in January 2019 regarding the painting due. Tigran assured the painting was 'almost finished'. Plaintiff thought that it was way too late for it to be *almost finished*, after the immense delay Tigran had caused. They scheduled a meeting to see the painting in January.

150.    When Plaintiff and his wife saw the painting, they were shocked by seeing that some parts are clearly unfinished. Tigran excused himself with vague arguments, and Plaintiff avoided a confrontation in front of his wife, but manifested his displease in a way as mild as he could. After that meeting, which was the last one in person ever between Plaintiff and Tigran, Plaintiff explained his point of view to Tigran as regards to the painting via WhatsApp messages. Plaintiff basically conveyed the idea that some parts for it were unfinished, and that that was incredible after the long delay, and that Tigran should finish it. Surprisingly it seems that Tigran got offence at Plaintiff stating his point of view about something that was supposed to be his upfront compensation up to May 2017, as it will demonstrated afterwards by messages by David Shara to Plaintiff, but the messages sent by Plaintiff show no offence, only the fact that Plaintiff explains his point of view and

it would be irrelevant and burdensome to include them as another exhibit. Plaintiff manifested his disappointment at the sight of the painting after seeing it for the first time. Tigran, however, employed the same tactics as in 2016 at a later date, as it will be explain soon below.[107]

151. In January 2019 Plaintiff manifested to David Shara his disappointment at Tigran's work on the painting that was to be given him by contract. David Shara acknowledged Tigran's interference in spite of his petitions (David's) and recognised that the painting was not a proper compensation in light of the long time the film had taken, much longer than proposed, in light of the painting himself, and promised to compensate Plaintiff with 'the two huge new projects in the making', he was referring to the one based on a big diamond mined in Canada, and most importantly the one based in Arthur Langerman's legacy and collection and the Nazi propaganda, both before mentioned. David asked for a budget to start production of the Nazi propaganda-Arthur Langerman project, and insisted Plaintiff should try to contact Sarandon's office. Both laid out terms, with David saying, for the sake of clarity, 'let's do it with the same terms as 'American Mirror', and Plaintiff accepted

---

[107] As an affirmation that Tigran did not consider the painting good enough neither finished, he never included it in any catalog neither in the online catalog of his website. That also contributes to lower its appearance of value in the eyes of anybody who would appraise it. He takes two years to finish a painting that normally, in his own words, never takes more than two months, an at that it was clearly unfinished and of lesser quality. And if Plaintiff protested, then Tigran egged David on to assure that Plaintiff had offended Tigran because he had protested about these. If Plaintiff expressed reasoned and justifiable dissatisfaction at the timing and final quality that was, in David's words, "to spew hatred".

them, this time making an upfront payment in cash to Plaintiff once the production budget was ready and calculated.

152. There was a growing number of questions related to proposals from film festivals sent to Plaintiff's office but for Sarandon to answer, and other requests, which remained unanswered on her side, and that was posing a problem for the best performance of the film during its participation in the international film festival circuit, and also in the coming distribution. For instance, Fabrique du Cinema organisation, where two-time Academy award winner Paul Haggis has presided over jury in 2018, requested if Sarandon was interested in being jury president in 2019. Sarandon did not answer. Plaintiff wanted to have good relationships to festivals and other actors in his industry, and Sarandon's rude silent treatment was obliging him to seem rude to others, not being able to bring back answers in a timely manner. This and other requests were sent to Sarandon around these dates, and the result was more silent treatment. The lack of attention of Sarandon to the questions related to the Film were creating a disadvantage, and were disappointing and disconcerting regarding the upcoming commercial distribution. Plaintiff's concerns were legitimate.

153. On February 5, 2019, an assistant at Plaintiff's office contacted Sarandon's office to inform her of five new film festival selections and of different urgent requests coming from them, which only needed a 'yes or

no' answer. Plaintiff's office also asked on behalf of Plaintiff that he wished to establish a more fluid conversation related to the matters of the Film with Sarandon.

154. On Feb 16, 2019, 2:08 PM to Sarandon's assistant "Arthur wishes to be granted a more fluid contact to Ms Sarandon. Can you pass to Susan Arthur's petition of a phone number? He thinks some promotional aspects related to this film and also possibilities that are arising on the way would be much easier to be solved by simple, plain, direct conversation."

155. Sarandon's assistant passed on the same phone number Plaintiff had had for nearly a year and that he never had used before out of respect for privacy, preferring always the communications to be in writing via email, as had been the case for years. He called to that number, nobody answered and left a voice message. Then Plaintiff received a call from an 'unknown number', or 'blocked number' which showed no ID. He almost did not answer it, because this kind of phone calls generally are coming from unwanted or suspicious scammers. He finally answered it. To his utter surprise, it was Sarandon's assistant, Brian. Plaintiff found it rude that Sarandon's office contacted him from this kind of 'hidden' line—an absurdity to hide the number, because, as said before, he had had this number for almost a year and never used.

156. In this conversation Plaintiff proposed the public acceptance of

the Parajanov-Vartanov Price by Sarandon out of respect to the Film and specially to the Institute that had bestowed it, and explained the promising continuation of the film in the film festival circuit in 2019. Brian, always rude as he had been, told Plaintiff to summarise these points on an email. As a consequence of this conversation, Plaintiff's assistant sent a new email titled "Follow up phone conversation Arthur-Brian"[108], in which it was detailed in writing the few petitions Plaintiff proposed to Sarandon to better assess, within industry standards, the issue of the Parajanov Vartanov Price[109], and the defendant's participation in the film. David Shara, the partner, had insisted in including an invitation to Sarandon to a meeting at his offices in Manhattan. The always friendly tone of the email is shown by Plaintiff's team writing: "This is not pressing at all, but whenever she would be available, we would love to invite her to our offices on 5th Avenue with 47th Street (576 5th Avenue #1200, NY), and **introduce the Parajanov-Vartanov Price with the due ceremony that she and the award deserve**, and also to have a meeting with the executive producer, David Shara" Sarandon's assistant answered the Plaintiff's assistant: "Thanks

---

[108] The correlation between emails sent and exchanged and dates displayed by emails won't leave any doubt as regards to truthfulness of the succession of this events.

[109] Not accepting publicly an award that had been welcomed publicly by the likes of Martin Scorsese and Francis Ford Coppola was more than an etiquette issue: Sarandon's attitude, the result of a calculated silent treatment, was obliging to Plaintiff and his team to look bad in the eyes of an organisation, the Parajanov Vartanov Institute, that had only acted out of kind generosity and recognition towards Sarandon.

Bella, I'll share with Susan when she's back in town." The continuation of this exchange of emails becomes a direct conversation between the defendant and the Plaintiff, and because of the dire consequences that this exchange of emails has for Plaintiff, it is important to explain clearly its succession and content.

157. On Feb 24, 2019, 11:53 AM, Plaintiff writes to Sarandon's assistant, making a reference to Brian's call not showing any ID number: "Hi Brian, let's catch up next week and talk in person about this situation. As almost everybody I generally do not answer "no ID callers" on the phone, you know how much spam there is out there, so sent me an email or notice before trying to contact me this way to be aware that's you."

158. On Feb 25, 2019, 10:07 AM, Sarandon's assistant answers to Plaintiff: "Hey Arthur, I don't have any news for you at the moment, so there's no need to meet. I'll get back to you when I hear anything from Susan."

159. On Feb 25, 2019, 12:11 PM, Plaintiff described the issues he felt the project was encountering in the festival circuit this way: "Hi Brian, the email containing the proposals is very concise and focuses on the main issues. Saying yes or no to the jury proposal of Fabrique Du Cinema cannot be delayed, because they have to announce a jury for 2019 and they cannot let it be 'indefinitely'." Further the Plaintiff complained in a

reasoned manner, summarising what simply had happened before as all evidence can show: "The proposal of our previous email is very clear, and very 'within' fair professional standards. I can aver that we have been all through this time very nice, patient people. I did not suggest, nor requested for, any public commitment from Ms Sarandon when it was most needed: at the beginning, before first screening or announcing it. And I think it was something expectable on my and my team's side, but I did not request it, neither did she do anything spontaneously to help us. What have we done, then, to deserve this estrangement from a great star whom we've treated as good as she has allowed us to do all these three years? She has gotten the Parajanov-Vartanov Prize thanks to my film being there (we got Best Innovative Film, Best Cinematography and Best Composer, additionally), and thanks to these three years of work of my team. She cannot welcome this film publicly along with the award? **The award is a good excuse to welcome the film, though not a necessary excuse to welcome it, and this is what I might call 'fair professional standards' among filmmakers and actors**. After winning in Italy, **a journalist as you well know since this info was in our office memo of past week, wrote at magazine Fabrique Du Cinema: "Sarandon looks at her most charismatic ever"**. (…) successful filmmaking, is a collaborative work, and I am missing a 'fair' collaboration, and at this point, in my opinion and anybody's opinion who

is familiar with matter, media o no media, this seems to be very well-deserved on my/our side."[110]

160.    On Feb 25, 2019, 6:20 PM, Sarandon sent this shocking answer to the previous communication sent by the Plaintiff. Sarandon signed it personally herself and addressing it directly, as she had done on some previous occasions as described before, since she has had always direct access to the email account managed by her assistant: "From Susan: Arthur, I find your email to be extremely rude. I've never received an email like that before from anyone, especially **someone whose film I briefly appeared in without compensation**. **I had no idea you were going to sell this film based on me** and **if Tigran's portrait was in some way obligating me to do press, I'll gladly give it back**. **I understand your wanting to get the most press you possibly can but I have nothing positive to say about your film and am no longer interested in being associated with it**. Please don't contact this office in the future unless it's to give me the address to return the portrait which again, I am happy to do. Susan."

161.    The email was a communication from Susan to Plaintiff that she was intending to breach the contract.

162.    That email, besides cruel in nature and undeserved in light of all what had happened before, is the announcement of Sarandon's making

[110] The terms of the offer sent and accepted by Sarandon were in Plaintiff's mind, and of course also the one referring to PR collaboration by Sarandon, that was never objected by her, but affirmed.

it clear that she is willing **to breach a contract** with someone whom she had made direct promises and assurances for years, a break of her promises since 2016, and of the specific terms she had agreed to in 2018, as shown before. Sarandon had been giving the silent treatment, a typified form of abuse, to Plaintiff. She was ignoring the film and anything that came from it to communicate power over it and over the people implicated in it, to show that without her attention it would sink, and breaching one of the terms related to the PR clause of the agreement. Once Plaintiff tried, in common agreement with David Shara and egged on by him, to recover contact, he just got a no caller ID phone call and no answer to his petitions. Once that was clear, Plaintiff manifested his displeasure at **Sarandon's ingratitude**, instead of accepting and suffering any further the abusive silent treatment Sarandon was giving to him, his team, and to a work that had been in the making for three years, with all her unambiguous and explicit approvals, in writing and by conduct, and her acceptance of terms for distribution, and her promises. Plaintiff would have never imagined in 2016, when she promised all in smiles in front of Tigran and his wife, that a person of her stature in the industry would play such low games has Sarandon had played. Plaintiff was shocked, and his answer to this email was a self-defence and in defence of his work. ***Sarandon had been just looking for an excuse to ditch the film because she had not gotten what she wanted not***

*from the Film, but from her plans with Tigran, which, according to David Shara, included a 'widely and publicly syndicated by the media love-story to propel again her ratings as a woman who can conquest young and attractive men, as the one she just had with the other guy to attract more film contracts and beauty promotion contracts'.*

163.     Sarandon's answer contained an intent of breach of contract that obviously deserved a clear summarisation of aspects she apparently had forgotten lightly.

164.     As a consequence of that, on Feb 27, 2019, 10:19 PM, Plaintiff answered directly Sarandon, as he had the right to his own opinions as she had her right to voice hers: "Ms. Sarandon: This time you've gone too far. Our society is tired out of 'celebrities' in a privileged position who humiliate capriciously the work, good faith and professionalism of others without whose enormous dedication they are nothing. You may have an Oscar, but regretfully you lack many other basic things. You are not only ungrateful, but also unfair. **<u>Your communication is full of wrong statements that are in outrageous conflict with the emails exchanged during the last almost three years</u>**, and overacting is the worst performance an actor can offer. You ought to be a paradigm of good practices, but the reality is far down deep below the acceptable. We are devastated, astonished, disappointed, but we also feel stronger than ever

in **our commitment to cinematic art and to fair practices in a film industry that still fosters abusive behaviors**. And now let's go by parts into your disgraceful note: "I find your email to be extremely rude." Overacted. Extremely rude is your office making phone calls from no-Id-callers (to avoid leaving a proof of the call taking place), which is a practice generally connected with certain types of 'businesses' whose name I do prefer not to remember; thus calling this way someone your 'office' knows is by definition more than an absence of etiquette. I've had your office phone number for more than a year and never used it until last week, when I left a message for Brian, which is an evidence of how respectful I and my team are regarding others' privacy. My email is a clear, consequential exposition of the situation. But the truth is uncomfortable. "I've never received an email like that before from anyone, especially someone whose film I briefly appeared in without compensation." **I've never in my life dealt with someone whose unfairness is so deep and unrelenting as yours, especially when all details regarding this film were exposed to you not only in person the day of shooting, but also before that shooting and also afterwards**. **The conversations regarding compensations are registered and there are emails about our intentions and your answers–see next below.** My first choice had been always Juliette Binoche for that part of the film, but Tigran insisted you lived in New

York. **You were never my first choice**, and I always had my doubts. "I had no idea you were going to sell this film based on me" Overacted: **the film is sold with what it contains, and you came to the shooting knowing we were making a film whose topic was Tigran's art in connection with artistic beauty. Logically, you are part of it.** You had idea: **emails show you were informed we were going to try to sell this film:** (…) **there were answers from your office to these emails, as one on which you accepted a percentage proposed on any benefits generated, among other things**, which shows our transparency and good will. "and if Tigran's portrait was in some way obligating me to do press, I'll gladly give it back." Overacted: **If requesting a public welcoming word from you for the Parajanov-Vartanov Award which you won only in connection with our film and our work of four years, is 'obligating to do press', then we are living in two completely different worlds, the real one, and Ms Sarandon's one. What you were asked for is education, respect, fairness and 'fair professional standards',** being respectful for the work of my crew and mine and the producer's, and being also, why not?, thankful to people of the Parajanov-Vartanov Institute. **That's not 'doing press', that's being consequent and fair with the facts**: **you willingly participated on a film, and you got an award thanks to that participation**. (Period.) **That's not 'doing press', that's showing**

**minimum respect to others people achievements. 'Doing press' you know it very well is something far different than thanking for a very prestigious award**. "I understand your wanting to get the most press you possibly can" Overacted: I did not need any publicity to generate in the first three months in the festival circuit more awards than all the documentaries that you have produced together in all your life (including from an Academy-award winner presided jury). **I don't need publicity from you, and never asked for it precisely when it was most logically needed, at the beginning. I requested respect, not publicity,** for our work AFTER the obvious success achieved. "but I have nothing positive to say about your film" **Whatever you may think about my film is absolutely irrelevant to me**, especially after, again, having won more awards in three months that all the documentaries that you have produced in your entire life. **You do politics with your documentaries, capitalizing on your public profile, while on the contrary I do ART. Obviously I know a lot more of how to make an extraordinary documentary film than you. The level on which I work on artistic terms is just something impossible to follow for you, and it doesn't matter if you understand it or not.** In short: I read Wordsworth, you read Twitter. Withal, **anybody knows that to make a great film is needed much more than 'a star'. Just watch VIPER CLUB to see what I want to say**. The **striking similarity of**

**the 'nurse-character' in both my script 16 HOURS and VIPER CLUB is of no importance, honestly, because no one can rescue a bad screen-writing as it is VIPER CLUB just adding a good character background in the last minute.** Not to speak about the cinematography or the position of the camera in respect to the frame consequential development. Additionally, **60K total domestic gross out of 70 theatres is more than it deserves**[111]. I won't go on to enumerate your last ten years of films bombing in theatres. "and am no longer interested in being associated with it"[112] Overacted. It is recalcitrant but necessary to enumerate: **you knew what cameras were going to be used, even what lens -the best zoom lens in the world at that time-, before you came to the shooting. Pretending 'not wanting to be associated' with a film where you willingly participated, see and approve of the rough and final cuts before going to festivals and after going to them (successfully), &c. is just overacting,** unimpressive, underwhelming. **It is WE who have been treated more than rudely, undeservedly, unfoundedly, and here is most**

---

[111] That was the result shown at that time by several movie in theatres trackers that display publicly available information in quasi 'real time' of films in theatres. VIPER CLUB was certainly 'bombing'.

[112] Established contract law doctrine and countless rulings will deem Sarandon's suddenly 'no longer interested', in light of the facts described hereto in this Complaint, as flagrant breach of contract, brach of good faith covenant, and clearly unjust enrichment, and make her responsible for all consequential and expectation damages arisen from her promises and then contract of 2018. The arrogance had clouded her mind, and Plaintiff was reminding her of the facts, and given the seriousness of the consequences that this situation could have, he was being specific to do her a favour and avoid litigation.

**possibly the truth WHY:** What for you came to the shooting, then, if you did not expect from us to make a film and consequently to try, in all fairness as everybody else –you included with your own films–, to recover one day at least part of the investment, but most importantly to make a unique, good film, as the awards show? **What was the REAL reason why you felt so disappointed so as to do all you could to distance yourself from the shooting and the project...?**[113] You often pretend to be brave; are you brave enough to recognize the true reason I am referring to? Or much more accurately: **What did you expect from an at that time 39-years-old painter (you were perhaps 70 already), if not just being portrayed, as he faithfully did as best he**

---

[113] As explained, she distanced herself once the Film's successful premiere has taken place, against her agreed on terms related to PR. That kind of attitude is far from good faith as related to a mild understanding of the clause of PR that was present since the beginning 2018's proposal, which she thanked, accepted, and even commented as regards to marketing of distribution.

**could?**[114] What else was expected on your side that did not 'happen'? Is it all this tit-for-tat a response to not getting something else, besides being portrayed, that you expected to get – at least at the time when you came to the shooting? What was it? "Please don't contact this office in the future unless it's to give me the address to return the portrait which again, I am happy to do." Please make sure you or your office do not send calls again from no-ID-callers in the future – ever, – neither contact me nor my office – ever, unless it is to present respectfully an apology and to redress the situation. We are the victims in all this story, because **the facts do not correspond in fairness with the consequences we**

---

[114] Sarandon certainly was not shocked by this notion, and it would be only self-serving hypocrisy to take these statement out of context. Recall her publicity campaign out of the previous relationship, broken just before she started meeting Tigran in 2016. For instance: "**Susan Sarandon, 67, and toyboy lover Jonathan Bricklin, 37, cheer on home team in Game Seven at the Garden**" [From https://www.dailymail.co.uk/tvshowbiz/article-2617552/Susan-Sarandon-67-toyboy-lover-Jonathan-Bricklin-36-cheer-home-team-Game-Seven-Garden.html ]
Also: "**Susan Sarandon, 68, 'ends relationship' with boyfriend of five years Jonathan Bricklin, 37**" [From https://www.dailymail.co.uk/tvshowbiz/article-2980609/Susan-Sarandon-68-ends-relationship-boyfriend-five-years-Jonathan-Bricklin-37.html ]
According to this reports Jonathan Bricklin was *also a business partner* of Sarandon.

Thus Plaintiff does not propose a scandalous idea, or a weird notion: he relays on David Shara's reports, certainly trustable, and Tigran's own comments in 2016 and 2017 to Plaintiff, and in Sarandon's publicly available information. In other words, for Sarandon to have a relationship with a man more than thirty years her junior is absolutely natural. Then, t suggest that Sarandon was interested in Tigran cannot be treated as scurrilous, derogatory or even offensive: it is more than clear that, if both parts happily agreed, a relationship between Sarandon or anybody else far younger than her is perfectly fine, and nobody impugns her personal life. What is utterly wrong, however, is the way she treats the Film and its team potentially and apparently ***as a consequence of not getting fully what she expected from Tigran,*** which is what Plaintiff highlights as deplorable and wrong. The boycott of the film, the silent treatment to it, happens because the film displays to audiences not her success as a conquering woman, but the fact that she had been close to Tigran but that that never became another public victory turned into the true PR campaign that she apparently wanted, according to David Shara's reports.

Remark that Plaintiff *poses a question* to Sarandon, and does not present as a consummate fact what he asks. He asks what was the reason, if not being part of a good Film, as she apparently expected, to make so many representations, promises, agreements &c.

**have had to endure, and only represent mounting disadvantage perfectly calculated on your side for reasons that are not clear**, and that bode ominously ill, **pointing clearly in a direction that is extremely rejectable in our society in a moment when everybody has decided to put an end on such behaviours**.[115] We are now analyzing all this situation, media or no media, and its many implications. Arthur.[116]"

165.    Plaintiff stood on principle, had rights to his opinions, his opinions were reasoned, and based on facts. Plaintiff, as anybody presented with unfair, in bad faith, breach of contract, took the time to remind the breaching party of her obligations and of her representations for years before. There is no insult, neither any threat in his email, besides a point-by-point reasoned number of answers to Sarandon's announcement of tentative breach of contract and breach of good faith covenant and unjust enrichment—all because Plaintiff suggested she was being ungrateful, which facts show she was, not only because there was a PR clause among the terms of the memorandum agreed on in writing in 2018.

166.    Sarandon —the Twitter-opinionated super-star who tells

---

[115] Plaintiff refers to the reckoning raised by the 'me-too movement' that has put in full public display the abusive tactics and manoeuvres by rich and influential people on the film industry in order to obtain what they wanted and, if not, to harm those who would not comply with their expectations, expectations not related to professional endeavours, but to totally personal matters.

[116] 'We' here means Plaintiff and his team, the one that had made the Film from the production point of view, because its cancellation would have far-reaching consequences for the professionals involved.

politicians and voters alike what they have to do and what they have to vote, the person who had sent the previous email thinking she was just crushing a person whom she had given the most abusive silent treatment for months, the 'brave' public talker— did not have the courage to answer, **because she knew Plaintiff was right at least as regards to the standing agreements, and because she knew, as much as she disliked it, that Plaintiff had also right to his opinions.**[117]

167.     She, however, decided that it was more efficient to cower David Shara and to put anybody against Plaintiff. From now on, a campaign of hatred unleashed by Sarandon in retaliation to Plaintiff's standing on principle, to Plaintiff's right to his opinion and to counter her tentative threat of breach of contract against all facts, unfolds, and her objective is cancel the Film and to destroy Plaintiff in all ways imaginable.

168.     Only four hours and a few minutes later Plaintiff received a barrage of unbelievable messages from David Shara. His tone had changed radically, he had been unduly harassed with threats of litigation that made no sense by Sarandon and by Tigran. On Feb 28, 2019, 02:37 AM, David Shara writes to the Plaintiff on WhatsApp: [2/28/19, 02:37:10] David Shara: Please give me a call when you wake up, **you need to be careful with Susan**. <u>**She can ruin you**</u> [2/28/19, 02:37:34] David Shara: **I want to call her and try and straighten things out, we do not**

[117] It also happens that those who most take advantage of the privilege of opinion as 'celebs', then are the most afraid ones of the basic right of regular people like Plaintiff to his own opinions.

**need her as an enemy** and it is not smart the way you were treating her [2/28/19, 02:51:46] David Shara: You cannot write this stuff, **she will make a lawsuit against us and ruin your dream**[118], this set of emails is unacceptable [2/28/19, 02:52:06] David Shara: I read the emails, that is not ok [2/28/19, 09:21:40] David Shara: **You need to write the nicest, most sincere apology in the world**.[119]

169. This set of messages was extremely concerning for the Plaintiff because they show clearly that the email, a private communication never intended by the Plaintiff to be shared or even less publicized, which the Plaintiff had the right to write in order to redress the situation and to give answer to the unjust, cruel statements of Sarandon, a set of opinions the Plaintiff had the right to, and a set of opinions that was not publicly voiced but simply exchanged between two individuals on the same level of mutual acceptance of a communication, that email had been disseminated

---

[118] In light of Sarandon's agreement to contract, her threats of litigation were unlawful, unfounded, and only directed to harass Plaintiff's partner to tortiously interfere from now in the contract and other business expectations of Plaintiff.

Plaintiff has pled conduct that makes Sarandon's threats of litigation a wrongful mean to harm Plaintiff. The threat of litigation, is only a wrongful means if (1) "the [claimant] has no belief in the merit of the litigation" or, (2) "having some belief in the merit of the suit, [the claimant] nevertheless institutes or threatens to institute litigation in bad faith, intending only to harass the third parties and not to bring his claim to definitive adjudication." RFP LLC v. SCVNGR, Inc., 788 F. Supp. 2d 191, 197 (S.D.N.Y. 2011) (citing Universal City Studios, Inc. v. Nintendo Co., Ltd., 797 F.2d 70, 75 (2d Cir.1986)).

David's acknowledging Sarandon's disseminating the emails to third Parties show Sarandon's first steps and leaves no doubt as to her modus operandi before harassing David with litigation that she knew was meritless, as the Court can draw from the facts alleged in chronological order and the evidence presented.

[119] Plaintiff is requested to present an apology. Recall this point, because 2019 will show Plaintiff and his company submitted to financial duress by David and Honey Shara as means to coerce Plaintiff to present an apology, not just encouraging him to do it. Plaintiff had nothing to apologise, it was Sarandon who had to apologise, he made it clear, and stood on principle until today.

directly by the only addressee of those communications, Sarandon, and **she had harassed David, Plaintiff's partner in contract, with litigation, when in fact there was no possibility for her to litigate because she had not been wronged in any way, on the contrary she was communicating a breach of contract and a promissory estoppel to Plaintiff.** Sarandon, instead of addressing the specific points raised by Plaintiff, if she so willed, she, a person who poses publicly as a very liberal and dialog-open individual, chose 1] to disparage privately Plaintiff's work and merits, in spite of them being obvious, and 2] when Plaintiff decided to also share his points of view about Sarandon's own opinions and announcements, since she had chosen first to do the same, Sarandon chose not to answer but to disseminate herself the private communications and to threaten with litigations[120] others only to start a tortious interference on the Plaintiff's present contract and other business expectancies and relations related to new projects with David Shara.

170. 1] Although the communications were a set of private communications, it is Sarandon who disseminates them, sending them to

---

[120] Sarandon's posterior actions will show that Sarandon's threats to institute litigation were in bad faith, only intending to harass David Shara with no intention to bring her claim to definitive adjudication because she had no belief in the merit of the litigation. Knowing and remembering what Plaintiff explained in his email as regards to previous contractual obligations, Sarandon never prohibited the usage of her image, of her voice, of her name being advertised in the film, neither communicate any such prohibition to Plaintiff or to any other venue where the film was being screened, applauded and awarded. Sarandon had enriched herself thanks to her participation in the Film, and the spectacular run of the Film worldwide in the festival circuit only benefitted Sarandon, which has been also a form of enrichment. The Film has only increased the positive perception of Sarandon in the audience, the lack of distribution has only deprived Plaintiff of what had been agreed on with Sarandon, and that has placed Plaintiff under the worst light possible in the eyes of the audience.

the Plaintiff's partner directly, as the messages show when David Shara states: "I read the emails". So he states he had seen the communications directly because they had been sent to him by her directly, since she had also decided to answer directly the Plaintiff with a set of opinions that the Plaintiff felt the need to answer, and had all the right to answer. No other person could have shared them in so short a period of time, so it is evident that the defendant chose not to answer Plaintiff, if she disagreed with his privately communicated opinions, but to disseminate the communication of the Plaintiff to the Plaintiff's partner, **of course without ever mentioning the entire set of emails exchanged before**.

171.    2] The messages show a clear change of opinion in Plaintiff's partner, that attest a sense of fear and dread instilled in him by Sarandon's threats of litigation, when in fact she could not claim anything at all to David Shara neither to Plaintiff. Circumstantial evidence in those messages sent by David to Plaintiff show David writes under the fear of potential litigation (he mentions 'a lawsuit') and unambiguously states **that Sarandon 'can ruin' the Plaintiff**, an echo of her voiced intentions to him as later will be shown and proven.

172.    3] Sarandon, knowing the existence of the partnership and contractual relation between Plaintiff and David Shara, decides, out of spite, not to answer the Plaintiff if she disagreed on his points of view or opinions, but to show the communication in connection with litigation

threats [David Shara puts it very clear **'we don't want her as an enemy**', he affirms '**she will make a lawsuit against us**'] that clearly accomplish their goal to instil enough fear in David Shara so as to make statements such as "**be careful with Susan. She can ruin you**", and goes on to state, more plainly showing his fear about implications on him, "we do not need her as an enemy". Clearly David had been cowered by a third party, Sarandon, as a result of her seeking retaliation on the freely exercised right of the Plaintiff to voice his opinion only after she had shared hers before, as clearly described, and after Plaintiff exercised within the bounds of propriety his legitimate right to try to seek the best performance of the film in the festival circuit by trying to address the obstinate uncooperativeness of the defendant and her abusive silent treatment, that seemed to be motivated by reasons clearly not related to the Film itself, but to her personal expectations related to Tsitoghdzyan.

173.   4] Furthermore, the final part of David Shara's messages indicates Plaintiff 'needs' [euphemism for 'must']to send 'an apology', as much as this states an attempt to violate, trample his right to his own opinions, as an unavoidable, mandatory condition to satisfy or placate the retaliatory mood of Sarandon. Plaintiff was being in fact coerced to send 'an apology'. The application of the 'double standard' had already begun before this set of communications, but from now on it will have dire

consequences for the Plaintiff[121].

174. On Feb 28, 2019, 11:54 AM, Plaintiff sent an email to his partner, David Shara. Since it is evident from David's messages that they had already read the communications between Plaintiff and Sarandon above detailed because Sarandon had shared them immediately, thus the Plaintiff, confused and alarmed by the words by his partner as shown on WhatsApp messages before, shares a communication with him, detailing his defence of the project. Plaintiff explains clearly that Sarandon is acting against her commitments towards the Film and its distribution. In this email Plaintiff summarizes how Sarandon's attitudes were placing the Film in a disadvantageous position, and that Sarandon had been calculating her steps to create this disadvantage for reasons that, to him, seem to be beyond the merits of the film, since the film benefitted and enriched her in all aspects in terms agreed on by Sarandon herself.

175. On Feb 28, 2019, 18:38, Tigran writes on SMSs to the Plaintiff: "Your email to Susan is a desastre. **I cannot believe you found that**

---

[121] Recall, to begin outlining the double standard Plaintiff was being submitted to on a regular basis for years: Tigran writes to Plaintiff, that the fact that he wanted a contract was "October 18 2016: "Today I feel like i hooked up with a hot girl who ask me to pay for the sex right in the middle of the action…"; that working with Plaintiff had been "like sailing at sea without a GPS"; and while David threatening Plaintiff to 'scrap the project and put in the garbage, Tigran added: "you cannot exist without it [this Film] as a film director."

All these insults were sent to Plaintiff because he wanted a contract simply because they did not want to sign any contract ever. When did David Shara request an apology from Tigran to Plaintiff? Never. Did Tigran apologise for such insults? Never. Instead he took more than two years to finish a painting that by contract should have been given to Plaintiff by May 2017, a painting that, in their words, Tigran's own also, Tigran could have painted maximum "in two months".

**much anger to hurt someone like Susan.**[122] It's beyond acceptable **regardless** interests of the movie **or anything else.**" Then adds: "**I think you [owe] her big apologies**[123], **don't know how she wouldn't just kill the film with her participation after all this**.[124]" Plaintiff defended his position, answering: "my office kindly suggests a welcoming public word just for the award she won [Parajanov Vartanov Award], awarded to her thanks to Doc LA participation [of 'American Mirror'] and THANKS TO four years of my work, then this is the answer from Ms Sarandon via email signed by her, **among other unfair statements not supported by emails exchanged during 3 years with her office**: "I don't have anything positive to say about your film and want to distance myself from it." Tigran answers: "**Well it's her choice and need to**

---

[122] It will be noted that the moment Plaintiff voices disagreement or defends very elemental rights, like defending the problem in front Sarandon's actions, his actions will be described and referred to as 'anger' or even 'hatred'. The facts show that Plaintiff simply wants everybody else to also fulfil their obligations and to leave him at peace. Any defence on the side of someone who was supposed to accept anything against him, will be interpreted as aggression simply to demean him.

Recall Tigran's messages in the context of the kind of words Tigran wrote to Plaintiff in 2016, referenced before. October 18 2016: "Today I feel like i hooked up with a hot girl who ask me to pay for the sex right in the middle of the action…"

Tigran gave testimony that Sarandon in 2016 promised it clearly that she wanted nothing. Instead she accepted many advantageous terms in 2018. Could Plaintiff, then, write apropos of Sarandon accepting those new terms in 2018 very different from what she had promised to Plaintiff in 2016, write to her: "Today I feel like i hooked up with a hot girl who ask me to pay for the sex right in the middle of the action…"? The answer is no, because Plaintiff had been acting out of generosity and thankfulness.

[123] The request of apology from Plaintiff will become a harsh crusade by the same hypocrites who had insulted Plaintiff in 2016 simply because he wanted a contract.

[124] It is a common believe among all our Defendants that they are entitled, by some kind of divine commandment [fame, wealth, influence, unbounded public approval…] that places them above the law, to do and undo deals at their convenience or caprice regardless of previous agreements, written promises, and of taking advantage of Plaintiff's work constantly.

**thank her and let her go. Not throw hate on her**[125], it's unexplainable for me" Plaintiff answers: "**No one has thrown hate on anybody**. We both, all have the right to exchange opinions in a free speech society. **Or do you think that only her has the right to say such things without me having the same right to also express my opinion?** Does she has the monopoly of opinion?" "**Of course for you this is not important because you were not 4 years hooked to a project trying to get the best film possible and also treating Ms Sarandon's office and her with silken gloves, all to be slapped off when reasonably I requested a bit of well deserved respect**. Very nice, Tigran, very nice." Tigran replied: "I shared with you my opinion on this and don't want to get into debates." "If she doesn't want to do more all we can do is to thank her and let her go." Plaintiff: "Who hasn't let her go? Who? When did I request any help to her office when it was most needed, at the beginning of the festival circuit? She is the one who publicly is criticizing 'conservative politicians' branding them as 'hypocrites'. Is she a hypocrite? And: Is this hypocrisy calculated to curtail, limit the fair possibilities of my work of the last 4 years? Is it ok for you? **A person has the right to act this way just because she is 'a celebrity'?** What for she came to the shooting?" "That's it: **you shared an opinion but opinion generate debates. If you don't want**

---

[125] If Plaintiff's arguments make sense, then he is accused to "Throw hate". Tigran's comments of 2016 show, perhaps, what is to 'throw hate'.

**debates don't share opinions with me**."

176.   On a phone conversation witnessed by the Plaintiff's wife, David Shara abused, insulted and threatened the Plaintiff with litigation. David acknowledged he had talked to Sarandon,  that she had threatened him with litigation, unless film festival circuit cancelled immediately for the Film and other film projects with him also cancelled. Plaintiff asked Sarandon should send any communication prohibiting usage of her image to him, Plaintiff, in writing, because he 'is the producer of this Film, I hold the copyright and she promised first in 2016 and then confirmed in 2017 and then accepted more advantageous terms in 2018'. David seemed to be very nervous and excited, and aggressively threatened Plaintiff to cancel all new projects they were planning to start since 2018, in preproduction, one of them called 'Arthur Langerman-Nazi propaganda, and also to cancel the entire festival circuit of the film, unless Plaintiff changed his opinion at least in appearance and sent the most "grovelling apology I have ever read in my life to Susan Sarandon."  Paradoxically, in his attempt to put Plaintiff on his knees, David recognised that it was wrong, but necessary 'if Plaintiff wanted the Film to continue ahead.' Plaintiff, aghast that such thing could be happening in our society, was being coerced to present an apology, when in fact everybody else should

apologise to him.[126] Plaintiff, offended and alarmed, explained to David that Sarandon had the right to her negative opinions about the film, even if they were a disgrace and did not make any sense, but not to breach the contract extant, and also that he, the Plaintiff, had his right to his own opinions, and that he stood on principle by his opinions privately, that had not voiced them publicly, neither had any intention to do so. Plaintiff asked how it was possible that this private emails had been in his power, and his partner answered that she had shared them with Tigran and with him, and also stated that she was threatening with a lawsuit against 'us', David and the Plaintiff, 'unless the Film is cancelled completely'. It was clear that the litigation threat was meant to interfere with the contract existing between Plaintiff and his partner, and also other projects, because Sarandon wanted retaliation, but retaliation executed by others under her influence, because she knew Plaintiff knew his rights as regards to the Film, as he had explained in his email. Plaintiff asked, perplexed, 'a lawsuit based on what?', and his partner insisted that the

---

[126] In the MTD, Defendants describe this and other worse things as **David Shara** "(ii) voiced his concerns over Plaintiff's unacceptable and rude communications with third parties; (iii) ***encouraged Plaintiff to apologize to Sarandon*** *and be nice after the wildly unprofessional email Plaintiff sent to her* **and** *Tsitoghdzyan.*

The MTD is rife with false statements. It is false that Plaintiff sent any rude email to Sarandon **and** Tigran (that's nowhere in the previous SAC, as explained before, it was emails exchanged between Sarandon and Plaintiff.

If coercing to force someone to present an apology when there is no obligation nor reason to do it, and if stop paying invoices due to place Plaintiff's company and the project under 'financial duress', can be interpreted as 'encouragement' then the standard will be drawn but to low to differentiate between a 'recommendation' punctually voiced, and outright invading someone's right to his opinions, and, even more, someone's right to defence his interests legitimate by contracts extant, which is what Plaintiff did.

reason would be 'because of your email'. Plaintiff explained that it was not possible to do that because he had his right to his own opinions, and because there were many written confirmations of Sarandon, and David hung up the phone call.

177. Plaintiff did not receive any communication from Sarandon that contradicted any standing term and the agreement, and kept in place the operations of the festival circuit for the film. The Film's acceptance was growing and an increasing number of festivals around the world were selecting it.[127]

178. Plaintiff ignored the threats and the coercive forces set upon him. On Apr 15, 2019, at 11:08 AM Plaintiff sent a report to David via email on how to better address the situation and the festival circuit, and after trying to contact him again, Plaintiff received the next WhatsApp messages from his partner: [4/15/19, 12:12:32] David Shara: **Unfortunately we are not able to continue our relationship** [4/15/19, 12:12:54] David Shara: **The way you write to Susan and Tigran is unacceptable** [4/15/19, 12:15:33] David Shara: I cannot work with you anymore [4/15/19, 12:16:04] David Shara: **The other projects can never be exposed to the angry hateful words you spew at**

---

[127] It must be noted that there was an estrange chemistry between these unfortunate events and the growth of accolades and acceptance, from independent juries, that the film was gathering: the moment these individuals, whose backing of the film was apparently 'crucial' to get the film to be successful, and that is what Sarandon and Tigran thought, the moment they turned truly their back on the film, at that moment the Film lifted off and left all this hypocritical controversy absolutely discredited and humiliated under an overwhelming pile of awards from all over the world.

**people**[128] [4/15/19, 12:16:12] David Shara: It is unacceptable" On Mon, Apr 15, 2019 at 12:21 PM, David wrote as a response to the Plaintiff on an email that complemented the Whatsapp messages and made reference to them: "See my WhatsApp texts... **we are finished. No more money, no more projects**"

179.    That set of messages perfectly coordinated with an email sent are the unambiguous proof that Plaintiff was deprived of the new project 'Nazi propganda Arthur Langeman' and diamond based in development as a direct consequence of the emails exchanged with Sarandon, and as a direct consequence of Sarandon sharing them to David along with baseless, meritless litigation threats to harass and cower David, with the intention of cause injury to present and future projects in which the participation and execution of Plaintiff as a producer and filmmaker had been already established before her tortious interference.

180.    The WhatsApp messages continued cascading from his partner into the Plaintiff's phone as follows: [4/15/19, 12:41:17] AB [from now on abbreviation of Arthur Balder]: We will have to talk. [4/15/19, 12:41:33] David Shara: Speak to my mother   [4/15/19, 12:42:17] David Shara: **I cannot do any other work together**  [4/15/19, 12:42:38] David Shara: **I'm finished with this project and the others**   [4/15/19, 12:42:48] David Shara: **Cancel the film festivals** [4/15/19, 12:42:55] David Shara:

---

[128] The "angry hateful words". It is good the Court can examine Plaintiff's words defending and reasoning his project to draw if they represent any kind of 'hate speech'.

**I do not care about them** [4/15/19, 12:44:41] David Shara: **The email u wrote to Susan and the way u treat Tigran is unacceptable[129]**.

[4/15/19, 12:56:24] David Shara: You cannot write that shit to Susan [4/15/19, 12:59:19] David Shara: **She never signed up for any of that, you were lucky enough to get her to sit for you and be filmed, but she did not want anything to do with the project.** In your head you made it that she was a part of this project, **but she is a busy and famous woman and you twisted it around[130]** [4/15/19, 12:59:35] David Shara: Speak to my mom, I'm done [4/15/19, 12:59:54] AB: **"in my head", no, in the emails. [4/15/19, 13:01:04] AB: She not only showed up knowing the camera was meant to be used, also knew the final result, consented to the use of her image, considered for 3 months going to Armenia's Yerevan film festival, and a long etc**. [4/15/19, 13:01:17] AB: **She is just a hypocrite.** [4/15/19, 13:04:31] AB: Then tell me: **Why then that 'busy and famous woman', as you mainly describe her, came to the shooting of a film, knowing the camera, setting, etc, if not to be part of it?** [4/15/19, 13:04:58] AB: **That's what I asked, simply, asked her.** Can you answer that...? [4/15/19, 13:05:18] AB: Of course you can. [4/15/19, 13:07:08] AB: You are

---

[129] "The way you treat Tigran". This clearly shows a new 'grand drama' created by Tigran, similar to the one in 2016, had been deployed against Plaintiff because Plaintiff had argued with Tigran that the painting was not finished after an immense delay in its making.

[130] David's comments are false in light of the evidence presented before. They echoed, most probably, Sarandon's baseless arguments presented to him.

the [executive] producer of this film, and it is with you with whom now I will have to talk, not with your mom, with all due respect to her of course. [4/15/19, 13:11:16] David Shara: **You told her she only wanted to fuck him and then when she was rejected it all changed**[131] [4/15/19, 13:11:26] David Shara: That's insane and mean [4/15/19, 13:11:32] David Shara: It's terrible [4/15/19, 13:11:40] David Shara: Not ok [4/15/19, 13:11:51] David Shara: **You're right about many things** [4/15/19, 13:11:45] AB: **I did not say that, ever.** [4/15/19, 13:11:57] David Shara: But not ok [4/15/19, 13:11:58] AB: **Read my email. I asked her what for she came.** [4/15/19, 13:12:04] David Shara: Yes you did [4/15/19, 13:13:55] AB: With all due respect, David, I demanded an answer from her after telling me 'she has nothing positive to say about my project', yes she did something, and also after saying I needed all possible publicity -- not true, we did well without any publicity from her. On the contrary, YOU KNOW she was pretending the film does not exist, looking somewhere else all the time. Then I requested some respect at least for the award she got thanks to US. [4/15/19, 13:14:52] AB: **I did not affirm what for she came, I asked her, and that's an enormous difference.** [4/15/19, 13:18:03]."

181.    This exchange of written communications shows the way

---

[131] Remarkably, none of those words are present in Plaintiff's email, and they are a fraudulent misrepresentation of what Plaintiff stated: these words by David, and exclusively by him, shows that those words, precisely, were the words David had mentioned many times in 2018 to explain Sarandon's attitude.

Plaintiff was informed of the dire consequences: 1] It explicitly shows that David decides that the festival circuit must be canceled, with all the consequences that professionally would entail to the Plaintiff. 2] It explicitly shows that David announces to the Plaintiff that the other projects in preproduction must be cancelled, and that he, his partner, does not want to partner with Plaintiff ever again, **not because Plaintiff's work is not good enough, but because he exchanged privately opinions with Sarandon** and because she had threatened David and put him on his knees to get what she wanted: retaliation, harming the Plaintiff; this way David expected to please Sarandon enough so as to avoid he himself her retaliation and to gain her approval. 3] Finally it is clear that all these events were happening because Sarandon did share the private exchange of emails between herself and the Plaintiff and because she had made such baseless, meritless legal threats so as to achieve a retaliatory effect on the Plaintiff's work and career, and because she had requests retaliatory actions to harm Plaintiff: new projects cancelled, and the actual film being ordered to disappear from the festival circuit, a work-in-progress with film festivals that had taken almost a year to be implemented by Plaintiff's team with no help nor fair recognition of the merits it hitherto had gained also for Sarandon.

182.    On April 26, 2019, Honey Shara shared with plaintiff an email sent by David to her and to Tigran. In it David wrote: "Mom, Did u speak

to Arthur Balder? Let's go over this with Tigran." Tigran and Honey Shara were instrumental and influencing and being part of the decisions David was making, because Tigran had also requested retaliation to harm Plaintiff, presenting himself as a victim, incredibly, of Plaintiff's critic of a panting that was unfinished after two years. On April 26, 2019, Honey Shara wrote to Plaintiff: "You have made a lot of valid points, and **may be totally justified in feeling the way you do**, but unfortunately, I cannot think of any other solution to allow us as a group to move forward and give the movie the recognition it deserves. I truly appreciate you, and your sincerity, **but sometimes we have to do "that" which will ultimately allow you/us to succeed**." This apparently kind words came with denial to pay pending invoices due to Plaintiff. Simply Plaintiff was again being coerced, as in 2016, but this time he was decided to stand on principle.

183.   At the beginning of May 2019, Honey Shara, a co-owner of Optimum Diamonds LLC, and Plaintiff sustained several phone conversations in which Honey Shara requested from the Plaintiff a written apology to be sent to Sarandon and Tigran as the only way to be able to continue with the project of the film in the festival circuit and the Oscar-qualifying US limited theatrical release as stipulated and budgeted, and scheduled tentatively for mid- or end 2019. Plaintiff asked her if she would request a written apology for the disgusting emails sent

by Tigran to him in 2016 simply because he had proposed a contract. Frustrated by Plaintiff's refusal and arguments, to that she shamelessly went on to say: "Do it for Bella". [referring to Plaintiff's wife, basically 'do it to avoid suffering to your wife']. At this point Plaintiff must confess that he was aghast at the coercive tactics that were being forced upon him. That Honey Shara affirmed that Plaintiff's wife was hostage of their cruel, coercive manipulations took the situation on a different level. Plaintiff made it clear that he had nothing to apologize about, that he had the right to his own opinions, as Sarandon had made it clear her rights to her own opinions. Honey Shara made it clear that "we", she included herself in it, would not honor the agreements as stated in the Producerss Agreement signed by the Plaintiff and David, neither the agreements confirmed by budgets or anything else standing unless and until Plaintiff presented written apologies to Sarandon and Tigran.[132]

184.    In May 2019 Plaintiff reminded David again by emails of his obligations under the Producers Agreement and other agreements concomitant and part of the course of performance, and subsequent plans and approved budgets in 2018 [course of dealing and trade] in order to continue with the project, and also complained that a project had been

---

[132] It does not seem necessary to enumerate the abusive treatment Plaintiff had been subjected to for years, but especially in 2016, 2018 by Sarandon, and 2019 onwards by all of them. There was a double standard in David and Honey Shara business dealing: Plaintiff was to be trampled freely and insulted, but if Plaintiff simply requested an answer for undeserved unthankfulness and abusive silent treatment, he had to be cancelled, his business ruined, the film not distributed, the film festival cancelled… &c.

robbed off him simply to please others' retaliation wishes. Notably, Sarandon, who had understood that Plaintiff knew his rights, never herself informed Plaintiff that her likeness should not be used anymore in the film, neither she sent any notice that she prohibited usage of her image. All these negative actions were the consequence of her demanding retaliatory actions to be executed by *others*, actions intended to harm the Plaintiff professionally and economically, by interfering in the business relationships of the Plaintiff. Firstly, interfering with the contract she knew existed and regulated the film production and exploitation; interfering, more clearly, with standing course of performance and concomitant, collateral agreements; secondly, with the economic expectancy the Plaintiff had in the other projects already discussed [the 'Nazi propaganda Artur Langerman' documentary film, cancelled] with the same partner and in preproduction, which had been obliterated.

185.    On May 28, 2019, 9:56 AM, David goes on to directly answer the private email conversation between Plaintiff and Sarandon, and in doing so he even included as CC copy Tigran, **unlawfully sharing the conversation and contents of the communications privately held by the Plaintiff**. He wrote: "(…) People are allowed to call from blocked numbers...it's not morally offensive. Then your disdain for her views, despite not being the same as yours. **She does not have to support our film, or you or anything. Without Susan, you would have nothing.**

161

**Without Tigran, you would have nothing. Without me, you would have nothing. You forget all of these things. Yet you think you are Martin Scorsese.   The parajanov-varatsnov award is lovely, but it's not an Oscar and she doesn't need to be there.**[133] But you go crazy here. **You say mean things about Tigran and everyone who doesn't support you and your views.**[134] You alienate. **Instead of trying to be nice and gain support,**[135] you insult her and her choices. I cannot understand your methods. Read what you wrote. This is tough and mean.[136] **I don't care about the 200-300,000 dollars I have put into this project**[137]**. I do not care about this film. I care about Tigran**

---

[133] David Shara's email, particularly exaggerated, was being sent with CC to Tigran, who also CCed to Sarandon. The purpose of David Shara was to write humiliating stuff that had even nothing to do with what he had thought and manifested for years, simply to please others.

[134] October 18 2016, Tigran's own words describing Plaintiff's requesting the existence of a contract: "Today I feel like i hooked up with a hot girl who ask me to pay for the sex right in the middle of the action…" Tigran describes Plaintiff's work this way: "like sailing at sea without a GPS" Tigran threatens Plaintiff with physical violence. It seems there was no problem in bullying and insulting Plaintiff for requesting a contract, even writing repugnant stuff as the first sentence before, but if Plaintiff defended his work when Sarandon had only showed abusive silent treatment and unthankfulness, Plaintiff should be 'burned at the stake'. Needless to say that Tigran never presented apologies for his attitude in 2016, neither David recriminated it. It was fine and well, and its purpose was well served, to intimidate, to coerce, to obtain a contract under coercion.

[135] Recall all communications exchanged with Sarandon, and to that extent, also with Tigran since 2016… impeccable from Plaintiff and from any of Plaintiff's collaborators. These tactics are cruel, and are part of discriminatory and toxic work environment rituals: first to bully someone, then, if he/she simply defends him/herself, to make that person feel guilty accusing him/her of what others are doing against him/her.

[136] Of note: again Tigran and David in a string of emails to coerce, humiliate and insult Plaintiff, similar setting as 2016. 'This is tough and mean', he states, words that perfectly describe not Plaintiff's actions to defence legitimately his work, but to describe his and Tigran's tactics, words, threats to deprive Plaintiff of a contract of 2016. To try to deprive someone of a contract under coercion, against what had been promised, after congratulating him for every single piece of filming, as it was the case in 2016, *that is tough and, particularly, very mean.*

[137] David Shara anticipates his actions that will take place afterwards in 2020: he does not care about losing any amount of money, that clearly for him and Honey Shara his irrelevant, as long as Plaintiff's work 'goes into the garbage' to use also David Shara's own words of 2016.

**and my family's reputation.** This string of email does not represent my views at all. I find it offensive and childish. I am having a very heard time spending tens of thousands or 100,000 to send you on trips to support you and this project I don't care about.[138] I **think you should try and find someone to buy this project ASAP[139]. I don't want to spend any more on it. I'll have my lawyer review the contracts, but <u>remember that very few people have signed talent release.</u>[140]** So think very carefully about what I have written and how you have acted towards Susan and Tigran...Sent from my iPhone"

186. On May 28, 2019, 3:59 PM, following the previous email, Tigran remarkably added: "**She came that day for me! Not for money, nor for the print.**" That shows very clearly how in his views her participation had been a consequence of their personal relationship, and how that factor was crucial to understand Sarandon's true motivations in

---

[138] Now he is 'having hard time' fulfilling the contractual obligations accepted and agreed on in 2018 and 2017.

[139] Again, like in 2016, David Shara reminds Plaintiff that it is Plaintiff's responsibility *to make money out of the film*, and the one to set up/organize distribution [it is a burden he always sets on Plaintiff's shoulders, not a privilege]. Even in this context of duress, David Shara leaves no doubt as regards to this concomitant, collateral extrinsic and inextricably united idea to the short Producers Agreement: Plaintiff must set up, an successfully, distribution. More extrinsic evidence that supplement, does not deny, what is also present but partially integrated in the Producers' Agreement simply because one bargaining part, exerting coercion and duress in collaboration with Tigran, overpowered the other with ultimatums and also demanded the contract to be "one-two pages long".

[140] This is quite clear,CCing Tigran, who had been refusing to sign the talent releases now for years, he states: "but remember that very few people have signed talent release". They were already coordinated in withholding the necessary talent releases as a means to thwart, control distribution. The threatening tone then follows, as it could not be otherwise: "think very carefully about what I have written". In other words, he says, 'think about we withholding distribution, and envision the consequences.'

coming close to the film. But there is something more important: it further affirms and gives testimony of the promises that Sarandon had made to Plaintiff in front of Tigran and Plaintiff's wife the the day of filming. Tigran here gives testimony.

187.   The previous communication prompted an answer from the Plaintiff on May 28, 2019, 2:44 PM, defending his position and his work and pointing out, among other things: "(...) My emails, on the contrary, aside from my opinions (to which I have a right as you have yours),  show the GOOD WILL to bring the film to its best fruition for everybody, but there is ill-will on your side, and against that little can be done. And one last thing: **If you don't respect me or my work, do not expect the same thing on my side.  <u>You either change course or just choose another person to communicate with me and this office.(...) Your communications are dangerously malicious, bullying, insulting, plagued with false statements, misleading, designed to cause anxiety on persons who had delivered the very best for this investment over a period of time that represents in itself plainly a breach of contract.</u> We have reached the limit."** Plaintiff added answering the string of emails: **<u>"Immoral is to ruin a film distribution just because two individuals exchange opinions."</u>**

188.   During June and July 2019 it is Honey Shara who is tasked to 'play good cop' and who communicates via email with Plaintiff, while she

withholds payment of due invoices with the sole intent to cause financial duress to Plaintiff to thwart the film festival circuit. Plaintiff requested the payments of the pending invoices, Honey Shara answered that 'there is no money'. **Her emails indicate that Plaintiff should present an apology to get pending invoices paid, clearly and unambiguously.** That's no encouragement, that's coercion, financial duress to ruin the Film's progress against standing agreements. Plaintiff made it clear that stopping paying the invoices related to the rest of 2019 film festival circuit would put the investment and the performance of the film in danger.

189.    Plaintiff kept up the operations, and in July 2019 Honey Shara, while not paying pending invoices, requested confidential information about the Plaintiff's company tax returns of previous years, which the Plaintiff questioned, but felt coerced to send to her in hopes that will bring some order to the situation of unpaid invoices. That was not the case. No payments showed up.

190.    On July 5th 2019 Oscar-qualifying Carthage Film Festival informed Plaintiff that the film had been selected as part of its official selection World Films out of competition to take place in October 2019. The director of the the festival, the late Neyib Ayed, sent a letter to Da Vinci Films LLC, inviting the director to attend in person, and a letter to Sarandon, **inviting her to preside over the 2019 Grand Jury that**

**would select the Oscar-qualifying winners**. A copy of this letter was also sent to Plaintiff. A staff member of Plaintiff's office sent a copy to Sarandon's by email on Jul 13, 2019, 7:46 AM. Sarandon's office answered on Jul 16, 2019, 1:50 PM: "Thanks so much for reaching out. **Susan is not associated with American Mirror** and is not available to attend." It was not true that she was not associated with the film if we believe her commitments since 2016 and as written in 2018, because she was part of it, **and it was again a tentative breach of contract, which however did not materialise, because she did not prohibit usage of image at all, and she knew the film was attending and being screened at many film festivals**. She did not do it because she knew she could not do it. Recall that the terms of the proposal, by which she had enrich herself, included a minimum of PR. In fact, around this dates and before Tigran makes public statements on Instagram and Facebook announcing that the Film is finalist for best documentary at the Melbourne Documentary Film Festival, Australia. Sarandon did not object neither oppose, objected to the public release of the film, and the film was being screened and was reaping awards, and prestige and publicity for her and for Tigran. As a consequence of that, and knowing the compromises she had promised and subscribed to Plaintiff, she obviously decided not to make any steps to deny the terms accepted.

191.    On 25 July, 2019, News.am published an interview with Tigran.

Tigran in this interview misrepresented to the public facts about Plaintiff's work as regards to the film. NEWS.am STYLE journalist : "Last year the film American Mirror starring Susan Sarandon and yourself was not included in The Golden Apricot's program… Why?" Tigran Tsitoghdzyan: The film won first place eight times and is currently nominated at the Melbourne Film Festival… But the organizers at The Golden Apricot at first decided that the movie was not good enough for the competition. And then they said "We will show it on the side". Well, we said okay. However, **the film director Arthur Balder, took the movie out of the screenings completely**". That was false, as these events have been explained before. First, that was not the reason why the film did not screen, and second the decision was not made by Plaintiff, was made by Plaintiff *and* David Shara. Tigran misrepresented to the audience that Plaintiff was fully responsible for the cancellation of the screening, and also represented a false reason for its cancellation, one that presents Plaintiff as the person that robbed Armenian audience of the screening. Tigran left out his agent, David Shara, executive producer of the film, who had made the decision with Plaintiff, and Tigran knew both had made that decision together. It was a new defamation and a misrepresentation to the public. Plaintiff contacted Tigran's at that time attorney, and requested a modification of the article. Tigran did not request modification of the article. Plaintiff's office also requested

modification of the article to News.am, sending a notice to the journalist, but they did not apply any change. The lie appears today online, and as Exhibit 4 is provided sworn translation of the part this Complaint references, which is the only one that is related to the film. Plaintiff seeks correction of the article and damages for defamation.

192.    Tigran was about to have a 'grand' solo show of his arts in Yerevan, Armenia, by end of August 2019, a few weeks after publication of that interview.

193.    In this context, after this interview was published by News.am , a very widely read news source in Armenia and the Armenian community, Tigran via an attorney, Carl Bedell, in an incredible act of unlawful copyright infringement, requested, and at that 'formally', a copy of the film. Plaintiff resisted this because he knew that he had no obligation to do it, and because that was a clear interference with the distribution. Plaintiff was open to screenings at film festivals in Armenia, but to allow anybody to have copy of the film for his own enjoyment. Tigran kept withholding the talent releases necessary for distribution, while enriching himself out of the publicity generated by the prestige of the film being selected at so many festivals. His attorney pressed Plaintiff on an unlawful request. As Plaintiff resisted this petition, Honey Shara suddenly appeared requested a copy of the film "for a friend in Canada", emails show. Honey Shara was simply an abettor: she was not paying due

invoices, she was coercing Plaintiff to present apologies if he wanted to see fulfilment of obligations by her and David Shara, Plaintiff did not see any talent releases signed by Tigran, and yet Honey Star requested a copy 'for a friend' simply because she wanted to send it to Tigran. Plaintiff had to give way against his will, under coercion. This is a tortious interference with contract and a copyright infringement, and Plaintiff seeks  damages from Tigran, and from Honey Shara as abettor.

194.    Between July and October 2019 the film won more than fifteen awards and participated in more than thirty festivals around the world. Official selections poured in for the last three months of the year.  At the same time, invoices were not being paid by David and Honey Shara as it had been agreed in 2018, but Plaintiff kept up operations with his own credit and that of his small business. This situation continued, until on Oct 15, 2019, 7:53 PM,   Plaintiff made it clear to his partner that if he would not change course and honor the agreements, oral and written, he would have to start a legal action for breach of contract and breach of fiduciary duty. On Oct 16, 2019, 1:19 AM, David answered: "**This project is over. You will never get another penny from me.** I will see you in court. **You should look in the mirror and speak to your lovely**

**wife**[141]. Perhaps she can teach you some manners." A few minutes later he added: "**Don't forget… you work for me, you do not own this film. You were paid with my money to make this film.** You will hear from my attorney." It is already clear that Plaintiff had never been an employee of David, but this statement conveys a clear idea of the disparaging treatment the Plaintiff was submitted to on a regular basis after Sarandon's tortious, retaliatory interference, the toxic environment Sarandon had created thanks to the low moral standards and lack of principles of David Shara. Plaintiff had already long ago decided that he would stand on principle.

195. On Oct 16, 2019, 11:07 AM, Plaintiff answered, among other reasonings, to his partner: "Nothing sustains your words, while I talk about proven facts. Yes, you do have obligations, of course you have, as I have had mine. **This film was made for its distribution, it's not a toy you can put out just because you got a fit**. It has taken years of work

---

[141] Both David Shara and Honey Shara mentioned Plaintiff's wife in coercive contexts committed against Plaintiff, and to highlight that she would suffer also the consequences of their actions upon Plaintiff.  It is unclear for Plaintiff what was the intention of David referring to Plaintiff's wife as 'lovely' in a context such as this one, but for Plaintiff it was highly insulting and provoking.

By doing all this he had been also injuring Plaintiff's wife work, since she had helped him in setting the film festival circuit since 2018. For instance, some of the bullying emails charged with insults and disregard towards Plaintiff's work for years were directly sent to Plaintiff's wife email address from which, David knew it, Plaintiff's wife dealt with film festivals, and including Tigran, who had requested in 2016, as a condition to the ultimatum for accepting a 'contract', that Plaintiff's wife footage should be taken off the film.

**Plaintiff's wife had been a favourite target of them whenever they wanted to harm Plaintiff.** First, obliging him to cut her footage, when there was no need for it, it was simply a ridiculous petition of Tigran; then Honey including that he should present an apology to Sarandon and Tgran "do it for Bella"; now David, in this dire context, brings also Plaintiff's wife into his threats in a way that was disgusting.

and very low budget for you, that's why you said, and you are acting consistently according to what you said, you "don't care about losing 300,000 USD" which is enough to show business disadvantage created on purpose." **"It is you who asked me to be in touch with your mother, it is she who has been executing your plan.** You decided to hide behind."[142] **"In the film industry we are tired of double standards, credit creep and abuse of power, hit lists, of boycotting careers and years of work to please someone: you are wading deep into a swamp**."

196. Then on the same day October 16, 2019, his partner backpedaled and agreed on trying to find a solution that would avoid legal action, stating: "I will move on and forget the past if you will. **If not, I will see you in court and it will be ugly**. You decide." **Plaintiff, trying to save the film, felt his best course of action was to accept the proposal of avoiding legal action**. In a phone conversation that followed this string of emails showing intention on both parts to find an amicable continuation, David Shara, as it was his mercurial temper, made confessions and acknowledged his difficulties: he had been acting since February 2019 under fear of Sarandon's threatening legal action against the film and against him, but he assured the Plaintiff that he would get all necessary talent releases as soon as possible, as it had been

---

[142] Honey Shara was not a designated agent of a principal, she was another principal, she behaved like that and she made decisions directed to harm Plaintiff.

agreed on since 2016, to guarantee the film distribution. Tigran had harassed David to urge him to ruin the Plaintiff and sink the film—yet he wanted a copy for himself to be able to show it to financiers, collectors, journalists, &c, and that Sarandon was OK with that. He also recognised the success the film was achieving was 'terrific', and in a fit of noble feelings he expressed that 'that was a lesson for those who have tried to ruin it, and I include myself', he said. David also warned of **Sarandon's growing hatred against the Plaintiff and the film on account of the tremendous success of the film**. He also excused himself stating that **all what had happened before had happened because it had been requested by Sarandon and Tigran as a consequence of Plaintiff's private email exchange with Sarandon**. He assured to Plaintiff that he would try to assuage Sarandon to sign a release, which was absolutely necessary to take the film to distribution. He also assured Plaintiff that she manifested that she had no intention to sign that necessary release in order to render the film un-distributable, although she had promised it and they had spent years and a lot of money based on her promises and contractual obligation, also, and that was why he had been trying to stop paying invoices. This further explains the degree of power and interference Sarandon was exerting on the contract between the Plaintiff and his partner, and how toxic her tactics are.

197. Plaintiff explained that the USA theatrical release, necessary to

render the film Oscar-qualifying, that they had agreed on more than a year ago, for which invoices had been paid, whose budget had been approved in 2018, was in peril because of all their actions. His partner stated that Sarandon wanted to thwart it at all cost, that she did not want the film to get the Oscar-qualifying US theatrical release, a condition necessary by the Academy rules to render a film selection-able for any category. Plaintiff also informed his partner of the several distribution offers already in conversations after attending the film market of the the American Film Market 2018 and the Carthage Film Festival [Carthage Pro], where critics had praised the film as **"American Mirror joins the pantheon of such films as David Lynch's, Stanley Kubrick's, but also of writers as Marcel Proust in his the search of lost time"**, and the urgency of getting all the releases as soon as possible, since without them no deal could be struck, and they might be lost. He also explained that the film was gaining great momentum internationally, and that had cost him great efforts and work during years, and the momentum could be lost if all pieces not be in place. David made himself responsible again of collecting all the missing releases, all of them related to people he had invited or Tigran had invited [Sarandon], that was not new, promising to change the mind of Sarandon and of Tigran in a conversation. It must be noted that by that date all the releases related to the people the Plaintiff had invited to be part of his film already had been

collected by Plaintiff, and also in the power of both partners, as proof of fiduciary duty by Plaintiff.

198.    *As regards to distribution deals and distribution opportunity.*[143] It must be noted that Defendants actions, withholding signed taken releases, **precluded the film from being properly and legally represented for distribution in any market**. To ascertain the harm done to distribution from the point of view of specifically the contracts lost sets a low standard as to the consequences of acting in bad faith: Defendants' action itself precludes from obtaining *any* distribution offers.

199.    Between October and end of December 2019 the film won another overwhelming tranche of international awards, but the USA limited Oscar-qualifying theatrical release must be suspended due to the key missing release of Sarandon, those related to Tigran, and the others David had promised and not presented. In another phone conversation by end of December 2019, David explained to Plaintiff that Sarandon and Tigran were not willing to provide the release, but that he was trying to convince them. On that same conversation the partner went on to state to

---

[143] Some of those offers cannot be mentioned 1) because the list would be burdensome to be added as Exhibit and 2) because non-disclosure agreements between Plaintiff and third parties do not allow to go as far as to publish here a detailed list. Defendants' argument in MTD are wrong: It is absurd to pretend a film like this one, going through the meteoric ascent in the festival circuit in 2019, has not been robbed of great opportunity. How was Plaintiff supposed to 'treat the film as if it was his own baby' [David Shara's words in 2016 referring to Plaintiff's obligation to set up successful distribution] how, if the the main pieces to be able to sign any contract were not there, the talent releases, all the ones promised by David since 2016 and by Tigran since 2016, from people he had invited, and all the ones he had recognised in 2020 he could get and at that 'expeditiously'? MTD argument is not based on the reality of facts.

Plaintiff that 'the situation was worse if it's possible because of the enormous success the film was conquering in the festival circuit, she [Sarandon] feels humiliated by it'. Plaintiff told his partner that was extremely concerning, and wrong. David also commented that he had strong ties to Netflix executives, and that it was possible to stream there in 2020. The USA theatrical release must be postponed to beginning 2020 in expectation of finding a solution with the defendant. By end 2019 many due invoices were still unpaid.

200. The film was losing commercial opportunities galore. One of them came from Middle East biggest distributor, MAD Solutions. MAD proposed an all-channel approach, including theatres in Cairo and other big Middle East cities, as also airlines licensing. MAD's offer stemmed from the Film's participation at Carthage Film Festival. Plaintiff tried to obtain the best terms for the agreement, and David Shara was particularly aware of the situation. Blood Sweat Honey, a distributor in Los Angeles, also had been in conversations because they wanted to represent the film. The conversations were exchanged with Alex Nohe[144], a seasoned agent and distributor in the industry. A theatres chain in Fort Lauderdale, Florida, also wanted to screen the film in 2020. The

---

[144] Alex Nohe's track of deals in the film industry is constant. The possibility of gaining good international deals was real.
[ https://www.google.com/search?q=alex+nohe+film&sxsrf=AJOqlzWFSrTOOjlWi71mErYGlreg-X05eA:1674614121607&source=lnms&tbm=nws&sa=X&ved=2ahUKEwjurere1-H8AhVISsAKHZGCAA8Q_AUoA3oECAEQBQ&biw=2400&bih=1185&dpr=1.6 ]

commercial Oscar-qualifying theatrical release had been scheduled and tentatively ready to screen in Los Angeles and New York, and it was postponed as a last recourse for January-February 2020. All these opportunities were real; for instance, MAD Solutions conversations went on to exchange draft contracts. Several USA distributors offered to take care of, or to partake of, the US distribution of the film, for instance Synchronised.

201.    However, it had been agreed, as emails show, that Plaintiff would set up directly distribution of the film across the most important platforms. Plaintiff and David had agreed on taking control directly of the US distribution market, without intermediaries. Thus: the opportunity of distribution was real, because Plaintiff could have set up all these channels according to contract. The only thing they needed was the necessary talent releases to show to the platforms that the permits were on place [the chain of title]. This is direct and undeniable loss, attributable directly at Defendants' actions. Recall that this idea was already there in the conversation collateral that complement the Producers Agreement. Recall is David Shara who mentions even the platforms for the film to be distributed in 2016 when he burdens Plaintiff with setting up a successful distribution, if Plaintiff wants 'to make any money'. Plaintiff and David elaborated this idea in 2017 and 2018, and they decided to retain the US market distribution for themselves directly

via platforms like Apple TV, because that way the could maximise revenue without sharing a part of it with a subagent in North America and Australia and UK, the English speaking areas of the world. The budgets proposed, discussed, congratulated by David Shara, give proof of it. The US Oscar- qualifying theatrical release and the US streaming release, two things expected to happen one after the other, had been thwarted by Defendants' breach of contract, breach of good faith and all to enrich themselves unjustly.

## D. 2020

202.   David and Honey promises, however, were ambiguous: many invoices of 2019 were still unpaid in 2020, and were not paid in full until August 2020. This fact was dragging the capacity of Plaintiff to fully set in movement the plans that had been approved. Commercial Oscar-qualifying theatrical release was suspended again in January, this time indefinitely.

203.   In January 2020 the film garners more awards, becoming most awarded film at Jaipur Film Festival, India, for instance. More conversations regarding distribution took place or continued or stalled. Connections of Jaipur Intl Film Festival also expressed interest in a deal for a distribution in India. Those conversations stalled because, in light of

Defendants actions, it was *absurd* to advance possibilities and empty conversations that were doomed to flounder as regards to distribution. The actions of Defendants precluded from any serious distribution efforts to take place, on the side of Plaintiff, and on the side of anybody else. [On January 30, 2022 5:13 PM, David Shara's counsel writes it very clear: "Hey Nathan - just to clarify - (...) - **if we don't have Susan's release, no distributor will accept [the film] for distribution.**]"

204. One of them came from MAD Solutions, the Arab world and Middle East biggest distributor to theatres, TV and online platforms, but the missing talent releases promised by David Shara, Tigran and Sarandon never came, and made striking a deal impossible.[145]

205. The malice and hypocrisy of Sarandon stands out when we expose events in the light of these claims, which show how double standard and privilege are understood by her as something normal. When The New York Times film critic Jeannette Catsoulis questioned, apropos of the theatrical release in the USA of the defendant's son Jack Henry

---

[145] Defendants statement in the MTD that MAD Solutions does not represent any loss, and that it is not sufficiently alleged, is preposterous. It is a repugnant abuse of the standards by which a claim can be considered plausible. Explaining in detail the itinerary of each lost opportunity would make (and would have made) this and previous versions of the Complaint extremely long: including the names of the participants of each negotiation, how each begun, where, citing the emails (there are many emails exchanged), and even providing a copy of the contract that was being drafted, which is, however, contrary to standing non-disclosure agreements. Even more: MAD Solutions' contract was ready to be signed if David agreed and if talent releases existed, and the conversation simply ends there because Plaintiff cannot sign it without written agreement by David Shara, but there is something more important: the talent releases David Shara, Sarandon and Tigran promised for years since 2016 were not signed and shown to Plaintiff to guarantee the actions of any potential partner for distribution, for instance MAD Solutions, and others, could proceed to distribute according to industry standard contracts; contracts that, of course, are ***not*** 'one or two pages long' as the one David Shara and Tigran coerced Plaintiff into signing in 2016.

Robbins' film "VHYes", on Jan. 16, 2020, [quoted from The New York Times, Jeanette Cassoulis, Jan. 16, 2020] **"Little more than a collage of meaningless nostalgia, "VHYes" <u>makes you wonder how it found its way into a movie theater</u>. Though I'm sure that has nothing to do with the fact that two of its actors, Susan Sarandon and Tim Robbins, are also the director's parents"**, Sarandon slammed publicly the critic at The Hollywood Reporter [Tittle "Susan Sarandon Slams New York Times Review of Son's Film", published February 14, 2020] **stating that the NYT critic's attitude was <u>"so unprofessional and obviously knows so little about the business"</u>**. It is a disgrace, and represents a new apex of hypocrisy, to see that precisely at that same time when this journalistic controversy was taking place, Sarandon had been already fully engaged in thwarting the distribution of the Film, a film that was legitimately successful on its own merits and performance in the festival circuit, about which she had, against all evidence, "nothing positive to say". It cannot be sufficiently emphasized the Film could not get the US theatrical Oscar-qualifying theatrical release precisely because the same Susan Sarandon that was slamming the NYT critic for voicing her opinions about her son's film's distribution was also engaged in wrongful actions directed to ruin the transition of Plaintiff's Film from the festival circuit *into the commercial distribution.* For Sarandon, the outstanding size of Plaintiff's Film's

cinematic merits, as recognized by independent critics and awards bestowed by independent juries from all over the world, were of no value as long as she could accomplish her retaliation[146].

206.    For Sarandon, relying on her immense prestige and career in the industry, as much as thwarting the film was clearly against her interest (as it is shown by the fact that she had been promised and she had agreed on a percentage of the profits in a business proposal), that damage was welcome as long as she could get the satisfaction she was looking for: a retaliation against the little known filmmaker, the plaintiff. She knew it was against her own interest, but this has been an act of malice, an interference to cause irreparable damage to the plaintiff.

207.    On February 17, 2020, Plaintiff voiced is anxiety and frustration as the situation to David Shara: "(…) theatrical release of AMERICAN MIRROR is about to be thwarted by the fact that the budget of 2019 is pending, and we know the rest of the tale after you wrote in May 2019 'I don't care about losing 300 K'. Yes, you wrote it, and after that no invoices were paid -- for very many months, leaving a budget hole lagging into 2020, submitting my business, my family and our life to great, undeserved distress. Please take my words friendly, **because all I want is a successful distribution implementation, but you are**

---

[146] Sarandon's success is also a consequence of films very good, bad and regular, but all of them distributed *in due time*. Any director, producer, film composer, or actor wrongfully deprived of the distribution of his work in due time is harmed professionally irreparably.

**helping to achieve the contrary**. I very much wish all this to end at peace without further drama." David Shara answer a few hours later: "Understand...waiting for more money to come in next 10 days...be in touch. Let's discuss Netflix connection on Wednesday." **The Netflix connection here David refers to was an offer he mentioned in phone calls without showing any documentation to Plaintiff, but he never came back to it after February 2020, and nothing materialised**. What is clear is that Netflix interest was not the first time that popped among agents, even in David's own circles, although absolutely would have been welcome. It is more than plausible that the Film had been robbed, since 2019, of tremendous opportunities going out of the festival circuit directly into commercialisation. Unfortunately a few months later it was clear that David and Honey had been withholding the talent releases with the sole purpose to try to coerce Plaintiff out of the contract, in coerced agreement with Tigran and Sarandon.

208. On messages and phone calls, Plaintiff made it clear to David that Mad Solutions distribution offer may flounder, as other important conversations related to international distributors, because they were missing the written releases. Additionally, still invoices pending from

2019 were not yet paid to Plaintiff[147]. This invoices were pending, in reality, as a last attempt to deprive Plaintiff of the bargaining power selecting theatres in New York and Los Angeles, which are the two cities to start and the two necessary, at a minimum, for an Oscar-qualyfing theatrical release. [148]

209. Among others, another example of opportunities lost in Australia. On Wed, Sep 16, 2020 at 3:47 AM, the director of Melbourne International Film Festival[149], to Plaintiff's team: "We were wondering if we maybe able to stream in Australia-only American Mirror as part of a Best of Our Festival at 25% of box office for December."

210. An important agent from Los Angeles, presented an offer in July 3, 2019: "We wanted to see if you would be interested in distribution.

---

[147] As regards to invoices from 2019. They were consequence of new budgets approved in 2018 in writing. Those emails show not only satisfaction by David Shara, but also congratulations as regards the way money had been spent all the way along. Those invoices' content show they are related to elements of the distribution to theatres and o the distribution online, already mentioned and described previously, scheduled to end 2019 or beginning 2020.

[148] Meetings at Carthage Pro, film market at Carthage Film Festival 2019, developed into formal offers that could not get properly addressed because of Defendants withholding what they had agreed to provide, in due time, since 2016. In December 2019, for instance an email from the head of acquisitions ad MAD Solutions, reads exactly: "We'd love to acquire the film's rights of "American Mirror - Intimations of Immortality" in the Arab world." This generated a negotiation to get best terms possible, but Plaintiff's team finally had to renounce to it because it was impossible to advance in spite of the contractual proposal sent by MAD's legal team. The situation was delayed until obviously it was not possible.
    Plaintiff could not invest time and prestige in representing to the market that the Film was for sell, when in fact, due to Defendants explicit actions to thwart it, it could be sold.
    MAD Solutions is the biggest producer and distributor for cinemas and all channels for the Arabic World, with offices in Cairo and Abu Dhabi. Similar opportunities were lost for all other markets that had not been reserved by Plaintiff and David, in common agreeement, to take care of its exploitation directly [the US theatrical and the North America and English speaking countries via Apple TV and other platforms].

[149] This is one of the most prestigious film festivals in Australia, where the Film won an Honorary Mention by the independent jury in 2019.

We offer a non-exclusive agreement 80/20 split 80 to you. I've attached the platforms we distribute to[150]. Please note, 2 documentaries we distribute made the top viewed and top three viewed on Amazon Prime for the past few months! We have also submitted a documentary and an Augmented Reality series for Emmy consideration."

211. These offers were explained to Honey Shara in phone conversations in context of her denial to provide and obtain talent releases by David, Tigran and Susan, and her denial to pay pending invoices. Plaintiff was aware that, without the existence of those elements, it was impossible to advance any deal, or to explore it further. Honey Shara used the situation to strong-arm Plaintiff: no invoices paid and no talent releases signed unless Plaintiff presented an apology to Sarandon and to Tigran. Plaintiff asked Honey Shara if she would also request an apology of Tigran to be presented to Plaintiff for comparing Plaintiff's request of a contract to a prostitute and for comparing Plaintiff's way to work to "sailing at sea without a GPS", among other things, and if she also was willing to get an apology from David for so many insulting comments from 2016 and 2019. She insisted, that Plaintiff's wife would also suffer the consequences, and said: "Do it for Bella" [she refers to Plainiff's wife, who by the way had helped so much in creating these opportunities since 2018 and managing the film festival

---

[150] They specifically showed distribution to more than 60 platforms, including Netflix under exclusive agreements.

circuit, and with whom David Shara, CCing his crony Tigran, also shared a barrage of insulting comments as already shown before].[151]

212.    After previously already requested information about the film's distribution, on September 5, 2019, to Plaintiff's team, this same company and agent insisted: "Just wanted to let you know I have several titles **I am offering an exclusive to Netflix[152]**. Obviously better positioning, money, etc. than non-exclusive over many platforms. I understand my notes (…), but now is when they are interested. **These types of opportunities do not come along everyday and I wanted to see if this interests you**."

213.    By September 2019, however, Honey Shara was very busy withholding payment of due invoices in order to put Plaintiff's business and the film festival circuit *under financial duress* to oblige Plaintiff to cancel it. The Film going out of the festival circuit directly into a Netflix release in 2020 would have brought a one-in-a-lifetime goldilocks opportunity cadence, unleashing tremendous financial success far over the ridiculous production budget spread over four years, because the

---

[151] For the record: Bella was as disgusted as I was at all Defendants and their tactics, their humiliations, double standards, toxic habits and repugnant arrogance in every single aspect, all mingled with their shocking demands, invading my fundamental rights to opinions and my legitimate right to protect my work and project from Sarandon's attempt at breach of contract as she sent it in her communication of February 2019.

[152] A Netflix release was one of the best options, and that option was real here, in timing and pre-position. Netflix's documentary releases reached all time record Hugh in revenue in 2020-2021. Plaintiff has been deprived, out of malice of Defendants, of tremendous prestige and financial results that he deserved on account the quality of his work and the length of his dedication to the project.

lockdowns turned 2020 in the best year in online revenue ever for online-only releases, and because the Film has gained the prestige necessary to raise the curiosity of great swaths of audience, including Sarandon's fans[153]. However, the pandemic struck in March, and the Oscar-qualifying theatrical release could have taken place in January. All could have gone perfect for the Film if the agreements in place would have been respected by everyone.

214.    Also members of the Fort Lauderdale Film Festival suggested in 2019 limited theatrical release in Florida at Cinemas Paradiso, Hollywood [Florida] and Savor Cinema Fort Lauderdale. Same initiatives were proposed by members of Orlando Film Festival. It was impossible to make any deal or to concert screenings, first because they should have been integrated, orderly, into the Oscar- qualifying theatrical release, which was the agreed on beginning, and second because all these plans were subject to a number of guarantees that were not being presented by Defendants—David had never obtained any of the people he had invited.

215.    By March 2020 COVID-19 pandemic paralysed the world. The

---

[153] It is obvious enough that Sarandon wanted to keep her fans as far of the film as possible: that's why she never welcomed the Parajanov-Vartanov Price. Sarandon's attitude towards the film is in conflict even with a liberal understanding of the clause of PR integrated into the proposal she accepted in 2018: **one thing is not to participate in events that would have altered her agenda** [going to Armenia in first class with Tigran and boast that in front of the media is another thing… and she clearly wanted that, but Tigran's lukewarm attitude, according to David Shara, discouraged her and she understood she would not get what she wanted, the publicity of a new affair with a young man for her business purposes] **and the other to pretend that the film did/does not exist, which for us is a breach of contract.** There existed a compromise, and what she offers is more culpable because it is intended to trample it.

entertainment industry was hit harder than many other, especially production. There were literally no projects. It was, however, a goldilocks moment for online distribution of documentaries. David and Honey Shara had not paid the pending invoices from 2019, Plaintiff dragged on a negative balance because he had not left the Film in the lurch in the most important part of the festival circuit in 2019. David and Honey Shara's action had been directed until November 2019 to thwart the film festival by not paying, as a last recourse to harm the Plaintiff in coordination with Sarandon and Tigran.

216. During this difficult months financial duress and problems overwhelmed the Plaintiff while Defendants kept their position of not sending the release and not paying spending invoices. The theatrical release in the USA and the online streaming release in the USA and for English speaking markets, agreed on for years, had been irreparably lost because of Defendants' coordinated actions to harm the Plaintiff. It was the result of Sarandon's instigation, of Tigran's instigation, of their breach of contract, of their acts in bad faith, and the actions by David and Honey Shara to destroy the festival circuit, all in the midst of blatant insults, bullying and coercive actions to break the Plaintiff's resolve to allow the film to go ahead.

217. In this scenario created by COVID-19 absolute business paralysis, which was much stronger than in other sectors in the

entertainment and audiovisual production industry, Plaintiff, already knowing the mercurial and abusive character of David Shara based on previous experiences already detailed, and knowing Honey Shara's low standard of hypocrisy, was pressed by the overwhelming circumstances to wait for David and Honey Shara to pay the pending invoices, and also to collect the talent releases.

218.    From June 22 to June 26 Plaintiff and his company attended Cannes film market, Marche Du Film, which was held online due to COVID restrictions. Plaintiff had many opportunities to market the film, but of course it was not possible to advance because the minimum guarantees for distribution left the film literally out of the market, as much as it had been very easy to find partners for European and Asian markets. Recall MAD Solutions negotiation for Middle East simply remain unanswered in limbo. Plaintiff, after seeing what had happened with Mad Solutions negotiation, could not allow this to happen because it was insulting for him and his company[154]. Plaintiff had planned attendance to Marche Du Film since 2019, and it was the moment when many opportunities could have come to fruition. However, it was clear that, as much as all factors that depended on Plaintiff had been

---

[154] MTD alleges that there were not many opportunities lost mentioned and detailed. They seem to expect Plaintiff was going to remain offering to market participants a film that could not be distributed, a film over which nothing could be signed, and tortiously use that against the victim of Defendants. Once a big contract like MAD Solutions had gone so far and left 'to die on the vine', Plaintiff could continue doing the same kind of 'work' that was doomed to fail. He instead wanted to see the talent releases missing first.

accomplished beyond the expectations of all participants in the film, it was impossible for him to go ahead with the Film's distribution gaining any other opportunities. To pretend that this attendance, in absence of talent releases withhold by Defendants, was not a loss of opportunity would only set the standards very low for business in the film industry: seasonability is clear a model to market films: they are produced, they go through festivals, and depending on results, that is the moment to strike deals. The Film had lost opportunities all over the world, from Carthage Pro, the market of Carthage Film Festival, an Oscar-qualifying film festival to biggest film market in the world, to Cannes' Marche Du film.

219.   At Cannes Marche Du Film it was only clear that it was impossible for Plaintiff to move forward with other projects, especially the Francis Bacon Project[155], basically because the Film was not distributed. Sarandon action was designed to defame the Plaintiff by omission, her tactics, clearly exemplified in the abusive silent treatment given to all communications once she had gotten what she wanted, were clear. Thwarting the distribution would only defame the Plaintiff, degrade him professionally. All this was happening because Plaintiff suggested her attitude was being ungrateful after giving the silent treatment in a manner that was abusive and offensive to Plaintiff and his production

---

[155] Possibilities, talent names, contractual negotiations, can be provided to proof that this project has been negatively affected by the Film not being distributed, but many of this situations are protected by non-disclosure agreements, and will presented to the Court in a form that does not brings problems to Plaintiff for their disclosure.

team for having won for her the Parajanov Vartanov Award.[156] Sarandon was in material breach of contract, as also Tigran was.

220. Plaintiff had been proposed to have an exclusive Add-on Producers Network Pass at Cannes film market. This would have granted him a much higher degree of opportunity, probably one of the highest achievable in all markets in the world as related to producers networks. Emails show that, in absence of distribution contracts signed for the Film [that raised interest among Cannes organisers of the Producers Network], which had to be presented to gain access, the ass was not granted. Plaintiff lost opportunity: Defendants actions were harming also Plaintiff's other professional endeavours, interfering with his opportunities. This further throated opportunities for his new project Francis Bacon Project.

221. David Shara finished paying the pending 2019 invoices by August 2020, but did not send any talent release. Plaintiff, pressed by the financial situation generated by David Shara's late payments, the Covid 19 paralysis, and the clear perspective of the film not being release, saw the necessity of selling the painting by Tigran, which was also unfinished, and that had been given to him by contract much later than

---

[156] Again, to elaborate on the details of how opportunities were lost, which ones, at what time, and describing how the persons who made those offers were dressed, to please the impossible standards the Defendants want to impose to review the Complaint, would be burdensome for the Court, since this complaint would be much longer, and against non-disclosure agreements that are standing and that Plaintiff must honor. During discovery all these details can be further exposed *inter partes*. The Complaint, however, contains a faction of those details, and that fraction is absolutely specific [for instance MAF Solutions contract negotiation].

when it should have come.

222.    It was only natural that Plaintiff requested an appraisal by Phillips Auctioneers LLC, which had hosted the 'successful' auctions of 2014 and 2015 of paintings by Tigran. Phillips had not auctioned again any painting by Tigran since those two isolated, very high auctions. Plaintiff was shocked when Phillips denied to make any appraisal of the painting submitted for auction. It was beyond suspicious: Phillips had represented to the public in 2014 and 2015 that Tigran's painting were appraised by 30,000-40,000 USD. That information is still online Exhibit 1. After those representations made to the public, then the auction that took place for each lot appraised resulted in much higher prices, surpassing upward Phillips' already generous appraisal of an artwork from a painter that in 2014 and 2015 had close to zero prestige in the art world. Phillips made money out of those auctions.

223.    In light of the denial of Phillips to appraise, Plaintiff scheduled a phone call with Rebecca Bowling, the head of contemporary sales at Phillips, and the person who had been also in charge of the sales of the 2015 auction, according to online information. She confirmed that information by end of August 2020, and in that conversation made striking revelations. First of all: she stated that the reason why Phillips was not accepting any paintings by Tigran for auction neither giving appraisals, and some new ones had been offered in 2016, 2017, 2018, and

2019, denying all offers, were not related the quality of the artworks offered, but instead to events that surrounded the auction of 2015, which is the one she had managed. Bowling confirmed that they had tampered with the auction, and as a consequence of that Phillips would not take any artworks by Tigran ever again, or until the situation would change drastically in the future. Sasha Rukovskaya, now Edelman, was the woman in the room who finally acquired the painting in 2015. She was Tigran's girlfriend at that time, Plaintiff knew that. Sasha had been filmed for a sequence of the Film. Plaintiff remembered that Tigran had expressed many times that Sasha, not having papers to stay in the USA, was having a hard time to pay everyday bills, for instance. It was strange to discover that Sasha had *purchased* a painting by close to 100,000 USD plus premium. It must be assumed that Sasha had been acting as an agent representing someone else's money, but there were also bettors via telephone who bet against her, and one of them was David Shara, and others close business associated of David Shara and Tigran. Later on Rebecca Bowling sent an email stating that "Yes, as we discussed, Phillips has decided that we aren't comfortable offering works by this artist at the moment."

224. An important question is that Tigran, personally, among his many interferences in the film editing, had insisted to Plaintiff, in person and in writing, in making of the footage, image and audio of Phillips

auction of 2015 an important and clear part of the film that should be presented to the public to better promote himself and the value of his art, something David agreed on. Phillips video had been obtained because for the sake of transparency Phillips streamed online the 2015 auction process lot by lot. Tigran insisted, however, in offering a biased version of that footage. Plaintiff had included that footage in the Film, including the final moment when the painting of 2015 reaches the final price. Tigran in writing had requested that the final price not be included, he wanted to leave it open, suggesting that the price continues going up, and he explained, because that price is no more accurate, 'my prices are much more higher'. This representations, Plaintiff discovered, had been all the way reckless and fraudulent since 2016.

225.     These revelations were appalling for the Plaintiff. He had been 'rewarded' for many years of excellent work with a painting that was unfinished and of no value, and his film, a work successful in spite of its main participants more than thanks to them, was already irreparably impair: the momentum of the festival circuit and the negotiation power granted by the winning of many awards had been lost thank to the Defendants' coordinated actions.

226.     The necessary changes to be applied to the film now to extirpate the footage and audio of the 2015 Phillips auction, which permission was clearly denied to be used by Phillips's legal department around September

2020, are a responsibility of David Shara and Tigran to pay for, since 1) they had insisted in including it and 2) they had guaranteed that there would be no problem with its inclusion. That could have been done, however, in a few weeks, and is not excuse to deny Defendants' obligations to allow distribution.

227.    Plaintiff brought the questions to Honey and David Shara, and also the fact that the talent releases were still missing, rendering the film un-distributable in a year, 2020, when the interest for online-only film commercialisation was breaking records because of the COVID-19 lockdowns, and the need of people for new content available online, since theatres were closed. It was a tremendous loss of opportunity for the distribution of a film that had had a stellar performance in the international film festival circuit in 2019, and the loss was real because it had been agreed a long time ago that that segment of distribution would be directly under David and Plaintiff's control. Conversations about the film distribution with international buyers had been lost as a consequence of Defendants' coordinated actions.

228.    Plaintiff also informed David Shara of a new project for a new film in development, in which there was Academy-award winning talent in talks and the approval of the Francis Bacon Estate on the life of British painter Francis Bacon, based on a script by the Plaintiff. The Francis Bacon Estate went on to assert that of the many proposals for a film

based on Francis Bacon received over the years, Plaintiff's proposal was by far the best and the one they wished to become a film. That was a great honor, and further illumines why Sarandon had been so interested in '16 Hours' script's synopsis, and why she had taken from there the character background of the nurse in an emergency room for her commercially ill-fated 'Viper Club' role, a film she co-produced. The situation was particularly troubling since the lack of distribution of the Film was lacking the logical continuity of the film from film festivals into distribution, and that was clearly damaging the professional perception of the Plaintiff by other film industry players. The no distribution of the Film was making the raising of funds for the new film based on the life of Francis Bacon impossible, creating a tremendous professional damage for the Plaintiff, injury for which the defendant is liable. This project counted with the real interest of Director of Photography that had been two-time Oscar nominated, a producer that had been Bafta nominated, and they suggested for costume and make up English talent that were Oscar-winners.[157]

229.    The new 'Francis Bacon Project' in development by the Plaintiff,

---

[157] It is again, abusive of the standard of review of plausibility of a claim to expect Plaintiff to present detailed information *demonstrating* every single allegation's itinerary. Standing non-disclosure agreements make it mandatory to keep all this information for discovery. The argument of Defendants in MTD, that the fact that the forced no-distribution of the film as a consequence of Defendants' action does not create disadvantages to Plaintiff, is not reasonable in plain sight. Contradicts the principle of seasonability, elements extrinsic to Producers Agreement that clarify and complement its distribution chapter, without contradicting it, but conforming to universal business practice in the film industry, and further contradicts even the existence of invoices paid that describe moneys that were specifically for the USA Oscar-qualifying theatrical release.

that had attracted Academy-award winning talent across all fields, and particularly a two-time Academy award winner actor as it will prove in discovery, stalled during all these months and faced growing challenges to get funding mainly because his last film, so multi-awarded, was lacking its due distribution plainly because of malicious maneuvers of Defendants and Sarandon's great influence and interference with the existing contract, and more simply, because of Sarandon's own breach of contract. The damage that the situation has caused to Plaintiff has far reaching consequences. When on August 2020 the Plaintiff pressed on these issues, and also his doubts about the value of the painting, David Shara disappeared, and Honey Shara announced they would send *their* attorney to contact the Plaintiff.

230. By mid-September, counsel representing David Shara ***and*** Honey Shara, sent a letter to the Plaintiff. The title of the letter leaves no doubt that counsel was representing both persons' actions: "**<u>RE: David Shara and Honey Sharks vs. Arthur Balder</u>**". The letter, however the title, stated no claim against Plaintiff, on the contrary, it congratulated Plaintiff for his great work at the helm of producing and directing the film, and then Defendants suggested that Plaintiff renounced to his rights as stated in the Producers Agreement in order to allow the Sharas to be

fully in charge of the distribution of the film[158], in clear violation of the terms of the Producers Agreement that are clearly based on many representations, contemporary to the memorialization of the contract, and also subsequent, that establish that the Plaintiff would be in charge of distribution, something that had been decided due to the extensive experience of the Plaintiff in documentary filmmaking, as the results in the festival circuit clearly had showed, and as a burden placed on his shoulders since the very beginning.

231.    David and Honey Shara[159] letter dated September 10, 2022 states, among other things: "We are the attorneys for David Shara **and** Honey Shara." "**They funded** [Honey and David] the Documentary, **fulfilled all of their obligations[160]** to you and you in turn made a great documentary – which was reflected in the fact that it has won so many awards." "**If you want our client to sell the painting on your behalf and pay you the proceeds, we can certainly discuss that as an**

---

[158] These conversations were not intended to solve the situation amicably: they were intended to coerce Plaintiff out of terms and agreements David Shara had breached for years, and, interestingly, to sign a new agreement where Honey Shara would also be present. That one was not going to be "one-two pages long".

[159] Honey Shara neither acts nor behaves as an agent or messenger, she considers herself owner of the film because she put money in it, according to her own statements: On January 29, 2022, on an email sen to this same attorney, David Fritz, and that Fritz kindly shared with Plaintiff's counsel: "I very much want to sell this movie and at least recover **my** $400,000 investment."

[160] Honey Shara thus **affirms** that she funded the film. She affirms that she fulfilled 'her' obligations. She behaves and makes decisions as someone who had signed the Producers Agreement itself with Plaintiff. Consequently she felt also she could make important decisions that interfere with the contractual relationship and extant and extrinsic evidence from 2016. The consequences of these actions cannot but be ascertained also directly to her. She is not 'an agent', she is making decisions.

**option**."[161] "Arthur, our clients have to deal with the financial stress presented by the pandemic." "**you felt that David disappeared behind Honey; that was not the case – they simply divide business responsibilities**[162]; Honey handles finances so she has been the one paying your invoices." She was responsible, and not a just messenger, for the delay of payments in 2019, an action that came only to coerce Plaintiff into actions he did not want, neither had to, commit. Honey Shara delayed payments in 2019 trying to asphyxiate the festival circuit and with it ruin the film and the work of Plaintiff, and also to force herself upon the rights to opinions of Plaintiff, obliging him, under coercion, to present apologies, to present tax documents, to give away unlawfully a copy of the film to Tigran because he wanted to show it in Armenia in the context of a big exhibition, violating copyright and interfering with the contract, enriching himself unjustly. The Sharas continue: "No one wants to "damage you financially". On the contrary, our client values your dedication, hard work and wants you to benefit from the success of the

---

[161] Plaintiff reminded that 1) the painting was badly made; 2) that it came to his hands far later than it should; 3) that Shara should take the painting and at least pay back the money represented in value for the painting plus interest. Those terms, however, do not represent Plaintiff's actual position as regards to this question, that was his answer at that time. That happened two years and a half ago. Those terms were not accepted by them. On the contrary: they disparaged the painting because it contained the image of Plaintiff's wife.

[162] Defendants MTD argument to dismiss Honey Shara as interfering with contract are also contradicted by Honey's own statements in this letter: Honey is not an agent, she *"shares responsibilities"*. That is why she had been at the helm of many decisions, and will be at the helm of what happened between 2020 and now. Thus she must "share responsibility" in the consequences of the decisions that she made in 2019 and 2020, 2021 and 2022 until now. The communications and letters sent by them in 2020, also, prove that Honey Shara was interfering with the contract directly and coordinately with all other Defendants.

Documentary. What makes the most sense is that you provide our client with the film assets (including all of the documents that you have entered into with respect to the production of the Documentary that make up the Chain of Title) and **our client will secure distribution opportunities for the film in consultation with you**. I will personally guide them in the exploitation process (our firm handles many film and TV matters)."

232.    It is important to note that this attorney made it clear that he was representing David Shara **and** Honey Shara[163]. A small set of important clarifications here: Honey Shara was presented to Plaintiff by David Shara by end of 2018 as a partner in funding the film, not as a designated agent. Honey Shara made public announcements as regards to distribution of the film at public events, as described in the section 2018 of this Complaint, Honey Shara interfered in 2019 in all aspects imaginable with the execution of budgets and the course of performance of the business, the attorney's description leaves no doubt: they 'share responsibilities'. Honey Shara, shamelessly and unlawfully, when on to request Plaintiff's company tax documents of previous years at a moment,

---

[163] Statements of fact made during settlement negotiations are excepted from the ban [FRE §208] and are admissible. The only escape from admissibility of statements of fact made in a settlement negotiation is if the declarant or his representative expressly states that the statement is hypothetical in nature or is made without prejudice.

Nowhere in the communications exchanged with Honey and David Shara's counsel in 2020 or in 2021 and 2022 is expressly stated that the statements were hypothetical in nature or made without prejudice. Particularly these are exchanged between Plaintiff and their counsel, here referenced and quoted. They were statements of facts presented as such to persuade Plaintiff to do something he had no need to do. They are coercive because they threaten Plaintiff with continued professional harm if the were not to accept, and that threat is materialise by the actions that follow between then and now.

July 2019[164] when she had stopped paying invoices to thwart the film festival circuit, and obtained those tax records by coercion.

233. Plaintiff discussed this 'proposal' that was against the terms agreed upon as demonstrated, not only alleged, with 2016 description of events. Recall David Shara had affirmed multiple times that Plaintiff had to distribute the film. After ruining all the previous opportunities of distribution by not obtaining the talent releases he had promised, after causing losses, after irreparably impairing the discussed and agreed upon, logical continuation of the film from festival circuit into commercial

---

[164] On July 22, 2019, Honey Shara, insisting on getting tax information from Da Vinci Films, in the name of Optimum Diamonds, where she is a partner and co-owner: "Optimum Diamonds has, over the past three years, sent you funds totaling in excess of $ 250,000.00 and has not received any tax benefit from these payments. Therefore, my CPA asked for the k-1's. He is not interested in your business structure or you, but wanted to know where the money went. I admire your tenacity and ability to achieve what you have accomplished. **I am sad that you are so angry at everyone.** It does not help you." Passive-aggressive Honey Shara requested K-1, distribution to partners, which are not due from Da Vinci Films LLC because Optimum Diamonds, Honey Shara or David Shara had never been a partner member of Da Vinci Films LLC. She states "He is not interested in your business structure or you", she says, because it was David, Honey and Tigran who were interested. The K-1s requested were unlawfully obtained under coercive manoeuvres: in a contemporary phone conversation addressing this situation, Honey Shara stated that he must do it if he wanted some invoices paid. It was, again, coercion, the favourite manoeuvre of the Sharas. Plaintiff's accountant had made it clear that the petition of Honey Shara was undue, and deceitful, just to unlawfully peep into Da Vinci Films LLC and Plaintiff's own tax records. Plaintiff sent this information knowing he was being coerced to do something he had no obligation to do, in order to get invoices paid. Plaintiff had nothing to hide, but had also no obligation to allow this kind of unlawful humiliations. Honey Shara did not honor her word, however, and did not pay any invoices, as it has been shown before, until Plaintiff by end of October 2019 expressed his intention to start litigation if they, Honey and David, did not pay the pending invoices because they were doing it just to destroy the festival circuit.

Note her comment "**I am sad that you are so angry at everyone**" only shows the toxicity of the psychological manipulation and tactics employed by Honey Shara in coordination with the others: first they bully, insult, offend Plaintiff, deprive him of projects, then they try to humiliate him coercing him into 'apologies' because he stands on principle, then clearly they announce they want to cancel and destroy the film festival circuit to please themselves and Sarandon and Tigran, and, *lo and behold!*, if Plaintiff gets upset after all that, *that is his fault to be angry —not theirs of course.* These psychological tactics are manipulative and normal in toxic environments.

distribution[165], after ruining the theatrical release in the US, postponing it from late 2019, the right moment, to beginning 2020, to nowhere, now, David and Honey Shara, who had tried to thwart the film festival circuit, now *they* wanted to distribute the film—without considering the damage they had already caused to the film's potential distribution—specific contracts and opportunities lost, product momentum lost, and damages based on expectations created by them and others.[166]

234.　In a subsequent email conversation between Plaintiff and their attorney, Plaintiff clearly stated the main issue at the beginning: "Da Vinci Films is the production company, and has collected Talent Releases of those invited to participate by me. It is paramount, and past due time, that your client shows the Talent Releases of those he invited and of those he made himself responsible for." "I am very thankful to you for raising

---

[165] § 1-205. Reasonable time; Seasonableness.

(a) Whether a time for taking an action required by the Uniform Commercial Code is reasonable depends on the nature, purpose, and circumstances of the action.
(b) **An action is taken seasonably if it is taken at or within the time agreed or, if no time is agreed, at or within a reasonable time.**

[166] § 2-208. Course of Performance or Practical Construction.

(1) Where the contract for sale involves repeated **occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, <u>any course of performance accepted or acquiesced in without objection shall be relevant to determine the meaning of the agreement.</u>**
(2) The express terms of the agreement and any such **<u>course of performance, as well as any course of dealing and usage of trade, shall be construed whenever reasonable as consistent with each other</u>**; but when such construction is unreasonable, express terms shall control course of performance and course of performance shall control both course of dealing and usage of trade (Section 1-205).
(3) Subject to the provisions of the next section on modification and waiver, **such course of performance shall be relevant to show a waiver or modification of any term inconsistent with such course of performance.**

the question of the Chain of Title, because precisely there we are missing paramount Talent Releases your client promised to get years ago, yet never appeared. I relied on his promise, but now I need to see them, and I request them formally to you." "I am not duly compensated for such attachment. **427,000$** [production budget to pay for everything] **for this kind of result, invested across 4 years, is a very, very low budget given the result and when the film stars an Academy award winner with epic success in the international circuit, and it is so low budget because the person who makes it possible, me, is not compensated according to industry standards.**"[167] "Because in this business we are together, and because I sent to your client all the Talent Releases by email as they were signed (he even received by mail one signed by Mr Donadl Kuspit), **now I need to see and have copy of the Talent Releases**."

235.    Plaintiff was not closing the conversation, even being coerced again, but at least it was only natural that he was requesting to 'see' that the Sharas had the necessary guarantees they promised, or else meeting any other agreement would be again disastrous. It was possible, given all the actions of all the Defendants, that they were coercing the Plaintiff into a new disadvantageous contract, and that, after signing it, they would have further been in power of withholding the distribution forever

---

[167] This is not new. Recall 2016's coercive contract negotiation communication.

erasing years of standing evidence as already explained. Facts that come after these events will show that was the true intention behind their coercive manoeuvres.

236.    Honey and David Shara made it clear through his counsel that:

"**The name and likeness releases have not been secured by our clients**; **_they_**[168] **can secure all of them in an expeditious manner - but you have to take a backseat on this project []**". Further adding relentlessly: "**if you're serious about making money with this film and using it as a work that you can showcase so that your credits build and you have additional opportunities, you need to hand over the control of the film to our client**." "without our client's written sign-off (**and the releases**), you simply can't exploit the film any further. **If you don't want to let them run the exploitation of the film at this point, our client is prepared to let the film "die on the vine"**.[169] "Unfortunately for you, **you have no choices here Arthur -**

---

[168] Note key point, **_they_**, David **_and_** Honey Shara. Honey Shara can obtain them but she won't, she is part of the setting of conspiracy, plus there is no doubt as regards to interfering with the contract and other business endeavours of Plaintiff: she considered it is 'her' contract, she has funded it, thus she feels she has the right to make decisions. Her decisions had been having, were having, and will have dire consequences for the film and for the Plaintiff, thus consequently her responsibility should not be ignored. She is not an agent making things for someone else: she is an investor, a co-payer, she considers she will have to be part of the NEW AGREEMENT that the attorney wants to sign. This conversation is about signing a whole new agreement, that certainly would have not had 'only 1 or two pages', recall David's coercive order as to the extension of the Producers Agreement, it is about placing Honey Shara as new partner of the new agreement. Not only she was interfering, she was trying to coerce Plaintiff into new terms and a new agreement where she would have been part of.

[169] Recall Tigran and David Shara coercive actions of 2016: if Plaintiff did not accept the terms, and among them, renouncing to any upfront compensation, the film would 'go in the garbage', 'was dead in the water'. Like mother, like son.

**just trust that David's self-interest in getting the best deals and making the most money from the film** is in your best interest as well."[170] Plaintiff was more than troubled by this situation. David and Honey were refusing to either consent to the Plaintiff's distribution of the film and willingly keeping the film hostage by not providing a number of talent releases necessary to distribute the film, **despite acknowledging that they could obtain the talent releases (and expeditiously so)**, all of them—included that of Sarandon and Tigran[171]. **These actions were an obvious attempt to seize control of a universally acclaimed film**. In fact, David and Honey **threatened the Plaintiff**

---

[170] [Flashback.] David Shara to Plaintiff, November 2016, extrinsic evidence that the Court cannot set apart from the insufficient 'four corners' of Producers Agreement: "The best solution here is to finish the film as best you can and **get it into as many film festivals and events as possible**. We are partners in this film and the better it does, the better we do together." Imperative mood: "**Finish the film and try to get it sold. Get it into theaters, amazon, Apple TV etc**" "If you are so confident then take the 33% and finish a killer movie. **If it goes well you will make hundreds of thousands of dollars.**" "You need to promote the film, enter into film festivals **and take care of it as it was your own baby**." In 2019, May 28, David Shara to Plaintiff: "I think **you** should try and ***find someone to buy this project ASAP***." "remember very few people signed the releases"

[171] This set of important revelations and unambiguous statements are clear about the setting necessary to be plausible for the conspiracy among Defendants to cause the underlaying tort: breach of contract. David and Honey Shara are 100% sure of their proposal: they can get all talent releases expeditiously. Their attorney sends a former letter, confirms these details, there ca not be any doubt. In order to make such affirmations, and to go so far as to present Plaintiff with a strong-arming Hobson choice, they had to be coordinated with Sarandon and Tigran. What we see plain is far above the standard of plausibility, they **affirm** it, thus it is **evidence** itself, that they were and had been conspiring. The agreement between all parties was corrupt (they were withholding talent releases even promised to Plaintiff, and they were doing it knowing that the were ruining the distribution); the act was overt (both Sharas state they could get the Sarandon's and Tigran's talent release expeditiously, that is not overt, it is openly visible and *speaks in the name of the other Defendants*), all conspiring parties participating was intentional and they knew what was the result: and the resulting damages of such actions were already being caused at the time this communications took place. The conspiracy takes place to obtain a breach of contract, that is the underlying tort, and the breach of contract is proven, also the damages. MTD, page 24, states "that no cause of action by a party to a contract will lie for conspiracy to breach the contract" Sarandon, Tigran and Honey Shara are NOT parties to the contract in question. Note also that these conspiracy is made in the midst of a coercion clearly stated. The conspiracy is set and coordinated in order to coerce the Plaintiff.

that **if he did not hand over control of the film, the Plaintiff would never receive profits from the film and would jeopardize his professional reputation and success**. **David and Honey's statements show, at a minimum, that they were acting in coordination with the Defendants, since they affirm that they could get all releases 'expeditiously', and by this, again, Defendants were conspiring to interfere with both the distribution of the Film and Plaintiff's other professional endeavors**, all in an effort to improperly enrich David and Honey Shara, who thanks to Sarandon and Tigran's collaboration were able to coerce the Plaintiff into a new 'agreement' that would deprive the Plaintiff of his asserted rights, and that without specifying the new terms of that agreement, and that without acknowledging any of the wrongs and losses he had already suffered, and the contracts lost for the film. The tortious interference of Sarandon, Honey Shara and Tigran has accomplished a *de facto* breach of the existing contract, something that was also against their own best interest; that, however, was not important for them as long as the interference was causing major injury to the Plaintiff. It is the result of Sarandon's immense influence and power in the industry to quash the rights of a small filmmaker who had made an excellent, respectful, acclaimed work with her likeness, image and voice. Sarandon did not care about her losses as long as she could maximize the ruin to the

Plaintiff.

237.     Being clear that David and Honey were conspiring with Sarandon and Tigran in making an effort to seize control of the film's distribution through coercion, and that they could only make those assurances regarding Sarandon's and Tigran's release thanks to the their ongoing collaboration to deny the release to the producer, Plaintiff, who is the person entitled to set up the distribution according to the Producers Agreement and the extrinsic evidence, including David Shara's own written assurances and 'instructions' and 'orders' to Plaintiff, then Plaintiff decided again to contact Sarandon.

238.     In September 2020 representatives of the Plaintiff contacted Sarandon's assistant, requesting a written, signed permission for image usage in the distribution of the film. On Sep 12, 2020, 9:21 AM, staff of Plaintiff's office requested via email from Sarandon to sign the 'attached talent release': "since the festival circuit has finished (70+ official selections, 40+ wins), and the film will start distribution, I request from you to send us the attached Talent Release signed by Ms Sarandon. It is a customary thing to do, and doesn't add anything new to the actual situation as it is, and confirms what you wrote in your previous email, that Ms Sarandon "is not associated with 'American Mirror'" in any way beyond that. I also attach the .docx file in case you may wish to add something. It contains a proviso that puts it clear that Ms Sarandon isn't

obliged to any kind a promotion, which also doesn't add anything new. In sum, the Talent Release just reflects the actual situation as it has been for these years." Sarandon, however, answered later to this email evasively: "Please refer any inquiries to Susan's agents. Thank you." Another proof of breach of contract, since Sarandon had already established and chosen the rules by which the distribution would stand, and now used that evasive to further deny *de facto* providing the release, which she would only give to Honey and David Shara if they succeeded in coercing Plaintiff into signing a new contract (now not one 'of one or two pages').

239.    Sarandon did not provide any release to allow distribution to happen. On Sep 14, 2020, 1:32 PM, Sarandon answered through his representative: "you're more than welcome to reach out to Shani Rosenzweig's office (Susan's agent)". This was the first time in four years that Sarandon mentioned an agent in order to proceed, while she herself had agreed on all the phases of the filmmaking, as described before, and she had accepted terms and conditions, and enrich herself out of the film and her participation. Attempts to call Shani Rosenzweig's office at United Talent resulted in the person answering hanging up the phone call as soon as they heard anybody was calling "on behalf of Arthur Balder". The moment the name of the Plaintiff was mentioned the phone call was cut. All this showed unambiguously that directing the Plaintiff's

assistants to an agent that had never been part of the negotiations was a tortious act further confirming the promissory estoppel and breach of contract and even a tactic to deflect the communications of the Plaintiff and his assistants only to thwart them via third parties who were in the know.

240. The COVID pandemic raging, economic activity paralyzed in the film industry, and not being able to distribute a work that had absorbed almost five years of his life, the Plaintiff decided to seek legal assistance.

241. Time passing, the momentum gained by the international acclaim won by the Plaintiff's work and extraordinary performance of the film in the international film festival circuit in 2019 faded into an irreparable loss for the business and for the professional perspectives of the Plaintiff. For all these loses the Plaintiff seeks the relief of the court in the form of monetary compensation and also punitive damages since the at-fault party behaved in a remarkably reckless and malicious manner.

242. If Honey and David Shara had had any intention to distribute the film, as they stated, they would have contacted the Plaintiff sometime between September 2020, when conversations with their attorney ended, and October 2021, when new attorneys of Plaintiff send a Demand Letter to them, in order to inform him, at least, that they had obtained all the

guarantees, the talent releases, but that was not the case. That would set now a different standard. David Shara and Honey Shara were contacted again by attorneys of Plaintiff in October 2021, and they assured, in all complacency, ***that they still did not have any of the missing talent releases***. That is an important element in this claim, because it shows that malice outweighed any possibility of 'making money' for the Sharas. Honey Shara and David Shara did not have any intention to distribute the film: they were fulfilling the wishes of Sarandon, and exerting extreme and cruel retaliation on the Plaintiff. They were doing that because the have and make enough money so as to have 'the pleasure' o ruining someone after making him work for years under false promises. The purpose was to harm, out of malice, against everybody's best interest, as much as they could, for as long as they could, **facts show**.

### E. 2021

243.    A law practice in New York, White & Case LLC, agreed in January 2021 on helping the Plaintiff pro bono to attempt to solve the distribution of the film with the collaboration of attorneys Nathan Aduddell and Andrew Hammond. After an extensive period of research and preparation by Addudell between February and September 2021, in which no communication was received from any Defendant, a Demand

Letter was sent by White & Case LLC as counsel of the Plaintiff to Honey and David Shara's attorney on October 8th, 2021.

244. The letter summarized Plaintiff's claims and demanded also securing and sending the missing talent releases as a guarantee that distribution would be a real possibility.

245. ***Written communications between counsel shines a light on Defendants' coordination.***

246. On November 15, 2021, 9:54 AM, Plaintiff's counsel requested clearly: "Given the passage of time already, and in light of your representation that the talent releases can be obtained "expeditiously," we request that all of the necessary and outstanding talent releases be provided no later than this coming Monday, November 22, 2021."

247. On November 18, 2021 1:46 PM, David Shara answered through his counsel: "**Tigran Tsitoghdzyan reached out to Susan Sarandon** - she is traveling right now but will be in NYC in the next few weeks - **she agreed to meet Tigran for coffee** - **when this meeting occurs, he will ask her to provide a release**[172].  I will have a release ready to be sent to her lawyer or manager once their meeting occurs **and we can confirm that she is willing to participate**[173] - I'll reach out to

---

[172] On July 12, 2022, Plaintiff called Tigran via telephone. Tigran accepted the phone call affirmatively when Plaintiff asked it. That phone call was recorded by Plaintiff. Tigran will make references to this moment that must be taken in context of David and Honey's attorney's reports.

[173] This premise was absurd: she was in material breach of contract, as shown before. Perhaps part of Sarandon's privileges, being above the law, is that she could promise, agree in writing, then undo, then disappear, and then in 2021 she still had the right to agree, again, if she wanted…?

you once the meeting occurs."

248.    On December 7, 2021 8:14 AM, after being urged by Plaintiff's counsel regarding the demands, David and Honey's counsel answered: "[] per my prior email to you, **everything hinges on Tigran Tsitoghdzyan's meeting with Susan Sarandon** which has not occurred yet." One month later there was still no answer, and Plaintiff's counsel insisted on the state of the situation.

## F. 2022

249.    On January 3, 2022 3:00 PM, Plaintiff's counsel insisted on Plaintiff's demands: "my client and I have been far more than accommodating so far. **It has been three months since I sent you a letter requesting the talent releases**. **It was shortly after that when you committed that David Shara would provide the talent releases and stop standing in the way of the film's distribution**, in violation of his obligations under the Producer's Agreement. **What is more, it was over one year ago, in September 2020, when you told Arthur that David [Shara] could secure "all of" the talent releases in an "expeditious manner."** But despite our accommodations – accommodations far beyond what good faith or basic courtesy would call for – we have now entered 2022 […]  As to Ms. Sarandon's talent release,

we also expect to receive that no later than January 24, 2022, but, in a spirit of compromise, we are willing to provide reasonable additional time as necessary to allow for a meeting to be held with Ms. Sarandon (if it has not already taken place)."

250.    On January 18, 2022 11:41 AM the partner's counsel insisted: "Hey Nathan - nothing changed from when we spoke - **Tigran is trying to get a meeting with Susan[174]** - he is self-motivated in his desire to have the film exploited - it only helps him - once that meeting occurs, the rest will fall into place."

251.    On January 30, 2022 5:13 PM, David Shara's counsel indicates what had been known and under discussion since 2019: "Hey Nathan - just to clarify - (…) - if we don't have Susan's release, no distributor will accept [the film] for distribution.  Therefore, **once you send me a copy of the release that she signed**, I'll get the process underway for the rest." It must be noted that, as part of his email, David Shara's counsel shared an email sent to him by Honey Shara in which she noted on January 29, 2022 at 12:15 PM: "I spoke to Tigran, who spoke to Susan.

---

[174] In the phone call recorded on July 12, 2022, Tigran explains that he in fact met Sarandon. Tigran explained Plaintiff that she said that she 'would give him the release if he needed it, but that she would "never give it to Arthur". In fact, on an email Honey Shara sends to her attorney (that her attorney, David Fritz, kindly included in the reply to Plaintiff's counsel) she states: "She didn't want to talk about the movie so he didn't push her." Either Honey Shara here lies to her counsel, or Tigran lied to her, or most probably both Tigran and Honey presented the lie. Tigran recorded explanation on July 12, 2022 about that meeting states something different, as noted before: that she would sign it for him, but not for Plaintiff. Tigran, however, was not part of the Producers Agreement, and recall Tigran's written assurances in 2016 as regards to all the permissions he would give to allow distribution.

She didn't want to talk about the movie so he didn't push her. **Tigran feels quite certain that Susan signed a release for Arthur Balder**."
[175]

252.     This was a falsehood introduced as a hear-say, since Sarandon had never signed a release and sent it to Plaintiff, as it will be proved by the Sarandon's own communications with Plaintiff's counsel a few days later on this chronology. It is impossible to believe, having Sarandon met David Shara's envoy [Tigran] to obtain the release, that Tigran was unable to clarify that fundamental point 'from her' directly. They put out a false assumption, allegedly made by Tigran himself, who in that meeting had had the opportunity to obtain the answer directly from Sarandon, with whom he met as the communication states unambiguously. The phone call recorded on July 12, 2022, between Plaintiff and Tigran, shows that they were lying in these written communications to Plaintiff's counsel. Plaintiff's counsel answers on Feb 4, 2022, at 10:03 AM: "Respectfully, I do not follow your response and it continues to raise serious concerns." The last communication prompts David and Honey's counsel to write to Plaintiff's counsel on February 4, 2022 10:09 AM "Sorry Nathan - **get me the Sarandon release and I'll**

---

[175] Tigran's statements from phone call recorded on July 12, 2022, that she would sign it for him, if Tigran needed, but never to Plaintiff. So it was clear for Tigran that she had never signed it, because if that be the case *she would had said clearly that she had already signed it*. Tigran, apparently, decided not to get the release from her, and instead of saying it clearly, presented a new lie with short legs: that Susan had signed it to Plaintiff, and he was 'quite certain'.

**go from there**."

253.     This tortious and absurd game, that simply revolves around all Defendants denying what they could provide in 24 hours, ends by mid-February 2022, when Plaintiff's counsel contacts directly Sarandon's office to address the situation of her release. Coordinated Defendants' hide-and-go-seek game begins to present cracks and inconsistencies after a phone conversation takes place between Sarandon's office and Plaintiff's counsel. In this conversation Sarandon, through counsel of the Plaintiff, was asked for the talent release again. In spite of all, later on February 23, 2022, SMS messages sent by Sarandon's representative to Plaintiff's counsel stated: Wed, Feb 23, 10:35 AM "hey nathan, it's brain from sarandon's. she had a talk with tigran and **might be willing to consider signing the release over to tigran and David**." Plaintiff's counsel answers: "Thank you very much for the update. Do you or Susan have a preference for the best way to move forward? If not, I would be happy to relay this message to Tigran and David, so that they could reach out to Susan directly. Thank you." The defendant's representative answers: "I think you/arthur need to get **with tigran**[176] and david and figure it out. whenever you all agree, feel free to reach back out. But **we'll only consider if tigran and david approve**." (See Exhibit 5.)

---

[176] Sarandon, in material breach of contract, still imposes a new partner that had renounce to all in writing in 2016, Tigran, something that is a tortious interference with the contract Producers Agreement, as a condition to do what she had agreed on in writing in 2018 as part of the business proposal sent by Plaintiff.

254. The previous messages prove unambiguously and directly from Sarandon the fact that she was in clear and open coordination with David Shara in accomplishing the ruin of the film by not providing the Plaintiff, the person holding the rights to start distribution, the necessary release for its distribution. Not only that, her approval to sign such a permission would 'only' happen 'if' Plaintiff agreed on the terms proposed by his partner, which, as it has been exposed before, were only intended to coerce the Plaintiff and deprive him of his asserted rights as established in the Producers Agreement and extrinsic evidence.

255. Plaintiff's counsel reached out immediately to counsel of Honey and David and counsel of Tigran Tsitoghdzyan, on February 25, 2022 8:02 AM, requesting: "We are writing today about collecting a talent release from Susan Sarandon, who participated in the film. As you know, one of steps is in the lead-up to public distribution of the film is the collection of all outstanding talent releases, so it is important that we obtain Ms. Sarandon's release." David and Honey's counsel answer on March 1, 2022 at 9:04 PM: "**as discussed numerous times with you by phone, Susan wants nothing to do with your client - to say she hates him is an understatement after he abused her by email and by phone**" (See Exhibit 6.) It is false, however, that Plaintiff ever abused Sarandon, much the contrary as previous emails references and exhibits show; it is false also that Sarandon ever had any phone conversation with Plaintiff

[she lied to this attorney and to the others if she said that she ever had any phone conversation with Plaintiff], but the testimony is important because it gives proof, from someone who really knows her and deals with her directly, that Sarandon's motivation is 'hate', and her 'hate' against the Plaintiff is in unambiguous relationship with the email discussed and showed in its entirety before from 2019, an email that informs her that she is intending to breach the contract. He then goes on to add: "We need to discuss logistics before we obtain her release - I suggest that we do a call with Andrew joining us." A meeting took place on which it allegedly was agreed that Sarandon's and all other missing talent releases would be obtained. The conversations show that Tigran apparently commits to obtain the talent release from Sarandon (which is what he acknowledges he could have obtained right in the meeting, according to Tigran's own testimony as recorded). After that conversation, counsel of David and Honey disappeared, never answering again the phone calls and emails made by Plaintiff's counsel, and Sarandon's release was never sent to Plaintiff nor to his counsel to this date. The last communication in writing is from April 5th, 2022.

256.    This set of emails show the intentions of the Defendants being fulfilled with Sarandon's active participation, even when other persons, who are perfectly acquainted with her plans and motivations, committed to obtain that release. Sarandon's pattern of behaviour, accomplishing her

vindictive designs to cause maximum harm to the Plaintiff by interfering in others business relations and contracts, is, however, recklessly malicious, ill-intentioned in nature, manipulative beyond doubt, and tortious. She is perfectly aware of the injury she is causing to the Plaintiff, and still her behavior continues in the same direction.

257. The communications exchanged in 2019, 2020, 2021 and 2022, show that Sarandon interfered tortiously between the partners to the Producers Agreement, doing all in her power to interfere with that contract in order to cause professional and financial injury to the Plaintiff by denying to Plaintiff the tales release she had promised in writing accepting the memo, by harassing with meritless litigation threats David Shara, by coordinating with Tigran, which accrues since the moment the film could and had to be starting closing deals related to commercial distribution, and of 2019. The events also show how the power of Sarandon cowered and manipulated David Shara and other third parties involved in the film, in order to curtail all possibilities of success of the film in 2019, when David and Honey and Tigran did all in their power to stop paying invoices to 'cancel' that way the performance in the festival circuit, and that had no other intention than to injure professionally the Plaintiff, who would have been deprived of dozens of awards bestowed upon him and his film. Sarandon knew that, having given promises and representations and after having agreed in writing to clear terms, she

could not prohibit directly the usage of her image, but used all in her power to limit in 2019 the success of the film by making others do what she could not do in a manner that would have been too obvious an act in bad faith and a breach of contract that would have give the Plaintiff a direct cause of action at that moment (2019). She chose instead to use her influence on others to injure the Plaintiff.

258.    David and Honey Shara affirm that they can obtain all missing talent releases expeditiously in 2020, but never asked for them, which is in itself an act in bad faith[177]. Finally in 2022 she indicates that she would only agree to sign "if" Plaintiff's partner, David, and even if Tigran, who is not a partner to the contract, agree on terms that are only related to the partner's breach of contract, i.e., accepting such terms would mean successfully coercing the Plaintiff into another form of contract, which is what she also tried to accomplish as a vindictive scheme to further injury the Plaintiff, depriving him of his rights under the Producers Agreement, or, in the meantime, depriving the film of any distribution, an act of spite that had caused irreparable damages.

259.    ***She imposes a condition to give her release, in spite of her breach of contract and promissory estoppel*** and the damages already caused by her actions when she states it in writing in 2020***, and that***

---

[177] § 1-304. Obligation of Good Faith.
*"Every contract or duty within the Uniform Commercial Code imposes an obligation of good faith in its performance and enforcement."*

***condition is in itself a undeniable proof of tortious interference with contract in plain sight***: She would only agree to sign, she writes to Plaintiff's counsel, then, 1) ***if*** the partner succeeded in coercing the Plaintiff into accepting, at his disadvantage, a new agreement, ***and*** 2) ***if*** a third party to the Producers Agreement, Tigran, says yes to it. Tigran is not party to the Producers Agreement, and that according to his own written declarations of 2016.[178]

260.    In April 2022 Plaintiff was diagnosed with Mayor Depression and Anxiety. The worsening situation created by the last years, progressively gave rise to many forms of suffering, translated in insomnia, difficulty for concentration, feelings of sadness, recurrent thoughts of death, and finally depression became so prevalent and intense that at this point the medical diagnosis became firm. For doctors it was clear the reason was the chain of professional challenges, toxic working environment, humiliations and the pressure put on Plaintiff on every level, suffered over the las five years, and especially its results from 2019 onwards.

261.    Plaintiff made last attempts to contact Defendants to solve the situation in July 2022.

---

[178] Recall 2016, written statements by Tigran: October 18, 2016, Tigran to Plaintiff, CCed David: "believe me, I'm honest that not even for a second I had thoughts that I want a dollar for it or any credit" "I refuse any kind of rewarding for this movie, I'm a subject here and don't want any credit, percentage or other rewarding forms for it. David is the one and only producer" "I'm out of this and David will decide if this movie will ever see the light or not. I trust all my rights as the subject of the film to him and only!" "I cc this letter to David, because all this is between 3 of us."

262.    On July 12, 2022, Plaintiff called David Shara to try to solve the situation. He left a message to him. There was no call back. On July 24, 2022, he sent an email to David Shara expressing the same intention to try to save the situation. David Shara answered: "My attorneys will be in touch with you next week." No attorneys of David and Honey Shara appeared.

263.    On July 12, 2022, Plaintiff called Tigran, and recoded the phone call. Tigran acknowledged that he had met Sarandon sometime before (recall attorneys' exchange of emails). He said that Sarandon would sign the release for him, but that she would never do it for Plaintiff (this testimony shows her breach of contract was not due to negligence, but a purposed act to harm Plaintiff, and she had the intention to continue). According to this conversation, Tigran then *did not request* the talent release to Sarandon, and that declaration is in conflict with what Honey and David's attorney stated. In this phone conversation Plaintiff requested to Tigran to sign and send the talent releases missing for him, his artworks and his son, a minor. Tigran stated that David had not requested it from him, ever. "I don't owe him [David Shara] anything, but it is his money he put in this movie, and we've been working for many years, we still work together, and I will do what David will tells me". Plaintiff reminded Tigran of his promises to him, but Tigran insisted that he would do it if David "tells me to send it I will do it". Tigran asked,

alarmed: "you want me to do something in David's back?" Plaintiff anwers: "No." Plaintiff told him to "send the talent releases via email CC copy to him [Plaintiff] to Honey Shara, and to David Shara". Then Tigran insisted "I will call David, I will call him right now and if tells me I will send it". Tigran acknowledged that Plaintiff had requested them many times in emails. Some other relevant parts of the conversation will be presented at trial. Among other things, Plaintiff reminds Tigran that he obtained a copy of the film unlawfully in July 2019. At this Tigran expresses scornful doubt. Plaintiff insisted: "you don't have any right to have a copy" Tigran replied scornfully: "I don't have a right to have a copy?" "of my movie?" Obviously he things it is his property.

264. **Tigran has been catering the Film to selected audiences with screenings at his Tigran Art Studio museum in Armenia, and his studio in New York, since he unlawfully obtained the final copy in 2019.**

265. No answer and no email with any talent releases signed came from Tigran. [Plaintiff requested them, for a last time, via email, CCing Hey Shara, to Tigran.] Plaintiff told Tigran that he will take legal action including him in the lawsuit because there is no other remedy. Tigran says: "I can also do things, we all can do things" Plaintiff answered: "I am not surprised, that's what you did in 2016 when I just requested a contract, to suggest a fight."

266.    As regard to Sarandon: Tigran states in the phone call that Susan requested David to pay her attorneys to represent her in the lawsuit that at that time was already filed in New York Supreme Court. Tigran acknowledged that he requested it to Honey Shara, and that he did it by email, but stops short of giving more details.

267.    The relationship between the Defendants is so clearly coordinated, that Sarandon requests directly to Tigran that David and Honey to pay her attorneys' fees.

268.    On July 12, 2022, Plaintiff called Honey Shara, who answered the phone call. Plaintiff reminded her of the obligation to distribute the film, Honey Shara affirmed that she had invested a lot of money in it, that she would send her attorneys. No attorneys of Honey Shara appeared. On July 26, 2022, Plaintiff send a last reminder to Honey Shara to send the talent releases she had stated she could get since 2020. Plaintiff wrote: "Our last conversation consisted on a phone call in which I reminded you of the obligation to distribute this film. In that conversation you incoherently mentioned the word 'money'. And you, Honey Shara: you, duly represented by your lawyer, made it very clear in 2020, that the film would not be distributed unless I was duly coerced out of my rights under the Producers Agreement. If money were so important for you, and if you had had any good faith, you would have, first of all, distributed the film immediately according to plan, and would have

respected the contract. You did not proceed to distribution in 2020 because you decided that harming me financially and professionally was far more important than getting back any money. This was done out of malice, and not out of negligence: because not distributing was also against your interests." No answer came from Honey Shara, no attorneys showed up.

269. Plaintiff added parties to the Complaint against Sarandon in his First Amended Complaint filed with this court.

270. Finally, as it could not be otherwise since David and Honey Shara were paying Sarandon's attorneys, after much delay in pretending service of the complaint to David and Honey was impossible, Sarandon's attorneys also represent here all other Defendants in this Court. Davidand Honey Shara pays them, either directly or through payments first sent to Sarandon. It is not clear if David and Honey were paying Sarandon's attorneys directly before they stated that they were being representing also them, or if David and Honey Shara send the money as part of an agreement that is clearly related to the actions that have taken place against Plaintiff for the last three years. In any case, their agreement is *corrupt* because it does not correspond to doing the right thing, which is distributing the film, but do all in Honey and David Shara's capacity to thwart its distribution and to harm Plaintiff and the product—the Film.

271.    It is clear that Sarandon's wrongful actions are rewarded with paying her attorneys once Plaintiff must assert his rights and defend his work. That is, however, what she likes most, to have privilege above others and to use it as an advantage. This further explains her statement sent to Plaintiff's attorneys, that she would **only** sign a talent release only **if** Tigran and David agree. To prove the setting of conspiracy now we present also Tigran's testimony that she gets financial advantages for doing all she had done.

272.    The reason why Sarandon can chose to go against her own interests as per contract is obvious: given the unbalance between her own prestige and career, her own opportunities and funds, and those of the Plaintiff, the filmmaker, she is perfectly conscious and aware that, in spite of the loss for herself ruining the distribution, that loss is nothing in comparison to the injury she caused to a filmmaker, the Plaintiff, with few credits, for whom this film represented a great opportunity that he had nailed to perfection, apparently to her dismay, as the list of awards shows unequivocally. **It is a spiteful, all-out-destructive, entirely vindictive, malicious in nature collection of acts intended to cause injury to the Plaintiff, depriving him of his well-deserved merits, and this liability should be multiplied as many times as the court deem possible precisely when we examine the merits of the film internationally acclaimed of the producer and filmmaker,**

**the Plaintiff, and we see the immense privilege that the defendant is wielding against the basic, fundamental, constitutional rights of the Plaintiff to his opinions, because it is thanks to the Plaintiff's vision and devotion, that American Mirror is a remarkable achievement**

273. It must be noted that "American Mirror: Intimations of Immortality" received an astounding reception on the film festival circuit, winning awards for Best Feature Film, Best Documentary Film, Best Experimental Film, Grand Prix, and Best Film of Festival at international film festivals including the UK Film Festival (UK), the Jaipur International Film Festival (India), the Arlington Intl Film Festival, (US), the 53rd Worldfest Houston (US), the Ferrara Film Festival (Italy), the Prvi Kadar International Film Festival (Boznia-Herzegovina), and the Near Nazareth Film Festival (Israel). In addition, American Mirror won Best Director at Ierapetra Documentary Film Festival in Greece, and Peak City International Film Festival in the US); it won Best Cinematography at Sydney Independent Film Festival in Australia, DOC Los Angeles Parajanov-Vartanov Institute in the US, and Jaipur International Film Festival in India; it won Best Original Soundtrack at Doc Los Angeles; and it was named a finalist for Best Original Soundtrack at the International Sound & Film Music of Croatia and the Tenerife Film Music Festival (FIMUCITE) in Spain. At the

Jaipur International Film Festival, American Mirror was honored with five awards (Best Documentary Feature, Best Cinematography, Best Editing, Best Sound, and the Best Released Film), making it the most awarded film in the history of the festival. The Film also became the most awarded film in the history of DOC Los Angeles, where it won for Best Original Film, Best Original Soundtrack, and Best Cinematography. In addition, the film won the prestigious Parajanov-Vartanov Prize, a distinction previously given to Martin Scorsese and Francis Ford Coppola.

274.    As the below sampling shows, critics from around the world have also given glowing praise to Mr. Balder and American Mirror: "American Mirror is "strikingly original" and "there's a lingering, finely-drawn intelligence to Arthur Balder's hallucinogenic compilation, one which welcomes many readings no matter how you look at it" [Film Inquiry, Australia] "Director Arthur Balder takes us on a visually spectacular journey." American Mirror is "a revelation to Balder's craft." [The Armenian Mirror-Spectator, US] "Arthur Balder is an artist at the same time creative and meticulous." [Chiara Carna, Fabrique Du Cinema Nr 24, Italy] American Mirror is a "very graceful and elegant work." [The Digital Journal, US] American Mirror is a "dynamic, visually sumptuous, cleverly directed film that leaves you breathless and enthralled long after you watch it." [Dragan Elcic, a film critic, a film professor and the Dean of Belgrade Academy of Arts in Serbia, and a highly regarded Serbian film

director who has directed films recognized at the Oscars.] Christos Solomos [Ierapetra Film Festival, Greece]: the Film "is the epitome of contemporary filmic challenges", "it blends beautifully and intelligibly the two main cinematic genres and at the same time distances its unique own elements from both — refusing to attach any mainstream label", "A brilliant casting, as Susan Sarandon, the most humanized character of the film, functions perfectly as the mirror-reflection of the talented painter Tigran Tsitogdzyan who plays himself during the whole film in a state between pleasant insecurity and innate narcissism, while the top-models Florence Faivre and Hillary Rhoda mark two alluring performances as symbols of eternal beauty and desire." "A one of a kind visual innovation which worthily makes of the director a front runner of the upcoming international film festivals and one of the most promising contemporary American filmmakers. "

275.    American Mirror also received praise from film critic Meriam Azizi in the Le Quotidienne, the official diary of the Oscar-qualifying Carthage Film Festival in Tunisia. Ms. Azizi wrote: "**American Mirror joins the pantheon of such films as David Lynch's, Stanley Kubrick's, but also of writers as Marcel Proust in his the search of lost time**." "Of all the documentaries [at the Carthage Film Festival], Arthur Balder's is the one that intrigues the most." "**It is a masterpiece.**"

276. Sarandon controlled Defendants out of court, and Sarandon controls them in court. She got from them retaliation, she manifested in 2022 that she 'might sign only if David and Tigran agree" [Tigran, recall his assurances from 2016, that is an imposition to the business relationship governed by contract and extrinsic evidence between David Shara and Plaintiff and Tigran, a tortious interference with contract] then once Plaintiff filed a lawsuit in NY Supreme Court, she requested her attorneys to be paid by David and Honey Shara [because she had been conspiring with them to get Plaintiff strong-armed until he would accept a 'new contract' with no guarantees that that new contract would have taken distribution to fruition], and then Tigran, David and Honey Shara ended up in this court in Sarandon's attorneys hands [David, Honey and Tigran's attorneys hitherto representing them have vanished in hot air], something that further guarantees that David and Honey will do whatever she needs to keep her safe in front of Plaintiff's claims against her also in Court, because they have been conspiring since the beginning in a corrupt agreement to harm Plaintiff.

277. There is not only a clear setting that establishes the plausibility of conspiracy, there is proof of conspiracy in testimonies, motivations, interrelations exposed by communications among attorneys and in Tigran's recorded testimony, whose contraptions are seen in movement with evidence presented, and how they are coordinated with one goal: to

harm the Plaintiff and to destroy the Film [both things fully accomplished at that].

278.    It was their notion, however, that Plaintiff would never be able to assert his rights in a Court of law because of the financial duress they have inflicted in him depriving him of the fruits of distribution at a moment, the agreed on one, 2020 onwards, where a financial crisis hit entertainment industry harder than many others, because it was paralysed. Defendants were pretty sure that attorneys working pro bono for Plaintiff would be reluctant filing a lawsuit against a celebrity, as much corrupt as she looked. They thought that, as long as Sarandon kept that position intimidating pro bono attorneys, they could maintain carefree the same course of action, and so they continued weaponising time against Plaintiff until his final breaking. This act of brinkmanship still they dared: to simply unhonour their own statements made to attorneys of Plaintiff once they had contacted Sarandon and obtained evidence and open admission that she was interfering with the contract tortiously, and that she intended to continue doing so [Sarandon: "might sign the release only if David and Tigran agree"].

279.    Sarandon, after that, and after Tigran and David and Honey's attorneys agreed on getting all the releases to Plaintiff's attorneys, then she decided that the silent treatment was the right formula to show her power to Plaintiff's attorneys, and the others felt comfortable under her

aegis, and they all disappeared again, but for the last time: at that moment Plaintiff, well advised, filed a lawsuit at New Supreme Court against Sarandon. Plaintiff contacted David, Honey and Tigran in July 2022 to find a solution as regards to their own actions, they confirmed their positions as described, and they were joined to this Complaint in due time, at the beginning of August.

280. Sarandon's endeavours behind Tigran only show her insatiable desire to bask in public ardor and adoration for other reasons than being part of a great Film, and beyond the advantages and enrichment obtained as a consequence of the Film itself, against her promises and written assurances and contractual assent in 2018.

281. The Court, in assessing the situation, will draw conclusions also from the fact that Plaintiff did all in his power, with and without counsel, to find an out-of-court solution with all Defendants which avoided the filing of this Complaint, and that Defendants spurned opportunities galore to avoid the continuation of their concerted, malicious actions. Wherefore this lawsuit is not frivolous, it is necessary, and filed as a latest recourse. As a consequence of these actions and occurrences as exposed before, Plaintiff suffers:

282.    **CAUSED BY DEFENDANT SARANDON.**

283.    Susan Sarandon chooses to participate in the Film; chooses dates for her participation; represents that she "wants nothing in exchange" [Tigran gives testimony of this representations as presented before via emails, and she makes this representations to Tigran, Plaintiff, David Shara, and to Tigran, Plaintiff and Plaintiff's wife in person]; she has direct access to the sequence, she approves of it not objecting anything but a mild petition, if it is possible to retouch her wrinkles under the eyes; she approves of the final cut; she receives a memo of terms of collaboration; she accepts them in writing, she comments on steps leading to commercial distribution, she requests specific changes to the draft-printed by Tigran, framed, that are part of the agreement; she discuss for months if to participate at Yerevan Intl Film Festival, Armenia, attending it with Tigran, depending in her shooting dates; she never objects anything, she knows the film that is going to be presented there, its content, form, presence, she knows the film is going to be distributed; she accept the terms offer, including a perfecta of profits. This facts are in writing, not verbal representations. Following her

---

[179] The briefings leading to each Defendant's injuring actions to Plaintiff cannot be taken as definitive. Plaintiff presents them as brief descriptions, but the Injuries' allegations are based the facts alleged in the Chronology. The absence of some of them in this section, for the sake of brevity, does not precludes from taking into consideration every single allegation.

representations, and in expectation of her fulfilling them, Plaintiff accepts to dedicate more time and resources to this project. David Shara, as part of those 2018 written conversations, which do not object or deny, but that affirm unambiguously all points, explains to Sarandon that he wants to "'make money" for her, and to "maximize exposure [to boost Tigran's sales and fame] and revenue [to recoup his investment and to make money for Susan]", and Plaintiff is owner of 20% of this profits according to the Producers Agreement. Plaintiff, and David, have advanced under 2016, 2017 Sarandon's unambiguous representations, and and now these representations change enriching Sarandon in ways described, and she, obviously in self-interest, welcomes and accepts the change. David Shara is explicit, however, that the percentage offered is in exchange of Sarandon's "participation and guidance".

284.    Sarandon not only does not guide the film anywhere once she gets the framed draft-prints, valued according to David and Tigran at 80,000 USD, but she conspicuously disappears and leaves the film in the lurch at the delicate moment when, after three years of hardships, it has to be premiered. She conspicuously stops answering emails. The film premieres, becomes most awarded film, and wins the Parajanov-Vartanov Price for Sarandon. Sarandon does not welcome it privately neither publicly. Recall the terms on which the 2018 contract is based includes a PR clause. The PR clause is flexible as regards to in-person participation

of Sarandon in PR events, respecting her other 'important' compromises, however, it is within the bounds of logical expectancy, that Sarandon would welcome publicly an important award such as the one mentioned before in connection with a film that was only enticing her out of a four hour collaboration in 2016. Sarandon tramples these notions based on common sense and fair standards in the film industry, and within the bounds of what was expectable under the terms of the contractual terms offered and accepted in 2018, and she gives the abusive talent treatment to the film and to Plaintiff, as its maker and producer. Sarandon betrayed what a few months had assured and disappear.

285.    The film continues ahead without any help expectable under the PR term of the proposal, and continues winning, and even reaping prestige for Sarandon and for Tigran. Critics praise Sarandon in Italy because of her presence, more awards are won in a film where she is unavoidably part of, and hat only enriches her career, as much as her career might be long enough as to allow her, out of arrogance, to pretend the Film does not exist. She is being enriched by it following her participation and the terms accepted.

286.    This situation created by Sarandon's disregards of the terms and of her representations for years persists, and Plaintiff and David decide to find out what was happening with Sarandon, because she simply did not answer emails related to the film. Plaintiff felt that her

attitude was offensive and incorrect, but also that she was violating one of the terms of the agreement.

287.   When Plaintiff raises the question to Sarandon, and reminds her of how well she had been treated, and that the film was winning awards also for her, and that it was not within expectable moral and industry standards not to answer to such news as the Parajanov Vartanov Award, Sarandon sends a number an email that clearly threats with a breach of contract. She informed that does not want to be associated with the film. That ambiguous manifestation, which in itself did not represent anything, Plaintiff thought, as producer, deserved a warning as regards to her previous steps, representations and standing compromises as described and proven heretofore: Plaintiff reminds her of what had happened previously, informed her of her copyright infringement as related to a character copied from his script '16 Hours' an pasted into 'Viper Club' film; informed her of her wrong idea that he was seeking publicity, because obviously and fortunately the quality of his work did not seem to need it; also informed her that she was enriching herself thanks to her participation; informed her that they had not request any PR, but a fair attitude from her as regards to an important award aforementioned won for her thanks to years of work making this film; and finally asked her what did she expect form her participation in the film if not all these things enumerated and positive to her, in her own terms

accepted, and if not being painted by Tigran. [Copyright Register Number PAu 3-939-175 and PAu-3-861-592]

288.    Sarandon makes an attempt of renegotiation threatening with breach of contract, stating that if the drafts-prints accepted oblige her to do promo, she gladly would give them back. This option is rejected by Plaintiff without further ado, because there was already an agreement in place, and it is also against common sense and accepted contractual doctrine that a first party is not able to renegotiate terms once a second party, under the representations and assurances made by the first party, has already set in movement all the actions implied and specified by the contract agreed upon by the first party.[180]

289.    Sarandon did not answer Plaintiff's clear reminder of her obligations and of the legal situation situation. Sarandon did not send any notification explicitly doing anything that, at that moment, would Plaintiff think that she was, or she had any intention to, breaching the contract, because she knew that would have prompted immediately legal action against her. She did not prohibit use of her image, she did not objected to the screenings, she did not start any action that would have prompted Plaintiff's claim of breach. The private conversation should have remained as that what had been, an arrogant collection of

---

[180] Additionally, United States Supreme Court has defined "an agreement 'implied in fact'" as "founded upon a meeting of minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding." Baltimore & Ohio R. Co. v. United States, 261 U.S. 592 (1923)

statements by Sarandon, some of them against contractual obligations standing, and a clear reminder by Plaintiff, the producer and director of the film, of her previous agreements, plus mutual opinions to which both parts had *equally* right to have.

290. Sarandon, however, disseminates those emails to Tigran and David Shara, and threats with litigation David Shara, as much as she knows that her threats are meritless and unlawful because she is under an agreement accepted by her, and because she knows cancelling unilaterally the usage of her image in the film would prompt immediately a legal claim by Plaintiff because she had been making affirmative representations since 2016, making undeniable assurances for all to believe her representations as regards to the permit to use her image in the film, and her approval of it, were positive and clear.

291. Sarandon interferes tortiously with the contract Producers Agreement from this moment on, simply because she knows she cannot directly cancel her own obligations without receiving a legal claim from Plaintiff. She interferes out of spite and malice, and against her own interest. The evidence submitted shows clear change of mid of David as a direct consequence of Plaintiff's defence of the project in the face of Sarandon's absurd threat to breach the contractual agreement, something that is absolutely legitimate in Plaintiff's position. David Shara, prone to do anything for rich and wealthy clients, feels stressed and harassed with

the possibility of being sued by Sarandon, a possibility that is unreal, but rapidly is also persuaded by Tigran, who also claims to have been treated ver bad simply because Plaintiff made him clear that the painting had taken an undue long period of time to be finished, and at that it was of lower quality, some parts unfinished.

292. All plans continue ahead in 2019 as budgeted and approved, Plaintiff's company work at the helm of distribution and the festival circuit cannot be denied yields excellent results, Sarandon dos not prohibit any screening or usage of image, thus not breaching her obligations in that sense, but clearly she keeps denying basic PR to the Film, pretending it does not exist, when in fact one of the terms agreed on was to execute minimum PR. Recall David Shara makes it clear "participation *and* guidance". She not only never guided the film, she pretended it did not exist.

293. But it exists, and it enriched her. It enriched her materially with an upfront compensation that was subject to all terms offered, not only those she wanted to choose at a later date capriciously and in total disregard of logical contractual doctrine and common sense; it enriched with close to a hundred film festival participations worldwide, in enriched her in the eyes of the audience, enhancing her positively in an very wide festival circuit, in enriched her with more critics awareness and positive at that, many fans requested when the film was to be released and found

it extremely interesting, and many independently appointed juries praised the film, and she was part of it because she willed it, not because anybody obliged her. Moreover, Sarandon's trajectory was being enriched with new nominations and even wins:

294.    Among the 88 nominations and awards listed by IMDb under her name, explicitly thanks to the Film [listed as "American Mirror: Intimations of Immortality"] Sarandon appears as winner of the Golden Film Award 2019 by the US Hollywood International Film Festival, as winner of the Jury Award by the European Cinematography Awards 2019, and, more importantly winner of the Parajanov Vartanov Award 2018, and nominated for the Monica Vitti Award by the Blow-up Chicago International Arthouse Film Fest, 2019. The question here is not if she needs or not, the question is if the film enrich her or not. It does, materially, in terms of positive publicity, positive appreciation of her work, and even yields some two important win [Parajanov-Vartanov Prize] and nomination [Monica Vitti Award nomination].

295.    Sarandon was in breach of contract as regards to the PR stipulation of the agreement. Even a mild understanding of that term shows that, at a minimum, Sarandon ought to be have been thankful publicly [and of course privately] for that award: instead **she choose to be rude** and to give silent treatment to the Production team, that had made the film possible. Something that was shockingly unprofessional

coming from someone who owes so much to many other professional thanks to whose work she has been able to reach her actual status[181], including Plaintiff and his team. She was also not honouring the "**and guidance**" condition explicitly stated by David Shara when he elaborates on the terms of the proposal she accept as a reply. Plaintiff relied on those representations, and there were being not honoured by Sarandon, while she had enriched herself in all ways described.

296. Sarandon interferes with other business expectancies of Plaintiff, as described before in detail, to gain retaliation against Plaintiff, by convincing David to cancel two other projects whose terms were already accepted by David and Plaintiff. Sarandon interferes with the Producers Agreement in multiple manners over the years: first she request the standing agreements collateral of course of performance to be shattered [because she cannot cancel them without having a legal problem herself at that time], requesting to David to cancel the festival circuit. David, a very rich man who clearly "does not care about losing 300,000 USD invested in the film" [his own words not extracted out of context, but from this precise chronological context and set of facts] willingly kowtows to the super-star's wrongful petitions to harm Plaintiff to ingratiate himself with her, and to avoid her ire [baseless, harassing

---

[181] Sarandon is a devoted practitioner of the film industry dreaded "double standards". She despises the production team that makes the film in a conspicuous and pathetic manner by pretending the Parajanov-Vartanov Price does not exist, and with it since October 2018 the entire film she had agreed to 'guide'; actually to guide into ruin.

litigations threats Sarandon knew had no merit]. They try to cancel the film festival circuit forcefully, submitting Plaintiff and his business to financial duress by simply not paying pending invoices not under vague excuses, but explicitly stating [Honey Shara requests it] that Plaintiff should present an apology to Sarandon and Tigran if he wanted invoices paid, when in fact Plaintiff had nothing to apologise to any of them, and and when in fact Tigran, as proven before, owed apologies to Plaintiff since 2016, and also her son.

297. The film festival circuit distribution of Film continues, Sarandon does not contradict her representations as regards to the terms accepted, and does not instate any action that clearly breaks the terms accepted, instead she expects others to do the dirty job of harming the Plaintiff so that she can keep herself 'apparently' apart from those actions.

298. David and Honey Shara were, however, doing wrong things, and finally by end of October 2019 they decided they had to honor the standing obligations and distribution plans. The Film itself, with its extraordinary film festival run, defeated them. The Film's run was, in David Shara's words, 'humiliating Sarandon', because it was an overwhelming answer to her malicious comment sent to Plaintiff: "I don't have anything positive to say about your film" and "I understand you need as much publicity as possible". Both notions false in light of the

events[182].

299.    David Shara acknowledges his wrongs and promises to obtain the missing talent releases, to pay the pending invoices, all of them, including Tigran, her son, and Sarandon, and also those of people he invited and he assured since the beginning he would obtain, and the commercial distribution plan as planned and agreed on.

300.    David Shara did not obtained any of them, although at a later date he and Honey Shara stated clearly that they "could obtain them expeditiously". David Shara finally chooses to do the wring thing, which is betray his contractual obligations and course of performance to please Sarandon's need of vengeance to harm Plaintiff. Sarandon did not provide her talent release once requested to her, and thus from that moment she is immaterial breach of contract.

───────────────

[182] **One thing is that someone *does not like a film*, which can be subjectively understood and accepted as that what it is, a mere opinion, and the other that someone *does not have anything positive to say about a film,* something that can be denied objectively by reals facts**. Since it is materially *false*, in this context and sent to the person that made the film, it stops being an opinion and becomes an offence, because the film objectively *benefits* Sarandon in all aspects expectable, and she even enriches materially herself out of it. If the comment is *materially false, and made to harm,* if expressed by her in her circumstances related to the film, then it is not opinion, but slander. The first one was possible as an opinion, the second one, what Sarandon stated, was clearly offensive in light of the awards already won for her thanks to the film and the project, of her other material enrichments, and also in light of the critical acclaim that she, Sarandon, was also receiving thanks to the film [Italy: "Sarandon looks at her best in American Mirror", for instance, a journalist wrote at important magazine, and she had been also notified all those details.] That's why Plaintiff rejected Sarandon's statement, because it was sent in bad faith with offensive intentions in light of the facts.

What we cannot do is accept slanderous offences blindly simply because the one who sends them has an immense prestige. On the contrary, the willing slanderous offence of such a personality will cause much more harm that the same statement sent by someone who is not acting from such a vantage point.

The slanderous comment was further humiliated not by Plaintiff's insults of any sort, but by the Film's performance in the festival circuit. That, and not any communication by Plaintiff justly motivated by hers, is what arouse the ire of Sarandon, among other things already explained, to thwart the festival circuit and specially an Oscar qualifying theatrical release at all cost.

301.    Sarandon also gives more proof of interference with the Producers Agreement. After years of damages caused by her breach of contract thwarting the distribution to satisfy vengeful intentions, she still, in writing, in 2022, states that she "might sign the release *only if* David and Tigran agree". She knows Tigran is not part of that contract. She knows Tigran had signed off in writing all his rights in 2016 because he wanted the publicity generated by the film and the public recognition and appreciation of his art and persona, she knows Tigran threats distribution by wrong withholding the signature he is obliged to, and those permits related to his son, a minor, resent in the film because he requested it willingly, yet she still wants to interfere with the contract by obliging Plaintiff to accept new terms and even new partners to it that had unambiguously accepted terms to it in 2016 [Tigran]. A recorded testimony by Tigran in June 2022, also states that "she said would never sign the talent release to Arthur", giving testimony of the motivation and her *conscious* breach of contract, and even attorneys of David Shara, more than familiar with the situation since 2020, affirm in writing in 2022, that **"to say that Sarandon hates your client is an understatement"**. Sarandon's motivation cause to cause harms is '**hatred**' against Plaintiff because he is the only one that does not kowtow and grovel whenever she decided to mistreat him and the film in manners that are unjust, against the dignity of a professional dedication of years,

and against some of the terms accepted in writing by her, and because he stood on principle.

302. In that same recorded phone conversation, Tigran gives testimony of the level of conspiracy and corrupt agreement behind doors: Sarandon requests her attorneys to be paid by David and Honey. The **level of corrupt agreement is such**, and the intent to destroy the film and to harm the Plaintiff so clear a corrupt agreement among all Defendants, **that its terms transpire, not only in Sarandon's statement that she "might sign if David and Tigran agree"**, an outrageous imposition to the Producers Agreement in light of Tigran's own signed off conditions since 2016, **but also in the fact that David and Honey Shara will pay anything Sarandon's needs to fend off Plaintiff's legal attempts to claim the harm caused by her wrongful acts—because they have been acted in a coordinated manner, they have conspired.**

303. *THEREFORE Sarandon injures Plaintiff as a consequence of her: breach of contract (since 2019), unjust enrichment (since 2016), tortious interference with contract (since 2019), tortious interference with business expectations (since 2019), promissory estoppel (since 2016), copyright infringement (since 2018's public release of 'Viper Club'), civil conspiracy (since 2019). Sarandon acts out of malice, and punitive damages are sought.*

304. **CAUSED BY DEFENDANT DAVID SHARA**

305. Allegations and dates of own Shara own written agreements show that Shara is in breach of contract.

306. Suspicious about delays in signing a contract he expected to be collecting the terms and stipulations customary to the film industry, in September 2016, Plaintiff starts the conversation sending proposals contract to Tigran, who had been on many occasions an intermediary of David. Tigran reacts with surprising hostility. Then David Shara continues the game. Their hostility puts Plaintiff under duress: David assures Plaintiff if he does not accept new terms, different from those assumed before, he would 'put the project in the garbage'[183]. Tigran in writing threats Plaintiff with starting a physical fight, reminding him he knows Plaintiff's home location. Tigran insults Plaintiff, and denigrates Plaintiff work that he previously praised: Plaintiff's work was like 'sailing at sea without GPS'[184], and compared Plaintiff's request of a contract to a 'freaking lawyer', and to 'being asked for money by a hot girl in the midst of sex'.[185]

---

[183] Recall, Sarandon's footage already exist, and both David and Tigran had congratulated over and over that footage and all other sequences shot hitherto.

[184] Tigran, an artist of Facebook and not of art museums, does not know, in the era of internet, that it is possible to sail at sea guided by the stars.

[185] This is the level of written insults Plaintiff had to suffer, and compare it to his reasoned emails, as sent to everybody during seven years. It is not comparable. These two individuals, who insult Plaintiff this way in 2016 because he requests a contract and because they did not want any to exist, are the same ones who consider Plaintiff's email to Sarandon 'repugnant stuff' [David Shara, May 2019]. It seems that, when the truly repugnant stuff is sent to Plaintiff by Tigran to help David obtain a 'contract' under coercion, then no apologies are necessary, and all is perfectly fine.

307. Thus the circumstances under which the Producers Agreement is signed are clearly coercive, Plaintiff is under duress, it is the result of a 24 hour ultimatum that deprives Plaintiff of regular peace of mind and pacific reasoning. This ultimatum, signed by David and Tigran, leaves no doubt as to Tigran[186] being not privy to terms agreed on, but to his involvement in coercing Plaintiff, and his duress upon Plaintiff, suggesting even physical confrontation as part of the situation. That explains the Producers Agreement suspiciously short length, since its length is an imposition of the bargaining party coercing, its ambiguity and that is necessarily partially integrated. Extrinsic evidence that does not contradict but that complement its contents leaves no doubt: Plaintiff was burdened in 2016 with setting up distribution by David Shara. Plaintiff states that he prefers an upfront compensation for his work, yet David denies it, makes reckless representations of value about Tigran's paintings to convince Plaintiff, and he states that if Plaintiff wants any money he must "finish the film and working distributing it." That Plaintiff would set up distribution is clear from the beginning in 'orders' by David. That the film would be made for distribution is a representation

---

[186] Recall: Tigran impugned Plaintiff for paying Donald Kuspit ["that's how much he [Donald] respects you"], the most important living art critic in the world, for participating in the film… in contrast with his 'friend' Sarandon who did it 'for free' [Tigran's own testimony, as promised by Sarandon in 2016]. In the end it was not for free at all. Donald Kuspit signed the talent release for Plaintiff as soon as Plaintiff requested it, and even Donald sent a second one signed to David Shara's offices, Sarandon simply got new terms and then plainly insulted Plaintiff and his team with abusive silent treatment for the Parajanov Vartanov Award, and afterwards breached the contract by not providing what was part of the agreement: do not stand of the way of distribution. She thwarted it in all ways possible.

that is there since the beginning: Plaintiff accept continuation in his involvement and work in the film because of the representations of all Defendants, and in this case the representations by David Shara do not leave any doubt. Otherwise, Plaintiff would have never accepted be hooked indefinitely in a film that consumed so much time of his life without any guarantees that it was going to be distributed. These terms are collateral, complement and do not contradict what is scarce, partially integrated and ambiguous in the Producers Agreement: and that happens because Plaintiff is under coercion, and duress, and because even the length of the Proiducers Agreement is an imposition of the coercing party, David Shara makes it clear: "a one or two pages agreement". This has been explained before in detail.

308. Agreements posterior, budgets discussed and approved and invoices paid in 2017, 2018, 2019 [Exhibit 10], as specified in the allegations, only confirm what had been discussed in 2016 even under coercion: that the film was made for distribution, that Plaintiff would have the obligation to help with it, and of course that all other parties would also follow suit with their own obligations to make that possible, including David Shara obtaining talent releases of people he invited to be part of the film.

309. David Shara affirms collaterally to the 'negotiation' of the Producers Agreement, something many times: that Plaintiff will have to

distribute the film if he wants to make any money. He makes it clear that it is Plaintiff who will have to do it, *simply as a burden on Plaintiff*, because he does not want to make any upfront payment to Plaintiff, because he does not know how to distribute a film, and because he does not want to have this responsibility because it means time invested he needs for his very profitable business.

310. In order to get rid of upfront compensation, David and Tigran represent exactly in reference to dimensions, enormous value of Tigran's paintings in 2016. These representations, later was discover, were reckless and fraudulent as explained before, and harmed Plaintiff: the painting came late according to contract, depriving Plaintiff of the possibility to sell it earlier if he needed, the painting also was of clear lesser quality with parts of unfinished. The painting also was smaller than what had been agreed upon initially verbally.

311. David Shara also imposes to the contract its length: one to two pages. Not only the contract is against terms previously agreed on, not only is obtained under coercion and threats, professional and physical, not only it is absolutely obtained submitting Plaintiff to duress, the Court may also have noticed that it is also *suspiciously* short, and that is because the length of the contract is part of the advantages David Shara wants and imposes.[187]

---

[187] Of course, the Court could ask Sarandon how many film contracts she has signed that are one-two pages long.

312.    David Shara, before that contract is signed, and as part of its terms, inextricably united with the contract itself that Plaintiff is ordered to summarise as bulletpoints "gentleman's agreement"[188], in "one-two pages", makes it clear that Plaintiff will set up distribution. This is not something David Shara does as a concession, it is just a tactic to get rid of Plaintiff's request of an upfront compensation in cash. David insists very clearly: make a good film, and distribute it, take to many events, gain prestige, "that's the only way here" to make any money.

313.    However, David Shara's own concessions and terms are very clear. The Producers Agreement, has been proven, is the result of fraudulent representation, of coercion, of duress, of threats, of denying previously accepted terms, and even its length is an imposition. Plaintiff after being submitted to such stress simply because he proposed, as a start point, a contract, could not risk preparing a longer version that would most likely provoke a new barrage of attacks or even the definitive cancellation of the project "in the garbage".

314.    The redaction of the agreement, however, does not state that Plaintiff cannot set up distribution. The Producers Agreement states that moneys paid for distribution, wherever they come from, should be paid to David Shara, but does not deny Plaintiff's right to obtain good options to

---

[188] David Shara did not want to sign *any* contract. The 'gentleman's agreement' refers to something very short, briefly summarized , because both parts must trust the 'gentleman's word of the other. It was a tactic to deprive Plaintiff of stipulations protecting his rights. The tactic was employed under duress and coercion.

distribution, on the contrary, it sets the boundary where Plaintiff, in spite of being tasked with distribution, must allow David to get paid the revenues. That does not entitles David to withhold indefinitely the obligation of distribution, while he and Tigran enrich themselves unjustly thanks to the publicity the film creates, appearing both on massive TV shows announcing distribution and promoting Tigran's artworks, out of which David and Honey Shara make an enrichment, it cannot be denied.

315.    The contract Producers Agreement is, as a consequence of the above explained, partially integrated, and not completely. A contract governing production and distribution of a film may very well occupy hundreds of pages, contemplating many case scenarios in todays complex panorama. Distribution contracts, however, do not leave any doubt regarding the mechanics of distribution of a product, in his case a Film. David Shara did not want a fair contract, because, acting in bad faith as usual, in the first place he did not wanted any contract to exist, because, once Plaintiff had obtained excellent material filming Sarandon, Tigran wanted to get control over the project, first imposing an inappropriate composer that was a friend of a friend of him, then getting rid of Plaintiff and finishing it according to his criteria. Clearly Sarandon, at that time 'in full swing' with Tigran, had also been part of this plan, as at a later date David Shara confessed to Plaintiff that she wanted instead to place her son, a would-be filmmaker, at the helm of the project.

316.    The contract is partially integrated, and what is missing, or ambiguously referenced, is **absolutely clear in David Shara's own statements collateral to finalise the form of the contract**, that should be only "one-two pages long".

317.    Besides that: David Shara did not sign that contract when it was finished and sent to him. David Shara simply did not answer. Plaintiff was left without the contract signed, not one week or one month, but until April 4, 2017, since December 2016. That shows the tactics of David Shara, a man of 'gentleman's word'. **It was only another show of power, a ritual of humiliation, to leave the contract *unsigned for months*, while they, David and Tigran, were requesting more and more sequences to be scripted, produced and edited by Plaintiff** [sequence with Tigran's son, a minor, February 2017], while they were making Plaintiff work more complicated and making him work more, because they knew the quality he delivered and how seriously he took every single step.

318.    Additionally to duress, fraud surround the 'negotiation' of the contract: David Shara and Tigran constantly raise the appearance and representation of value of Tigran's paintings to entice Plaintiff into accepting a painting as a compensation for his work instead of upfront cash based on final budget, at that of smaller size than agreed on. The representations of value made by David Shara in those emails that

surround the 'negotiation' of the Producers Agreement, grow and grow as Plaintiff tries to get an upfront in cash, and they are made recklessly, and they are false because David Shara was not selling those paintings by the prizes he presents even at that time. They also base the prices in auction records that are a fraud orchestrated directly by David and Tigran in 2014 and without any doubt in 2015, Plaintiff discovered late August 2020.

319.    The extrinsic evidence presented is indispensable to solve the doubts the contract presents, because it does not contradict any term in the contract, on the contrary, it supplements and explains it: David Shara instructs, as a burden, Plaintiff to set up distribution, and that is something he does constantly also later, and that agreement generates budgets approved and more details as regards to a course of performance agreed on that leaves no doubt as regards to the intentions of the parties.

320.    That the film was made for distribution, that is something undeniable thanks to overwhelming written evidence, a fraction of it has been noted here in this complaint. It is a course of performance that is decided by both parties, and that is executed orderly and successfully until David Shara decides to thwart it 2019, and then more definitively in 2020.

321.    Plaintiff and David agreed on taking care directly themselves of the USA theatrical distribution, at a minimum of a "Oscar qualifying

theatrical release", and the North American and English-speaking countries online distribution via certain streaming platforms, especially Apple TV. The purpose was to retain that segment of the market without subagents and intermediaries that would just reduce the revenue in a territory that both felt confident to control directly.[189]

322.    The course of performance is affirmed by budgets presented and confirmed, production breakdowns, emails exchanged between Plaintiff and David show in 2017, 2018 and 2019. David Shara encouraged massive PR to promote the film, including, of course that to would be distributed, as early as 2017, when for instance, he introduced as part of the team to coordinate PR a collaboration of his other business, Sarah Raimo, emails show. The press releases sent were not an idea of Plaintiff, fully envisioned by himself: it was a shared vision, and David Shara placed Sarah Raimo in 2017 as his right hand to help spread the news, and in September 2018 he placed another of his collaborator, Mia Tonelli. Their purpose was clear: to promote the film and Tigran and his artworks, those two objectives were inextricably united one with the

---

[189] Emails exchanged show the planning and confirmation of this intention, which translates into actions implemented by Plaintiff. Nevertheless, that is the agreement, and those steps are absolutely impossible if talent releases not collected. Consequently Plaintiff obtains all of people he invited, including Donald Kuspit, and naturally David (and Tigran) made themselves responsible for the people they invite respectively. Tigran makes some models he invited to sign the same release form that signed Kuspit, the same he never signs (neither there is any kind of proof that suggests that he preferred to present another contractual release or form; he presented just nothing, ever).

other, and Tigran of course participated actively.[190]

323.    Additionally: course of dealing and course of performance leave no doubt as to explain and supplement what in the contract is partially integrated. Budgets examined and approved of by David Shara, even congratulated, many months to set up a film festival circuit and then a protracted film festival circuit of more than a year, and even invoices from 2019, from budgets approved of in 2018, that clearly David and Honey Shara pay explicitly *for* the US theatrical release.[191]

324.    David Shara appears on National Armenian TV, alongside with Tigran, informing that the Film is about to be distributed to festivals as first step, also that will be shown and accessible in Armenia, etc. *(2) The express terms of the agreement and **any such course of performance**, as well as any course of dealing and usage of trade, **shall be construed whenever reasonable as consistent with each other (...)***

---

[190] On May 23, 2019, a summary [titled: AMERICAN MIRROR DISTRIBUTION STRATEGY // MEMORANDUM MAY 2019] collects specific strategy outlines settled in 2018, on an email sent to David and Tigran by Plaintiff. As a consequence of the instability created by Sarandon's tortuous interference, Plaintiff communicates: "POSTPONEMENT OF THE US-THEATRICAL RELEASE TO FEBRUARY-2020 WHILE INCREASING PRESSURE ON INTERNATIONAL AND NATIONAL FILM FESTIVAL CIRCUIT UNTIL END OF JANUARY 2020, GETTING AS MUCH PRESTIGE AS POSSIBLE FOR THE FILM IMMEDIATELY BEFORE IT LANDS THE USA OSCAR-QUALIFYING THEATRICAL RELEASE."

And that is exactly what happened: the Film won tremendous prestige during the second half of 2010, and was ready for its distribution no later than beginning 2020. Invoices exchanged and paid show explicitly moneys accounted for "US Oscar qualifying theatrical release". **Sarandon wanted to thwart an Oscar- qualifying theatrical release at all cost.**

[191] To pretend to pass the Producers Agreement, which is a joke of a contract in the film industry, as the 'four corners' doctrine that must govern any dispute arising from it, is a desperate tactics of Defendants. It would but set a very low standard in protecting parties from ongoing, obvious and malicious breach of the essential covenant of good faith, and at that against evidence proving the course of performance based logically in the principle of seasonableness.

*(Section 1-205)*. The course of performance chosen by both parties since 2016 is consistent with the express terms of the agreement, and is reasonable and adjust to the seasonableness principle[192], and it is David Shara who, by not obtaining the necessary talent releases, acts in bad faith and breaches the contract and collateral and posterior agreements by irreparably impairing the possibilities of distribution the film had won during the course of the festival circuit. Even more, **by not obtaining them he precludes the film from being ready to go to _any_ market, so it is not enough to make David Shara responsible for the specific contracts that were lost, which exist and are there, he is responsible for creating circumstances in bad faith that make it impossible to get _any_ distribution contract**.

325. Parole evidence rule cannot bar the extrinsic evidence because there is evidence of fraud and of duress. Plaintiff is coerced into terms, obliged to renounce to other terms for no reason, and the length of the contract is an imposition. The result is reasonably a partially integrated contract, and agreements previous and contemporaneous to it must be admitted because of reasons before mentioned, and also because they do not contradict the substance of the contract, they complement and clarify

---

[192] § 1-205. Reasonable time; Seasonableness.

(a) Whether a time for taking an action required by the Uniform Commercial Code is reasonable depends on the nature, purpose, and circumstances of the action.
(b) An action is taken seasonably if it is taken at or within the time agreed **or, if no time is agreed, at or within a reasonable time.**

it. The contract does not reasonably appear to be, in view of its completeness and specificity, a complete statement of the terms related to the deal, and thus the court can allow consistent, additional terms to supplement the written contract. The extrinsic agreements are collateral (are not distinct and independent) and do not contradict the provisions of the written contract.[193]

326.   As to distribution, the Producer's Agreement stated that: "[Plaintiff] will inform and discuss any distribution possibilities with [Shara], both being informed in due time to ensure the best performance possible of the business. [Plaintiff] cannot make any decision regarding distribution without contacting and getting written confirmation by [Shara]. Revenues have to be paid directly to [Shara], being distribution contracts always under his surveillance and executed according to his criteria."

327.   The language is ambiguous: Why Plaintiff should be 'obliged' to inform and discuss distribution possibilities, if he were *only* tasked with directing and producing? The paragraph ***references*** the extrinsic evidence. Why both, included Plaintiff, should be "informed in due time to ensure the best *performance of **the business***"? If there is no distribution in due time, there is no business, only an enormous time invested by

---

[193] The Producers' Agreement terms, if taking solely in two pages to regulate direction, production and distribution, are so extremely unjust, and overwhelmingly one-sided in favor of the party who had the superior bargaining power by coercion, that they are contrary to good conscience.

Plaintiff in developing a project under absolutely false representations that breach the covenant of good faith[194]—all for Defendants to enrich themselves unjustly, because the film promotes and enhances Tigran's public profile and the perception of his art by wide swaths of audience. And even more clear the ambiguity of the text: "[Plaintiff] cannot make any decision regarding distribution without contacting and getting written confirmation by [Shara]" This is consistent with the extrinsic evidence, that David expected Plaintiff to set up distribution, to obtain possibilities, "to make a killer movie", "to bring it to Apple", but that he, David must be informed and authorise it. The Producers Agreement state that Plaintiff cannot make any decision, because he has been tasked to create and find possibilities, thus he must be able to show a product with all its *guarantees*, thus David Shara, if acting in good faith, should have obtained all talent releases in due time if he wanted to ensure a "good performance of the business". Without the talent releases, not only Plaintiff but nobody can find and successfully represent the possibility of distribution to potential partners. The Producers Agreement states: "being distribution contracts always under his surveillance and executed according to his [David Shara's] criteria". By not obtaining those releases

---

[194] Kirke La Shelle Company v. The Paul Armstrong Company et al. 263 N.Y. 79; 188 N.E. 163; 1933 N.Y., the New York Court of Appeals: *"In every contract there is an implied covenant that **neither party shall do anything, which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.** In other words, every contract has an implied covenant of good faith and fair dealing."*

he makes impossible to accomplish that specific obligation of him under the agreement: he acts in bad faith.

328. David Shara had the obligation to distribute the film on time, and at that 'contracts' were supposed to be "executed under his criteria". That makes him fully responsible of being punctual in the course of performance as to obtain any necessary guarantees to execute those contracts.

329. Plaintiff also invokes the Ambiguity Exception. It is admitted doctrine that "*If the language in the original written contract is reasonably susceptible to more than one meaning* [was the film made for being distributed according to seasonableness standards[195] of the industry, or we must believe the made-for-litigation tale that the film was never made to be distributed, but to remain in limbo against the proven rationale of the written assurances, agreements, and even moneys invested in setting up US theatrical and online distribution directly by

---

[195] § 1-205. Reasonable time; Seasonableness.

(a) Whether a time for taking an action required by the Uniform Commercial Code is reasonable depends on the nature, purpose, and circumstances of the action.
(b) An action is taken seasonably if it is taken at or within the time agreed **or, if no time is agreed, at or within a reasonable time.**

    **Sarandon**, in the set of emails that gives proof of contractual acceptance of terms, **leaves no doubt as to what is seasonableness in the film industry and what is best for the Film itself: she states that it was "late in the season", and because of that she suggests, as a first step to marketability, to go to film festivals** before commercialisation. That is exactly what was executed, and with a success she obviously did not expect. All parts are in agreement on timing of distribution, and aware of the sense of seasonableness, and **David Shara is direct part of this conversation in emails, acknowledges it and makes accordingly decisions that leave no doubt as to what was the intention of the parties**, generating budgets presented and approved of by email, and even invoices detailing dates of commercial distribution. They have not been attached as exhibits because this Complaint would be too long.

the partners themselves…? Was Plaintiff tasked to set up distribution, although not in power to sign any contracts? Is it clear that this point cannot be accomplished unless following a basic expectancy of good faith in David Shara obtaining all talent releases necessary to be able to make such promises…?]*, the court will permit the admissibility of parol evidence to determine the meaning of the contract language under the ambiguity exception.* **The rationale for the ambiguity exception is that a judge should look at all credible evidence to determine the parties' true intentions. If the parties' intentions are found in a side agreement, generally this supersedes explicit written agreements*."* Especially if the explicit written agreement is obtained under duress, coercion, 24-hours ultimatums threatening to destroy all the work [David Shara: "I am tempted to destroy all and start from zero with someone else"[196]] and its length is an imposition of the coercing party, and as a consequence of all that is also partially integrated in plain sight, and ambiguous in its expression as regards to some aspects, and insufficient as regards to all

---

[196] That particular threat cannot be taken lightly: the bargaining power is such, that Plaintiff is deprived of it while David and Tigran hold absolute power over all the work done up to then: if Plaintiff do not accept terms contrary to what had been agreed on. **The Court must keep in mind that this happened without any existence of disagreement or objection with the quality of the work done.** On the contrary, evidence show utter satisfaction, elation with Plaintiff's every single step before. Even in the midst of these agreement conversation collateral to contract memo, David Shara admits: "The film is a wonderful achievement". Basically Plaintiff is submitted to this unfair circumstances because Tigran wanted him fire, and because both Tigran and David had no intention to sign any contract with Plaintiff, especially once Sarandon had participated.

At a later date in 2017 David admitted that that was wrong, and that happened because Tigran wanted to get control over the project and **all because Sarandon had suggested to Tigran to place one her sons at the helm of the project after her participation, superseding Plaintiff**.

aspects.

330.     If extrinsic evidence is admitted, not only David Shara had the obligation to distribute, he was very excited about it, he invested money in it, he burdened Plaintiff with setting up successful distribution options, he approved of preparing a US theatrical release and online release, &c.

331.     Exchanged budgets approved and paid willingly in invoices in 2017 and 2018 and 2019, clearly state that David and Plaintiff had agreed on taking the US distribution for themselves directly in order to avoid subagents to maximise revenue. That means that the subsequent loss of US distribution, theatrical and in online Platforms, scheduled to start by end 2019 or beginning 2020, is a real loss not depending of finding any deal out of the deal already extant between Plaintiff and David Shara. That enormous loss is real and indisputable: David thwarts it. Add to it that 2020, due to lockdowns was a goldilocks year for online distribution of all kind of content due to lockdowns and extremely high rates of streaming films at home. What had been agreed on and was already schedule was to be a success and it was nothing because of all Defendants coordinated actions.

332.     David Shara is liable for breach of contract and tortious interference in business expectations of Plaintiff. He was conscious that, thwarting irremediably the distribution of the Film, he was defaming the Plaintiff as a filmmaker, and curtailing the possibilities for his other

endeavours, of which he had notice and he knew.

333.    David Shara enriches himself unjustly by pushing the film into massive news public releases to better sell Tigran's artistic productions, out of which he made and still makes a 50% profit of anything sold worldwide. He even appears on Armenian National TV announcing the film and its distribution to massive audiences, thus defaming and misrepresenting the filmmaker and producer, because finally the film won't be distributed thanks to his actions.[197]

334.    David Shara did not provide the painting on the date as stipulated in the Producers Agreement, but almost two years later. It is a material breach of contract, because Plaintiff lost the opportunity to sell if in 2017 or 2018. Additionally, extrinsic evidence shows that the painting was in substitution of upfront compensation for Plaintiff' work on the film until 2017, while his obligations were extended, and at that to David and Tigran's advantage and self enrichment, far beyond 2019 until beginning 2020.

335.    Additionally the painting is of inferior quality within the 'mirror's series. When the Plaintiff tried to sell it, he discovered that it is impossible to obtain even a fraction of the value represented by David and Tigran. Plaintiff has suffered damages as a consequence of accepting,

---

[197] Any inaction [Defendants not doing on time what they should under contract or promise or representation] is an action if the subject actioning chooses not to act with a purpose. If the inaction furthers actively a purpose, it can only be considered an action.

under coercion and duress, a deal, the Producers Agreement, that forced him to obtain a painting instead of cash upfront based in total final budget, which is the regular in the industry, as he requested. David insisted on reckless representations of value, and to convince Plaintiff cited the auction records, and insisted that potentially the value "would be much higher". When the film was not distributed because Defendants coordinated actions, Plaintiff was not able to make a dollar out of the painting. Valuations of that painting do not reach 10,000 USD by auction houses in Europe, and Phillips, as explained before, does not even want to appraise Tigran's creations for the reasons stated before.

336. David Shara is liable for defamation. He appeared on the National TV of Armenia, alongside with Tigran. He presented himself as producer to the public, when the contract clearly states he is not, trailing the Plaintiff's credits. He disseminated himself massively the notion that the film would be distributed, then thwarted it in bad faith with sole purpose to harm Plaintiff.

337. David Shara's unctuous obsequiousness to his hyper-rich clients, always anxious to please the ones who are, from his point of view, in a higher and indisputable position simply because they have more money or fame at their fingertips, has degenerated into this collection of iniquities in order to please someone, Sarandon, whose assumed (and deserved as a great actress) prestige, world media status and ties with

political power in the US seem to be infrangible.

338.    *THEREFORE David Shara injures Plaintiff as a consequence of his: breach of contract (since 2019), unjust enrichment (since 2016), damages for the work on two projects agreed on and that Plaintiff worked on and then were cancelled explicitly as a retaliation, civil conspiracy (since 2019). David Shara acts out of malice, and punitive damages are sought.*

339.    **CAUSED BY DEFENDANT TIGRAN TSITOGDZYAN.**

340.    Tigran is liable for promissory estoppel and breach of contract. He made promises to Plaintiff multiple times in 2016 and 2017 that he would provide the talent release signed for him, his son and his artworks, but he never signed it. However, he also stated in writing in October 2016 that he left all rights of 'his image, his studio, his artworks', he also stated that he 'had no credit' in the film besides participating in it, as part of the emails in which the contract Producers' Agreement is formed. Those conditions have the force and validity of enforceable contractual obligation, because Tigran goes on taking advantage of the film in every single aspect, thus he enriches himself, as it will detailed below, but never satisfies his part of feal, thwarting distribution willingly and out of spite and malice, and even against his own interests. Tigran was aware of the terms of the agreement because the ultimatum imposing them under duress **was also signed by him**.

341. Tigran intentionally did not finish the painting by the date stipulated by contract **to tortiously interfere with it by turning the delay into a material breach of contract**.

342. Tigran tortiously interfered with the contract by not proving the talent release for his son, a minor, after he himself requesting a sequence in which espclifically the minor would participate, and all others related to him and in accordance to his written sign off in 2016 [quoted and referenced]. He did not provide them to thwart the distribution of the film, to keep Plaintiff's work hostage of his tactics acting bad faith.

343. Tigran is liable for damages for inducing Plaintiff to believe that Phillips would agree introducing footage of the auction of his painting at Phillips NY 2015. Tigran assured that, and also forced that footage to be part of the film. Now in order to distribute the film that footage must be retired, **and Tigran is liable for the damages it brings and the cost of modification of the film.**

344. Tigran is liable for tortious interference with contract and copyright infringement for requiring *formally*, with no right to do so, in July-August 2019, a copy of the film under false pretence to show the film to his parents. That was false because Plaintiff had already shared with him many rough cuts: he wanted the copy to have it, to show it in Armenia because some kind of 'big' show in Yerevan was about to take place by end of August 2019, to enrich himself out of Plaintiff's work,

while at the same time he was denying the signature of talent releases aforementioned to harm Plaintiff, to allow further coercion on him, all in breach of contract. Tigran has used the copy of the film to take advantage of the Plaintiff's work by showing it to collectors, art dealers and others as a privilege private, while he was not providing the talent releases—it is blatant unjust enrichment.

345.    On August 21 2017, email of Tigran to Plaintiff: "when do you think I can/should start posting the content with susan and her painting?" "The scene looks great, can't wait to see the final thing!" On August 28, Tigran to Plaintiff: "We can plan the exposure thing when i come back." On February 14 an email collects dozens of links to Armenian media as a result of a press release sent to Tigran ad David by Plaintiff, collecting also plans made in accordance with David as to promote the film's imminent release. Tigran receives the email, and answers: "I will promote the movie as we decide is the best way to do it." "Lets just work together as and go through all this. **We are a team here and have the same goal to promote and get the best out of it**, so I just need the green light and advises if you have any."[198] **The New York Times**

---

[198] As long as the film was a source of publicity, of prestige, Tigran affirms his interest in every action. But his talent release is not provided, and David simply assures Plaintiff that he will get it soon. Neither Tigran answered the emails requesting it, nor David requested it ever. The representation of distribution is clear, the expectation created in Plaintiff is undeniable, the enrichment that Plaintiff's work provokes in Tigran and David, both partners in selling artworks by Tigran, is also as undeniable as their own assurances and interest in the actions as described.

   Their actions destroying the inertia and momentum generated by so much work, years of work, while all the way along taking advantage of it, makes their representations **more culpable**.

**requests via email to be updated once the theatrical release takes place in New York in order to attend a screening for a review. [Exibit 11]**

346.   Tigran's model of series 'mirrors' had been invariably young women before Sarandon's participation. The idea of portraying for the series a woman of more advanced age, and not a young woman, came from Plaintiff's original and central script since the beginning: to show beauty is not merely something attached to youth was a leitmotif Plaintiff's original idea. Emails presented in this complaint show Tigran presented the idea to make a painting to Sarandon because he first and foremost wanted to use that sympathetically invitation to convince Sarandon of his real goal: to invite her to be part of the film, because he calculated the publicity that this would generate for him, meals clearly show in Tigran's own words.

347.   David and Tigran's fraudulent representations are not mere opinions as regards to the value of Tigran's paintings; they are made by the artist himself and by his only sales agent, thus they were reliable to the highest degree; nonetheless, an opinion can be considered a representation of fact if it is proven that the speaker "claimed to have special knowledge of the subject matter" that the listener did not have [the statement of the avowed sales agent can't but be taken as from a person with special knowledge, he states in writing]; the representation

was made "not in a casual expression of belief, but in a way that declared the matter to be true"; both speakers were in a position of trust and confidence as to this specific matter up to then, the deal had been met, as proved, before those date, being one the artist and the other his agent; additionally, Plaintiff, being coerced by both them, had no other remedy that to believe what they said. However, a significant part of this conversation of 2016 shows, unambiguously, that Plaintiff tried to get an upfront compensation and to get out of the project, yet this David also denied, representing, in a now clear reckless manner, higher value of the paintings, "potential much more", to justify his denial to pay upfront compensation for Plaintiff's work as a filmmaker, and to convince him, and to retain him in the project at a very low cost, while deploying more moneys to increase the production cost of the film, an the publicity power on Tigran and his artworks, while making more difficult to recoup the production budget before profits, thus making more difficult for Plaintiff the project to be profitable, while the higher the value, the longer the making of the film, the more press releases pressurising upwards the aggrandising of Tigran's persona and perception of value. In the meantime, the agreement supposed to compensate for a film to be finished by May 2017 extends into beginning 2020, at that with no guarantees promised collected to distribute, and at that with breach of contract as regards to the date to deliver the painting [the painting is delivered

almost two years later], plus the panting of lower quality and parts of it simply unfinished. These are clearly damages connected to a breach of contract by David, and a tortious interference with contract by Tigran.

348. Their statements were intentional misrepresentation, the person who made it must either have known the statement was false or been reckless as to its truth [David increases the represented value in the course of the emails exchange so as to persuade Plaintiff to renounce to upfront compensation]. Obviously the Court can infer unambiguously that David and Tigran intended that Plaintiff would rely on it, and Plaintiff reasonably relied on the promise and also been harmed because of that reliance.

349. Tigran is liable for copyright infringement for same reasons stated paragraph before. Plaintiff is copyright owner and author of the Film, and Tigran obtained the copy unlawfully, with no claim to do so, while David and Honey Shara submitted plaintiff to coercive manoeuvres by not paying invoices due and threatening to ruin the festival circuit, while also Honey Shara participating actively in the plot to force the copy unlawfully. [Copyright Registration Number PAu-3-823-642]

350. Tigran is liable for defamation. His comments to the media, as described before in 2019, were false representations made on purpose because he knew the true reason for the film's screening cancellation at Armenia Film Festival was not the one he propounds to the public—as

explained before, and exhibits.

351. Tigran is liable for defamation, for encouraging Plaintiff to disseminate massively the false representation that the film would be distributed, while has done all to obtain the opposite. Tigran takes advantage of Plaintiff's work even advertising himself, his artworks on Armenian National TV, assuring audiences that the film would be distributed, thus defaming the Plaintiff as a producer and director, because this afterwards did not happened precisely because Tigran failed to comply with his written contractual obligations, promises and representations.

352. Tigran is liable for copyright infringement of a text created and copyrighted by Plaintiff, that Tigran has been displayed on his websites until recently, advertised as copyrighted by him. Plaintiff gave him permission *only* to show that text in a catalog published in paper in 2015, but not to use the text online indiscriminately and indefinitely, and even more to advertise it as copyrighted by him. [See Exhibit 9] [Copyright Registration Number TX 9-120-102]

353. Tigran presented himself in several film festivals to attend screenings, in the fall 2018 at Toronto and Los Angeles. In Toronto, he went onto stage to take an award, Best Cinematography, in the name of the production team and made public statements as regards to the distribution of the film. The award, to this date, is still withheld from

Plaintiff, and claims now its devolution to him.

354. Tigran made fraudulent and reckless representations of value as regards to his paintings, as described in the Complaint. The purpose was to make Plaintiff believe the value was much higher so that Plaintiff would renounce to upfront compensation in favour of David Shara. **Plaintiff was paid for almost four years of continued work with a painting that does not have even a fraction of the represented value**. Tigran additionally left some parts of the painting unfinished and interfered with the explicit terms of the contract he knew by delaying its finishing it and giving it to Plaintiff almost two years beyond the stipulated date, bringing more damages to Plaintiff.

355. *THEREFORE Tigran Tsitoghdzyan injures Plaintiff as a consequence of his: breach of contract (since 2016 he does not present any talent release he promised to send in 2016 in writing), unjust enrichment (since 2016 he takes advantage of the contract and the film as described while not fulfilling his obligations), tortious interference with contract (since 2019), tortious interference with business expectations (since 2019), promissory estoppel (since 2016), plagiarism and copyright infringement (since 2019 after obtaining unlawfully a copy of the film for his own advantage and enrichment; since 2017 for misrepresenting to the public in his website that he is the copyright owner of a text that is copyrighted by Plaintiff, and for making use of it indiscriminately online when in fact he*

*only had permission to use it once in a catalog paper-printed), civil*

*conspiracy (since 2019). Tsitoghdzyan acts out of malice, and punitive*

*damages are sought.*

356. **CAUSED BY DEFENDANT HONEY SHARA.**

357. Honey Shara, represented by an attorney in 2020, interfered with the contract tortiously **by coercing Plaintiff into signing a new contract of which she intended to be added as part**y. Honey Shara requested via her attorney to be part of the new contract. Honey Shara coerced Plaintiff assuring that she could get all talent releases missing, but she would not unless Plaintiff accepted new terms and signed a new contract. Honey Shara acted and presented herself and was introduced as a co-executive producer by David Shara in 2018, and not as a designated agent of a principal. The actions of Honey Shara were not those of an agent of a disclosed principal, she presented herself as investor in the film, she wrote that "she had invested" money in the film, and afterwards she manifested that position clearly when her attorney, David Fritz, represented her and David Shara in 2020, 2021, and 2022. No 'agent of a disclosed principal' sends a demand letter in her name. Honey Shara is liable for the actions and harm she causes since 2019. As a consequence of this interference, the film has not been distributed because she did not want unless Plaintiff accepted be coerced, since 2020.

358. Honey Shara is liable for copyright infringement since she

coordinated with Tigran to coerce Plaintiff into sending unlawfully a copy of the Film to Tigran for his own enrichment. Honey Shara went on to also request a copy to show the film "to friends in Toronto", a badly excuse to obtain it for Tigran so that Tigran could take advantage of it in Armenia in August 2019, right in the midst of a big solo show in Yerevan, Armenia, so to unjustly enrich Tigran while trying, at the same time to thwart the film festival circuit by denying payment of invoices unless Plaintiff presented an apology to Sarandon and Tigran, for reasons still unknown, but to satisfy perverse rituals of humiliation in which Sarandons seems to find much pleasure once her mood is retaliatory and vengeful.

359.    Honey Shara is liable for requesting and obtaining secret, confidential information, tax records, unlawfully, from Plaintiff, Plaintiff's wife and Plaintiff's business. She submitted Plaintiff to duress in 2019; she only obtained those secret, confidential records because she was withholding payment of pending invoices in 2019 with the purpose of purposely destroy the festival circuit and thus damage the film and Plaintiff's work and prospects of deserved professional recognition. Honey Shara shared those records with others, including David Shara, Tsitoghdzyan and Sarandon, who were conspiring and plotting to deprive Plaintiff of his rights under the contract Producers Agreement.

360.    Honey Shara presented herself in several film festivals as co-

producer to the audience, which is false, in the fall 2018 at Toronto and Los Angeles. In Toronto, she went onto stage to take an award in the name of the production team and made public statements as regards to the distribution of the film. The award, to this date, is still withheld from Plaintiff, and claims now its devolution.

361.    _THEREFORE Honey Shara injures Plaintiff as a consequence of her: unjust enrichment (since 2016 she takes advantage of the film's with massive press releases, publicity and dozens of screenings across the film festival circuit that promote Tigran's artworks, a product that she and David sells and out of which they make a 50% profit of all sells worldwide, while at the same time do not fulfil her obligations to also guaranty commercial distribution, because she can get all talent releases **expeditiously**), tortious interference with contract (since 2019; in 2020 she even, represented by attorney, **coerces Plaintiff into signing a new contract to which she intends to be party**), tortious interference with business expectations (since 2019), copyright infringement (since 2019 after helping Tigran to unlawfully obtain a copy of the film for his own advantage and enrichment), interference with Plaintiff's business for obtaining unlawfully and under financial duress tax records of Plaintiff, Plaintiff's wife and Plaintiff's business, and  civil conspiracy (since 2019). Honey Shara acts out of malice, and punitive damages are sought._

362.    Finally, Defendants' actions are the reason behind health issues

for Plaintiff, and great strain to his family. They have deprived him of the fruits of his work, but also they have ruined his artwork completely for no other reason than Plaintiff allowing himself to have reasoned opinions and for sharing them punctually and privately whenever others shared theirs with him. In September 2020 Plaintiff and his wife were thrown into a vortex of misery by David and Honey Shara after reading, in disbelief, their shocking coercive manouvers, harbingers of what materialised in 2021 and 2022 and 2023. Plaintiff is truly convinced that Defendants purpose is him to commit suicide. Nothing would be more convenient for each and all of them, it seems. The coordinated actions of the Defendants amounts to a calculated 'professional murder': they intend to injure professionally the Plaintiff in a way that produces irreparable professional harm in such a sustained and prolonged manner that finally also brings personal harm and consequences on his very health.

363.   As a consequence of these injuries, Plaintiff seeks and is entitled to:

## IV. RELIEF

364.   In the form of, but not limited to, reliance damages (on Defendants' promises written and oral), expectation damages (on Sarandon's, David Shara's and Tigran's breach of contract), compensatory

damages, and punitive damages, and any other form the Court deems proper and just. Defendants act against that clear interest and perspective. David and Honey Shara lose money by not distributing even when they recognise they can get all talent releases 'expeditiously'. They do "not care about losing" the money invested [recall David Shara's explicitly writing it in 2019] because they make and have so much money, that they can afford it to please someone they want to ingratiate themselves with [Sarandon], and ***because the true intention behind the breach of contract is to harm the Plaintiff as much as possible[199]***. Their actions also harm themselves financially, and go against their clear financial interest by not distributing, but that is not the ***purpose*** of the Defendants, to distribute it and allow it to have a regular course. The purpose behind so many well coordinated actions is to harm—plus they all find ways to unjustly enrich themselves out of Plaintiff's work, as explained. They cannot argue anything about Plaintiff's right to his opinions. Plaintiff had hundreds of occasions to voice his opinions to media members, events organisers, fans of

---

[199] David Shara's intentions were not new in 2020, since on May 28, 2019, 9:56 AM, he wrote an email to the Plaintiff: "(…) I don't care about the 200-300,000 dollars I have put into this project. I do not care about this film. (…) I don't want to spend any more on it. (…) **remember that very few people have signed talent release**. **So think very carefully about what I have written** (…)"

This is what the MTD defines as David Shara's 'encouragement' to present an apology to Sarandon, when in fact the apology should have been sent by her, and by Tigran for having delayed the making of the panting, plus leaving it unfinished after a two year delay, or after his truly disgusting insults as shown and sent to Plaintiff in 2016. This is how double standards work in the film industry: Plaintiff must present an apology to Sarandon for telling her that she was being ungrateful, and at that against terms related to PR accepted in writing, or else the entire film should be cancelled.

Sarnandon, and journalists in Erupe, East Europe, Asia, and the USA, as he attended several important film festivals and film markets: he never talked about any Defendant out of his experience in making the Film, and at that limited only to artistic aspects. In fact, Plaintiff never talk about any Defendant: he only discussed about his work, his cinematic vision and other technical and artistic aspects, it can be drawn from the extant, publicly available information.

365.   Because of defendants' breaches and the uncertainty, loses and defamation they have created on concerted purpose, **Plaintiff faces irreparable harm absent relief**. Defendants' actions in derogation of the deal's consummation create uncertainty and delay that harm the Plaintiff and his company and deprive them of their bargained for rights. They also have exposed the Plaintiff to adverse effects on its business operations, employees, and new projects. Remedial action in the form of specific performance and injunctive relief, collecting damages, and punitive damages is sought from the Court.

366.   As the Court may deem if appropriate, Plaintiff seeks:

367.   To declare valid all terms of the initial agreement met in 2016, because the Producers Agreement is the result of coercion, ultimatums, threats and duress upon Plaintiff, granting Plaintiff 40% of the profits, David 60%, after production expenses recouped from revenue. Tigran should also be listed as executive producer, unless he willingly renounces

to it, since it was one of the initial terms.

368.  Order Defendants to compensate the Plaintiff for the professional harm he has suffered to date as a consequence of their coordinated malicious actions as regards to the Film, no less than $3,000,000. The Defendants knew perfectly that their actions, depriving the Film of worldwide distribution, and particularly depriving it of the budgeted, approved of, scheduled and already set up Oscars-qualifying theatrical release in the United States and US steaming online platforms, would exponentially increase the professional harm of the Plaintiff by several orders of magnitude.

369.  Order Defendants to compensate the Plaintiff for the professional harm he has suffered to date as a consequence of their tortious interference with business expectancies, robbing him of two new projects as described before, no less than $3,000,000.

370.  Order Defendants to compensate the Plaintiff for the Emotional Distress caused by the malicious actions, causing medical conditions that they have brought upon him in the form of Major Depression and General Anxiety Disorder, with the personal consequences that this has caused to him, no less than $2,000,000.[200]

---

[200] Compensating for pain and suffering. *Pain and suffering refers to the physical discomfort and emotional distress that are compensable as noneconomic damages. It refers to the pain, discomfort, anguish, inconvenience, and emotional trauma that accompanies an injury. In New York, the term "pain and suffering" includes all items of nonpecuniary damages and includes the loss of enjoyment of life. Damages for the loss of enjoyment of life compensate for the frustration and anguish caused by the inability to participate in activities that once brought pleasure.*

371.   Order Defendants to compensate Plaintiff for the harm caused by the malicious obstruction of the Film release since the beginning of 2020, taking into consideration that 2020 and 2021 have been the best years for online streaming of documentaries as a consequence of the pandemic-induced lockdowns worldwide. No less than $2,000,000.

372.   Order David Shara, and Honey Shara, and Tsitoghdzyan to pay the cost of modifying the Film in order to comply with Phillips Auctioneers LLC's prohibition of showing the auction footage of Lot 217 of October 2017 because the inclusion of that footage was an imposition of them to better misrepresent to the public the value of Tigran's artworks, and they assured no problem could emanate from its inclusion in the Film, including the reasonable costs required to modify the picture and final sound mix and to take all other production steps necessary to revise and finalize the Film for distribution; no less than $70,000.

373.   Order Defendants to pay no less than $2,000,000 as a publicity budget, non refundable from the Film's distribution revenue as part of the general Film's costs simply because it compensates for the damage his actions have caused to the great momentum the film had and it has lost, to be spent initially to promote the distribution of the Film, in order to reboot it — to compensate for the momentum and expectation that the protracted film festival caused, and that was ruined by his actions. This is as a consideration to the fact that the Film, as it has been left in oblivion,

has been irreparably impaired by their actions unless such kind of invigorating action would take place.

374. Order Tigran Tsitoghdzyan to pay for the damages caused by the copyright infringement related to his unlawful asking for copy in his power since August 2019. Calculation as the Court may deem it proper.

375. Order Sarandon to pay for damages for copyright infringement after stealing the character of Plaintiff's script '16 Hours' and using it in her film 'Viper Club'; since the 'Viper Club' release, thus since October 2018. Calculation as the Court may deem it proper.

376. Order Defendants to compensate composer Mark Petrie for the damages created, since their actions have deprived him of 1) the professional prestige harm from not distributing his work and making it available to the public when it was agreed on, *sine qua non* condition for him to participate; and 2) he has been unable to distribute and sell the music at the time agreed on and since then until now, thus deprived of the peaceful enjoyment of the terms of his agreement with Plaintiff, which David Shara knew in 2017, when the agreement between Plaintiff and Composer was met, which entitled him to distribute his original soundtrack at the same time and moment when the commercial release would have started in the USA. To be determined by the composer and

the Court.[201]

377.   Order Tigran and David to pay the difference between the actual value today of the painting given of 75x50 (10,000-15,000 USD/EUR) inches and the represented value they gave him in 2016 of a 100x75 inches painting (250,000), which is what had been promised to him originally, plus interest.

378.   Order punitive damages no less than **ten times the sum of all harm caused** because their actions have taken place out of sheer malice, against their own interests, and because it can be proven to the Court that they have despised and disparaged multiple occasions to find amicable resolutions since 2020, choosing instead to prolong the ordeal until finally it had caused negative medical conditions upon the health of Plaintiff.

379.   Order to authorize the immediate distribution and best performance of the Film for profit, ordering David Shara and Honey Shara to provide confirmation of the Plaintiff's distribution decisions reasonably and in good faith.

380.   Order David Shara to provide all necessary talent releases that are missing and related to people he personally invited to keep the Film

---

[201] This has come at the expense of Petri's familiy, that was increased with the birth of a child in 2020. Instead of allowing his work to contribute to his prestige and revenue, Defendants concerted efforts have thwarted another family's rights in economically challenging times right when the Pandemic struck. Defendants knew perfectly in March 2020 that the Pandemic was hitting the entertainment industry harder than many others. Plaintiff seeks punitive damages against all Defendants.

hostage by not obtaining them since 2016, **forthwith**, including, without limitation, those for Morgan Shara; Ashley Hinshaw; Hilary Rhoda; Ryan Ross; Jules Weinstein; and Melissa Wood.

381.    Order Tsitoghdzyan to provide all talent releases he is responsible for and promised to the Plaintiff since 2016 (for the use of both his image and his artworks); his son (including releases from both Tsitoghdzyan and the mother of the minor).

382.    Order Sarandon to provide her talent release that is due as per the terms of the contractual agreement of 2018, her promises since 2016, and her hitherto representations.


## V. ARGUMENTS OF LAW


383.    No filmmaker or producer would ever accept investing such a prolonged period of time in making a film and then getting it ready for distribution, if the possibility of not collecting all the talent realises depended so unilaterally of one party who, additionally, represents and acts in a course of performance according to the contrary since the beginning, or if knowing that the other party, in this case, David Shara, would hold such superior bargaining power so as to, at will [at ill-will, would be more precise], decide that the film won't be distributed against all his actions intended to do so, and against agreement after agreement

in writing, supported by a course of performance and invoices specifying terms, that complement a contract that is ambiguous, partially integrated, and which extension, suspiciously short, is an imposition resulting from ultimatums, threats and duress. Typically, an unconscionable contract is held to be unenforceable because no reasonable or informed person would otherwise agree to it. Plaintiff lacked choice to form a reasonable contract within fair industry standards.

384. *§ 1-304. Obligation of Good Faith.* "Every contract or duty within the Uniform Commercial Code imposes an obligation of good faith *in its performance and enforcement.*"

385. There is a remarkable difference here between 1) not having ever collected the talent releases, and 2) not being willing to give/show them to Plaintiff. David and Honey Shara show no shame in recognise that they had been making fraudulent representations for years to Plaintiff: they had not even tried to get the missing talent releases of people David Shara invited himself, or even of persons who sent written assurances giving David capacity to obtain some of them (Tigran's written assurances from 2016, were clearly and unambiguously put at David's disposition, as part of the substance of the contract Producers Agreement, except the permits related to Tigran's son, a minor,). Where is the standard of the law to draw the lines of or to fathom the degrees of bad

faith in plain sight? Is it the same to *have* the releases but not to *show* them, as *not having ever collected them*, although they could get them expeditiously? It is clear that one premise shows deeper bad faith than the other. What for, then, to keep Plaintiff making the film in 2017, 2018, absorbing his lifetime and attention…? To better sell Tigran's paintings, which are a business of David Shara, to better present him to potential buyers, to get Plaintiff to send massive press releases aggrandising Tigran's persona and art in the eyes of the public under the utterly false pretence they had the intention to distribute the film. Is it not a basic notion that David Shara, if he had ever had any intention to fulfil his obligations, would have collected some releases, at least — even if afterwards he denied sending copy of them to Plaintiff, that's another point? Brazenly the answer is yes, it is a basic notion if he had had any true intention: but even basic notions are missing here, they never got any of them because these set of actions are coordinated, and at that, after losing contracts and opportunities for distribution galore in 2019 and 2020, they acknowledge in September 2020 that they could have gotten them expeditiously, but they never got them simply because they do not act in good faith, because violating the basic covenant as stated in § 1-304 is not a casual flirt with dishonesty, it is their everyday modus operandi.

386.    Defendants alike mock in plain sight the obligation of good faith

that every contract, promise, compromise or duty imposes in its performance and enforcement: David Shara even acknowledges that he never got the talent releases he made himself responsible for, year after year, while at the same time creating and maintaining expectations to Plaintiff, but at that he adds that he could have gotten them *expeditiously*. And he sees in it, which itself is a already proof of breach of the basic covenant of good faith, an opportunity to coerce Plaintiff into new terms in 2020... He sees in his own 'advantageous' breach of covenant of good faith and of contract, not shame and responsibility tout a remedy as soon as possible after contracts lost and damaged caused, but an opportunity to do more wrong, to coerce Plaintiff, along with Honey Shara in conspiracy with Tigran and Sarandon, under the pressure of David's own breach and disregard of good faith, into new terms, a new contract, making him renounce to the losses already caused by David by that date in September 2020. If Plaintiff does not accept, he will suffer the professional and financial consequences, the shame of being defamed after bringing a film through an international festival circuit, that afterwards is not released when it had been agreed.

387.    Implied contracts are legally enforceable promises of mutual assent to be bound, see U.C.C. § 1-201. An express contract is communicated orally or in writing, which requires expressing assent. An implied contract, which does not have explicitly stated terms, is still

found to exist because parties assumed a contract existed *based on conduct*, or *denying the contract's existence would result in unjust enrichment to one of the parties*. Tigran's conduct is a playbook that summarises such doctrine, there is nothing in his actions, public and private, that contradicts that he wants the film to exist to promote him, that he uses it to promote it, he even wants *a copy* of it in due time for his grand Armenian show, and for being able to cater it privately to collectors, journalists &c. However, at the same time, **he thwarts the distribution in breach of contract.** An implied-in-fact contract is formed *when parties' promises are inferred from their intentional conduct and one party knows or at least has reason to know the other party will interpret the conduct as assent or an agreement*. Plaintiff could not but understand Tigran's and Sarandon's actions as assent to being part of the film and to the terms discussed.[202]

388.    However, there are written statements that confirm and detail affirmation and assent by Tigran and Sarandon. Tigran in 2016 details is cession of rights, and obligation to present any necessary releases, an Sarandon accepts terms to a contractual proposal that grandly betters her terms promised in 2016 (she wanted nothing, Tigran even gives testimony of that promise made to Tigran, Plaintiff and Plaintiff's wife in person).

---

[202] Facts show none of them, after written assent, has any right now to invoke NEW YORK CIVIL RIGHTS LAW § 50 neither NEW YORK CIVIL RIGHTS LAW § 51. In MTD, however, preposterously attorneys depict their wrongful actions as: "Sarandon and Tsitoghdzyan exercising a legal right to control their publicity rights"

They are in material breach of contract, and their actions and conduct before and after 2018 leaves no doubt about that. It is Sarandon who, as part of the conversation of the new terms offered and acceptance, she mentions 'marketing' and recommends "going to festivals" or "hire an agent" in a conversation that she thanks the 10% of profits offered initially by Plaintiff in his proposal, and she accepts material enrichment in the form of drat-printings by Tigran, even choosing the sizes.

389. *Promissory estoppel refers to the doctrine that a party may recover on the basis of a promise made when the party's reliance on that promise was reasonable, and the party attempting to recover detrimentally relied on the promise.* In Cohen v. Cowles Media Co. 501 US 663 (1991), the Supreme Court recognized promissory estoppel as a "*state law doctrine creating legal obligations never explicitly assumed by the parties that are enforceable.*"

390. Plaintiff detrimentally relied in the promises made by Sarandon in 2016, and in her written agreements and assurances made in 2018. Since the written assurances are unambiguous, Sarandon is in material breach of contract. But Sarandon has obviously tampered with the brakes the film hit in its distribution phase, and past, what happened and was requested in 2019, the attempt at cancellation of the film festival, was simply prologue of 2020.

391. The particular configuration of the case, its development and

results over years, Defendants' recklessness, the consequences of their actions on the personal and professional level, the stark contrast between the situation of the film today and its international credentials by beginning 2020, the fact that a well-known member of the highest star system has contributed ***not to highlight the value of a cinematic artwork that benefits her in every single aspect, but to destroy it***, are unexampled in the film-industry; and that is why Plaintiff finds difficulties in locating parallels for his memorandum of law when searching for other cases. It is, however, our hope, that the Court rises with vigour to plumb the depth of the iniquity, assessing it as it deserves, honouring the values that are treasured in our Constitution: that this case deserves unwavering and mighty action to settle an example to society in general, and to an industry, the film-industry, that unfortunately represents a model that fails to those who often have the capacity, the talent, but not the fame neither the money, an industry in which fame trades as privilege versus right.

392.    This is the most important Court in the world. Its decisions inspire the world in many ways. It is not the 'tweets' of stars and billionaires that should set double standards as a bad example for society, but the resolute action of the Law that seeks the *one standard*, the one

that makes all equal under the Law, and wrong is wrong no matter who commits it.[203]

WHEREFORE, Plaintiff requests that the Court enter judgment against the Defendants, ascertain their respective liability as it deem proper and just, in the amounts aforementioned; together with pre- and post-judgment interest as allowed by law; and punitive damages no less than four times the relief because the defendants behaved purportedly in a remarkably malicious manner, even disparaging all the opportunities they have had to find an amicable solution for their own wrongful acts; costs and disbursements of the action; and such other and further relief as the Court deems just and proper.

## VI. PLAINTIFF'S CERTIFICATION AND WARNINGS

By signing below, I certify to the best of my knowledge, information, and belief that: (1) the complaint is not being presented for an improper purpose (such as to harass, cause unnecessary delay, or needlessly increase

---

[203] For over 20 years, Vartanov's films had been suppressed, unmentioned by press, or blocked from submission to foreign film festivals by the tyrannical apparatus of the Soviet authorities. In a letter to the imprisoned Parajanov, Vartanov wrote, quoting his favorite poet Boris Pasternak: *"the time will come and the power of meanness and malice would be overcome by the spirit of kindness."* Parajanov responded to Vartanov: *"Dear Misha, I received your amazing letter... Never have you been more accurate in evaluating the world and expressing yourself…"*

the cost of litigation); (2) the claims are supported by existing law or by a nonfrivolous argument to change existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Federal Rule of Civil Procedure 11.

I agree to notify the Clerk's Office in writing of any changes to my mailing address. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Dated: On January 26, 2023

Respectfully submitted,

**/s/ ARTHUR BALDER**

2813 Palisade Avenue
Union City,
New Jersey
07087
Telephone:
(919) 888-3802

CC: All other Defendants (Via Pro Se Intake)