IN THE UNITED STATES DISTRICT
COURT FOR THE SOUTHERN
DISTRICT OF NEW YORK
————————————————————x

ARTHUR BALDER,

           Plaintiff,

  - against-

SUSAN SARANDON,
DAVID SHARA,
HONEY SHARA,
TIGRAN TSITOGHDZYAN

           Defendants.

————————————————————x

Case No. 1:22-cv-06401-JLR-SN


**MEMORANDUM OF OPPOSITION TO MOTION TO DISMISS, IN
SUPPORT OF THIRD AMENDED COMPLAINT**

Plaintiff answers the Motion to Dismiss of Defendants and submits this Memorandum of Opposition[1] in support of his Third Amended Complaint ("TAC"). Plaintiff beseeches Motion to Dismiss ("MTD") be quashed with prejudice because **Defendants utterly fail to meet the basic standard necessary to dismiss under Rule 12(b)(6) of the FRCP: the MTD conspicuously and shamelessly ignores the allegations that are in the TAC visible in plain sight, thus is written as if the allegations do not exist in the TAC**.[2] That alone corrupts, invalidates the use of <u>Rule 12(b)(6)</u> and makes the MTD inadmissible. It would be inappropriate, also, to partially accept any arguments in the MTD granting partial dismissal, when clearly the MTD is a sophistry that has been written *knowingly* without taking into consideration the totality of the allegations[3]. By doing that the risk of leaving claims untried only following arguments sophistically presented under such disguise, which violates the very essence of the Rule under which the MTD is filed, would only be too high and would incur in premature conclusions, without trying TAC's allegations that the MTD plainly ignores. The MTD can, acting unethically, ignore them, yet the Court should not. The MTD fails to address the allegations properly [*completely*, thus leaving out parts], it is rife with self-serving and blatant omissions, states falsities, propounds falsities and paltering interpretations, all aimed at confound, at disinform, by partially and biasedly cherry-picking only some allegations, or even part of them [avoiding the complete sentences to

---

[1] Any emphasis noted, unless otherwise indicated, is added.

[2] MTD is filed under Rule 12(b)(6), yet MTD pg 9, pg 10 present arguments under Rule 11(b)(3). This must be struck from MTD, because in order to fully prove the theory there propounded, evidence should be tried, yet they file MTD under Rule 12(b)(6). Basically they want the advantages of arguments under Rule 11(b)(3) not tried but forced inside a MTD to dismiss without allowing the evidence extant to be tried. **Therefore those parts of the MTD related to Rule 11(b)(3) should be struck and not taken into consideration at all.**

[3] "To dissociate one or some things from everything else is to destroy totally everything there is to say", Plato, *"The Sophist"*.

turn them upside down], then construing false arguments denied by the TAC's allegations themselves and the Exhibits thereto attached and the supporting evidence referenced in TAC, which they do not want to be tried by the Court—because they know are real.

After Defendants requesting and being granted 'more time', such flagrant irresponsible attitude, pretending allegations not present, turns the MTD into just another frivolous and concerning affair to delay and deflect, burdening (and mocking) equally Plaintiff and Court.[4] No matter how particularized the allegations, what is clear is that they had no intention to address them[5], making this MTD under Rule 12(b)(6) unviable, and deserving of sanctions.

Of note, if we take into consideration all the allegations present in TAC, then

---

[4] Plaintiff has included as Exhibit 2 the Motion to Dismiss filed by Defendants as answer to the SAC [Docket Nr. 52 filed on 12/05/2022], to show that many paragraphs coincide sometimes word-by-word with the MTD answering the TAC, without taking any notice of the presence of many and important sets of allegations in the TAC.

[5] MTD pg 5, footnote: "**allegation that he was coerced** […] **is** conclusory and **irrelevant because he acknowledges he agreed to accept it**" The whole idea of successfully coercing someone, is to get someone to do something that goes against someone's interest by means typified as coercive. According to MTD, because Plaintiff "agreed to accept it" then the coercion did not take place and is "irrelevant"; that is a sophism, a false argument, and wrong. **_That Plaintiff had no other remedy that to agree proves_ the success of the coercion from alfa to omega, not its absence.** The explicit circumstances, however, are alleged quoting extant evidence and dates in TAC, and is not irrelevant, but necessary to understand the puzzling incompleteness, absurdity and suspiciously short extension of the Producers Agreement. That Plaintiff was, on top of that, forced to summarize himself any provisions of a director/producer/distributor agreement in "one or two pages", is abusive and coercive: 1) Plaintiff did not have the expertise to be tasked with such responsibility, 2) it is obvious that imposing the extension and specifically requesting "only bullet points" [Shara did not wanted provisions and clear execution clauses, although he was explicitly writing them at the same time around that exactly period of time "finish the film and get to distribute it" ] of brief "gentlemen' agreement" [Shara's instructions] only show how Plaintiff was being cornered into signing ever-lasting disadvantage or else he would lose all the work he had already done: "project scrapped", "film is dead in the water" "I'm tempted to start over with someone else" [Shara's own threats if those terms not accepted, including no upfront payment, but a painting under representations of value that were false and reckless]. The intentions of the parties can only be understood, and at that clearly and unambiguously, from concomitant terms, manifestations and directions to actions, budgets gladly approved and excellently executed, all of it alleged in TAC—which complement, do not contradict the Producers Agreement.

many, if not all, the authorities quoted in the MTD to support it only support the TAC[6],
and make the MTD look, quite frankly, as flimsy and absurd a mechanical recital of
denials as it is[7].

## ON DOCUMENT DOC 74- [EXHIBIT 2]

MTD insisted in singling out as Doc 74-2 [Exhibit 2 'the correspondence'
between Plaintiff and Sarandon of February 2019] and in presenting it, in spite of it
being fully referenced in TAC. First, it is false that that is 'the correspondence', because
it is a part of it, thus incomplete[8]: the conversation starts before as the allegations
describe and without its preliminaries it cannot be understood properly. However, the
TAC [pg. 22 paragraph 26] also alleges the email sent by Plaintiff to Sarandon on June
18, 2016 right after the filming her sequence, when she made clear representations as
related to the Film, her participation, and what she expected from it, and also her

---

[6]For instance, many of the authorities quoted in MTD argue disputes over long contracts that cover a wide
gamut of situations: the Producers Agreement is a joke in comparison to them. Quoting such authorities is
misleading, since they are based on entirely different contractual foundations, which were fair and not
obtained under coercive manoeuvrers.

[7]How can the MTD affirm on pg 5 "Plaintiff has failed to allege any factual content regarding what was
contained in the invoices" when **TAC Exhibit 10 shows two invoices** which show clearly: "**Securing of
Theatres for Oscar-qualifying USA theatrical release of film 'American Mirror'**"? In short, the word
"invoices" is present 54 times in the TAC, and at that each time with descriptions of what those invoices
were related to. MTD pg 5: "Shara was only responsible if there was a new approved budget" and MTD
pg 5 "or that they [invoices] were part of an approved budget there is no plausible inference that Shara
was responsible for them." The word budget appears 42 times in the TAC, many of those occasions
reference the budgets, and/or describe them by quoting extant emails and dates.
    MTD pg 2 "Plaintiff alleges that on or around April 4, 2017 he and Shara entered into the Producers
Agreement" That is false: the TAC alleges that the agreement was being shaped in November 2016 and
ready, and the reasons why Shara did not sign it are also alleged in the context of the coercion forced
upon Plaintiff and how he was deprived of bargaining power. To unilaterally delay the signature six
months was part of the coercive manoeuvre of Shara to keep Plaintiff at a total disadvantage and on hot
embers—while requesting additional sequences he had no problem financing after denying any cash
upfront compensation to Plaintiff.

[8]The TAC describes all what happened before that correspondence, and the previous conversations that it
directly follows. Presenting only a part of it, pretending Sarandon's representations and written statements
from 2016 until 2019 do not exist in the TAC, is **their barely concealed attempt to implore this case
should be treated by the Court as one of 'lese-majesty',** instead of what it actually is.

promises[9]. It shows the relation between Plaintiff and Sarandon was cordial, and also particularly shows the way Plaintiff treated Sarandon at that time and for years to come afterwards. The email's title was "**A letter for M Sarandon with greatest gratitude**" [Exhibit 1 of this Opposition.] Plaintiff writes, among other things: "**With the truest admiration towards your talent and the human being you are, and with love and gratitude, Arthur**."[10]

That is the way Plaintiff treated Sarandon since the beginning. Let us remind, *in proper order*, how Sarandon treated Plaintiff and the Film.

In 2018, after accepting terms (PR clause, percentage of profits, artworks as material compensation) offered by Plaintiff as producer as the allegations show, after recommending steps previous to commercialization of the Film (she directly recommends "hiring an agent", "going to film festivals", i.e. bringing the Film to participate in them), she spurned the Parajanov-Vartanov Award, pretended the Film did not exist once it successfully premiered, and, in material breach of contract, spit to Plaintiff: "I don't have anything positive to say about your film" "I don't want to be associated with it" "if accepting the prints means I am obliged to do any PR, I am glad to

---

[9]Corroborated inter alia by Tigran's testimony in writing, see TAC pg. 32 *"you forgot that Susan [Sarandon] came for me, as all the others. You got Donald [Kuspit] and he is the one who is getting payed for every his word, so it's not a charity"* Tigran asserts energetically that Mr Kuspit's demanded some payment, but that Sarandon did not in exchange of her participation, comparing that to "charity", i.e. disinterested donation. MTD pretends these and other allegations simply are not present in TAC: [MTD [pg 19] "Sarandon and Tsitoghdzyan exercising a legal right to control their publicity rights [...] are not wrongful means or unlawful conduct. To the contrary, they are lawful exercises of rights." They are made-for-litigation tales placed in the MTD as excuses concocted a posteriori, but they truly do not deprive them of liability.

[10]The emails further reads: "Dear Susan, All this 7 years have had a compensation beyond my expectations as a documentary filmmaker (a very 'misty' and underfed category in the industry), because let me say you are an amazing human being and a professional that is so full of talent and of greatness, that I just, when I saw it with my own eyes and as part of what I am trying to do, was somehow blocked and incapable of assuming it."

give it back"[11]. MTD pg 19: "Plaintiff […] impugning her [Sarandon's] body of work" is also false because **it is Sarandon who unjustly impugns Plaintiff's work first and who announces outright breach of terms agreed on and accepted since 2016 simply because Plaintiff reminds her attitude was ungrateful and below professional standards not only fully justified by the PR clause**. MTD pg 19 assertion Plaintiff "accusing Sarandon of having an affair with Tsitoghdzyan" **is also utterly false[12].** Reading Plaintiff's reasoned email will be clear that he never accused Sarandon of anything. In any case: Sarandon, according to David Shara's own representations and univocal corroborations in writing to Plaintiff[13] was turning her back to the Film, impugning Plaintiff's work, attempting to breach the terms already accepted, simply because, **always according to Shara[14], she did not get what she wanted from Tigran, not because she got it,** which is fairly different from what the MTD interprets falsely to distract. Plaintiff had found increasingly alarming Sarandon's attitude once she had gotten all she wanted [written testimony of Tigran from 2016 shows initially in 2016 she

---

[11]Thus she stated unambiguously she had 'accepted' and received the prints. The deal, which included the offering of prints, contained other stipulations, which she also accepted. She cannot, after making several deals, decide to undo them a posteriori, or to cherrypick what stipulations yes and which ones no, years later, for reasons not specify besides sheer bad faith.

[12]The MTD tries to justify all the actions of Defendants because Plaintiff presented his reasoned, and justified, concerns to Sarandon. Only after she communicated alarming breaches, Plaintiff was obliged, and justified in doing so, to defend his work and to remind Sarandon of her previous representations and assurances, and her liability.

[13]TAC pg. 109 transcript of WhatsApp messages between David Shara and Plaintiff corroborating specific conclusions previously stated and many times before commented by Shara. Plaintiff summarizes to David Shara: "What stands clearly is that, no matter how good our work might be, no matter if you made clear the point regarding she being rewarded [a reference to the business proposal a few months ago that she accepted], **she WON'T do anything basically because she did not get what she wanted --from Tigran. Did Harvey Weinstein punish actresses because they did not give him what he wanted…?"** David Shara answers to all that and more unambiguously: **"Agreed on all fronts**" "Ashley isn't more than a model in her bra for 30 seconds [10/16/18, 21:42:52] David Shara: [while] **"Susan is [the] star"** [10/17/18, 11:35:49]"

In this respect, Plaintiff had relied in representations and commentaries made by David Shara as confidant of Tigran.

[14] "No one is more hated than he who speaks the truth", Plato, *"The Apology"*.

clearly wanted nothing in exchange for her participation], pointing to breach all her representations since 2016 acting in bad faith, after Plaintiff's dedication since 2016 into a Film that simply was earning her praise, awards, and many more positive elements than many films, not all, she had participated in during past years—which is objectively real by sheer comparison[15]. The falsity propounded by the MTD hides the true alarm that Sarandon's brute email sounded in Plaintiff with her shocking rude and low-standard words to him: **Sarandon was spurning a Film *not because the Film itself, but because she hadn't got what she wanted from her personal relationship with Tigran*,** whichever it had been—that was not the question, and all according to the many representations by David Shara to Plaintiff, as evidence shows. In any case, Plaintiff had been clearly under the influence of David Shara's conclusions as regard to the relationship between Sarandon and Tigran, evidence proves.

That was and is very concerning given the consequences of Defendants concerted wrongful actions.

## STAMENT OF FACTS

The Statement of Facts section presented by the MTD is incomplete, leaving out elements because they do not fit the narrative to dismiss they are trying to force upon the TAC itself[16].

### I. BREACH OF CONTRACT CLAIMS

---

[15]TAC contains allegations that particularize the advantages Sarandon obtains thanks to Plaintiff's work: critical acclaim internationally, important awards, and several nominations at film festivals, plus other material advantages as described before. That Sarandon does not 'need' them, or does not want them at a later date, is not an excuse to break her promises, impugn Plaintiff's work, neither to spurn them, and is against the laxest imaginable understanding of the PR clause she accepted.

[16]Right from the beginning Defendants choose to avoid allegations and entire parts of the TAC that simply go against their interest. Those omissions are addressed in the following sections in direct references to the TAC without unnecessary reasoning, because that would make it impossible to fit the space limitations of this Opposition to MTD.

### A. Against Sarandon.

Besides what has been stated in the previous introduction, in 2016 Sarandon promises verbally to provide any necessary talent release [TAC's Tigran's written testimonies from 2016]. She willingly participates in the Film. TAC provides not only an allegation but also written testimony by Tigran via email that affirms and corroborates the terms Sarandon stipulated in 2016: she wanted nothing as a compensation, and she knew the film was for distribution and gave permission for it. TAC alleges also Tigran assures Sarandon agreed on her participation in the Film being promoted via massive news agencies public releases. The Producers' Agreement **does not** regulate the contractual relationship between Plaintiff and Sarandon[17]. Sarandon further affirms approval of her image in 2017 and 2018, in writing; Sarandon can see and in fact confirms in writing that she had seen the film in 2017 and 2018. Sarandon is aware, and confirms satisfaction with via Tigran, of the massive press releases distributed by news agencies in the US, Latin America and Europe, as specified in TAC. Sarandon's promises to Plaintiff in presence of witnesses, of which Tigran's emails quoted in TAC give testimony, that she would provide any necessary talent release whenever requested. Sarandon's attitude towards the Film in 2016, 2017 and 2018 —she sees it, recommends retouching her image, she knows the Plaintiff's plan and schedule for distribution— are more than sufficient to rely in her promises..

If that were not enough in 2018 Sarandon's receives a contract proposal from Plaintiff [TAC, Exhibit 2] with better terms than those agreed by her on in 2016. Plaintiff offers terms to her:

---

[17]Sarandon's wrongful denial of the terms she accepted in 2018 only would bring her back to the terms she accepted in 2016, corroborated by written testimonies of Tigran, by witnesses, and by her concomitant and consequential actions in 2016, 2017 and 2018.

-**A large print**, hand-embellished and signed by Tigran, of your own portrait (estimated value around $40k)[18]

-And **another print** hand-embellished and signed by Tigran of your choice (estimated value $40k)

-Plus a **10% of all profits generated** by the movie in any platform.

**We'd like you** along with Tigran **to be part of the PR of the film**, as far as your agenda would allow it, and organizing everything in anticipation for your convenience.

She accepted that proposal in writing as Exhibit 2 of TAC shows, and comments it[19]. Sarandon, not her assistant, signs personally and directly some of the set of written communications provided as part of Exhibit 2. Plaintiff offers two prints because, after commenting these terms with David Shara and Tigran both had made themselves responsible to provide them—*if* Sarandon accepted all the terms. Plaintiff sent this proposal because Plaintiff is the Producer of this Film, it was his idea, and he was the right person to do it[20]. Plaintiff sent this proposal to Sarandon out of sheer

---

[18]The estimations of value, as usual, were provided by Shara and Tigran to Plaintiff.

[19]MTD pg 14: "it is clear from Plaintiff's own allegations that there was no assent by Sarandon." That is outright false. TAC pg 83: "Sarandon accepted all the terms."

[20]Sarandon's and Honey Shara's tortious interference was intended to eliminate Plaintiff as producer of the Film and deprive him of his *obligation* and *right* to set up distribution [see TAC pg. 203 footnote 170 David Shara to Plaintiff, November 2016, extrinsic evidence that the Court cannot set apart from the insufficient 'four corners' of Producers Agreement: "The best solution here is to finish the film as best you can and **get it into as many film festivals and events as possible. We are partners in this film and the better it does, the better we do together.**" Imperative mood: "**Finish the film and try to get it sold. Get it into theatres, amazon, Apple TV etc**" "If you are so confident then take the 33% and finish a killer movie. **If it goes well you will make hundreds of thousands of dollars.**" "You need to **promote the film, enter into film festivals and take care of it as it was your own baby.**" In 2019, May 28, David Shara to Plaintiff: "**I think you should try and find someone to buy this project ASAP**."] —once he had produced it and once many opportunities had been already lost. In 2020 Honey Shara tries to force herself as part of a new contract whose terms are not explained by her attorney, besides coercing Plaintiff to accept them, blindly, or else "the film will die on the vine" his credits would be jeopardize, &c. See TAC pg. 202 <u>**Statements of fact**</u>: "**The name and likeness releases have not been secured by our clients [Honey and David Shara]; they can secure all of them in an expeditious manner - but you have to take a backseat on this project []**". "**If you don't want to let them run the exploitation of the film at this point, our client is prepared to let the film 'die on the vine'.**"

<u>**Since 2018, David Shara requested to list and credit Honey Shara as executive producer, and those changes were introduced as early as 2018 in the website of the Film. She did not act, neither**</u>

generosity.    MTD's excerpts of pleadings to get them dismissed are based in sophistically isolating one sentence and not providing the next one, or simply in providing a part of a sentence… which is misleading in plain sight, and utterly frivolous as argument to dismiss, since the TAC's allegations provide the full and detailed context. For instance: Sarandon accepted PR in the terms before exposed as the evidence provided shows, which are quite lax, but those terms make expectable and logical Sarandon's thanking privately and also publicly (that's the aim of the PR clause) the Parajanov-Vartanov Award. As regards to prints offered, MTD prevaricates stating "Plaintiff's own pleading indicates that Sarandon stated that she did not want prints that were 'gigantic'" because Sarandon's words in fact are that **she would _love_ to have them**, just not too big.[21] Sarandon accepted the proposal of PR as a general term, and here the MTD tries to transform the _specific_ Armenia-trip discussed, into the general clause. The PR clause is accepted, and any PR clause makes sense only once the Film is premiered and runs a festival circuit and a commercial release—not only _before_, which makes no sense at all. The _specific_ Armenia-trip is <u>one possibility among many,</u> and possible only under understanding affirmatively the general sense of the PR clause proposed. Sarandon explains that _that particular, specific trip_ may not be possible, because of potential conflict with other productions' dates. **She does not reject the PR clause—at all. She never rejected the 10% of profits, neither the two prints; on the contrary, she mentions what sizes _exactly_ she would 'love' to have—and she gets**

<u>presented herself, as the agent of a principal.</u>

[21]TAC, Exhibit 2, March 27, 2018, email signed by Sarandon personally: "Thank you so much **I would love to have prints** that aren't gigantic."], **only because she was choosing smaller sizes, not because she did not want them, in fact she loved to have them, and she thanks the entire proposal**. In terms of going to Armenia in June, I know that Im working on my TV show and there's no way to know if that would be possible at this point, we'd just have to wait, **though I'd love to visit Armenia**."

**them because Plaintiff offered them and took care of the sizes and made sure of delivery—She thanks Shara's further clarification, that he wants 'to make money for Sarandon', that he 'intends to maximize exposure and profits'— she affirms commercialization of the Film and recommends steps into it, she is aware of dates, just weeks before the Films world premiere in Los Angeles.**[22] That is because Plaintiff had offered all those terms, and Shara follows Plaintiff's indications because both think it is the best for the Film's release, and because both thought it was generous on their side. Shara's intervention in that same conversations leaves no doubt as to the capacity of Plaintiff to satisfy each and all of the terms in his proposal. Yet it is Plaintiff who sends it and she knows it is Plaintiff who has directed and produced the Film. The MTD presents made-for-litigation tales and abstruse excuses denied by the allegations and evidence presented. In fact this is further explained by Shara in the same conversation, he writes to Sarandon: "Arthur Balder has done an incredible job on all aspects of this film including submission to film festivals. He deserves an enormous amount of credit. He has put in so much time, effort, expertise and skill. I am beyond proud of him. It is very rare that someone surprises me these days, but he truly impressed me with his patience, expertise, originality and skill level." Sarandon could not—cannot—choose retroactively not to have struck this deal, or parts of it, neither to renounce to its terms— unless general law and natural test does not apply to her for unknown reasons[23]. Not sending the talent release to allow commercial distribution is a breach of contract

---

[22]Additionally, **TAC's Exhibit 2 and allegations prove that** David Shara confirms her requests as regards to the sizes of the prints. The business proposal sent to her by Plaintiff, bounds her to the project, its course of performance, which she knows and recommends on in writing, and binds her to the Producer of the Film, the Plaintiff, who is the person who sent her the terms of the proposal in 2018, and the person who also was preparing the distribution, allegations show.
[23]Lese-majesty, which is by itself extraordinarily un-American.

intended to harm Plaintiff professionally and financially. As regards to the PR clause she acts in bad faith. That is why **her email of 2019,** stating suddenly after years of work making the Film, that she "did not want to be associated with the Film"[24] **was avery alarming attempt at breaching terms and promises on which reliance Plaintiff had invested years of work, thousand of hours and tens of thousands of dollars**, and at that, according to independently appointed juries, with excellent results. Her stating "I don't have anything positive to say about the film" was slanderous for reasons explained in the TAC, because it was clearly false, and a falsity aimed to harm. In light of context, this is not an opinion but slander meant to insult: because there were objectively positive things to say on her side about the film —she was being praised by film critics, as alleged[25], she had won already the Parajanov-Vartanov Award thanks to the Film, she had gotten the prints in the sizes she chose and she had agreed upon a 10% of profits, among other terms.[26]

That slanderous email of hers, attempting at breach of contract (recall remember the chronological order) was unleashed by Plaintiff expressing his frustration in the face of what was far from the laxest understanding of the PR clause offered to and accepted by Sarandon. **The fact that someone enjoys great public acceptance and reputation does not allow that individual to act in bad faith freely and without**

---

[24]Sarandon actions are those of a reckless hypocrite who publicly propounds values to which she does not adhere privately, since she relies on privilege rather than on equality, and since her very words and promises are worth nothing because she has not honoured them, evidence proves.

[25]TAC pg. 225 Italy, Fabrique Du Cinema, Carna: "Sarandon looks at her most charismatic in American Mirror", just to cite one example among many others; Chtistos Solomos, Greece, "Sarandon looks more human than ever".

[26]Furthermore, the TAC pg 98 shows that Shara's words state in the conversation that the percentage of profits is "for her participation **and guidance**." She did not fulfilled either that condition, because once that conversation ended and she got what she wanted the way she wanted, she pretended the Film did not exist, and she spurned the Parajanov-Vartanov Award in a way that breaches the PR clause. She thanked, however that proposal, also, unambiguously.

**regard of consequences.**

To argue that there was no meeting of the minds is mere recital only possible by pretending the facts are not alleged in the TAC visible in plain sight. Furthermore, with Sarandon commenting on the distribution of the Film, confirming it and even recommending first steps previously to commercial distribution, all those allegations make it impossible to argue that there was no meeting of the minds.

Sarandon cannot choose retroactively with whom she struck a contractual relation: evidence proves it, her actions confirm it. It is with the Producer of the Film with whom she had struck that contractual relationship, and Plaintiff requested that directly to her and she confirmed directly to him. The Producers Agreement does not govern that contractual relationship between Plaintiff and Sarandon. Among the many contradictions that form the MTD's conundrum is one that states that it is the Producers Agreement that govern the liabilities of Sarandon and Tigran to Plaintiff and the Film. That is false. Sarandon and Tigran cannot "exercise a legal right to control their publicity" [MTD's pg. 19] because evidence proves they already exercised those rights years *before* and struck terms and conditions and accepted them. They cannot use it as an excuse to elude liability for the harm they have caused already to Plaintiff and Film, and at that in a vindictive and malicious way because the lack of distribution clearly goes against their own interests[27].  In any case: many formal attempts for years [2020 to 2022] to reach an agreement prove that Defendants **were never trying** "to exercise a legal right to control publicity rights": they were plowing ahead to ruin the Film's many possibilities conquered in the 2019's stellar film festival distribution circuit— recommended as a previous step to commercial distribution by Sarandon herself.

---

[27]See TAC, Exhibit 2, see TAC, 2016, Tigran's terms expressed by him in writing.

B. **Against David Shara.**

In 2016, after months requesting contracts to formalize the terms previously agreed on as also allegations show evidence of, David Shara **and** Tigran harassed, insulted and Tigran threatened physically Plaintiff in writing[28], in a concerted attempt to put Plaintiff under extreme duress simply because he insisted in setting the terms in contracts, then *both* David *and* Tigran signed and sent a 24 hours ultimatum to accept disadvantageous terms or else [David Shara's words in TAC:] "the project will be scrap", "the film is dead in the water", "I am tempted to start all over again with someone else" [i.e. filming all over again if Plaintiff did not accept].[29] The TAC's alleged previously orally agreed on terms should be enforced as valid and also the course of performance agreed on in several budgets in 2016, 2017, 2018 and 2019: Plaintiff has presented also evidence in form of testimony by Tigran that clearly shows the project was meant to be

---

[28]Coercion: use of **express or implied threats of violence** [Tigran's physical violent threats explicitly mentioning he knows his address inviting to solve the issue physically fighting] **or reprisal (as discharge from employment)** [Plaintiff must leave the project, is fired, "we are done working together (Shara to Plaintiff), must renounce to previously accepted terms or else the film will be 'dead in the water' 'will start over again with someone else' project in the garbage'] **or other intimidating behaviour** [Tigran's physical violent threats explicitly mentioning he knows his address, David's acts of pressure, 24-hours ultimatums signed by both, imposing extension of the contract, designed by both] **that puts a person in immediate fear of the consequences** [Plaintiff may lose all the work he had done before, losing time, business prospect, and professional credit already merited and won-at that congratulated by both coercers] **in order to compel that person to act against his or her will or interests** [prepare a two-page contract, renounce to upfront compensation, reduced measurements of the painting, much smaller percentage of profits &c].
    2016's allegations and detailed evidence quoted show Defendants' unlawful threats, implied and explicit, were meant to coerce Plaintiff to act in a manner otherwise he would not, depriving him of all bargaining power. Aggravating this situation, **all** extant evidence proves, in writing, this extreme duress was the consequence, simply and clearly, of Plaintiff simply requesting something absolutely reasonable: insisting on signing a contract describing and preserving his rights according to the terms previously agreed upon.
[29]It is accepted doctrine that if a party enters into a contract under duress (generally, under threats of harm or retaliation), then that contract may be considered illegal and thus unenforceable. Even in situations where most of the contract is in fact legal, the entire contract may be rescinded (i.e. cancelled) if it can be proven that a single term was entered into under duress.

done in less than 12 months when those terms were accepted[30]. Emails exchanged with

Tigran also prove the terms of the oral agreement[31], only superseded by the Producers

Agreement after submitting Plaintiff under duress. Plaintiff was being robbed of any

bargaining power. That is not a fair preparation of a contract that must regulate direction,

production and distribution. The contract[32] is insufficient to regulate all aspects, vague,

incomplete, and that's why so many terms met around that time and afterwards are

necessary to understand, to see in fact clearly, what was the intention of the parties, and

there were budgets shared and approved in 2016, 2017, 2018 and 2019, and MTD

pretends they are not part of TAC. These budgets contained the terms and the proposals

in detail that are being alleged. These budgets were accepted and congratulated by David

Shara, and he paid correspondent invoices. MTD falsely states the TAC has not

particularized sufficiently: Exhibit 10 contains two Invoices that explicitly make

reference to the Oscar-qualifying theatrical release agreed on, scheduled and in

preparation. The extension of the contract itself: Shara demands it to be "one or two

pages long" in writing, Shara is who threats Plaintiff to put all his work up to that

---

[30]TAC pg. 29, email from Tigran to Plaintiff and Shara: "**if you had a proper contract with producer, you will be in charge and penalized for 12 months late**". Even Tigran stated Plaintiff **had no "proper contract"**... Tigran explicitly talks about the fact that the project was discussed and approved of to be done in less than 12 months. The TAC also contains Tigran's comment in 2016 that Plaintiff was requesting contract just around the time the film was expected to be released, which also shows indication of the expected initial period of less than 12 months. See also TAC pg 17-18 P 20. Production memo and its correspondence.

[31] TAC pg 10 "Plaintiff has also failed to allege any writing that contains all of the material terms of the Alleged Oral Agreement entered into by Shara or Tsitoghdzyan, the parties being charged." That is false: see TAC pg 17 P 20 and onwards.

[32]TAC describes why the contract was signed so many months after [ready to sign by end of November 2016, but Shara refused to do it and signed it in April 2017]: simply because Shara used delaying the signing for five months as another tactic to deprive Plaintiff of any assurance—while requesting more sequences to be shot, increasing, and taking advantage of, Plaintiff's responsibilities and expertise, like the ones including Tigran's son, shot in February 2017. Shara constantly acts in bad faith, it is an ingrained modus operandi of the Sharas, in order to gain advantages or to simply harm Plaintiff in different ways in coordination with the other Defendants.

moment in the garbage. If we accept those tactics in business in a Court, the standard would be very low, because there is an enormous imbalance between lack of terms in the contract and the rich evidence, concomitant, contemporary, in writing, budgets, invoices, that leaves no doubt as to what was the intention of the parties, **complementing and not contradicting any of those terms present yet insufficiency detailed in the Producers Agreement**—because it was an imposition it to be 'one or two pages long'. To impose the limitations of a contract's extension that is obviously not fully integrated, obtained in those coercive[33] and disadvantageous circumstances to Plaintiff as fully alleged, and to use it to justify an unreasonable position after causing enormous harm, a position that is contradicted by years of budgets and invoices, memos and many other written agreements, seems a forced denial of what is plain-sight obvious in the evidence: that David Shara breached his agreement to distribute the Film, his fiduciary duty and trampled the covenant of good faith not once, but on a regular basis, and at that thanks to others collaboration and own breaches, with the sole purpose of harming, going against all his interests. The calculation presiding over their actions is visible: they don't care about their own loses because they can afford them, and because in exchange they would ruin Plaintiff's reputation and well-deserved economic prospects: they act maliciously. The allusions of David Shara in 2016 to the fact that Plaintiff is burdened with distribution if he wants to make 'any money', is also crucial[34], because Plaintiff in

---

[33]5 U.S. Code § 6385 - Prohibition of coercion "the term "intimidate, threaten, or coerce" includes taking or threatening to take any reprisal (such as deprivation of appointment, promotion, or compensation)". From allegations, testimonies, and written extant emails, and also from witnesses, the actions of Defendants can only be identified as coercive, threatening, and intimidating in 2016, 2019 and 2020.

[34]TAC pg 51, 2016 Shara to Plaintiff: "The best solution here is to finish the film as best you can and **get it into as many film festivals and events as possible**. We are partners in this film and the better it does, the better we do together." Imperative mood, burdening Plaintiff with more tasks, besides making a good Film…, if he wants to be rewarded, because he denies [TAC describes in detail] any upfront compensation based on Plaintiff work as producer, director, writer: "**Finish the film and try to get it**

exchange of that is also denied any upfront compensation based on budget. Plaintiff is denied cash payment [upfront compensation] under 24-hours ultimatum coercion, under the clear representation that Tigran's paintings were, at a minimum of 150,00-250,000 USD value by end of 2016 [measurements are part of those allegations and present in the emails referenced], and with the condition that Plaintiff must "get to work distributing it [the Film]" "try to get it sold" "get into theatres[35], Amazon, Apple TV etc." Memos, invoices, budgets approved, prove in writing that that plan *continues* in detail and is developed from month to month between 2016 and 2019 [a long trail of proven course of performance]. Plaintiff obtains opportunities, details them to Shara, yet none of those opportunities can be profited because Shara does not obtain the talent releases he promises many times he will obtain [and because the others do not supply them when Plaintiff, entitled to do so, requests them directly to them], simply to harm Plaintiff because he "does not care about losing the 300,000" [Shara's own written words] invested[36]. The TAC contains detailed evidence as to many potential customers and opportunities lost directly because Defendants broke their promise to present the talent release with purpose of harming Film and Plaintiff. The MTD denies they exist in the TAC simply for convenience, but they are present in the TAC on multiple pages.

Therefore MTD's pretension to pass as valid their theories is utterly frivolous.

---

sold. Get it into theatres, amazon, Apple TV etc. **That is the only option here.**" "So **I recommend we finish the film and you get to work distributing it**." Shara states it: 'we' finish, but 'you' [Plaintiff] 'get to work distributing it.'

[35]Afterwards, following budgets, decisions, approvals and even invoices show unambiguously how Shara never changed these intentions, on the contrary. Additionally, all these elements simply complement, do not contradict, was is insufficiently integrated in the Producers Agreement, which makes references to the 'business', yet there is no reasonable possibility of business unless Film is properly distributed according to seasonableness and proper course of performance, both clearly part of all the Defendants' actions previous to Sarandon's tortious interference and attempt at breach of contracts in February 2019—as the 'correspondence' proves.

[36]TAC pg. 162 Shara to Plaintiff CCed Tigran: "I don't care about the 200-300,000 dollars I have put into this project. I do not care about this film."

C. **Against Tsitoghdzyan.**

The Producers' Agreement does not govern the contractual relationship between Plaintiff and Tigran, neither Tigran's obligations. First, Tigran promised to Plaintiff he would provide any talent release necessary for distribution in the oral agreement since beginning of 2016. The project was meant to be accomplished in less than 12 months, Tigran's own proposed and accepted terms in 2016 in writing prove, in the context of the Producers Agreement's coercion. His assurances were explicit and exact[37]. Tigran never contradicted these terms ever[38]. But when Plaintiff requested from Tigran, in the name of the promises made since the beginning and also because David Shara requested that following those stamens of Tigran in 2016, Tigran never sent back the signed release[39]. Tigran encouraged and participated in massive promotion, wrung a copy out of Plaintiff for his own private promotion, yet he never did what he had to ensure distribution. Tigran took advantage of Plaintiff, enriched himself, lied about his intentions for years, then thwarted the distribution—against his clear promotional interests—because his purpose was malicious.

Permits related to Tigran's son form a set of important allegations in the TAC over which Defendants attorneys also have shown utter amnesia. That is very concerning

---

[37]TAC, pg. 40 p47: "believe me, I'm honest that not even for a second I had thoughts that I want a dollar for it [his participation in the Film] or any credit", "**I refuse any kind of rewarding for this movie, I'm a subject here and don't want any credit, percentage or other rewarding forms for it**." [TAC pg. 34 p]

[38]On the contrary, he affirmed them in self-interest. The MTD is presided over by pretending allegations are not present. TAC pg 263, paragraph 345 **Tigran to David and Plaintiff: "We are a team here and have the same goal to promote and get the best out of it."** Tigran only got the best out of it, the massive promotion he and Shara pushed Plaintiff to take to the highest level possible, then leaving the distribution in the lurch because he did not fulfilled his obligations and promises—because he unlawfully obtained a copy of the Film for his business promotion.

[39]The same contract he was inviting others to sign, the same one Donald Kuspit signed twice after Plaintiff petition. Apparently it was good for him to invite everybody to sign it, not for him to sign it.

when filing a MTD under Rule 12(b)(6). Tigran proposes to introduce his son, a minor, in a new sequence, he made himself responsible to provide all permits for him, including the mother's. [TAC pg 54 onwards.] The releases were never provided, although they were requested multiple times. Tigran introduces his son to promote him in future prospects of the child's career[40], then does not provide releases signed to keep the Film hostage in distribution against his representations.

Tigran refuses to do what he promised in coordination with all other Defendants. In the phone conversation recorded in 2022 [another set of allegations in TAC over which Defendants' attorneys show utter, self-serving amnesia] between Plaintiff and Tigran, Tigran affirms and recognizes he had promised to present all those talent releases, then goes on to affirm: "I wash my hands", "talk to David[41]" He also acknowledges expressly that he never sent releases related to his son, that Plaintiff had requested them multiple times in 2017 and 2018 in the name of David [Shara], who told him to request them, as emails show;  that Susan told him she would never sign the release for Plaintiff; that Susan requested him to pay the attorneys facing Plaintiff claims, that he set her in contact with Honey Shara via emails. Expressly stated that he would sign release only if all others agree, confirming his action was coordinated with David, and implying that it would only happen if David and Honey succeeded in obtaining new terms in a new contract [thus confirming representation of fact in 2020 by them that they could get all talent releases 'expeditiously' but that they never had gotten it in spite of the course of performance chosen, agreed on, invoiced, and shamelessly trampling the Oscar-qualifying US theatrical release and the online distribution

---

[40]Tigran assured to Plaintiff that his son may one day become a good actor, and that was one of the reasons to allow him to appear in a sequence of the Film.
[41]Tigran's testimony proves his actions are coordinated with Shara and Sarandon, are interdependent.

specifically planned for and prepared since 2017, emails and budgets prove—Tigran tramples all promises made orally and in writing in 2016, 2017 and 2018 while unambiguously and actively taking advantage of Plaintiff's work and dedication under fraudulent representations. The coordination between Defendants is manifest in David Shara's own words: in 2019, May 28, David Shara to Plaintiff: "remember very few people signed the releases" in the context of ordering Plaintiff to cancel the film festival circuit, and threatening Plaintiff that he would not be able to distribute the Film unless Plaintiff presented apologies to Sarandon and Tigran, stating he would not pay any pending invoices stemming from the approved budgets of 2018-2019 [emails prove] unless Plaintiff did so[42]. Then Sarandon's office in 2022, on an SMS: "Susan will only sign if Tigran and David agree." Tigran had no say in agreeing to anything, because he had agreed in 2016 explicitly stating his terms, he had been taking advantage of all the publicity the press releases were having in 2017, 2018, even appearing on National Armenian TV next to David Shara announcing the imminent distribution of the Film. Sarandon had no say [it is sheer interfering] in the contractual relationships between Plaintiff and Tigran and David Shara, yet **she was making her signature conditional to Plaintiff being coerced into new terms different from those that had been already made clear years ago since 2016** [in 2020, Honey and David, both, state they want

---

[42]MTD pg 7 "Shara […] (iii) **encouraged** Plaintiff to apologize to Sarandon". The emails extant prove David and Honey Shara demands cannot fall within the category of 'encouragement'. It was sheer coercion (threats clearly expressed in writing announcing reprisals if Plaintiff did not presented such apologies to Sarandon and Tigran, for having expressed to Tigran that his portrait of Plaintiff's wife, after sent to Plaintiff almost two years delay… was of very poor quality and unfinished), with harassment and written insults, professional threats of reprisal, and finally exerting real financial duress on Plaintiff and his company in a last-ditch, all-out attempt to impose cancellation of festival circuit in 2019, simply because Plaintiff rejected such cancellation for being a professional reprisal and part of the coercive tactics of Defendants; **recall that such cancellation would have deprived Plaintiff of a great part of the accolades won as described in TAC**.

Plaintiff to sign a new contract, without stating any terms, or else 'the film would die on the vine' because they never obtained any talent release but 'they can obtain them al expeditiously'[43]. Sarandon was tortiously interfering with the contract, and with the contractual relationship between Plaintiff and Tigran. Her interference had cost the ruin of the distribution and of the distribution plans. Sarandon's wrongful actions caused Plaintiff to lose his agreed on Oscar-qualifying theatrical release in the US [invoices show] and the online distribution he had been working on as a consequence of agreed on terms, among other things.

The allegations as regards to Future projects Plaintiff was deprived of are clear. Again, the MTD pretends they are not there, it seems useless, and also impossible for limitation of pages, to invoke them one by one, Plaintiff invokes them and refers to the TAC.

# I. <u>TORTIOUS    INTERFERENCE    WITH    CONTRACT    AND BUSINESS RELATIONSHIPS</u>

A. Breach of identified agreement: Producers' Agreement. As a consequence: breach of the agreement with composer, Mark Petri. Loss of distribution contracts and opportunities [MAD Solutions et al alleged TAC].There is breach of identified agreements, as they are described in TAC with detail, the existence of complete sets of emails showing budgets exchanged, terms and dates specified, and some invoices have been provided.

Their actions interfere with third-party agreements—as alleged. They pretend

---

[43]All communications show a clear indication of statement of facts, they are not barred under FRE 408. They were not intended to resolve any dispute, they were intended to coerce Plaintiff into signing a new contract where Honey Shara will be introduced, and by which all alleged in TAC indicating Plaintiff was to distribute the Film, would be changed—with no guarantee that Shara could distribute the Film at all—and all that after distribution losses.

the contract between Plaintiff and the Film's composer, Mark Petrie, does not exist, yet it exists, Shara knew there was a deal with him, and its terms. Lost potential customers are many as described in the TAC, and again MTD's references to MAD Solutions distribution is only burdensome and a frivolous denial, because it pretends the TAC does not particularize. The arguments of the MTD are word-for-word basically the same presented in the anterior version of the MTD to SAC.

The TAC shows knowledge and Intentional Procurement of the Breach by Sarandon and Tigran, and the use of wrongful means without justification [coercion, financial duress, constant threatening Plaintiff's professional career and credits,] and Unlawful conduct [Sarandon threats Shara with litigation to successfully obtain from him cancellation of new projects, cancellation of film festival circuit, cancellation of distribution of Film, and their coordination and her enormous influence occasions harm to Plaintiff].

## III.  **FRAUD CLAIM AGAINST DAVID SHARA AND TSITOGHDZYAN.**

The arguments of the MTD are frivolous. The TAC proves Plaintiff was not able to find out the fraud extant behind Phillips' auction records related to Tigran's works, which they use to present a false pretense of value since 2014 publicly, because 1) he received the Painting almost two years after the date stipulated 2) Plaintiff discovered the fraud of the auctions in conversations with Phillips employees by end August 2020 and 3) the statute of limitations applies because the fraud allegations were filed at the beginning of August 2022.  The TAC presents explicit actual matter and plausible inference of intent to defraud. The reliance was justifiable, but also imposed by

the coercion[44]—Plaintiff has no other remedy than to accept, and TAC shows emails that prove Plaintiff tried to get upfront compensation, and Shara kept raising the representations of value of the paintings of such and similar measurements. TAC shows Plaintiff tried to get a cash upfront compensation to accordingly compensate Plaintiff's work as Producer, Director and Writer. The detailed itinerary of emails presented in the TAC also shows how Shara's and Tigran's representations of value as regards to Tigran's paintings *grow* in the own written words as he [Shara] tries harder to convince Plaintiff that he must accept any Painting, but not the agreed on initially, because he does not want to pay upfront compensation. MTD argues that the quality of the painting is not specified: yet the price is specified. It is expectable that the painting should be of the represented value and quality[45]. In any case, Plaintiff insisted in getting a cash

[44]MTD propounds falsities: the detailed conversations quoted in TAC's section 2016 show that the conversations are references to similarly sized paintings. In fact, at some point Shara offers a much smaller painting, and that prompts Plaintiff's protest specifically as regards to that aspect. MTD pg 22 reference to reliance on public auction records that only were discovered were directly orchestrated, thus fraudulent, by Shara and Tigran by end August 2020, cannot be counted as reliable: it is Shara and Tigran who reinforce in 2016 the idea of value based on those auctions, to increase the assurance to Plaintiff as regards to value.

[45]If someone buys fish at a supermarket, the reliance on the fish being sound, edible, and not rotten, is expectable. That is the purpose to buy fish: to be able to eat it. The fact that the advertisement does not show explicitly written that the fish on sale 'is sound' does not precludes the customer from relying on the basic notion and principle that the fish he is buying *will be* 'sound and safe, and edible, not rotten. Nobody would buy it if it were not edible. The painting is proposed as a compensation for Plaintiff dedication up to May 2017 by contract, when the film was supposed to be finished—if Defendants would not request more and more sequences and betterments, stretching Plaintiff's involvement. Therefore, the painting should be 'sound and safe' as a representation of value that Plaintiff could rely on to sell in the future for the value represented or even "potentially much more" [value, Shara's own words]. The MTD pg 5: "Plaintiff's **allegations that the painting he received was of lower value and inferior quantity than what was promised to him also do not support a claim for breach (TAC ¶¶310, 335), as the Producer Agreement did not specify those items."** The fact that the contract did not make any specific mention as to the quality, does not precludes from expecting it to be unfinished and of obvious less quality than all other 'Mirror' series paintings, a fact that it is mentioned in the Producers Agreement—and at that after almost two years delay in the process of its making. The auction records of 2014 and 2015 are a fraud orchestrated directly by Tigran and Shara, thus, to continue with the analogy, 'the fish' was potentially not edible in the future, thus the painting something that could not be sold at a later date, besides being incomplete and of lower quality, and not correspondent to the total Plaintiff was involved fully responsible for the Film's production and postproduction and settling distribution, fat beyond the May 2017 end date on the Producers Agreement. In order to degrade the paintings value even more,

compensation and abandoning the project, yet he was forced to accept any painting, and he was denied upfront or cash because he was tasked to distribute the Film successfully if he wanted 'to make any money', or else to sale the painting at a later date. The date was May 2017, and the painting was not given to Plaintiff until February 2019: Plaintiff was denied the possibility of making any money, if he needed, because the painting was not being given to him, in material breach of contract. Once he tried, Phillips[46] employees elaborated on the reasons why and how Tigran and Shara had tampered the auction records, with David Shara participating himself remotely in the auction of 2015, to inflate the appearance of value of Tigran's paintings in the market and to better screw up not only Plaintiff, but any other potential buyer.

## IV. DAVID SHARA'S BREACH OF FIDUCIARY DUTY.

Not duplicative in light of the allegations present in TAC since it is not based on allegations of fiduciary wrongdoing that are expressly raised in Plaintiff's breach of contract claim, but in the promises.

## V. PROMISSORY ESTOPPEL

Not duplicative in light of the allegations present in TAC, since many of them regard promises and agreements that are separate from the obligations under the contract. There is much more than simple oral evidence supporting the existence of the

---

Tigran never included that painting in his official websites paintings' galleries—yet included a complete section with Plaintiff's text [Copyright Claim], advertising with the text publicly for years that he, Tigran, had copyrighted it, which is false, plus he did not have any permit to use that text indiscriminately online.
[46]Phillips denied permission to use of the 2015 auction of Tigran's lot by October 2020: this does not excuse at all the possibility of distribution before that date because 1) it would have taken just a couple of weeks to rearrange the Film without that specific part at any time, or 2) It would had been also easy to do so even if the film had been distributed, by substituting the electronic files of Film without disrupting at all the commercial distribution. It is, however, Tigran and David who specifically insisted in including such scene at all costs, for obvious commercial intenrests [details sufficiently explained chronologically in TAC]. Phillips prohibition is related to the actions of Tigran and David behind that auction record, and the cost of modification of Film should be charged to them.

promises, as TAC unambiguously shows.

## V. __COPYRIGHT INFRINGEMENT__

### __Against Sarandon.__

Sarandon had had access privately, timely, to Plaintiff's script '16 Hours' while the film 'Viper Club' was in pre-production. This is not a case of stock-characters cited in a general sense, but a situation in which **Sarandon takes advantage of privately shared information to which she has privileged access**, of a script she considers, in her own words 'very worthy', and which she incorporates into her 'Viper Club' production. It is not a basic character type, but a character within a set of specific circumstances: in "Viper Club"[47] the nurse works in emergency environment and the main scenes are specifically focused on children, exactly the same situation as in '16 Hours' script, where the character offered to Sarandon was that of an emergency room nurse that is focused on children. It is the same character's distinctive delineation for the same purpose.

### __Against Tsitoghdzyan and Honey Shara__

No license existed for Tigran to have a copy of the film. Tigran had no right to obtain any copy of the Film under any circumstance. Tigran had, on the contrary, stated his self-avowed obligation to facilitate distribution in a timely manner. Tigran demands a copy via a shady attorney, Carl Bedell[48] in 2019, who requested it 'formally'

---

[47]In 'Viper Club' a doctor, emigree from Iran, states that Iran is a peaceful place where nobody can have a gun "because police take it from you"; also same doctor has problems sending money to his family, due to sanctions imposed on Iran. If it not were for the news informing us women dying in Iran's Moral Police custody, if one only watched 'Viper Club' one would feel there is an aura of peace about Iran's regime. Perhaps Iran embodies the values Sarandon embraces most, such as equivalents to lese-majesty sentences imposed on those who are critical of the Iranian regime, those who are in power. Plaintiff 'dared' to be critical of Sarandon, and the results are visible in plain sight. Tigran, born in Armenia, a country sharing border with Iran on the north, seems to be familiar with these values and procedures.

[48]There is no trace of any representation ever or participation in any civil actions across the entire system

without stating any right, coordinately with Honey Shara's coercive actions as described: she is denying payment of pending invoices, putting Plaintiff and the distribution under financial duress; Honey Shara is an abettor, interferes tortiously with the contract, endangers the distribution of Film by distributing copies against copyright law and she also obtains, under such actions, copy of it specifically to distribute it to 'friends'. Plaintiff had and has exclusive rights over the Film: Plaintiff is the owner of the copyright, as much as he has obligations (fiduciary duties, which are reciprocal) towards Shara to facilitate commercial distribution. Plaintiff, as producer and director, and creator of the writing and original ideas of the Film, obtained copyright of the Film. This is sufficiently alleged in TAC, even copyright number [TAC pg 266, P 349]. Honey Shara interfered with the contract by wringing a copy of the Film, violating copyright rights, and she obtained it only because she was exerting financial duress over Plaintiff and the Film, interfering with the contract extant. Again: the fact that Plaintiff was successfully coerced, does not justifies the actions he must agreed to simply because he is being coerced to them.

Against Tsitoghdzyan[49] for the copyright violation of the text by Plaintiff, as sufficiently alleged with Exhibits in the TAC, for same reasons. Plaintiff requested in writing to Tigran to take down such false statements that promoted the text as copyrighted by him: that is false, the MTD pretends such allegations are not present. Tigran falsely presented the text for years in his website as copyrighted by him, which

---

of Federal courts in the USA in which this attorney has ever participated, as far as Plaintiff has been able to investigate on PACER. We are not surprised, accordingly, that he has not been retained by Tigran to represent him in this case—in reality taken Sarandon's attorneys, although bills paid by the Sharas, according to Tigran's own recorded testimony.

[49]Tigran received written notices as regard to this matter on July 23 2022 with a "Cease and desist letter". Another one later on October 14, 2022. In both cases Tigran received, and there was an answer confirming it.

was false. Tigran had no right to present the text as one section of his promotional websites, since Plaintiff only gave clear limitations to the permission he gave for the usage of that text. It must be noted that Plaintiff allowed that text to be used out of generosity, and was never compensated for it.

## VI. <u>DEFAMATION CLAIMS</u>

The actions of Tigran and Shara in the media as regards to promoting the distribution of the Film only defame Plaintiff as its producer and director, because ultimately they are who also have done all in the power to thwart distribution, out of malice, since that was against their own interests. The MTD palters as regards to the statements made by Tigran as regards to why the Film did not premiere in Armenia, misrepresenting the facts and placing the entire weight of the cancellation on Plaintiff's decision, avoiding correcting it and replacing it with the truth, as Plaintiff requested at that time.

Also, Tigran and Sharas assuring publicly, present at Film festivals and crowded events [TAC, Tigran and Honey Shara in Toronto] the Film would be distributed, and encouraging, participating in, taking massive publicity advantage of the public releases as sufficiently alleged in TAC, is also cause of defamation: they represent to the public a notion and expectation that it is they who afterwards thwart, and all with massive negative repercussions on Plaintiff's professional reputation.

## VII. <u>UNJUST ENRICHMENT</u>

It is not barred. Tigran enriches himself proactively: he is very interested, he encourages, and impulses, he participates in massive press releases, national Armenian TV programs, specifically related to the Film. Tigran requests the Film's trailer and

keeps it for years as the front vide of his front page on Facebook and Instagram, his massive way to communicate with audiences.  Sarandon enriches herself materially as the TAC shows, she gets what she wants from a the deal, then she ditches the deal unilaterally after not complying with laxest understanding imaginable of the PR clause, which she accepts.

The Sharas, both, enrich themselves because the TAC proves [Tigran's declarations in 2016, then explicit the confirmation of the phone call recorded in 2022] that the Sharas uninterruptedly since 2016 take 50% of all what Tigran produces and is sold: hence the interest of the Sharas in propel the publicity of Tigran, and in allowing Tigran to unlawfully obtain a copy of the Film, because it was only helping them enriching themselves out of the benefits the publicity was producing on Tigran and the selling of his artworks.

## VIII. <u>CIVIL CONSPIRACY CLAIM</u>

The MTD fails to address the proven net of interrelations and common agreements in coordinated manner whose only purpose is to harm the Film and Plaintiff as a consequence of his communications with Sarandon. Since they succeed in accomplishing the underlying torts, this cannot be dismiss. Previous sections prove this modus operandi, and the TAC itself.

## <u>CONCLUSION</u>

As regards to the Amendments: it is necessary to remind here briefly their circumstances. The FAC was hurriedly written to comply with the fraud claims' statute of limitations, and was filed a few days after the lawsuit was moved from NY Supreme Court to SDNY. It was struck because Defendants protested against its length. Being

time an important factor, and taking into consideration very seriously the Court's recommendations in Order striking the FAC, as regards to conciseness, Plaintiff made the mistake of hurriedly censor himself as regards to detail. He did not have the time nor the mental strength to go over seven years of notes, SMS, communications and emails, and at the same time, being time weaponized against Plaintiff and his Film, Plaintiff presented SAC in a too abridged fashion without proper and in-depth revision of the years of facts, specially those at the beginning. It is only true that Defendants have been playing hide-and-seek with service of process, in order to win time and delay. Defendants had much more time to prepare the first MTD as a response to SAC, than Plaintiff had had to write the SAC itself—and that only as a consequence of Defendants arguing it was long. Additionally, it was Defendants who did not invite Plaintiff to amend when they announced that they intended to file a MTD, hiding it was by Rule 12(b)(6) FRCP so as to deprive Plaintiff of his right to amend. Only when Plaintiff, who is not an attorney, read the baseless arguments of MTD answering SAC he understood the game they had been playing since the beginning. Consequently the TAC is the document that identifies and describes in chronological order the actions over a period of seven years: it is a long period of time. It is when Plaintiff prepares the TAC when he for first time goes in-depth over many evidences that he had not had the time, as described before, to uncover in the hurried circumstances of August and September 2022.

Another factor that plays a role is medication. Plaintiff can demonstrate that some of the mendicants prescribed to him in those months had many consequences over sleep and lack of mental concentration. August-September 2022 was a particularly bad moment. This played a very important role in combination with the circumstances

described above. Defendants have imposed a terrible burden playing these games for years, and obliging Plaintiff to go to a court of law to assert and describe the iniquity of their actions.

Moreover, what characterizes the TAC is the fact that the allegations made are also *supported by references to the specific extant* evidence (sometimes emails, or SMS) *on which those allegations are based*, and Plaintiff have been meticulous to allege with particularity. When allegations clarify elements of a long past, and when they are based in more carefully reviewed evidence, and when evidence is provided to prove it, the Court should reasonably try to discover if those allegations are true. Dismissing them *a priori*, given the set of circumstances explained and the fact that the allegations are supported even by testimony of the Defendants themselves, seems improper if the ultimate aim is to find the truth. The position of Defendants is suspiciously deflecting by a mechanical recital of denials that even is only possible, as explain here, by merely pretending the allegations are not present in the TAC.

A MTD based on Rule 12(b)(6) cannot be accepted if it does not takes into consideration the very marrow of the complaint: its allegations. These Opposition sheds light on a fact that is clear, that the MTD pretends brazenly that the allegations, and even the exhibits supporting some of them, are not there in TAC—a concerning course of action.[50]  The MTD is rife with self-serving omissions and other made-for-litigation tales

---

[50]The MTD states that Plaintiff failed to present invoices, but they are present in TAC, also the budgets are cited with dates and its contents described; also the business opportunities lost are described very clearly; also the fact is clear that, without proper alert releases, more seeking of contracts, or more advancing of negotiations was useless and even inappropriate… Also they pretend the contract with composer, Mark Petrie, does not exist, that the introduction of a minor in the Film is not alleged—the MTD raises serious concerns and is frivolous under Rule 12(b)(6).

and impossible excuses[51]. The MTD is an act of brinkmanship, and is unethical given the circumstances, and an abuse of process aimed to harass. The MTD is a forced, blunt denial of the very existence of the allegations and exhibits of the TAC—and that is not proper under Rule 12(b)(6). It is not proper to burden Plaintiff and the Court with this extra work simply because they intend to put forward a recital of denials that is based, at that, in shameless pretense that the allegations are not present in the TAC. Outright denial of a set of facts is not conducive to any resolution, rather to the contrary. Plaintiff beseeches severe and resolute action from the Court in order to expedite redressing a situation that is inadmissible no matter how we look at it.

The nonmovant has demonstrated a strong showing that he is likely to succeed on the merits of the complaint.

As the Ninth Circuit stated, when reviewing a Rule 12(b)(6) motion, a federal court must "take as true all allegations of material fact stated in the complaint and construe them in the light most favorable to the nonmoving party." Warshaw v. Xoma Corp ., 74 F.3d 955, 957 (9th Cir. 1996). The Supreme Court has stated "the issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence in support of the claims. Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test." Scheuer v. Rhodes , 416 U.S. 232, 236 (1974). The TAC, however, weaves from moment to moment the events by quoting emails and specific dates, not mere allegations that are not sustained

---

[51]The position of Defendants is unacceptable because it does not pass the test of what is natural from any possible angle. MTD pg. 5 "Shara was only responsible if there was a new approved budget", the TAC alleges on several budgets, quotes them, and if they had been particularized more the TAC would have reached 500 plus pages. The MTD does not address proven course of performance chosen and admitted and in execution by Defendants, seasonableness principle affirmed and addressed by Defendants in writing, &c.

by evidence. At that, the TAC is short in spite of its length, because there are more written statements by Defendants that reinforce the perspective already given by the TAC. Rather, "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson , 355 U.S. 41, 45-46 (1957). Plaintiff references specifically wherefrom the allegations find support, mostly on emails that are easily presentable to Court as irrefutable evidence. Pleadings filed by pro se litigants are "held to less stringent standards than formal pleadings drafted by lawyers..." Haines v. Kerner, 404 U.S. 519 (1972).

**Plaintiff constitutional rights to his opinion were directly violated by Honey Shara, David Shara and Tsitoghdzyan, and Sarandon, a hypocrite as regards to civil rights, was the instigator.**

Plaintiff was threatened with reprisals, and afterwards submitted to financial duress, unless he changed his opinions in writing and "sent an apology to Sarandon" simply because he voiced his concerns as producer of the Film as regards to Sarandon's attempt at breach of contract at the beginning of 2019.

Some examples of falsities and false arguments present in MTD:

MTD pg 9 "The Alleged Oral Agreement clearly falls within the Statute of Frauds as it was intended to last longer than a year." That is false, see TAC 2016, Tigran's own testimony. MTD pg 9 "Plaintiff has also clearly alleged that a documentary like this should take "two years for its production and film festival run"" A general statement does not supersede facts as they happened, additionally Plaintiff was not responsible for the execution of festival run at that time, that was a burden imposed on

him at a later date [TAC 2016], as also was to settle distribution [TAC, 2016, Shara's own directions]. MTD pg 11, footnote 7 "two projects the parties allegedly discussed (id. ¶134), which Plaintiff's implies were similar two-year projects" Plaintiff does not imply such things, that is a false argument contradicted by the allegations themselves. MTD pg 14 "It is clear from Plaintiff's own allegations that there was no assent by Sarandon", that is utterly false. Allegations show assent, implied and expressed, since 2016. Allegations show testimony even from Tigran as to the promises of Sarandon in 2016, TAC section October-November 2016[52]. MTD pg 15 footnote 8 propounds the falsity that Honey Shara was an "agent of a disclosed principal", allegations do not allow this to be plausible: she was not acting as an agent, attorneys represented her directly, requested credit as co-executive producer, presented as such to crowds at film festivals in 2018 and a long &c. MTD pg 16 footnote 17 related to MAD Solutions, in light of the information provided in TAC, is concerning because it is written in total disregard to the allegations; same related to the Francis Bacon Project, the Oscar qualifying theatrical release, the invoices, the budgets mentioned, quoted, congratulated &c. One by one the cases quoted work in favor of the TAC not the MTD. For instance, MTD pg 18'Wrongful means' include […] some degrees of economic pressure". Yet the previous paragraph acknowledges the MTD itself: "Honey Shara did not pay invoices […]" was to submit Plaintiff and the endeavor to financial duress, to suffocate the festival circuit already in movement, and to cancel it forcefully, breaching the agreements supported by budgets for years. MTD pg 19 "Sarandon and Tsitoghdzyan exercising a legal right to control

---

[52]TAC pg 32, Tigran to Plaintiff and Shara: "you forgot that Susan[Sarandon] came for me, as all the others. You got Donald[Kuspit] **and he is the one who is getting payed for every his word, so it's not a charity** and shows how much respect he have for you... If Susan will ask to get payed for this we'll need to break thebank, and you know it" This confirms Sarandon's promise to Plaintiff, corroborates it by Tigran reminding it.

their publicity rights" that is false, they had already expressly made their rights available years ago. Tigran's recorded conversation testimony omitted in MTD, Tigran's placing his son a minor in the Film also omitted in MTD. MTD pg 20 "Plaintiff has once again failed to plead fraud with particularity. Plaintiff has mostly failed to allege the time, place, and description of the allegedly false misrepresentation" and that is false in light of the allegations TAC 2016. "Plaintiff does not make factual allegations that the statements regarding the past or current values were actually false". There are: Phillips auctions are a fraud and that is discovered in end August 2020. Phillips does not want to appraise the painting, which shows its value is close to zero, that the painting is not sellable because the auctions were orchestrated by Tigran and David themselves directly participating in them to fake the price in 2014 and 2015[53]. MTD pg 23 "the information needed was publicly available", but that information had been tampered with and falsified by Tigran and Shara's actions, no "ordinary intelligence" could allow discovery of the "true nature" in 2016. MTD pg 22 "justifiable reliance": when it is clear that Shara did not want to pay any upfront compensation, when it is clear that the circumstances were coercive and Plaintiff deprived of bargaining power, then 'reliance' was forced upon Plaintiff as no other remedy to move on... The contract is illegal because was obtained by coercion. Sarandon's original agreement is what she stated in 2016, that she wanted nothing in exchange of her participation. MTD pg 35 "no cause of actionby a party to a contract will lie for conspiracy to breach the contract", it is false that Honey Shara, Sarandon or Tigran are parties to the contract Producers Agreement or to the agreements directly met by Plaintiff and Shara. Shara breaches fiduciary duty[54],

---

[53]Not only Plaintiff has been a victim of fraud by this manoeuvrer, but a multitude of buyers that were inspired by such representations.
[54] Partners have with each other fiduciary duty under New York law.

for instance, by self-dealing: the publicity that generates on Tigran and his productions keeping Plaintiff for years making the Film under false promises of distribution (and both intervene directly in self-interest in the media to promote publicly the distribution and the making of the Film) only benefits the Sharas because they make a 50% of anything produced and sold by Tigran (recorded phone call shows he states they are in collaboration until now). Under New York law, a person who induces a breach of fiduciary duty is also liable; Tigran, Honey and Sarandon are liable. Under New York law, the injured party may sue a relatively peripheral figure that induced the breach, who may have the resources to pay a judgment. The definition of an arm's length relationship is a relationship where the parties engaged in a transaction act freely, in their own self-interest, and without unduly influencing each other, circumstances denied by the allegations since Plaintiff has been coerced and deprived of bargaining power repeatedly.

The purpose of the MTD is no other than harassment, abuse of process, and lucrative enrichment for the attorneys.

If it is visible and clear that this MTD filed under Rule 12(b)(6) is propounding false conclusions *by directly pretending the allegations that contradict them are not present in the Complaint*, such MTD should be dismissed in its entirety because it represents consequently no fair arguments of law, but sheer falsities, formulaic constructions, mere recitals, and it is in itself an act in bad faith, an abuse of process, and is filed to harass and to enormously burden Plaintiff and Court, **and at that shamelessly as the many instances quoted here from the TAC clearly have shown how they have been omitted by the MTD. In plain sight it is visible the MTD states outright falsities when it denies, or even worst, omits the existence of allegations**

**present in TAC**, which quote supporting evidence, or even evidence submitted as exhibits, as it is this case. As it has been proven in this Opposition, that such an attempt pervades this MTD, and that it is rife with such falsities as regards to extant allegations, then, as an act of caution, the Court should dismiss this MTD in its entirety, because it is presided over not by a true aim at clarify anything in defense of Defendants, but simply by bad faith, to impose its filing simply because Defendants wanted it and can pay it, and they do not care about money, at all cost and because their attorneys find it extremely lucrative, although they know what they are doing, especially if experienced attorneys, as it is the case, who know that this is irresponsible, file the motion not caring about the consequences of such burden imposed on others (for instance in plain sight evidence [Invoices as Exhibit 10 TAC] has already shown that Plaintiff has been robbed of an Oscar-qualifying Theatrical release in the USA[55], with all that this entails professionally, right before a pandemic that brought the film industry to a grinding standstill), a burden that is unjust because they are doing it by sheer omission of the allegations themselves.

That bad faith is more manifest, and more culpable, if we recall how Defendants' attorneys have requested more time to read the Complaint, and more time to answer it, only to file a document that clearly does not address entire sets of allegations and even exhibits, or that quote them partially, to outright and shamelessly affirm that certain allegations are missing in the TAC, when it has been demonstrated they are present there.

---

[55]Recall MTD pg 5 "Plaintiff has failed to allege any factual content regarding what was contained in the invoices […]". Word 'invoice' present 58 times in TAC, plus correlated to budget approved invoices present in Exhibit 10 of TAC. MTD pg 5 "Shara was only responsible if there was a new approved budget. […]" Word 'budget' and detailed explanations with it present 42 times in TAC.

Parts of the MTD argued under Rule 11(b)(3) should be struck from MTD and not taken into consideration at all because they bring about conclusions without allowing evidence to be tried.

THEREFORE Plaintiff beseeches the MTD to be quashed with prejudice, and sanctions imposed on Defendants' attorneys.


Dated: On April 10, 2023
Respectfully submitted,

**/s/ ARTHUR BALDER**

2813 Palisade Avenue
Union City,
New Jersey 07087
Telephone:
(929) 888-3802