**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------X

ARTHUR BALDER,

                              **Plaintiff,**

            -against-

SUSAN SARANDON, et al.,

                          **Defendants.**

-----------------------------------------------------------------X

**22-CV-06401 (JLR)(SN)**

**REPORT AND
RECOMMENDATION**

**SARAH NETBURN, United States Magistrate Judge.**

**TO THE HONORABLE JENNIFER L. ROCHON:**

      Arthur Balder brings this action against Susan Sarandon, Tigran Tsitoghdzyan, David

Shara, and Honey Shara (together, the "Defendants"). Balder, proceeding *pro se*, asserts twelve

claims: (1) breach of contract against Sarandon, Tsitoghdzyan, and David Shara; (2) tortious

interference with contract against the Defendants; (3) tortious interference with business

relations against the Defendants; (4) fraud against Tsitoghdzyan and David Shara; (5) copyright

infringement against Sarandon, Tsitoghdzyan, and Honey Shara; (6) promissory estoppel against

Sarandon and Tsitoghdzyan, (7) unjust enrichment against the Defendants; (8) breach of

fiduciary duty against David Shara; (9) civil conspiracy against the Defendants; (10) duress

against Honey Shara; (11) defamation against Tsitoghdzyan and David Shara; and (12)

conversion against Tsitoghdzyan and Honey Shara. The Defendants move to dismiss the Third

Amended Complaint ("TAC") pursuant to Rule 12(b)(6) for failure to state a claim. I recommend

that the Court GRANT in part and DENY in part the Defendants' motion to dismiss.

## PLAINTIFF'S ALLEGATIONS

"American Mirror: Intimations of Immortality" ("American Mirror") is a documentary starring painter Tigran Tsitoghdzyan and actress Susan Sarandon. TAC, ¶ 22. Arthur Balder directed and co-produced the documentary. Id. at ¶ 3. David Shara, a diamond dealer and Tsitoghdzyan's sales agent, was the film's executive producer. Id. at ¶¶ 8, 78. David Shara funded the documentary's production with the help of his mother and business partner, Honey Shara. Id. at ¶¶ 128, 197. Composer Mark Petrie wrote an original score. Id. at ¶ 82. The documentary centers on a series of Tsitoghdzyan's paintings titled "Mirrors." Id. at Ex. 3. "American Mirror's" "central pillar" is a scene of Tsitoghdzyan painting Sarandon, showing that "beauty is not merely something attached to youth." Id. at ¶¶ 22, 346. The film was intended to "promote the career and artworks" of Tsitoghdzyan. Id. at ¶ 8. Balder copyrighted the documentary in 2017. Id. at ¶ 80.

Before beginning filming, Balder, Tsitoghdzyan, and David Shara orally negotiated a production agreement. Id. at ¶ 10. Under that agreement, Balder would receive 40% of the documentary's profits and a 100 by 75-inch painting of his wife from Tsitoghdzyan's "Mirrors" series. Id. The agreement required Tsitoghdzyan to provide Balder "any necessary permissions for showing his personal image and that of his artworks." Id. For the next several months, while filming most of the documentary's footage, Balder made unsuccessful attempts to memorialize the agreement. Id. at ¶ 19. In October 2016, Balder emailed Tsitoghdzyan two contract proposals. Id. at ¶ 37. Tsitoghdzyan responded angrily and denied ever agreeing to the alleged oral terms. Id. at ¶ 44. After six weeks of contentious negotiations, Balder and David Shara came to an agreement. Id. at ¶ 70. They memorialized their new terms in the Producers' Agreement five months later, in April 2017. Id. The Producers' Agreement's terms were less favorable to

Balder than the oral agreement's terms; he would instead receive 20% of profits and a 75 by 50-inch painting. TAC, Ex. 7. Balder alleges that he signed the agreement under duress. Id. at ¶ 46.

Balder, Tsitoghdzyan, and David Shara invited Sarandon to participate in "American Mirror," hoping to elevate the film's status. Id. at ¶ 14. Sarandon agreed. Id. at ¶ 15. Balder filmed Tsitoghdzyan's scene with Sarandon over just one day in June 2016. Id. at ¶ 23. She expected no compensation and agreed to "provide any necessary talent release." Id. Almost two years later, via email, Balder and David Shara offered Sarandon two Tsitoghdzyan prints and 10% of "American Mirror's" profits "as a compensation for [her] participation and kind visit [to] Tigran's studio for filming." Id. at ¶ 98. They also asked Sarandon to help with the documentary's press. Id. Sarandon emailed back, accepting the offer for prints and adding that there was "no way to know" whether she would have time to help with press. Id. She did not address the profits-related offer. Id. Balder claims that these emails constitute an enforceable contract obligating Sarandon to assist with press. Id. at ¶ 284.

As "American Mirror" started screening at film festivals, Sarandon ignored emails from Balder requesting her help with press. Id. at ¶ 124. Balder emailed Sarandon's assistant, asking what he had done to "deserve this estrangement from a great star." Id. at ¶ 159. Sarandon replied to Balder directly, writing: "Arthur, I find your email to be extremely rude. I've never received an email like that before from anyone, especially someone whose film I briefly appeared in without compensation. I had no idea you were going to sell this film based on me and if Tigran's portrait was in some way obligating me to do press, I'll gladly give it back. I understand your wanting to get the most press you possibly can but I have nothing positive to say about your film and am no longer interested in being associated with it." Id. at ¶ 160. In response, Balder sent Sarandon a litany of insults and accusations. Id. at ¶ 164.

Relationships quickly fell apart. Balder claims that as retaliation for his email, Sarandon planned to "destroy [him] in all ways imaginable." Id. at ¶ 167. She threatened to sue David Shara if he continued to work with Balder. Id. at ¶ 169. David Shara told Balder to "write the nicest, most sincere apology in the world." Id. Honey Shara and Tsitoghdzyan also urged Balder to apologize. Id. at ¶¶ 175, 183. Balder refused. Id. at n.119. Because Balder refused to apologize, David and Honey Shara left invoices for the U.S. Oscar-qualifying theatrical release unpaid for a year and a half. Id. at ¶¶ 188, 194, 199, 221.

David Shara and Balder had been planning future film projects together; David Shara canceled them. Id. at ¶¶ 151, 178. Sarandon and Tsitoghdzyan refused to sign talent releases, rendering "American Mirror" "un-distributable." Id. at ¶ 227. Counsel for David and Honey Shara suggested to Balder that he "renounce his rights as stated in the Producers' Agreement in order to allow the Sharas to be fully in charge of the distribution of the film." Id. at ¶ 222. Counsel explained that the Sharas did not have the outstanding releases but could "secure all of them in an expeditious manner" if Balder took "a backseat." Id. at ¶ 236. Balder declined the proposed contract modification, never apologized, and never received the signed talent releases.

"American Mirror" received praise, awards, and distribution interest at film festivals worldwide, but striking a distribution deal was "impossible" without Sarandon's and Tsitoghdzyan's talent releases. Id. at ¶¶ 204, 273. The film premiered at the Los Angeles Documentary Film Festival in 2018 and was "the most awarded film in the history of the festival." Id. at ¶ 126. Critics dubbed it "strikingly original" and "a masterpiece." Id. at ¶ 274. Distributors extended Balder offers. Id. at ¶¶ 200, 209-210. Negotiations with MAD Solutions, a Middle East-based distributor, reached the point of exchanging draft contracts. Id. at ¶ 200. However, no distribution deal could go through without the missing talent releases, which

Sarandon and Tsitoghdzyan kept "hostage." Id. at ¶ 75. Despite the film's widespread festival success, it was never distributed and never earned any profit. However, Tsitoghdzyan has been "showing it to collectors, art dealers and others" without Balder's permission. Id. at ¶ 344.

Because "American Mirror" was never distributed, Tsitoghdzyan's painting was Balder's sole compensation for his years of work on the documentary. Id. at ¶ 225. Balder received the painting 16 months late and unfinished. Id. at ¶ 77. Balder had agreed to receive the painting as compensation based on Tsitoghdzyan's and David Shara's representations of value; David Shara had claimed that a 75 by 50-inch Tsitoghdzyan painting was worth $100,000, but its actual value was between $10,000 and $15,000. Id. at ¶¶ 70, 377. Balder tried to sell the painting to Phillips, an auction house that had previously sold Tsitoghdzyan's work. Phillips declined, telling Balder that Tsitoghdzyan and David Shara had tampered with past auctions to artificially inflate the value of Tsitoghdzyan's art. Id. at ¶ 223. Balder alleges that David Shara's and Tsitoghdzyan's representations of value were fraudulent.

Balder's claims largely stem from his allegation that the Defendants acted in bad faith to impede "American Mirror's" distribution. Balder also makes miscellaneous unrelated claims, alleging that: Sarandon stole from him a copyrighted movie idea; Tsitoghdzyan has posted copyrighted text by Balder on his website; Honey Shara obtained Balder's tax records by duress; and Honey Shara and Tsitoghdzyan have withheld film festival awards from Balder. Id. at ¶¶ 131, 139, 352, 353, 361.

## PROCEDURAL BACKGROUND

Balder filed a lawsuit against Sarandon in New York state court on May 24, 2022. ECF No. 1. Two months later, Sarandon removed the case to this Court. Id. Following removal, Balder filed the First Amended Complaint ("FAC"), adding Tsitoghdzyan and the Sharas as

defendants. ECF No. 8. Because the FAC was 175 pages with 70 additional pages of exhibits, the Court struck the FAC as overly long and directed Balder to file a Second Amended Complaint ("SAC"). ECF Nos. 18, 20. Balder filed a SAC, and the Defendants filed a motion to dismiss. ECF Nos. 22, 50. Balder then filed a letter seeking leave to file a Third Amended Complaint ("TAC"), explaining that the Court's insistence on brevity had prevented him from making crucial arguments in the SAC. ECF No. 60. The Court granted Balder's request, and he filed the TAC, the operative complaint here. ECF Nos. 61, 62. The Defendants then filed this motion to dismiss the TAC. ECF No. 73.

## DISCUSSION

### I.  Legal Standard

A complaint must be dismissed if it fails "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To state a legally sufficient claim, a complaint must plead "enough facts to state a claim for relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). In evaluating a complaint under this standard, a court must accept as true the well-pleaded factual allegations set forth in the complaint and draw all reasonable inferences in favor of the plaintiff. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Twombly, 550 U.S. at 556. While the plausibility standard "does not require detailed factual allegations," it "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Iqbal, 556 U.S. at 678; see also Cantor Fitzgerald Inc. v. Lutnick, 313 F.3d 704, 709 (2d Cir. 2002) (stating that a court need not give "credence to [a] plaintiff's conclusory allegations"). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 555). "A pleading that offers labels

and conclusions or a formulaic recitation of the elements of a cause of action" is insufficient to survive a motion to dismiss under Rule 12(b)(6). Id. (internal quotation marks omitted).

Where a plaintiff proceeds *pro se,* his complaint "must be held to less stringent standards than formal pleadings drafted by lawyers." Erickson v. Pardus, 551 U.S. 89, 94 (2007) (quotation marks omitted) (quoting Estelle v. Gamble, 429 U.S. 97, 106 (1976)). When addressing a motion to dismiss, "courts must construe [a *pro se* complaint] broadly, and interpret [it] to raise the strongest arguments that [it] suggest[s]." Weixel v. Bd. of Educ. of City of New York, 287 F.3d 138, 145-46 (2d Cir. 2002).

A complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference. See, e.g., Hart v. FCI Lender Servs., Inc., 797 F.3d 219, 221 (2d Cir. 2015) (citing Fed. R. Civ. P. 10(c) ("A statement in a pleading may be adopted by reference elsewhere in the same pleading or in any other pleading or motion. A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.")). "[I]n ruling on a 12(b) motion to dismiss," courts are also "permitted to consider matters of which judicial notice may be taken." Simmons v. Trans Express Inc., 16 F.4th 357, 360 (2d Cir. 2021) (internal quotation omitted). Court records are subject to judicial notice, and so may be properly considered on a motion to dismiss. See Akhenaten v. Najee, LLC, 544 F. Supp. 2d 320, 327 n.9 (S.D.N.Y. 2008).

A complaint does not include allegations raised for the first time in opposition to a motion to dismiss, and such allegations do not automatically amend the complaint. See O'Brien v. Nat'l Prop. Analysts Partners, 719 F. Supp. 222, 229 (S.D.N.Y. 1989) ("[I]t is axiomatic that the Complaint cannot be amended by the briefs in opposition to a motion to dismiss."); Capers v. Kirby Forensic Psychiatric Ctr., No. 13-cv-6953 (AJN), 2016 WL 817452, at *2 (S.D.N.Y. Feb.

25, 2016) (applying rule against amending complaint by the briefs to *pro se* plaintiff). A court may, however, consider new allegations in an opposition brief "in determining whether to grant [the plaintiff] leave to file a[n] . . . Amended Complaint." Capers, 2016 WL 817452, at *2; see also Jordan v. Chase Manhattan Bank, 91 F. Supp. 3d 491, 500 (S.D.N.Y. 2015).

## II. Breach of Contract

Balder asks the Court to enforce the oral agreement between himself, Tsitoghdzyan, and David Shara instead of the Producers' Agreement. In the alternative, Balder asserts breach of contract claims against David Shara under the Producers' Agreement. The Defendants argue that the oral agreement is barred by the Statute of Frauds and that the Producers' Agreement is enforceable, but that they did not breach it. Def. Br. at 8-11.

Balder alleges that Tsitoghdzyan breached their oral agreement by refusing to sign a talent release and by delivering a painting smaller than 100 by 75 inches. The oral agreement is, however, unenforceable because it is barred by the Statute of Frauds. Under the Statute of Frauds, an oral agreement that cannot be completed within one year is unenforceable. N.Y. Gen. Obl. § 5-701(a)(1); Cron v. Hargro Fabrics, 91 N.Y.2d 362, 366 (1998). A contract term for a percentage of profits for an indefinite period falls within the Statute of Frauds. Morgenweck v. Vision Capital Advisors, LLC, 410 F. App'x 400, 402 (2d Cir. 2011) (finding a contract barred by the Statute of Frauds because it is "impossible that *annual* profits could be earned and distributed within one year of the alleged agreement") (emphasis in original); Rosenthal v. Kingsley, 674 F. Supp. 1113, 1123 (S.D.N.Y. 1987) (finding a contract barred by the Statute of Frauds because a contract term for 25% of gross income "whenever said income is received" cannot be completed within one year). Despite Balder's claim that he, Tsitoghdzyan, and David Shara "had the intention . . . to finish the project within one year," the oral agreement's indefinite

profit-sharing terms render it barred by the Statute of Frauds. TAC, ¶ 10. Accordingly, Balder's breach of contract claims made under the oral agreement should fail. [1]

Balder sufficiently alleges two breaches of the Producers' Agreement. First, Balder asserts that David Shara breached the Producers' Agreement by not timely paying invoices. Id. at ¶ 310. "[T]he elements of a cause of action for breach of contract are: the existence of an agreement, performance by the plaintiff, breach of contract by the defendant, and resulting damage." McCabe v. ConAgra Foods, Inc., 681 F. App'x 82, 84 (2d Cir. 2017). The Producers' Agreement required David Shara to pay music-related costs and "any additional production costs . . . upon approval of new estimations and new budget." TAC, Ex. 7. The Defendants argue that Balder "has failed to allege any factual content regarding what was contained in the invoices, or that they were part of an approved budget." Def. Br. at 5-6. But Balder attached the invoices to the TAC. TAC, Ex. 10. Based on that exhibit, the invoices totaled $30,000 and were for the documentary's Oscar-qualifying U.S. theatrical release. Id. As alleged, David Shara approved a budget for the U.S. theatrical release that encompassed the invoices, which David Shara paid a year and a half late. TAC, ¶¶ 3, 101, 202, n.56, Ex. 10.

Although the Producers' Agreement did not specifically require David Shara to pay invoices on time, such a requirement is implied by the covenant of good faith and fair dealing "implicit in every contract" in New York. Semple v. Eyeblaster, Inc., 08-cv-9004 (HB), 2009 WL 1457163, at *7 (S.D.N.Y May 26, 2009). Under that covenant, "neither party to a contract

---

[1] Balder also argues that the Court should enforce the oral agreement, and not the Producers' Agreement, because he allegedly signed the Producers' Agreement under duress. "[A] subsequent contract regarding the same matter will supersede the prior contract." Barnum v. Millbrook Care Ltd. Partnership, 850 F. Supp. 1227, 1236 (S.D.N.Y. 1994). Essentially, Balder argues that the alleged duress renders the Producers' Agreement unenforceable, and so the Producers' Agreement does not supersede the oral agreement. Because the Court finds that the Statute of Frauds bars enforcement of the oral agreement, it is not necessary for the Court to evaluate Balder's duress-related argument.

shall do anything which has the effect of destroying or injuring the right of the other party to receive the fruits of the contract." M/A-COM Sec. Corp. v. Galesi, 904 F.2d 134, 136 (2d Cir. 1990). Balder alleges that the failure to timely pay invoices sabotaged the film's U.S. theatrical release, depriving him of profit owed to him under the Producers' Agreement. The covenant of good faith and fair dealing encompasses "any promises which a reasonable person in the position of the promisee would be justified in understanding were included." Rowe v. Great Atlantic & Pac. Tea Co., Inc., 46 N.Y.2d 62, 69 (1972). A reasonable person in Balder's position would understand David Shara's obligation to pay invoices as an obligation to pay them on time. Balder has therefore sufficiently alleged a breach of contract against David Shara for paying invoices late.

Second, Balder sufficiently alleges that David Shara breached the Producers' Agreement by delivering Tsitoghdzyan's painting of Balder's wife unfinished. TAC, ¶ 310. The Defendants argue that, because the Producers' Agreement did not include terms specifying the painting's quality, the Court should disregard Balder's allegation that the painting was unfinished. Def. Br. at 5. The Court disagrees. The covenant of good faith and fair dealing again applies; a reasonable person in Balder's position would understand compensation via painting to mean compensation via a *finished* painting. The painting's unfinished state diminished its value, depriving Balder of his "fruits of the contract." Galesi, 904 F.2d at 136. Balder sufficiently alleges that the failure to furnish a finished painting constitutes a breach of contract.

Balder insufficiently pleads two other breach of contract claims under the Producers' Agreement. First, Balder alleges that David Shara breached the Producers' Agreement by delivering the painting of his wife late. Under the contract, Balder was owed the painting by May 31, 2017, but did not receive it until January 2019. TAC, ¶ 150, Ex. 7. The Defendants argue that

Balder failed to allege damages resulting from the breach. Def. Br. at n. 3. The Court agrees. Balder alleges that the late delivery deprived him of the ability to sell the painting sooner. TAC, ¶ 310. This allegation is insufficient because Balder did not actually try to sell the painting until August 2020, a year and a half after he received it. TAC, ¶ 222. Additionally, Balder fails to identify specific damages that flowed from his inability to sell the painting between May 2017 (when he was supposed to receive it) and January 2019 (when he did receive it). Balder has therefore failed to sufficiently allege damages arising from the late delivery, and this breach of contract claim should fail.

Second, Balder alleges that David Shara breached the Producers' Agreement by failing to procure talent releases from Sarandon and Tsitoghdzyan. There is no provision in the Producers' Agreement requiring David Shara to secure talent releases, and the implied covenant of good faith and fair dealing "cannot be used to create independent obligations beyond those agreed upon and stated in the express language of the contract." Granite Partners, L.P. v. Bear, Stearns & Co. Inc., 17 F. Supp. 2d 275, 306 (S.D.N.Y. 1998). For that reason, the Court cannot interpret within the Producers' Agreement a requirement for David Shara to secure talent releases. Balder urges the Court to use extrinsic evidence to conclude that the Producers' Agreement includes such a term. TAC, ¶ 319. But under New York law, a court can look beyond a contract's four corners only to resolve ambiguities. RJE Corp. v. Northville Industries Corp., 329 F.3d 310, 314 (2d Cir. 2003). The Producers' Agreement's terms "have a definite and precise meaning and are not reasonably susceptible to differing interpretations" and are therefore unambiguous. Id. (citing Red Rock Commodities, Ltd. v. Standard Chartered Bank, 140 F.3d 420, 424 (2d Cir. 1998)). Accordingly, the Court cannot look to extrinsic evidence. Because the Producers' Agreement did

not require David Shara to secure talent releases, the breach of contract claim on that basis should fail.

Balder also asserts a breach of contract against David Shara for canceling future projects. TAC, ¶ 338. Enforcement of that alleged contract is barred by the Statute of Frauds. Balder claims that he and David Shara orally agreed to make a documentary about Nazi propaganda. Id. at ¶ 151. That oral contract had the same terms as the Producers' Agreement, under which Balder was to receive 20% of profits for an indefinite period. Id., Ex. 7. As explained above, such a term cannot be completed within one year, bringing the contract within the Statute of Frauds. Balder's breach of contract claim against David Shara for canceling future projects should therefore fail.

Balder asserts a breach of contract claim against Tsitoghdzyan for refusing to sign a talent release. Balder alleges that during negotiations of the Producers' Agreement, Tsitoghdzyan emailed that he agreed to "transfer all necessary rights and permissions as to use his image and the images of his artworks and studio to David Shara in the film." TAC, ¶¶ 75, 340. According to Balder, that email had "the force and validity of enforceable contractual obligation." Id. at ¶ 340. But a statement made while negotiating is inadmissible parol evidence if it is absent from the complete and final written contract. Schron v. Troutman Sanders LLP, 20 N.Y.3d 430, 436 (2013); Laskey v. Rubel Corp., 303 N.Y. 69 (1951). The promise is therefore unenforceable. Even if Tsitoghdzyan's email were an enforceable promise, it would guarantee David Shara, not Balder, a signed talent release. TAC, ¶ 75. Accordingly, this breach of contract claim against Tsitoghdzyan should fail.

Balder also asserts a breach of contract claim against Sarandon. Balder claims that he formed an enforceable contract with Sarandon via email that required her to assist with press for "American Mirror." TAC, ¶ 288. "To create a binding contract, there must be a manifestation of

mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to *all material terms*." Express Industries and Terminal Corp. v. New York State Dept. of Transp., 93 N.Y.2d 584, 589 (1999) (emphasis added). Balder emailed Sarandon offering two of Tsitoghdzyan's prints and 10% of the documentary's profits as compensation for Sarandon's participation with filming. TAC, ¶ 98. Balder also wrote, "We'd like you along with Tigran to be part of the PR of the film, as far as your agenda would allow it, and organizing everything in anticipation for your convenience." Id. Sarandon accepted the paintings, which Balder argues constituted acceptance of "all the terms." Id. Sarandon's actual response contradicts that argument: she told Balder that "there was no way to know" whether her schedule would allow helping with press. Id. Accordingly, Balder does not sufficiently allege Sarandon's assent to the press-related term. These emails therefore do not constitute an enforceable contract, and this claim should fail.

## III. Tortious Interference with Contract

Balder alleges that Sarandon, Tsitoghdzyan, and Honey Shara tortiously interfered with the Producers' Agreement. TAC, ¶ 341. "Tortious interference with contract requires the existence of a valid contract between the plaintiff and a third party, defendant's knowledge of that contract, defendant's intentional procurement of the third-party's breach of the contract without justification, actual breach of the contract, and damages resulting therefrom." Lama Holding Co. v. Smith Barney Inc., 88 N.Y.2d 413, 424 (1996). As is explained above, Balder successfully pleads that David Shara breached the Producers' Agreement by: (1) delivering Balder an unfinished painting; and (2) not timely paying invoices for the U.S. theatrical release. Only procurement of these two specific breaches can support a tortious interference claim. For the painting-related breach, Balder does sufficiently allege Tsitoghdzyan's tortious interference

by asserting that: the Producers' Agreement between Balder and David Shara was valid; Tsitoghdzyan knew about it; Tsitoghdzyan intentionally did not finish the painting; delivery of the unfinished painting constituted David Shara's breach; and the painting's unfinished state diminished its valued and deprived Balder of compensation under the Producers' Agreement. The tortious interference with contract claim against Tsitoghdzyan should therefore survive the Defendants' motion to dismiss.

Balder does not sufficiently allege Sarandon's or Honey Shara's tortious interference with the Producers' Agreement. Neither procured David Shara's painting-related breach, so that breach cannot support a tortious interference claim against them. For the invoice-related breach, Balder does not allege that Sarandon knew of the Producers' Agreement, so the tortious interference claim against her should fail. Balder does not allege that Honey Shara convinced or pressured David Shara to pay invoices late, so the tortious interference claim against her on that basis should also fail. Balder also alleges that Honey Shara tortiously interfered with the Producers' Agreement by proposing a formal modification. TAC, ¶ 357. Balder, however, declined Honey Shara's proposed modification, so he fails to allege any related breach or damages. Id. The Court should therefore dismiss the tortious interference claims against Sarandon and Honey Shara.

Balder also alleges that the Defendants tortiously interfered with his contract with "American Mirror's" composer, Mark Petrie. As the Defendants note, David Shara "is the only defendant who knew about the alleged agreement with Petrie." Def. Rply. at 8; TAC ¶ 83. Because Balder does not plead that Sarandon, Honey Shara, or Tsitoghdzyan knew about his contract with Petrie, those tortious interference claims should fail. For the claim against David Shara, Balder fails to allege that the breach caused him – and not just Petrie – damages. TAC, ¶

85. According to Balder, Petrie's score "has not been released," and Petrie "has not been able to enjoy the prestige and rewards, professional and monetary, that [Balder] expected for him" because the documentary was never distributed. Id. Balder asks the Court to order the "Defendants to compensate composer Mark Petrie for the damages created." Id. at ¶ 375. Essentially, Balder seeks to bring a claim on behalf of Petrie, which Balder lacks standing to do. Kowalski v. Tesmer, 543 U.S. 125, 129 (2004) (explaining that, absent exceptional circumstances, "a party 'generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties'"). Balder's claims for tortious interference with his contract with Petrie should therefore fail.

## IV.    Tortious Interference with Business Relations

Balder alleges that Sarandon tortiously interfered with his business relationship with David Shara. "To state a claim for this tort under New York law, four conditions must be met: (1) the plaintiff had business relations with a third party; (2) the defendant interfered with those business relations; (3) the defendant acted for a wrongful purpose or used dishonest, unfair, or improper means; and (4) the defendant's acts injured the relationship." Catskill Dev., L.L.C. v. Park Place Entm't Corp., 547 F.3d 115, 132 (2d Cir. 2008). Balder sufficiently pleads this claim against Sarandon by alleging that: he and David Shara were planning to make a documentary about Nazi propaganda; Sarandon interfered with that plan by making "litigation threats to harass and cower David" into canceling the project; Sarandon's litigation threats were wrongful; and as a result of those threats, David Shara did cancel the Nazi propaganda project. TAC, ¶¶ 134, 151, 178.

The Defendants argue that Sarandon's actions were not wrongful. "Wrongful means" are generally defined as "acts that would be criminal or independently tortious." Carvel Corp. v.

Noonan, 3 N.Y.3d 182, 191 (2004). But where "a defendant engages in conduct 'for the sole purpose of inflicting intentional harm on plaintiffs,'" there is an exception to the general rule. Id. at 190 (citing NBT Bancorp, Inc. v Fleet/Norstar Fin. Group Inc., 215 A.D.2d 990 (3d Dep't 1995)). Because Balder alleges that Sarandon's sole "intention [was to] cause injury to [Balder's] present and future projects," her litigation threats were wrongful. TAC, ¶ 179. This claim against Sarandon should therefore survive the motion to dismiss.

Balder also alleges that the Defendants tortiously interfered with his business relationship with the film distributor MAD Solutions.[2] To state a claim for this tort, a plaintiff must plead that the alleged wrongful conduct was "directed not at the plaintiff [him]self, but at the party with which the plaintiff has or seeks to have a relationship." Carvel Corp. v. Noonan, 3 N.Y.3d 182, 192 (2004). Balder alleges that Sarandon and Tsitoghdzyan interfered with the prospective distribution deal by refusing to sign talent releases, and that the Sharas interfered by failing to procure talent releases. TAC, ¶¶ 200, 204. Those actions were directed at Balder, not MAD Solutions; it is not even clear from the TAC whether Sarandon, Honey Shara, or Tsitoghdzyan were aware of Balder's negotiations with MAD Solutions. Accordingly, Balder has failed to sufficiently plead that the Defendants tortiously interfered with this business relationship.

## V.    Fraud

Balder asserts fraud claims against Tsitoghdzyan and David Shara, alleging that they lied about the value of Tsitoghdzyan's paintings during the Producers' Agreement negotiations.[3] The

---

[2] Balder is vague about which specific business relationship the Defendants allegedly interfered with. Due to Balder's pro se status, the Court interprets the TAC to allege interference with the prospective MAD Solutions distribution contract, the most promising distribution contract identified by Balder.

[3] Balder explicitly alleges fraud against Tsitoghdzyan, but not David Shara. However, all fraud-related allegations against Tsitoghdzyan also apply to David Shara. Given Balder's pro se status, the Court interprets the TAC to include a fraud claim against David Shara. Because Balder has pleaded the fraud-related facts with sufficient particularity, interpreting the TAC to include a fraud claim against David Shara is consistent with Rule 9(b)'s heightened pleading standard (more below).

elements of fraud are: "(1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance." Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank, 57 F.3d 146, 153 (2d Cir. 1995). Balder satisfies each of these elements by alleging that: when negotiating the Producers' Agreement in 2016, David Shara falsely claimed that a 75 by 50-inch Tsitoghdzyan painting was worth $100,000, and Tsitoghdzyan falsely claimed that a 100 by 75-inch painting was worth $200,000; Balder reasonably relied on those false representations when he agreed to the Producers' Agreement; and because of Balder's reliance, he received a painting of lesser value than promised and was not adequately compensated for his years of work on "American Mirror." TAC, ¶¶ 54, 318, 348. Additionally, the facts alleged by Balder "give rise to a strong inference of fraudulent intent" (more below). Nakahata v. New York-Presbyterian Healthcare Sys., 723 F.3d 192, 198 (2d Cir. 2013) (citing First Capital Asset Mgmt., Inc. v. Satinwood, Inc., 385 F.3d 159, 179 (2d Cir. 2004)).

Even with the heightened pleading standard for fraud claims in Rule 9(b) of the Federal Rules of Civil Procedure, Balder has sufficiently alleged fraud against Tsitoghdzyan and David Shara. Under Rule 9(b), a plaintiff "must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). This requires the plaintiff to specify "(1) the fraudulent statements, (2) the speaker, (3) where and when the statements were made, and (4) why the statements were fraudulent." United States ex rel. Chorches v. Am. Med. Response, Inc., 865 F.3d 71, 88 (2d Cir. 2017). Balder identifies specific fraudulent statements made by Tsitoghdzyan and David Shara during the Producers' Agreement negotiations: on October 18, 2016, Tsitoghdzyan emailed Balder claiming that a 100 by 75-inch painting was worth $200,000;

on October 25, 2016, Tsitoghdzyan and David Shara co-signed an email, sent from David Shara's account, claiming that they had sold other 100 by 75-inch Tsitoghdzyan paintings "for up to 200,000 dollars"; and on November 30, 2016, David Shara emailed Balder that a 75 by 50-inch painting was worth "worth 100,000 dollars now, potentially much more" and added "I sell those pieces regularly for 125-150." TAC, ¶¶ 42, 44, 55, 70. According to Balder, these statements were false, with the actual value of a 75 by 50-inch Tsitoghdzyan painting landing between $10,000 and $15,000. Id. at ¶ 377. Additionally, Balder alleges that Tsitoghdzyan and David Shara lied about prices of past sales. Id. at ¶¶ 377. According to Balder, these statements were fraudulent because they were made to induce him to accept a smaller painting with lesser value as compensation for his work on "American Mirror." Id. at ¶¶ 318, 377. Balder therefore states with sufficient particularity the circumstances surrounding the alleged fraud.

The Defendants argue that Balder fails to allege that their statements were materially false. According to the Defendants, they only "speculated about what they thought might happen in the future," which "cannot support an action for fraud since it is not a statement of fact." Def. Rply. at 10. But based on the TAC, David Shara and Tsitoghdzyan made non-speculative claims about current value and past sales. TAC, ¶¶ 42, 44, 70. For example, David Shara allegedly wrote, "We will do a 75x 50 inch of your wife...worth 100,000 dollars now, potentially much more. I sell those pieces regularly for 125-150." TAC, ¶ 70. Because Balder claims that David Shara and Tsitoghdzyan made non-speculative false representations of value, Balder sufficiently pleads material falsity.

The Defendants also argue that Balder fails to plead that David Shara and Tsitoghdzyan had fraudulent intent, claiming that Balder "did not allege facts that the Defendants had motive" to defraud. Def. Br. at 22. Under Rule 9(b)'s heightened pleading standard, a plaintiff must

"allege facts that give rise to a strong inference of fraudulent intent." <u>Nakahata</u>, 723 F.3d at 198. Balder's allegations show a clear motive for David Shara and Tsitoghdzyan to lie about the value of Tsitoghdzyan's paintings: to pay Balder as little as possible. This motive, combined with the allegations that David Shara and Tsitoghdzyan made false representations and knowingly cited manipulated auction records to support those representations, gives rise to a strong inference of fraudulent intent. TAC, ¶ 335.

The Defendants further argue that Balder has failed to plead reasonable reliance. Balder explicitly alleges that he relied on the false representations when he agreed to the Producers' Agreement's terms. <u>Id</u>. at ¶¶ 54, 318, 348. Contrary to the Defendants' arguments, Balder's eagerness to receive paintings as compensation does not negate his alleged reliance; had Tsitoghdzyan and David Shara made honest representations of value, Balder could have negotiated larger or additional paintings under the Producers' Agreement. The Defendants argue that Balder's reliance was unreasonable because the Phillips website posted more accurate appraisal estimations of Tsitoghdzyan's work, so Balder should have known not to rely on the representations from Tsitoghdzyan and David Shara. Def. Rply. at 10. Based on the TAC, Phillips' website posted both "appraisal estimations" and "the two auction records of 2014 and 2015." TAC, ¶ 11. The appraisal estimations were much lower than the auction records (which Balder later learned were the product of tampering). The Defendants' argument implies that Balder should have relied solely on the appraisal estimations and should have ignored both Phillips' auction records and David Shara's and Tsitoghdzyan's representations. This is a question of fact for the jury. For pleading purposes, it was reasonable for Balder to rely on representations made by an artist and his sales agent, particularly when they directed him to corroboration of their claims on the Phillips website. <u>Id</u>. at ¶ 335. Balder has sufficiently pleaded

justifiable reliance, and the Court should not dismiss the fraud claims against Tsitoghdzyan and David Shara.

## VI.    Copyright Infringement

Balder asserts copyright infringement claims against Honey Shara and Tsitoghdzyan, alleging that they unlawfully acquired a copy of "American Mirror." For a plaintiff's copyright claim to survive a motion to dismiss, the plaintiff must allege: "(1) which specific original works are the subject of the copyright claim, (2) that plaintiff owns the copyrights in those works, (3) that the copyrights have been registered in accordance with the statute, and (4) by what acts and during what time the defendant infringed the copyright." Energy Intelligence Group, Inc. v. Jefferies, LLC, 101 F. Supp. 3d 332, 338 (S.D.N.Y. 2015). Balder claims that he copyrighted "American Mirror" in 2017. TAC, ¶ 80. Two years later, Tsitoghdzyan's counsel approached Balder to request a license to show the documentary. Id. at ¶ 193. Balder declined. Id. Honey Shara then requested a copy of the documentary "for a friend in Canada," which Balder agreed to. Id. at ¶¶ 193, 358. Balder alleges that Honey Shara gave Tsitoghdzyan a copy, and he "used the copy of the film to take advantage of [Balder's] work by showing it to collectors, art dealers and others," particularly at an art show in Armenia in 2019. Id. at ¶ 344. In substance, Balder alleges that he granted Honey Shara a nonexclusive license, and that by sharing the "American Mirror" copy with Tsitoghdzyan, she exceeded the scope of that license.

The Defendants assert an affirmative defense for Honey Shara, arguing that, as a licensee, she is immune from the copyright infringement claim. Def. Br. at 30. "A copyright owner who grants a nonexclusive license to use his copyrighted material waives his right to sue the licensee for copyright infringement." Graham v. James, 144 F.3d 229, 236 (2d Cir. 1998). But "when a license is limited in scope, exploitation of the copyrighted work outside the specific limits

constitutes infringement." <u>Spinelli v. NFL</u>, 903 F.3d 185, 202 (2d Cir. 2018) (explaining that a licensee is immune from a copyright infringement claim when breaching the terms of their license, but not when acting beyond the scope of their license) (citing 3 Nimmer on Copyright § 10.15 (2018)). Because Balder argues that Honey Shara exceeded the scope of the license, she is not immune from the copyright infringement claim.

The Defendants further argue that Honey Shara did not exceed the scope of the license. Def. Br. at 30-31. According to the Defendants, the license permitted Honey Shara to share the "American Mirror" copy with Tsitoghdzyan because they were friends. <u>Id</u>. This argument stretches common sense; as framed by the TAC, no reasonable person in Balder's position would have thought that Honey Shara's "friend in Canada" was Tsitoghdzyan. Accordingly, Balder has sufficiently alleged that Honey Shara exceeded the scope of her copyright license by giving Tsitoghdzyan a copy of "American Mirror."

The Defendants also argue that Balder gave Tsitoghdzyan a license to show "American Mirror," and that Balder has failed to allege how Tsitoghdzyan exceeded that license. But based on Balder's allegations, he explicitly refused to grant Tsitoghdzyan a license. TAC, ¶ 193. Tsitoghdzyan sought a license through legal means, Balder refused, and Tsitoghdzyan decided to show "American Mirror" to art dealers anyway. <u>Id</u>. at ¶¶ 193, 344. Accordingly, Balder has sufficiently pleaded copyright infringement against Tsitoghdzyan.

Balder also alleges that Tsitoghdzyan infringed a second copyright. Balder claims that in 2015, he gave Tsitoghdzyan a copyrighted text only for use in a print catalog. <u>Id</u>. at ¶ 352. Balder alleges that Tsitoghdzyan has displayed that text on his website until recently, claiming it as his own. <u>Id</u>. The Defendants argue that Balder has "has failed to identify what 'text' he is referring to, how it was used, or the time frame infringed," depriving them of notice. Def. Br. at 31. But

Balder included in the TAC the identifying copyright registration number and a screenshot of the text. TAC, ¶ 352, Ex. 9. Balder claims that Tsitoghdzyan started posting the text in 2017, and the screenshot shows that it was still on his website in July 2022. TAC, ¶ 352, Ex. 9. Balder has sufficiently pleaded that Tsitoghdzyan exceeded the scope of his license to use the text.

Balder also asserts copyright infringement and plagiarism claims against Sarandon, alleging that she stole his idea for her to play an emergency room nurse. Id. at ¶¶ 287, 375. Because plagiarism is not a legal claim, the Court evaluates only Balder's copyright claim. Leary v. Manstan, No. 13-cv-00639 (JAM), 2018 WL 1505571, n.1 (D. Conn. Mar. 27, 2018) (citing Black's Law Dictionary 1170 (7th ed. 1999)). A defendant infringes a copyright only where "a substantial similarity exists between the defendant's work and the protectible elements of plaintiff's." Fisher-Price, Inc. v. Well-Made Toy Mfg. Corp., 25 F.3d 119, 122-23 (2d Cir. 1994). "[A] copyright does not protect an idea, but only the expression of an idea." Kregos v. AP, 3 F.3d 656, 663 (2d Cir. 1993). "If the similarity between two works rests solely on a shared underlying idea, rather than the particular way in which that idea has been portrayed, there is no 'substantial similarity.'" Hudson v. Universal Studios, Inc., No. 04-cv-6997 (GEL), 2008 WL 4701488, at *2 (S.D.N.Y. Oct. 23, 2008). Balder alleges that Sarandon copied his "16 Hours" concept for her movie "Viper Club." TAC, ¶ 131. The only alleged similarity between Balder's concept and Sarandon's movie is the idea for Sarandon to play an emergency room nurse. Id. The shared idea for a particular actress to play a character with a particular profession is far too general to fall within copyright law's protection. Accordingly, Balder has failed to allege "substantial similarity," and his copyright claim against Sarandon should fail.

## VII.    Promissory Estoppel

Balder asserts promissory estoppel claims against Tsitoghdzyan and Sarandon, alleging that he relied, to his detriment, on their oral promises to sign talent releases. The Defendants argue that, under New York Civil Rights Law § 51, any oral promise to sign a talent release is unenforceable. Under that statute, the use of a person's "name, portrait, picture or voice . . . for advertising purposes or for the purposes of trade" requires that person's written consent. N.Y. Civ. Rights § 51. Courts have described this provision as a Statute of Frauds. See e.g. Felicie, Inc. v. Leibovitz, 67 A.D.2d 656, 657 (1st Dep't 1979). Promissory estoppel is an exception to the Statute of Frauds "if application of the statute would result in unconscionability." Matter of Hennel, 29 N.Y.3d 487, 494 (2017). An unconscionable agreement is one that "no person in his or her senses and not under delusion would make on the one hand, and no honest and fair person would accept on the other, the inequality being so strong and manifest as to shock the conscience and confound the judgment of any person of common sense." Christian v. Christian, 42 N.Y.2d 63, 71 (1977). Only in rare circumstances should courts avoid the Statute of Frauds via unconscionability findings. Hennel, 29 N.Y.3d at 497. Balder alleges unfairness, but not unconscionability. Tsitoghdzyan's and Sarandon's false promises to sign talent releases rendered Balder's work virtually unpaid, but Balder took on the risk of unpaid work when he agreed to profit as compensation. Additionally, Balder could have avoided his detrimental reliance by simply requiring Sarandon and Tsitoghdzyan to sign talent releases *before* filming their scenes. Accordingly, promissory estoppel does not apply as an exception to the Statute of Frauds in N.Y. Civ. Rights § 51, and Sarandon's and Tsitoghdzyan's alleged oral promises to sign talent releases are unenforceable.

## VIII.  Unjust Enrichment

Balder asserts unjust enrichment claims against all Defendants. Balder argues that any benefit that the Defendants derived from "American Mirror" was unjust because their refusal to sign and procure talent releases blocked distribution. TAC, ¶ 344. The Defendants argue that the unjust enrichment claims simply duplicate Balder's breach of contract claim, rendering them barred. "An unjust enrichment claim is not available where it simply duplicates, or replaces, a conventional contract or tort claim." Corsello v. Verizon N.Y., Inc., 18 N.Y.3d 777, 790 (2012). However, the Defendants' refusal to sign and procure talent releases did not constitute breach of the Producers' Agreement (see above). Because such conduct is not covered by the Producers' Agreement, Balder's breach of contract claims do not duplicate his unjust enrichment claims.

Even though Balder's unjust enrichment claims are not duplicative, they are insufficiently pleaded. To adequately plead unjust enrichment, a plaintiff must allege "that (1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to permit the other party to retain what is sought to be recovered." Corsello v. Verizon N.Y., Inc., 18 N.Y.3d 777, 790 (2012). Balder argues that "American Mirror" enriched Sarandon by bringing her critical acclaim, and enriched Tsitoghdzyan and the Sharas by bringing them increased art sales. TAC, ¶¶ 293, 327, 334-35, 355, 361. Balder claims that this enrichment was at his expense because the Defendants prevented the film's distribution. Id. at ¶ 333. But the Defendants' alleged enrichment was not at Balder's expense; critical acclaim of a documentary's stars would benefit, not harm, its director. Balder was harmed by the Defendants' actions to thwart distribution, not the Defendants' enrichment. Further, it is not inequitable for the Defendants to retain whatever intangible benefit they received from mildly elevated public attention years ago. Balder has therefore failed to allege unjust enrichment.

IX.    **Breach of Fiduciary Duty**

Balder alleges that, by thwarting "American Mirror's" distribution, David Shara breached his fiduciary duty to Balder under the Producers' Agreement. This claim requires Balder to prove "the existence of a fiduciary relationship." Johnson v. Nextel Communs., Inc., 660 F.3d 131, 138 (2d Cir. 2011). A person "acts in a 'fiduciary capacity' when 'the business which he transacts, or the money or property which he handles, is not his own or for his own benefit, but for the benefit of another person, as to whom he stands in a relation implying and necessitating great confidence and trust on the one part and a high degree of good faith on the other part.'" United States v. Chestman, 947 F.2d 551, 568 (2d Cir. 1991) (citing Black's Law Dictionary 564 (5th ed. 1979)). Balder fails to establish a fiduciary relationship with David Shara. David Shara's only obligations to Balder stem from the Producers' Agreement, which benefited both David Shara and Balder. TAC, Ex. 7. Additionally, David Shara funded the production of "American Mirror," so "the money . . . which he handle[d]" for the documentary was "his own." Chestman, 947 F.2d at 568; TAC, ¶ 231. Because Balder fails to allege a fiduciary relationship with David Shara, this claim should be dismissed.

X.    **Civil Conspiracy**

Balder claims that the Defendants engaged in a civil conspiracy to breach the Producers' Agreement. TAC, n. 168, 171. "New York does not recognize an independent cause of action for conspiracy to commit a civil tort." Abacus Fed. Sav. Bank v. Lim, 75 A.D.3d 472, 474 (1st Dep't 2010). Rather, a civil conspiracy cause of action serves to "connect the actions of separate defendants with an otherwise actionable tort." Alexander & Alexander, Inc. v. Fritzen, 68 N.Y.2d 968, 969 (1986). Balder makes clear that the "otherwise actionable tort" underlying his conspiracy claim is breach of the Producers' Agreement, and particularly the Defendants'

alleged breach for failing to sign and procure talent releases. TAC, n. 171. However, as is explained above, the Defendants' failure to sign and procure talent releases did not constitute a breach of the Producers' Agreement. Accordingly, there is no breach of contract claim available to support the conspiracy claims, and they should be dismissed.

## XI.    Duress

Balder alleges that Honey Shara obtained his tax records by duress. TAC, ¶ 361. New York law is "unsettled with respect to whether duress may be asserted not only as an equitable defense but also as a tort claim." Dantas v. Citigroup, Inc., 779 F. App'x 16, n.2 (2d Cir. 2019). Even assuming – but not deciding – that New York does recognize a duress cause of action, Balder fails to allege duress. "Duress is the compelling of an individual to perform an act which he is not legally obligated to do." Ressis v. Mactye, 108 A.D.2d 960, 961 (3d Dep't 1985). Balder claims that Honey Shara "requested confidential information about [Balder's] company tax returns of previous years." TAC, ¶ 189. Balder provided them, hoping that doing so would "bring some order to the situation of unpaid invoices." Id. A request does not constitute compulsion, despite Balder's claim that he "felt coerced." Id. Accordingly, the Court should dismiss the duress claim.

## XII.    Defamation

Balder asserts defamation claims against Tsitoghdzyan and David Shara for allegedly making false statements to the Armenian press in 2018 and 2019. TAC, ¶¶ 107, 191. In New York, defamation claims are subject to a one-year statute of limitation. CPLR § 215(3). "A cause of action for defamation accrues when the material is published." Shamley v. ITT Corp., 869 F.2d 167, 172 (2d Cir. 1989). Because Tsitoghdzyan and David Shara made the allegedly false

statements several years before Balder filed this case in 2022, the defamation claims are time-barred.

## XIII.    Conversion

Balder asserts conversion against Tsitoghdzyan and Honey Shara for wrongfully accepting film festival awards in 2018.[4] TAC, ¶¶ 139, 353, 360. Balder claims that Tsitoghdzyan and Honey Shara should have given him the awards but have not. Id. Conversion has a three-year statute of limitation, which "runs from the date that the conversion took place." Torrance Constr., Inc. v Jaques, 127 A.D.3d 1261, 1265 (3d Dep't 2015) (citing C.P.L.R. § 214 (3)). Tsitoghdzyan and Honey Shara allegedly accepted the awards in 2018, and Balder filed this case in 2022, rendering these claims time-barred.

### LEAVE TO AMEND

Rule 15(a)(2) requires that leave to amend be freely given when justice so requires. Fed. R. Civ. P. 15(a)(2). "However, in determining whether leave to amend should be granted, the district court has discretion to consider, *inter alia*, the apparent futility of amendment." Grace v. Rosenstock, 228 F.3d 40, 53 (2d Cir. 2000) (internal citations and quotation marks omitted); Cancel v. New York City Hum. Res. Admin./Dep't of Soc. Servs., 527 F. App'x 42, 44 (2d Cir. 2013) ("While district courts should generally not dismiss *pro se* claims without affording leave to amend, it need not do so when amendment would be futile."). The court should not dismiss a *pro se* Plaintiff's claims "without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." Cuoco v. Moritsugu, 222

---

[4] In the TAC, Balder is not clear about the cause of action asserted on these facts, but he does ask the Court to order return of the awards. TAC, ¶¶ 353, 360. In light of Balder's *pro se* status, the Court interprets Balder to allege conversion, defined as the "unauthorized assumption and exercise of the right of ownership over goods belonging to another to the exclusion of the owner's rights." Employers' Fire Ins. Co. v. Cotton, 245 N.Y. 102, 105 (1927).

F.3d 99, 112 (2d Cir. 2000). Even considering Balder's *pro se* status, I recommend that the Court deny him leave to amend for two reasons. First, Balder has already had one opportunity to correct the issues with his complaint. The Court granted Balder's request to amend the SAC after the Defendants filed their initial motion to dismiss, and Balder directly responded to the Defendants' arguments from their motion throughout the TAC. See, e.g., TAC, n.48, n.50, n.52, n.62, n.98, n.126, n.143. Second, amendment would be futile because the insufficiencies remaining in Balder's complaint could not be cured with amendment. Accordingly, I recommend that the Court deny Balder leave to amend.

**CONCLUSION**

I recommend that the Court DENY the Defendants' motion to dismiss as to these claims: (1) breach of contract against David Shara; (2) tortious interference with contract against Tsitoghdzyan; (3) tortious interference with business relations against Sarandon; (4) fraud against Tsitoghdzyan and David Shara; and (5) copyright infringement against Tsitoghdzyan and Honey Shara. I recommend that the Court GRANT the Defendants' motion to dismiss as to these claims with prejudice: (1) breach of contract against Tsitoghdzyan and Sarandon; (2) tortious interference with contract against Sarandon, David Shara, and Honey Shara; (3) tortious interference with business relations against Tsitoghdzyan, David Shara, and Honey Shara; (4) copyright infringement against Sarandon; (5) promissory estoppel against Tsitoghdzyan and Sarandon; (6) unjust enrichment against the Defendants; (7) breach of fiduciary duty against David Shara; (8) civil conspiracy against the Defendants; (9) duress against Honey Shara; (10)

defamation against Tsitoghdzyan and David Shara; and (11) conversion against Tsitoghdzyan and Honey Shara.

_____

SARAH NETBURN
United States Magistrate Judge

DATED:       December 18, 2023
             New York, New York

*              *              *

**NOTICE OF PROCEDURE FOR FILING OBJECTIONS
TO THIS REPORT AND RECOMMENDATION**

The parties shall have fourteen days from the service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. A party may respond to another party's objections within fourteen days after being served with a copy. Fed. R. Civ. P. 72(b)(2). Such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Jennifer L. Rochon at the United States Courthouse, 500 Pearl St., New York, New York 10007, and to any opposing parties. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b). Any requests for an extension of time for filing objections must be addressed to Judge Rochon. The failure to file these timely objections will result in a waiver of those objections for purposes of appeal. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b); Thomas v. Arn, 474 U.S. 140 (1985).