# IN THE UNITED STATES DISTRICT COURT

# FOR THE SOUTHERN DISTRICT OF NEW YORK

_____x

ARTHUR BALDER,                                    Case No. **1:22-cv-06401-JLR-SN**

      *Plaintiff,*

 - against- -

SUSAN SARANDON,
DAVID SHARA,
HONEY SHARA,
TIGRAN TSITOGHDZYAN

      *Defendants.*

_____ x

**PLAINTIFF'S PARTIAL OBJECTIONS TO TO U.S.M.J. SARAH NETBURN'S REPORT
AND RECOMMENDATION**

## TABLE OF CONTENTS

I. OBJECTIONS TO CONCLUSIONS IN SECTION "PLAINTIFF'S ALLEGATIONS"

II. CONTRACT OBTAINED UNDER DURESS AND FRAUDULENT REPRESENTATIONS EXERTED BY D. SHARA AND TSITOGHDZYAN

III. BREACH OF CONTRACT

A. Against Sarandon [Allegations Pertaining to 2018's Section of TAC]

B.  Against Sarandon as a consequence of 2016's Offer and Acceptance by Performance.

C. Objections to Wrong Conclusions Regarding Interactions between Plaintiff and Sarandon.

D. David Shara's Breach of Contract Allegations Allowing Parole Evidence Rule Exception.
d.1. Ambiguities in Language of Producers' Agreement.

E. David Shara's Breach of Contract for the Painting's Late Delivery.

F. Against Tsitoghdzyan and Against Tsitoghdzyan as Regards to his Son, a Minor.


IV. TORTIOUS INTERFERENCE WITH CONTRACT

A. Against Sarandon.

B. Against Honey Shara.

C. Against Tsitoghdzyan.


V. TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS

A. Against Sarandon.

a—1. Against Sarandon as regards to Expectations of the Producers' Agreement.

a—2. Against Sarandon. It should include also the Big Canada-mined Diamond Documentary Project.

B. Against Honey Shara.

C. Against Tsitoghdzyan.

D. Against David Shara.

VI. FRAUD

VII. COPYRIGHT INFRINGMENT

VIII. PROMISSORY ESTOPPEL

A. Against Sarandon and Tsitoghdzyan.

B. Against David Shara.

IX. UNJUST ENRICHMENT

A. Against Tsitoghdzyan, Honey and David Shara.

B. Against Sarandon.

C. Objection to Report's Conclusion.

X. BREACH OF FIDUCIARY DUTY

XI. CIVIL CONSPIRACY

A. Against Sarandon, Tsitoghdzyan, Honey Shara and D. Shara.

XII. DURESS

A. Against Tsitoghdzyan and D. Shara.

B. Against Honey Shara.

XIII. DISCRIMINATION

A. Against Sarandon.

XIV. NEGLIGENT OR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

A. Against all Defendants.

XV. DEFAMATION.

LEAVE TO AMEND

UNSETTLED CONSTITUTIONAL ISSUE

PROCEDURE

CONCLUSION

Plaintiff Arthur Balder ("Plaintiff") respectfully submits the following objections to the Report and Recommendation Dated December 18, 2023, by the Honorable Sarah Netburn, recommending that Defendants' Motion to Dismiss Plaintiff's Third Amended Complaint (the "TAC")[1]. [Dckt. No. 86] (the R&R") be denied in part.

Plaintiff respectfully objects to some of Judge's Netburn's findings in the R&R, specifically the part that recommended granting Defendants' Motion to Dismiss the TAC as to the claims of (1) breach of contract against Tsitoghdzyan and Sarandon; (2) tortious interference with contract against Sarandon, David Shara, and Honey Shara; (3) tortious interference with business relations against Tsitoghdzyan, David Shara, and Honey Shara; (4) promissory estoppel against Tsitoghdzyan, Sarandon and David Shara; (5) unjust enrichment against the Defendants; (6) civil conspiracy against the Defendants; (7) duress against Honey Shara, Tsitoghdzyan and David Shara; and reviews the extant allegations in the TAC that allow incorporation of causes of action as explained herein. The Plaintiff respectfully submit that the Court should reject these portions of the R&R and deny Defendants' motion partially.

## STATEMENTS OF FACTS

The Plaintiff's TAC are referred to herein, and as such are expressly incorporated herein by reference.

## STANDARD OF REVIEW

In evaluating a Magistrate Judge's Order with respect to a pretrial matter that is dispositive of a claim or defense of a party, a district court shall, pursuant to Rule 72(b) of the Federal Rules of Civil Procedure and the Federal Magistrates Act, 28

---

1  The Plaintiff's TAC and Opposing papers submitted against of their Motion to dismiss the TAC are referred to herein, and as such are expressly incorporated herein by reference.

U.S.C. 636(b)(1), review the recommendation *de novo*. Rule 72(b)(3) instructs the district judge to "determine de novo any part of the magistrate judge's disposition that has been properly objected to."[2] The district judge's review may be based on the entire record. Fed. R. Civ. P. 72(b). Rule 72: "the district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions." Fed. R. Civ. P. 72(b)(3).

This Court's review is *de novo*. See 28 U.S.C. § 636(b)(1) ("A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made.").

## OBJECTIONS

## I. OBJECTIONS TO SOME CONCLUSIONS IN SECTION "PLAINTIFF'S ALLEGATIONS"

Plaintiff affirms unambiguously greatest respect to Hon. Sarah Netburn's work and dedication. Without prejudice, however, Plaintiff disagrees and objects to some conclusions present in the Report as follows. Unless otherwise indicated, emphasis is added.

Since wrong or misled conceptions of the allegations present in TAC can consequently affect the way such facts are weighted in relationship to claims, individually and collectively, we will preliminarily clarify the record comparing some parts of the section "Plaintiffs Allegations" of the Report (as filtered, or remembered, by the mind of the judge) to the allegations, facts, and details described in the TAC.

---

2    Nelson v. Smith, 618 F. Supp. 1186, 1190 (S.D.N.Y. 1985).

There are specific and manifest inconsistencies and important omissions. We find some conclusions to be wrong as a consequence thereof.

The Report states "Arthur Balder directed and co-produced the documentary" ["American Mirror: Intimations of Immortality", from now on the "Film"] [Report pg 2]. That is not what the Exhibit 7 shows: Arthur Balder is "Producer/Director" the Film, and D. Shara is "Executive Producer".[3] This is an important distinction, because as the Producer he is, Plaintiff could have denied filming invitees of D. Shara if he intended not to provide the talent releases that were necessary to keep the contract "for profit". D. Shara represented the opposite to the Producer of the Film, Plaintiff,, that he would get them, and not providing them is blunt bad faith to render the contract profitless.

## II. CONTRACT OBTAINED UNDER DURESS AND FRAUDULENT REPRESENTATIONS EXERTED BY D. SHARA AND TSITOGHDZYAN

By New York law's standards, "[unconscionability] requires '**some** showing of an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party.'"[4] "The focus is on such matters as the size and commercial setting of the transaction…, whether deceptive or high-pressured tactics were employed, the use of fine print in the contract, the experience and education of the party claiming unconscionability, and whether there was disparity in bargaining power."[5]

---

3  Assuming D. Shara produced the Film equals to ascribing to him responsibilities and ideas he never had. This is not to subtract relevance from D. Shara's role but simply to present facts as they are, and as they are presented in TAC. As the **Contract shows [ TAC, Exhibit 7, line 4]**, D. Shara was 'executive producer' specifically in charge of obtaining necessary funds for Plaintiff to produce it. Original idea, scripts, and all other creative decisions are the result of Plaintiff's dedication—exclusively. The fact that D. Shara tried after signing the contract on several occasions to be promoted in the media as producer or co-producer, and the fact that he did in TV apparitions, only responds to his wish to aggrandize his role in the existence of the Film.

4  Gendot Assocs. Inc. v. Kaufold, 56 AD3d 421, 423 (2d Dept 2008) (citing Williams v. Walker-Thomas Furniture Co., 350 F2d 445, 449 [DC Cir 1965]).

5  Gillman v. Chase Manhattan Bank, N.A., 73 NY2d at 11.

The Report, pg. 2, states: "After six weeks of contentious negotiations, Balder and D. Shara came to an agreement." **"Balder alleges that he signed the agreement under duress."** The Report does not address the allegations of duress, but they are present in the TAC. Unconscionability requirements as referenced before are present as follows: D. Shara and Tsitoghdzyan told Plaintiff he should disappear from the project once he simply requested that oral terms previously accepted should be settled in writing as a contract at ¶ 44 after almost a year working in the project. In emails CCing D. Shara, Tsitoghdzyan, who up to then had been praising Plaintiff's work, states, now that Plaintiff wanted the terms on a written contract: "200k value painting for your work this will never been accepted…" [¶ 42] Then he insults and denigrates Plaintiff: "So it will be honest to say, that you **can do a crapmovie with 80k**" [¶ 42]. Plaintiff answered reasonably to the barrage of insults and humiliations and argued his position, then Tsitoghdzyan suggested to **harm physically Plaintiff** at ¶ 47, 39, 52, then **compared him to a prostitute for requesting a contract** at ¶ 44. Once this ritual had started by Tsitoghdzyan, then D. Shara threatened to film everything from the beginning directed by someone else, and **to "destroy" Plaintiff's work, if Plaintiff did not accept D. Shara's new terms**, without Plaintiff being able to bargain at ¶ 52. Additionally to his terms, D. Shara indicated that Plaintiff should distribute the film if he wanted to make any money, "**that is the only solution here**"[6] at ¶ 201, 309, increasing unfairly the burden of responsibilities of Plaintiff.

---

6   The "only solution here' to make profits, is to distribute the Film. Plaintiff acts under that premise. The contract is 'for profits'. No profits can be made if D. Shara does not do what he promised he will: getting the talent releases of people he invites and of people he assures he can get it "expeditiously". The Court errs: the promise of obtaining those talent releases on both sides is a basic promise that any reasonable person would understood as included in any film made for profit, and represent breach of inherent covenant of good faith.

Plaintiff is subject to disparity of bargaining power, in fact he cannot bargain in absence of meaningful choices. See D. Shara's barrage of Hobson choices at ¶ 56: "We will finish the movie separately with a music editor" "**If** this does not work for you, **then** we will finish the project with other editors" [¶ 48 ], "**If** this does not work [then] I will **scrap the project and the film will go in the garbage**. I am very tempted **to throw out the film** (I paid for it) **and start over with someone else. you have 24 hours to choose**." "we are finished working together **whatever you choose**. David and Tigran." "whatever you choose" shows absence of meaningful choices. High-pressured tactics were employed. D. Shara: "**If not, we are finished** and **project  is over**. Emails only, no calls." "**I am tempted to destroy all and start from zero with someone else**" [ ¶ 329]. Therefore there is disparity of bargaining power and Plaintiff must act in absence of meaningful choices under high pressure tactics.

Once Plaintiff was threatened with the possibility of losing all his work of a long period of time invested in it, he had no remedy but to accept what was offered. Then Plaintiff is ordered by D. Shara to prepare a contract *himself*, without Plaintiff having any professional capacity or knowledge wheresoever to do so in such adverse circumstances [recall these events refer to November 2016, eight years ago] D. Shara: **"write up a "gentlemen's" short bullet point contract between us on one or 2 pages"** at ¶¶ 63 Footnote 52, 53.  D. Shara ensures saving money in attorneys, and second, and most importantly, he exerts more pressure on Plaintiff, not allowing him to request an attorney, and knowingly compressing the Producers' Agreement  "**on one or 2 pages"** but D. Shara is specific **"not the 'contract' you put forward'"** [¶ 48] specifically in reference to a template for film contracts previously used by Plaintiff as an initial proposal that contained at least some commonplace protective

provisions. Therefore "the experience and education of the party claiming unconscionability", who was not prepared as an attorney to prepare a contract, is used by D. Shara to his advantage by ordering Plaintiff to prepare a contract that is constrained to "one or 2 pages".

Some terms clearly defined during that time and alleged [D. Shara: "hopefully the movie is a great success and **we can get it to many festivals and on apple tv.** So far the only stumbling block is having your wife in the film" "David Shara makes it clear, as the contract 51 is being drafted,that the film is to be distributed to film festivals, andcommercially, **he mentions Apple TV as a channel for monetisation**" ¶ 60] [D. Shara: "The best solution here isto finish the film as best you can and get it into as many filmfestivals and events as possible. We are partners in this film andthe better it does, the better we do together." Plaintiff proposes a termination agreement, but D. Shara instructs him directly: "Finish the film **and try to get it sold. Get it into theaters, amazon, Apple TV etc**. That is **the only option here**." "So I recommend **we finish the film and _you_ get to work _distributing it_**." at ¶ 62] are not present in the Producers' Agreement simply due, in part, to Plaintiff's inability to perform such task as preparing a contract in such adverse circumstances, in part fearing more adverse reactions from them ["Obviously Plaintiff had reasons to fear the mercurial Defendants would not stand by their words" ¶ 62], in part due to the maximal extension of the agreement—imposed by the same party exerting duress. Such extension is a limitation that no reasonable person [filmmaker] would accept in the film industry (probably in no industry), unless the contract is obtained under coercion. Plaintiff manifests he was afraid of their reactions "Plaintiff was under the threat of his film being 'destroyed', of being embarrassed

6

publicly for having promoted a film that afterwards would not show up, of suffering the professional loss of the film not existing, and of being physically harmed by Tigran, because **Defendants clearly stated they would film all with someone else if he did not accept heir terms.** That explains the suspiciously short extension of the contract, and that Plaintiff could not dare to add anything beyond two pages, even less to add provisions that would have been there to protect his rights and contract performance. His inability to prepare the contract (he had no idea of law), acting under such circumstances (duress, possibility of being physical harmed), is manifest in the contract itself and the fact that basic elements acknowledged during those weeks are not included, although clearly stated in the emails, which are the extrinsic evidence necessary to understand the mind of the parties, and how it was obtained. D. Shara decided unilaterally not to sign it until four months later [¶  ], simply not to give any guarantee to Plaintiff in the meantime and to make sure he would not dare to propose any changes, showing him with that that even accepting in writing via email certain terms, he was not willing yet to sign anything. In that meantime, however, Plaintiff was requested to prepare and execute the production, filming and editing of new scenes, from script to filming-tasks he performed impeccably, as results show.

Plaintiff has invoked the extrinsic evidence extensively in the TAC's allegations, in its conclusions and legal arguments, and has requested in his Opposition to the MTD thatextrinsic evidence should be look at. The fact that as a pro se he did not know the name of the adequate term or legal statute to refer to it, and if invoking the exact term parole rule evidence exceptions was instrumental, does not apply: because the allegations present in the TAC show that "the plaintiff pleads factual content that

allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[7] The Court has been able to raise questions from the pleadings of the pro se, as for instance in the case of the Fraud allegations, the same would have been possible here. There are enough facts to state that the extrinsic evidence is necessary in this case.

Plaintiff alleges unconscionability and shock, and the allegations as present in TAC and referenced before show plausibility on its face: "Plaintiff was in a state of the mind that did not allowed him react properly to further defend his rights" at ¶58.

**Therefore the Producers' Agreement is obtained under duress, should be declared void**, **and the terms and the intention of the parties be extracted from the extrinsic evidence**, since they are precise, unambiguous, do not contradict but clarify and make it possible the *purpose* of the agreement, show the mind of the parties, and from the course of action shown by detailed budgets exchanged then and later via email and approved by both parties and showing a clear path of intent in 2017, 2018 and 2019. Giving absolute credence to the **Producers' Agreement,** the Court simply establishes a very low standard for validating any contract obtained under duress manoeuvres in the midst of actions and threats that render someone's behavior 'unconscionable', a contract that afterwards is used to justify positions that no reasonable person would consider admissible. No reasonable filmaker would sign a contract for profit if it contains the inherently unfair element that D. Shara may invite people to participate in it, without having any obligation to obtain their talent releases (in spite of promising to getting them to his contract's partner, the Plaintiff, who in turn obtains and shares all talent releases of the people he invites), simply with the purpose to render the contract un-profitable, all as a new way to coerce Plaintiff into

7    Bell Atl. Corp. v Twombly, 550 US 544, 570, 127 S Ct 1955, 167 L Ed 2d 929 [2007].

new and more unfavorable terms [see TAC Chronological Section 2019, 2020 "you don't have any remedy" "**handover the project** [to D. Shara *and* Honey Shara] **or my client is ready to *let it die on the vine***"]. Therefore the contract terms are oppressive enough (Plaintiff's possibility to obtain profits amounts to impossible at the discretion of one party already liable for Fraud within the same contract) and outrageous enough (the contract is de facto fraudulent as regards to the possibility of profits, even having been obtained by fraudulent representations of value as regards to several of its elements, the painting and the possibility of profits) to warrant a finding of unconscionability, directly derived from the coercive contract formation process under duress.

Plaintiff was lied to trick him into the agreement: Plaintiff relied on the possibility of making profits, but also on the value of the painting as compensation. Plaintiff's safety was threatened by Tsitoghdzyan if he refused to accept the terms offered without bargaining power. The contract is so "grossly unreasonable or unconscionable in the light of the mores and business practices of the time and place [the film industry in the USA] as to be unenforceable according to its literal terms"[8]. The contract is patently one-sided: D. Shara, the party who imposes terms, time-ultimatum [24 hours] and contract length constraints [one or 2 pages, bulletpoints] can render it profitless at will, if the Court allows it. The Producers' Agreement, result of parties with disproportionate bargaining power and obtained by suspect means, is so tainted that the Court should declare it unenforceable – notwithstanding the fact that the parties "agreed" to it, formed as a product of gross inequality.

---

8    Gillman v. Chase Manhattan, 73 N.Y.2d 1, 10 (1988); see also, King v. Fox, 7 N.Y.3d 181, 191 (2006); Mandel v. Liebman, 303 N.Y. 88, 94 (1951)

Plaintiff acted in absence of meaningful choice and the contract terms are unreasonably favorable to D. Shara, who can turn it into profitless at will, and who also imposed its length-restriction. **If Plaintiff would have known that D. Shara was entitled not to obtain any release, he would not have agreed as Director/Producer on certain participations invited by D. Shara under that promise**. Additionally, if a contract is 'for profit', and a 20% is promised, **no reasonable person would sign it if that principle would not include the necessary, obvious promise that the talent releases would be obtained by any party to it**, because it betrays the basic principle that no party can do anything that destroys or hampers the right of the other to peacefully enjoy the fruits of the contract. The allegations show D. Shara did not obtain them not out of negligence, but because he did not want to do it [¶¶ 198, 236]  "can secure  all of them in an expeditious manner"]—once Plaintiff had made use of his right to his opinion in an exchange of email with Sarandon, and is the result of tortious interference with the contract by all other defendants to harm Plaintiff thwarting the distribution to deprive him of any profits, professional prestige, leverage to gain other opportunities. Where the disparity in the consideration exchanged by the parties is overwhelming, that factor alone "may be sufficient to sustain [a finding that the contract is unconscionable]," since the disparity "itself leads inevitably to the felt conclusion that that knowing advantage was taken of [one party.]"[9] A determination of unconscionability is a matter of law for the court to decide.[10] Where the significant facts germane to the unconscionability issue are known and essentially undisputed, the court may determine the issue

---

9    Matter of Friedman, 64 A.D.2d at 85, quoting Jones v. Star Credit Corp., 59 Misc.2d 189, 192 (1969) (Sup. Ct. Nassau Co.) (Wachtler, J.); see also, Wolowitz, supra; Miner v. Walden, 101 Misc.2d 814, 818 (1979) (Sup. Ct. Queens Co.)

10   Gillman, supra; Emigrant Mortgage Co., 95 A.D.3d at 1170-71; Simar Holding Corp., supra.

without a hearing. The purpose of "the unconscionability doctrine is to prevent **unfair surprise and oppression**".[11] There is no bigger surprise than finding that D. Shara decided not to get the releases while acknowledging he can get "all of them in an expeditious manner" simply because he wants to deprive Plaintiff of the fruits of the contract, as a means to coerce him, again, into new and even more disadvantageous terms, and that finding that the painting given to Plaintiff has close to no value, and a fraud. "You should **negotiate with David for your %** on the film and I'm totally fine with whatever you and David decide! **That will be your reward for the movie as it should be.** " Even Tigran  affirms the only way for Plaintiff to be rewarded is "%" of profits on distribution"  TAC, at ¶51.

High-pressured tactics were employed, and the experience and education of Plaintiff were not those of a professional of the law to prepare any contract. In fact, no reasonable professional in contract law would accept to compress it "in one or 2 pages" unless to leave out dozens of basic provisions that are commonplace in the film industry[12]. Plaintiff's behavior can only be described as unconscionable, and the allegations explain with particularity why. Defendants' argue that Plaintiff was 'a professional', which only further affirms and shows the success of the high pressure and deceptive tactics, combined, because no professional, in normal circumstances would have accepted that contract dictation by the other party [D. Shara]. Being a professional, Plaintiff knew the threat of all his work being "destroyed" was extremely damaging, and with no bargaining power left as described he had no other remedy but to accept any terms offered to allow his work to survive—believing at least the

---

11  Clinton v. Oppenheimer & Co., 824 F. Supp. 2d 476, 483 (S.D.N.Y. 2011).

12  Plaintiff had produced and directed three other feature-length documentaries before the Film. Two of them premiered at the Museum of Modern Art in New York. He can prove that none of those contracts is less than 10 to 20 pages long. Plaintiff acted under coercion in this case, or else his work would be 'destroyed'.

painting to be made would be of the value represented, "potentially much more" [D. Shara]. He had no other remedy than to act unconscionably in absence of any other meaningful choice.

Deceptive tactics were employed in obtaining the contract, to such a degree that the Report [pgs. 16-20] affirms that D. Shara and Tsitoghdzyan must be tried for fraud. **That fraud instance is not something '*other*' or *extrinsic*, but is part of, is embedded in, the contract itself and *contributed decisively* to obtain it: it was used to *convince* Plaintiff not to obtain any other upfront compensation or profit, since the contract is inherently unfair as regards to profit-making.** The Court has relied in the allegations, in extrinsic evidence, to analyze this element of the contract as fraudulent. The Court has shown great attention to detail in this regards, but not as regards to others. Plaintiff accepted such disadvantageous terms in the contract also under a representation of value of that element of the contract [the painting] that also the Report acknowledges was the 'only profits for Plaintiff' —which has close to no value, and because Defendants wanted to 'to pay Plaintiff as little as possible' [Report, Section Fraud].

The Court has used the extrinsic evidence to clarify its recommendation as regards to the fraud behind one element of the contract, yet it does not take into consideration the rest—that the contract itself is obtained in the midst of fraudulent representations and coercive high pressure tactics "to pay [Plaintiff] as little as possible" [Report pg. 19]. It is obvious that both defendants engaged repeatedly in a pattern of deceit based on an enormous disparity of bargaining power.

Since there is evidence of fraud and duress, the Court should discard the parole evidence rule and use its exceptions.

**If one element of the contract, and one that had been conspicuously used to obtain the signature of the contract, is fraudulent, then the entire contract should be declared illegal and void**[13], and all conclusions as to the mind of the parties be extracted from detailed extrinsic evidence[14].

### III. BREACH OF CONTRACT

**A. Against Sarandon [allegations related to 2018 section of TAC].**

The Report states that Plaintiff claims breach of contract against Sarandon, and that she had the enforceable obligation to do press for the Film. This is not precise: Plaintiff claims that Sarandon had the enforceable obligation to present her talent release on time to guarantee the distribution of the film, which she herself recommends, as a consequence of an offer sent by Plaintiff to Sarandon in 2018, which contained four elements.

Report, pg 3: "Balder filmed Tsitoghdzyan's scene with Sarandon over just one day in June 2016". It took months of preparations to obtain that result in 'just one day' [¶¶ 10 to 25]. [The extension of the performance does not change the outcome for an offer accepted by Performance]. Sarandon saw on several occasions the Film in 2017 [¶ 97]. Sarandon did not object to it, and requested some retouches to her images [¶ ¶97, 283]. Sarandon knew that a substantial amount of time and money was being employed in making the Film [¶¶ 10 to 25]. Sarandon was aware that massive press releases had been published in 2017 and 2018 that included: announcement of distribution and her participation as central aspect [Tsitoghdzyan: "I don't think she mind if we advertise her presence.." ¶¶ 30, 99]. Sarandon saw the Film's poster, that was based on a painting Tsitoghdzyan made of her face, and was aware of its

---

13  Fraud in inducement and fraud in the factum [deceitful subject matter is contained in the contract] are met here.

14  When a contract is found to be fraudulent, it is generally considered to no longer be enforceable. Contracts are considered to be void when there are mistakes, or cases of duress or fraud by one or more of the contracting parties.

distribution [TAC, 2018 section, interactions between Plaintiff and Sarandon]. Plaintiff expressed at large his gratitude to Sarandon sending her a letter via email whose title was "A letter to Ms. Sarandon with greatest gratitude." [¶ 26]. Sarandon's representations can only be understood as a corroboration of what she had promised in person to Plaintiff the day of the filming in 2016, which represent acceptance by performance, and before: that she would present whenever necessary image release to distribute the Film. In any case, those instances represent tacit acceptance of giving that permission. [¶¶ 10 to 25].

However, Balder and D. Shara wanted to be generous with her, as the Report, pg 3, states: "Almost two years later, via email, Balder and D. Shara offered Sarandon two Tsitoghdzyan prints and 10% of "American Mirror's" profits [...]." Id. at ¶ 98. They also asked Sarandon to help with the documentary's press. Id. Sarandon emailed back, accepting the offer for prints and adding that there was "no way to know" whether she would have time to help with press. Id. She did not address the profits-related offer." Those conclusions of the Report are wrong in light of the allegations.

TAC, Exhibit 2, pg 1, email sent by Plaintiff on January 24, 2018, describes the offer. The offer consists of four elements: *"-A large print, hand-embellished and signed by Tigran, of your own portrait (estimated value around $40k)-And another print hand-embellished and signed by Tigran of your choice (estimated value $40k)-Plus a 10% of all profits generated by the movie in any platform.We'd like you along with Tigran to be part of the PR of the film, as far as your agenda would allow it, and organizing everything in anticipation for your convenience."*

Sarandon's exact answer on March 27, 2018, and specifically coming from her, was: *"From Susan: Thank you so much. I would love to have prints that aren't gigantic.*

14

*In terms of going to Armenia in June, I know that Im working on my TV show and there's no way to know if that would be possible at this point, we'd just have to wait, though **I'd love to visit Armenia**.*"

Unambiguously acceptance in writing to parts of an offer, coupled with never objecting to any other part of it, is considered acceptance of the entire offer, or else it causes damages to the other party with one party enriching herself unjustly. Denying the acceptance of parts of the offer many months or years later only represent a breach of contract in bad faith. Additionally, Sarandon had already allowed Plaintiff to spent an enormous amount of time and money in preparing the Film, with Sarandon even requesting additional changes to embellish her image during the editing process.

Her answer simply thanks the offer, the *entire* offer, and *specifically* makes observations as regards to some of the items of the offer. She wants the prints, but specifically not "gigantic" ones. She does not oppose the clause of being "part of the PR of the film, as far as your agenda would allow it", on the contrary, she refers to an specific item of that general clause of being part of the PR, to the item that Plaintiff's communication describes on same Exhibit: *"**For instance**, in June 8-15 takes place the International Film Festival of Yerevan, capital of Armenia, and would be awesome if you'd like to go there with Tigran. On the other hand, the festival is considering to offer you the life-achievement award and pick it up on same occasion".*

The description of these facts in Report's "Plaintiff's Allegations" section fails by presenting as a matter of fact an interpretation that is subjective, far from the reality on Exhibit 2 and TAC, and unfair to Plaintiff and that denies all other circumstances detailed before. Likewise, Sarandon's answer is unambiguous: she refers to her possible inability to attend *specifically* the Armenian film festival (although she'd love

to go there): *"In terms of going to Armenia in June, I know that Im working on my TV show and there's no way to know if that would be possible at this point."* She is not denying any of the elements of the offer, on the contrary, she affirms them all, she thanks them all firstly, and then she goes into those details that do not fit her needs and agenda. She just excuses herself because she does not know if she will be able to attend that specific event of Armenia. Then she adds: "we'd just have to wait, **though I'd love to visit Armenia**." Not only she does not deny the clause, she discusses an item of it (a particular instance of it, a travel to Armenia) and at that **not to deny it**, but to express her willingness to participate. **We cannot extract from this the Report interpretation that she *denied* the entire PR clause, given, on top of that, that the clause is extremely lax and comfortable to her "as far as her agenda would allow it".** She manifests how much she wants to participate, and she is hopeful of making it, recommending to "wait" for that specific one.

There is no indication or sentence that makes it clear that she would not have time to help with the press in general. **Plaintiff offer's PR clause has a general sense, her answer thanks the offer, and discusses an *item* of that general clause**: the one that is most pressing because is schedule for the next few months and most demanding because includes travel.

Sarandon makes a particular statement on a particular item of her participation in press, never denying 'all possibilities' in the future. It is impossible to extract from the interaction described the absolute conclusion that Sarandon "would not have time to help with any press" as stated in the Report, and is a wrong conclusion that does not conform to what is seen on the Exhibit. Out of that to justify hat she could not even answer a simple thank you for the Parajanov-Vartanov Award

16

on an email a few months later in October 2018, to thank the institution that gave it, privately or publicly, is another very long stretch to keep Defendant Sarandon in a territory of untouchable ambiguity that is not supported by the evidence. In any deal is understood a covenant of good faith. No reasonable person would have ever believed anything else but what is being objectively read from the presented evidence. Additionally, although this will be discussed later: Defendant **Sarandon could not retroactively choose among all four elements of the 2018 offer those she preferred in 2019, or in 2023 to satisfy her needs in the Motion to Dismiss**. Plaintiff had reason to rely on her representations and her words, or else he would have never offered any prints to her neither any profits in exchange of nothing. She received the prints and she kept them.

The compromise was made on *the four* elements of the offer. **She thanks the prospective 10% of profits, because**, as regards to that, differently to the immediateness of the Armenia press travel and the prints that should not be 'gigantic', *she had no objection whatsoever,* and that is what the conversation shows: no objection to it. The Court is reading the Exhibit from the perspective of Sarandon's allegations in 2023, not from what it means and implies in 2018 and what preceded it for more than two years, when it took place. **Afterwards she discussed distribution with D. Shara and Plaintiff.**

Of note, the Court had been explicit and told Plaintiff that at the moment of presenting his Complaint, 'no exhibits were necessary'. This, if taken word by word, would have been disastrous, because the first thing the Court has done is applying a highly stringent criteria not only as regards to the allegations of a pro se litigant, who obviously does not know the law, and reading them liberally, but making also a very

17

far-fetched interpretation of just a part of Exhibit 2, and from there to make Sarandon immune to her own representations and statements during years [2016-2019].

Exhibit 2 does not end there, and the Report does not takes the rest into consideration.  On page 4 of Exhibit 2, on April 4  [recall Sarandon's answer dated on March 27, 2018, just a week afterwards], D. Shara writes a follow-up to the previous conversation on behalf of himself and Plaintiff [thus including Plaintiff's email CCed as a token of good faith, because all this was part of the film's distribution]. Plaintiff had insisted to D. Shara that he should also write Sarandon to show her that he was on the same page in every single aspect as regards to the contract she already knew it existed [through Tigran] for years. D. Shara is specific, sending the email to Sarandon's assistant. Referring to her, he confirms what Plaintiff had already offered and Sarandon thanked for: **"I am very interested in Susan's involvement in this movie** and I am **willing to give her a percentage of profits for her involvement** and guidance." "I am very happy to share profits and accolades." As regards to distribution he is specific: "I would also like to **discuss your thoughts on film festivals**." D. Shara does not doubt Sarandon is onboard as regards to all necessary permissions to distribute the Film. No reasonable person would, after years of representations, promises and the emails exchanged with her. "Arthur Balder has done an incredible job on all aspects of this film including submission to film festivals. He deserves an enormous amount of credit. He has put in so much time, effort, expertise and skill. I am beyond proud of him. It is very rare that someone surprises me these days, but he truly impressed me with his patient, expertise, originality and skill level." And he circles back to profits: "I am extremely interested in maximizing both exposure and profits. **I am also interested in sharing profits and making**

18

**money for Ms. Sarandon.** I am a huge believer in karma and taking care of your partners." […] "Thank you in advance."

Ten days later, on April 16, 2018, Sarandon answers, directly undersigning [again, specifically]: "It's a very special film, but I really have no idea how to market it. I think you need an agent or maybe just **look into submissions to festivals**. The season is upon us so I think it's too late for this cycle."

**Sarandon had had four months to be particular about not willing to accept the offer or parts of it once film started film festival distribution.** On the contrary: she was asked for advice and opinion as regards to distribution, because both Plaintiff and D. Shara have been thanked for the 10% of profits. **She knew it is going to be distributed**, and a film can be distributed if everybody who appears on it does gives permission, and even she advised on that point. She was clear about the 'awards season' and the year cycle for films: in mid-April is already 'late' in her eyes for a breakthrough meaningful enough in 2018. Plaintiff and D. Shara, however, had agreed on terms and actions for a festival circuit for 2019 and an Oscar-qualifying US theatrical release by end 2019.

The TAC, and also the Exhibit 2 of the TAC, contradict the conclusions briefly presented by the Report on page 3, as regards to Sarandon's communications with Plaintiff and D. Shara. There are other communications that reinforce this perspective, but the Court was clear as regards to the Complaint, and recommended Plaintiff not to add any exhibits initially. It is thus premature and rushed over to dismiss Defendant Sarandon for breach of contract. Plaintiff started that conversation and oversaw it, and her acceptance of Plaintiff's offer is about all items of the offer, not

the ones she choose to affirm five years later. What Defendants have argued in the MTD is a tale made for litigation.

The Report, pg. 3, states: "Balder claims that these emails constitute an enforceable contract obligating Sarandon to assist with press." That is not the only one of Plaintiff's claims, at ¶ 284. Plaintiff claims that these emails constitute an enforceable contract *obliging Sarandon to present her signed talent release so that the distribution that she herself recommends after accepting terms of an offer would take place, <u>and in any case she accepted Plaintiff's offer by performance in 2016</u>.* That she did not want the terms of 2018, does not make her immune to her actions since 2016. Plaintiff requested this talent release to Sarandon directly on several occasions, included in 2020, 2021 and 2022, and she never gave it against her obligation to guarantee the distribution she had been recommending and thanked for prospective 10% of profits, and to assist with press in the terms the offer describes ["to be part of the PR of the film, as far as your agenda would allow it"]. See for instance Exhibit 5 of TAC[15].

**B. Against Sarandon as a Consequence of 2016's Offer and Acceptance By Performance.**

The fact that Sarandon was offered better terms in 2018, in exchange of more elements, like the PR clause included, does not mean that she did not have any contractual obligation since 2016 to Plaintiff. This is directly not addressed or raised by the Court.

---

15  SMS sent on February 23, 2022, by SusanSarandon to Plaintiff's counsel, Nathan Aduddell, stating that she might sign the release **only to D. Shara and Tigran Tsitoghdzyan**— she had never signed it, and even more, she placed conditions to something she had agreed on in 2016 and then in 2018, interfering with the Producers Agreement between D. Shara and Plaintiff.

Sarandon is invited to participate and be part of the Film [¶ 21]. She accepted in writing via email. She knew the nature of the filming, technical equipment used "Plaintiff also sent directly to Sarandon emails describing the kind of filming and the quality he expected" "Plaintiff details the equipment he intends to use, and requests if Sarandon has any special demands" ["best zoom lens that exist"] "Arthur is documenting everything during this period of time. Also the whole process of Susan's painting would be covered in every stage" Sarandon answered: "**Susan said she doesn't have any requests, so I think we're all good**." "Let her know I will receive her downstairs and that I am immensely grateful for her visit" [¶ 21]. Plaintiff, his wife and Tsitoghdzyan received Sarandon downstairs [¶¶ 21, 22, footnote 16 "because that day Tigran's apartment was crammed with people". Plaintiff elaborated on his intentions, the distribution plans, things all she already knew, and she agreed and promised to provide any missing paperwork anytime afterwards. She had been invited to be part of the film, she chose a date, June 16 of 2016 at 12:00 pm, confirmed, knew the equipment used ["the most advanced zoom Angenieoux that existed" ¶ 22 ], made her requests, attended and accepted the offer to be part of the film by performance. She already knew, but was informed more in detail that day, that the film is made with all intention to be distributed, that the Director/Producer [Plaintiff] is investing funds and time to make the Film [that is only obvious if you attend a shooting and see it...], she agreed to it and to provide any image release, if necessary, at a later date, and willingly ***accepted the greater and most significant part of the offer by performance***. She did not request anything in exchange, except that Plaintiff 'makes a very good Film'[16]. "Sarandon was kind, open, receptive to Plaintiff's ideas,

---

16   Report, pg 3: "Balder filmed Tsitoghdzyan's scene with Sarandon **over just one day** in June 2016".
    The scene with Sarandon is the central pillar of the film because of itsquality in every single aspect, from content to image, and has been praised on all fronts.

professional,confident about the situation, and assured that she would provide any necessary talent release signed, either sent by Plaintiff or prepared by her20Case 1:22-cv-06401-JLR-SN Document 62 Filed 01/26/23 Page 20 of 287own agent, in order to guarantee distribution." [¶ 23]   **Plaintiff directed Defendant Sarandon**, **who followed his instructions** [as extant sound recordings of the day will prove] along with all team in order to obtain the best result possible for the Film. Plaintiff believed Sarandon's representations because he was deluded by her apparent generosity, and because accepting to perform part of the offer was a guarantee to perform the rest of the offer, her word to be of 'gold standard', and trusted her blindly,  "terms [of the offer] she had never objected, on the contrary, she had accepted them by conduct" [¶ 145 ]

"Acceptance by performance requires that at least part of what the offer requests be performed or tendered, and includes acceptance by a performance which operates as a return promise." [Restatement Second of Contracts § 50, (2)]. **Plaintiff offers Sarandon to participate in the Film, tells her it will be distributed and that later a talent release would be needed, Sarandon agrees, and on that day accepts by performance,** which is the biggest "part of what the offer requests" (be filmed for the sequence, being the remaining part to sign a talent release later)**.[17]**

Tsitoghdzyan also confirmed what Plaintiff alleges via email: "All the people involved in the movie where professionals, **and including Susan [Sarandon] no-one asked to berewarded.**"

---

"[…] over just one day" gives a wrong impression of preparation and post-production. A 'perfect "one day" that yields excellent results, as proven by the awards won by the Film, takes much more work and dedication than a mediocre 60-day shooting period. It is easier to get some perfect one-day shots if you try sixty times.

17  Uniform Commercial Code (UCC) also adopts this view; under Section 2-206(1)(a), "an offer to make a contract shall be construed as inviting acceptance in any manner and by any medium reasonable in the circumstances"

No notification of objection is given by Defendant Sarandon to Plaintiff after the her filming in 2016, 2017, or 2018. Sarandon saw on several occasions the Film in 2017 [¶ 97]. Sarandon did not object to it, and requested some retouches to her images [¶ ¶97, 283]. Sarandon knew that a substantial amount of time and money was being employed in making the Film [¶¶ 10 to 25]. Sarandon was aware that massive press releases had been published in 2017 and 2018 that included: announcement of distribution and her participation as central aspect [Tsitoghdzyan: "I don't think she mind if we advertise her presence.." ¶¶ 30, 99]. Sarandon saw the Film's poster, that was based on a painting Tsitoghdzyan made of her face, and was aware of its.

"Where an offeree fails to reply to an offer, her silence and inaction operate as an acceptance [...]" "(c)Where because of previous dealings or otherwise, it is reasonable that the offeree should notify the offeror if she does not intend to accept. [Restatement Second of Contracts § 69].

Defendant Sarandon never objects or retracts or opposes her previous 2016 acceptance by performance in 2017 or 2018. Her performance ["previous dealings"] makes it reasonable that she should have had to notify Plaintiff if she did not intend to accept, although that would have come at a high cost for Plaintiff already. Yet Defendant Sarandon does the opposite, confirms in new written communications the absence of opposition in 2017 and 2018. It is not reasonable to decide that she did not "want to be associated with the Film" in February 2019, without shocking Plaintiff after all these facts for years. One was deluded [Plaintiff], and the other was shockingly unfair [Sarandon].

"(2) the rendering of a performance does not constitute an acceptance **if within a reasonable time** the offeree exercise reasonable diligence to notify the offeror of

non-acceptance." [Restatement of Contracts §53.] Sarandon informing Plaintiff that she "does not want to be associated with the Film" in *February 2019* , *three years after the acceptance by performance,* cannot be considered "within a reasonable time" to inform of that, once the Film is being distributed to film festivals following even her own advice as Exhibit shows [Sarandon in 2018, after accepting the prints offered by Plaintiff to her: "look into submissions to film festivals"]. It is extremely unfair, and would bring about damages to Plaintiff, damages for which she is liable.

As regards to Defendant Sarandon's performance as answer to Plaintiff's 2016's offer, "(2) **Such an acceptance** [by performance] **operates as a promise to render** **complete** **performance**." [Restatement of Contracts 62.[18]] Where the offer invites a choice between a performance and a promise, the [Plaintiff's, offeror] reliance on part performance creates a promise to complete (bilateral contract) [on Sarandon, offeree].

Defendant Sarandon's obligation to present the talent release originates in her acceptance by performance, since that operates as a promise to render complete performance. Not providing the signed talent release she promised next to the acceptance by performance only renders years of work and hundreds of thousands of dollars useless, harming Plaintiff professionally and financially. Defendant Sarandon could accept or reject better terms offered in 2018 [as explained before, she accepted them, because they only benefited her in comparison to the 2016 terms of offer, when she wanted nothing in exchange], but she had already a contractual obligation with Plaintiff to render **complete** performance, because Plaintiff "relied on part performance" [her filming and her communications in 2017 and 2018] that creates "a promise to complete" the terms offered. Request for an act waives requirement of

---

18  Effective of Performance by Offeree Where Offer Invites Either Performance or Promise.

communication of acceptance[19], and performance of the act waives requirement of acceptance [*Industrial America, Inc. v. Fulton Industries, Inc.*, 1971]. No written acceptance of the offer is necessary, since the request and the performance of the act by Defendant Sarandon waive requirement of communication and requirement of acceptance—because it has already happened.

A contract implies, also, all the promises that any reasonable promisee would understand to be included, because without such basic promises being included, then the contract would be un-profitable, and that is *inherently* unfair. Defendant Sarandon denying the talent release on time is a breach of the basic covenant of good faith implied in every contract.

Therefore Defendant Sarandon is liable for breach of contract with Plaintiff, and she should have rendered complete performance when she was requested at least, and provide the talent release when Plaintiff requested, as alleged in 2020, 2021, and 2022. She did not do it until today in civil conspiracy with all co-defendants, and as a consequence of that Plaintiff could not distribute the Film and is entitled to relief. The Court has failed to apply the principle by which it must raise the strongest argument from the pro se litigant's allegations, and this claim should not fail.

### C. Objections to Wrong Conclusions Regarding Interactions between Plaintiff and Sarandon.

These interactions took place before Sarandon's tortious interference with business relations, tortious interference with the Producers' Agreement and breach of contract, and they are her motivation to harm Plaintiff, herself and in association with others, or using wrongful means to that result.

---

19  Carlill v. Carbolic Smoke Ball Co. 1893.

The Report pg. 3 states wrongly: "As "American Mirror" started screening at film festivals, Sarandon ignored emails from Balder **requesting her help with press.**" This is not what is described on ¶ 124 of TAC. ¶ 124 describes the frustration at Sarandon's *ungrateful* attitude as regards to the Parajanov Vartanov Award, **not** that she had been requested for any help with press. **Sarandon was *not* requested to do *any* press by Plaintiff** after those assurances described before in 2016, 2017, 2018, and shared on emails. **Plaintiff and his team *informed* Sarandon of the screenings from September 2018 onwards**, **but did *not* request any help** with the press for those screenings neither for any others, [from ¶¶ 126, 127 onwards] **and that is very different from what the Report understands.** At its premiere in October 2018, the Film won for Sarandon the Parajanov Vartanov Award at the Los Angeles Documentary Film Festival, where it went on to become most awarded film in the history of the festival. Plaintiff and his office *informed* **Sarandon what had happened and that they had the Parajanov Vartanov Award, and did not request anything**. She did not answer that email. She did not say a word from now on. Plaintiff's office afterwards simply *informed* her periodically of new film festivals and new award wins in November and December 2018, **but allegations show did not request any help with the press**. [¶¶ 128, 129]. Sarandon did not answer any email. Plaintiff was aware his film did not need any help from her, yet she had promised it along with other elements of the offer in 2018. There was no festival that did not award the film between October 2018 and December 2018. Two-time Academy Award winner Paul Haggis congratulated Plaintiff on the Best International Documentary Award in Rome **[¶ 144].** Sarandon gave the silent treatment after the communications referred here [¶ 145].

Therefore the conclusion in Report page 3 [emphasis added] "As "American Mirror" started screening at film festivals, *Sarandon ignored emails from Balder* **_requesting her help_** *with press*" **is utterly wrong** and does not align with the allegations. **She ignored emails, but those emails did not include any request of help with the press**, they *informed* her of her Parajanov Vartanov Award, and Plaintiff did not know what to do with it. **Plaintiff did not request any help with the press before or after the Film's premiere (when it was most logical to expect it in light of her previous representations), and did not allege that**. Plaintiff *did try to address the situation of the Parajanov-Vartanov Award* and her ungrateful private silence towards everybody in February 2019. That's very different: the Report states the wrong conclusion that Plaintiff pressured Sarandon for press, **which never happened**—although he had the right to expect a minimum from her in accordance with the offer sent by him and accepted by her. Her attitude was shocking and extremely unfair.

**D. Shara had stated on numerous occasions that Tigran did not want to be Sarandon's sexual partner, but just a friend**, and that *that* **was what Sarandon really wanted when she joined the film.** D. Shara had joked about it and also expressed concern as regards to Sarandon's wayward attitude in relation with her age gap with Tigran. That these are not mere allegations, but that there is supporting evidence is referenced in TAC. Whatsapp messages exchanged between Plaintiff and D. Shara on 10.16/2018 are referenced in which this situation is simply further discussed privately, [¶ 129] Plaintiff summarized Sarandon's attitude: "The more this progresses the more obvious it becomes that Her Highness Sarandon is 'forcefully' ignoring our movie. (…) **What stands clearly is that, no matter how**

**good our work might be, no matter if you made clear the point regarding she being rewarded** [a reference to the business proposal a few months agothat she accepted], **she WON'T do anything basically because she did not get what she wanted --from Tigran**. **Did Harvey Weinstein punish actresses because they did not give him what he wanted...? She came into Tigran's movie, yes, but Tigran didn't go into Susan's movie.** And she had her own 'script' already written right at the beginning -- and he rejected it very nicely, very nicely, but he rejected it." [10/16/18,21:42:24] and D. Shara's answer leaves no doubt as regards to his own opinion: *"Agreed on all fronts"* [10/16/18,21:42:47] even adding D. Shara: **"But Ashley isn't more than a model in her bra for 30 seconds [10/16/18, 21:42:52] D. Shara: [while] "Susan is [the] star"** [10/17/18, 11:35:49].

Therefore the description in Report "Plaintiff's Allegations" does not reflect the totality of the allegations, neither is extracted from an evaluation of the totality, because what happened afterwards is consequence of all this. Sarandon's turning her back on everybody and the Film was simply stemming from the same main circumstance, that Tigran had not shown the personal interest she had expected as a potential sexual partner, especially during the discussions held for her attending screenings in Armenia—recall, *if* accompanied by Tigran. **What else she expected, that's something that, as shown in one of the exchanges with D. Shara quoted before, was suspected for whose were close to Tsitoghdzyan—and Plaintiff believed D. Shara's representations.**

The gap left by the description of the allegations in the Report is longer. D. Shara, concerned and feeling baffled and insulted by Sarandon's attitude, and his father Michael Shara, and his mother Honey Shara, discussed on some occasions

28

[Plaintiff's wife is witness of meetings with Honey Shara] that it was necessary to try to address Sarandon and solve the issue [¶¶ 145, 146, 147].

*Only then,* in February 2019, six months after film's premiere in Los Angeles, not having ever requested any "help with press" to Sarandon before, in spite of having the right to do so, Plaintiff's team approached *__for the very first time__* Sarandon's assistant to try to generously rebuild the insulting vacuum Sarandon had created after receiving the two prints according to her wishes, after recommending the film going into film festivals, after acknowledging all terms offered almost a year ago. Recall, this is past January 2019, and Sarandon had never answered any email related to the Parajanov-Vartanov Award since October 2018's film premiere in Los Angeles. This low professional standard, of calculated and protracted disrespect to others who had worked for years in the Film, had also embarrassed Plaintiff and his team professionally in front of the Parajanov-Vartanov Institute of Los Angeles, for instance. Thanking the award and saying where to send it in an answer to the emails sent to her in October 2018 informing her of the triumph of the film at Los Angeles Film Festival, was not within the bounds of the clause of PR agreement as described before, but **within a minimum of professional decorum and decency**. But it is now more widely known, also in the public sphere, that Sarandon revels in divisive attitudes[20] [Sarandon spoke to national and international media, recently, after a spike in anti-semitism in the USA, that **Jewish people are "getting taste of what it feels like to be Muslim in America."** NYT, New York Post, later National Post,

---

20  Just a few weeks ago, in December 2023, in New York, Sarandon made it clear, after the brutal attacks on innocent Jews in Israel by Hammas terrorists, where babies were tortured and women spreadeagled for multiple raped to death, that [quoted from National Post, "Susan Sarandon says Jewish people are 'getting taste of what it feels like to be Muslim'. [ https://nationalpost.com/entertainment/celebrity/susan-sarandon-israel-hamas ]
  **'There are a lot of people afraid of being Jewish at this time, and are getting a taste of what it feels like to be a Muslim in this country,' the actress said at a demonstration.**"
  Even more: NY Post: "Susan Sarandon slammed after sharing post claiming Israel attacked own civilians on Oct. 7"
[ https://nypost.com/2023/11/16/news/israel-hamas-war-live-updates-photos-videos-latest-news/ ]

November 21, 2023.] Probably she also says that Plaintiff has been getting a taste of what happens when you oppose any of her opinions.

After Plaintiff approached Sarandon trying to address the situation of hers not being able to say a simple thank you for the Parajanov Vartanov Award, and simply disappearing after getting the two framed and mounted prints, Sarandon slammed Plaintiff with this: "Arthur, **I find your email to be extremely rude**. I've never received an email like that before from anyone, especially someone whose film **I briefly appeared in without compensation**. I had no idea **you were going to sell this film based on me** and if Tigran's portrait was in some way obligating me to do press, **I'll gladly give it back.** I understand **your wanting to get the most press you possibly can but I have nothing positive to say about your film** and am no longer interested in being associated with it." She never gave back any of the prints.

Defendants, in Reply to Opposition pg. 13 [Doc. 83], admit that: "**The TAC is utterly devoid of any alleged statements that could be considered to be defamatory**", and that includes all allegations pertaining to this exchange between Plaintiff and Sarandon. There is no legal doubt that Plaintiff *could* answer Sarandon, unless a statute related to lese-majesty has been enacted recently in the USA. The Report, however, states, pg. 3: "In response, Balder sent Sarandon a litany of insults and accusations." This is wrong. Plaintiff mostly shared reasoned opinions that were unfavorable about Sarandon and some of her work [she started equally sharing an unfavorable opinion with Plaintiff about Plaintiff's work], but no accusations, and he posed questions and doubts about the true intentions of Sarandon—based on D. Shara's spoken and written acknowledgments. To define the answer as *insults* is misleading, and requires a review of what is present in the TAC. As regards to the

length of answer, litany or short shrift, Plaintiff's response could be as long as he wanted in his right to his opinion. Plaintiff chose to address each sentence of Sarandon in a reasoned manner with his own opinions, preliminary stating: "***Our society is tired out of 'celebrities' in a privileged position who humiliate capriciously the work, good faith and professionalism of others without whose enormous dedication they are nothing***. *You may have an Oscar, but regretfully you lack many other basic things.* **You are not only ungrateful, but also unfair."** That is not an insult.

Plaintiff quotes Sarandon in his answer: "*I've never received an email like that before from anyone, especially someone whose film I briefly appeared in without compensation.'* Then Plaintiff addresses it recalling previous interactions: *"all details regarding this film were exposed to you not only in person the day of shooting, but also before that shooting and also afterwards."* That is not an insult.

Plaintiff quotes Sarandon in his answer: "*I had no idea you were going to sell this film based on me"* Then Plaintiff addresses it: "***the film is sold with what it contains, and you came to the shooting knowing we were making a film whose topic was Tigran's art in connection with artistic beauty. Logically, you are part of it.*** *You had idea: emails show you were informed we were going to try to sell this film: (…) there were answers from your office to these emails, as one on which you accepted a percentage proposed on any benefits generated, among other things, which shows our transparency and good will."* That is not an insult.

Plaintiff quotes Sarandon in his answer: "*and if Tigran's portrait was in some way obligating me to do press, I'll gladly give it back."* Then Plaintiff addresses it: "*If requesting a public welcoming word from you for the Parajanov-Vartanov Award*

*which you won only in connection with our film and our work of four years, is 'obligating to do press', then we areliving in two completely different worlds, the real one, and Ms Sarandon's one.* **What you were asked for is education, respect, fairness and 'fair professional standards', being respectful for thework of my crew and mine and the producer's, and being also, why not?, thankful to people of the Parajanov-Vartanov Institute.** *That's not'doing press'.* <u>That is not an insult.</u>

Plaintiff quotes Sarandon in his answer: *"I understand your wanting to get the mostpress you possibly can"* Then Plaintiff addresses it: ***I did not need any publicity to generate in the first three months in the festival circuit more awards than all the documentaries that you have produced together in all your life (including from an Academy-award winner presided jury).*** *I don't need publicity from you, and never asked for it precisely when it was most logically needed, at the beginning.* ***I requested respect, not publicity, for our work AFTER the obvious success achieved."*** <u>That is not an insult, it simply refers to true facts</u>.

Plaintiff quotes Sarandon in his answer: *"but I have nothing positive to say about your film"* Then Plaintiff addresses it: *"Whatever you may think about my film is absolutely irrelevant to me, especially after, again, having won more awards in three months that all the documentaries that you have produced in your entire life.* ***You do politics with your documentaries, capitalizing on your public profile, while on the contrary I do ART.*** *Obviously* ***I know a lot more of how to make an extraordinary documentary film than you***[21]*. The level on which I work on*

---

21 TAC at ¶ 274, collects some of the critical acclaim references that were written about the Film in 2019: "American Mirror is "strikingly original" and "there's a lingering, finely drawn intelligence to Arthur Balder's hallucinogenic compilation, one which welcomes many readings no matter how you look at it" [FilmInquiry, Australia] "Director Arthur Balder takes us on a visually spectacular journey." American Mirror is "a revelation to Balder's craft."[The Armenian Mirror-Spectator, US] "Arthur Balder is an artist at the same time creative and meticulous." [Chiara Carna, Fabrique Du CinemaNr 24, Italy] American Mirror is a "very graceful and elegant work." [TheDigital Journal, US]

*artistic terms is just something impossible to follow for you, and it doesn't matter if you understand it or not.*[22] *In short: I read Wordsworth, you read Twitter.”* [...] *Just watch VIPER CLUB to see what I want to say.* [...] *Additionally,* **60K total domestic gross out of 70 theatres is more than it deserves**.*”* <u>That is not an insult, it refers to true facts.</u> That was the result of Viper Club film's US theatrical release at that moment. That it was an astounding flop is not Plaintiff's fault.

Plaintiff quotes Sarandon in his answer: *"and am no longer interested in being associated with it”* [...] Then Plaintiff addresses it: “**What for you came to the shooting, then, if you did not expect from us to make a film and consequently to try, in all fairness as everybody else –you included with your own films–, to recover one day at least part of the investment, but most importantly to make a unique, good film, as the awards show?** *What was the REAL reason why you felt so disappointed so as to do all you could to distance yourself from the shooting and the project...?* **You often pretend to be brave; are you brave enough to recognize the true reason I am referring to?** *Or much more accurately:* **What did you expect from an at that time 39-years-old painter (you were perhaps 70 already), if not just being portrayed, as he faithfully did as best he could? What else was expected on your side that did not 'happen'?** *Is it all this tit-for-tat a response to not getting something else, besides being portrayed, that you expected to get – at least at the time when you came to the shooting? What was it?”* <u>Plaintiff expresses his concerning doubts as to Sarandon's true intentions</u> (D. Shara's conclusions on this

---

**American Mirror is a “dynamic, visually sumptuous,cleverly directed film that leaves you breathless and enthralled long afteryou watch it.”** [Dragan Elcic, film critic and film professor, Dean of Belgrade Academy of Arts in Serbia.]

22 TAC, ¶ 273, references a part of the accolades won by the Film. In 2019, over the next 12 months after this email was sent to Sarandon, Plaintiff's Film, in fact went on to win more than forty accolades across all the spectrum of film specialties, from Best Director to Best Film to Best Cinematography, all over the world. Plaintiff was utterly right.

matter leaves no doubt about his mind: "**Agreed on all fronts**" [¶ 129], referencing extant messages sent by D. Shara to Plaintiff.)

Plaintiff quotes Sarandon in his answer: *"Please don't contact this office in the future unless it's to give me the address to return the portrait which again, I am happy to do."* Then Plaintiff addresses it: *"Please make sure you or your office do not send calls again from no-ID-callers in the future – ever, – neither contact me nor my office – ever, unless it is to present respectfully an apology and to redress the situation.* ***We are the victims in all this story, because the facts do not correspond in fairness with the consequences we have had to endure, and only represent mounting disadvantage perfectly calculated on your side for reasons that are not clear****, and that bode ominously ill,* ***pointing clearly in a direction that is extremely rejectable in our society in a moment when everybody has decided to put an end on such behaviors."*** <u>That is not an insult. The length of an answer is neither an insult.</u>

If Sarandon's unfavorable opinion "I don't' have anything positive to say about your film" is not an insult neither provocative, if Sarandon's never answering a word about anything since October 2018, neither as regards to what to do with the Parajanov-Vartanov Award is not an insult, then none of Plaintiff's answers to her statements can be consider insults either. That the Court considers them as such is concerning, because there is a biased way to read the events, and double standard is being applied, and that is wrong. Both Sarandon and Plaintiff had right to their opinions—not only Sarandon.

Sarandon, however, did not expect anybody dare to answer her.  Report states on pg. 4 that Plaintiff "never apologized". The allegations show that Plaintiff had been

unfairly treated, and the Court fails to acknowledge that Sarandon did not apologized either. It would be more in tune with the allegations as specifically described to state that "neither Sarandon nor Plaintiff did apologize". **It is, however, not clear if any of them should do it, but what is clear is that both had right to opine, and none obligation to apologize.** Sarandon did not answer Plaintiff—instead she concerted a destructive campaign against him and tortiously interfered in the contract Producers' Agreement, tortiously interfered in Plaintiff's business relationships, she breached her contract and she did it all in civil conspiracy with Tsitoghdzyan and Honey Shara to obtain breach of contract from D. Shara.

Besides that, the avalanche of awards that before and specially after that exchange of opinions came all along 2019 simply puts in place who was right about the unfavorable statement of Sarandon: "I understand **your wanting to get the most press you possibly can but I have nothing positive to say about your film."** The film did not need any press from her before or afterwards. That she had nothing positive to say about the film proved to be absolutely irrelevant, as Plaintiff had told her in his answer, since the opinion of independent juries appointed all over the world corroborated his opinion the film, not hers [¶¶ 274, 275, 276]. Without any press from her, the Film was hailed as 'a masterpiece' [¶ 275] and awarded across all possible categories.

Therefore, Plaintiff's opinions as regards to Sarandon's understanding of making documentaries sent to her were right in light of the results [¶¶ 274, 275, 276]. It is also clear that she sent him her unfavorable opinion about the film to simply provoke and offend him after being ungrateful as regards to, for instance and egregiously, the Parajanov-Vartanov Award.

**D. David Shara's Breach of Contract Allegations Allowing Parole Evidence Rule Exception.**

Shara was only responsible for "additional production costs" if there was a new approved budget – "[Shara] would have to provide additional funds upon approval of new estimations and new budget". TAC Ex. 7.  Balder had to "inform and discuss any distribution possibilities with [Shara]." Those discussions are referenced and described in particularity: those invoices are the result of Plaintiff informing and discussing in person and in writing the distribution possibilities, and both Plaintiff and D. Shara making decisions that both approve of to start distribution. D. Shara's arguments have no remedy here, because they are based in the very conspicuous tendency of his attorneys to ignore the existence of allegations that do not benefit their concoctions. The Court has not ignored them in its R&R. The budget detailed an entire distribution Plan in emails exchanged in 2017 and 2018, and it is frivolous to pretend that did not exist. Plaintiff alleges unpaid invoices at ¶ 189, 199, 202, 349, and it is explained in Chronological Section 2019 of the TAC. D. Shara answers the emails detailing such actions and their plan to distribute.

Plaintiff invoked extensively the necessity of looking into extrinsic evidence in the TAC [¶¶ 52, 59, footnote 50 complete about parol; 186, footnote 139; 228 footnote 194; 231 footnote 160; 236 footnote 170; 237 "the extrinsic evidence, including David Shara's ownwritten assurances and 'instructions' and 'orders' to Plaintiff"; 254 "asserted rights as establishedin the Producers Agreement and extrinsic evidence", 276; 307 "Extrinsic evidence that does not contradict but that complements its

36

contents"; 319 "the extrinsic evidence presented" [in form of quoted emails]; 327, 330, 334…].

Explicitly, at ¶ 325 "Parole evidence rule cannot bar the extrinsic evidence because there is fraud and duress."[23]

"Neither party to a contract shall do anything which has the effect of destroying or injuring the right of the other party to receive the fruits of the contract."[24] Although the Producers' Agreement did not specifically require D. Shara to obtain the talent releases on time, such a requirement is implied by the covenant of good faith and fair dealing "implicit in every contract" in New York[25] because without that requirement the Producers' Agreement is profitless and inherently unfair, a fraud. Plaintiff obtains all talent releases of people he invites to be part of the Film, and shares them with D. Shara. [¶¶ 18, 93]. The Producers' Agreement states, [no added emphasis but originally part of the contract, Exhibit 7, pg 1]: "**the Director/Producer** will have **20% of profits**," and then clarifies: "The **Director/Producer** will inform and discuss any distribution possibilities with the **Executive Producer**, both being informed in due time to ensure the best performance possible of the business." Distribution is mentioned as the only way to make "profits", since the first paragraph states: "as a compensation of his work […] will receive […] an original painting". "Thus the **Director/Producer** [...] renounces to any additional upfront compensation, but the **Director/Compensation** will have 20% of profits." On page 2  refers to distribution: "The **Director/Producer** cannot make any decision regarding distribution without

---

23  The lists shows the futility of Defendants' desperate statement on Reply to Opp. pg. 3 [Doc. 83], when in fact Plaintiff invokes this aspect extensively in the TAC. Plaintiff addressed this question since the beginning and never conceded a renounce to the parole evidence rule exceptions. On the contrary, it is central across the entire TAC.
24  M/A-COM Sec. Corp. v. Galesi, 904 F.2d 134, 136 (2d Cir. 1990).
25  Semple v. Eyeblaster, Inc., 08-cv-9004 (HB), 2009 WL 1457163, at *7 (S.D.N.Y May 26, 2009)

contacting and getting written confirmation by **Executive Producer**, being distribution contracts under his surveillance and executed according to his criteria."

The contract leaves it clear that Plaintiff renounced to upfront compensation in exchange of a painting (whose represented value is fraudulent), *only because* he "will have 20% of profits". The only way to get profits is by obtaining the talent releases of all the people who are invited.

Plaintiff insisted on a cash compensation at ¶ 62, and D. Shara denied it and pointed to distribution as the only way to make profits: "The best solution here is to finish the film as best you can and **get it into as many film festivals and events as possible**. We are partners in this film and **the better it does, <u>the better we do together</u>**." "Finish the film and **try to get it sold**. **Get it into theaters, amazon, Apple TV** etc. ***<u>That is the only option here</u>***." "So I recommend we finish the film and **<u>you</u> get to work distributing it"** at ¶ 62. It is only deceptive and fraudulent to push someone under such circumstances to accept terms based specifically on profits ["that is the only option here"]  that the contract itself would made impossible to make by breach of basic promises *inherent* to any film made-for-profit. Therefore the promise of providing the talent releases is not a new obligation, it is part of the basic understanding of the contract itself if it is about a film made-for-profit, because if not the contract is profitless and inherently unfair, a travesty,  simply [another] fraud under the disguise of contract.

D. Shara argues now that he did not have any obligation under the Producers Agreement to get any talent releases. That is wrong. If any party to a contract does something to destroy or hamper the peaceful and basic rights and expectation of the other party to enjoy the 'fruits of the contract', then there is a breach of the basic

covenant of good faith. A contract implies all the promises that any reasonable promisee would understand included, because without such basic promises being included, then the contract would be un-profitable, and that is *inherently* unfair and deceptive[26].

Furthermore, D. Shara promised always to get the talent releases of any persons he invited to participate, promising and assuring it, and Plaintiff would obtain those of the persons he invited, and Tsitighdzyan did the same. Plaintiff obtained them and shared with D. Shara soon after each filming. Tstighdzyan obtained some signed releases of people he invited, and shared them with D. Shara and Plaintiff [but Tsitoghdzyan never provided his own neither those of his son signed by mother and father (himself)].

**If Plaintiff would have known that D. Shara would not obtain them, he would have never signed that contract, even in such circumstances, because that renders it fruitless**, without that it is a fraud. If during the course of making the film before and after the existence of the contract, D. Shara would have told Plaintiff that he did not intend to obtain the talent releases of any of his invitees to participate in the film, **Plaintiff would have denied, as Producer/Director before and after the contract signing, the filming of any such person**. Therefore D. Shara **used deceptive tactics all the way along, and as regards to**

---

26  We humbly propose **the "Bag of Bread Test".**

   If we buy a **'bag of bread'** we believe that the bag will contain bread. If once we buy it, it does not contain bread, the seller cannot allege that the bag states that is "a bag for bread",  but there is no assurance that any bread will be inside. This the situation we have here. The contract is *for profits,* and refers to some aspects of distribution as Plaintiff dare to include not to risk all his work to be 'destroyed', since it had to be "one or 2 pages long".

   If D. Shara decided not to obtain the talent releases of the people he invites, inherently the contract cannot be profitable, and **he entered into it with second intentions which are far from a dealing in good-faith, or was tortiously interfered and cowed into breaching the contract by others [we know who]**. It is not an option, neither a far-flung promise or an out-the-contract obligation, to obtain the talent releases. It is as basic as a bag of bread containing bread, without the need of any further assurance. It falls within the scope of promises that must be understood as present even if not noted in this kind of contract—not noted for reasons clearly related to duress, coercion and unfair dealing under high pressure tactics during the contract's formation.

**the terms of the Producers' Agreement,** also under high pressure tactics. The result is a contract that is inherently unfair, with terms that are unreasonably favorable to D. Shara and unreasonably negative for Plaintiff.

The Court is affirming unreasonably favorable terms to D. Shara, even when the allegations show in plain sight what was being discussed, the terms that should have been detailed on the contract, that Plaintiff acts under duress, and that he is ordered to prepare himself a "one or 2 page" contract[27].

No reasonable person would have ever signed the contract and accepted devoting years of dedication into this business, if that person would have not expected the other parties doing what is *minimally* and *inherently* necessary to render a film-for-profit contract fruitful, i.e. for the contract to be able to yield the "profits" it states.

Tsitoghdzyan sent notice in writing that he would lend all his rights [he was specific: his image, his artwork's images and his studio] to D. Shara in November 2016 [¶¶ 54, 259, footnote 178], in one of the emails previous to formalizing the contract, in an email he shares with Plaintiff. He makes it clear that, if David goes ahead, he won't be a problem for the film's distribution. In a recorded phone between Plaintiff and Tsitoghdzyan at ¶ 252, Tsitoghdzyan recognizes he had promised it to Plaintiff, but that he will provide his talent release if D. Shara requires it, and that D. Shara did not ask for it. D. Shara refused to obtain the talent releases when he had promised to obtain them. In 2020 D. Shara **_and_** Honey Shara tried to coerce Plaintiff into signing a new contract with more adverse terms [¶ 236]. Plaintiff requested to see the talent releases D. Shara had promised, to make sense of any promise to distribute, to see if

---

27 "[Unconscionability] requires 'some showing of an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party.'" Gendot Assocs. Inc. v. Kaufold, 56 AD3d 421, 423 (2d Dept 2008) (citing Williams v. Walker-Thomas Furniture Co., 350 F2d 445, 449 [DC Cir 1965]).

that was possible, in the first place, and D. Shara's answer was: that he did not have any talent release, but that he could "get all of them in an expeditious manner" [¶¶ 236, 246, 249] as long as Plaintiff signed new disadvantageous terms.

The standard prescribed by the Court in the Report is not applied: "The covenant of good faith and fair dealing encompasses "**any promises which a reasonable person in the position of the promisee would be justified in understanding were included.**"[28] A reasonable person in Plaintiff's position would understand D. Shara's promise to obtain the talent releases as an obligation to obtain them *on time* in order to keep the contract profitable. Otherwise that action would only be intended to 'destroy the rights' of Plaintiff to enjoy 'the fruits of the contract'.

From the application of that standard, Plaintiff has therefore sufficiently alleged a breach of contract against D. Shara for not obtaining the talent releases of the persons he had invited and others he stated he could get "in an expeditious manner", since the he could have obtained them at any time and at that "expeditiously" in his own words. This he does in civil conspiracy with Sarandon, Tsitoghdzyan and Honey Shara and under their tortious interference with the contract.

The Court should look into the overwhelming extrinsic evidence surrounding the inception and execution of the Contract to see what was the mind and intention of the parties. It is no secret: memos, budgets approved, actions congratulated, only show a clear path of actions for years [references and even descriptions and quotations from them are present, among others[29], in ¶ 147]. There is no doubt as regards to why D.

---

28  Rowe v. Great Atlantic & Pac. Tea Co., Inc., 46 N.Y.2d 62, 69 (1972).

29  At ¶¶ 196, 201, 207, 208, 213, 234, 292… In some budgets are referenced, in others quoted or described. Plaintiff and D. Shara followed a defined course of performance, that was broken clearly and unambiguously by Sarandon's tortious interference.

Shara in 2019 decides to breach contract, under tortious interference of Sarandon, because Plaintiff answers Sarandon's email. **The TAC simply abounds in specific dates, specific written statements, since 2016 through 2018,** specific budgets, invoices, payments directed at and actions that leave no doubt as regards to the veracity of the course of action decided by D. Shara and Plaintiff in order to distribute the film on time [¶  ].

On the other side, not to take that evidence as proof of the promises upon which relied Plaintiff, "promises which a reasonable person in the position of the promisee would be justified in understanding were included", because otherwise the Contract very intent does not make any sense. Here the Court errs applying its own avowed doctrine in a manner too contradictory even within the evaluation of the same complaint. The doctrine applied in the Report affirms that D. Shara breached the contract by not paying timely the invoices, yet those invoices reference "Oscar qualifying theatrical release". In other words, for the Court the act of paying them late supersedes, outweighs **rendering in bad faith *impossible* the ultimate and inherent, most obvious goal of the contract, which is *to be profitable***, and fails to address the elephant in the room: that the invoices indicate both parties intent intent to distribute the film, and at that in what kind of release—a US theatrical release, and that all happens because Plaintiff exchanges opinions with Sarandon. Not only Plaintiff is showing in plain sight that D. Shara's not obtaining the talent releases on time goes against the very covenant of good faith and the simple and obvious purpose of the contract, he also provides enough particular allegations and even evidence that D. Shara does it in bad faith [to ingratiate himself with Sarandon and to avoid her unlawful legal threats], against a course of performance clearly

defined, budgeted, executed and invoiced [read references before to budget across the entire TAC], all because, in conspiracy with Sarandon and others [the Report is unambiguous about Fraud and Sarandon's tortious interference with business and with contract], he wants to harm Plaintiff.

In his own words in 2019, after Plaintiff exchanged opinions with Sarandon, D Shara states: "I don't care about losing 300,000 USD" referring to approximate production budget spent, [¶ 195, 296]. D. Shara was so cowed and panicked by Sarandon's unlawful legal threats and her public influence potentially harming his color-diamonds wholesale business, that he affirms he prefers to lose money than risk Sarandon's ire. Plaintiff rights weight nothing in the scales, and he must be 'sacrificed to please the Gods'; since the film's production budget had been inexpensive enough for him to "send the film into the garbage" because the fraudlent allegations allowed him "to pay Plaintiff as little as possible" [the Report's own conclusion, section Fraud]. Plaintiff answer was clear: "In the film industry we are tired of double standards, credit creep and abuse of power, hit lists, of boycotting careers and years of work to please someone." [¶ 195] Plaintiff was in Sarandon's hit list for having answered her unfavorable opinions via email, and D. Shara was now cowered by her unfounded legal threats into her henchman ["you have to be careful with Susan. She can ruin you" "we do not need her as an enemy", "she will make a lawsuit against us and **ruin your dream**", at ¶ 168]. D. Shara: "**This** project is over. You will never get another penny from me." [¶ 194] i.e. he would not pay any pending invoices.

D. Shara is liable for breach of contract as regards to rendering the Film profitless and cancelling distribution in bad faith under the tortious interference of Sarandon, Tsitoghdzyan and Honey Shara. To accept dismissal in light of the facts

would place the legal standard to render contracts profitless as avowed retaliation, to do wrong, and at that by acting in plain sight bad faith, too low.

The doctrine propounded by the Court in pages 9-10 of the Report is simply contradicted in its application to this set of facts. If "neither party to a contract shall do anything which has the effect of destroying or injuring the right of the other party to receive the fruits of the contract" then D. Shara's actions are bad faith's playbook. The Court here errs, applying its own avowed criteria very contradictorily, and that error brings about others, because they are connected like a house of cards.

D. Shara does not have the right to render the contract fruitless simply because, in conspiracy with Sarandon and because of her tortious interference with the contract, he decides that this is the most efficient means to harm Plaintiff to please Sarandon after their private exchange of opinions, without breaching the contract's inherent purpose: distributing the film and making profits.

Parol evidence is any agreement that is not contained within the written contract. Under the parol evidence rule, these agreements made outside of the contract are inadmissible in court *unless* **there is evidence of fraud, duress, or a mutual mistake**. Plaintiff has sufficiently alleged duress in the TAC, and the Report affirms fraud in the contract. Therefore, extrinsic evidence should not be barred. The contract is clearly not completely integrated, leaving missing affirmations as regards of obtaining talent releases, without which the basic purpose of the contract, for profit, becomes completely at the discretion of one party, D. Shara, who promises to obtain them and who never obtained them simply to use it to harm Plaintiff as a consequence of Plaintiff's exchange of emails with Sarandon.

Extrinsic evidence leaves no doubt as regards to course of dealing, usage of trade and course of performance, as alleged across the TAC. The parole evidence rule exception applies because the extrinsic agreement is collateral, does not contradict the the express and implied provisions of the Producers' Agreement, and also because including the guarantees to distribute, being the contract for profit, is something that pertains to the kind of promises any reasonable person would expect being part of the implied in the very essence of the contract of a film that is being made to be distributed.

The ordinary or natural test leaves no doubt that the extrinsic agreement ('treat this film as a baby' 'finish it and start distributing it' on 'Amazon, Apple[…]' 'this is the only solution here' [to make any money]) is the sort of promise that one might reasonably expect to be in the original written contract if it is for profit[30].

The covenant of good faith and fair dealing again applies; a reasonable person in Plaintiff's position would understand 'compensation via distribution' to mean 'compensation via a ***possible*** distribution'. That the distribution should be possible, and no party to it fraudulently representing the other that it was possible without that being the case, is inherent to the contract. Yet we do not need to make suppositions about this to understand the mind of the parties: they wrote it, D. Shara wrote it, and Plaintiff has pleaded it all with particularity, referencing emails and dates as regards to budgets approved and intentions confirmed. D. Shara's not obtaining the talent releases of the persons he invites renders the film un-distributable and the contract un-profitable [against his own intentions as described and materialized in budgets confirmed and invoices paid], destroying Plaintiff right to his "fruits of the contract." not because he did not want to distribute it all the way along, but because in 2019 he

---

30   Mitchill v. Lath, 247 N.Y. 377, 160 N.E. 646 (1928).

decides to please Sarandon, even if he will lose the money invested [D. Shara: 'I don't care about losing 300,000 USD'. [31]

  Therefore Plaintiff sufficiently alleges that D. Shara's intentional failure to furnish the talent releases constitutes an egregious breach of contract perpetrated in bad faith, since the allegations show D. Shara's intention is to harm Plaintiff to please Sarandon's vengeful demands, prompted by her unlawful legal threats against David Shara after February 2019—once the Film is already in film festival distribution.

  The recorded phone conversation between Plaintiff and Tsitoghdzyan of July 12, 2022 [¶¶ 252, 255, inter alia] also shows that Tsitoghdzyan is not sending any talent release because D. Shara did not request it.[32] In that conversation, Tsitoghdzyan describes meetings with Sarandon in which she told him that she "would sign the talent release if he [Tsitoghdzyan] wants it, but never to Arthur [Plaintiff]". All Defendants act in civil conspiracy to successfully execute business torts: interference with the Producers' Agreement, among others. The Report fails to address what is obvious and interconnected: the only purpose of all these actions has been to harm Plaintiff because of his exercising his right to an opinion in the exchange with Sarandon, and errs.

  The law provides exceptions in looking at extrinsic evidence in New York, and the Court leaves them aside, in spite of the fact that D. Shara's actions are clear bad faith playbook, and not negligence. Since there is evidence of fraud and duress, the Court should discard the parole evidence rule and use its exceptions.

  The Court has seen the circumstances under which the contract is 'negotiated' under duress.  In spite of all that, the Court establishes that the Contract's terms

---

31  Galesi, 904 F.2d at 136
32  Recall Tsitoghdzyan's written cession to D. Shara in writing [¶ 44] in 2016.

"have a definite and precise meaning and are not reasonably susceptible to differing interpretations" and therefore unambiguous."

Here we have two interpretations as to the four corners of the contract, and its degree of ambiguity:

1] Either the Contract is unambiguous in the eyes of the Court, and, being made on a promise of "profits" then with it must accept, and apply consequently, that as part of its unambiguousness and inherent to the promise of profit-making "any promises which a reasonable person in the position of the promisee would be justified in understanding **were included**" [33], and therefore that includes obtaining the talent releases of the persons D. Shara invited and those that were missing [and he acknowledged in writing that he can get all missing talent releases "expeditiously"]; or else the Contract is unprofitable. D. Shara is in breach of contract because any reasonable understanding of 'good faith' requires that "neither party to a contract shall do anything which has the effect of destroying or injuring the right of the other party to receive the fruits of the contract", and as regard to the contract, if understood unambiguously, any promises "which a reasonable person in the position of the promisee would be justified in understanding were included", and also they must be here included.

Or 2] the Contract is ambiguous in the eyes of the Court, and in that case we need to look into extrinsic evidence to confirm "the mind of the parties". In that case the proof of the parties intentions as regards to distributing is also very clear in plain sight, and therefore here D. Shara is in breach of contract.

The Court makes choices that are contradictory as to the application of its legal standards of choice, and errs. The only explanation is having read the TAC too

---

33  Rowe v. Great Atlantic & Pac. Tea Co., Inc., 46 N.Y.2d 62, 69 (1972).

hurriedly or at separated intervals during the time after the last filling related to the motion to Dismiss, which has spanned almost eight months since last Repply of Opposition to MTD by Defendants and publication of the Report.

### d. —1. Ambiguities in Language of the Producers' Agreement.

The Ambiguity Exception of the parole evidence rule also applies here.

The Producers' Agreement states that the "T**he Director/ Producer <u>will inform</u> and discuss any distribution possibilities with** the Executive Producer, both being informed in due time to ensure the best performancepossible of the business." And "**The Director I Producer <u>cannot make</u> any decision regarding distribution without contacting and getting written confirmation by** the Executive Producer".

Plaintiff, not being an attorney, was ordered to prepare a "one or 2 pages contract". The extrinsic evidence shows that D. Shara instructs Plaintiff with distributing the film, specifically, and that that is "the only solution here" to make profits for Plaintiff. The terms are not reflected in the contract because it is Plaintiff, not an attorney, under high pressure, who is instructed to prepare a contract, not having any professional qualification to do it, and with an important extension-restriction: "no more than one or 2 pages". This has been discussed before an referenced to the paragraphs of the TAC: Plaintiff was supposed to be the partner setting up distribution, and that is why the language of the contract indicates that the Director/Producer will inform […]" &C. And that is why D. Shara signed it, because he himself chose that burden for Plaintiff.

Therefore the original written contract is reasonably susceptible to more than one meaning, and the court should permit the admissibility of parol evidence to determine the meaning of the contract language under the ambiguity exception, simply looking at the contemporary extrinsic evidence. A superficial look to it shows in plain sight D. Shara was unambiguous then and for years afterwards as regards to distributing the Film, until Sarandon's unlawful legal threats cower him into submission to harm Plaintiff. The court may look towards the rules of statutory construction to determine whether the language is ambiguous.

When it was time to distribute, however, D. Shara decided not provide any releases. The film now was being hailed as "a masterpiece" and D. Shara and Honey Shara wanted to impose new terms and absolute control, and unilaterally, in bad faith, decides not to obtain any talent releases, choosing to render the film profitless unless Plaintiff ceded to his and his mother's, Honey Shara, outrageous demands[34].

But if we find it ambiguous, New York law provides remedy: look into extrinsic evidence under collateral contract exception. That evidence, before, during and after the signature of the contract is unambiguous, plentiful, and direct [as referenced before]. The intentional mind of the parties translates into actions, and the course of the action chosen can be traced very clearly. D. Shara and Tsitoghdzyan even announce on TV that the film will be distributed, but even more importantly for contract evaluation: the TAC is clear about referencing, also providing excerpts, of memos, budgets approved, congratulations and excitement on D. Shara's side, payment of invoices after action planned [as extensively referenced before], Oscar-qualifying US theatrical release, translations of the contents &c.

---

34  Recall, attorneys of David Shara and Honey Shara, representing both and not one, make such requests in 2020.

In 2020, D. Shara and Honey Shara tried to coerce Plaintiff into signing another contact depriving him of his rights under the Producers' Agreement, and to take a "back seat". This is simply a reference to that point of the contract: **that Plaintiff was to be the party in charge in distribution. Plaintiff** requested to see the talent releases that they assured him they never got, but that D. Shara could get "expeditiously" in his own words. Therefore the bad faith to harm the rights of Plaintiff to enjoy the 'fruits of the contract' is expressly manifested by D. Shara.

Extant jurisprudence only shows that the standard to applying exceptional review of extrinsic evidence is high—but not *barred*.

The extrinsic evidence does not contradict, but complements and clarifies what in the contract is too briefly described for reasons well referenced in TAC [duress and coercion, unconscionability, high pressure and deceptive tactics, Plaintiff not being an attorney obliged to summarize it, absent of meaning choice and extremely unfair contract that is unprofitable, contract prepared by Plaintiff, who had no idea of law and was the one under threat to see all his work up to then "destroyed" [referenced before].

When both applications of the legal standard takes us to the same objective conclusion, while we but too obviously see that the conflict starts years **after, once** Plaintiff had exchanged an email with Sarandon, then the Court errs in this case.

Therefore D. Shara is in breach of contract no matter what angle we choose, unless the contract is declared illegal as explained, and in that case the extant extrinsic evidence will show the mind of the parties. Since there is evidence of fraud and duress, the Court should discard the parole evidence rule and apply the exception.

The Report states: "Counsel for David and Honey Shara suggested to Balder that he "renounce his rights as stated in the Producers' Agreement in order to allow the Sharas to be fully in charge of the distribution of the film." Id. at ¶ 222. Counsel explained that the Sharas did not have the outstanding releases but could "secure all of them **in an expeditious manner"** if Balder took "a backseat." Id. at ¶ 236. Balder declined the proposed contract modification, never apologized, and never received the signed talent releases."

"The name and likeness releases have not been secured by our clients; **they can secure all of them in an expeditious manner**—but you have to take a backseat on this project" ¶ 236. Plaintiff did not *decline* to take 'a backseat'. On the contrary, Plaintiff simply *requested proof* that the talent releases had been obtained by the Sharas *before* discussing any new distribution arrangements ¶¶ 234, 235. Then the high pressure tactics employed were the same as in 2016 to obtain the contract: "you need to **handover the control of the film to our client" or "our client is prepared to let the film will die on the vine**". Deprive Plaintiff of any meaningful choice, and no bargaining power: "**you don't have any remedy**" "Unfortunately for you, **you have no choices** here Arthur", "**trust that David's self-interest** in getting the best deals and making the most money from the film" ¶ 236.

'You have no choices.' Plaintiff had been left without meaningful choices. They know perfectly the degree of inherently unfairness of the contract, where one part is "deprived of meaning choices" and the other enjoys disproportionate unfair advantage.

The rationale for the ambiguity exception is that a judge should look at all credible evidence to determine the parties' true intentions. If the parties' intentions are found in a side agreement, generally this supersedes explicit written agreements.

51

**E. David Shara's Breach of Contract for the Painting's Late Delivery.**

The Report end of pg. 10-11, states: "Balder fails to identify specific damages that flowed from his inability to sell the painting between May 2017 (when he was supposed to receive it) and January 2019 (when he did receive it). Balder has therefore failed to sufficiently allege damages arising from the late delivery". Plaintiff clearly alleges that he was damaged by the painting's late delivery. That he fails to identify the damages in the complaint, does not mean that they are not inferable. But it is obvious that Plaintiff cannot *enjoy* the painting because it is not sent to him.

Therefore damages do not arise only from inability to sell the painting.

A painting is an artwork. Artworks are tangible assets, as real state. An Artwork is not an abstract investment without physicality. Contemplating it, having it physically, is no small part of the expected *profit* of it being given to Plaintiff on time. **Plaintiff was deprived of the enjoyment of the artwork for the time this clause was left unfulfilled, therefore he is entitled to damages** as a consequence of D. Shara's breach of contract.[35] The fact that Plaintiff did not try to sell it until 2020 does not mean that he would not have enjoyed the tangible asset since he should have had it by contract. Plaintiff is deprived by its enjoyment for the time delayed. Therefore damages arise from the late delivery, and the Court has failed to raise the strongest argument of the pro se's pleadings as regard to the nature of the artwork as a tangible asset, that can be enjoyed or even rented.

---

35  Likewise, a real state property is a tangible asset and could be an investment, but also a place we can live in. It can be enjoyed by living in it, renting it. There is no doubt that receiving a real state property later than stipulated by contract represents a breach of contract that cause claimable damages because that party could enjoy it in multiple ways.
An artwork is also a tangible asset, a physical property, is enjoyable having it, and can be rented for profit, as any other tangible asset. Therefore damages arise from the late delivery.

Defendants concede in their Reply to Opp. pg. 11, [Doc. 83] that "art can be received for many purposes."

Additionally, as regards to the implied warranty of fitness, if Plaintiff had received the Painting *sooner* [i.e. on time, on or before May 31, 2017], he would have discovered its poor quality *sooner*, and he would have been able to address this situation *sooner* with his partner, D. Shara, *before* the tortious interference of Sarandon. Since the painting is not delivered on time in civil conspiracy between D. Shara and Tsitoghdzyan to interfere tortiously with the contract, there is ***intent*** to cause damage.

Sarandon's divisive and tortious interference starts around the end of February 2019, while the painting should have been finished and delivered by May 31, 2017. In interpreting the pro se's complaint, the Court is not choosing the strongest argument, in spite of it "agreeing" unambiguously in affirming the breach of contract as regards to the painting's late delivery, and limits Plaintiff's rights to redress. Plaintiff is entitled to relief for such breach of contract. If we take into consideration that the Court recommends to proceed against D. Shara and Tsitoghdzyan for fraud in relation with the Painting's represented value *and* quality [implied warranty of fitness], the time by which it should have been finished and given to Plaintiff is important, and not something to leave out, a flagrant and clear breach of the Producers' Agreement. It is a fraud to misrepresent value, and its equally coercive and deceptive to hide it for much longer than stipulated from Plaintiff, so that he cannot make any assessment as of why the painting is not being finished and given and as regards to its quality. There is a reason: to keep Plaintiff working blindfolded as regards to his compensation for as long as possible without any guarantees on the horizon that the painting would be

finished with the quality promised and on time, and, in the end, this is part of the Report's conclusion: "to pay Plaintiff as little as possible", even if to do it they can also limit Plaintiff's enjoyment of the Painting, which is unambiguously part of his right to enjoy the 'fruits of the contract'.

The late delivery, which deprives Plaintiff of the painting's enjoyment, also contributes to inflicting emotional distress because it only disappoints Plaintiff after years of wrongly obliging him to wait for it.

Therefore the Court has not considered that Plaintiff would had enjoyed the painting much sooner. Plaintiff had wanted to show it to his wife by her birthday in 2017, and in 2018, and of that also he was deprived. The Court is not raising the strongest argument from a pro se's pleadings, as much as Plaintiff states that it was detrimental for him not to receive it when it should, ["compensatory for the delay in giving him the painting under the Producers Agreement" ¶¶ 134, 142, 147, 149] according to the contract. The damages that flow from the painting's late delivery are inferable from the pleadings.

Without prejudice, nominal damages[36] are *sufficient to support a claim for breach of contract*.[37] The violation of rights *matters,* even if it would not give rise to compensable harm.[38]

### F. Against Tsitoghdzyan, and against Tsitoghdzyan as regards to his son, a minor.

As regards to Tsitoghdzyan's beach of contract claim for not providing his talent release, Report pg. 12. The TAC states that D. Shara instructed Plaintiff on several

---

36  Second Restatement of Contracts §346: Availability of Damages (1) and (2).

37  3*7 East 50th St. Corp. v. Restaurant Group Management Services, LLC,* 2014 NY Slip Op. 31595(U). "a breach of contract claim in pursuit of nominal damages. Nominal damages are always available in breach of contract actions. Nominal damages are a way of recognizing the fact that harm is caused by the fact of one party's breaking its contractual promise to another [...]"

38  19-968 Uzuegbunam v. Preczewski (03/08/2021), Supreme Court of the United States.

occasions to request Tsitoghdzyan's talent release signed. The TAC refers partial transcripts of a recorded phone call between Plaintiff and Tsitoghdzyan in 2022 in which Tsitoghdzyan acknowledges he had promised to Plaintiff the signature of talent releases related to him and his son, a minor, whom he wanted at all costs to be part of the film. In this conversation also Tsitoghdzyan recognizes that he wants to do whatever D. Shara asks him to as regards to the talent releases requested "because they are partners". The Court leaves these allegations, which references extant evidence, out of its calculations, and choses to evaluate the claim against Tsitoghdzyan only on one set of facts alleged.

In any event, Tsitoghdzyan accepted to be filmed under same promise as Sarandon, and was filmed multiple times and he accepted Plaintiff's offer by performance in 2016 and afterwards in 2017's filmings. He has failed to fulfill the promise under same arguments used in (III)(B) ["Against Sarandon as a consequence of 2016's Offer and Acceptance by Performance."] Plaintiff incorporates here those arguments of breach of contract by acceptance of offer by performance against Tsitoghdzyan.

The Court also here fails to address all the detailed allegations regarding Tsitoghdzyan's introducing his son in the film. That happened *after* the Producers' Agreement terms had been discussed and selected and was not mentioned at all during its 'negotiation'. With this inclusion, Tsitoghdzyan increased the burden of work of Plaintiff, and the budget against which any profits would be made, and then kept hostage the talent release related to his son [and also the one provided by the mother, which he promised to obtain] to render the film unprofitable.

Plaintiff made an offer for the son of Tigran to be part of a sequence in exchange of the talent releases of father and mother provided, since it is a child. Tsitoghdzyan agreed. There were exchanged emails describing the sequence. The sequence was shot in February 2017. Tsitoghdzyan accepted Plaintiff's offer by performance. Plaintiff incorporates here the legal arguments of acceptance by performance as detailed in (III) (B) ["Against Sarandon as a consequence of 2016's Offer and Acceptance by Performance."]

## IV. TORTIOUS INTERFERENCE WITH CONTRACT

### A. Against Sarandon.

The Report, section III [Tortious Interference with contract]: "For the invoice-related breach, **Balder does not allege** that Sarandon knew of the Producers' Agreement, […]". But Plaintiff alleges it, and explicitly in this context: "Sarandon, **knowing the existence of the partnership and contractual relation between Plaintiff and David Shara,** decides, out of spite, not to answer the Plaintiff if she disagreed on his points of view or opinions, but to show the communication **in connection with litigation threats**" [¶ 172]; "she had threatened him [D. Shara] with litigation, unless film festival circuit cancelled immediately **for the Film"** the allegation connects the legal threat with tortious interference with the Producers' Agreement "[…] unless Plaintiff changed his opinion at least in appearance and sent the most 'grovelling apology I have ever read in my life to Susan Sarandon' [D. Shara's words]". [D. Shara] "also stated that she was **threatening with a lawsuit against 'us' […] 'unless the Film is cancelled completely'."** "the litigation threat was **meant to interfere with the contract existing between Plaintiff and his partner**" […] [D. Shara to Plaintiff: "because of your email'" [¶ 176].

Further allegations of Sarandon's knowing the contract between Plaintiff and D. Shara: "Tigran was frustrated for not having gained total control over the project **in collaboration with Sarandon**, **who** according to David Shara **had flirted with the idea to get her son at the helm of the project**" [TAC ¶ 92, pg. 78]. The Report affirms unambiguously Tsitoghdzyan's knowledge of all details of the Producers' Agreement [he was privy to its 'negotiation']. Tsitoghdzyan had been the closest person to Sarandon since the beginning, and he even had affirmed her specific assent as regards to many aspects of execution in 2016 and 2017 [affirming for instance in 2017 that she was pleased with the dissemination of massive press releases announcing making and posterior distribution of the Film [<span style="color:red">referenced before to TAC</span>]. In order to get "her son at the helm of the project", it was necessary to fire Plaintiff, because he was the Director/Producer, as she knew. Plaintiff's allegations state unambiguously and also imply that she knew about the existence of the contract between Plaintiff and D. Shara. The allegations and the facts and circumstances alleged do have way more weight than any outright negations concocted to obtain dismissal of the cause of action, and overcome threshold of plausibility. It is not believable that Tsitoghdzyan was so close to her as to guarantee to Plaintiff she was happy with "massive press releases announcing her presence in the Film", and that she did not know that there was a contract and between whom. She could not "flirt" with such idea of "placing" her son [replacing Plaintiff] at the helm without knowing the contractual relationship between Plaintiff and D. Shara.

Plaintiff alleges it: "Sarandon chose not to answer but to disseminate herself the private communications and to threaten with litigations others only to start a tortious

interference on the Plaintiff's **present** contract and other business expectations and relations [...]"[¶ 169 ]."

Report, pg. 16: "Because Balder alleges that Sarandon's sole "intention [was to] cause injury to [Balder's] **present** and future projects," her litigation threats were wrongful. TAC, ¶ 179" the Court affirms. Therefore Plaintiff alleges that Sarandon's litigation threats were also "to cause injury to [Plaintiff's] **present** [...] [at that time, 2019] projects." Plaintiff's at that time present project was "American Mirror".

Plaintiff alleges: "David acknowledged he had talked to Sarandon, that she had threatened him with litigation, **unless film festival circuit cancelled immediately for the Film[39] and other film projects with him also cancelled**" [D. Shara] "stated that she was threatening with a lawsuit against 'us', David and the Plaintiff, 'unless the Film is cancelled completely'" [TAC, ¶ 176]. The breach of contract for not payment of invoices to Plaintiff is directed to 'cancel the film festival circuit' and its execution [D Shara: "no more money, no more projects"] [TAC, referenced in (I)].

The TAC does not allege that Sarandon made a set of actions to tortiously interfere with business relations and then another completely different devised to tortiously interfere with the Producers' Agreement. That is also illogical since both actions happened at the same time [February 2019] and arise from the same event [Sarandon and Plaintiff sharing mutually unfavorable opinions]. Sarandon's litigation threats were "to cause injury to [Plaintiff's] **present and future** projects." [¶ 179] "her objective is **cancel the Film** [American Mirror, present project] and to destroy Plaintiff in all ways imaginable" [¶ 167]. As a consequence, to cancel the Film D. Shara ordered "cancel the festival circuit" and he announced **no payment of**

---

39  The TAC, at the beginning, clarifies that any reference to 'the Film' in it refers to 'American Mirror: Intimations of Immortality". There is no doubt that Plaintiff and D. Shara were talking about the only one festival circuit at that time, the one of the Film.

**pending invoices** precisely to accomplish it, which brings breach of contract. The TAC is clear in reference to this: the request to cancel the festival circuit was demanded by Sarandon to harm Plaintiff ["**present** and future projects"].

That Sarandon knew about the Producers' Agreement is obvious from the allegations, yet it is also *inferable* from them, even if it were not stated in a 'recital manner'. It is impossible to imagine she was tortiously interfering with other business relations of Plaintiff, and that at the same time she was not interested in sinking, ruining, stopping 'American Mirror', which was the ***present*** project that was headed towards a very busy festival circuit, and the most immediate way to harm Plaintiff.

The Court fails to apply the principle by which to raise the strongest argument from a pro se's pleadings that are specific about this claim.

No reasonable person would believe that Sarandon wrongful means to influence D. Shara to harm Plaintiff were solely and carefully designed to tortiously interfere in "business relationships" [to cancel the Nazi propaganda project ***and*** the Canada-mined big diamond project] and not in the present contract governing the distribution of 'American Mirror'.  It is not necessary to use the imagination because it is inferable from the pleadings and the communications exchanged with Sarandon, to establish that Plaintiff's pleadings imply Sarandon's perfect knowledge of the contract between D. Shara and Plaintiff—also through her fluid contact with Tsitoghdzyan since 2016, who is the one who suggested her collaboration initially and who gave the details. It is clear and out of doubt that Tsitoghdzyan knew perfectly all Producers' Agreement details, he was part of its 'negotiation' along with D. Shara.

The decision of the Court to leave this claim against Sarandon is contested by the allegations. It is premature and incautious, and could bring about more injustice, to leave it out without further examination of the evidence.

That decision based on the lack of a "recital allegation" stating that "Sarandon had perfect knowledge of the contract", is less strong than Plaintiff's direct allegation as quoted before and the inference that can drawn from the pro se's allegations and pleadings, that obviously Sarandon knew about the contract for several years through Tsitoghdzyan and by her interactions with Plaintiff and D. Shara, pleadings that should be submitted "to less stringent standards" "to raise the strongest argument possible". ["Sarandon […] requests the standing agreement […] to be shattered […] requests to David [Shara] to cancel the festival circuit" which had been budgeted and approved, and in order to do so invoices are not paid [D. Shara: "no more money, no more projects"]. D. Shara "willingly kowtows to the super-star's wrongful petitions to harm Plaintiff to ingratiate himself with her, and to avoid her ire (baseless, harassing litigation threats Sharandon knew had no merit." See complete ¶ 296. ]

In any event, the Court has seen that Sarandon's actions were intended to harm, that D. Shara was cowered by her wrongful litigation threats ("you need to **be careful with Sarandon. She can ruin you**", "she will make a lawsuit **against us**', "**we** do not need her as an enemy" [he includes himself, which implies she threatens him, not only Plaintiff, 'a lawsuit **against us**'] "I read the emails" [because she disseminated them to Tsitoghdzyan and D. Shara] [¶ 168]), that those threats brought a result direct on the present project: "cancel the festival circuit" "no more projects, no more money". D. Shara stops paying invoices ['no more money'] to effectively cancel the Film's festival circuit. The purpose of cancelling a festival circuit is obvious:  Film

and Plaintiff would be deprived of any opportunity to prove his stance as regards to the quality of his work, also would deprive him of recognition and of any profits. This comes as a direct result of Sarandon threatening D. Shara with litigation to harm Plaintiff "by all means". Tsitoghdzyan writes to Plaintiff around same time: "don't know how she wouldn't **just kill the film** with her participation after all this" [¶ 175]. He shows disagreement with Plaintiff, but also fear. He cannot imagine, after talking to her, how she is not going to get it, what she wants: ***to kill the film***. There is only one way to *kill* the film: to interfere with the contract between Plaintiff and D. Shara. This shows how determined she was to get vengeance, and cowed the others into submission. Tsitoghdzyan was closer to her than anybody else, and she had cowered him to exert as much pressure on D. Shara, his business partner as regards to painting sales, as possible to get from him retaliation on Plaintiff.

D. Shara being liable of breach of contract for not paying invoices is only direct consequence of Sarandon's tortious interference with a contract she perfectly knew existed, and Plaintiff alleges it.

Additionally, TAC Exhibit 2 shows D. Shara himself explains to Sarandon CCing Plaintiff the wide plans they have to "festival circuit". He states it clearly: "I would also like to discuss your thoughts on film festivals. Arthur Balder has done an incredible job on all aspects of this film including submission to film festivals. He deserves an enormous amount of credit. He has put in so much time, effort, expertise and skill. I am beyond proud of him. It is very rare that someone surprises me these days, but he truly impressed me with his patients, expertise, originality and skill level." Sarandon herself encourages them to "submit to film festivals". She is aware of the existence of the circuit.

Her litigation threats are not only intended to interfere in other business relations of Plaintiff, but to directly seek vengeance by prompting the cancelling of a film festival circuit and distribution she is perfectly aware is in place and is part of the business. D. Shara not paying invoice is the result of Sarandon's tortious interference with a contract.

All elements are met: '[...] existence of a valid contract between the plaintiff and a third party, defendant's knowledge of that contract, defendant's intentional procurement of the third-party's breach of the contract without justification, actual breach of the contract, and damages resulting therefrom.[40]"

Therefore the claim against Sarandon should survive and proposed dismissal be denied.

### B. Against Honey Shara.

The Report, section III, pg. 14 states: Plaintiff "does not allege that Honey Shara convinced or pressured David Shara to pay invoices late, […]." This conclusion contradicts the allegations. Plaintiff exposed the question of unpaid invoices to D. Shara. Then Plaintiff alleges at ¶ 182: "On April 26, 2019, Honey Shara shared with plaintiff an email sent by David to her and to Tigran. In it David wrote: "Mom, Did u speak to Arthur Balder? Let's go over this with Tigran." Tigran and Honey Shara were instrumental and influencing and being part of the decisions David was making."

Honey Shara, a partner of D. Shara and in charge of decision-making to pay invoices, simply does not pay them. That is directly proof of the interference, because Plaintiff requests payment also to her. But Plaintiff alleges that, and describes how Honey Shara exerts compulsion. Honey Shara talks to Plaintiff, and demands an apology to Tigran and Sarandon unless invoices won't be paid ["Honey Shara

---

40   Lama Holding Co. v. Smith Barney Inc., 88 N.Y.2d 413, 424 (1996).

requested from the Plaintiff awritten apology to be sent to Sarandon and Tigran as the only way to beable to continue with the project of the film in the festival circuit and theOscar-qualifying US limited theatrical release as stipulated andbudgeted" at ¶ 183, "Frustrated by Plaintiff's refusal and arguments, to that she shamelesslywent on to say: "Do it for Bella". (referring to Plaintiff's wife, basically 'doit to avoid suffering to your wife')]. In no moment she is acting on behalf of or only communicating D. Shara's own ideas. She is imposing her own ideas actively. By acting that way, she is tortiously interfering with the contract.

That Plaintiff's pro se pleadings may fail to assert a formulaic statement declaring that Honey Shara "pressured or convinced D. Shara" of not paying the invoice is not enough to grant dismissal of his claim, because the pleadings in plain sight allow inference of such circumstance to raise the strongest argument. Is clear in plain sight, because the pleadings allege that Honey Shara threatens Plaintiff to cancel the US theatrical release of the Film by not paying invoices unless he presents that apology, something he has no legal obligation to do. "Frustrated by Plaintiff's refusal and arguments, **she** shamelessly went on to say: "**Do it for Bella**" [TAC, ¶ 194, footnote 141]. [referring to Plaintiff's wife, basically 'do it to avoid suffering to your wife']. [TAC, ¶ 183].

These are actions by Honey Shara coordinated with others, not on behalf on anybody, but because she has joined Sarandon's camp and, as a partner of D. Shara, she has influenced him and she herself not paying the invoices, along with the others, in doing anything possible to harm Plaintiff. Scared by Sarandon's unlawful litigations threats against her son D. Shara, Honey Shara makes a decision to please her and avoid her wrath and the potential fallout for their high-profile color-diamonds

wholesale business: not to pay any invoices to Plaintiff unless he presents an apology to her and Tsitoghdzyan, even announcing that Plaintiff's wife will also suffer the consequences ["Do it for Bella"] [TAC, ¶ 194, footnote 141], which in fact she suffered.

Honey Shara pressured D. Shara in 2020 not to obtain the talent releases to thwart distribution unless Plaintiff accepted new terms proposed by Honey Shara herself. That new terms were not obtained because Plaintiff did not cede, that does not mean that Honey Shara did not pressure and influence D. Shara in the breach of contract related to not obtaining them to render the film profitless with one and the same aim: to harm Plaintiff. She clearly states it: they could get them "expeditiously".

Therefore Honey Shara is liable for tortious interference with contract as regards to all D. Shara's breaches of contract, invoices not paid and actions directed to thwarting distribution.

### C. Against Tsitoghdzyan

Additionally to tortiously interfere with the breach of the late-delivery of the painting, Tsitoghdzyan is liable for tortiously interfere in the breaches: **no payment of invoices by D. Shara and not obtaining the rest of the talent releases D. Shara had to obtain**, **all in order to thwart the Film's distribution**, while at the same time he had committed copyright infringement in obtaining unlawfully a copy of the Film to use it for his own—and Honey Shara's and D. Shara's, his partners in paintings' sales worldwide—unjust enrichment.

Plaintiff exposed the question of unpaid invoices to D. Shara. Then Plaintiff alleges at ¶ 182: "On April 26, 2019, Honey Shara shared with plaintiff an email sent by David to her **and to Tigran**. In it David wrote: 'Mom, Did u speak to Arthur

Balder? L**et's go over this with Tigran**.' Tigran and Honey Shara were instrumental and influencing and being part of the decisions David was making."

Plaintiff alleges: "[…] he [D. Shara] had been unduly harassed with threats of litigation that made no sense by Sarandon **and by Tigran**" [¶ 168]. Plaintiff sufficiently alleges that Tsitoghdzyan had threatened D. Shara in 2019 after Plaintiff's exchange of emails with Sarandon, in order to cower him into doing what he and Sarandon wanted. Tsitoghdzyan, also expressing fear towards Sarandon's retaliatory mood in text messages sent to Plaintiff, simply joins her camp and goes after D. Shara. D. Shara's breaches of contract are consequence also of Tsitoghdzyan's unlawful legal threats and civil conspiracy, as alleged in TAC [¶ 168].

Therefore Tsitoghdzyan is liable for tortious interference with contract as regards to the breach of not paying invoices and breach of not distribution by D. Shara.


## V. TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS

### A. Against Sarandon.

**a—1.** AS REGARDS TO THE EXPECTATIONS OF THE PRODUCERS' AGREEMENT SHOULD BE INCLUDED

The pleadings show that Sarandon's would be also liable for tortious interference with business relations as regards to the Producers' Agreement's fruits, and not only as regards to cancelling the Nazi propaganda film and the big Canada-mined diamond project: because she is aware of that business relation, of Plaintiff's expectations, even if she argues that that is not sufficiently alleged, which is not true as allegations showed before in TAC.

But if that were the case, as regards to the cause of action claim "tortious interference with business relations", there should also be included her influence on the negative outcomes related to the Producers' Agreement. The fact that she may argue that she did not know the contract does not mean that she did not intend to interfere negatively in the business relation between Plaintiff and D. Shara by the same means and actions by which she interfered in the cancelling of the Nazi propaganda film and the Big Canada-mined Diamond Project[41].

**a—2.** AGAINST SARANDON SHOULD INCLUDE ALSO THE DOCUMENTARY RELATED TO THE BIG CANADA-MINED DIAMOND DOCUMENTARY PROJECT

TAC,  [¶ 178] ""See my WhatsApp texts… we are finished. No more money, no more projects"" .¶ 178. "Plaintiff was deprived of the new project 'Nazi propaganda Arthur Langeman' *and* the big Canada-mined diamond project in development as a direct consequence of the emails exchanged with Sarandon, and as a direct consequence of Sarandon sharing them to David **along with** baseless, meritless litigation threats to harass and cower David." at ¶ 179.

The rationale provided by the Report [Section IV, pg.15-16] as regards to the cause of action 'Tortious Interference with Business Relations' against Sarandon is equally valid for both alleged projects. "David Shara: I'm finished with this project ['American Mirror'] **and the others** [4/15/19, 12:42:48] David Shara: **Cancel the film festivals** [4/15/19, 12:42:55]" [¶  180]. "David Shara: The email u wrote to Susan and

---

41  Plaintiff has pled conduct that makes Sarandon's threats of litigation a wrongful mean to harm him. The threat of litigation, is only a wrongful means if (1) "the [claimant] has no belief in the merit of the litigation" or, (2) "having some belief in the merit of the suit, [the claimant] nevertheless institutes or threatens to institute litigation in bad faith, intending only to harass the third parties and not to bring his claim to definitive adjudication." RFP LLC v. SCVNGR, Inc., 788 F. Supp. 2d191, 197 (S.D.N.Y. 2011) (citing Universal City Studios, Inc. v. Nintendo Co., Ltd., 797 F.2d 70, 75(2d Cir.1986)).

the way u treat Tigran is unacceptable .[4/15/19, 12:56:24] David Shara: You **cannot** write that shit to Susan". There is no doubt that the cause is Plaintiff's exchange of opinions with both Sarandon and Tsitoghdzyan. [¶ 180.]

Plaintiff further alleges: "the other projects in preproduction must be cancelled, and that he, his partner, does not want to partner with Plaintiff ever again, not because Plaintiff's work is not good enough, but because he exchanged privately opinions with Sarandon and because she had threatened David and put him on his knees to get what she wanted: retaliation, harming  Plaintiff" at ¶ 181.

**B. Against Honey Shara.**

The Report does not address this claim in section IV. Plaintiff incorporates here the references of the previous sections related to Honey Shara's tortious interference with contract, for context.

Plaintiff sufficiently alleges that he and D. Shara had a business relationship to make the film Nazi Propaganda Project, see for instance its acknowledgement by the Report Section IV. ph. 15, among others, and the many references in TAC [¶¶ 134, 151, 176].

Plaintiff alleges that "Frustrated by Plaintiff's refusal and arguments, **she** [Honey Shara] shamelessly went on to say: "**Do it for Bella**". [referring to Plaintiff's wife, basically 'do it to avoid suffering to your wife']. [TAC, ¶ 194, footnote 141] [TAC, ¶ 183].  Therefore Plaintiff sufficiently alleges that Honey Shara engages in conduct for the purpose of inflicting emotional harm to Plaintiff and his family, and even acknowledging her actions would have that effect in Plaintiff's family. "Honey Shara

was not a designated agent of a principal, she was another principal, she behaved like that and she made decisions directed to harm Plaintiff" [¶ 195, footnote 142].

"To create the visual animations of the Nazi propaganda cartoons for that film, Honey Shara suggested to approach close relatives of her. They intended to include Oscar-winning team Alison Snowden and David Fine behind 1993's "Bob's Birthday", a Canadian-British animated short film that won the Academy Award for Best Animated Short Film in 1993." [¶ 134]. Therefore Plaintiff sufficiently alleges that Honey Shara was aware of the Nazi Propaganda Project and Big Canada-mined Diamond Project.

Honey Shara is aware of the distribution opportunities of the film, among them of MAD Solutions. She wrongfully pressures D. Shara so that he won't obtain the talent releases. But for this wrongful influence of her, MAD Solutions and other business contracts are lost by Plaintiff.

Honey Shara's acts injured the relationship between Plaintiff and D. Shara.

Therefore the claim against Honey Shara for tortious interference in business relations should not fail.

Plaintiff also alleges that Honey Shara was aware of the MAD Solution contract negotiation, among many other offers, as the TAC shows [¶ 200].

**C. Against Tsitoghdzyan.**

D. Shara acknowledges Sarandon's and Tsitoghdzyan's threats are behind his decision to cancel present and future projects already in preproduction: "Unfortunately we are not able to continue our relationship [4/15/19, 12:12:54] David Shara: The way you write to Susan **and** Tigran is unacceptable." ""See my WhatsApp texts... we are finished. No more money, no more projects" [¶ 178]. Those texts prove that

Tsitoghdzyan had been also sharing Plaintiff's messages exchanged with him in which Plaintiff expressed his concerns as regards to the low quality of the painting of his wife and for its late-delivery to Plaintiff [breach of contract, tortious interference with the contract and fraud].  Tigran had joined Sarandon's camp in retaliation for Plaintiff having dared to express his concerns as regards to the painting, and to please her vengeful mood.

Plaintiff sufficiently alleges that Tsitoghdzyan's wrongful actions and pressures on D. Shara did happened and had the purpose to harm Plaintiff to please Sarandon: "Tigran had also requested retaliation to harm Plaintiff, presenting himself as a victim, incredibly, of Plaintiff's critic of a panting that was unfinished after two years" [¶ 182].

His actions effectively harm the business relation between Plaintiff and D. Shara, as D. Shara acknowledged himself above.

Therefore Plaintiff sufficiently alleges that Tsitoghdzyan's actions cause tortious interference with Plaintiff's business relations with D. Shara and the claim should not fail.

### D. Against David Shara.

By not providing the talent releases, D. Shara interferes with the contract negotiations with biggest Middle East distribution MAD Solutions. D. Shara is aware of the negotiation, knows the details, knows that the releases are necessary to sign it, and does not provide them in breach of contract. This same frame can be applied to multiple losses that are being alleged in the TAC and related to distribution opportunities [Blood Sweat Honey, Mad Solutions, Netflix, among others, are referenced across the TAC].

But for D. Shara's conduct, this potential contract would have been entered into by the Plaintiff, and as such, the tortious interference claim succeeds.[42] (Tortious interference with prospective economic relations requires an allegation that plaintiff would have entered into an economic relationship but for the defendant's wrongful conduct).

## VI. FRAUD

Plaintiff accepts the Report's recommendation as regard of this claim.

The Court has addressed this issue in a manner that shows attention to detail and also application of the principle that "pleadings from a pro se litigant must be subject to less stringent standards" "to raise the strongest argument possible". Plaintiff is grateful for raising the arguments from the pleadings, since he is not aware of such complexities, and simply expects the same degree of attention to detail and inference from to be applied to all pro se's pleadings extant in TAC.

## VII. COPYRIGHT INFRINGMENT

Plaintiff accepts the Report's recommendation as regard of this claim. As regards to Sarandon's, however, although it many not amount to a copyright infringement, **Sarandon took ideas from Plaintiff's work as a screenwriter**.

Plaintiff never conceded that conceded that he did send H. Shara a copy of the Film under any terms. He explains the coercion H. Shara was exerting by not paying invoices, and we refer here to the section "Duress" of this Objections.

## VIII. PROMISSORY ESTOPPEL

### A. Against Sarandon and Tsitoghdzyan.

---

42   Vigoda v DCA Productions Plus Inc., 293 AD2d 265 (1st Dep't 2002).

Plaintiff sufficiently alleges to infer that he acted under delusion as regards to Tsitoghdzyan's and especially Sarandon's promises.

"Plaintiff was confused by Sarandon's attitude, deeply disappointed discovering how wayward her games could be, and how unjust, coming from a person whose word he had taken for granted was 'gold standard' because of her reputation and career." [¶ 145].

No little to not known filmmaker, as it is the case of Plaintiff, would not believe, a priori and trusting Sarandon's professional reputation, would doubt of Sarandon's word and promise, when in fact she accepted his offer by performance to participate in the Film in 2016.

Plaintiff had never before worked with a person of that professional stature, and Sarandon's professional stature was coupled in his deluded understanding with a moral stature—which only afterwards he learned was not there.

D. Shara states and describes this by accusing Plaintiff of having been deluded: "**In your head you made it** that she was a part of this project, but she is a busy and famous woman and you twisted it around [4/15/19, 12:59:35] and Plaintiff answered: "AB: She is just a hypocrite. [4/15/19, 13:04:31] AB: Then tell me: **Why then that 'busy and famous woman'**, as you mainly describe her, **came to the shooting** of a film, knowing the camera, setting, etc, **if not to be part of it**? [4/15/19, 13:04:58] [TAC, at ¶ 180].

The Court errs: Plaintiff was under delusion, as many others in his position in 2016 would have been in his particular situation. And Sarandon has shown that she does not act as an honest and fair person [denied to fulfilled the rest of 2016's offer accepted by performance, actively engaged in other torts to deprive Plaintiff of film

projects]. D. Shara's own words assure us of her true intentions in joining the Film—in expectation of a sexual partner in Tsitoghdzyan [D. Shara: "Agreed on all fronts"]. That she would go to such lengths because she did not get what she wanted, that was *impossible* to imagine or foresee or expect for Plaintiff, and for any reasonable person in Plaintiff's position.

It is futile to reference lawsuits in the last years, some of them of great public attention, in which persons of great name, fame or bearing in the film industry do abuse of the 'starstruck' power they have on others who do not know them personally, and who have been seeing them simply on screen, intermittently, for years. Harvey Wainstein's victims have denounced and described the mechanism by which ultra-famous and powerful people in the film industry abuse of this 'starstruck' effect on others—and what do they demand, or what do they *expect* from others whom they do favors. Recall D. Shara's unambiguous acknowledgment, as regards to Sarandon's frustrated expectations for not having turned young Tsitoghdzyan into her bedfellow: "Agreed on all terms" [ already provided TAC's reference], extant WhatsApp messages.

Sarandon is someone who abuses of such standing, and the fact that she is a woman does not change the modus operandi, neither should excuse it. And the fact that the style may be more refined than a Harvey Weinstain's, does not make it different as regards to the mechanism at work.

To place Sarandon and Plaintiff on the same level of professional and business knowledge, fame and influence, is simply absurd, not being fair neither true: it is clear that Plaintiff was totally deluded, and it is clear that Sarandon acted extremely unfairly, because the Court cannot avoid the details of the allegations, and to see that Sarandon makes all kind of affirmative representations [recall section about 2016's

offer's acceptance by performance], yet she behaves with malignity and uses her influence on those who are still deluded in one way or other—to her own advantage.

Recall the phone conversation recorded between Plaintiff and Tsitoghdzyan [TAC ¶¶ 247, footnote 172; 250 footnote 174], where Tsitoghdzyan explains that Sarandon, after being sued by Plaintiff in Supreme Court, requested that the Sharas pay her attorneys. Once she removes the lawsuit to SDNY, and Plaintiff joined the other defendants, the Sharas, who had agreed on paying Sarandon's attorneys, found it convenient to keep the same one for them—because they had already accepted to pay Sarandon's Motion to Dismiss.

The Court must treat all persons equally, but in evaluating the unconscionability it must also assess who is who in each particular situation. Defendant Sarandon deserves to be treated rightfully by law, yet that does not include forgetting what advantages, power, influence she has on others *as a consequence of who she is* in order to assess Plaintiff's pleadings as regards to this and other claims.

The Report, on page 23: "Balder alleges unfairness, but not unconscionability." Balder *is* a pro se litigant, the Court at times forgets, but he alleges sufficiently to *infer* unconscionability. Even D. Shara accuses Plaintiff of being deluded as regards to Sarandon, to believe her, **that all was "in your [Plaintiff's] head"**. Those elements, although not attached to the exact legal term "unconscionability", which Plaintiff did not known at all, show that he refers to that principle without mentioning it explicitly precisely because of is utter ignorance of the law. The same principle and law standard that has operated intermittently across the Report should have operated here: Plaintiff's pleadings *show* unconscionability, as much as the principle itself may not have been mentioned in a recital or formulaic manner in the TAC, but the TAC's

allegations *show* he was deluded by Sarandon's friendly representations coupled with her stardom and professional reputation, and the TAC shows Sarandon acts shockingly unfairly and is not an honest person as regards to her representations and her acceptance of Plaintiff's offer by performance—in fact, the Report considers that she is liable for tortious interference with business relations. Sarandon represents to Plaintiff by numerous means that she will allow the film to be made and to be distributed.

The Report, on pg. 23, states: "Sarandon's false promises to sign talent releases rendered Balder's work virtually unpaid, but **Balder took on the risk of unpaid work when he agreed to profit as compensation**." Sarandon accepted 2016's offer by performance, Plaintiff could only believe the rest of the promise would be fulfilled, as she had obligation to [argued before].

The Report, pg 23, adds to our dismay: "Balder could have avoided his detrimental reliance by simply requiring Sarandon and Tsitoghdzyan to sign talent releases *before* filming their scenes". The Court is not addressing the allegations, **but simply shame-faces the Defendants' deluded victim—for being deluded**.

By the same principle, the Court could say that Harvey Wainstein's victims should have thought *before* meeting him and/or believing in his standing and reputation in the industry. Wainstein had a hit-list of people, mostly women, he wanted to harm by professional means because they did not give him what he wanted. Sarandon has done exactly the same here in that respect, and all because Plaintiff expressed clearly and privately his doubts as regards to her true intentions joining the Film. Many of Wainstein's victims were deluded, but we see no court has dared to shame-face them.

Tsitoghdzyan's promise that he would present the talent release to Plaintiff for his son, a minor, stems from 2017, when that sequence was shot, and not from his writing that he would grant all rights ["his image, artworks and studio"] to D. Shara [¶  ]. Plaintiff believed it, and he was deluded.

Accordingly, promissory estoppel applies as an exception to the Statute of Frauds in N.Y. Civ. Rights § 51, and Sarandon's and Tsitoghdzyan's alleged oral promises to sign talent releases are enforceable.

**B. Against David Shara.**

D. Shara promised to obtain the talent releases of the people he invited to be part of the Film and others he made himself responsible for to obtain. A claim for promissory estoppel is precluded where the plaintiffs "do not point to any promise separate and apart from the obligations under the contract" since promissory estoppel is "designed to provide a remedy in the absence of a contractual obligation."[43]

The TAC contains numerous instances that allege what D. Shara promised. If te Court considers the contract to be unambiguous, then the promissory estoppel claim should have been raised here, since in that case Plaintiff's claim against D. Shara points to "promises and obligations apart from the obligations under the contract."

There is more than simply oral evidence in the TAC itself regarding D. Shara's promise to obtain the talent releases. "there was since October-November a budget approved for execution of film festival circuit into 2019, and they had decided to have an Oscar-qualifying theatrical release in the US by summer 2019" [¶ 147]. it is impossible to decide on that kind of distribution, without not obtaining the talent releases. The existence of those plans enacted shows the mind of Plaintiff and D.

---

43  Kyusung Cho v. Youn Tae Yoo, 2010 WL 2469969, (N.Y. Sup. Ct. June 2, 2010); Four Finger Art Factory, Inc. v. Dinicola, No. 2000 WL 145466, *8 (S.D.N.Y. 2000).

Shara, and infers the plausibility of the promise by D. Shara to his partner. "After Plaintiff shared some budget proposals, David Shara answered on October 23, 2017: "Thanks for the update and keep up the good work!!! I have shown the trailer 10 times andpeople LOVE it...Love it Let's talk budget, let's talk music, order of scenes/storyline, VFX, filmfestivals, PR etc" [¶ 87] "Invoices of 2019, from budgets of 2019, show that what hadbeen agreed was in now course of performance: the US Oscar qualifyingtheatrical release and the North America and English speaking countries distributing directly sent in movement by Plaintiff and David to securehigher revenue avoiding secondary market actors for those markets. In fact, invoices show cost of translation for the languages to be added as anoption in Apple TV platform, including many other languages differentthan English." [¶ 101] and its Footnote 77: "Budget memos shared, approved of and congratulated by David show other terms agreed on, andwere paid. They haven't been included not to make this Complaint longer, but are at the Court's disposition."

"Emails exchanged as part of a budget in October 5, 2017, includes the DCP costs [Digital Cinema Package], a cost is only incurredfor if distribution is intended, in the context of distribution affirmative discussion. It mentions the possibility of obtaining under the same budget "unlimited positive copies" for theatres, and the section "TheatersDistribution, bicoastal" elaborates on the theatrical release under their control, and another section "Internet Distribution Costs" leaves nodoubt as to the online distribution being hands-on by them, and set up by Plaintiff, as simply part of the agreement initial, and the agreed onmonetization step for North American and English speaking languages." [¶ 104].

Plaintiff sufficiently shows that there were many actions beyond the limited and insuficient scope of the contract, that otherwise corroborated that "point to promises separate and apart from the obligations under the contract" and since promissory estoppel is "designed to provide a remedy in the absence of a contractual obligation, D. Shara is liable for promissory estoppel, and the Court should raise the strongest argument from the pro se pleadings.

### IX. UNJUST ENRICHMENT

**A. Against Defendants Tsitoghdzyan, Honey Shara and D. Shara.** Tsitoghdzyan obtaining a copy and using it privately for years represents a source of unjust enrichment. He infringes unlawfully Plaintiff's copyrights, as the Report concludes, then uses it for his own direct benefits.

The copy obtained by Tsitoghdzyan helps him and his sales agent, D. Shara, to sell more paintings. Honey Shara requests the copy of the Film from Plaintiff, copyright owner, because she wants to hand it to Tsitoghdzyan and to facilitate his having it. Honey Shara acts in coordination with D. Shara. D. Shara benefits from Tsitoghdzyan having a copy, and that is why he is interested in him obtaining it, because he is Tsitoghdzyan's sales agent, and makes profits out of any sale. The film only helps them to sell better, and catering it to collectors, other art dealers and privately to other influential persons.

D. Shara breaches of contract are aimed at depriving Plaintiff of his right to 'fruits of the contract', yet at the same time coordinates [civil conspiracy] Tsitoghdzyan and Honey Shara's unlawful copyright infringement to unjustly enriching himself out

of the usage of the Film to better sell Tsitoghdzyan's paintings, where is a 50% partner on any single sale worldwide.

Honey Shara, being a partner of D. Shara, joins this actions (as described) in civil conspiracy (as argued clearly below), in self-interest, because the 50% of profits on any of Tsitoghdzyan's sales only enriches her at the same time.

The Film costs years of dedication to Plaintiff. They obtain it [copyright infringement coordinated with D. Shara] to take advantage of Plaintiff's work, while at the same time actively executing torts to harm Plaintiff.

This does not "simply duplicate a conventional contract or tort claim". The Report [Section VIII, pg. 24] concludes: "Because such conduct is not covered by the Producers' Agreement, Balder's breach of contract claims do not duplicate his unjust enrichment claims."

All three are liable for unjust enrichment, since the Film unlawfully obtained helped them materially, and was used with that aim, to sell more and make more profits out of Tsitoghdzyan's sales.

**Defendant Sarandon.**

Sarandon accepts by performance Plaintiff's 2016's offer, as already presented in detail before. Sarandon takes *parts* of Plaintiff's 2018's offer **not objecting to any part of it**, *the prints*, as a material compensation for her participation in the Film. This would represent unjust enrichment, since she did not follow up with the other terms of the offer presented by Plaintiff, neither with the 2016's offer, which she accepted by performance.

This does not "simply duplicate a conventional contract or tort claim". The Report [Section VIII, pg. 24] concludes: "Because such conduct is not covered by the

Producers' Agreement, Balder's breach of contract claims do not duplicate his unjust enrichment claims."

The benefits retained by Defendants at Plaintiff's expense were tangible. Sarandon is liable for unjust enrichment.

**C. Objection to Report's conclusion**. The Report, pg. 24 refers to "mildly elevated public attention" as a consequence of the film festival. The Court describes it as 'mild' because it takes into consideration Defendant Sarandon's status as a film star. Yet the Court should measure the enrichment against that metric, or else it would be unjustly applied: the question is if Sarandon did enrich herself or not out of that, not if that is mild in comparison to her career, while at the same time executing multiple torts.

Applied to Tsitoghdzyan, however, a little to not known painter, the impact of 80 film festivals, many of them of great statutes, cannot be considered a 'mild heightening", but a very clear positive influence. We know how he thanked it.


## X. BREACH OF FIDUCIARY DUTY

Plaintiff accepts the Report & Recommendation's conclusions.


## XI. CIVIL CONSPIRACY

### A. Against Sarandon, Tsitoghdzyan, Honey Shara and D. Shara.

The Report [section IV. Pg 20] establishes the coordination between Honey Shara, D. Shara and Tsitoghdzyan to unlawfully cause copyright infringement, concluding on pg. 21: "[…] as framed by the TAC, no reasonable person in Balder's position would have thought that Honey Shara's "friend in Canada" was

79

Tsitoghdzyan." A civil conspiracy cause of action serves to "connect the actions of separate defendants with an otherwise actionable tort" [Report, section X. pg. 25]. The separate actions of Honey Shara and Tsitoghdzyan are perfectly connected and coordinated in time, as framed in TAC, with an actionable tort, copyright infringement, that the Report establishes should not fail in light of the pleadings. Plaintiff sufficiently alleges [¶¶ 193], in the same frame of TAC, that D. Shara is actively behind this set of events. Therefore D. Shara, Tsitoghdzyan and Honey Shara are liable for civil conspiracy.

Plaintiff sufficiently alleges that Tsitoghdzyan and Sarandon tortiously interfere with business relations and tortiously interfere with the Producers' agreement, the Report acknowledges. The pleadings of Plaintiff "connect the actions of separate defendants with otherwise actionable tort[s]." Tsitoghdzyan and Sarandon conspire to breach the Producers' Agreement in two ways, not paying invoices and thwarting distribution. They pressure D. Shara with unlawful legal threats to get invoices paid late to "cancel the festival circuit", and they render it unprofitable by not providing the talent releases to Plaintiff when he requested them. Tsitoghdzyan and Sarandon conspire to tortiously interfere in business relations, by using the same pressure and unlawful legal threats on D. Shara to get the cancellations of the two projects alleged by Plaintiff. Therefore Tsitoghdzyan and Sarandon are liable for civil conspiracy.

Defendants actions are a multi-pronged approach that is clearly coordinated with one aim: to harm Plaintiff by all means possible and for as long as possible.

D. Shara and Tsitoghdzyan acted in civil conspiracy for Tsitogdzyan's tortious interference with the Producers' Agreement and D. Sharas breach of contract as

regards to the painting not being finished and in right quality by the date stipulated by the Producers' Agreement. We recall and incorporate here, without need to repeat them, the arguments of the section "**D. Shara's breach of contract for painting's late delievery**".

The TAC sufficiently alleges that D. Shara acts in concert with co-defendants to harm Plaintiff, to please them and cowered by their legal threats at the beginning, then in absolute concert, even "paying Sarandon's attorneys". See TAC, recorded conversation between Plaintiff and Tsitoghdzyan. Tsitoghdzyan acknowledges there Sarandon requests the Sharas pay her attorneys.

Defendants civil conspiracy is directed, among other things, to cause **unreasonable restrain trade of the Film**. The Sherman Act establishes when several parties are in secret or concerted unlawful agreement to limit a third party's rights and to restrain trade. All defendants are concerted to block any possibility of distribution of the Film in order to limit Plaintiff's right to compete economically. Their coordinations amount to negative monopoly on the distribution of the Film, all to deprive Plaintiff of the peaceful enjoyments of his rights to the fruits of the contract. Since Plaintiff is New Jersey, and Defendants in New York, interstate commerce regulation needs of the Act applies.

Therefore, all Defendants are liable for civil conspiracy and that claim should not fail.

## XII. DURESS

### A. Against Tsitoghdzyan and D. Shara.

We incorporate here all the Objections described in the previous section "**II. Contract Obtained Under Coercion By D. Shara and Tsitoghdzyan**" of these Objections. For the reasons stated there, D. Shara and Tsitoghdzyan are liable for Duress and that claim should not fail.

**B. Against Honey Shara.**

We incorporate the previous allegations at IV Tortious Interference With Contract / B Against Honey Shara for economy, and continue from there:

Plaintiff was not legally obligated to present any apology, neither to give a copy of his taxes to Honey Shara. Plaintiff sufficiently alleges by describing Honey Shara's actions that he was being compelled to give a copy of his taxes in the midst of coercive **actions *executed by her directly***. She was aware of the pressure put on Plaintiff, and she used it to obtain things from Plaintiff unlawfully.

The Report, pg. 26, states: "A request does not constitute compulsion, despite Balder's claim that he 'felt coerced'". The Court does not take into consideration the allegations to establish why Plaintiff 'felt coerced'. According to the allegations as described before and below, Plaintiff was in fact being coerced, irrespective of feeling it or not: "Tigran via an attorney, Carl Bedell, in an incredible act of unlawful copyright infringement, requested, and at that 'formally', a copy of the film. Plaintiff **resisted** this because **he knew that he had no obligation to do it**, and because that was a clear interference with the distribution." at ¶ 193. Plaintiff alleges that he knew he was being coerced to do something that 1) he had no obligation to do and 2) imperiled the distribution of the Film. TAC, at ¶ 193: "Plaintiff had to give way **against his will**". Giving away against one's will is the result of compulsion not of conformity. The Report confounds forms and ways of referral to fact, with the decisive facts

themselves: it is clear that there is compulsion, or else Plaintiff would have not done things he clearly opposed to do when he was requested, things he alleges he knew he had no obligation to do, even more, wrenched from him by unlawful means.

Honey Shara, by obtaining a copy by copyright infringement, was in fact gravely interfering with the Film's distribution, and interfering with the contract between Plaintiff and D. Shara.

No reasonable person in Plaintiff's stead would provide tax confidential information, in the midst of such manoeuvres of Honey Shara and others as described, in the midst of such hostility directed against him, knowing he had no obligation to do it, unless other forces were operating over him. The Court chooses not to see the compulsion apparently for lac of formulaic allegation,, yet the compulsion is there in plain sight because of the facts and setting described.

Honey Shara knew that Plaintiff's family will also suffer, and she 'negotiates' with that potential suffering of Plaintiff's most precious family member to coerce Plaintiff into doing something he did not want to do. That did not happened once, but continued for months and months. "Frustrated by Plaintiff's refusal and arguments, so that she shamelessly went on to say: **"Do it for Bella".** [referring to Plaintiff's wife, basically 'doit to avoid suffering to your wife']. At this point Plaintiff must confess that he was **aghast at the coercive tactics that were being forced upon him. That Honey Shara affirmed that Plaintiff's wife was hostage of their cruel, coercive manipulations took the situation on a different level**" at ¶ 183.

The request of the copy of Plaintiff's taxes and request of a copy of the Film that translates into copyright infringement by Honey Shara cannot be evaluated without taking into consideration this set of circumstances. Honey Shara is submitting

Plaintiff to duress by all those actions and by threatening even the wellbeing of his family if he does not cede.

That Plaintiff "provided them, hoping that doing so would 'bring some order to the situation of unpaid invoices'" only proves the success of their high pressure, coercive tactics and compulsion—the *success of the duress*, not that it was not being employed.

It must be noted, in fact, that the chronological order was as follows: first Honey Shara requested the copy of taxes, which Plaintiff objected to clearly in writing. Honey Shara insisted while not paying any invoice [to "cancel the festival circuit"], which was submitting Plaintiff's business to duress. She requested the taxes again. Once she got it, after Plaintiff denying a copy of the Film to Tigran simply because he wanted to cater it to audiences as a consequence of a big solo show in Yerevan, Armenia, she requested the copy of the Film, which translates in her copyright infringement. Honey Shara was testing the limits of her tactic, and continued to break the will of Plaintiff by not paying any invoices. That Plaintiff ceded because the invoices were not being paid, and it is Honey Shara who is stating very clearly that she won't pay them unless her demands met by Plaintiff—unless Plaintiff did things he had no legal obligation to do, is not an admission of any kind, but the result of duress' success.

Coercion may be not solely alleged by simple mention of formulaic compulsion: context and detailed, particularized circumstances may allow even more clearly its inference. In fact, few people who are aware of employing the coercive tactics—and Honey Shara has always been aware—will write it down directly. It is the *actions* that may allow to infer the compulsion itself, sufficiently alleged by Plaintiff, even if Plaintiff does not formulaicly allege compulsion.

Honey Shara's coercive announcements and actions, suggesting Plaintiff's family and business will also suffer the consequences, amount to compulsion: they were unlawfully forcing him to do things he had no obligation to do, and to which he objected clearly and repeatedly. Yet Honey Shara continued not paying invoices under the premise that an apology should be presented, and continued demanding from Plaintiff things that he had no obligation of doing—until she got them.

Therefore Honey Shara should be tried for duress and obtaining business secrets and confidential information by unlawful means.

## XIII. DISCRIMINATION

## ALLEGATIONS AGAINST DEFENDANT SARANDON NOT ADDRESSED

"Plaintiff felt bad at Sarandon's silent treatment in the light of growing recognition being awarded to the Film, and could not understand this kind of discrimination" [TAC, ¶ 146].

"[…] the disparaging treatment Plaintiff was submitted to on a regular basis after Sarandon's tortious, retaliatory interference, **the toxic environment Sarandon had created thanks to the low moral standards and lack of principles of David Shara.**" [¶ 194]. Sarandon's "**rude forms sent to Plaintiff's wife simply because they were offering Sarandon** signed and framed prints" [¶ 111]. "Sarandon's office tone changed radically when she or her assistant exchanged emails directed to people she did not consider 'rich' or 'important'. **Her kindness in these emails is in direct proportion with the money the interlocutor she talks to she understand has**" [¶114]. "**Sarandon's office and Sarandon's assistant**

had shown a discriminatory tone in dealing with Plaintiff's team." [¶ 116]. "**Sarandon's silent treatment** in the light of growing recognition being awarded to the Film, and could not understand this kind of **discrimination**." [¶ 146]

Therefore the TAC contains sufficient allegations for the Court to raise an argument for discrimination at workplace by Sarandon against Plaintiff.


## IV. NEGLIGENT [NIED]

## (OR INTENTIONAL [IIED]) INFLICTION OF EMOTIONAL DISTRESS

Plaintiff sufficiently alleges in the TAC [at ¶ 370] that Defendants' actions are the direct cause of him suffering up to this day a major depression under clinical treatment.

"NIED occurs when a person, through extreme or outrageous behavior intentionally (or recklessly) causes severe emotional distress, mental trauma and/or bodily harm to another." "There need not be bodily harm to establish this tort. A plaintiff may recover damages for both the emotional harm and physical harm." Although under New York law, courts — including the New York Appellate Division, First Department (the "First Department") — have historically required a showing of extreme and outrageous conduct to sustain a cause of action for negligent infliction of emotional distress ("NIED"), in *Brown v. New York Design* Ctr., Inc., 2023 WL 2417772 (N.Y. App. Div. 1st Dep't Mar. 9, 2023), however, the First Department reversed itself on this point, **holding 6-0 that NIED claims do not require such a showing.** This holding put the First Department in line with the Appellate Divisions for the Second, Third, and Fourth Departments, each of which has **eliminated the**

**"extreme and outrageous conduct" requirement in recent years**[44]. The First Department's decision in *Brown* also confirmed that plaintiffs asserting an NIED claim may recover for emotional harm, even if they were not physically injured[45].

Plaintiff sufficiently alleges all elements of this tort.

D. Shara's breaches of contract and fraud [fraudulent, reckless representations of value] against Plaintiff causes severe "emotional stress, metal trauma" to Plaintiff, who sufficiently alleges he has suffered the consequences since 2019, becoming a full-fledged major depression and major anxiety disorder clinically treated since mid-2022. Defendants spurn any and every occasion to solve the situation. Plaintiff alleges sufficiently that he tries to solve it in 2019, 2020, 2021, 2022 and 2023, with and without his previously representing attorneys, by directly contacting D. Shara and his attorneys. The Court ordered Defendants to try to solve the issue in good faith in February 2023. The result is part of the record: they spurned this option. In the midst of the COVID-pandemic, when the film industry is virtually ground to a complete halt, Plaintiff tried to sell the Painting and discovered fraud behind it. D. Shara *and* Honey Shara answer Plaintiff's demands with an attempt to coerce him out of his rights to the fruits of the Producers' Agreement.

Therefore D. Shara is liable for the infliction of emotional distress to Plaintiff and his family for acting in civil conspiracy with all other Defendants.[46]

Defendant Sarandon breach of contract [2016's acceptance by performance of offer, then denying to Plaintiff fulfilling the offer many years later to block distribution at all costs as a retaliation to Plaintiff's opinions], Sarandon's tortious

---

44  See Taggart v. Costabile, 131 A.D.3d 243 (2d Dep't 2015); Doe v. Langer, 206 A.D.3d 1325 (3d Dep't 2022); Stephanie L. v. House of the Good Shepherd, 186 A.D.3d 1009 (4th Dep't 2020).

45  Brown, 2023 WL 2417772, at *1.

46  Throughout this section we avoid references to the TAC because they are so conspicuous before as regard to each instance of pleadings that would only be burdensome for the Court to be encumbered with its long list of paragraphs that give credence of the presence of those allegations in the TAC.

interference with business relations [deprives Plaintiff of two new projects], and Sarandon's tortious interference with the Producers' Agreement [she demands the breaches of D. Shara], acting in civil conspiracy with all other Defendants, cause infliction of severe "emotional distress, mental trauma" to Plaintiff and his family. On same occasions as D. Shara, Sarandon spurns any opportunity to settle and stop the situation that causes the infliction of emotional distress.

Therefore Defendant Sarandon is liable.

Tsitoghdzyan's fraud, copyright infringements, breach of contract (acceptance of offer by performance related to him and to his son, a minor he introduces in the film) tortious interference with contract and tortious interference with business relations in civil conspiracy with all other Defendants cause infliction of severe "emotional distress, mental trauma" to Plaintiff and his family. On same occasions as D. Shara, Tsitoghdzyan spurns any opportunity to settle and stop the situation that causes the infliction of emotional distress.

Therefore Tsitoghdzyan is liable.

Honey Shara's copyright infringements, tortious interference with contract and tortious interference with business relations in civil conspiracy with all other Defendants cause infliction of severe "emotional distress, mental trauma" to Plaintiff and his family. On same occasions as D. Shara, Honey Shara spurns any opportunity to settle and stop the situation that causes the infliction of emotional distress. Honey Shara is liable.

Therefore all Defendants are liable for this claim, is inferable from pleadings, and should not fail against them.

## XV. DEFAMATION

The Report concludes that the Defamation claim against Tsitoghdzyan and D. Shara should fail on account of the statute of limitations. Plaintiff, however, requests those facts not be forgotten, simply because they illustrate the recurrent patterns of bad faith and fraudulent representations they follow in the public sphere. Additionally, those allegations are also proof of extrinsic evidence as regards to the mind of the parties D. Shara and Tsitoghdzyan in their willingness to distribute the Film. That only shows clearly the impact of Sarandon's tortious interferences.

## LEAVE TO AMEND

Plaintiff was present in all the filmings of the persons D. Shara suggested to participate in the Film. In those filmings Plaintiff exposed their intentions to distribute the Film to each person. D. Shara told Plaintiff not to request at that time their talent releases. Plaintiff trusted D. Shara that he would request them later. Those persons, however, accepted by performance (allowing to be filmed after proposing dates) the invitation of Plaintiff and D. Shara to be part of the Film. D. Shara made himself responsible to obtain their talent release at a later date, yet those persons promise to fulfill the entire offer was made to both, Plaintiff and D. Shara. Although D. Shara had affirmed he can obtain their releases 'in an expeditious manner', he has not obtained them ever—to thwart distribution and harm Plaintiff.

Plaintiff has the right to request those talent releases from all those persons, and since they seem to act in coordination with D. Shara, they have not provided them. Plaintiff has the right to request it again in Court and to claim damages to them for their breach of contract with Plaintiff, resulting in thwarting the distribution.

89

None of these persons ever reported that they did not wish anymore to be part of the Film.

Plaintiff has the right to obtain full performance of the promise they fulfilled partially by attending the filming, because they were informed of the fact that the Film would be distributed later, and they simply expressed their interest in being part of it not requiring anything else.

Since this claim arises from the same set of occurrences, it is only logical that they should be joined as co-defendants in this action, since starting a different action so intertwined with this one, the one that contains the most relevant facts, is only illogical also from the point of view of judiciary economy.

Plaintiff, as a pro se litigant, did not know that he could have done this previously, and thus requests leave to amend to join them to this complaint.

The Report, pg. 28: "Second, amendment would be futile because the insufficiencies remaining in Balder's complaint could not be cured with amendment." The Report does not contemplates the situation now presented to join other parties.

From the Report we see that because of the way some pleadings have been written (by a pro se litigant) important claims are being left unjustly dismissed in clear contradiction to the pleadings. Pleadings from a pro se litigant must be submitted to less stringent standards and interpreted to raise the strongest arguments. On some occasions, the Court fails to follow that legal standard.

If short and precise amendment would cure such insufficiencies, right to amend should be granted, since the first and foremost purpose is to allow a just cause to be tried, and not to discard it as a consequence of some confusing pleadings, that come from a pro se, and that can be easily cured according to the already extant pleadings.

If a de novo review takes an in-depth evaluation of the objections and the TAC and applies or recommends to applying the legal standard expectable to pro se pleadings, and claims recommended to be dismissed are not dismissed, then there would be no need to ammend.

Yet the question here is that important claims, whose substantiation is obvious, should not be left dismissed simply as a consequence of confused or long pleadings that the Court has not paid enough attention to possibly due to important burden of duties in Court, by a pro se litigant who does not know the law, and from whom is not expectable to make 'perfect pleadings'. They can be cured.

## UNSETTLED CONSTITUTIONAL ISSUE

The Report goes on to state: ""American Mirror" received praise, awards, and distribution interest at film festivals worldwide."

Everybody wanted this film to be distributed since 2016, there were more than four years of work to reach the international prestige of a 'masterpiece', and all had to be destroyed because Plaintiff shared unfavorable opinions with someone who had been clearly ungrateful before [Sarandon], who had accepted an offer by performance coming from Plaintiff [Sarandon], and who had previously shared her unfavorable opinion about the film with Plaintiff. Plaintiff had right to reply.

As much as this is an irrelevant private exchange, it is at the core of the Complaint, and it is the very reason why all Defendants have done wrong.

Leaving those facts out or rasping the edges to level the field, ends up not addressing the elephant in the room: that a film considered a 'masterpiece' must be suppressed because its director/producer shares his opinions privately with one

person, a heavy wight in Hollywood, someone who previously states it very clear: "I don't have anything positive to say about your film." Plaintiff had his right to rebuttal. Yet the question is unsettled and constitutional: Plaintiff is persecuted, harassed to do things he has no obligation to do, his film's distribution destroyed, his professional prestige eroded, his opportunities erased, new projects canceled, because Sarandon wills it as a vengeance for Plaintiff using his basic constitutional right to his opinions.

The Report, by being oblivious of sets of facts, careless in considering *in totum* their intertwined connections, or choosing a more-lenient interpretation of the existing jurisprudence [avoiding drastically and against overwhelming evidence the need of considering extrinsic evidence and parole evidence rule exceptions as regards to the contract obvious incompleteness or its 'for profit' central purpose] avoids to address the 'elephant in the room', which is an unsettled constitutional issue: that all these wrongs clearly happen because Plaintiff shares opinions with Sarandon, and at that after she having shared first with him an unfavorable opinion about his Film. The origin of everything that happens after February 2019 is the fact that Plaintiff shares an opinion. Plaintiff was then harassed to present apologies, coerced to present apologies, is deprived of payment of invoices, projects, deprived of an Oscar-qualifying theatrical release, is told to suspend a festival circuit [that yielded an overwhelming collection of awards due to the quality of his work] simply because Sarandon, in coordination with D. Shara, Honey Shara and Tsitoghdzyan, all of them under Sarandon's influence, decide to wrong Plaintiff because he makes use of his right to defend his work, and to his constitutional right to opine and to express it freely.

At the nucleus of all this lawsuit lies a substantial constitutional question: that someone is being wronged because he made use of a right protected under the

constitution, his right to an opinion. Let's add to it that his opinion was absolutely private. This raises the bar because it shows there is no defamation whatsoever, yet he is persecuted by all means existing at Sarandon's hands.

It is important to see that the Report describes Plaintiff's answer as a "litany of insults and accusations". This paper has objectively analyzed Plaintiff's words: there are no insults of any kind under any definition of US laws neither NY state laws. There is no hate speech of any kind. There *are* unfavorable opinions, and also *facts*, and Plaintiff gives expression to his doubts as regards to Sarandon's true intentions joining the film, after years dealing with her and with persons close to her [Tsitoghdzyan] and close to Tsitoghdzyan [D. Shara]. The Report fails here. By describing as insults what cannot be considered as such under any law, by terming as insult what is opinion, the Report is trying to wrap the 'elephant in the room' behind a side-curtain. It is, however, too big not to be noticed.

That Sarandon has helped for decades congressmen and congresswomen and senators from New York State to be elected, contributing to their campaigns with personal involvement [Alexandra Ocasio Cortez, for instance, owes much also to Sarandon's involvement] is no secret. That congressmen and congresswomen do have, as a matter of fact, a bearing in the appointment of federal judges, is simply another fact of law. To pretend that Plaintiff is on equal terms anywhere facing Sarandon's influence, directly or indirectly exerted, is a pose that only badly disguises hypocrisy: we all know Sarandon works to manage a news cycle of public influence at all cost.

Sarandon turned her back on all she said, broke her promises and tried to ruin the Film as described in the TAC, because she did not get what she wanted from Tigran, not because the Film was not good enough, or respectful in all senses to her

image. D. Shara ["Agreed on all fronts"] acknowledges that all Sarandon wanted was to have her affair with a younger man, Tigran, who felt embarrassed and 'obliged' to her, but who resisted that kind of liaison. Only Plaintiff confronted Sarandon's unfair games, and when he did it, the others panicked.

Sarandon stumbled upon people who did not do what she expected from them, D. Shara knew that Tigran remained as nice as possible to Sarandon, but kept his distance as regards to Sarandon advances, and Plaintiff simply answered her clearly. Those things were not of her liking, because she is what now much more people have seen clearly recently: a hypocrite in search of privilege, abusive character of the star-system, someone who, under disguise of a pacifist, revels in divisive, anti-semitic rants publicly, a person who knows how to weaponize her opinions privately and publicly, and who did not doubt a moment in demanding under legal threats all sorts of harms against Plaintiff because he made use of a constitutional right to opinion.

This case, if necessary, will be presented to the Supreme Court. It won't stop at any circuit of appeals because there is a constitutional matter at issue, if all those torts can be executed as persecution of someone who uses his right to opinion, and at that in a new tweak of what has been too common in the last decades: the abusive tendencies of powerful members of the Film and Entertainment industry.

Simply because Sarandon is a battle-cry for those who do not know her at all, or simply because she is a woman, does not make her less guilty of her using her power and influence for exactly same purposes as other men in her industry. It is abusive. That she turned her back on years of work, or that she treated Plaintiff's team with disdain after contacting her, not to request to do any press but to ask her what to do with the Parajanov-Vartanov Award won by the Film for her, that she chose to do

94

those things simply because she could not inflate her ego as diva and because she did not get the sex she so much professes publicly to crave in general, and in this case from Tigran, is repugnant and it is disgusting. It was repugnant then, and it is repugnant now, and Plaintiff had, has, will have never anything to apologize about.

No reasonable person would have thought without personal and direct knowledge of Sarandon, that she would not complete her promises of 2016, and the offer of Plaintiff that she accepted by performance. It can be stated that she is a liar, but that does not solve the problem. To place Sarandon and Plaintiff on equal footing as regards to her promises is choosing a very lenient and permissive standard by the Court, where one was clearly deluded by the star, and when the star acts with enormous unfairness.

Allowing that, the Court would set an extremely low standard as regard to matters of contract, also, in light of D. Shara's and Tsitoghdzyan's duress and fraud upon Plaintiff and present in the contract.

The Report's opinion, at some points accuses the victim of being a victim, in oder words, argues that Plaintiff deserves whatever others do in plain bad faith, simply because he had not been able to prevent it. That is utterly wrong. If we consider the circumstances, this kind of standard of review would have made impossible the prosecution of Harvey Weinstain: it is the victims who must be heard, and proof reviewed in context. What would anybody think of a Report related to sexual assault victims in which the Court's opinion would be that 'the victim should have done more to avoid becoming a victim'? Public outcry guaranteed. But here the victim is a man, and the source of all evil, an only-apparent feminist. That in reality

Sarandon understands feminism as a revenge on men, and as a supplanting of the symbolic-patriarchal figure of man by that of an equally abusing woman, does not seem to solve the problems created by oppressive men—it simply substitutes them.

That Defendant Sarandon uses her influence, name, fame and outreach to sow dangerous discord is not new, although of late the tendency has been particularly clear for any impartial witness with her declarations on Jews in America, "getting a taste of what is to be a Muslim in America". That does not solve the underlying problem—but earns her headlines, which is what she wants at all cost.

If she has been able to go to those lengths publicly in the face of the world, what has she not been able of, *privately*, under the cover of influence yielded with secrecy and impunity, to retaliate against Plaintiff?  I remind the Court that a civil claim does not require the same burden of proof as a criminal case, that a pro se's complaint must be read to raise the strongest arguments, not to leave aside forgotten entire sets of allegations.


## PROCEDURE

Parts of the Third Amended Complaint [TAC] have not been taken into consideration. Recall that the Court struck the First Amended Complaint [FAC], Report pg. 4: "**Because the FAC was 175 pages with 70 additional pages of exhibits, the Court struck the FAC as overly long and directed Balder to file a Second Amended Complaint** ("SAC")." That was a rash decision. In fact, Plaintiff had to request not to invalidate the timing of statute of limitations of pleadings by simply striking the FAC and resetting the time. The Court corrected. With the SAC, Plaintiff, a disconcerted pro se litigant, found himself obliged simply to reduce his

pleadings drastically, which afterwards proved to be a mistake that the Court tried to remedy allowing Plaintiff filling the TAC. However, whole sets of pleadings present in the TAC have not been addressed by the Report. We do not think the Court has been prejudiced against "long" pleadings, or more probably has acted under a great burden of duties. The Court deals with many cases and deadlines, and, a priori, there is a rejection of pleadings apparently long. In comparison with the extant evidence in this case, however, Plaintiff's pleadings present in the TAC are truly shortened not to burden the Court, yet the Court should address them all with equal application of legal standard, keeping all the allegations in scope and following its doctrine: "Where a plaintiff proceeds pro se, his complaint "must be held to less stringent standards than formal pleadings drafted by lawyers." When addressing a motion to dismiss, "courts must construe [a pro se complaint] broadly, and interpret [it] to raise the strongest arguments that [it] suggest[s]." This has not been the case.

The Court ordered a Settlement Conference date on January 4, 2024, [Doc. 94]. Hon. Netburn's "Procedures for Cases Referred for Settlement To Magistrate Judge Sarah Netburn" states " 5) Attendance of parties Required. **The parties—not just the attorneys—must attend in person.** A party's attendance **is essential** to the settlement process. It is **vital** that parties hear the other side's presentation and have the opportunity to speak with the mediator outside the presence of any adversary. **If a party is in prison, or the party resides more than 100 miles from the Courthouse and it would be a great hardship to attend in person, counsel may write to the Court seeking permission to participate by telephone**." Defendant Sarandon filed a letter on January 11, 2024, [Doc. 95] "pursuant to paragraph 5" stating that she "would be out of the country by that date" as all the

reason to justify her absence and requested attending via phone call, without providing any evidence that she would be out of the country—which is not a reason not to attend, because there was enough time to re-arrange her agenda, as everybody else. All other defendants confirmed attendance in person, as ordered and according to Hon. Netburn's Procedure. Plaintiff opposed that petition January 11, 2024, [Doc. 97] and requested the procedure to be applied according to its rules, allowing that medical reasons, if proven, could be understood as a good reason not to attend in person, or at all, depending on circumstances, but not unproven and overtly frivolous reasons. Magistrate Judge Netburn endorsed Sarandon's petition, not applying her own avowed principles as described in her aforementioned "Procedure" on January 12, 2024, [Doc. 98].

Therefore Hon. Netburn's "Procedures for Cases Referred for Settlement To Magistrate Judge Sarah Netburn" are either misleading or not applied equally. Plaintiff based his decision to get a Settlement Conference under Hon. Netburn's on reading Hon. Netburn's "Procedures". He relied on her paper. They seem to be clear and specific, and emphasize the importance of attending in person, as 'essential' and 'vital'.  It is not expectable that she would not apply her own rules, since they are very clearly described, with the exceptions to apply via telephone: domiciled more than 100 miles away from court, or incarcerated. A manifest justice principle should be enshrined as the proper context for the application of reasonable apprehension of bias' tests or real possibility of bias' tests.

Simply to state that one would be out of the country, is not something that we would expect Hon. Netburn's to accept as an excuse to bypass her own principles from many other defendants that are not as famous and influential as Defendant Sarandon.

98

That Sarandon purchased a ticket and stated she would be out of the country is neither a proper way to show cause. And if she had another cause, she should have prove it. Plaintiff expects Sarandon will be treated by the Court with same standards as anybody else. Plaintiff fears that is not being and won't be the case. We understand Hon. Netburn's "Procedure" emphasizing the value and import of personal attendance, establishing that is 'mandatory', and giving to it two exceptions [residing more than 100 miles away, or being incarcerated], **has an impact on her analysis and impressions**. For one reason, Plaintiff and all other Defendants accepted attendance *in person*, and **that includes the observation and consideration of gestures, voice and body language by the Court. Sarandon only will show her voice on the phone**. All other attendees are in material disadvantage—that is why her procedure states that it is 'vital' and 'essential' attendance in person—"not just the attorneys". What the Court has granted to Sarandon is a privileged exception to her 'Procedures', not an expectable impartial application of it.

If Hon. Netburn made such exception to the application of a very clearly stated principle of her Procedures, we do not know what other exceptions she may have considered and granted, or may consider and grant in the future, that represent disadvantages based on bias for Plaintiff.

This lawsuit is about Defendant's Sarandon's influence and coordination with others, and that is at the very center of the Complaint. Plaintiff has suffered gave consequences on account of her interference. It is only logical he is concerned in front of this situation.

In some cases, Hon. Netburn is not raising the strongest arguments of a pro se litigant according to the allegations present in the Complaint. Complaint for tortious

interference with Contract against Sarandon is granted dismissal by the Report, for instance, simply because "Plaintiff does not allege that Sarandon knew the contract." This Objections has shown Plaintiff alleges it, and several times and from different angles, in the TAC.

In most cases, as specifically detailed in this Objections, Hon. Netburn does not apply the law standard she briefly notes before addressing each cause of action, choosing to discard them either because she does not remember sets of allegations (therefore not taking them into consideration, for instance duress in the creation of the Producers' Agreement), or because invariably the exceptions provided for the application of law [parole evidence rule exceptions, for instance] and legal standard are directly set aside, choosing straight lines that cut like scissors through the Complaint, leaving aside strong arguments, unreferenced and unraised.

As regards to time, Hon. Netburn needed around eight months to address the TAC and the Motion to Dismiss once the last paper filed [May 1, 2023, Doc. 83[47]], which only means she was not in need of more time.

This is not a claim for bias against Hon. Netburn, neither a request of recusal. We think a packed agenda of cases may have weight on some of her conclisions as objected, perusal can cure them, and we express thankfulness for her work and the overall attention of the Court to this case.

However, Hon. Netburn's application of the settlement conference procedure, in combination with some dispatched conclusions in her Report, raises certain concerns in a case that arises from the influence of a person, Susan Sarandon, who stops at nothing to get what she wants by any means at her hands as a consequence of blind faith (hers and others') in her public profile.

---

47  Defendants' "Reply memorandum of Law in further Support of Defendants/ Motion to Dismiss".

## CONCLUSION

Plaintiff has been coerced, harassed and unfairly treated. From 2019, this has happened under direction of a well-known member of the star system, Susan Sarandon, who has used her overwhelming prestige, influence and fame to manipulate Plaintiff's partners and collaborators into wrongdoing against a little to no known filmmaker and his family, for her own vindictive motivations and satisfaction after Plaintiff held privately unfavorable opinions about Sarandon's dubious intentions. This has happened because Plaintiff addressed her ungratefulness without fear, because Plaintiff defended his work without fear, because Plaintiff answered her unfavorable opinions with his own opinions without fear,  because he expressed his doubts as regards to her true intentions joining the film without fear, and because Plaintiff stood and stands by his opinions without fear.

Finally, Plaintiff has a proposition for this Court. It is a 'test' to be run with some mental effort, and it is as follows: Taking all the allegations as they stand, *without modifying absolutely anything*, Plaintiff proposes to change *only* the gender of some actors in this complaint without changing their age. Imagine Plaintiff were a woman in her mid-40s, and not a man, Tsitoghdzyan a woman instead of a man in his late-30s, and Sarandon a man instead of a woman. Once the genres are changed, how things stand? At the time of the start of these events, Plaintiff would be a woman who asserts her worth as a little to not known filmmaker in the difficult and all-male-dominated film industry; Tsitoghdzyan a very attractive artist woman in her late thirties who courts lots of attention on facebook; Sarandon a powerful male film-star

in his early 70s with a public track-record of his penchant for relationships with much younger women—in fact, just at the moment of joining the Film in 2016, Sarandon had ended publicly a relationship with a man in his mid-30s. What happens if D. Shara "agrees on all fronts" as regards to the powerful male star's turning his back on the film not because of its quality, but because the attractive late-30s artist woman wants to be his friend but *not* his sexual partner? What happens if the female filmmaker in her mid-40s stands up to this situation, which is coupled with utter disregard to what the film-star represented, stands her ground in the face of this all-mighty male figure of the industry, and finally confronts such iconic filmstar in his early 70s…? Is it all the same after running this test? What would be the outcome if after all she—the filmmaker—is 'cancelled', film and projects, by wrongful means because D. Shara, afraid of the male iconic filmstar's influence and power and litigation threats, fearful of what impact could that have on his diamond business, caves in rapidly and does anything to deprive her—the filmmaker, his partner—of the "fruits of her contract". How would be the Report and Recommendation? And the result after reading this Objections? And last but not least: what would be the public outcry, if they found it out…?

It *should be* the *same* result.

If we strife for a just society, wrong is wrong no matter who does it. It is up to the discretion of the Court to run this test that Plaintiff proposes, which does not represent any kind of disadvantage to the impartial application of the law neither to the rights of Defendants.

For the foregoing Objections and their arguments and allegations present in the Third Amendment Complaint, Plaintiff respectfully objects to the Magistrate Judge's Report and Recommendation, since it forgets to address entire sets of allegations well connected that needed the application of the Court-avowed principle of raising the strongest argument of pro se litigant's complaint, and reading his pleadings under less stringent standards—inferring from what is present in the allegations the strongest argument. Defendants' Motion to Dismiss should be partly denied, and the causes of action incorporated or completed as regard to each Defendant, or the Complaint be amended to cure the pleadings that show simply formal errors related to lack formulaic allegation that Plaintiff was and is not aware of, that are bringing direct and contradictory dismissals instead of raising the strongest argument.

Respectfully submitted,

/s/ Arthur Balder

All other parties via ETC.