**IN THE UNITED STATES DISTRICT COURT**

**FOR THE SOUTHERN DISTRICT OF NEW YORK**

_____x

ARTHUR BALDER,                          Case No. **1:22-cv-06401-JLR-SN**

      *Plaintiff,*

 - against- -

SUSAN SARANDON,
DAVID SHARA,
HONEY SHARA,
TIGRAN TSITOGHDZYAN

      *Defendants.*

_____ x

**PLAINTIFF'S PARTIAL OBJECTIONS TO U.S.M.J. SARAH NETBURN'S REPORT AND RECOMMENDATION**

i

**TABLE OF CONTENTS**

STATEMENT OF FACTS……………………………………………………......…1

STANDARD OF REVIEW…………………………………………………………1

OBJECTIONS………………………………………………………………………1

I. BREACH OF CONTRACT……………….…...……………………………………1

A. Plaintiff Adequately Plead Breach of Contract against David Shara as a Result of (1) Late Payments of Invoices and (2) Not Providing Talent Releases, both to Thwart Distribution and Maximize Harm…………………………………………………………1

B. Plaintiff Adequately Plead To Satisfy Parole Evidence Rule Exception Use Against David Shara's Breach of Contract...……………………………………………………9

C. Plaintiff Adequately Plead Breach of Contract Against Sarandon Related to Plaintiff's 2018's Offer and Her Acceptance by Performance………………….……………12

D. Plaintiff Still Sufficiently Alleges Breach of Contract Against Sarandon as a Consequence of Plaintiff's 2016's Offer and Her Acceptance By Performance………..14

E. Plaintiff sufficiently alleges breach of contract against Tsitoghdzyan, and against Tsitoghdzyan as regards to introducing his son, a minor…………………………………18

II. DURESS………………………………………….…...…………………………19

A. Plaintiff Adequately Plead Contract was Obtained under Duress and Fraudulent Representations Exerted by Shara and Tsitoghdzyan, Justifie Parole Evidence Rule Exception……...……………………………………………………..………19

B. Plaintiff Adequately Plead Duress Against Honey Shara……………………………25

III. TORTIOUS INTERFERENCE WITH CONTRACT………………………………27

A. Plaintiff Adequately Plead Tortious Interference With Contract Against Sarandon. …………….…..………………………………………………………..………27

B.  Plaintiff Adequately Plead Tortious Interference With Contract Against Honey Shara…………………………………………………….……………30

C. C. Plaintiff Adequately Plead Tortious Interference With Contract Against Tsitoghdzyan………………….…..…………………………………..………32

IV. TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS………………32

A. Plaintiff Adequately Plead Tortious Interference with Business Relations Against Honey Shara…………………………………………………………………..………32

B. Plaintiff Adequately Plead Tortious Interference with Business Relations Against Tsitoghdzyan…………………………………………………………………..………33

C. Plaintiff Adequately Plead Tortious Interference with Business Relations Against David Shara…………………………………………………………………..………34

LEAVE TO AMEND, UNSETTLED CONSTITUTIONAL ISSUE & CONCLUSION …………………………………………………………..…………………...35

Arthur Balder ("Plaintiff") respectfully submits his Objections to the Report and Recommendation ("R&R") by the Honourable USMJ Sarah Netburn, recommending that Defendants' Motion to Dismiss ("MTD") Plaintiff's Third Amended Complaint ("TAC"). [Doc. No. 86] (the R&R) be denied in part. The Contract is the "Contract"; "American Mirror: Intimations of Immortality" is the "Film". Emphasis is added unless otherwise indicated.

## STATEMENTS OF FACTS

TAC 's allegations & Exhibits are referred to herein, and expressly incorporated as Exhibit 12.

## STANDARD OF REVIEW

This Court's review is *de novo*, pursuant 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b)(3).

## OBJECTIONS: I. BREACH OF CONTRACT

## A. Plaintiff Adequately Plead Breach of Contract Against David Shara as a Result of (1) Late Payments of Invoices and (2) Not Providing Talent Releases, both to Thwart Distribution and Maximize Harm.

Among others, Shara breaches the Contract's distribution provisions [TAC's Ex. 7, pg. 1 *Terms*, ¶ 6]:

> The Director/ Producer [Plaintiff] **will inform and discuss any distribution possibilities with** the Executive Producer [Shara], **both being informed in due time to ensure the best performance possible of the business**.

Plaintiff alleged how and when such discussions took place and that Shara provided multiple written confirmations (reinforced 'by performance')[1] [¶¶ 29 (footnote 20), 87 (footnote 66)]. ¶ 101: "it had been agreed" "the US Oscar qualifying theatrical release and the North America and English speaking countries **distributing it [the Film] directly by Plaintiff and David Shara to secure higher revenue** avoiding secondary market actors for those markets." This is consistent throughout 2017, 2018, 2019 in budget memos exchanged and approved of by both in writing.  ¶ 101 alleges:

---

1    Uniform Electronic Transactions Act: (c) If a law requires a record to be in writing, an electronic record satisfies the law; (d) If a law requires a signature, an electronic signature satisfies the law.

"invoices show cost of translation for languages to be added as an option in Apple TV platform [...]". Footnote 77 [TAC, pg 86] adds: "Budget memos shared, approved of and congratulated by David show other terms agreed on, and were paid. **They haven't been included not to make this Complaint longer, but are at the Court's disposition**." Plaintiff submits them now as Exhibit 1 "2017-2020 Partners' Agreements".[2]  ¶ 104: "Emails exchanged as part of a budget on **October 5, 2017,** include the DCP costs [Digital Cinema Package], a cost is only incurred for if distribution is intended, in the context of distribution affirmative discussion. It mentions the possibility of obtaining under the same budget 'unlimited positive copies' **for theatres**, and the section **"Theatres Distribution, bicoastal" elaborates on <u>the theatrical release under their</u>** [Plaintiff and Shara's] **<u>control,</u>** [...] **<u>"Internet Distribution Costs"</u>** leaves no doubt as to the **<u>online distribution being hands-on by them</u>**, and **set up by Plaintiff**, as simply part of the agreement initial, and the agreed on **monetization step for North American and English speaking languages**. David Shara is elated, and [...] **October 5**: **<u>"I sent 25,000".</u>** Invoices were sent. **Oct**. **23, 2017,** David's assent in his own words: 'Thanks for the update and keep up the good work!!!'." [More at TAC, footnote 78, pg. 89, verbatim.] New meetings and conversations take place in November and December 2017. **Jan. 23, 2018**, Plaintiff writes  "Renders of American mirror are ready I will bring a hard drive tomorrow to your office with the two versions"; D Shara answers: "I am in from 12-5:30 today". Another meeting takes place, decisions made, budget prepared, shared, approved of, paid for: **Feb**. **9, 2018**, Plaintiff informs, email title "Budget Situation" , two days later, Shara answers: "**Call me tomorrow to discuss**... Please prepare for me a spreadsheet of everything I and you have paid for... I need very detailed spending for my accountant. Thank you." As a consequence of those communications and meetings, as regards to distribution, the email titled "**Production Breakdown 2018**" **<u>spans Feb. 2018 to July 2020</u>**. [Exhibit 1]. Sent to Shara **Feb. 16, 2018**, Plaintiff informs: "here is the

---

2  The Court's order indicated that it was not necessary to include Exhibits in the TAC, that allegations were enough. Defendants have been pretending allegations not present in TAC. Therefore, not including Exhibits has been detrimental to Plaintiff.

2018 estimation. It contains what was mentioned and described before and a couple of notes based on how things are unfolding." The email details what they had discussed and agreed on: "Final SoundMix 25-30k"[3] "Final Graphics Main Titles (for film and 5 trailers)" "DCP negative (3 copies on hard drives, including the hard drives)" "Film festivals fees". Shara's intention and acceptance, also by performance (pays part of the budget): "**I will pay everything you ask" "I appreciate everything you are doing. I will send 25,000 next week**[4]**.**" **April 17 2018** same email thread, after more meetings of informing and discussions, Plaintiff provides updates. Shara accepts them, makes new payments to achieve the goals of their decisions. **July 31 2018,** conversation retaken, new conversations and meetings are summarized. Plaintiff informs: "conversations with distributors who access the doc theatres in NYC" "I am working now hard on **distribution and exhibition and commercialization**". In this email's section **"Distribution Standards"** Plaintiff summarizes in writing possibilities and conclusions. Plaintiff details new costs. **August 15, 2018,** Shara answers this email: "**I'll get you some money by the end of the month**" "I am moving to Florida and I have huge expenses." "**Thanks and do the best you can**." They discussed and agreed to split payments. **September 3, 2018**, Shara confirms: "I will care of it next week… **Please send me the list of the film festivals it is confirmed for.** Thanks." Plaintiff provides list, details, adds: "Sarandon hasn't helped at all once the film was made. The reasons for me are obvious." On a phone call Shara expounded on his negative conclusions about Sarandon. **September 20, 2018,** he affirms: "**You will be paid tomorrow.** Call me tomorrow and I will send the money." TAC, ¶136: "Plaintiff and David agreed on the expansion of the film festival circuit into the end 2019, planning a US Oscar qualifying theatrical release by the end of 2019".[5] [Also, ¶ 147] The same email has a continuation on **Feb-**

---

3   Contract, *Terms* ¶ 5: "The Executive Producer [Shara] agrees he **will pay any additional costs to composer of original soundtrack**, and the Director I Producer will provide the composer any necessary files to ensure his the optimal performance of his work."

4   Any condition precedent was waived by the Defendant's actions. Shara also paid submitted invoices from the plaintiff, which is another factor establishing acceptance by conduct/ performance.

5   Invoices paid confirm it. See TAC, pg. 115, footnote 98: "Attaching all those emails would be

**ruary 13, 2019**, describing budget from 2018, and then for 2019. This took place after several conversations. It contains **distribution elements**: **"Oscar-qualifying theatrical release", "US media outlets budget"**, **"extra film festival submissions fees"**, **"Securing Oscar-qualifying theatrical release** (IFC Center theatre in NYC)", and adds: "NY and LA Theatrical Release Publicity Budget", **"Academy Campaigning if Submission Accepted"** and "Travel Expenses to Film Festivals". On Dec. 20, 2018, Shara to Plaintiff on Film's distrib. results: "we will gross more than 60,000 dollars" **[Exhibit 13]** [[**February 25-27**, Plaintiff and Sarandon exchanged mutually unfavourable opinions via email. Sarandon shared those communications and threatened Shara. Panicked Shara to Plaintiff via WhatsApp messages [**Exhibit 2**]: "You have to **be careful with Susan. She can ruin you**" "**She will make a lawsuit against us**" &c. Plaintiff alleges 1) Shara was threatened by Sarandon with litigation, 2) she knew the Contract between them, 3) she wanted vengeance and to harm Plaintiff in all "present and future projects"]] **April 15, 2019,** Plaintiff follows up and sends invoices [Exhibit 4] related to the terms agreed on same email thread [in Exhibit 1]. Shara's answer: "See my WhatsApp texts...**we are finished. No more money, no more projects**." **April 20**, 2019, Plaintiff requests **"payment of pending invoices sent before" "continuation of the Oscar qualifying theatrical release as planned", "honour your word according to what had been agreed"**. **April 21 2019** Plaintiff presented a comprehensive complaint to Shara. He reasoned what Shara had acknowledged and confirmed in writing [**"agreed on all fronts"**, see Exhibit 5 D. **Shara: "She[Sarandon]'s uselss"** Plaintiff: **"she has a big mouth"** D. Shara **"Agreed" in Exhibit 13**], that she had turned her back on the project because she did not get from Tigran sexually what she wanted. Plaintiff included his reasons why he believed Sarandon was antisemitic after Nazi Propaganda Project was "cancelled" due to her interference: "There's an old joke about upper-class British anti-Semitism: It means someone who hates Jews more than is strictly necessary. Susan Sarandon […] would more

---

burdensome for the Court." There are emails showing exchange and approval of budgets in 2018 and 2019, where steps are detailed as to distribution. More exactly, invoices make references clear to distribution. Some invoices are provisions for the US theatrical release.

than meet the 'progressive' American version of that standard". Plaintiff stated Sarandon was wrong-
fully interfering with Contract and other business: "Following the thread of emails and messages it
seems that I get all this dire consequences, designed to damage my reputation professionally (no
distribution, cancelling attending film festival where the film is finalist), **just because Sarandon
and the child-painter [Tsitoghdzyan] want it.** This is not so different to many cases of women
who have publicly accused Mr Harvey Weinstein of stopping the advancement of their careers by
telling others that they should not work with this or that actress […]." And he added: "I am being
taking off new projects, with its professional and prospectively financial damage according to your
words as a consequence of [Plaintiff] answering Sarandon['s email] just because I ask her what's the
problem with the Parajanov-Vartanov Award. **Obviously you want to please her by damaging
me.**" [Exhibit 3.]  **April 26, 2019**, Honey answered that email, stating: "**He [D. Shara] was born in
Israel.**" Then she insisted, referring to contemporaneous conversations with Plaintiff: "unfortu-
nately, **I cannot think of any other solution <u>to allow us as a group</u> to move forward and give the
movie the recognition it deserves**. I truly appreciate you, and your sincerity, but **sometimes we
have to do "that"** which will ultimately allow you/<u>us</u> to succeed." The quotes of "that" are not
ours, but original, referring to Plaintiff presenting apologies if the standing agreement should be
honoured, invoices paid, and Film distributed. She mades it clear that "us", she included, would
only succeed that way, referring to Srandon's legal threats. **April 30, 2019**, Plaintiff insisted, at-
tached invoices again, included Honey. **May 6, 2019**, Plaintiff insisted: "My right to share an opin-
ion with another individual is legitimate. My right to respectfully request respect for an award [the
Parajanov Vartanov Award won by Plaintiff's team for Sarandon, never thanked by her] is also legit-
imate. My claims to you are legitimate **regarding standing agreements**." **May 6, 2019**, Shara an-
swers that: "**I will honour <u>my commitments</u>**, but I am not at all pleased. **This** [American Mirror]
**will be our last project together**." Invoices, however, were not being paid from now on.  H. Shara

insisted she would not pay them unless Plaintiff presented an apology to Sarandon and Tsitoghdzyan because they demanded it as condition of contract [¶ 183[6]], or else she would not pay any invoice, interfering with Shara's affirming that "he will honour his commitments". Her purpose was to pressure Shara to cancel the Film's festival circuit to please Sarandon and Tsitoghdzyan and avoid fallout from Sarandon's threats. On **October 14, 2019** Shara still had not paid the invoices in spite of his assurances, and on same email thread Plaintiff reminded Shara of his own words, that **he should "honour his commitments"**. That was making impossible Oscar-qualifying US theatrical release and online distribution as agreed on and planned for end of 2019. Shara again mentioned Plaintiff's wife here out of context. Plaintiff indicated he would start a legal action. Shara apologized and assured to honour his word, pay the invoices and sharing the talent releases with Plaintiff. Reminders to Honey on **July 1, 2020**, show part of invoices remained unpaid. The majority of the budget was paid by end of March 2020, and the talent releases pending not shared with Plaintiff, effectively thwarting distribution as agreed on. This succeeded in depriving the Film of the Partners' agreed on specific distribution (the fruits of the contract), causing financial and professional harm to Plaintiff. That also thwarted and ruined other distribution possibilities [Exhibit 11], like the MAD Solutions' Middle East distribution contract [theatres, TV rights, airlines and online]. There are more opportunities lost in TAC [at ¶¶ 200, 201 &c.]: "However […] Plaintiff and Shara had agreed on taking control directly of the US distribution market, without intermediaries." Emails detailing MAD Solutions rights offer were sent to Shara **and** Honey Shara, thus she was absolutely aware [Exhibit 1, pg 33, 34, 37]. On Netflix, Shara on February 17, 2020: "Let's discuss Netflix connection on Wednesday" [Exhibit 1, pg. 36.] Another Netflix opportunity lost: [¶ 212 and ftnote. 151] "Just wanted to let you know I have several titles I am offering an exclusive to Netflix."

Therefore, Contract's *Terms*, distribution provision ¶ 6 is followed by Partners as regards to

---

6   ¶ 183: "Frustrated by Plaintiff's refusal and arguments, to that she [Honey] shamelessly went on to say: **"Do it for Bella". [referring to Plaintiff's wife, basically 'do it to avoid suffering to your wife']**."

distribution possibilities and planning, but **is breached by Shara**, since his actions do not "ensure the best performance of the business". The Contract exists, Plaintiff more than performs, Shara breaches, and it results in damages, because Plaintiff is deprived of 'the fruits of the contract', which are the profits of distribution, because Shara: "I don't care about losing 300,000" [Exhibit 6]. The  mutual obligations derive from, are simply direct and logical consequence of, both parties following Contract's *Terms* ¶ 6. Shara states he won't get the talent releases necessary to ensure or profit any distribution opportunity to make sure Plaintiff won't be able to start distribution. On May 28, pressured by Tsitoghdzyan, Honey and Sarandon, he writes, fearful of consequences of Sarandon's and Tsitoghdzyan's actions: "**Sarandon can shut down this movie in one minute**" "I don't care about this film. I care about Tigran and my family's reputation." "try to find someone to buy this project ASAP", yet he adds immediately afterwards: "Remember very few people signed the release" ¶ [Exhibit 6]. How can Plaintiff "sell the proyect" under the threat that "very few people have signed" (refering to the participants whose release he kept hostage, while Plaintiff shared with him all related to persons he had invited)? In light of the Exhibits, it was only *inherent* to the covenant of good faith that Plaintiff expected Shara to provide them and that Shara should have provided them —or else, following Contract, Terms ¶6, Shara should have informed Plaintiff **"in due time"** of not having intention to secure them, something clearly against "the best performance of the business". It is not an obligation alien to the contract itself,  far less to  decisions made following provision Terms ¶ 6. Shara did the opposite: he had assured Plaintiff he would get them to ensure distribution. Shara since 2016 promised to obtain the talent releases of the people ha had invited to participate in the Film, because he only made the Film with one goal in mind: to distribute it[7]. The moment he extensively agrees to *distribute it himself with Plaintiff* since 2017, specifically in the way described by evidence, he cannot waive his oral promise *to provide the talent releases,* because it breaches his

---

7  See TAC, Chronological Section 2016, at and around Contract creation allegations. See "Duress"  below for more detail on Shara's pointing to distribution as "the only way to make money here".

clear obligation under *Terms* ¶6's "to ensure the best performance of the business", since such action simply renders such agreements and extended Plaintiff's work to distribute, and the Contract's purpose for profit itself, useless and fraudulent. The obligation is guaranteed by the Contract, but, if there is any doubt, it is guaranteed by the *actions* described as consequence of Contract's *Terms* ¶ 6. Not only is a breach of the covenant of good faith implied in fair dealing depriving Plaintiff of the fruits of the Contract, it has one aim: to satisfy Sarandon's wrongful (by litigation threats to Shara) demands to harm Plaintiff as a consequence of his private answer to her[8]. Impossible not to see why and when Shara breaches, changing course radically, cowered by Sarandon and  Tsitoghdzyan, pressured by Honey: exactly after Plaintiff and Sarandon's opinions' exchange via email, once Defendant Sarandon's interference to harm Plaintiff's "present and future projects" has taken place. Both partners to the Contract had the freedom to modify and interpret the Contract in common agreement following Terms ¶6, and as such they made decisions as now the Exhibits attached show, discussion and written acceptance of modifications, with one clear aim "to ensure the best performance of the business". Breaching them Shara obtained the opposite: ruining years of work. Did the decisions made by both in common agreement *fail*? No. They succeeded: see **Exhibit 7**, list of nominations and awards. Who paid invoices late to harm Plaintiff by thwarting distribution? Shara. When? After Plaintiff and Sarandon exchanged mutually unfavourable opinions. Why did Shara breach those agreements? Because he was terrified by Sarandon's infuence in public sphere and her wrongful intimidations by impossible litigations, and pressured hard by Tsitoghdzyan and H. Shara. On Sept. 18, 2020, Shara via counsel "The name and likeness releases **have not** been secured by our clients; **they can secure all of them in an expeditious manner**—but you have to take a backseat on this project" ¶ 236. Plaintiff simply *requested proof* that the talent releases had

---

8    TAC ¶ 255,  Shara's counsel on the difficulties of Shara to address an amicable settlement proposal by Plaintiff to Shara: **"as discussed numerous times Susan wants nothing to do with your client—to say that she [Sarandon] hates him [Plaintiff] is an understatement."** The interference is manifest:  Sarandon "wants nothing to do with" Plaintiff, and Shara must follow suit and do anything in his capability to harm him to satisfy her.

been obtained by the Sharas *before* discussing any new distribution arrangements ¶¶ 234, 235. The high pressure tactics employed were the same as in 2016 to obtain the contract: "you need to **hand over the control of the film to our client" or "our client is prepared to let the film will die on the vine**". Deprive Plaintiff of any meaningful choice, and no bargaining power: "**you don't have any remedy**" "Unfortunately for you, **you have no choices** here Arthur", "**trust that David's self-interest** in getting the best deals and making the most money from the film" ¶ 236. Therefore Plaintiff adequately pleaded breach of contract against Shara as result of: 1) late payment of invoices to thwart distribution in the specific way he had agreed on with Plaintiff; 2) not proving the talent releases Shara made himself responsible for since 2016 to thwart distribution in the specific way he had been agreed on with Plaintiff; and 3) the late-delivery of the Painting[9].

### B. Plaintiff Adequately Plead To Satisfy Parole Evidence Rule Exception Use Against David Shara's Breach of Contract.

Plaintiff, a pro se, describes extrinsic evidence extant before, during and after the signing of the Contract multiple times[10]. Plaintiff was obliged to "inform and discuss any distribution possibilities with [Shara]." Those discussions are referenced and described in particularity. Shara and Plaintiff agreed on distribution terms. Shara's arguments have no remedy here. They are based in the very conspicuous tendency of his attorneys to ignore the existence of allegations that do not benefit their concoctions. Plaintiff alleges unpaid invoices at ¶ 189, 199, 202, 349, among others, and it is explained in TAC, *Chronological Section* 2019, and see Exhibit 4. "Neither party to a contract shall do anything which has the effect of destroying or injuring the right of the other party to receive the fruits of the contract."[11] Although the Contract did not specifically require Shara to distribute the Film on time, such a requirement is implied by the covenant of good faith and fair dealing "implicit

---

9  On (3) see Plaintiff's Reply to Objections and its new Exhibits.

10  In TAC [at ¶¶ 52, 59, 62 ftnote. "§2-202", 110 ftnote. "§2-202", 112 ftnote, 228 ftnote., 231 ftnote., 236 ftnote., 237, 276, 254, 307, 319, 325: "Parole evidence rule cannot bar the extrinsic evidence", 327, 330, 334 &c], in the Opposition to the MTD [Ftnote. 19], and in this Objections.

11  M/A-COM Sec. Corp. v. Galesi, 904 F.2d 134, 136 (2d Cir. 1990).

in every contract" in New York[12] because without that requirement the Contract is profitless and inherently unfair, a fraud. Plaintiff obtains all talent releases of people he invites to be part of the Film, and shares them with Shara. [¶¶ 18, 93]. Contract, *Terms* ¶ 3: "[Plaintiff] will have **20% of profits**," and then clarifies ¶ 6: "[Plaintiff] **will inform and discuss any distribution possibilities with [Shara]**, **_both_ being informed in due time to ensure the best performance possible of the business.**" Distribution is mentioned as the only way to make "profits". The contract leaves it clear that Plaintiff renounced to upfront compensation in exchange of a painting, *only because* he "will have 20% of profits". The only way to get profits is distributing: by obtaining the talent releases of all the people who are invited and paying the invoices **_on time_** according to the agreed on plan. Plaintiff insisted on a cash compensation at ¶ 62, yet Shara denied it with distribution as the only way to make profits: "The best solution here is to finish the film as best you can and **get it into as many film festivals and events as possible**. We are partners in this film and **the better it does, the better we do together**." "Finish the film and **try to get it sold**. **Get it into theaters, amazon, Apple TV** etc. **_That is the only option here_**." "So I recommend we finish the film and **you get to work distributing it**" at ¶ 62**.** It is only deceptive and fraudulent to push someone under such circumstances to accept terms based specifically on profits ["that is the only option here"] that the contract itself would made impossible to make by breach of basic promises *inherent* to any made-for-profit film. Therefore the promise of providing the talent releases is not a new obligation. A contract implies all the promises that any reasonable promisee would understand included, because without such basic promises being included, then the contract would be un-profitable, and that is *inherently* unfair and deceptive. **If Plaintiff had known that Shara would not distribute the Film and take actions not to distribute [breaching signed clause "to ensure the best performance of the business"], Plaintiff would have never signed that Contract, because that renders it fruitless**, it is a fraud. Therefore Shara **used deceptive tactics all the way along, and as regards to the terms of**

---

12  Semple v. Eyeblaster, Inc., 08-cv-9004 (HB), 2009 WL 1457163, at *7 (S.D.N.Y May 26, 2009)

**the Contract [see "Duress" below]**. The result is a contract that is inherently unfair, because Shara argues that he can render it profitless at will against the spirit of the venture and the agreements he affirms in writing. No reasonable person would have ever signed the contract and accepted devoting years of dedication into this venture, if that person would have not expected the other parties doing what is *minimally* and *inherently* necessary to render a film-for-profit contract fruitful, i.e. for the contract to be able to yield the "profits" it states. Any action directed to harm the distribution is breach of Contract. The standard prescribed by the Court in the R&R is not applied: "The covenant of good faith and fair dealing encompasses **any promises which a reasonable person in the position of the promisee would be justified in understanding were included.**"[13]  The Court should look into the overwhelming extrinsic evidence surrounding the inception and afterwards during the execution of the Contract according to clause *Terms* ¶6, to see what was the mind and intention of the parties. If "neither party to a contract shall do anything which has the effect of destroying or injuring the right of the other party to receive the fruits of the contract", then Shara's actions are bad faith's playbook. Execution of Contract *Terms* ¶6 leaves no doubt here. But under Parol Evidence Rule agreements made outside of the contract are inadmissible in court **unless there is evidence of fraud, duress, or a mutual mistake**. Plaintiff has sufficiently alleged Duress [See below] in the TAC, particularly during the 'negotiation' of the Contract in 2016 and in 2019. Therefore, extrinsic evidence should not be barred.  Extrinsic evidence leaves no doubt as regards to course of dealing, usage of trade and course of performance, as alleged across the TAC and previously here.  Parole Evidence Rule Exception applies. The ordinary or natural test leaves no doubt that the extrinsic agreement ('treat this film as a baby' 'finish it and start distributing it' 'try to sell this project ASAP' , on 'Amazon, Apple[…]' 'this is the only solution here' [to make any money]) is the sort of promise that Plaintiff might reasonably expect to be in the original written contract if it is for profit[14]. The

---

13  Rowe v. Great Atlantic & Pac. Tea Co., Inc., 46 N.Y.2d 62, 69 (1972).
14  Mitchill v. Lath, 247 N.Y. 377, 160 N.E. 646 (1928).

Court makes choices that are contradictory as to the application of its legal standards. The only explanation is having read the TAC too hurriedly or at separated intervals during the time after the last filling related to the motion to Dismiss, which has spanned almost eight months between Defendant's Reply to Opposition to MTD and the R&R .

**C. Plaintiff Adequately Plead Breach of Contract Against Sarandon Related to Plaintiff's 2018's Offer and Her Acceptance by Performance.**

Conclusions of the R&R are wrong in light of the allegations.vTAC, Exhibit 2, pg 1, email sent by Plaintiff **on January 24, 2018**, describes the offer's four (4) elements:

> **A large print,** hand-embellished and signed by Tigran, of your own portrait (estimated value around $40k) -And **another print** hand-embellished and signed by Tigran of your choice (estimated value $40k) -**Plus a 10% of all profits** generated by the movie in any platform. -We'd like you along with Tigran **to be part of the PR of the film, as far as your agenda would allow it**, and organizing everything in anticipation for your convenience.

Sarandon's exact answer **on March 27, 2018**, and specifically coming from her, was:

> "From Susan: Thank you so much. **I would love to have prints** that aren't gigantic. In terms of **going to Armenia in June**, I know that I'm working on my TV show and there's n**o way to know if that would be possible** at this point, we'd just have to wait, **though I'd love to visit Armenia**."

Sarandon accepts in writing two parts of the offer. She wants the prints, but specifically not "gigantic" ones, then gets them. Her answer simply thanks the offer, the *entire* offer. She does not oppose the clause of being "part of the PR of the film, as far as your agenda would allow it". She refers to a *specific item of that general clause* of being part of the PR, to the item that Plaintiff's communication describes on same Exhibit: *"**For instance**, in June 8-15 takes place the International Film Festival of Yerevan, capital of Armenia, and would be awesome if you'd like to go there with Tigran. On the other hand, the festival is considering to offer you the life-achievement award and pick it up on same occasion"*. Sarandon's answer is unambiguous: she refers to her possible in-

ability to attend *specifically* the Armenian film festival (although she'd love to go there): *"In terms of going to Armenia in June, I know that Im working on my TV show and there's no way to know if that would be possible at this point."* She is not denying any of the elements of the offer. Then she adds: "we'd just have to wait, **though I'd love to visit Armenia**." Not only she does not deny the clause, she only discusses an item of it, and at that **not to deny it**, but to express her willingness to participate. **We cannot extract from this the** R&R **interpretation that she** *denied* **the entire PR clause, given, on top of that, that the clause is extremely lax and comfortable to her "as far as her agenda would allow it".** Defendant **Sarandon could not retroactively choose among all four elements of the 2018 offer those she preferred in February 2019, one year later to harm Plaintiff, or in 2023, to satisfy her needs in a Motion to Dismiss**. Plaintiff had reason to rely on her representations and her words. She received the prints —and she kept them. On page 4 of TAC's Exhibit 2 [Dk. nr. 62-2], **on April 4, 2018**, Shara writes a follow-up to the previous conversation on behalf of himself and Plaintiff. Shara is specific: **"I am very interested in Susan's involvement in this movie and** I am **willing to give her a percentage of profits for her involvement** and guidance." "I am very happy to share profits and accolades." As regards to distribution: "I would also like to **discuss your thoughts on film festivals**." "Arthur Balder has done an incredible job on all aspects of this film including submission to film festivals." And he circles back to profits: "I am extremely interested in maximizing both exposure and profits. **I am also interested in sharing profits and making money for Ms. Sarandon.**" April 16, 2018, Sarandon answers: "It's a very special film [...]. I think you need an agent or maybe just **look into submissions to festivals**. The season is upon us so I think it's too late for this cycle." **Sarandon had had four months to be particular about not willing to accept Plaintiff's offer, or parts of it**. She was asked for advice and opinion as regards to distribution, because both Plaintiff and Shara have been thanked by her for the 10% of profits. **She knew it was going to be distributed**. At ¶ 284 Plaintiff claims that these emails consti-

tute an enforceable contract **obliging Sarandon to present her signed talent release so that the distribution that she herself recommends after accepting terms of an offer would take place, and in any case she accepted Plaintiff's offer by performance taking the two prints**. Plaintiff requested this talent release to Sarandon directly on several occasions, included in 2020, 2021 and 2022, and she never gave it against her obligation to guarantee the distribution she had been recommending and thanked for prospective 10% of profits, and to assist with press in the terms the offer describes ["to be part of the PR of the film, as far as your agenda would allow it"]. See for instance Exhibit 5 of TAC[15].

### D. Plaintiff Still Sufficiently Plead Breach of Contract Against Sarandon as a Consequence of Plaintiff's 2016's Offer and Her Acceptance By Performance/Conduct.

2018's events do not deny her contractual obligation since 2016 to Plaintiff to present her talent release signed in writing because she accepted by performance Plaintiff's 2016 Offer. This is directly not addressed or raised by the Court in spite of being plead. Sarandon is invited to participate and be part of the Film [¶ 21]. She accepted in writing via email. She knew the nature of the filming, technical equipment used "Plaintiff also sent directly to Sarandon emails describing the kind of filming and the quality he expected" "Plaintiff details the equipment he intends to use, and requests if Sarandon has any special demands" ["best zoom lens that exist"] "Arthur is documenting everything during this period of time. Also the whole process of Susan's painting would be covered in every stage" Sarandon answered: "**Susan said she doesn't have any requests, so I think we're all good**." "Let her know I will receive her downstairs and that I am immensely grateful for her visit" [¶ 21]. Plaintiff, his wife and Tsitoghdzyan received Sarandon downstairs [¶¶ 21, 22, footnote 16 "because that day Tigran's apartment was crammed with people". Plaintiff elaborated on his in-

---

15  SMS sent on February 23, 2022, by Susan Sarandon to Plaintiff's counsel, Nathan Aduddell, stating that she might sign the release **only to Shara and Tigran Tsitoghdzyan**— she had never signed it, and even more, she placed conditions to something she had agreed on in 2016 and then in 2018, interfering with the Contract between Shara and Plaintiff.

tentions, the distribution plans, things all she already knew, and she agreed and promised to provide any missing paperwork anytime afterwards. She had been invited to be part of the film, she chose a date,  June 16 of 2016 at 12:00 pm, confirmed, knew the equipment used ["the most advanced zoom Angenieoux that existed" ¶ 22 ], made her requests, attended and accepted the offer to be part of the film by performance, and made oral promise. She already knew, but was informed more in detail that day, that the film is made with all intention to be distributed, that the Director/Producer [Plaintiff] is investing funds and time to make the Film [that is only obvious if you attend a shooting and see it...], she agreed to it and to provide any image release, if necessary, at a later date, and willingly ***accepted the greater and most significant part of the offer by performance***. She did not request anything in exchange, except that Plaintiff 'makes a very good Film'[16]. "Sarandon [...] assured that she would provide any necessary talent release signed, either sent by Plaintiff or prepared by her own agent, in order to guarantee distribution." [¶ 23]  Plaintiff believed Sarandon's representations because he was deluded by her apparent generosity, and because accepting to perform part of the offer was a guarantee to perform the rest of the offer, her word to be of 'gold standard', and trusted her blindly,  "terms [of the offer] she had never objected, on the contrary, she had accepted them by conduct" [¶ 145 ]  "Acceptance by performance requires that at least part of what the offer requests be performed or tendered, and includes acceptance by a performance which operates as a return promise." [Restatement Second of Contracts § 50, (2)]. Plaintiff offers Sarandon to participate in the Film, tells her it will be distributed and that later a talent release would be needed, Sarandon agrees, and on that day accepts by performance, which is the biggest "part of what the offer requests" (be filmed for the sequence, being the remaining part to sign a talent release later)**.**[17] Tsitoghdzyan also

---

16 R&R , pg 3: "Balder filmed Tsitoghdzyan's scene with Sarandon **over just one day** in June 2016". The scene with Sarandon is the central pillar of the film because of its quality in every single aspect, from content to image, and has been praised on all fronts. "[…] over just one day" gives a wrong impression of preparation and post-production.

17 Uniform Commercial Code 2-206(1)(a), "an offer to make a contract shall be construed as inviting acceptance in any manner and by any medium reasonable in the circumstances."

confirmed what Plaintiff alleges via email: "All the people involved in the movie where professionals, **and including Susan [Sarandon] no-one asked to be rewarded.**" ¶ 42. No notification of objection is given by Defendant Sarandon to Plaintiff after the her filming in 2016, 2017, or 2018. R&R, pg 3: "Balder filmed Tsitoghdzyan's scene with Sarandon over just one day in June 2016". It took months of preparations to obtain that result in 'just one day' [¶¶ 10 to 25]. [The extension of the performance does not change the outcome for an offer accepted by performance]. Plaintiff expressed at large his gratitude to Sarandon [¶ 26].  Sarandon saw on several occasions the Film in 2017 [¶ 97]. Sarandon did not object to it, and requested some retouches to her images [¶ ¶97, 283]. Sarandon knew that a substantial amount of time and money was being employed in making the Film [¶¶ 10 to 25]. Sarandon was aware that massive press releases had been published in 2017 and 2018 that included: announcement of distribution and her participation as central aspect ¶¶ 30, 99]. Sarandon saw the Film's poster, that was based on a painting Tsitoghdzyan made of her face. Sarandon's representations can only be understood as a corroboration of what she had promised in person to Plaintiff the day of the filming in 2016: that she would present whenever necessary image release to distribute the Film. [evidence submitted in **Exhibit 8,** communications with Sarandon in 2016 and 2017.] "Where an offeree fails to reply to an offer, her silence and inaction operate as an acceptance [...]" "(c)Where because of previous dealings or otherwise, it is reasonable that the offeree should notify the offeror if she does not intend to accept. [Restatement Second of Contracts § 69]. Defendant Sarandon never objects to, retracts or opposes in 2017 or 2018 her previous 2016's acceptance by performance. Her performance ["previous dealings"] makes it reasonable that she should have had to notify Plaintiff if she did not intend to accept, although that would have come at a high cost for Plaintiff already. Yet Defendant Sarandon does the opposite, she confirms in new written communications the absence of opposition in 2017 and 2018. Stretches too far common sense that she did not "want to be associated with the Film" in February

2019, without shocking Plaintiff after all these facts since 2016. One was deluded [Plaintiff], and the other [Sarandon] was shockingly unfair. "(2) the rendering of a performance does not constitute an acceptance **if within a reasonable time** the offeree exercise reasonable diligence to notify the offeror of non-acceptance."[18]Sarandon informing Plaintiff that she "does not want to be associated with the Film" in February 2019, *three years after the acceptance by performance,* cannot be considered "within a reasonable time" to inform of that, once the Film is being distributed to film festivals following even her own advice as TAC's Exhibit 2 shows. As regards to Defendant Sarandon's performance as answer to Plaintiff's 2016's offer, "(2) **Such an acceptance** [by performance] **operates as a promise to render <u>complete</u> performance**." [Restatement of Contracts 62.[19]] Where the offer invites a choice between a performance and a promise, offeror's reliance on part performance creates a promise to complete bilateral contract by offeree. Defendant Sarandon's obligation to present the talent release originates in her acceptance by performance (and her parallel oral promise), since that operates as a promise to render complete performance. Defendant Sarandon could accept or reject better terms offered in 2018, but she had already a contractual obligation with Plaintiff to render <u>**complete**</u> performance, because Plaintiff "relied on part performance" [her filming and her communications in 2017 and 2018] that creates "a promise to complete" the terms offered. Request for an act waives requirement of communication of acceptance[20], and performance of the act waives requirement of acceptance [*Industrial America, Inc. v. Fulton Industries, Inc.*, 1971]. No written acceptance of the offer is necessary, since the request and the performance of the act by Defendant Sarandon waived requirement of communication and requirement of acceptance— because it had already happened. A contract implies, also, all the promises that any reasonable promisee would understand to be included, because without such basic promises being included, then the contract would be un-profitable, and that is *inherently* unfair. Defendant Sarandon denying

---

18  [Restatement of Contracts §53.]
19  Effective of Performance by Offeree Where Offer Invites Either Performance or Promise.
20  Carlill v. Carbolic Smoke Ball Co. 1893.

the talent release *on time* is a breach of the basic covenant of good faith implied in every contract. Moreover, it is a newsworthy documentary about Tsitoghdzyan, imparting truthful events and analysing social trends as of how society perceives beauty and aging; is not advertising; there is a real relation between her participation and the makers; her image and voice bear a real relationship to the subject matter of the documentary [she is being *painted* by *painter* Tsitoghdzyan], she voluntarily joined, later approved of massive press releases. She had no expectation of privacy at all, and NY Civil Rights Laws §§ 50 & 51 are no defense here to deny full performance. [Same applies to Tstitoghdzyan's position.][21] Therefore Defendant Sarandon is liable for breach of contract with Plaintiff, and she should have rendered complete performance. The Court has failed to raise the strongest argument from the pro se allegations, and this claim should not fail.

### E. Plaintiff sufficiently alleges breach of contract against Tsitoghdzyan, and against Tsitoghdzyan as regards to introducing his son, a minor.

R&R pg. 12. The TAC states that Shara instructed Plaintiff on several occasions to request Tsitoghdzyan's talent release signed. The TAC refers partial transcripts of a recorded phone call between Plaintiff and Tsitoghdzyan in 2022 in which Tsitoghdzyan acknowledges he had promised to Plaintiff the signature of talent releases related to him and his son, a minor, whom he wanted at all costs to be part of the film. Tsitoghdzyan accepted to be filmed under same promise as Sarandon, and was filmed multiple times and he accepted Plaintiff's offer by performance in 2016 and afterwards in 2017's filmings. He has failed to fulfill the promise under same arguments used in Breach of Contract [Against Sarandon as a consequence of 2016's Offer and Her Acceptance by Performance.] Plaintiff incorporates here those arguments of breach of contract by acceptance of offer by performance against Tsitoghdzyan. The Court also here fails to address all the detailed allegations

---

21 That producers were interested in profit and engaged in commercial exploitation does not negate their right to depict a matter of public interest. [Alfano v. NGHT, INC, 623 F. Supp. 2D 355, Dist. Court ED NY 2009. Newsworthyness depends solely on the content of the documentary, no the producers' motive to make money.

regarding Tsitoghdzyan's introducing his son in the film. That happened *after* the Contract terms had been discussed and selected and was not mentioned at all during its 'negotiation'. With this inclusion, Tsitoghdzyan increased the burden of work of Plaintiff and the budget against which any profits would be made, and then kept hostage the talent release related to his son [and also the one provided by the mother, which he promised to obtain] to render the film unprofitable. Plaintiff made an offer for the son of Tsitoghdzyan to be part of a sequence in exchange of the talent releases of father and mother, since it is a child. Tsitoghdzyan agreed. There were exchanged emails describing the sequence. The sequence was shot in February 2017. Tsitoghdzyan accepted Plaintiff's offer by performance and this claim should not fail and he has liability for not completing the offer accepted to damage distribution.

## II. DURESS

### A. Plaintiff Adequately Plead Contract Obtained under Duress and Fraudulent Representations Exerted by Shara and Tsitoghdzyan, Justifie Parole Evidence Rule Exception

By New York law's standards, "[unconscionability] requires '**some** showing of an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party.'"[22] "The focus is on […] whether deceptive or high-pressured tactics were employed, the use of fine print in the contract, the experience and education of the party claiming unconscionability, and whether there was disparity in bargaining power."[23] Shara and Tsitoghdzyan told Plaintiff he should disappear from the project once he simply requested that oral terms previously accepted should be settled in writing as a contract [¶ 44]. In emails CCing Shara, Tsitoghdzyan, who up to then had been praising Plaintiff's work, states, now that Plaintiff wanted the terms on a written contract: "200k value painting for your work this will never been accepted…"

[¶ 42] Then he insults and denigrates Plaintiff: "So it will be honest to say, that you **can do a crap**

---

22  Gendot Assocs. Inc. v. Kaufold, 56 AD3d 421, 423 (2d Dept 2008) (citing Williams v. Walker-Thomas Furniture Co., 350 F2d 445, 449 [DC Cir 1965]).
23  Gillman v. Chase Manhattan Bank, N.A., 73 NY2d at 11.

**movie with 80k**" [¶ 42]. Plaintiff answered reasonably to the barrage of insults and humiliations [see ¶ 42 and following] and argued his position, then Tsitoghdzyan suggested to **harm physically Plaintiff** at ¶ 47, 39, 52, then **compared him to a prostitute for requesting a contract** at ¶ 44. Once Tsitoghdzyan's intimidatory ritual had the desired effect, then Shara threatened to film everything from the beginning directed by someone else, and **to "destroy" Plaintiff's work, if Plaintiff did not accept Shara's new terms**, without Plaintiff being able to bargain, at ¶ 52. Additionally to his terms, Shara indicated that Plaintiff should distribute the film if he wanted to make any money, "**that is the only solution here**"[24] at ¶ 201, 309, increasing unfairly the burden of responsibilities of Plaintiff.  He in fact was not able to bargain in absence of meaningful choices. See Shara's barrage of Hobson choices at ¶ 56: "We will finish the movie separately with a music editor" "**If** this does not work for you, **then** we will finish the project with other editors" [¶ 48 ], "**If** this does not work [then] I will **scrap the project and the film will go in the garbage**. I am very tempted **to throw out the film** (I paid for it) **and start over with someone else. you have 24 hours to choose**." "we are finished working together **whatever you choose**. David and Tigran." ["whatever you choose" the result is the same, this is transparent absence of choices.] High-pressured tactics continue: Shara: "**If not, we are finished** and **project is over**. Emails only, no calls."  "**I am tempted to destroy all and start from zero with someone else**" [ ¶ 329]. Shara shares the conversation wuth Tsitoghdzyan, who also signs ultimatum. Threatened with the possibility of losing all his work of a long period of time invested in it, Plaintiff had no remedy but to accept. Then Plaintiff is ordered by Shara to prepare a contract *himself*, without Plaintiff having any professional capacity or knowledge wheresoever to do so *in such adverse circumstances* [recall these events refer to November 2016, eight years ago]. Shara: **"write up a "gentlemen's" short bullet point contract between us on one or 2 pages"** at ¶¶ 63 Footnote 52, 53.  Shara ensures saving money in attorneys, and second,

---

24 The "only solution here' to make profits, is to distribute the Film. Plaintiff acts under that
premise.

and most importantly, he exerts more pressure on Plaintiff, not allowing him to request an attorney, and knowingly compressing the Contract "**on one or 2 pages**" but Shara is specific **"not the 'contract' you put forward'**" [¶ 48]  in reference to a template for film contracts previously used by Plaintiff as an initial proposal that contained at least some commonplace protective provisions [for all signing parties]. Therefore "the experience and education of the party claiming unconscionability", who was not prepared as an attorney to prepare a contract, is used by Shara to his advantage. Shara: "hopefully the movie is a great success and **we can <u>get it to</u> many festivals and on apple tv.** So far **the only stumbling block is having your wife[25]** in the film" "David Shara makes it clear, as the Contract is being drafted, that the film is to be distributed to film festivals, and commercially, **he mentions Apple TV as a channel for monetization**" ¶ 60] [Shara: "The best solution here is to finish the film as best you can and g**et it into as many film festivals and events** as possible. We **are partners in this film and the better it does, the better we do together.**" Plaintiff proposes a termination agreement [¶ 62], but Shara instructs him directly: "Finish the film **and <u>try to get it sold</u>. Get it into theaters, amazon, Apple TV etc**. That is <u>**the only option here**</u>." "So I recommend **we finish the film and <u>*you*</u> get to work <u>*distributing it*</u>.**" at ¶ 62]. Those terms not present clearly in the Contract simply ***due***, in part, ***to Plaintiff's inability to perform such task as preparing a contract in such adverse circumstances,*** in part fearing more adverse reactions from them ["Obviously Plaintiff had reasons to fear the mercurial Defendants would not stand by their words" ¶ 62], and also in part ***due to the maximal extension of the agreement***—imposed by the same party exerting duress. Such extension, 1-2 pages, is a limitation that no reasonable person [filmmaker] would accept in the film industry (probably in no industry), unless the contract is obtained under coercion.

---

25  Plaintiff's wife, who had never been remotely involved closely with any of Defendants, has been a permanent target simply to offend Plaintiff. Recall, e.g. Honey: "Do it for Bella' coercing Plaintiff into presenting an aplogy to Sarandon and Tsitoghdzyan if she was to pay any pending invoices, into giving her his tax records, and into giving her a copy of the Film in conspiracy with Tsitghdzyan, for Tsitoghdzyan's own unauthorized use and advantage. Shara directed truly repugnant stuff to emails he know were being administered by Plaintiff's wife, inviting Tsitoghdzyan to a new verbal written lynching in 2019.

Plaintiff sufficiently plead he was afraid of their reactions: Plaintiff was under the threat of his film being 'destroyed', of being embarrassed publicly for having promoted a film that afterwards would not show up, of suffering the professional loss of the film not existing, and of being physically harmed by Tigran, because **Defendants clearly stated they would film all with someone else if he did not accept heir terms.** That explains the suspiciously short extension of the contract, and that Plaintiff could not dare to add anything beyond two pages[26]. Shara decided unilaterally not to sign it until four months later , simply not to give any guarantee to Plaintiff in the meantime, and to make sure he would not dare to propose any changes, showing him with that that even accepting in writing via email certain terms, he was not willing yet to sign anything. In that meantime, however, Plaintiff was asked: to prepare and execute the production, filming and editing of new scenes, from script to filming-tasks he performed impeccably, as results show. Therefore "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[27] Plaintiff has alleged unconscionability and shock, and the allegations as present in TAC and  referenced before show plausibility on its face: "Plaintiff was in a state of the mind that did not allowed him react properly to further defend his rights" at ¶58.  **Therefore the Contract is obtained under duress, should be declared void**, **and the terms and the intention of the parties be extracted from the extrinsic evidence**. **The contract terms are oppressive enough** (Plaintiff's possibility to obtain profits amounts to impossible at the discretion of one party already liable for Fraud within the same contract) **and outrageous enough** (the contract is de facto fraudulent as regards to the possibility of profits, even having been obtained by fraudulent representations of value as regards to several of its elements, the painting and the possibility of profits) **to warrant a finding of unconscionability, directly derived from the coercive contract formation process**

---

26 Plaintiff had produced and directed three other feature-length documentaries before the Film. Two of them premiered at the Museum of Modern Art in New York. He can prove that none of those contracts is less than 10 to 20 pages long. Plaintiff acted under coercion in this case, or else his work would be 'destroyed'.

27 Bell Atl. Corp. v Twombly, 550 US 544, 570, 127 S Ct 1955, 167 L Ed 2d 929 [2007].

**under duress**. Plaintiff was lied to trick him into the Contract: Plaintiff relied on the possibility of making profits, but also on the value of the painting as compensation. Plaintiff's safety was threatened by Tsitoghdzyan if he refused to accept the terms imposed, without bargaining power. The contract is so "grossly unreasonable or unconscionable in the light of the mores and business practices of the time and place [the film industry in the USA] as to be unenforceable according to its literal terms"[28] because, being for profit, makes it to easy for one party to make it profitless without any defense to Plaintiff (unless agreements consequence of Terms ¶6 are reviewed and included).

**The contract is patently one-sided: Shara, the party who imposes terms, time-ultimatum [24 hours] and contract length constraints [one or 2 pages, bullet points] can render it profitless at will,** if the Court allows it. The Contract, result of parties with disproportionate bargaining power and obtained by suspect means, is so tainted that the Court should declare it unenforceable – notwithstanding the fact that the parties "agreed" to it, formed as a product of gross inequality. Where the disparity in the consideration exchanged by the parties is overwhelming, that factor alone "may be sufficient to sustain [a finding that the contract is unconscionable]," since the disparity "itself leads inevitably to the felt conclusion that that knowing advantage was taken of [one party.]"[29] A determination of unconscionability is a matter of law for the court to decide.[30] Where the significant facts germane to the unconscionability issue are known and essentially undisputed, the court may determine the issue without a hearing. The purpose of "the unconscionability doctrine is to prevent **unfair surprise and oppression**".[31] There is no bigger surprise and oppression than finding that Shara decided not to get the releases neither to distribute on time while acknowledging he can get "all of them in an expeditious manner" simply because he wanted to deprive Plaintiff of the fruits of

---

28  Gillman v. Chase Manhattan, 73 N.Y.2d 1, 10 (1988); see also, King v. Fox, 7 N.Y.3d 181, 191 (2006); Mandel v. Liebman, 303 N.Y. 88, 94 (1951).

29  Matter of Friedman, 64 A.D.2d at 85, quoting Jones v. Star Credit Corp., 59 Misc.2d 189, 192 (1969) (Sup. Ct. Nassau Co.) (Wachtler, J.); see also, Wolowitz, supra; Miner v. Walden, 101 Misc.2d 814, 818 (1979) (Sup. Ct. Queens Co.).

30  Gillman, supra; Emigrant Mortgage Co., 95 A.D.3d at 1170-71; Simar Holding Corp., supra.

31  Clinton v. Oppenheimer & Co., 824 F. Supp. 2d 476, 483 (S.D.N.Y. 2011).

the contract, as a means to coerce him, again in 2020, into new and even more disadvantageous terms; and that finding that the Painting given to Plaintiff has close to no value, is unfinished, and is a fraud [See more representations of value in 2018, Exhibit 9]. Even Tsitoghdzyan affirms: "You should **negotiate with David for your %** on the film and I'm totally fine with whatever you and David decide! **That will be your reward for the movie as it should be**" as the only way for Plaintiff to be rewarded is "%" of profits on distribution"  TAC, at ¶51.

Defendants' argue that Plaintiff was 'a professional', which only further affirms and shows the success of  high pressure and deceptive tactics, combined, because no professional, in normal circumstances, would have accepted that contract dictation by the other party [Shara]. Being a professional, Plaintiff knew the threat of all his work being "destroyed" was extremely damaging, and with no bargaining power left as described he had no other remedy but to accept any terms offered to allow his work to survive—believing at least the painting to be made would be of the value represented, "potentially much more" [Shara]. He had no other remedy than to act unconscionably in absence of any other meaningful choice. Deceptive tactics are not alien to Defendants, and were employed in obtaining the contract, to such a degree that the R&R  [pgs. 16-20] affirms that Shara and Tsitoghdzyan must be tried for fraud. The **fraud instance is not something '*other*' or *extrinsic*, but is part of, is embedded in, the contract itself and *contributed decisively* to obtain it in such circumstances: it was used to *convince* Plaintiff not to obtain any other upfront compensation or profit, since the contract is inherently unfair as regards to profit-making.** The Court has relied in the allegations, in extrinsic evidence, to analyze this element of the contract as fraudulent. Plaintiff accepted such disadvantageous terms in the contract also under a representation of value of that element of the contract [the painting] that also the R&R acknowledges was the 'only profits for Plaintiff' —which has close to no value, and because Defendants wanted 'to pay Plaintiff as little as possible' [R&R, Section **Fraud**]. It is obvious that Shara and Tsitoghdzyan engaged repeatedly in a

pattern of deceit based on an enormous disparity of bargaining power. Since there is evidence of fraud and duress, the Court should discard the parole evidence rule and use its exceptions to achieve a just result. **If one element of the contract, and one that had been conspicuously used to obtain the signature of the contract, is fraudulent, then the entire contract should be declared illegal and void[32]**, and all conclusions as to the mind of the parties be extracted from detailed extrinsic evidence.[33] Duress claim against both should not fail.

### B. Plaintiff Adequately Plead Duress Against Honey Shara.

We incorporate arguments at "Tortious Interference With Contract / Against Honey" for economy, and continue from there: Plaintiff was not legally obligated to: 1) present any apology to Sarandon and Tsitoghdzyan, 2) to give a copy of his taxes returns, 3) to give away copyrighted material for others advantage, to Honey. Her alleged coercive **actions were *executed by her directly***. She was aware of the pressure put on Plaintiff *by her actions*, and she used it to obtain things from Plaintiff unlawfully. R&R, pg. 26, states: "A request does not constitute compulsion, despite Balder's claim that he 'felt coerced'". The Court does not take into consideration the allegations to establish why Plaintiff 'felt coerced'—the circumstances plead. According to them, Plaintiff was in fact being coerced, irrespective of feeling it or not: "Tigran via an attorney, […] and at that 'formally', a copy of the film. Plaintiff **resisted** this because **he knew that he had no obligation to do it**, and because that was a clear interference with the distribution." at ¶ 193. Plaintiff alleges that he knew he was being coerced to do something that 1) he had no obligation to do and 2) imperiled the distribution of the Film. TAC, at ¶ 193: "Plaintiff had to give way **against his will**". Giving away against one's will is the result of compulsion, not of conformity. R&R confounds ways of referral to fact with the decisive facts themselves: it is clear that there is compulsion, or else Plaintiff

---

32 Fraud in inducement and fraud in the *factum* [deceitful subject matter is contained in the contract] are met here.

33 When a contract is found to be fraudulent, it is generally considered to no longer be enforceable. Contracts are considered to be void when there are mistakes, o**r cases of duress or fraud by one or more of the contracting parties.**

would have not done things he clearly opposed to do when he was requested. Honey, by obtaining a copy by copyright infringement, was in fact gravely interfering with the Film's distribution, and interfering with the contract between Plaintiff and Shara. No reasonable person in Plaintiff's stead would provide tax confidential information, in the midst of such manoeuvres of Honey and others as described, in the midst of such hostility directed against him, knowing he had no obligation to do it, unless other forces were operating over him. Here the Court fails. The Court chooses not to see the compulsion for lack of formulaic allegation, yet the compulsion is there in plain sight because of the facts and setting alleged. Honey knew that Plaintiff's family will also suffer, and she 'negotiates' with that potential suffering of Plaintiff's most precious family member to coerce Plaintiff into doing something he did not want to do. That did not happened once, but continued for months and months. "Frustrated by Plaintiff's refusal and arguments, so that she shamelessly went on to say: **"Do it for Bella".** [referring to Plaintiff's wife, basically 'do it to avoid suffering to your wife']. At this point Plaintiff must confess that he was **aghast at the coercive tactics that were being forced upon him. That Honey affirmed that Plaintiff's wife was hostage of their cruel, coercive manipulations took the situation on a different level**" at ¶ 183. The request of the copy of Plaintiff's taxes and request of a copy of the Film that translates into copyright infringement by Honey cannot be evaluated without taking into consideration this set of circumstances. Honey is submitting Plaintiff to duress by all those actions and by informing him that the wellbeing of his family is threatened if he does not cede.  That Plaintiff "provided them, hoping that doing so would 'bring some order to the situation of unpaid invoices" only proves the success of their high pressure, coercive tactics and compulsion—the *success of the duress*, not that it did not take place. Honey was testing the limits of her tactic, and continued to break the will of Plaintiff by not paying any invoices. That Plaintiff ceded because the invoices were not being paid, and it is Honey who is stating very clearly that she won't pay them unless her demands met by Plaintiff—unless Plaintiff

did things he had no legal obligation to do—is not an admission of any kind, but the result of duress' success.Coercion may be not solely established by simple conclusory formulaic allegation: context and detailed, particularized circumstances may allow even more clearly its inference. In fact, few people who are aware of employing the coercive tactics—and Honey has always been aware—will write it down directly. It is the *actions* that may allow to infer the compulsion itself, sufficiently alleged by Plaintiff, even if Plaintiff does not formulaicly allege compulsion. Honey's was exerting coercive actions  by wrongful means (tortiously interfering with contract and business relations between Plaintiff and Shara and copyright infringement). Therefore Honey Shara should be tried for duress and obtaining business secrets,   confidential information by unlawful means, violating copyright and tortiously interfering with the Contract and business relations.

### III. TORTIOUS INTERFERENCE WITH CONTRACT ("TIWC")

### A. Plaintiff Adequately Plead TIWC Against Sarandon.

R&R, III [Tortious Interference with contract]: "For the invoice-related breach, **Balder does not allege** that Sarandon knew of the Contract, […]". Plaintiff alleges it, in fact several times, and explicitly in this context: "Sarandon, **knowing the existence of the partnership and contractual relation between Plaintiff and David Shara,** decides, out of spite, not to answer the Plaintiff if she disagreed on his points of view or opinions, but to show the communication **in connection with litigation threats**" [¶ 172]; "she had threatened him [Shara] with litigation, unless film festival circuit cancelled immediately **for the Film"** the allegation connects the legal threat with tortious interference with the Contract "[…] unless Plaintiff changed his opinion at least in appearance and sent the most 'grovelling apology I have ever read in my life to Susan Sarandon' [Shara's words]". [Shara] "also stated that she was **threatening with a lawsuit against 'us' […] 'unless the Film is cancelled completely'."** "the litigation threat was **meant to interfere with the contract existing between Plaintiff and his partner**" […] [Shara to Plaintiff: "because of your email" [¶ 176]. "Tigran

was frustrated for not having gained total control over the project **in collaboration with Sarandon**, **who** according to David Shara **had flirted with the idea to get her son at the helm of the project**" [TAC ¶ 92, pg. 78]. R&R affirms Tsitoghdzyan's knowledge of all details of the Contract [how not, if he was privy to its 'negotiation'...?]. Tsitoghdzyan had been the closest person to Sarandon since the beginning.  In order to get "her son at the helm of the project", it was necessary to fire Plaintiff. Plaintiff's allegations state unambiguously and also imply that she knew about the existence of the contract between Plaintiff and Shara. The allegations and the facts and circumstances do have way more weight than any outright negations concocted to obtain dismissal of the cause of action, and overcome threshold of plausibility. It is not possible that Tsitoghdzyan was so close to her as to guarantee to Plaintiff she was happy with "massive press releases announcing her presence in the Film" in SMSs, and that she did not know that there was a contract and between whom [See new Exhibit 8]. "Sarandon chose not to answer but to disseminate herself the private communications and to threaten with litigations others only to start a tortious interference on the Plaintiff's **present contract** and other business expectations and relations [...]"[¶ 169 ]." R&R, pg. 16: "Because Balder alleges that Sarandon's sole "intention [was to] cause injury to [Balder's] **present** and future projects," her litigation threats were wrongful" the Court affirms.  Plaintiff has sufficiently alleged that Sarandon's litigation threats were also "to cause injury to [Plaintiff's] **present** […]  [at that time, 2019] projects." Obviously, Plaintiff's at that time present project was "American Mirror". "David acknowledged he had talked to Sarandon, that she had threatened him with litigation, **unless film festival circuit cancelled immediately for the film and other film projects with him also cancelled**" [Shara] "stated that she was threatening with a lawsuit against 'us', David and the Plaintiff, 'unless the Film is cancelled completely'" [TAC, ¶ 176]. **The breach of contract for not payment of invoices to Plaintiff is directed to 'cancel the film festival circuit' and its execution** [D Shara: **"no more money, no more projects"**] [¶¶ 178]. The TAC does not allege that Sarandon

made a set of actions to tortiously interfere with business relations and then another completely different devised to tortiously interfere with the Conract. That is illogical, since both actions happened at the same time [February 2019] and arise from the same event [Sarandon and Plaintiff sharing mutually unfavorable opinions]. Sarandon's litigation threats were "to cause injury to [Plaintiff's **present and future** projects." [¶ 179] "her objective is **cancel the film** [American Mirror, present project] and to destroy Plaintiff in all ways imaginable" [¶ 167]. Consequently, to cancel the Film Shara ordered "cancel the festival circuit" and he announced **no payment of pending invoices** precisely to accomplish it, which brings breach of contract. The TAC is clear in reference to this: the request to cancel the festival circuit was demanded by Sarandon (and Tsitoghdzyan) to harm Plaintiff's ["**present** and future projects"]. That Sarandon knew about the Contract is obvious from the allegations, yet it is also *inferable* from them, even if it were not stated in a 'recital manner'. It is impossible to infer from the facts that Sarandon was tortiously interfering with other business relations of Plaintiff, and that at the same time she was carefully and mercifully avoiding the ruining 'American Mirror', the *present* project, Plaintiff's Film in which she appeared, and the most immediate way to harm Plaintiff. As a simile, the facts do allow us a strong inference that this carnage is *not* the result of a careful surgeon that avoids arteries, but that of a wrathful butcher. Shara "willingly kowtows to the super-star's wrongful petitions to harm Plaintiff to ingratiate himself with her, and to avoid her ire (baseless, harassing litigation threats Sharandon knew had no merit)" [¶ 296]. In any event, the Court has seen that Sarandon's actions were intended to harm, that Shara was cowered by her wrongful litigation threats, that those threats brought a direct result on the present project: "cancel the festival circuit" "no more projects, no more money". Shara stops paying invoices ['no more money'] to effectively cancel the Film's festival circuit. Tsitoghdzyan writes to Plaintiff around same time: "don't know how she wouldn't **just kill the film** with her participation after all this" [¶ 175]. He showed disagreement with Plaintiff, but also fear. This shows how deter-

mined she was to get vengeance, and cowered the others into submission. Tsitoghdzyan was closer to her than anybody else, and she had cowered him to exert as much pressure on Shara as possible. Shara being liable of breach of contract for not paying invoices is only direct consequence of Sarandon's tortious interference with a contract she perfectly knew existed. TAC's Exhibit 2 shows Shara himself explains to Sarandon CCing Plaintiff the wide plans they have for the "film festival circuit". Sarandon then encourages them to "submit to film festivals". She is aware of the existence of the circuit. Her litigation threats are not only intended to interfere in other business relations of Plaintiff, but to directly seek vengeance by prompting the cancelling of a film festival circuit and distribution she is perfectly aware is in place and is part of the business. All elements of the tort are met: '[...] existence of a valid contract between the plaintiff and a third party, defendant's knowledge of that contract, defendant's intentional procurement of the third-party's breach of the contract without justification, actual breach of the contract, and damages resulting therefrom.[34]" Therefore the claim against Sarandon should not fail.

### B. Plaintiff Adequately Plead TIWC Against Honey Shara.

R&R, section III, pg. 14: Plaintiff "does not allege that Honey convinced or pressured David Shara to pay invoices late, […]." This conclusion contradicts the allegations. Plaintiff exposed the question of unpaid invoices to Shara. Then Plaintiff alleges at ¶ 182: "On April 26, 2019, Honey shared with plaintiff an email sent by David to her and to Tigran. In it David wrote: "Mom, Did u speak to Arthur Balder? Let's go over this with Tigran." Tigran and Honey were instrumental and influencing and being part of the decisions David was making" because both were pressuring him not to pay invoices: H. Shara because she did not want, Tsitoghdzyan because of Plaintiff's complaing for the painting late-delievey. Shara: "I will honor my commitments" answers when Plaintiff requests payment of invoices. Yet Honey, in charge of decision-making to pay invoices, simply did not pay them. That is enough proof of the interference, because Plaintiff requested payment also to

---

34  Lama Holding Co. v. Smith Barney Inc., 88 N.Y.2d 413, 424 (1996).

her. But Plaintiff alleges that, and describes how Honey exerts compulsion [Section "Duress"]. Honey talks to Plaintiff, and demands an apology to Tigran and Sarandon unless invoices won't be paid ["Honey requested from the Plaintiff a written apology to be sent to Sarandon and Tigran as the only way to be able to continue with the project of the film in the festival circuit and the Oscar-qualifying US limited theatrical release as stipulated and budgeted" at ¶ 183, "Frustrated by Plaintiff's refusal and arguments, **she** shamelessly went on to say: "**Do it for Bella**" [TAC, ¶ 194, footnote 141]. [referring to Plaintiff's wife, basically 'do it to avoid suffering to your wife']. [TAC, ¶ 183]. In no moment she is acting on behalf of or only communicating Shara's own ideas. She is imposing her own ideas actively. By acting that way, she is tortiously interfering with the contract. ¶ 183: "Honey made it clear that **"we", she included herself in it,** would not honour the agreements as stated in the Contract signed by the Plaintiff and David, neither the agreements confirmed by budgets or anything else standing unless and until Plaintiff presented written apologies to Sarandon and Tigran".  These are actions by Honey coordinated with others, not on behalf on anybody, but because she has joined Sarandon's camp and, as a partner of Shara, she has pressured him not paying the invoices (something she can block directly in her position), along with the others, in doing anything possible to harm Plaintiff. Scared by Sarandon's unlawful litigations threats against her son Shara, Honey convinces him and makes a decision to please her and avoid her wrath and the potential fallout for their high-profile color-diamonds wholesale business: not to pay any invoices to Plaintiff. Later in 2020, Honey pressured Shara not to obtain the talent releases to thwart distribution unless Plaintiff accepted new terms proposed by Honey herself. That new terms were not obtained because Plaintiff did not cede, that does not mean that Honey did not pressure and influence Shara in the breach of contract related to thwart distribution  to harm Plaintiff and please Sarandon. She clearly states it: they could get them "all in an expeditious manner". Emails detailing MAD Solutions rights offer were sent to Shara **and** Honey Shara, thus she was absolutely aware [**Exhibit**

**1**, pg 33, 34, 37]. Therefore Honey is liable and this claim should not fail.

### C. Plaintiff Adequately Plead TIWC Against Tsitoghdzyan.

Additional to Painting's late-delievery and incomplete parts, Tsitoghdzyan is liable for: **no payment of invoices by Shara and thwarting distribution and not obtaining the rest of the talent releases Shara had to obtain**. Plaintiff exposed the question of unpaid invoices to Shara. Then at ¶ 182: "On April 26, 2019, Honey shared with plaintiff an email sent by David to her **and to Tigran**. In it David wrote: 'Mom, Did u speak to Arthur Balder? **Let's go over this with Tigran**.' Tigran and Honey were instrumental and influencing and being part of the decisions David was making." Plaintiff alleges: "[…] he [Shara] had been unduly harassed with threats of litigation that made no sense by Sarandon **and by Tigran**" [¶ 168]. Plaintiff sufficiently alleges that Tsitoghdzyan had threatened Shara in 2019 after Plaintiff's exchange of emails with Sarandon, in order to cower him into doing what he and Sarandon wanted. Tsitoghdzyan, also expressing fear towards Sarandon's retaliatory mood in text messages sent to Plaintiff, simply joins her camp and pressures Shara to harm Plaintiff. Shara's breaches of contract are consequence also of Tsitoghdzyan's unlawful legal threats and civil conspiracy, as alleged in TAC [¶ 168]. Therefore Tsitoghdzyan is liable for tortious interference with contract as regards to the painting's late-delivery and blotched result, of not paying invoices and breach of not distribution.

### IV. TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS ["TIWBR"]

### A. Plaintiff Adequately Plead TIWBR Against Honey Shara.

R&R does not address this claim in section IV. Plaintiff incorporates here the references of the previous sections related to Honey's tortious interference with contract, for context. Plaintiff sufficiently alleges that he and Shara had a business relationship to make the film Nazi Propaganda Project, see R&R, Section IV. pg. 15, and TAC [at ¶¶ 134, 151, 176 &c.]. Therefore Plaintiff sufficiently alleges that Honey engages in conduct for the purpose of inflicting emotional harm to Plain-

tiff and his family, and even acknowledging her actions would have that effect in Plaintiff's family. "Honey was not a designated agent of a principal, she was another principal, she behaved like that and she made decisions directed to harm Plaintiff" [¶ 195, footnote 142]. "To create the visual animations of the Nazi propaganda cartoons for that film, Honey suggested to approach close relatives of her. They intended to include Oscar-winning team Alison Snowden and David Fine behind 1993's "Bob's Birthday", a Canadian-British animated short film that won the Academy Award for Best Animated Short Film in 1993." [¶ 134]. Therefore Plaintiff sufficiently alleges that Honey was aware of the Nazi Propaganda Project and Big Canada-mined Diamond Project. Honey is aware of the distribution opportunities of the film, among them of MAD Solutions. She wrongfully pressures Shara so that he won't obtain the talent releases. But for her wrongful influence, MAD Solutions and other business contracts are lost by Plaintiff. [¶ 200]. Honey's acts injured the relationship between Plaintiff and Shara. The Exhibit shows the emails are directed to Shara **and** Honey. She is aware of all details realted to MAD Solutions. Emails detailing MAD Solutions rights offer were sent to Shara **and** Honey Shara, thus she was absolutely aware [Exhibit 1, pg 33, 34, 37]. Therefore the claim against Honey for tortious interference in business relations should not fail.

### B. Plaintiff Adequately Plead TIWBR Against Tsitoghdzyan.

Shara acknowledges Sarandon's and Tsitoghdzyan's threats and wrongful actions are behind his decision to cancel present and future projects already in preproduction: "**Unfortunately** we are not able to continue our relationship [4/15/19, 12:12:54] David Shara: The way you write to Susan **and Tigran** is unacceptable." "See my WhatsApp texts… we are finished. No more money, no more projects" [¶ 178]. Those texts prove that Tsitoghdzyan had been also sharing Plaintiff's messages exchanged with him in which Plaintiff expressed his concerns as regards to the low quality of the Painting and for its late-delivery to Plaintiff. [**Exhibit 10**.] The Court can read Plaintiff's messages are no justification for Shara's actions. Tsitoghdzyan, in conspiracy and concert with Saran-

don, cowered his partner by wrongful means to interfere with the business relationship, not only the Contract. The plausibility standard is satisfied. Plaintiff sufficiently alleges that Tsitoghdzyan's wrongful actions and pressures on Shara did happened and had the purpose and result to harm Plaintiff to please Sarandon, and himself: "Tigran had also requested retaliation to harm Plaintiff, presenting himself as a victim, incredibly, of Plaintiff's critique of a panting that was unfinished after two years" beyond the deadline [¶ 182]. His actions effectively harm the business relation between Plaintiff and Shara, as Shara acknowledged himself above ["The way you write to Susan **and Tigra**n is unacceptable"]. Because the messeges of Exhibit show no offense, we must infere Shara was cowered by threats, inventions about Plaintiff, concocted by Tsitoghdzyan. Therefore Plaintiff sufficiently alleges that Tsitoghdzyan's actions cause tortious interference with Plaintiff's business relations with Shara and the claim should not fail.

### C. Plaintiff Adequately Plead TIWBR Against David Shara.

Tortious interference with prospective economic relations requires an allegation that plaintiff would have entered into an economic relationship **but for the defendant's wrongful conduct**. By not paying invoices and thwarting distribution, Shara interferes with the contract negotiations with MAD Solutions. Shara is aware of the negotiation [Exhibit 1, end o 2019 and 2020], knows the details, knows that the releases are necessary to sign it, and does not provide them in breach of contract. Even more, Plaintiff explains [**Exhibit 1, pg 13**, on January 13, 2020]: "The problem here is that they [MAD Solutions] assume that **our theatrical release in the USA will take place in April** [delay caused from end 2019 by Honey and Shara not paying invoices], because they are thinking of a limited theatrical release in Egypt. So it is difficult with the situation." Shara knows MAD Solutions negotiation depends on the planned distribution execution, and the Exhibit is specific as regards of Shara's affirmation in writing as regards to his "commitments". This same frame can be applied to all multiple losses that are being alleged in the TAC and related to distribution opportunities

[Exhibit 8, also TAC]. Plaintiff is deprived of the prestige of Mark Petrie's score being published in due time at time of distribution, because of Shara's tortious interference, since he knows perfecty about those terms. But for Shara's conduct, this and other potential contracts would have been entered into by the Plaintiff, and as such, the tortious interference claim succeeds.[35]

## **INABILITY TO INTRODUCE ALL THE OBJECTIONS**

Plaintiff humbly recognizes he hasn't been able address all the Objections in 35 pages. His Reply can be 25 pages long. Since he won't need to use all Reply's pages to counter Defendants' Objections, he intends to use them to address Objections missing here as regards to: **Promissory Estoppel, Civil Conspiracy, and Unjust Enrichment**. The Court has failed, but we can cure it, to address **Negligent or Intentional Inflictment of Emotional Distress, Discrimination**, which Plaintiff also alleges in the TAC, and will propose and argue as part of the Reply.

## **LEAVE TO AMEND, UNSETTLED CONSTITUTIONAL ISSUE & CONCLUSION**

Plaintiff should be granted right to amend if such circumstance would allow to cure any of his claims, since the Court has failed on numerous occasions to raise the strongest argument from a pro se's pleadings. Plaintiff replied a personal email sent to him by Sarandon. Plaintiff had right to his opinions. The entire case rests on that pivotal situation[36]. Defendants harm Plaintiff because he makes use of his freedom of speech. All torts are committed to violate his constitutional rights under the First Amendment. For the foregoing reasons, as well as the reasons set forth in the Plaintiff's TAC and Opposition to Defendants' Motion to dismiss it, Plaintiff respectfully requests the Court reject the Report and Recommendation as to  claims discussed, supra, denies partially Defendants' Motion to dismiss the TAC, with such other relief as this Court may deem just and proper.

 Dated: New York, New York, Feb. 16, 2024                    /s/ Arthur Balder

---

35 Vigoda v DCA Productions Plus Inc., 293 AD2d 265 (1st Dep't 2002).

36 **Exhibit 13** shows: the business relation between Plaintiff and Shara was excellent, they were of the same mind regarding Sarandon, and is destroyed directly by Sarandon's and Tigran's interference.